K173MCGC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ELLIOT McGUCKEN,

4                   Plaintiff,              New York, N.Y.

5            v.                             19 CV 9617 (KPF)

6   NEWSWEEK LLC,

7                   Defendant.

8   ------------------------------x         Premotion Conference

9                                           January 7, 2020
                                            11:45 a.m.
10  Before:

11                  HON. KATHERINE POLK FAILLA,

12                                          District Judge

13

14                           APPEARANCES

15

16

17  DONIGER BURROUGHS
         Attorneys for Plaintiff
18  BY:  LAURA M. ZAHARIA

19  COWAN, DeBAETS, ABRAHAMS & SHEPPARD, LLP
         Attorneys for Defendant
20  BY:  NANCY E. WOLFF
            LINDSAY R. EDELSTEIN
21

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

K173MCGC

1    THE DEPUTY CLERK:  In the matter of McGucken v.

2    Newsweek LLC, counsel, please state your names for the record

3    beginning with plaintiff.

4    MS. ZAHARIA:  Laura Zaharia of Doniger Burroughs for

5    plaintiff Elliot McGucken.

6    MS. WOLFF:  Nancy Wolff for defendant Newsweek, LLC.

7    MS. EDELSTEIN:  And Lindsay Edelstein for defendant

8    Newsweek, LLC.

9    THE COURT:  To the folks at the back table, is there

10   one of you to whom I should be directing questions?  Ms. Wolff,

11   okay.  Ms. Wolff, you've been dimed out by your colleague.

12   Thank you both.

13   This is our initial conference in this case.  It is

14   also a premotion conference in the case.

15   Ms. Zaharia, I am going to begin with you to talk

16   about your case, and then we'll talk about the defendant's

17   contemplated motion.

18   Tell me about your client.

19   MS. ZAHARIA:  Thank you, your Honor.  My client,

20   Dr. Elliot McGucken, is a fine art photographer.  He maintains

21   a website where he sells some of his fine art prints.  In March

22   of 2019, McGucken traveled to Death Valley to photograph a

23   certain natural phenomenon.  He took a series of photographs

24   and registered them with the copyright office.  He also

25   published the photograph at issue on his Instagram account.

K173MCGC

1        THE COURT:  I appreciate that you've said to me that

2   he created and owns a valid copyright registration.  If you

3   know, could you tell me the date that he filed or the date he

4   received and had the copyright registered?  Because in your

5   letter of December 11 I didn't see it.

6        MS. ZAHARIA:  Sure.  The photographs were published on

7   March 8th, and the effective date of registration on the

8   copyright certificate is April 1st, 2019.

9        THE COURT:  Okay.  Please continue.

10        MS. ZAHARIA:  McGucken published the photograph on his

11   Instagram account, and the next day, defendants reproduced and

12   displayed this image on their for-profit website alongside with

13   commercial advertising.

14        THE COURT:  When they did that, your client may have

15   been surprised to see his photograph displayed, but did he

16   recall being interviewed by a reporter?  I thought there was a

17   reference to a quote from him.

18        MS. ZAHARIA:  He was not.

19        THE COURT:  Where did the quote come from?

20        MS. ZAHARIA:  His Instagram account.

21        THE COURT:  I see.  Thank you so much.  So, he became

22   aware the next day or shortly thereafter that Newsweek had not

23   merely appropriated the photograph, but a quote that he had

24   embedded with the photograph on his Instagram account.

25        MS. ZAHARIA:  That's correct.

```
 1                THE COURT:  Again, please continue.

 2                MS. ZAHARIA:  So, the following month, McGucken

 3     provided notice of his claims to Newsweek's designated

 4     copyright infringement.  This case was McGucken's last resort

 5     after Newsweek failed to meaningfully respond.

 6                THE COURT:  Well, I want to understand what that

 7     means, so thank you.  He saw in or about the 14th of March that

 8     the photograph -- well, was his photograph posted to Instagram

 9     on the 13th?

10                MS. ZAHARIA:  I believe so, your Honor.

11                THE COURT:  Okay.  I understand from your letter that

12     it was on the 14th of March that it was published on Newsweek's

13     website.  Also correct?

14                MS. ZAHARIA:  Correct.

15                THE COURT:  When was the first time that he or someone

16     acting on his behalf contacted Newsweek to let them know that

17     he believed it inappropriate for them to have this content on

18     their website?

19                MS. ZAHARIA:  It was early April of 2019, the

20     following month.

21                THE COURT:  The following month.  I see from your

22     letter to me there is a reference to a cease and desist letter

23     that is dated on or about April 4 of 2019.  Was that the first

24     communication of which you are aware?

25                MS. ZAHARIA:  Yes, your Honor.
```

K173MCGC

1        THE COURT:  In substance, that says please take down

2    this -- well, what, take down the photograph?

