UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOT MCGUCKEN, an individual, | Case No: 1:19-cv-09617 (KPF) |
| *Plaintiff*, | |
| v. | |
| NEWSWEEK, LLC, a New York Limited Liability Company; and DOES 1-10, inclusive, | |
| *Defendant*. | |

**DEFENDANT NEWSWEEK DIGITAL LLC'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF
ELLIOT MCGUCKEN'S AMENDED COMPLAINT**

Nancy E. Wolff
Lindsay R. Edelstein
COWAN, DEBAETS, ABRAHAMS &
SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Tel: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com
ledelstein@cdas.com

*Attorneys for Defendant Newsweek Digital
LLC*

## **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ....................................................................................iii-iv

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ....................................................................................................3

    I.    Plaintiff's Use of the Photograph.............................................................3

    II.   Pursuant to Instagram's Terms, By Publicly Sharing the
        Photograph, Plaintiff Authorized Publishers to Share His
        Instagram Post Via Web Embed ........................................................6

    III.  Newsweek's use of the Instagram Post Pursuant to the
        Instagram's Sub-License to Report on a Matter of Public
        Interest.......................................................................................10

ARGUMENT ....................................................................................................12

    I.    PLAINTIFF'S PUBLIC SHARING OF HIS INSTAGRAM POST
        GRANTED NEWSWEEK A SUB-LICENSE TO EMBED
        PLAINTIFF'S POST IN ITS ARTICLE ..............................................12

    II.   NEWSWEEK'S USE OF THE INSTAGRAM POST FOR NEWS
        REPORTING PURPOSES IS A FAIR USE ..........................................14

        A.    The Purpose and Character of Newsweek's Use Favors
              Fair Use....................................................................................15

        B.    The Nature of the Copyrighted Work Favors Fair Use............................19

        C.    The Amount and Substantiality of the Use Favors Fair
              Use ........................................................................................19

        D.    The Effect of the Use on the Potential Market Favors
              Fair Use....................................................................................20

    III.  PLAINTIFF HAS NOT PLEADED ANY FACTS THAT WOULD
        ENTITLE HIM TO THE ENHANCED DAMAGES REQUESTED IN
        HIS PRAYER FOR RELIEF ..........................................................21

IV.    PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT NEWSWEEK
       IS CONTRIBUTORILY OR VICARIOUSLY LIABLE FOR THE
       UNIDENTIFIED ACS OF UNIDENTIFIED THIRD PARTIES ........................22

CONCLUSION.........................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agence Fr. Presse v. Morel*,
   934 F. Supp. 2d 547 (S.D.N.Y. 2013)......................................................................23

*Allen v. WestPoint-Pepperell, Inc.*,
   945 F.2d 40 (2d Cir. 1991)..............................................................................4, 12

*Applebaum v. Lyft, Inc.*,
   263 F. Supp. 3d 454 (S.D.N.Y. 2017)..................................................................13

*Ariel (UK) Ltd. v. Reuters Grp. PLC*,
   No. 05 CIV. 9646 (JFK), 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006), *aff'd*,
   277 F. App'x 43 (2d Cir. 2008) ..........................................................................13

*Arista Records LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)................................................................................22

*Artists Music, Inc. v. Reed Pub. (USA), Inc.*,
   No. 73163, 1994 WL 191643 (S.D.N.Y. May 17, 1994)........................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................12, 21

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)..................................................................14, 19, 20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................3

*Bill Graham Archives v. Dorling Kindersley*,
   448 F.3d 605 (2d Cir. 2006)....................................................................14, 16, 19, 20

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)................................................................................18

*Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*,
   No. 11 Civ. 8921(DAB), 2013 WL 6670584 (S.D.N.Y. Mar. 29, 2013) .................5

*Burnette v. Carothers*,
   192 F.3d 52 (2d Cir. 1999)..................................................................................12

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).......................................................................... *passim*

*Cariou v. Prince,*
    714 F.3d 694 (2d Cir. 2013)..............................................................................15, 20

*Clark v. Transp. Alts., Inc.,*
    No. 18-cv-9985 (VM), 2019 WL 1448448 (S.D.N.Y. Mar. 18, 2019)....................15

*Consumer Concepts, Inc. v. Mego Corp.,*
    458 F. Supp. 543 (S.D.N.Y. 1978)...........................................................................6

*Demetriades v. Kaufmann,*
    690 F. Supp. 289 (S.D.N.Y. 1988)..........................................................................22

*Dhillon v. Does 1-10,*
    No. 13 Civ. 1465, 2014 WL 722592 (N.D. Cal. Feb. 25, 2014)...........................18

*Fitzgerald Pub. Co. v. Baylor Pub. Co.,*
    807 F.2d 1110 (2d Cir. 1986)..................................................................................21

*Fteja v. Facebook, Inc.,*
    841 F. Supp. 2d 829 (S.D.N.Y. 2012).....................................................................13

*Generale Bank v. Czarnikow-Rionda Sugar Trading, Inc.,*
    47 F. Supp. 2d 477 (S.D.N.Y. 1999).........................................................................6

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,*
    443 F.2d 1159 (2d Cir. 1971)..................................................................................22

*Hosseinzadeh v. Klein,*
    276 F. Supp. 3d 34 (S.D.N.Y. 2017).......................................................................16

*Hotel Emps. & Rest. Emps Union, Local 100 v. City of N.Y. Dep't of Parks &*
*Recreation,*
    311 F.3d 534 (2d Cir. 2002).....................................................................................4

*Katz v. Chevaldina,*
    No. 12 Civ. 22211, 2014 WL 2815496 (S.D. Fla. June 17, 2014) ........................18

*Keeling v. Hars,*
    809 F.3d 43 (2d Cir. 2015)......................................................................................15

*Kelly-Brown v. Winfrey,*
    717 F.3d 295 (2d Cir. 2013)....................................................................................15

*Lasica v. America Online, Inc.,*
    No. CV 15-4230, GW (FFMx), 2015 WL 12791495 (C.D. Cal. Oct. 8, 2015).......12

*Lefkowitz v. John Wiley & Sons, Inc.,*
    No. 13 CIV. 6414 (KPF), 2014 WL 2619815 (S.D.N.Y. June 2, 2014)..................23

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*,
 No. 13 Civ. 4664, 2014 WL 3368893 (N.D. Ill. July 8, 2014) ..............................................18

*Levin v. Tiber Holding Corp.*,
 277 F.3d 243 (2d Cir. 2002) ..............................................................................................14

*May v. Sony Music Entm't*,
 No. 18-cv-2238 (LAK), 2019 WL 2450973 (S.D.N.Y. Feb. 13, 2019) ...................................15

