UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOT MCGUCKEN, an individual,<br><br>              *Plaintiff*,<br><br>   v.<br><br>NEWSWEEK, LLC, a New York Limited Liability Company; and DOES 1-10, inclusive,<br><br>              *Defendant*. | Case No: 1:19-cv-09617 (KPF) |

**DEFENDANT NEWSWEEK DIGITAL LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF ELLIOT MCGUCKEN'S AMENDED COMPLAINT**

Nancy E. Wolff
Lindsay R. Edelstein
COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Tel: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com
ledelstein@cdas.com

*Attorneys for Defendant Newsweek Digital LLC*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii-iii

PRELIMINARY STATEMENT ................................................................................................1

I.  BY POSTING THE PHOTOGRAPH TO HIS PUBLIC INSTAGRAM
    ACCOUNT, PLAINTIFF MADE A "CHOICE" THAT PERMITS
    THE USE AT ISSUE ..........................................................................................................3

II. THE FACTS NECESSARY TO ESTABLISH NEWSWEEK'S FAIR
    USE DEFENSE ARE BEFORE THE COURT ON THIS MOTION .................................6

    A. First Factor: Newsweek's Use Was for the Purposes of News
       Reporting and Commentary .........................................................................................7

    B. The Nature of the Copyrighted Work Favors Fair Use................................................8

    C. The Amount and Substantiality of the Use Favors Fair Use .......................................8

    D. Fourth Factor: Any Alleged Market Harm Could Have Been
       Avoided or Mitigated if Plaintiff Set His Profile to "Private Mode" ..........................9

III. PLAINTIFF CANNOT CURE THE PLEADING DEFICIENCIES WITH
     RESPECT TO HIS WILLFULNESS ALLEGATIONS......................................................9

IV. PLAINTIFF FAILS TO ADDRESS NEWSWEEK'S ARGUMENTS WITH
    RESPECT TO THE INSUFFICIENCY OF HIS SECONDARY LIABILITY
    CLAIMS ............................................................................................................................10

CONCLUSION............................................................................................................................10

# **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Agence Fr. Presse v. Morel*,
 769 F. Supp. 2d 295 (S.D.N.Y. 2011)..................................................................................2, 5

*Authors Guild v. Google, Inc.*,
 804 F.3d 202 (2d Cir. 2015)......................................................................................................8

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*,
 297 F. Supp. 3d 339 (S.D.N.Y. 2017)...............................................................................2, 7, 8

*Bill Graham Archives v. Dorling Kindersley*,
 448 F.3d 605 (2d Cir. 2006).................................................................................................8, 9

*Blanch v. Koons*,
 467 F.3d 244 (2d Cir. 2006)......................................................................................................6

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
 196 F. Supp. 3d 395 (S.D.N.Y. 2016)...................................................................................2, 7

*Cariou v. Prince*,
 714 F.3d 694 (2d Cir. 2013)......................................................................................................8

*Ferdman v. CBS Interactive Inc.*,
 342 F. Supp. 3d 515 (S.D.N.Y. 2018)......................................................................................7

*Force v. Facebook, Inc.*,
 934 F.3d 53 (2d Cir. 2019).......................................................................................................6

*Fteja v. Facebook, Inc.*,
 841 F. Supp. 2d 829 (S.D.N.Y. 2012)..................................................................................3, 4

*Goldman v. Breitbart News Network, LLC*,
 302 F. Supp. 3d 585 (S.D.N.Y. 2018).......................................................................................2

*Nunez v. Caribbean Int'l News Corp.*,
 235 F.3d 18 (1st Cir. 2000)...................................................................................................7, 8

*Otto v. Hearst Commc'ns, Inc.*,
 345 F. Supp. 3d 412 (S.D.N.Y. 2018)...............................................................................2, 7, 8

*Sinclair v. Ziff Davis, LLC*,
 No. 18-CV-790 (KMW), 2020 WL 1847841 (S.D.N.Y. Apr. 13, 2020)......................... *passim*

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002) ............................................................................................ *4*

*Yang v. Mic Network, Inc.*,
   405 F. Supp. 3d 537 (S.D.N.Y. 2019) ............................................................................. 6

**Rules & Statutes**

17 U.S.C. § 505 ........................................................................................................................ 11

Fed. R. Evid. 201 ...................................................................................................................... 6