3        MS. ZAHARIA:  The cease and desist letter indicated

4    that McGucken owns the photograph at issue, that the defendants

5    were violating the DMCA, and that McGucken requested that

6    defendants remove the photograph from their website along with

7    providing certain information about the use of his website,

8    such as whether or not it was shared across other social media

9    sites, and information about the types of advertising that was

10   run alongside his photograph.

11       THE COURT:  I am going to ask you, just for me and for

12   the court reporter, if you can slow down just a little bit.

13   Thank you very much.  It is the acoustics in the courtroom;

14   it's not you.

15       All right.  So this is on the 4th of April.  Did he

16   receive a response, and if so, when and what was it?

17       MS. ZAHARIA:  He did not receive a response.

18       THE COURT:  Did he resend the letter or make some

19   other communication before reaching out?  You just mentioned

20   someone that handles copyright information for Newsweek.

21       MS. ZAHARIA:  Well, the cease and desist letter was

22   sent to the designated copyright agent for Newsweek.

23       THE COURT:  Okay.  Earlier in our conversation today,

24   what you said to me was that he communicated with this

25   individual because he had not received any redress otherwise.

K173MCGC

1    I want to make sure I understand how many times he tried to get

2    them to do things only to receive no response.

3              MS. ZAHARIA:  No, I apologize, your Honor.

4              THE COURT:  That's fine.

5              MS. ZAHARIA:  McGucken sent the cease and desist

6    letter on April 4 and received no response.  The notice was

7    sent to the designated copyright agent, and after he received

8    no response, in October we filed the complaint.

9              THE COURT:  Thank you.  That clarification is what I

10   needed.  Okay.

11             I don't want you to start anticipating their

12   arguments, I want to hear what they are first.  One of the

13   reasons I have a premotion conference, in addition to making

14   sure I understand the case a little bit better, is there are

15   some deficiencies in pleading that can be corrected by an

16   amended complaint, or there are some things that are arguably

17   deficiencies in pleading that can be corrected by an amended

18   complaint.

19             So what I am trying to prevent is a situation where

20   they file a motion to dismiss and you respond with an amended

21   complaint that obviates some or all of their issues, because

22   then I feel as though we've just wasted time.

23             Having looked at the defense letter to me, and

24   recognizing that you don't agree with it, are there amendments

25   that you would want to make to the pleadings to perhaps either

1    address or minimize or reduce the force of certain of the

2    arguments they wish to make?

3            MS. ZAHARIA:  We could certainly provide the copyright

4    registration as an exhibit to the complaint, and include the

5    actual information in the complaint itself.

6            THE COURT:  Okay.  Other than that, there is nothing

7    else you wish to do to amend your complaint?

8            MS. ZAHARIA:  Not that I can think of currently, your

9    Honor.

10           THE COURT:  Of course.  Okay.  I'll ask because this

11   is what I do as a judge.  There is no possibility of settling

12   the case at this time?

13           MS. ZAHARIA:  Plaintiff is amenable to settlement,

14   whether before the magistrate judge or before a mediator.

15           THE COURT:  Okay.  I ask because I don't know the

16   costs of a motion to dismiss.  But I also don't know the type

17   of -- this is not my first of these cases.  Probably I've had

18   several hundred of them.  And in some cases, I think for me,

19   not for either side, it's the delicate balance between

20   something that is more than what would have been the licensing

21   fee and less than a full willful copyright infringement

22   payment.  What that number is varies among the cases that I

23   have.

24           But I suspect they would be willing to pay you

25   something equivalent to a licensing fee, and I suspect you

K173MCGC

1    would be happy to settle at something close to willful

2    infringement.  Between the two them is a number, and I wondered

3    if you had explored with defense counsel the possibility of

4    settling this matter at this stage in the case.

5         MS. ZAHARIA:  I believe we requested certain

6    information before so we could make an informed demand.  But,

7    if your Honor feels that this case is appropriate for

8    settlement, then we respectfully defer to you.

9         THE COURT:  Well, you may have heard me speaking with

10   Mr. Casiano in my last conference.  I don't force the parties

11   into settlement.  This something that annoys some attorneys.

12   They wish that I would.  But I think that it is unfair to make

13   a party go to a mediation or a settlement conference when they

14   don't want to.  I rely on the maturity and the thoughtfulness

15   of my attorneys and parties who appear before me in deciding

16   whether this is something they want to do.

17        I simply feel that it is appropriate to ask before we

18   engage in either the expense of discovery or the expense of

19   motion practice whether that's something that the parties want

20   to do.

21        But let me do this.  I'll hear from your adversaries

22   about their motion, I'll hear from you about your thoughts on

23   that motion, and perhaps we'll then revisit the issue.

24        Before I do that, if there is anything that is

25   specific to your case but not a response to their motion,

K173MCGC

1    please let me know.