*McGucken v. Chive Media Grp., LLC*,
 No. CV 18-01612-RSWL-KS, 2018 WL 3410095 (C.D. Cal. July 11, 2018) ........................24

*McGucken v. Chive Media Grp., LLC*,
 No. CV 18-01612-RSWL-KS, 2018 WL 5880751 (C.D. Cal. Nov. 8, 2018) ........................25

*New London Assocs., LLC v. Kinetic Soc. LLC*,
 384 F. Supp. 3d 392 (S.D.N.Y. 2019) ............................................................................23, 24

*Patsy's Italian Rest., Inc. v. Banas*,
 575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011) ............................5

*Person v. Google Inc.*,
 456 F. Supp. 2d 488 (S.D.N.Y. 2006) ...............................................................................13

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
 99 F.3d 1381 (6th Cir. 1996) (en banc) ............................................................................21

*Quiroga v. Fall River Music, Inc.*,
 No. 93 CIV. 3914 (RPP), 1998 WL 851574 (S.D.N.Y. Dec. 7, 1998) ...................................22

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000) ................................................................................................4

*Sarl Louis Feraud Int'ls v. Viewfinder Inc.*,
 627 F. Supp. 2d 123 (S.D.N.Y. 2008) ...............................................................................18

*Schwartz v. HSBC Bank USA, N.A.*,
 160 F. Supp. 3d 666 (S.D.N.Y. 2016) .................................................................................4

*Sekisui Am. Corp. v. Hart*,
 15 F. Supp. 3d 359 (S.D.N.Y. 2014) ...................................................................................5

*Spinelli v. Nat'l Football League*,
 96 F. Supp. 3d 81 (S.D.N.Y. 2015) ...................................................................................12

*Spinks v. Equity Res. Briarwood Apartments*,
 90 Cal. Rptr. 3d 453 (2009) ..............................................................................................14

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)..........................................................................................16, 19

*Wang v. Pataki*,
    396 F. Supp. 2d 446 (S.D.N.Y. 2005).........................................................................4

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012).......................................................................22

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991)..............................................................................16, 21

*Yang v. Mic Network, Inc.*,
    405 F. Supp. 3d 537 (S.D.N.Y. 2019)......................................................................15

**Statutes**

17 U.S.C. § 107.............................................................................................15, 19, 20

17 U.S.C. § 504.........................................................................................................21

17 U.S.C. § 505.........................................................................................................25

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Newsweek Digital LLC ("Newsweek") respectfully submits this memorandum of law in support of its motion to dismiss plaintiff Elliot McGucken's ("Plaintiff") Amended Complaint, dated January 24, 2020 (the "Amended Complaint" or "Am. Cplt."; Dkt. No. 17), in its entirety with prejudice.

## PRELIMINARY STATEMENT

This case, at base, is about Plaintiff's attempts to chill Newsweek's First Amendment right to report on a matter of public interest – namely, Plaintiff's newsworthy discovery of a rare, ephemeral lake in Death Valley, coined the "Salt Creek Spectacle" – so that he can make a profit through litigation.  Plaintiff's Amended Complaint should be dismissed for multiple, independent reasons.

Plaintiff's personal media exposure following his discovery of the Salt Creek Spectacle was due, in part, to the fact that: (1) he was live at the scene of the phenomenon; (2) he photographed a collection of images that were widely shared; and (3) his Instagram post relating to the event (which contained, *inter alia*: a photograph of the scene, the date, his Instagram handle, a caption, various hashtags, the location, the number of "likes" the post received; all elements collectively, the "Instagram Post") was available for anyone with an internet connection to access.  Plaintiff happily reaped the rewards; he became the "face" of the Salt Creek Spectacle and was extensively quoted in many articles covering the event.

But Plaintiff cannot have his cake and eat it too: he should not be permitted to rush to sue media outlets for fairly reporting on his discovery, and for permissibly sharing content made publicly available *by Plaintiff himself* via Instagram's application program interface ("API"). Using the API, Newsweek, a prominent magazine and online news company that caters to a world-wide audience, chose to cover the "Salt Creek Spectacle" story.  Part of Newsweek's

coverage included quotes from Plaintiff about this discovery, reference to Plaintiff's viral photographs, and a web embed of the Instagram Post that was not hosted on the Newsweek Website and which linked to Plaintiff's own original Instagram Post within his larger Instagram page.

Pursuant to Instagram's integrated agreements, which Plaintiff agreed to when he signed up to use the platform, publicly shared Instagram posts (containing all elements of the post itself) may be sub-licensed to, *inter alia*, publishers and broadcasters for use "via web embeds" *subject to the user's privacy settings*.  In other words, at any time, Plaintiff could have revoked this sub-license by making his post private.  To date, he has not.   Plaintiff is not willing to accept the trade-off inherent to the Instagram agreements: by publicly sharing photographs on Instagram, a user may gain more exposure due to the permitted sharing, but the same user may not bring suit against entities for simply doing what he authorized them to do by signing up for the service.

Even if Instagram's agreements did not sub-license such use – and even if its API did not facilitate such use (both of which Newsweek does not concede) – Plaintiff's claim is brought under the blinkered view that the doctrine of fair use – which is expressly in the Copyright Act – does not exist.  As a matter of law, and as can be determined at the pleading stage, Newsweek's transformative use of the Instagram Post, of which the photograph is just one piece, is fair use and lies at the core of the First Amendment.   Without the use here, Newsweek would not be able to effectively tell the story: Plaintiff's discovery, capturing, and subsequent comments on the ephemeral beauty of the "Salt Creek Spectacle" as seen through his lens and as publicly shared with the world.  In fact, the photograph at issue was even more necessary to tell the story because of the lake's ephemeral nature, and the fact that the photograph taken by Plaintiff captured its brief and fleeting appearance.

Furthermore, despite being given the opportunity to amend his Complaint once, and being put on specific notice of certain deficiencies that are fatal to his claim for enhanced damages and his secondary liability claims, Plaintiff has not corrected these deficiencies. Plaintiff, an experienced litigator, should know better; particularly because identical allegations made by him in similar cases have been held to be insufficient to state a claim and the relevant causes of action were dismissed.

For these reasons, Plaintiff's Amended Complaint should be dismissed with prejudice, and he should be denied leave to amend.

## **BACKGROUND**

Accepting as true for purposes of this motion all factual allegations contained in the Amended Complaint, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007), the relevant facts are as follows:

**I.     Plaintiff's Use of the Photograph**

Plaintiff, a Los Angeles-based nature photographer, specializes in "Fine Art Landscapes & Seascapes," as showcased on his Instagram feed, which solely contains vibrant and colorful fine art photographs, a representative selection of which are shown below:







| Venice Beach, posted on Instagram on Feb. 19, 2020 | El Matador Beach, posted on Instagram on Feb. 21, 2020 | Ancient Bristelcone Pine Forest, posted on Instagram on Feb. 13, 2020 |
|---|---|---|

Declaration of Nancy E. Wolff, dated February 28, 2020 ("Wolff. Decl.") ¶ 2, Exhibit A.[1]  *See also* Am. Cplt. ¶¶ 4, 8.