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

<0>

## PRELIMINARY STATEMENT[1]

In the face of Newsweek's Motion to Dismiss, which is based on uncontested legal precedent and specific analysis of why Plaintiff's causes of action fail on multiple, independent grounds, Plaintiff's opposition (the "Opposition"; Dkt. No. 26) resorts to hollow potshots baselessly attacking Newsweek's reputation and legacy.[2]

Plaintiff eschews the undisputed facts of the case at bar, as well as established law, in favor of his self-serving interpretation of both contract formation online and the Copyright Act, desperately trying to force this Court to reconsider the recently-issued *Sinclair* decision.[3] Plaintiff's concerns given the timing of the *Sinclair* decision are warranted, as the factual underpinnings of both cases are nearly identical. In *Sinclair*, as is the case here, the plaintiff photographer maintained a publicly-searchable website to showcase photographs to potential customers, and also maintained an account on Instagram where she shared photographs on "Public

---

[1] Defined terms used herein have the same meanings as set forth in Newsweek's opening brief ("Moving Brief" or "Mot."; Dkt. No. 21).

[2] Indeed, an oft-cited source in the Opposition is an article by a former employee of Newsweek's parent company with an obvious axe to grind. *See* Declaration of Scott Alan Burroughs, dated April 13, 2020, ¶ 3 Exh. 1 at 3 ("I worked at IBT in 2011 and 2012, the year before it bought Newsweek."). Plaintiff would have the Court take judicial notice of this irrelevant, inflammatory article, but simultaneously argues that certain documents incorporated into the Amended Complaint by reference may not be judicially noticed. Opp. at 2. These two positions cannot be reconciled.

[3] As Your Honor is aware, on April 20, 2020, following Judge Kimba Wood's decision in *Sinclair*, Plaintiff obtained Newsweek's consent to file a supplemental brief in opposition to Plaintiff's Motion to Dismiss (the "Supplemental Opposition" or "Supp. Br.") by mispresenting the content of his submission. Instead of merely "addressing" the *Sinclair* decision, Plaintiff set forth an entirely new set of arguments, legal theories, and positions, which reads more like a request for reconsideration of the *Sinclair* decision than a response to Newsweek's Motion to Dismiss. The Court agreed that Plaintiff had misrepresented his intention vis-à-vis the Supplemental Opposition, "warn[ed] counsel for Plaintiff that it will look less kindly on such 'bait and switch' tactics in the future," and stated it would "ignore extraneous portions of the supplemental brief." Dkt. No. 31. The Court later added that it would "consider Plaintiff's supplemental brief insofar as it relates to the *Sinclair* decision. The Court will not, however, consider any arguments that are inconsistent with or substantially expand upon points already made in its opening brief." Dkt. No. 33. Accordingly, Newsweek interprets the Order to preclude consideration of Plaintiff's argument in his Supplemental Opposition that, *inter alia*: (1) Newsweek is not an intended beneficiary of the Instagram Agreements (as this point "substantially expand[s] upon points made in [Plaintiff's opening brief]"; *compare* Opp. at 13-14, *with* Supp. Br. at 1, 2, 9, 10); his expanded argument with respect to Newsweek's purported failure to obtain permission from Plaintiff to use the Photograph (despite its fair use of the image and its validly issued sub-license); and (3) his argument that Instagram never stated that it was "sub-licensing anything" to Newsweek (this point is "extraneous" and does not relate to the *Sinclair* decision, as Plaintiff admits the Court never even addressed it). Supp. Br. at 7-8. To the extent Your Honor disagrees with Newsweek's interpretation of its Order, Newsweek requests leave to address such issues.

1

Mode," viewable by anyone. In *Sinclair*, as is the case here, the plaintiff did not accept an offer by the defendant, a news publisher, to license the photograph at issue. In *Sinclair*, Judge Wood dismissed the case, holding that the publisher did not need the photographer's express permission to embed the content in an article, as such use was permitted pursuant to a valid sub-license from Instagram. The same outcome is warranted here, particularly given Newsweek's alternative, and independently meritorious, fair use defense. Indeed, as much as Plaintiff wishes to analogize this case to others where photographs were used as illustrative aids for celebrity news stores (as in *Gossip Cop, Barcroft, Otto*, and others cited by Plaintiff), Newsweek's use is demonstrably different. Plaintiff, his discovery, and his viral photographs, became a newsworthy story of public interest. Newsweek reported on that story – which was, in part, about the embedded Instagram photograph – in accordance with its rights under the Copyright Act and the First Amendment.