2              MS. ZAHARIA:  No, nothing at this time, your Honor.

3              THE COURT:  Thank you so much.  Ms. Wolff, when you're

4    ready I will hear from you.

5              MS. WOLFF:  Thank you.

6              THE COURT:  That's fine.  First of all, perhaps you

7    did not have the registration date until now.  But I now have

8    it; you do too.  I don't know if that changes the arguments

9    that you wish to make to me.  So I will hear from you on that.

10             MS. WOLFF:  That was one of several arguments.  And

11   the facts as we know it are slightly different.

12             THE COURT:  Okay.

13             MS. WOLFF:  Newsweek of course is a reputable and

14   established publisher.  And it wrote an article about this sort

15   of ephemeral lake that instantly appeared in Death Valley, as

16   it said, huge lake appears in Death Valley, one of the hottest,

17   driest places on earth.  As part of the article it referenced

18   quotes from Mr. McGucken in SFGate, another online publication

19   where he was quoted and --

20             THE COURT:  Let's pause there for a moment.  I was

21   mistaken in thinking that Mr. McGucken had been interviewed.

22   Is it your understanding that the quotes in SFGate were

23   something different from his Instagram feed?

24             MS. WOLFF:  Yes.

25             THE COURT:  Okay.

K173MCGC

| | |
|---|---|
| 1 | MS. WOLFF:  Yes. |
| 2 | THE COURT:  He actually was interviewed? |
| 3 | MS. WOLFF:  Well, the article, the full article is not |
| 4 | attached to the complaint, but I do have it here. |
| 5 | THE COURT:  Okay. |
| 6 | MS. WOLFF:  And there's quotes, and it says, I quote, |
| 7 | "Photographer Elliot McGucken captured the salt creek spectacle |
| 8 | and shared several snaps on Instagram this week."  And it |
| 9 | quotes him, "It is a surreal feeling seeing so much water in |
| 10 | the world's driest place, he told SFGate.  Nature presents this |
| 11 | ephemeral beauty and I think a lot of what photography is about |
| 12 | is searching for and then capturing it." |
| 13 | And what Newsweek did is that it took -- it used an |
| 14 | Instagram API that licensed publishers, online publishers to |
| 15 | use the API to share public Instagram content. |
| 16 | THE COURT:  Yes. |
| 17 | MS. WOLFF:  So it followed those rules, and I could |
| 18 | walk up and show it to you, but the entire post then -- the |
| 19 | article continues and says, "McGucken said park officials told |
| 20 | him the lake appeared to reach a length of 10 miles at its peak |
| 21 | but they don't know exactly how large the body of water had |
| 22 | stretched.  Although the water was still there Tuesday, the |
| 23 | lake is reportedly shrinking." |
| 24 | So, according to the license in Instagram, it used the |
| 25 | API that the allows an online publisher to use an embed, and it |

K173MCGC

1    takes the entire Instagram photograph, with all the hashtags

2    and the comments of the photographer.

3           So the article was sort of about this ephemeral idea

4    of photography, about this photographer, and the fact that he

5    was able to take this photograph before this lake disappeared.

6    And then it went on talking about -- the article talks about

7    storms and other things that have been battling California.

8           THE COURT:  There is no suggestion that that

9    information came from Mr. McGucken?

10          MS. WOLFF:  The following did not, no.  It was an

11   article about sort of the phenomenons that have been happening

12   in California where there is either too little water or too

13   much water.

14          At the end, they do have another photograph that's

15   from Getty Images that they do license, but that's just a

16   photograph.  It isn't an embed from a feed where you see

17   everything that Mr. McGucken permitted in the feed.

18          So, Newsweek's position is that when someone chooses

19   the public feature in posting to Instagram, they are agreeing

20   to various terms and conditions, and they're very broad, and

21   they are allowing Instagram to make a sublicense.  Part of that

22   sublicense permits publishers to make web posts to develop a

23   story.

24          So this story was in fact about phenomenons in

25   California.  It was about Mr. McGucken's actual ability to take

K173MCGC

|   |   |
|---|---|
| 1 | this picture, and the fact that he had made these comments and |
| 2 | added this to his feed.  It was part of the story, and |
| 3 | Newsweek, understanding a lot about publishing and about |
| 4 | licensing and copyright, believed that they were well within |
| 5 | the bounds of the Instagram license to do so, and that they had |
| 6 | rights under this Instagram API that Instagram could sublicense |
| 7 | the right to do this because in fact they did not make a copy. |
| 8 | It goes directly to the Instagram feed because this was not in |
| 9 | the print version, but of course the digital.  They couldn't |
| 10 | have done this in a print version.  The digital version. |
| 11 | Whether Newsweek is in print anymore, I'm not sure. |
| 12 | THE COURT:  They may be down to the online version |
| 13 | only, but that's a different issue. |
| 14 | MS. WOLFF:  Right. |
| 15 | THE COURT:  Let me say this.  Again, this is not my |
| 16 | first copyright case of this type.  But, it's one of a couple |
| 17 | of recent cases where the licensing effect or not of Instagram |
| 18 | is at play.  I will tell you, I haven't issued a decision on |
| 19 | the issue, although at some point in this calendar year I |
| 20 | suspect I will be.  I don't know that there are many circuit |
| 21 | court or district court decisions addressing specifically what |
| 22 | happens when you are embedding an image from Instagram.  Each |
| 23 | of you has made the argument why it does or does not work. |
| 24 | But, tell me please, are there -- I don't think the Second |
| 25 | Circuit's decided the issue, correct? |