In March of 2019, Plaintiff was in Death Valley National Park to photograph a storm and its aftermath, when he discovered a temporary lake that had emerged in the usually arid desert. Am. Cplt. ¶ 12, Exh. A (the "Newsweek Article").[2]  Plaintiff photographed the lake – later coined by media outlets as the "Salt Lake Spectacle" – and both Plaintiff's photograph (the "Photograph"), and his discovery of the lake, became newsworthy. Am. Cplt. ¶ 8; *see*, *e.g.*, Amy Graff, *Rare 10-mile-long lake forms in Death Valley after heavy rains and flooding*, SFGATE (Mar. 12, 2019 at 1:42 p.m.), https://www.sfgate.com/weather/article/lake-Death-Valley-National-Park-flooding-water-CA-13679346.php ("Photographer Elliott McGucken was in Death Valley to photograph the storm and its aftermath . . . The result was a collection of images with the rugged Panamint Range, its tallest Telescope Peak frosted in snow, reflected in glassy waters"); Jason Daley, *Flooding Creates a 10-Mile-Long Lake in Death Valley*, SMITHSONIAN MAGAZINE (Mar. 13, 2019), https://www.smithsonianmag.com/smart-news/flooding-creates-10-

---

[1] Although not annexed to the Amended Complaint, the Court may take judicial notice of Plaintiff's Instagram page, which is referenced in paragraph 8 of the Amended Complaint.  *See* Am. Cplt. ¶ 8 (stating that Plaintiff "published [the Photograph] on his Instagram account").  *See Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (court may consider documents that Plaintiff "either possessed or knew about and upon which [he] relied in bringing the suit"); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (the Court may consider "the documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken").  As of the date of this filing, Plaintiff's full Instagram page is publicly available at https://www.instagram.com/elliotmcgucken/, and the Court may take judicial notice of it on that basis as well. *See Hotel Emps. & Rest. Emps Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002) (noting the appropriateness of taking judicial notice of material on a website); *Wang v. Pataki*, 396 F. Supp. 2d 446, 458 (S.D.N.Y. 2005) (same).  To the extent the Court determines that some materials referenced in this motion cannot be judicially noticed, the Court may convert the motion to dismiss to one for summary judgment.  *See Schwartz v. HSBC Bank USA, N.A.*, 160 F. Supp. 3d 666, 672 (S.D.N.Y. 2016). In that event, Newsweek respectfully requests that the Court permit Newsweek to make further evidentiary submissions in support of a motion for summary judgment.

[2] Notably, Plaintiff annexed a misleadingly cropped version of the Newsweek Article at issue, which obscures the context of Newsweek's use of Plaintiff's Instagram Post.  Annexed to the Wolff Declaration is a copy of the entire article posted by Newsweek (Wolff Decl. ¶ 4, Exh. C), as well as the entire Instagram Post by Plaintiff (*id.* ¶ 3, Exh. B).  The Court may take judicial notice of both.  *See Allen*, 945 F.2d at 44.

mile-long-lake-death-valley-180971699/ ("The shallow body of water was discovered by

photographer Elliott McGucken on March 7 . . . McGucken was able to shoot some once-in-a-

lifetime images of the flooding"); Javier Panzar, *That lake in Death Valley? It's 'just a puddle,'*

LOS ANGELES TIMES (Mar. 14, 2019 at 11:55 a.m.), https://www.latimes.com/local/lanow/la-me-

ln-death-valley-lake-20190314-story.html ("Social media and blogs were ablaze this week with

photos of a so-called 'lake' that formed in Death Valley National Park last week after another

heavy rainstorm . . .  Photographer Elliott McGucken told sfgate.com that he captured the big

pool the day after the latest rain during a pause in the wind").[3]

Indeed, Plaintiff's photograph, and direct quotes from Plaintiff about his discovery of the

lake, are included in many news articles available online as of the date of this filing.  *See id.*  On

March 13, 2019, Plaintiff *publicly* posted the Photograph on his Instagram page, as shown

below:



**Plaintiff's Instagram Post**

---

[3] As discussed *supra* at n. 1, the Court may take judicial notice of internet materials.  *See also Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11 Civ. 8921(DAB), 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013) (courts in this Circuit "generally ha[ve] the discretion to take judicial notice of internet material"); *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 365 n.59 (S.D.N.Y. 2014) ("tak[ing] judicial notice of the public information on [a third party's] website..."); *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y. 2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."), *aff'd*, 658 F.3d 254 (2d Cir. 2011).

Wolff Decl. ¶ 3, Exh. B.  Accordingly, Plaintiff's post, accessible to anyone with access to the internet, contained six elements: (1) the Photograph; (2) attribution to Plaintiff (via his Instagram handle @elliotmcgucken) ("Attribution"); (3) the location where the Photograph was taken (*i.e.*, Death Valley National Park) (the "Location"); (4) the caption: "Death Valley Lake! See more golden ratio harmonies" (the "Caption"); (5) the hashtags (including, but not limited to: #nationalparks," "#dreamworldimages," and "#igpodium") (the "Hashtags"); (6) the date of the post, March 13, 2019 (the "Date"); and (7) the amount of "likes" the post received (the "Instagram Response") (the Photograph, Attribution, Location, Caption, Hashtags, Date, and Instagram Response, collectively referred to herein as, the "Instagram Post").  Notably, none of the elements of Plaintiff's Instagram Post contained any reservation of rights or copyright notice. To date, the Instagram Post is still publicly displayed on Plaintiff's Instagram feed.[4]

## II.    Pursuant to Instagram's Terms, By Publicly Sharing the Photograph, Plaintiff Authorized Publishers to Share His Instagram Content Via Web Embed

Instagram is a "free photo and video sharing" mobile application and website where users may "upload photos or videos" to be shared with others.[5]  In order to join Instagram, each user must agree to its "Terms of Use" ("Terms") and "Privacy Policy," which appear via prominent hyperlinks on Instagram's "Sign Up" page.  Wolff Decl. ¶¶ 5-7, Exhs. D-F.[6]  Instagram's "Platform Policy," is incorporated into its Terms by reference.  *See* Terms at p. 4-5 of 7 ("Our Agreement") ("your use of our API is subject to our Platform Policy").[7]  As shown below, the

---

[4] *See* Elliot McGucken (@elliotmcgucken), Instagram (Mar. 13, 2019), https://www.instagram.com/p/Bu-VGhzlRSN/.