Plaintiff similarly tries to create a false equivalency between this case, *Morel*, and *Goldman*.[4] But the superficial similarities – essentially, that all three cases involve social media platforms – are not enough to overcome the fundamental differences in the platforms' terms, the facts of each case, and the legal issues each case addresses.

Plaintiff's attempt to overinflate *Sinclair* as being a death knell to photographers' rights is misguided and overlooks a key limitation to publishers' rights to embed Instagram posts in online articles under the sub-license granted by Instagram: photographers may, at any time, choose to change their settings to "Private Mode."[5] To date, Plaintiff's Instagram Post is still set to "Public

---

[4] Newsweek addressed why *Goldman* is inapplicable in its Moving Brief. *See* Mot. at 9, n. 12.

[5] Newsweek does not intend to minimize the importance of copyright protection and enforcement, where warranted, or to imply that sharing photographs publicly on Instagram does not present a dilemma to photographers. To the extent Plaintiff objects to the *Sinclair* decision, his remedy is to petition Instagram to change its policies and to restrict embedding (which other social media websites, like YouTube, do), not to unnecessarily litigate over a licensed use. As of mid-April, certain artist's rights organization, such as the American Society for Media Photographers, began soliciting input for letter-writing campaigns to Instagram. *See*, *e.g.*, Thomas Maddrey, *Does Posting to Instagram Create an Unlimited Sublicense? Sinclair v. Ziff Davis and What To Do Now*, ASMP (Apr. 15, 2020),

Mode," which is telling as to his concerns regarding the dissemination of the Photograph via Instagram's API. Moreover, the embedding of Instagram posts by publishers is not equivalent to, nor a substitute for, traditional licensing of a stand-alone image out of context from an Instagram post. Notably, the Newsweek Article also contained a licensed stand-alone image used for illustrative purposes, as unlike Plaintiff's Instagram Post, that photograph and photographer were not the subject of the story. *See* Dkt. No. 22-3 at 4.

Under Plaintiff's blinkered view of the Copyright Act, valid defenses and statutory exceptions such as fair use do not apply to him, and there are no permissible uses of creative works by anyone other than the copyright holder. Such is not the state of the law, as much as Plaintiff would like it to be so.

## I. BY POSTING THE PHOTOGRAPH TO HIS PUBLIC INSTAGRAM ACCOUNT, PLAINTIFF MADE A "CHOICE" THAT PERMITS THE USE AT ISSUE

Plaintiff's Opposition relies on a self-serving premise that he never agreed to Instagram's Terms of Use by signing up to use the platform, an assertion that is contradicted by both his actions and the plain language of the Instagram Agreements. *See* Opp. at 9 ("even if Instagram had the rights to sub-license (it does not) . . . "). He does not deny the content of the agreements, nor that he used the publicly-facing platform, but rather claims that because "[t]he sign up page does not require users to affirmatively click on a box (or take any specific overt act) to agree to Instagram's terms, which are simply referenced by title," they cannot be enforced. Supp. Br. at 3. This mischaracterization of how assent to user terms are made electronically is demonstrably false, unsupported by any case law, and, if accepted, would overturn years of binding precedent enforcing website user agreements. *See* Mot. at 13 n. 16; *see also Fteja v. Facebook, Inc.*, 841 F.

---

https://www.asmp.org/copyright/does-posting-to-instagram-create-an-unlimited-sublicense-sinclair-v-ziff-davis-and-what-to-do-now/.

Supp. 2d 829, 840 (S.D.N.Y. 2012) ("Here, Fteja was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences. That was enough.").[6]

As discussed in detail in Newsweek's Motion, in *publicly* posting the Instagram Post – and thus agreeing to Instagram's Agreements – a license was granted to third parties to share the Instagram Post via web embed using Instagram's API. *See* Terms at p. 3 of 7 ("Permissions You Give to Us").[7] As Plaintiff points out, the license is limited by the content owner's privacy settings. *See* Opp. at 11 (Instagram's right to sub-license such content must be "consistent with [the user's] privacy and application settings").[8]