1          MS. WOLFF:  The Second Circuit has not decided the

2     issue on these terms.  Instagram terms are quite broad.  And I

3     know that online contracts are generally valid.  So when you

4     agree to terms and conditions, those type of contracts have

5     been found to be valid in other contexts.  So when you click on

6     and online say I agree and I accept, which I believe when you

7     upload your Instagram post you are agreeing to Instagram terms

8     of use.  And those terms of use include this policy that says

9     if you elect to put it make it public, others will use your

10    works according to our policies, and let me just read the one

11    policy at issue.

12          THE COURT:  Please.

13          MS. WOLFF:  That's the most relevant.  They have many

14    policies.  They have a whole section on rights.  In fact, I've

15    been following this for years as I represent a trade

16    association of all the image licensors.  We've been keeping our

17    eye on this.  It says "We don't claim ownership of your content

18    but you grant us a license to use it."

19          THE COURT:  Slow down for court reporter and judge.

20          MS. WOLFF:  I'm sorry.  So it's permission you give to

21    us.  And "as part of our agreement, you also give us permission

22    that we need to provide the service."  So it starts in bold,

23    "We do not claim ownership of your content but you grant us a

24    license to use it."  Then there is some other content, it says,

25    "Instead, when you share, post or upload content that is

K173MCGC

```
1   covered by an intellectual property rights like photos or
2   videos, on or in connection with our service, you hereby grant
3   to us a non-exclusive royalty free transferable sublicensable
4   worldwide license to host, use, distribute, modify, run, copy,
5   publicly perform, display, translate and create different works
6   of your content consistent with your privacy and application
7   settings."
8            THE COURT:  Let's pause right there, please.
9            MS. WOLFF:  But then -- yeah.  I meant this one.
10           THE COURT:  That's fine.  Before we do that, I want to
11   make sure I understand what that means.  Clearly, what that
12   prevents is someone posting something to Instagram and then
13   suing Instagram for copyright violation.  But according to your
14   adversary, these terms also make clear that there are no rights
15   created in favor of third parties.  So, how do I reconcile
16   that?
17           MS. WOLFF:  So I don't think that's accurate.
18           THE COURT:  Okay.
19           MS. WOLFF:  That there are certain rights that third
20   parties can have because this API embed is part of the
21   Instagram platform policy.  And part of the platform policy
22   which everyone who uses Instagram agrees to, states that
23   "Finally, we provide the Instagram platform to help
24   broadcasters and publishers discover content, get digital
25   rights to media and share media using web embed." And that's
```

K173MCGC

```
 1   exactly what Newsweek did.  So the line that McGucken's
 2   attorney referenced to was only half of the -- where it says we
 3   don't grant you, it wasn't the entire --
 4              THE COURT:  It says this agreement does not give
 5   rights to any third parties.  That's quoted from the terms of
 6   use.
 7              MS. WOLFF:  Right.  But I believe it goes on further.
 8   If I could find that section of the terms of use.
 9              THE COURT:  Okay.
10              MS. WOLFF:  I don't know what rights that's
11   referencing, because it says it doesn't transfer copyrights.
12   But it is sublicensable, and it does say when you upload the
13   platform that you can embed.  And I suspect they don't believe
14   that embedding is giving rights to third parties because
15   nothing's been transferred.  Because the embed is just code
16   that brings you straight back to Instagram.  So what you are
17   viewing is the Instagram page.
18              THE COURT:  Let's put this into real life.  If I am a
19   person who is not a commercial photographer and I post
20   something to Instagram, according to the terms of use, I have
21   given a limited license to Instagram.  Correct?
22              MS. WOLFF:  It depends if you post it private or
23   public.
24              THE COURT:  Yes.  Okay.  And here it was public, and
25   so therefore, in my hypothetical it would be public as well.
```

K173MCGC

1    Instagram doesn't owe me anything for that, for the fact that

2    I've posted a picture, nor do I owe Instagram anything for

3    posting a picture through their platform.