[5] *What is Instagram?*, Instagram, https://help.instagram.com/424737657584573 (last visited Feb. 28, 2020).

[6] Contract documents that are interrelated "must be read together." *Consumer Concepts, Inc. v. Mego Corp.*, 458 F. Supp. 543, 545 (S.D.N.Y. 1978); *Generale Bank v. Czarnikow-Rionda Sugar Trading, Inc.*, 47 F. Supp. 2d 477, 481 (S.D.N.Y. 1999).  Accordingly, Instagram's Terms, Privacy Policy, and Platform Policy should be read *in pari materia*.

[7] Instagram's API allows "Users" (*i.e.*, "all visitors, users, and others who access the Service"), to access and use content posted by Instagram users.  *See* Wolff Decl. ¶ 7, Exh. F (Privacy Policy) at p. 1 of 5 (preamble); *see also*

Terms, Privacy Policy, and Platform Policy (collectively, the "Instagram Agreements"; Wolff Decl. ¶ 6-8, Exhs. E-G) provide, in relevant part, that Instagram users who share photographs on Instagram grant – to Instagram – among other things, a sub-license to distribute the user's content to media publishers for use in "web embeds"[8]:

---

### Terms of Use

**Permissions You Give to Us.** As part of our agreement, you also give us permissions that we need to provide the Service.

- We do not claim ownership of your content, but you grant us a license to use it. Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service. Instead, when you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). You can end this license anytime by deleting your content or account. However, content will continue to appear if you shared it with others and they have not deleted it. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

---

### Platform Policy

We provide the Instagram Platform to support several types of apps and services. First, we provide them to help members of our community share their own content with apps or services. We also support apps and services that help brands and advertisers understand and manage their audience, develop their content strategy, and obtain digital rights. Finally, we provide the Instagram Platform to help broadcasters and publishers discover content, get digital rights to media, and share media using web embeds. The Instagram Platform is not intended for other types of apps or services. For those we do support, the following terms and information also apply:

---

"Embedding," INSTAGRAM, https://www.instagram.com/developer/embedding/ (last visited Feb. 28, 2020); Wolff Decl. ¶ 10, Exh. I (Embedding Policy, for ease of reference).

[8] *See* "Embedding Policy," *supra* n. 7 ("Embedding Instagram posts is an easy way to add Instagram photos and videos to the stories you want to tell on articles or websites. You can embed your own content as well as photos and videos from public profiles. As always, people own their Instagram content, and embedded posts give the proper attribution by showing the username and linking back to the original content on Instagram.").

---

**Privacy Policy**

By using our Service you understand and agree that we are providing a platform for you to post content, including photos, comments and other materials ("**User Content**"), to the Service and to share User Content publicly. This means that other Users may search for, see, use, or share any of your User Content that you make publicly available through the Service, consistent with the terms and conditions of this Privacy Policy and our Terms of Use (which can be found at http://instagram.com/legal/terms).

---

Instagram Agreements (highlighting added for emphasis).  "Users" are defined as "all visitors, users, and others who access the Service."  Wolff Decl. ¶ 7, Exh. F (Privacy Policy) at p. 1 of 5 (preamble).

As shown above, there are two relevant limitations to Instagram's sub-license to publishers:

*First*, Instagram's right to sub-license such content must be "consistent with [the user's] privacy and application settings."  Terms at p. 3 of 7 ("Permissions You Give to Us").  In other words, if a user does not want their content shared via web embed by media outlets, the user may post the content "privately" – as opposed to publicly – so that its audience is limited.  Instagram even provides comprehensive instructions on how users may set their Instagram accounts "to private."[9]  Once a user's profile or individual post is "private," only approved followers can view the user's content and Instagram's sub-license right is limited.[10]

*Second*, the publisher may only "share media using *web embeds*," as opposed to hosting the content on its own servers (the latter would typically not include the Instagram post containing the content in its entirety, including, but not limited to, attribution, a link back to the

---

[9] *See* "Controlling Your Visibility," Iɴꜱᴛᴀɢʀᴀᴍ, https://help.instagram.com/116024195217477 (last visited Feb. 28, 2020).
[10] *See* "Privacy Settings and Information," Iɴꜱᴛᴀɢʀᴀᴍ, https://help.instagram.com/196883487377501 (last visited Feb. 28, 2020).

original post and profile, and anything else associated with the content on Instagram's platform, such as hashtags, captions, and other user comments).[11]

Instagram's intention to facilitate the use of content by "broadcasters and publishers" via web embeds through its platform is further evidenced by the fact that it features step-by-step directions on how to do so; as shown below, Instagram encourages internet users to "embed . . . photos and videos from public profiles":



**Embedding Instructions**

Embedding Instagram posts is an easy way to add Instagram photos and videos to the stories you want to tell on articles or websites. You can embed your own content as well as photos and videos from public profiles. As always, people own their Instagram content, and embedded posts give the proper attribution by showing the username and linking back to the original content on Instagram.

*See* "Embedding," *supra* n. 11.[12]   A third-party who "embeds" content simply add specific "embed code," provided by Instagram, to the HTML instructions on its website.  *See* Wolff Decl. ¶ 10, Exh. I.  When a viewer visits the third-party's webpage, the code refers the viewer's browser to the Instagram post, causing the entire Instagram post to appear on the third-party page as if it were posted there.  *Id.*

---

[11] *See* "Embedding," INSTAGRAM, https://www.instagram.com/developer/embedding/ (last visited Feb. 28, 2020).
[12] It is worth mentioning that the type of embedding at issue here is very different than the Twitter embeds at issue in *Goldman v. Breitbart News Network, LLC*.  *See* 302 F. Supp. 3d 585 (S.D.N.Y. 2018).  *Compare* Wolff Decl. ¶ 9, Exh. H (uses at issue in *Breitbart*), *with* Wolff Decl. ¶ 4, Exh. C (Newsweek's use at issue).  In *Breitbart*, the subject photograph appeared on each news outlet's website as a standalone photograph without all the collective elements of the original post.  *Id.*  Here, Plaintiff's entire Instagram Post, with all associated elements, including a link back to Plaintiff's Instagram page, appeared in the Newsweek Article.  Furthermore, the issue of whether the use of a web embed is a "display" under the Copyright Act – which Newsweek disputes – is not dispositive here, where Newsweek's arguments are that Plaintiff authorized Instagram to sub-license the use at issue, and that Newsweek's use was otherwise permissible under the fair use doctrine.