Plaintiff's insistence that Newsweek needed permission from him personally to use the Instagram Post ignores the fact that Newsweek's ability to obtain a sub-license from Instagram operates independently from any license of the stand-alone image potentially issued by him, and all Plaintiff's arguments with respect to additional permissions and/or authorizations required under the Instagram Agreements fail for the same reason. All provisions relating to such permission (*see* Opp. at 10-11), only apply to third parties who – unlike Newsweek – did not obtain valid sub-licenses. Indeed, Plaintiff concedes that Newsweek has the "ability to use an embedding process to display Instagram users' content under certain of Instagram's general terms," but then

---

[6] *Specht v. Netscape Commc'ns Corp.* is inapposite because, in that case, the sole reference to the terms and conditions was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen where there was the following sentence: "Please review and agree to the terms of the Netscape SmartDownload software licensing agreement before downloading and using the software." 306 F.3d 17, 29 (2d Cir. 2002). Here, as in *Fteja*, the Sign-Up page's reference to Instagram's Agreements appear immediately below the "Sign–Up" button." *See* Dkt. No. 22-4.

[7] Plaintiff's erroneous argument that Instagram's Platform Policy is not intended for general users of the site who post photographs (Supp. Br. at 3) contradicts the language of the integrated Instagram Agreements. As discussed *supra* at 3-4, Plaintiff agreed to the Terms when he signed up to use the Instagram platform. Instagram's Platform Policy is incorporated into its Terms by reference. *See* Terms at p. 4-5 of 7 ("Our Agreement") ("your use of our API is subject to our Platform Policy").

[8] *See also Sinclair v. Ziff Davis, LLC*, No. 18-CV-790 (KMW), 2020 WL 1847841, at *2 (S.D.N.Y. Apr. 13, 2020) ("Plaintiff granted Instagram the right to sublicense the Photograph, and Instagram validly exercised that right by granting Mashable a sublicense to display the Photograph.").

4

cites to provisions requiring third parties to obtain permission, ignoring the existence of said license. Opp. at 10.

Plaintiff's argument that Instagram's Agreements do not "give rights" or "transfer rights" to any third parties also misses the mark and attacks a position that no one is taking.[9]  Opp. at 8. The sub-license itself is not a "right" that must be granted.  The only parties with relevant "rights" or "permissions" under the Instagram Agreements are the content owner (Plaintiff) and the sub-licens*or* (Instagram).[10]  *See* Terms at p. 3 of 7 ("Permissions You Give to Us").[11]

In Plaintiff's Supplemental Brief, he relies extensively on *Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011), arguing that – because both Twitter (the platform at issue in *Morel*) and Instagram are social media websites – the decision in *Sinclair*, and a similar outcome here, would be inconsistent with *Morel*.[12]  Plaintiff delves no further into the specifics of *Morel*, declining to include a comparison of the terms at issue in that case versus the case at bar in favor of sweeping generalizations about social media terms of use.  Supp. Br. at 1.  If he had, he would have realized that the applicable Twitter terms in *Morel* merely provided to Twitter the right to sub-license to Twitter "and its partners," and Twitpic (a subsidiary) "or affiliated sites," versus

---

[9] Plaintiff also misconstrues Newsweek's position (in accordance with the clear terms of the Instagram Agreements) that Instagram is a sub-licens*or* of content publicly posted on its platform.  Plaintiff cites case law holding that "non-exclusive licens*ees*" cannot sub-license.  Opp. at 13.  No one is claiming that Instagram is a sub-licens*ee*.

[10] Plaintiff – perhaps in an attempt to distract the Court from the lack of case law supporting his positions with respect to the sub-license issue – muddles numerous copyright concepts that have nothing to do with the issues at bar.  *See*, *e.g.* Opp. at 9 (discussing cases involving "publication" of copyrighted works).

[11] Plaintiff also puzzlingly cites a requirement that third parties "[o]btain a person's consent before including their User Content in any ad," but does not explain how this is relevant to Newsweek, who used the Instagram Post in the context of a newsworthy article about Plaintiff and his Instagram Post.  Opp. At 11.  Plaintiff does not and cannot claim the Newsweek article is an ad.