4              MS. WOLFF:  That's correct.

5              THE COURT:  But the extension of that argument you are

6    making is that anybody else, whether it be my mom or my law

7    clerk or Newsweek, can take something that I have publicly

8    posted to Instagram, and by embedding it in their own work, can

9    use the image in the form of the embed without paying anything

10   for it.  Because we are talking about a license, but no one's

11   paying the poster anything.  Correct?

12             MS. WOLFF:  No one's paying for the post, but if you

13   grant the right to make a sublicense, you allow someone to

14   allow a third party, it has to be outside the system, to use

15   it.  And when you do the embed, you can't just frame it so all

16   you have is the image.

17             The way it looks in the Newsweek article you see all

18   the attributions.  So I believe the embed policy rights require

19   you to maintain all the attribution, what goes with it.  So you

20   have all the hashtags.

21             THE COURT:  You have who did the posting, when it was

22   done, and how many followers they have, and what they have been

23   following so it looks just like --

24             MS. WOLFF:  Just like the -- there was no restriction

25   on Mr. McGucken's post saying no one can reuse this.  And the

K173MCGC

1    policy specifically said it's used for publishers to make these

2    web embeds as part of their story.

3            So, it would seem clear, if you read all the terms --

4    and I don't know how many do -- but if you do read all these

5    terms, that there would be third-party publishers, that if they

6    use this particular API, that they could embed, which would

7    make the article part of the story itself.  But it brings you

8    right back to the Instagram user's page with all the Instagram

9    user's content, with the hashtag, which could easily send you

10   back to his site, where if you wanted to acquire a work of fine

11   art, you could do that.

12           THE COURT:  But your argument is, it's not the same

13   thing as taking a photograph that someone else has taken and

14   placing it into a written article.  The Newsweek article is an

15   article that contains basically a window into an Instagram

16   feed.

17           MS. WOLFF:  Right.  And in addition, there was

18   relevance to why this Instagram post was used.  Because they

19   were talking about this photographer, and how he was able to

20   capture this ephemeral incident that happened where you had a

21   lake that was I guess disappearing and evaporating moment by

22   moment.  And how photography is ephemeral, and so the whole

23   story incorporated the idea of photography, Mr. McGucken's

24   photography, the fact he could actually take this picture.  So

25   the article in part was really about this photograph, about

K173MCGC

```
1    him, and how he could capture it.  So, there was relevance to

2    embedding.  And if they only wanted the photo, then they would

3    have typically just licensed the photo, but this wasn't just

4    about the photo.  This was about him and the fact that he took

5    this Instagram picture.  And so, that was the purpose of using

6    the embed and going directly to his website, because it was

7    part of the story.

8             THE COURT:  Does Newsweek have a relationship with

9    SFGate?

10            MS. WOLFF:  I don't know.

11            THE COURT:  Okay.

12            MS. WOLFF:  But I believe --

13            THE COURT:  No one from SFGate has complained about

14   copying pieces of their interview.  I think it's actually

15   Dr. McGucken and not mister.

16            MS. WOLFF:  Yes, you're right.

17            THE COURT:  But, point is, I didn't know until you

18   told me, that he was interviewed by SFGate.

19            MS. WOLFF:  Right.  The entire article --

20            THE COURT:  Yes.

21            MS. WOLFF:  -- from Newsweek has a portion of the

22   interview.  And I'm sorry, because in the interview he is

23   called Elliot McGucken and not Dr. McGucken, so I wasn't aware.

24            THE COURT:  That's fine.  We'll figure that out later

25   on in this case.  All right.
```

1          I will tell you, just thinking out loud for a moment,

2     I don't know that I would be able to decide fair use as a

3     matter of law on a motion to dismiss.  What you are really

4     saying to me is that I don't need to worry about that, because

5     I can just look at the relevant Instagram agreements, and that

6     will give me the comfort that I need that this is not in fact a

7     copyright violation.

8          But, as a practical matter, if I were someone who did

9     make my living on photography, and I had the decision to post

10    it publicly so that it was more widely available, the risk I

11    run is that others could embed my Instagram posts into their

12    articles, thereby potentially depriving me of license fees that

13    would be associated with those photographs.

14         MS. WOLFF:  Well, I represent many, many

15    photographers, and they use Instagram because it's a great

16    public portfolio for them.  The number of followers they have

17    is what helps give them other assignments and book publishing.

18    And they do know when, I mean, there's many conversations about

19    the fact that these rights are very, very broad and this can

20    happen.  I think it's a balance that photographers and other

21    artists take when they use social media, that they have given

22    the social media accounts very broad terms, and Instagram has

23    created these APIs that allow web publishers to use Instagram

24    posts that are made public.

25         So Instagram is helping facilitate stories and they do

K173MCGC

1    say that in their platform policy.  They make it clear that if

2    you do choose public, then they do allow publishers to use the

3    account.  But again, you're not just grabbing a photograph to

4    illustrate something.  You have to grab, from what I

5    understand, of the embed, you get the whole post.  So you get

6    all the information about the content.