**Newsweek's Use of the Instagram Content Pursuant to the Instagram's Sub-License to Report on a Matter of Public Interest**

On March 14, 2019, as shown below (in pertinent part), Newsweek ran an article on its website entitled "Huge Lake Appears in Death Valley, One of the Hottest, Driest Places on Earth," (the "Newsweek Article"), reporting on the "Salt Creek Spectacle," the public's fascination with this natural phenomenon, and, specifically, Plaintiff's presence at the site to take photographs:



*See* Wolff Decl. ¶ 4, Exh. C.[13]  As shown above, following reference to Plaintiff's "shar[ing] of several snaps on Instagram[,]" and in compliance with Instagram's sub-license, Newsweek embedded Plaintiff's Instagram Post in the Newsweek Article. Viewers of the Newsweek Article could see the Instagram Post linking back to Plaintiff's Instagram page (and containing all attribution and content originally associated with the Photograph), but the Instagram Post was not hosted on Newsweek's servers.[14]  Notably, the Newsweek Article, when viewed in its entirety, demonstrates that, when Newsweek does not have authorization to use a photograph, or when it simply needs a photograph to illustrate a particular story, it licenses such content.  *See* Wolff Decl. ¶ 4, Exh. C.  Indeed, just a few paragraphs following its use of the Instagram Post, Newsweek included a 2017 photograph of Death Valley National Park (the "2017 Photograph") to use as a source of comparison to the lake Plaintiff discovered.  *Id.*  The 2017 Photograph contains a gutter credit: "RHONA WISE/AFP/GETTY IMAGES."  *Id.*

If Plaintiff wanted his post to be removed from the Newsweek Article, at any time he could have changed his Instagram Post privacy setting to "private," as all embeds link back to live content hosted by Instagram.  Instead, Plaintiff filed this lawsuit.[15]

---

[13] While Plaintiff alleges that Newsweek made multiple uses of the Photograph (*see* Am. Cplt. ¶ 12: "A true and correct image of the Subject Post and/or the URLs for the Subject Post are attached hereto as Exhibit A.  These examples reflect a non-exhaustive series of uses and addresses at which Newsweek published the various [sic] Subject Photograph"), he only annexes a depiction of *one use* – the only use – by Newsweek.  Plaintiff's error is likely due to Plaintiff's firm's use of cookie-cutter complaints to file hundreds of copyright infringement suits.  *See* Ashley Cullins, *Has This Man Sued You? A "Copyright Troll" Takes on Hollywood*, HOLLYWOOD REPORTER (Apr. 6, 2018), https://www.hollywoodreporter.com/thr-esq/has-man-sued-you-a-copyright-troll-takes-hollywood-1099156 ("Liebowitz isn't the only IP attorney who's caught the attention of others in the field for filing cases en masse. Stephen Doniger of Venice, California-based Doniger/Burroughs proudly notes that he and his colleagues handle more copyright cases than any other firm the country.").

[14] *See* "Embedding," *supra* n. 11.

[15] The Instagram Post remains live as of the date of this filing.  *See supra* n. 4.

## ARGUMENT

Rule 12(b)(6) compels dismissal of the Amended Complaint.  The standard for assessing a motion to dismiss requires that the plaintiff plead sufficient facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  While a court must "[accept] the allegations contained in the complaint as true and [draw] all reasonable inference in favor of the nonmoving party," *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999), a complaint that offers mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S at 678 (quoting *Twombly*, 550 U.S. at 555).  To survive a motion to dismiss, plaintiff's well-pleaded facts must "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

In addition to the well-pleaded "facts stated on the face of the complaint," on a motion to dismiss the Court may consider "documents appended to the complaint or incorporated in the complaint by reference," and "matters of which judicial notice may be taken." *WestPoint-Pepperell*, 945 F.2d at 44 (citation omitted).  Judicial notice may also be taken of internet materials, including websites and social media posts. *See supra* n. 1, 3.

## I.   PLAINTIFF'S PUBLIC SHARING OF HIS INSTAGRAM POST GRANTED NEWSWEEK A SUB-LICENSE TO EMBED PLAINTIFF'S POST IN ITS ARTICLE

"In general, a copyright owner who grants an exclusive or nonexclusive license to use a work waives any right to assert an infringement claim against the licensee, or anyone whom the licensee is entitled to sublicense, for acts within the scope of the license or sublicense." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)).  *See also Lasica v. America Online, Inc.*, No. CV 15-4230, GW (FFMx), 2015 WL 12791495, at *4 (C.D. Cal. Oct. 8, 2015) (copyright owner who grants nonexclusive,

limited license "waives the right to sue licensees for copyright infringement, and it may sue only for breach of contract"); *Ariel (UK) Ltd. v. Reuters Grp. PLC*, No. 05 CIV. 9646 (JFK), 2006 WL 3161467, at *10 (S.D.N.Y. Oct. 31, 2006), *aff'd*, 277 F. App'x 43 (2d Cir. 2008) (stating that plaintiff was "precluded as a matter of law from suing valid licensees of the allegedly copyrighted works for copyright infringement").

Here, as shown below, such a complete defense exists because, when Plaintiff posted the Instagram Post publicly on Instagram, he agreed – via the Agreements[16] – to allow Instagram to grant sub-licenses to third parties, including Newsweek:

| STEP 1 | By opening an Instagram account, Plaintiff was required – as a condition to using the platform – to agree to Instagram's Agreements.<br><br>Plaintiff creates an account and begins sharing content. |
|---|---|
| STEP 2 | Plaintiff is bound by the contractual terms of the Instagram Agreements, which grants to Instagram a sub-licensable license to use and distribute Plaintiff's content (subject to his privacy settings), including to publishers to share Plaintiff's content via web embeds.<br><br>Via Instagram's Platform Policy, Plaintiff grants to "all visitors, users, and others who access [Instagram]" the ability to share any content Plaintiff publicly shares. |
| STEP 3 | Plaintiff publicly shares the Instagram Post. He does not share it privately or otherwise restrict the public's access to the Instagram Post, and thus Instagram has the right to sub-license it to third parties to use in web embeds. |
| STEP 4 | Newsweek uses the Instagram Post as a web embed, in accordance with Instagram's Agreements. |

---

[16] Courts in this Circuit have routinely enforced such agreements. *See*, *e.g.*, *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 469 (S.D.N.Y. 2017); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012); *Person v. Google Inc.*, 456 F. Supp. 2d 488, 493 (S.D.N.Y. 2006).