[12] Despite the fact that *Morel* was decided nearly a decade ago (indeed, Plaintiff admits it is a "long-standing decision"; Supp. Br. at 1), and despite the fact that Newsweek already directly addressed the case (and why it is not applicable) in its Moving Brief, Plaintiff conspicuously failed to even reference it in his Opposition.  Plaintiff would now have the Court believe it is the primary case supporting his position. Supp. Br. at 1. While Newsweek would argue that Plaintiff's discussion of *Morel* falls into the category excluded from consideration by the Court (*see supra* at 1 n. 3), it addresses it here in an abundance of caution.

here, where the Instagram Agreements unambiguously authorize using and sharing by "other Users," meaning any third party accessing the service.[13]

## II. THE FACTS NECESSARY TO ESTABLISH NEWSWEEK'S FAIR USE DEFENSE ARE BEFORE THE COURT ON THIS MOTION

Even if Newsweek did not have a valid sub-license to embed the Instagram Post in the Newsweek Article – which it did – the case may be dismissed at this stage on the independent ground that the fair use doctrine permits the use at issue.[14] Indeed, where, as here, "discovery would not provide any additional relevant information and all that is necessary for the court to make a determination as to fair use are the two works at issue," an infringement claim may be dismissed at this stage. *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) (dismissal at pleading stage based on fair use defense); *see also* Mot. at 15 (collecting cases).[15]

---

[13] Twitter has since changed it terms, granting broad rights to third parties. *See Terms of Service*, TWITTER, https://twitter.com/en/tos (last visited May 4, 2020).

[14] Plaintiff fails to cite to any specific evidence bearing on the applicability of Newsweek's defense that requires discovery, and he supports his argument that a fair use determination is premature with one distinguishable, out-of-circuit case. Opp. at 14 (citing *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1174 (N.D. Cal. 2019), where the court declined to make a fair use determination because of specific information relevant to the inquiry that it could not judicially notice, including, but not limited to, the functionality of hyperlinks located on certain websites, and the presence of "underlying code in a copy of the Post located at some location at some unknown time."). Such is not the case here, where the Court may take judicial notice of everything relevant to a fair use determination. In a Hail Mary to save his case in light of the *Sinclair* decision, Plaintiff throws sham issues of fact at the wall to see what sticks, such as the fact that Instagram's Agreements may have changed over the years. This issue was already addressed in *Sinclair*, and it did not affect the Court's decision. *See Sinclair*, 2020 WL 1847841, at *4, n.2 ("The Court takes judicial notice of Instagram's contemporaneous Terms of Use and Privacy Policy, both of which are publicly available online. *See* Fed. R. Evid. 201(b)(2); *Force v. Facebook, Inc.*, 934 F.3d 53, 59 n. 5 (2d Cir. 2019). These agreements, which are incorporated into the Platform Policy by reference, are properly considered in deciding this motion to dismiss. *See Sira*, 380 F.3d at 67. Finally, the Court notes that Instagram's policies have been updated since the infringement alleged in the Second Amended Complaint."). Regardless, when Plaintiff initially joined Instagram (thus agreeing to Instagram's Terms), he agreed to be "bound by [any] updated Terms." Dkt. No. 22-5 at 8. The Terms annexed to the Moving Brief have been in effect as of the date of the purported infringement (*i.e.* in or around March of 2019). *See id.* Terms, "Revised: April 19, 2018").

[15] Plaintiff erroneously claims that Newsweek failed to consider in its first-factor analysis whether the use was commercial. It was directly addressed (*see* Mot. at 18-19) to specifically note that almost all publications are "commercial enterprises," but that the commercial nature of the use of discounted where a work is transformative. *See*, *e.g., Blanch v. Koons,* 467 F.3d 244, 254 (2d Cir. 2006). If "commercial use" was a *per se* bar to application of the fair use defense, it would be rendered moot

### A. First Factor: Newsweek's Use Was for the Purposes of News Reporting and Commentary

As set forth in Newsweek's Moving Brief, Newsweek's use of Plaintiff's Instagram Post – in conjunction with editorial content specifically referencing Plaintiff, his discovery of the ephemeral lake, and the fact that the photographs he posted on Instagram had gone "viral" – was highly transformative, as it placed the Photograph in a new context, and for a different purpose than the original creation. Mot. at 17. *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000); *see also* Mot. at 18 n.18 (collecting cases).[16]