7            But that is a tradeoff that photographers make when

8    they use platforms like Instagram.

9            THE COURT:  When we began this segment of our

10   discussion, I asked you about the amendments that were proposed

11   by plaintiff's counsel, and you indicated that it addressed one

12   but not the majority of the claims that you raised.  I will ask

13   you the same question I asked of Ms. Zaharia, which is, is it

14   your client's wish to proceed to motion practice or is there

15   any interest in trying to resolve the case before the motion is

16   filed?

17           MS. WOLFF:  I might turn this over to my colleague

18   Lindsay who had the conversation with the client.

19           THE COURT:  Thank you very much.

20           MS. EDELSTEIN:  So there's not much by way of an

21   update, I guess.  Just that our client wanted to see the motion

22   through, and then we would discuss.  But if your inclination is

23   we should revisit that.

24           THE COURT:  Please understand, this is not some subtle

25   way I have of telling you what to do.  I am simply aware as a

K173MCGC

1    human being and as a former practicing lawyer that motions cost

2    money.  For some entities and litigants, it's cheaper, given

3    the potential uncertainties, to settle.  But for others, they

4    are concerned about the possibility of similar claims being

5    raised in the future and wanting some clarification on the

6    issue.  Or it may just be that the parties are too far apart in

7    terms of the bid and ask on settlement.

8         I'm agnostic as to whether the case settles.  I want

9    to know before I schedule a motion whether the parties have

10   considered the possibility of settlement.  That's really all

11   I'm asking.

12        MS. WOLFF:  As a publisher, Newsweek believed it had

13   the right to use the Instagram APIs as part of its story.  It

14   used the API.  It licensed a photograph from Getty for a

15   different part of the story.

16        I think part of the concern is that because Instagram

17   has offered publishers these APIs, that they do use these.  And

18   that it would be an issue if they have other embeds, I'd have

19   to talk further to my client, but I think that's why they asked

20   us to bring this motion initially, based on the license as part

21   of this API.

22        Also, one other factor just to clear up, the client

23   has no recollection of receiving the first letter.  We have

24   asked them, and they just did not have any recall of ever

25   getting notice to have this taken down.

K173MCGC

```
1          THE COURT:  What if they had?  What if they had
2   received the letter in or about April of last year.  Would they
3   have taken it down?  Because on the theory that you are
4   espousing before me this afternoon, there's no legal reason for
5   them to have to do so.
6          MS. WOLFF:  I don't know.  It is a hypothetical.
7          THE COURT:  Yes.
8          MS. WOLFF:  Publishers often will, if they get notice
9   of something, take it down just to investigate until they know
10  the legalities.  That's just a practice, but I don't know what
11  Newsweek's practice is.
12         THE COURT:  Okay.  Is there a central location or an
13  easily identified person or e-mail address to which cease and
14  desist letters of the type described by plaintiff should be
15  sent?
16         MS. WOLFF:  They do have a registered agent.
17         THE COURT:  Okay.  That seems to be where it was sent.
18         MS. WOLFF:  We'd have to check with the client.  I
19  don't know --
20         THE COURT:  Okay.
21         MS. WOLFF:  -- what went wrong.
22         THE COURT:  All right.  Let me please return to
23  Ms. Zaharia.  Thank you very much.
24         MS. WOLFF:  Okay.
25         THE COURT:  Ms. Zaharia, let me hear you in
```

K173MCGC

1   opposition.  First of all, was your client interviewed by

2   SFGate or someone else?

3           MS. ZAHARIA:  Yes, your Honor.  I apologize.  I

4   misspoke.  I thought he only licensed the photograph to SFGate,

5   but he did provide some quotes.

6           THE COURT:  So it wasn't merely the obtaining of

7   quotes from the Instagram feed.  He actually was interviewed by

8   SFGate.

9           MS. ZAHARIA:  Correct.

10          THE COURT:  And he did give a license to SFGate.

11          MS. ZAHARIA:  Correct.

12          THE COURT:  Of course where that license extends is a

13  different issue.

14          Let me hear from you.  Your client does this for a

15  living, yes?

16          MS. ZAHARIA:  Yes, your Honor.

17          THE COURT:  He is a doctor, I don't know if he is a

18  doctor in fine art or something else.  Is he not a doctor?

19          MS. ZAHARIA:  He is a doctor.

20          THE COURT:  Okay.  Medical doctor?

21          MS. ZAHARIA:  No, I believe he has a PhD in nature

22  photography.  I don't want to misstate.

23          THE COURT:  I don't want you to.  What is his job?  Is

24  he someone who takes photographs and then sells them for a

25  living?  Is he someone who writes and speaks and discusses

K173MCGC

1    nature for a living?  Does he teach?  Or some combination of

2    that?