*See* Instagram Agreements.  Plaintiff's entire claim is based on a validly licensed use.[17]

Moreover, if contract terms "necessarily require the promisor to confer a benefit on a third person," that person may enforce the benefit.  *Spinks v. Equity Res. Briarwood Apartments*, 90 Cal. Rptr.3d 453, 468 (2009); *see also Levin v. Tiber Holding Corp.*, 277 F.3d 243, 249 (2d Cir. 2002).  The Instagram Agreements necessarily require Plaintiff to allow other Instagram users, including Newsweek, to use and re-share his publicly posted user content, because those were conditions to Plaintiff's signing up for and using Instagram's service.

## II.   NEWSWEEK'S USE OF THE INSTAGRAM CONTENT FOR NEWS REPORTING PURPOSES IS A FAIR USE

Due to the importance of protecting the First Amendment right to free speech and expression, the copyright law has exceptions, such as the fair use doctrine, that permits the use of an author's work even where consent is not given.  The doctrine effectively "permits unauthorized copying in some circumstances, so as to further 'copyright's very purpose'" of promoting artistic creation.  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994)).  Section 107 of the Copyright Act permits the use or reproduction of a copyrighted work if it is "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107. *See also Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605, 608 (2d Cir. 2006).  In determining whether a use is fair, courts weigh the following factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of

---

[17] *Agence France Presse v. Morel*, is instructive to compare terms of use which merely provide a right to sub-license *to the social network* (in that case, Twitter "and its partners," and Twitpic "or affiliated sites"), versus here, where the Instagram Agreements unambiguously authorize using and sharing by "other Users," meaning any third party accessing the service.  *See* 769 F.Supp. 295 (S.D.N.Y. 2011).

the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Campbell*, 510 U.S. at 577-78.

Although fair use is an affirmative defense, courts in this District routinely grant dismissal based on this defense at the motion to dismiss stage where "the facts necessary to establish [fair use] are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (citation omitted); *see, e.g., Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537 (S.D.N.Y. 2019) (dismissing infringement claim based on fair use defense on a Rule 12(b)(6) motion); *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013) (same); *Clark v. Transp. Alts., Inc.*, No. 18-cv-9985 (VM), 2019 WL 1448448, at *2 (S.D.N.Y. Mar. 18, 2019) (same); *May v. Sony Music Entm't*, No. 18-cv-2238 (LAK), 2019 WL 2450973, at *12 (S.D.N.Y. Feb. 13, 2019) (courts have adjudicated motions to dismiss based on a fair use defense "when discovery would not provide any additional relevant information and all that is necessary for the court to make a determination as to fair use are the two works at issue") (citing cases) (internal quotation marks and brackets omitted).

Here, the Court need only review the Amended Complaint and compare the Photograph and Newsweek's use of the Instagram Post in the context of the Newsweek Article to make a determination as to fair use. For the reasons set forth below, all four factors weigh in favor of a finding of fair use in this case, and the Court may thus conclude as a matter of law on this motion to dismiss that Newsweek's challenged use qualifies as a fair use of Plaintiff's work.

### A.  The Purpose and Character of Newsweek's Use Favors Fair Use

The first factor in the fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). *See Keeling v. Hars*, 809 F.3d 43, 53 (2d Cir. 2015) ("[T]he first factor – 'the purpose

and character of the use' – lies at the 'heart of the inquiry' . . . while the other three factors are much less important.") (citation omitted).

The crux of this factor is to determine whether and to what extent the new work is "transformative" – that is, whether the new work "merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579 ([T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."). *See also Bill Graham*, 448 F.3d at 608.

There is a strong presumption that the first factor favors defendant if the allegedly infringing use is among the illustrative statutory categories of fair use enumerated in § 107. *See* 17 U.S.C. § 107 (stating that fair use of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching [ ], scholarship, or research, is not an infringement of copyright"); *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991); *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 42 (S.D.N.Y. 2017); *Campbell*, 510 U.S. at 578-79 (the "purpose and character" analysis is to be "guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like").

In this case, where the landscape Photograph was transformed into newsworthy illustration, the first factor weighs heavily in favor of a finding of fair use, and Newsweek's use of the Instagram Post was undeniably for the purposes of news reporting and commentary. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83-84 (2d Cir. 2014) (noting in a fair use analysis that "deliver[ing] newsworthy . . . information . . . lies at the core of the First

16

Amendment [and] would be crippled if the news media and similar organizations were limited to 'authorized sources of information'").

    *Nunez v. Caribbean Int'l News Corp.* is instructive.  235 F.3d 18, 23 (1st Cir. 2000).  In *Nunez*, plaintiff, a professional photographer, took several photographs of Miss Puerto Rico Universe 1997, Joyce Giraud, for use in Giraud's modeling portfolio.  *Id.* at 21.  After the photographs were distributed, controversy arose due to the fact that Giraud was naked or nearly naked in at least one of the photos.  *Id.*  Nunez filed suit against various media defendants for subsequently using the photographs to report on the story.

    In determining that the use at issue was "transformative," the *Nunez* court compared the original purpose of the photographs at issue (for a modeling portfolio), with the defendants' use (to report on a news story):

> Rather, what is important here is that plaintiffs' photographs were originally intended to appear in modeling portfolios, not in the newspaper; **the former use, not the latter, motivated the creation of the work**. Thus, by using the photographs in conjunction with editorial commentary, **El Vocero did not merely "supersede[ ] the objects of the original creation[s]," but instead used the works for "a further purpose," giving them a new "meaning, or message."** *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. It is this transformation of the works into news—and not the mere newsworthiness of the works themselves—that weighs in favor of fair use under the first factor of § 107. *See id.* ("central inquiry is whether defendant's use is transformative"); *see also Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 478, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting) (key question is whether defendant's use "result[s] in some added benefit to the public beyond that produced by the first author's work").

*Id.* at 23 (emphases added).  The court further opined that the "informative function is confirmed by the newspaper's presentation of various news articles and interviews in conjunction with the reproduction . . . Appellee reprinted the pictures not just to entice the buying public, but to place its news articles in context; as the district court pointed out, 'the pictures were the story.'"  *Id.* at 22.