The cases cited by Plaintiff highlight the differences between Newsweek's use and the use of photographs as "illustrative aids." For example, *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, involved the use of plaintiff's photographs of actors Mila Kunis, Ashton Kutcher, Robert Pattinson, and model Liberty Ross on a website presenting celebrity gossip news. 196 F. Supp. 3d 395, 398 (S.D.N.Y. 2016). The photographers of the photographs were not referenced in the articles themselves, were not quoted in the articles themselves, and there was no fanfare around the circumstances of the photographs being taken. The photographers and the photographs themselves had nothing to do with the story. Similarly, *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515 (S.D.N.Y. 2018), and *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339 (S.D.N.Y. 2017) involved celebrity photographs used in articles about the celebrities themselves. If anything, these cases distinguish use as an "illustrative aid" from the use here. *Otto v. Hearst Commc'ns, Inc.*, is also distinguishable. 345 F. Supp. 3d 412 (S.D.N.Y. 2018). In *Otto*,

---

[16] Plaintiff claims that, because he sometimes "licenses select photographs for media use," the use at issue was not transformative. Opp. at 16. He further claims that, since he purportedly licensed the photograph to the publication SF Gate for use in a web article about the Salt Lake Spectacle, Newsweek's fair use defense must fail. *Id.* This argument, however, cuts *against* Plaintiff's argument and weighs in favor of a fair use finding. Plaintiff's discovery was newsworthy, and its widespread coverage by multiple media outlets is the exact type that the fair use doctrine is meant to protect: reporting on matters of public interest. Indeed, SF Gate's use of Plaintiff's quotes – and its extensive reference to Plaintiff and his photographs – demonstrates that his photographs were not simply "an illustrative aid."

7

the only commentary regarding the photograph related to the subject of the photograph. Judge Woods opined that *Otto* was not a case like *Nunez*, where the photograph "itself was the story." *Id*. The use at bar tracks the factual pattern of *Nunez*, not the "illustrative aid" line of cases.[17]

### B. The Nature of the Copyrighted Work Favors Fair Use

Plaintiff concedes that works such as the Photograph are farther from the core of intended copyright protection, as they are "factual or informational in nature." Opp. at 20. While Plaintiff may have made some decisions in taking the Photograph that required skill or judgment, the Second Circuit has held that the factor "has rarely played a significant role in the determination of a fair use dispute," *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015).

### C. The Amount and Substantiality of the Use Favors Fair Use

Because Newsweek merely used Instagram's API as directed to embed the Instagram Post in the Newsweek Article, Newsweek cannot be considered to have taken more than was necessary to accomplish its purpose of news reporting. *See Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013) ("The secondary use must be permitted to conjure up at least enough of the original to fulfill its transformative purpose."). *See also Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605, 613 (2d Cir. 2006) ("[T]he third-factor inquiry must take into account that the extent of permissible copying varies with the purpose and character of the use.") (internal quotation marks omitted).[18] Plaintiff fails to meaningfully address this factor given the context of the use.

---

[17] Plaintiff's argument regarding Newsweek's purported "bad faith" in a red herring. Opp. at 18. Newsweek's request was to "upload the photograph to its website." As discussed above, asking permission operates independently where a use is otherwise permissible (either by sub-license or a valid affirmative defense, such as fair use). Plaintiff did not approve Newsweek's "upload[ing]" of his Photograph, and it never did "upload" it. Plaintiff cannot point to one case where this type of evidence was sufficient to weigh against a finding of fair use.

[18] Plaintiff's arguments with respect to Newsweek's "use" of the original caption in Plaintiff's Instagram Post – which was automatically embedded with Plaintiff's Photograph, along with the date of the Instagram Post, Plaintiff's Instagram handle, a caption, various hashtags, the location, and the number of "likes" the post received – misunderstands fundamental concepts of copyright law. *See* Opp. at 21 ("This factor also weighs in favor of McGucken because Newsweek reproduced and displayed his entire work, including his text."); *id.* at 2 (claiming that

### D. Fourth Factor: Any Alleged Market Harm Could Have Been Avoided or Mitigated if Plaintiff Set His Profile to "Private Mode"

In his Opposition, Plaintiff still never addresses why the Amended Complaint fails to plead any basis to believe that Newsweek's use of Plaintiff's Instagram Post caused any harm to the market for licensing or selling the photograph. Even if he could plead any degree of market harm, which he cannot, the fourth factor weighs in favor of fair use where, as here, the allegedly infringing use is transformative and does not compete with the copyrighted work. *See Bill Graham*, 448 F.3d at 614-15 (secondary use does not affect the market for the original where it is "transformatively different from their original expressive purpose").[19] Moreover, despite the recent ruling in *Sinclair*, Plaintiff's Instagram Post is still set to "Public Mode," which is telling as to his attempts to mitigate any alleged "market harm."