3              MS. ZAHARIA:  Combination of that, your Honor.

4              THE COURT:  One of the things he does is he takes

5    photographs of nature and natural phenomena and sells them for

6    a profit.

7              MS. ZAHARIA:  That's correct.  He treats his

8    photography more as fine art.  I wanted to clarify that.  So

9    it's my understanding that he's highly selective about who

10   he'll license the photographs to, because he treats his prints

11   as fine art.

12             THE COURT:  When he posts things on Instagram, is he

13   posting them publicly or privately or both?

14             MS. ZAHARIA:  He's posting them publicly.

15             THE COURT:  What does he understand his agreement with

16   Instagram to be?

17             MS. ZAHARIA:  I believe he understands his agreement

18   with Instagram to be that by simply using Instagram, he is not

19   giving third parties permission to do whatever they'd like to

20   do with his work.  The terms of use indicate that the agreement

21   doesn't give rights to any third parties.  And it seems that

22   these guidelines are meant to help Instagram users themselves,

23   not third parties.

24             As a matter of fact, their platform policy indicates

25   that it provides guidelines "to help members of our community

K173MCGC

1  share their own content with apps or services."  And Instagram

2  also further instructs brands to not promote content that

3  violates any rights of any person, including, but not limited

4  to intellectual property rights, rights of privacy, or rights

5  of personality.

6       Instagram also notes that brands are "solely

7  responsible for making use of user content in compliance with

8  owners' requirements or restrictions."  And Newsweek failed to

9  obtain permission from Dr. McGucken to use his photograph.

10      THE COURT:  Just one moment, please.  I was looking at

11  the frequently asked questions on Instagram regarding copyright

12  law.  And they make a point of telling me they can't provide

13  legal advice, which I do appreciate.  It just seems to me that

14  the questions that they are asking really relate to the

15  original posters' prevention of copyright violations, but in

16  the sense of making sure that someone who is posting a

17  photograph is not posting a photograph in which someone else

18  has a copyright interest, which is not what happened here in

19  your case.  Your client is the original poster of the

20  photograph on Instagram.  No one is suggesting he did not have

21  a copyright in that photograph, although we now know the date

22  of it.

23      Instagram, at least the questions I've been reviewing,

24  is not so helpful in letting me know what happens with the

25  embeds later on.  I guess that's what this litigation is about.

K173MCGC

1      So this is where you and defense part company.  Your

2    view is that these terms of use are useful to the poster, so

3    the poster knows he or she is not violating the copyright law,

4    but in no way do they provide any ability to a third party or

5    any safe harbor for a third party who wishes to embed an

6    Instagram image into their works.  Is that correct?

7      MS. ZAHARIA:  That's correct, your Honor.  And the

8    Southern District has also held in Goldman v. Breitbart that

9    when a defendant causes an embedded image to appear on the

10   defendant's website, defendant has violated a copyright owner's

11   exclusive display right, irrespective of the fact that the

12   image is stored on the server on an unrelated third party such

13   as a social media platform, Instagram.

14     THE COURT:  To be fair, or not, the Breitbart case is

15   of course not precedential to me, it is a sister court in this

16   district.  But are the terms of use on Breitbart identical to

17   those on Instagram?  I have not sat down and compared all of

18   the relevant policies to know whether there is any wiggle room

19   among them.

20     MS. ZAHARIA:  I believe that they are similar, but I

21   do think that Instagram gives more guidelines in their

22   policies.

23     THE COURT:  Okay.  So it wasn't that I didn't see your

24   citation.  I am not sure it's dispositive of my issue.  Other

25   things you'd like me to know?

K173MCGC

1          MS. ZAHARIA:  Yes.  I also wanted to indicate that I

2     believe we provided defense counsel with a copy of the

3     copyright registration and cease and desist letter via email on

4     November 14.

5          THE COURT:  Okay.  You have it now?  Yes.  Yes, they

6     do have it now.  They didn't have it then, but they do have it

7     now.  Their client still can't find the copy that was sent to

8     them in April, which is unfortunate, but the way things are.

9          Other things?

10         MS. ZAHARIA:  That's all, your Honor.  Just to

11    reiterate that we don't believe that the Instagram API

12    authorizes third parties to exploit, reproduce or display

13    Instagram users' content without permission.

14         THE COURT:  Thank you.  Ms. Wolff, you wanted to be

15    heard briefly in reply?

16         MS. WOLFF:  Briefly.  I'll try to keep it brief.

17         So, the platform policy that we addressed has two

18    parts.  And it says that Instagram -- the Instagram platform

19    supports several types of apps and services.  The one

20    plaintiffs reference is just one type.  First, we provide them

21    to help members of our community share their own content with

22    apps or services.  And then it says:  We also support apps and

23    services that help brands and advertisers understand and

24    provide the Instagram platform to help broadcasters and publish

25    discover content, get digital rights to media, and share media

K173MCGC

1    using web embeds.