As in *Nunez* and the cases cited above, Newsweek's use of the Instagram Post was plainly put in a different context than Plaintiff's artistic use of the Photograph, and was used for commentary, a different purpose than originally intended.  Whereas the Photograph was used by Plaintiff (like all the other works displayed on his Instagram page) as a work of fine art landscape photography, Newsweek's use of the Instagram Post – which consisted of the Photograph, Attribution, Location, Caption, Hashtags, and Instagram Response – was used to identify the Instagram Post at issue (following the discussion in the article that Plaintiff had captured the Salt Creek Spectacle and posted photographs to his Instagram account), and to report on Plaintiff's reaction to the natural phenomenon (which was newsworthy in itself). Because Plaintiff's statements regarding the phenomenon were specifically about his photographs, and the ephemeral beauty of nature as captured in photographs, the Instagram Post was necessary to illustrate the story of the day.  The fact that the photograph of an ephemeral event existed, was the news, and did not just illustrate the news.  Commenting on a newsworthy event is at the heart of fair use, and is consistent with the cases that have followed *Campbell*.[18]

The last component of the first statutory factor – whether Newsweek made a commercial use of Plaintiff's copyrighted work – is of little significance in light of the discussion above. Courts in the Second Circuit generally discount the "commercial" factor where, as here, a defendant makes a transformative use of a copyrighted work for purposes of commentary or news reporting, even if the defendant is a commercial entity.  *See, e.g.*, *Blanch v. Koons*, 467

---

[18] *See, e.g.*, *Sarl Louis Feraud Int'ls v. Viewfinder Inc.*, 627 F. Supp. 2d 123, 128-29 (S.D.N.Y. 2008) (fashion site's photographs of copyrighted articles was transformative, despite leaving the character of the garments unchanged, because the purpose was to "provide the public with news dispatches from the front lines of the fashion world"); *Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 Civ. 4664, 2014 WL 3368893, at *13 (N.D. Ill. July 8, 2014) (use of a copyrighted DVD cover in an article about a legal controversy surrounding the video was "news reporting" and qualified as fair use); *Katz v. Chevaldina*, No. 12 Civ. 22211, 2014 WL 2815496, at *7 (S.D. Fla. June 17, 2014) (use of copyrighted photo of plaintiff in blog posts about plaintiff held a fair use); *Dhillon v. Does 1-10*, No. 13 Civ. 1465, 2014 WL 722592, at *5-6 (N.D. Cal. Feb. 25, 2014) (use of headshot was transformative when used in article criticizing the subject's political views).

18

F.3d 244, 254 (2d Cir. 2006) ("discount[ing] the secondary commercial nature of the use" where the work was transformative); *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 83 (recognizing that "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," and nevertheless affirming dismissal on fair use grounds based in part on finding that use was for purposes of news reporting) (citation omitted).

### B.  The Nature of the Copyrighted Work Favors Fair Use

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  This determination has little effect on the fair use analysis, however; the Second Circuit has acknowledged that this factor "has rarely played a significant role in the determination of a fair use dispute." *Authors Guild*, 804 F.3d at 220.

### C.  The Amount and Substantiality of the Use Favors Fair Use

The third fair use factor – "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3) – not only considers quantity, but also asks whether the "value of the materials used [ ] [is] reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal citation omitted).  While a fair use finding is generally more likely where the copier uses smaller or less important parts of the original, *see Authors Guild*, 804 F.3d at 221, the rule is not as rigid when it comes to photographs.  *See Bill Graham*, 448 F.3d at 613 ("[T]he third-factor inquiry must take into account that the extent of permissible copying varies with the purpose and character of the use.") (internal quotation marks omitted).  Regardless, since Instagram's API, not Newsweek, selected the amount of the Photograph visible in the Instagram Post, and Newsweek merely used Instagram's API as

directed, Newsweek cannot be considered to have taken more than was necessary to accomplish its purpose of news reporting.  *See Cariou*, 714 F.3d at 710 ("The secondary use must be permitted to conjure up at least enough of the original to fulfill its transformative purpose.") (internal quotations and parentheticals omitted); *Nunez*, 235 F.3d at 24 (the "amount and substantiality of the portion used in relation to the copyrighted work as a whole" was of little consequence to its fair use analysis because "to copy any less than that would have made the picture useless to the story").  Thus, the Court should find in favor of Newsweek on this factor.

### D.  The Effect of the Use on the Potential Market Favors Fair Use

The fourth statutory factor, "the effect of the use upon the potential market or value of the copyrighted work," also weighs in favor of fair use.  17 U.S.C. § 107(4).  Courts look not for theoretical or speculative harm, but for copying of "sufficiently significant portions of the original as to make available a significantly competing substitute." *Authors Guild*, 804 F.3d at 223.  The focus is whether the use would "deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Id.*  The fourth factor ordinarily weighs in favor of fair use where, as here, the allegedly infringing use is transformative and does not compete with the copyrighted work.  *See Bill Graham*, 448 F.3d at 614-15 (secondary use does not affect the market for the original where it is "transformatively different from their original expressive purpose").

Plaintiff pleads no plausible basis to believe that Newsweek's use of his Instagram Post for a transformative purpose caused any harm to the market for licensing or selling the Photograph.  *See generally* Cplt.  If he truly believed there was any harm, he could have easily set his profile to private, which would cease any use, by any entity, of the Instagram Post via web embed.  *See* "Controlling Your Visibility," *supra* n. 9.  Furthermore, Plaintiff makes no

mention of any market for the Photograph in the Amended Complaint, much less any usurpation of any market for the Instagram Post anywhere.  The Court should therefore find in favor of Newsweek on this fourth and final factor, hold that Newsweek's challenged use of the Instagram Post is fair, and dismiss Plaintiff's copyright infringement claim.

### III.   PLAINTIFF HAS NOT PLEADED ANY FACTS THAT WOULD ENTITLE HIM TO THE ENHANCED DAMAGES REQUESTED IN HIS PRAYER FOR RELIEF

Where infringement is willful, a plaintiff may receive enhanced damages.  17 U.S.C. § 504(c)(2).  Willful infringement means "a defendant's actual or constructive knowledge 'that its actions constitute an infringement.'" *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1116-17 (2d Cir. 1986).  Plaintiff's only allegations with respect to purported "willfulness" are conclusory allegations that Newsweek's actions were "willful, intentional, and malicious" and that Newsweek "knew, or should have known, were not authorized to be published by Newsweek."  *See* Am. Cplt. ¶¶ 21, 23, 27.  Plaintiff's allegations have two fatal defects.

*First*, Plaintiff fails to satisfy the pleading standards under *Iqbal*, as discussed *supra* at p. 12 (a complaint that offers mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'").  *Second*, in asserting that Newsweek's purported lack of authorization to use the Instagram Post imputes willfulness, Plaintiff ignores the fact that, "[i]f [a] use is otherwise fair, then no permission need be sought or granted."  *Campbell*, 510 U.S. at 585 n.18; *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 737 (2d Cir. 1991) (where fair use has been made, "lack of permission is beside the point").  Newsweek's good faith, reasonable belief that its copying constituted fair use was not so "unreasonable as to bespeak willfulness." *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996) (en banc), *cert. denied*, 520 U.S. 1156 (1997).  Accordingly, in light of Newsweek's fair use defense, any claim for enhanced damages should be dismissed.