### III. PLAINTIFF CANNOT CURE THE PLEADING DEFICIENCIES WITH RESPECT TO HIS WILLFULNESS ALLEGATIONS

Plaintiff's "smoking gun" revelation that Newsweek commented on Plaintiff's Instagram Post asking if Newsweek could "upload" the Photograph is irrelevant, for the reasons discussed above. *See supra* at 8 at n.16; *id.* at 4. Even if Newsweek did not have a valid sub-license to use the Photograph (which it did), and even if its use was not fair (which it was), Plaintiff would have needed to plead facts in his Amended Complaint bearing on willfulness (which he did not).[20] Instead, he throws around allegations in his Opposition and even concedes that he misrepresented evidence he purported to have regarding Newsweek's "bad faith." In the Amended Complaint and at the pre-motion conference, Plaintiff made much of the allegation that Newsweek had received

---

Newsweek "stole the original caption that McGucken wrote to accompany the Photograph," amounting to "theft of McGucken's text"). This incendiary language ignores the fact that the text accompanying the photograph was automatically included alongside the Photograph by virtue of Instagram's API, which Plaintiff authorized when joining the platform, and incorrectly implies that such use is relevant at all in the third-factor analysis. It is not.

[19] The cases cited by Plaintiff do not involve transformative use like the use at issue here. *See*, *e.g.*, *BWP Media USA, Inc.* at 406 (involving use of paparazzi photographs as illustrative aids).

[20] Furthermore, Plaintiff's claim that media companies are *per se* willful is unsupportable as a matter of law.

a takedown notice but refused to act on it. Now, for the first time, he admits that he received contemporaneous confirmation that his purported copyright notice was never delivered. Opp. at 2, 4-6. This actually cuts *against* a finding of willfulness, and seriously calls into question what other facts Plaintiff's lack of due diligence may uncover.[21]

### IV. PLAINTIFF FAILS TO ADDRESS NEWSWEEK'S ARGUMENTS WITH RESPECT TO THE INSUFFICIENCY OF HIS SECONDARY LIABILITY CLAIMS

Plaintiff's Opposition fails to explain why, after being put on notice of the deficiencies in his secondary liability claims, and after already being given the chance to amend the Complaint to address such deficiencies, he failed to do so. Opp. at 22. Plaintiff also fails to address the fact that he has established a pattern of asserting identical, insufficiently pleaded claims in the past.[22] *See* Mot. at 24-25. As discussed in Newsweek's Moving Brief, Plaintiff's failure to cure the deficiencies despite being put on notice of them, and the fact that his counsel has a pattern of wasting both judicial time and resources addressing the exact same pleading deficiencies to no avail, is sufficient ground to deny leave to amend. *Id.*

### CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in its Moving Brief, Newsweek respectfully requests that the Amended Complaint be dismissed in its entirety with prejudice, and Newsweek reserves the right to move for recovery of its reasonable attorney's fees pursuant to 17 U.S.C. § 505.

---

[21] Notably, during the parties' conference on January 7, 2020, Plaintiff's counsel failed to mention that Plaintiff had received error messages in response to his alleged e-mail notifications to Newsweek. *See* Tr. of Jan. 7, 2020 Conference at 6:5-6:8 ("McGucken sent the cease and desist letter on April 4 and received no response . . . after he received no response . . . we filed the complaint."). Newsweek can confirm that it was receiving emails properly addressed to its DMCA agent during the relevant period.

[22] Plaintiff ironically defends his right to assert cookie-cutter claims by taking an unsubstantiated dig at Newsweek's purported "repackaging of content." Opp. at 23. Plaintiff's inappropriate *ad hominem* attacks on Newsweek highlight the weakness of his arguments.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: New York, New York<br>May 4, 2020 | COWAN DEBAETS ABRAHAMS<br>& SHEPPARD LLP |

By:   <u>/s/Nancy E. Wolff</u>
      Nancy E. Wolff
      Lindsay R. Edelstein
      41 Madison Avenue, 38th Floor
      New York, NY 10010
      Tel: (212) 974-7474
      Fax: (212) 974-8474
      nwolff@cdas.com
      ledelstein@cdas.com

*Attorneys for Newsweek Digital LLC*