2              And so a web embed doesn't mean you can do anything

3    you want with someone's content.  It means that you are

4    directed back to the Instagram account.  That is very different

5    than what happened in the Breitbart case that I'm familiar

6    with.  Breitbart did not actually use -- not Breitbart.  the

7    photographer did not use Twitter.  He was actually using a

8    private Snapchat group.  One of the members of the group took

9    literally a screen save of his photo, posted it on Twitter.

10   Then what happened is the media then used what was called

11   framing, and so they didn't take the entire Twitter account.

12   They only took the photograph and framed it so it was

13   completely integrated into the article.  And there was no

14   reference to anything about how the photographer took the

15   picture, it was used invisibly, so it looked like it was

16   seamlessly woven into the article.  Which is very different

17   from this instance where Newsweek, using the Instagram API

18   embed, incorporates the entire Instagram feed, which has --

19   maybe it's not called a feed on Instagram.  But the Instagram

20   image with all the numerous hashtags and comments actually and

21   did write the story about it.  So I think that those two

22   situations are very different.

23             The only thing we would address per the motion to

24   dismiss was for the secondary liability, because we don't

25   believe that's been pled.  There isn't one instance of any

K173MCGC

1    direct infringement by a third party because of this article

2    that was written about in Newsweek, which was required, and in

3    fact I believe the same plaintiff recently had a case dismissed

4    in California based on the secondary liability claim for also

5    not pleading any facts that would support that a third party

6    had used this image merely because of the actions of Newsweek.

7             THE COURT:  Well I thought I understood from your

8    adversary that is something that they intend to develop further

9    in discovery, and that they are not in a position to identify

10   those entities at this time, which is why they are listed as

11   John Does.  But hopefully they believe with discovery, they

12   would be able to identify someone.

13             I suppose you are going to tell me that's insufficient

14   to keep the claim in at this time.

15             MS. WOLFF:  That's correct.

16             THE COURT:  We'll see.  I did offer to Ms. Zaharia an

17   opportunity to replead.  She has not asked for a repleading on

18   that point, probably because she cannot identify with

19   specificity entities who may have contributed to the

20   infringement.

21             MS. WOLFF:  I think the last thing was that I think

22   when Instagram says it doesn't grant any rights, a sublicense

23   is a license.  It is not giving someone rights.  And an embed

24   is directing you right back to the Instagram page.  So I think

25   they are consistent to be read together.

K173MCGC

1       THE COURT:  All right.  Again, as I began, part of my

2   reason for having this conference is to understand the case

3   better.  I thank you all for be so prepared to help with that

4   point.  The second was to see whether, if you will, you are

5   hellbent on filing this motion.  And it sounds like, having

6   discussed this with your client, you are.  And the third part

7   was did the plaintiff want to amend, which apparently on one

8   level he does.

9       So, Ms. Zaharia, how much time would you like to file

10   an amended complaint in this case, please?

11       MS. ZAHARIA:  We could do that within two weeks, your

12   Honor.

13       THE COURT:  Let me please get me calendar together.

14   Let's go to the 24th of January.

15       Ms. Wolff, is it still your client's intent to file a

16   motion to dismiss?

17       MS. WOLFF:  As far as I know.  We'll of course discuss

18   this conference with our client.

19       THE COURT:  Don't read too much into it.  Sometimes it

20   is easier to settle, sometimes it is not.  You all make the

21   decision that's right for you.  I have the obligation to

22   explore it.  How much time would you like to file your motion,

23   your opening brief?

24       MS. WOLFF:  Two weeks after the amended --

25       THE COURT:  That's fine.  That's aggressive, but it's

K173MCGC

 1   fine by me.

 2         MS. WOLFF:  Then we'll take three.

 3         THE COURT:  Let me give you until February 28, and for

 4   the response March 30, the opposition, and then the reply

 5   April 13.  I believe those are all days that are actual

 6   business days when court is in session.  And you will tell me

 7   if they are not.

 8         All right.  Ms. Wolff, because it is your client's

 9   desire to file a motion in this case, please get a transcript

10   of this conference.

11         MS. WOLFF:  Sure.

12         THE COURT:  And if you order it, I'll receive it

13   automatically.  When I have the briefing, I want to have as

14   well the transcript of this conference so I can remind myself

15   of what we've discussed.

16         And Ms. Wolff, inasmuch as you are the movant, is

17   there anything else you want to bring to my attention in this

18   proceeding?

19         MS. WOLFF:  No, your Honor.

20         THE COURT:  Thank you.  Ms. Zaharia, anything else

21   you'd like to bring to my attention in this proceeding?

22         MS. ZAHARIA:  No, your Honor.

23         THE COURT:  Thank you very much.  We are adjourned.

24         (Adjourned)

25