## IV.    PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT NEWSWEEK IS CONTRIBUTORILY OR VICARIOUSLY LIABLE FOR THE UNIDENTIFIED ACTS OF UNIDENTIFIED THIRD PARTIES

Claims for contributory infringement and vicarious infringement are reserved for cases where the defendant(s) "have not themselves engaged" in the alleged infringing activity. *See*, *e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 749–50 (S.D.N.Y. 2012) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014). While Newsweek does not concede that it engaged in direct copyright infringement, the Amended Complaint is woefully insufficient to place this case in the realm of secondary infringement.

Though contributory and vicarious infringement both flow from the general premise that a defendant may, in certain cases, be secondarily liable for another's infringement, they each have distinct required elements. To state a claim for contributory infringement, the plaintiff must allege sufficient facts demonstrating that the defendant "induce[d], cause[d] or materially contribute[d] to the infringing conduct of another . . . ." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). The defendant's participation in the third party's infringement must be "substantial," *Demetriades v. Kaufmann*, 690 F. Supp. 289, 294 (S.D.N.Y. 1988), and "[a] mere allegation that the defendant provided the third party with the opportunity to engage in wrongful conduct" is insufficient to survive a motion to dismiss. *Quiroga v. Fall River Music, Inc.*, No. 93 CIV. 3914 (RPP), 1998 WL 851574, at *37 (S.D.N.Y. Dec. 7, 1998). And, even if the above elements are satisfied, the plaintiff must also allege sufficient facts supporting the plausible inference that the defendant "kn[ew] or ha[d] reason to know" of the third party's infringement. *Arista Records LLC v. Doe 3*, 604 F.3d 110, 117–18 (2d Cir. 2010) (citation omitted).

22

To state a claim for vicarious copyright infringement, a plaintiff must plead facts showing that the defendant has "(1) the right and ability to control or supervise the infringing activity and (2) a direct financial interest in the exploitation of the copyrighted materials." *Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 574 (S.D.N.Y. 2013). "The mere fact that the [defendant] could have policed [the infringer] . . . is insufficient." *Artists Music, Inc. v. Reed Pub. (USA), Inc.*, No. 73163, 1994 WL 191643, at *6 (S.D.N.Y. May 17, 1994).

Here, the Amended Complaint alleges *no facts* in support of either theory of secondary liability. As a threshold matter, the allegations that Newsweek used Plaintiff's Instagram Post on its own website only goes to a theory of direct infringement. The Amended Complaint makes no attempt to identify any third-party infringers or infringements, much less ones that could form the basis for secondary liability as to Newsweek. This shortcoming alone requires dismissal of the contributory and vicarious infringement claims. *See*, *e.g.*, *Lefkowitz v. John Wiley & Sons, Inc.*, No. 13 CIV. 6414 (KPF), 2014 WL 2619815, at *11 (S.D.N.Y. June 2, 2014) (dismissing secondary claims where complaint failed to sufficiently identify third party for whom defendant could be secondarily liable). Even if the Amended Complaint did identify any third-party infringers, it still would not state a claim for contributory or vicarious infringement.

*First*, as to contributory infringement, Plaintiff merely offers the legal conclusion that Newsweek "knowingly induced, participated in, aided and abetted in and profited from the illegal reproduction and distribution of the Subject Photograph . . ." Am. Cplt. ¶ 23. That is insufficient to state a claim, and courts in this district routinely dismiss contributory infringement claims on that basis. *See*, *e.g.*, *New London Assocs., LLC v. Kinetic Soc. LLC*, 384 F. Supp. 3d 392, 410 (S.D.N.Y. 2019) (dismissing contributory infringement claim where complaint "made no factual

allegations to support an inference that [defendant] had any involvement at all in [third party's] infringement").

*Second*, as to vicarious infringement, the Amended Complaint does not identify who Newsweek supposedly controlled, how that control extended to the alleged infringing activity, or what "direct financial interest" Newsweek had in any third-party infringement.   Rather than identify any such facts, the Amended Complaint again parrots the legal elements of the claim, stating in conclusory fashion that Newsweek "had the right and ability to supervise the infringing conduct" and had a "direct financial interest in the infringing conduct" of the images.  Am. Cplt. ¶¶ 23-25. That is plainly insufficient.  *See*, *e.g.*, *New London Assocs.*, 384 F. Supp. 3d at 410.

Plaintiff's failure to include more salient allegations in the Amended Complaint with respect to his secondary liability claims – particularly after having been put on notice of them via Newsweek's pre-motion letter to dismiss (*see* Dkt. No. 13) – or to remove them altogether, evidences Plaintiff's haphazard manner in pursuing this case.  Indeed, he knows better; in a similar case involving photographs purportedly owned by Plaintiff (represented by the same counsel here), *see McGucken v. Chive Media Grp., LLC*, No. CV 18-01612-RSWL-KS, 2018 WL 3410095 (C.D. Cal. July 11, 2018), Plaintiff filed a complaint containing the exact same language, *verbatim*, with respect to the secondary liability claims.  *Compare* Wolff Decl. ¶ 11, Exh. J ("Chive Complaint") ¶¶ 22-27, with Am. Cplt. ¶¶ 22-27.  The defendant in that matter moved to dismiss the secondary claims, which was thereafter granted.  Judge Lew opined: "Here, Plaintiff does not plead sufficient facts to indicate that direct infringement by a third party occurred. In fact, there is not a single third party identified in the Complaint. Without establishing this preliminary requirement for a claim of contributory/vicarious copyright infringement, Plaintiff's claim inherently fails."  Chive, 2018 WL 3410095 at *4.  Plaintiff's subsequently removed the claims from his first amended complaint in

24

that matter, and was later denied leave to file a second amended complaint in light of the fact that he was put "on notice of the potential pleading defects" in his original complaint yet "still fail[ed] to remedy the defects." *McGucken v. Chive Media Grp., LLC*, No. CV 18-01612-RSWL-KS, 2018 WL 5880751, at *5 (C.D. Cal. Nov. 8, 2018).  The circumstances here warrant the same outcome: dismissal of the deficient claims without leave to amend.

## CONCLUSION

For all of the foregoing reasons, Newsweek respectfully requests that the Amended Complaint be dismissed in its entirety with prejudice, and Newsweek reserves the right to move for recovery of its reasonable attorney's fees pursuant to 17 U.S.C. § 505.

Respectfully submitted,

Dated: New York, New York
       February 28, 2020

COWAN DeBAETS ABRAHAMS
& SHEPPARD LLP

By:    /s/Nancy E. Wolff
       Nancy E. Wolff
       Lindsay R. Edelstein
       41 Madison Avenue, 38th Floor
       New York, NY 10010
       Tel: (212) 974-7474
       Fax: (212) 974-8474
       nwolff@cdas.com
       ledelstein@cdas.com

*Attorneys for Newsweek Digital LLC*