UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN,

          *Plaintiff*,

   v.

NEWSWEEK, LLC,

          *Defendant*.

Case No: 1:19-cv-09617 (KPF)

**DEFENDANT NEWSWEEK DIGITAL LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND
<u>IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Nancy E. Wolff
Sara Gates
COWAN, DEBAETS, ABRAHAMS
& SHEPPARD LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Tel.: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com
sgates@cdas.com

*Attorneys for Defendant*
*Newsweek Digital LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................1

LEGAL STANDARD...............................................................................................4

ARGUMENT.........................................................................................................5

I.     NEWSWEEK'S EMBEDDING OF THE INSTAGRAM
POST DID NOT INFRINGE ANY OF PLAINTIFF'S
EXCLUSIVE RIGHTS UNDER THE COPYRIGHT ACT ...................................5

      A.     Plaintiff Has Not Established a Violation of the Display Right .................6

      B.     Plaintiff's Arguments Regardingthe Display Right Are Unpersuasive .......9

      C.     Plaintiff Has Not Established a
Violation of Any Other Exclusive Rights..................................................12

II.    NEWSWEEK HAD A LICENSE TO EMBED THE INSTAGRAM POST ........12

      A.     Plaintiff Authorized Instagram to Grant Newsweek a License ................13

      B.     Instagram Granted Newsweek a License Through Its Terms....................14

      C.     Newsweek Did Not Breach the License
Granted Through Instagram's Terms..........................................................16

      D.     Newsweek Had an Implied License to Embed the Instagram Post ...........18

III.    NEWSWEEK'S USE OF THE INSTAGRAM POST WAS FAIR USE ............23

      A.     The Purpose and Character of the Use.......................................................24

      B.     The Nature of the Copyrighted Work .........................................................27

      C.     The Amount and Substantiality of the Portion Used
in Relation to the Copyrighted Work as a Whole ......................................28

      D.     The Effect of the Use Upon the Potential
Market for or Value of the Copyrighted Work ...........................................30

IV.   PLAINTIFF HAS NOT ESTABLISHED THAT
THE ALLEGED INFRINGEMENT WAS WILLFUL .........................................32

CONCLUSION...................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................4

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    992 F.3d 99 (2d Cir. 2021)....................................................................................24, 25

*APL Microscopic, LLC v. United States*,
    144 Fed. Cl. 489 (2019) ..........................................................................................9

*Ariel (UK) Ltd. v. Reuters Grp. PLC*,
    No. 05 CIV. 9646 (JFK), 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006)................................14

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ..................................................................22

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015)..................................................................................25

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014)............................................................................28, 31

*Barcroft Media, Ltd. v. Coed Media Group, LLC*,
    297 F. Supp. 3d 339 (S.D.N.Y. 2017) ............................................................22, 25

*Beastie Boys v. Monster Energy Co.*,
    66 F. Supp. 3d 424 (S.D.N.Y. 2014) ..................................................................34

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)..........................................................................28–29

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)............................................................................23, 27

*Boesen v. United Sports Publ'ns, Ltd.*,
    No. 20-CV-1552 (ARR) (SIL), 2020 WL 6393010 (E.D.N.Y. Nov. 2, 2020)......24, 27, 28, 29

*Bourne v. Walt Disney Co.*,
    68 F.3d 621 (2d Cir. 1995)..................................................................................13

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
    196 F. Supp. 3d 395 (S.D.N.Y. 2016) ..................................................................26

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)......................................................................................28, 30

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008)...................................................................7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..........................................................................4

*Fallaci v. New Gazette Literary Corp.*,
   568 F. Supp. 1172 (S.D.N.Y. 1983) .................................................35

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006).................................................21

*Fox News Network, LLC v. TVEyes, Inc.*,
   43 F. Supp. 3d 379 (S.D.N.Y. 2014) .................................................32

*Free Speech Sys., LLC v. Menzel*,
   390 F. Supp. 3d 1162 (N.D. Cal. 2019) .............................................11

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) ...............................................13

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
   22 F.3d 1219 (2d Cir. 1994)...............................................................4

*Graham v. James*,
   144 F.3d 229 (2d Cir. 1998)........................................................16, 18

*Goldman v. Breitbart News Network, LLC*,
   302 F. Supp. 3d 585 (S.D.N.Y. 2018) .........................................9, 10, 11

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021).............................................................. *passim*

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985)........................................................................28

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
   413 F.3d 257 (2d Cir. 2005)..............................................................32

*John Wiley & Sons, Inc. v. DRK Photo*,
   998 F. Supp. 2d 262 (S.D.N.Y. 2014) .................................................5

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
   399 F. Supp. 3d 120 (S.D.N.Y. 2019) ...............................................19

*Keane Dealer Servs., Inc. v. Harts*,
   968 F. Supp. 944 (S.D.N.Y. 1997) ....................................................21

*LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*,
    424 F.3d 195 (2d Cir. 2005)..................................................................................16

*Leader's Inst., LLC v. Jackson*,
    No. 3:14-CV-3572-B, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017)....................11

*Lipton v. Nature Co.*,
    71 F.3d 464 (2d Cir. 1995)...................................................................................32

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,
    345 F. Supp. 3d 482, 505 (S.D.N.Y. 2018) ........................................................30

*Muench Photography, Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*,
    367 F. Supp. 3d 82 (S.D.N.Y. 2019) ...................................................................17

*MyPlayCity, Inc. v. Conduit Ltd.*,
    No. 10 CIV. 1615 (CM), 2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012) ...............12

*N. Jersey Media Grp. Inc. v. Pirro*,
    74 F. Supp. 3d 605 (S.D.N.Y. 2015) ...................................................................29

*Núñez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000).............................................................................25, 30

*Peer Int'l Corp. v. Luna Recs., Inc.*,
    887 F. Supp. 560 (S.D.N.Y. 1995) ......................................................................35

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................................1, 8, 9

*Photographic Illustrators Corp. v. Orgill, Inc.*,
    953 F.3d 56 (1st Cir. 2020)..............................................................................18–19

*Quest Software, Inc. v. DirecTV Operations, LLC*,
    No. SACV 09-1232 (AG) (ANX),
    2011 WL 4500922 (C.D. Cal. Sept. 26, 2011) ....................................................17

*Sinclair v. Ziff Davis, LLC*,
    No. 18-CV-790 (KMW), 2020 WL 3450136 (S.D.N.Y. June 24, 2020) ...............13

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*,
    211 F.3d 21 (2d Cir. 2000)...................................................................................19

*Sohm v. Scholastic Inc.*,
    959 F.3d 39 (2d Cir. 2020).............................................................................16–18

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020) .................................................................19

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)..................................................................................26

*Vian v. Carey*,
    No. 92 CIV. 0485 (MBM), 1993 WL 138837 (S.D.N.Y. Apr. 26, 1993) ..............................22

*Walsh v. Townsquare Media, Inc.*,
    464 F. Supp. 3d 570 (S.D.N.Y. 2020) ..............................................................24, 26

*Ward v. Nat'l Geographic Soc'y*,
    208 F. Supp. 2d 429 (S.D.N.Y. 2002) ..................................................................14

*Wu v. Pearson Educ. Inc.*,
    No. 10 CIV. 6537 (KBF), 2013 WL 145666 (S.D.N.Y. Jan. 11, 2013) ..........................13, 15

*Yi Fu Chen v. Spring Tailor, L.L.C.*,
    No. 14 Civ. 218 (PAE), 2015 WL 3953532 (S.D.N.Y. June 29, 2015)..............................4–5

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001)................................................................................34

**Rules & Statutes**

17 U.S.C. § 101 ....................................................................................6, 7, 10, 12

17 U.S.C. § 106 ........................................................................................5, 12

17 U.S.C. § 107 ....................................................................................23, 24, 30

17 U.S.C. § 202 ............................................................................................6

17 U.S.C. § 504 ............................................................................................5

Fed. R. Civ. P. 56(a) ......................................................................................4

**Other Authorities & Sources**

5 William F. Patry, *Patry on Copyright* § 15:7 (Mar. 2021 Westlaw update)................7–8, 10–11

Complaint, *Hunley v. Instagram, LLC*,
    No. 3:21-cv-0377 (CRB) (N.D. Cal. May 19, 2021), ECF No. 1 ..........................................22

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.02 (2018) ..............................12

Second Amended Complaint, *Goldman v. Breitbart News Network LLC*,
    No. 17-cv-03144 (AJN) (SN) (S.D.N.Y. May 26, 2017), ECF No. 38 ..................................10

Defendant Newsweek Digital LLC ("Newsweek") respectfully submits this memorandum of law in support of its cross-motion, pursuant to Fed. R. Civ. P. 56, for summary judgment against plaintiff Elliot McGucken ("Plaintiff") and in opposition to Plaintiff's motion for summary judgment ("P. Mot.").

## PRELIMINARY STATEMENT

Plaintiff's case comes down to 85 lines of HTML code.  There is no dispute that Newsweek copied the code provided by Instagram, which enables website operators and publishers to embed public Instagram posts and share the content through a window into the platform.  There is also no dispute that Plaintiff granted Instagram a license to use his content, by posting to the platform.  But Plaintiff asks this Court to hold Newsweek liable for copying the embed code, attempting to shoehorn a common industry practice into a Copyright Act violation.  Plaintiff's case fails for at least three reasons.  *First*, Plaintiff's case primarily hinges on a violation of his public display right, but his position is not aligned with the text of the Copyright Act, which requires an actual copy (*i.e.*, a "material object . . . in which a work is fixed") and transmission by the defendant.  Though not binding in this circuit, the "server test" adopted in *Perfect 10, Inc. v. Amazon.com, Inc.*, provides a helpful application of the text of the Copyright Act.  *Second*, in any event, Newsweek had a sublicense from Instagram to use Plaintiff's content, either through its grant of an express license in its Platform Policy, or an implied license based on its conduct.  *Third*, even if the Court does consider Newsweek's use of Plaintiff's Instagram post, there is ample evidence for the Court to decide that Newsweek's use was fair as a matter of law.  There is also no basis for this Court to find a willful violation.

## STATEMENT OF FACTS

This case arises over a Newsweek story about a post from Plaintiff's public Instagram account, where he shares selected landscape and nature images from his fine art photography.

Defendant's Rule 56.1 Statement of Material Facts ("SUMF") ¶¶ 10–11, 31–32.  Plaintiff visited Death Valley National Park in March 2019 to take fine art photographs and, at the time, an ephemeral lake appeared in the desert-like landscape.  *Id.* ¶¶ 2–3.  Plaintiff happened to capture this rare event, and shared dozens of those photographs widely on his public social media accounts, including Facebook and Instagram.  *Id.* ¶¶ 3–6, 10–11.  As Plaintiff testified, Instagram compresses uploaded images, so the posted photograph was a cropped, lower-resolution version. *Id.* ¶ 13.  The Instagram post at issue showed a lower-resolution of Plaintiff's photograph, alongside factual information and Instagram markings, including (1) a username, (2) a geographic location, (3) links/directions to view the profile or view more on Instagram, (4) the number of likes, (5) a short descriptive caption, (6) a link to another Instagram account, (7) 28 hashtags of words and short phrases, and (8) other features inherent in Instagram's functionality (the "Instagram Post").  *Id.* ¶ 15.  Plaintiff also posted an album of high-resolution photographs on his website, which offers an embed option, whereby visitors can copy a code to embed a slideshow of the Death Valley photographs on their website.  *Id.* ¶¶ 7–9.

As Plaintiff was the source of the news, numerous media outlets, websites, and blogs reported on Plaintiff's photographs of this unique natural phenomenon, including *SFGate*, Smithsonian.com, *Accuweather*, *Live Science*, *PetaPixel*, *Atlas Obscura*, the National Parks Conservation Association, *The Daily Mail*, *Express Digest*, *The Los Angeles Times*, *IFL Science*, *Hartford Courant*, *The Independent*, and *Science Alert*.  *Id.* ¶¶ 17–19.  Plaintiff permitted many of the outlets to select any of the photographs that they wanted to use for free for various reasons, including because he "enjoyed the website," wanted to be published for "promotional purposes," considered the use an "honor," or thought the website "aligned with [his] fine art brand."  *Id.* ¶¶ 20–21.  Plaintiff received only a nominal licensing fee in two instances.  *Id.* ¶ 23.

In mid-March 2019, a writer for Newsweek reached out to Plaintiff via Instagram to request permission to upload and host one of his Death Valley photographs in Newsweek's content management system ("CMS") (*i.e.*, the back end of its website) in connection with an article about the temporary lake and the happenstance of Plaintiff capturing the rare event, as is Newsweek's standard practice.  *Id.* ¶ 24.  The Newsweek writer also reached out to several experts to question them regarding the science behind the photographed event.  *Id.* ¶ 26.  As Plaintiff did not respond, the Newsweek writer requested the embed code for Plaintiff's Instagram Post from Instagram, through its application programming interface ("API"), and copied the code (*i.e.*, the HTML instructions) into Newsweek's CMS.  *Id.* ¶¶ 25, 27.  When Newsweek copied and used the code, it did so pursuant to Instagram's terms—specifically, the Platform Policy (which, via an express license provision, grants website operators a license to use the Platform, including "APIs" and "content").  *Id.* ¶¶ 27–30.

The Newsweek article described the 10-mile-long lake, first reported and captured by Plaintiff, Plaintiff's photography of the event, and the scientific explanation for the natural phenomenon.  *Id.* ¶ 31 .  The article included Plaintiff's full Instagram Post, embedded using the code provided by Instagram—so the Instagram Post was not hosted within Newsweek's CMS or on its servers—as well as a stock photograph licensed from Getty Images of Death Valley, which was hosted in Newsweek's CMS.  *Id.* ¶¶ 32–34.  The Getty Images photograph appeared as the lead image in social media posts for the article.  *Id.* ¶ 35.  Ultimately, the article did not generate much interest, receiving only 5,427 page views, amounting to nominal advertising revenue for the article.  *Id.* ¶ 36.

Seven months later, in October 2019, without any notice,[1] Plaintiff filed this action

---

[1] Plaintiff concedes that his counsel's notices to Newsweek were not delivered.  P. Mot. at 9 n.4.

against Newsweek. *Id.* ¶ 37.  After Plaintiff filed his amended complaint on January 24, 2020 (the "Amended Complaint" or "AC"), Newsweek moved to dismiss. *Id.* ¶¶ 38–39.  The Court granted Newsweek's motion in part and dismissed Plaintiff's secondary liability claim. *Id.* ¶ 40. Newsweek filed its answer on November 9, 2020, in which it asserted numerous affirmative defenses including non-actionable infringement by virtue of embedding, license (whether express or implied), fair use, and innocent and non-willful infringement. *Id.* ¶ 41.

## LEGAL STANDARD

Summary judgment on a particular claim or defense is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994).  For instance, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment [in favor of the movant] is proper." *Id.* at 1224.

"As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In determining whether there are genuine issues of material fact, the Court is 'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Yi Fu Chen v. Spring Tailor, L.L.C.*, No. 14

Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)).  "The standard used to decide cross-motions for summary judgment, such as the motions pending before the Court, is the same as that for individual summary judgment motions, and a court must consider each motion independent of the other." *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 275 (S.D.N.Y. 2014) (internal quotations omitted), *aff'd*, 882 F.3d 394 (2d Cir. 2018).

## ARGUMENT

**I.   NEWSWEEK'S EMBEDDING OF THE INSTAGRAM POST
       DID NOT INFRINGE ANY OF PLAINTIFF'S
       EXCLUSIVE RIGHTS UNDER THE COPYRIGHT ACT**

The Court should grant summary judgment to Newsweek because Plaintiff has not established that Newsweek infringed any of Plaintiff's exclusive rights under the Copyright Act. *See* 17 U.S.C. §§ 106, 504.  As a threshold matter, Plaintiff has not established that the photograph purportedly covered by the copyright registration was "actually copied."  P. Mot. at 6.  The only evidence that Plaintiff proffers is (1) a comparison of a photograph allegedly covered by the registration, and the Newsweek article, and (2) an obvious mischaracterization of deposition testimony.[2]  *Id.*  But Plaintiff overlooks direct evidence, including screenshots of Newsweek's CMS, and testimony by Newsweek's Rule 30(b)(6) witnesses that establish that what was *actually copied* is the embed code to Plaintiff's Instagram Post.  *See* Gates Decl. Ex. L; Rice Tr. at 37:21–38:11, 132:5–11; Gates Decl. Ex. C at 135:18–21, 135:25–136:2, 143:4–11.[3]

---

[2] Plaintiff claims that "Newsweek admitted during deposition that its copying was verbatim," but the cited testimony only indicates that the Instagram Post appeared as it would on Plaintiff's Instagram account.  *See* Declaration of Sara Gates, dated June 21, 2021 ("Gates Decl."), Ex. B at 186:18–25.  References to Ex. B, the Deposition Transcript of Diane Rice, are hereinafter referred to as "Rice Tr."

[3] References to Ex. C, the Deposition Transcript of James Etherington-Smith, are hereinafter referred to as "E-S Tr."

The Court should view Plaintiff's case through this lens.

### A.    Plaintiff Has Not Established a Violation of the Display Right

Plaintiff's case primarily hinges on Newsweek's purported "display" of his photograph on its website.  *See* AC ¶¶ 10, 13, 17; P. Mot. at 9, 10.  However, merely copying Instagram's embed code to Plaintiff's public Instagram Post, as Newsweek did, does not violate the public display right.  The following definitions from the Copyright Act are relevant to this analysis:

- "To 'display' a work means to show a *copy* of it, either directly or by means of a film, slide, television image, or any other device or process . . . ."
- A copy is a "material object[], . . . in which a work is fixed . . . ."
- A work is "'fixed' in a tangible medium of expression when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."
- The display must also be public, meaning to "display it at a place open to the public," or "to transmit or otherwise communicate a . . . display of the work . . . to the public . . . ."
- Transmission of a display is defined as "communicat[ing] it by any device or process whereby images or sounds are received beyond the place from which they are sent."

17 U.S.C. § 101 (emphasis added).  Although "material object" is not expressly defined, as evident from the numerous examples of "material objects" in Section 101, Congress intended for the term to signify a tangible or physical object that could embody a work of creative expression. *See* § 101; *see also* 17 U.S.C. § 202.  For instance, the definition of audiovisual works, references "material objects" such as "films or tapes."  § 101.  Similarly, the definition of literary works provides examples of "material objects" as "books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards," and the definition of sound recordings provides examples of "material objects" as "disks, tapes, or other phonorecords."  *Id.*

Considering the undisputed facts before the Court, in light of the language of the Copyright Act, Newsweek did not violate Plaintiff's display right because it did not show a

"material object" in which Plaintiff's work is fixed; Newsweek copied only Instagram's embed code, which consists of HTML directions to the *provider* of the material object: Instagram. Gates Decl. Ex. L.  Instagram showed a copy of Plaintiff's work, based on Plaintiff's posting of the photograph to Instagram.  *See* Gates Decl. Ex. A ("McGucken Tr.") at 79:4–8, 87:21–88:13; Gates Decl. Ex. R.  On its face, the embed code does not support a finding that it constitutes a "material object" in which Plaintiff's work is fixed to support a violation of the display right. § 101.  To be fixed, a "work must be embodied in a medium, i.e., placed in a medium such that it can be perceived, reproduced, etc., from that medium (the 'embodiment requirement'), and it must remain thus embodied 'for a period of more than transitory duration' (the 'duration requirement')."  *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127 (2d Cir. 2008) (quoting 17 U.S.C. § 101).  As evident from a review of the code, visible in screenshots of Newsweek's CMS, the text contains a jumble of numbers and letters that are incomprehensible to human readers.  Gates Decl. Ex. L at NEWS000009.  The embed code does not *embody* the photographic work, as the photograph cannot be perceived from the code.  *See id.*  Notably, unlike other definitions in Section 101, the definition of "fixed" does not permit a work to be perceived with the aid of a device or process.  *See* § 101.  This was a conscious choice by Congress to include the "device or process" language in other definitions within Section 101, while expressly excluding it from the definition of "fixed."  As the photographic work is not embodied within the code, the duration requirement would not even be reached.

Newsweek also did not engage in a "public display," as that term is understood in copyright law.  As William Patry, a prominent copyright scholar and author of one of the leading copyright treatises, points out, the "definition of 'to display a work publicly' requires that the *direct infringer* be the one who is transmitting the display of the work."  5 William F. Patry,

*Patry on Copyright* § 15:7 (Mar. 2021 Westlaw update) (emphasis added).  There is no statutory violation where the defendant "merely sent to the user's browser instructions for where the copy resided (typically plaintiff's own website) . . . ."  *Id.*  Reviewing the text of the Copyright Act and the case law on framing and embedding, Patry agrees that "[t]here is all the difference in the world, legally, from transmitting instructions to a place (what the referring site does) and transmitting the instructions that actually display the work (what plaintiff's website does)."  *Id.*

The Ninth Circuit recognized the important distinction between display and direction when it adopted the "server test" in *Perfect 10, Inc. v. Amazon.com, Inc.*, drawing directly from the language of the Copyright Act.  508 F.3d 1146, 1159–60 (9th Cir. 2007).  There, the court, applying the statutory definitions, concluded that a "photographic image is a work that is '"fixed' in a tangible medium of expression," for purposes of the Copyright Act, when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device). The image stored in the computer is the 'copy' of the work for purposes of copyright law."  *Id.* at 1160.  Based on this finding, the court held that Google does not "display" a copy for purposes of the Copyright Act when it "frames in-line linked images that appear on a user's computer screen" because Google does not store the images on its computers.  *Id.*  As a result, Google does not show any "material objects . . . in which a work is fixed," but, rather, "provides HTML instructions that direct a user's browser" to the website that stores the image.  *Id.* at 1160–61.

The Ninth Circuit's conception of the server test provides a helpful application of the text of the Copyright Act to distinguish between the communication of a copy and the provision of instructions.  As the court pointed out, Google's provision of HTML instructions, in that instance, was not equivalent to displaying a copy, as that term is defined in the Copyright Act for two independent reasons:

8

> First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen.

*Id.* at 1161.  Like Google, or any other entity's use of a reference link, Newsweek may facilitate readers' access to Plaintiff's Instagram Post, but this does not constitute infringement of Plaintiff's display right.

### B.    Plaintiff's Arguments Regarding the Display Right Are Unpersuasive

Plaintiff argues that Newsweek violated his public display right by relying, first and foremost, on an inapposite and non-binding U.S. Court of Federal Claims decision—on a motion to dismiss—that considered only when a public display was alleged to have occurred, for statute of limitations purposes, after NASA uploaded a work to its server and showed the work on its website.  *See APL Microscopic, LLC v. United States*, 144 Fed. Cl. 489, 498–499 (2019). Though the court cited *Perfect 10*, it focused only on the Ninth Circuit's decision regarding Google's storage of thumbnail images and did not address in-line linking or framing.  *See id.*  On this distinctively different set of facts, the court did not have the opportunity to consider whether a public display occurs when a social media post is embedded on a separate website, where the website owner did not store or serve the post, as is the case here.  *See id.*

Plaintiff additionally relies on the *Goldman v. Breitbart News Network, LLC* decision— likewise, on a motion to dismiss—that declined to follow the server test. 302 F. Supp. 3d 585, 593 (S.D.N.Y. 2018).  While this Court may consider the decision of a sister court, it need not follow it, especially where the facts are markedly different.  In *Goldman*, the image at issue, visible on Twitter, was several times removed from the original source when used by the defendants, as the Court acknowledged the image went "viral" and rapidly moved from

9

"Snapchat to Reddit to Twitter . . . ." *Id.* at 586.  Here, Plaintiff directly uploaded the photograph to his public Instagram account, making it available for sharing by any users of the API. McGucken Tr. at 50:25–51:12, 87:21–88:13, 88:24–89:9.  Plaintiff maintained control over the Instagram Post and could (and still can) take it down at any time.  Gates Decl. Ex. Q at NEWS000167.  Additionally, unlike the embeds in the *Goldman* case, which did not show the source, including framing, or provide any context regarding the image (*see* Second Amended Complaint, *Goldman v. Breitbart News Network LLC*, No. 17-cv-03144 (AJN) (SN) (S.D.N.Y. May 26, 2017), ECF No. 38), the Instagram Post here contained a distinct frame, showed all the markings of Instagram, and expressly indicated the source of the material object.  Gates Decl. Ex. L at NEWS000005.  The frame was not "seamlessly presented" on the webpage in such a way that it would be a substitute for a licensed use (as in *Goldman*), but rather provided a direct window to the source: Instagram.

In addition to dissimilar facts, the *Goldman* decision also overlooked that the text of the Copyright Act requires an actual copy (*i.e.*, a "material object . . . in which a work is fixed") and transmission *by the defendant*.  § 101.  The *Goldman* court side-stepped this portion of the text and instead focused on how the statute does not contain the word "possession" and on the process that the defendants used to copy the embed code.  *See Goldman*, 302 F. Supp. 3d at 593–94.  While Newsweek is not asking the Court to read "possession" into the Copyright Act, for there to be a violation of the display right, there must be a "material object" shown.  § 101. Provision of HTML instructions, which do not embody the work, does not meet this statutory requirement.  *See id.*  Moreover, the Goldman court confused the "process" that should be considered under the statute.  *Goldman*, 302 F. Supp. 3d at 593–94.  As Patry aptly points out, "it is only the process for actually *displaying* the work that triggers the display right," so the

10

*Goldman* court's analysis was flawed because it considered only the particular steps that the defendants took to copy the HTML instructions, rather than how the host site (*i.e.*, Twitter) transmitted or conveyed the work.  5 Patry on Copyright § 15:7 (emphasis added).

Plaintiff's citations to other district court decisions outside this circuit are similarly inapposite.  The *Leader's Institute, LLC v. Jackson* court relied upon the same unsound analysis as the *Goldman* court regarding the "process" by which the code on the plaintiffs' website *instructed* users' web browsers to provide a frame into another website, acknowledging that the website merely provided instructions, and failed to consider the definition of "copies."  No. 3:14-CV-3572-B, 2017 WL 5629514, at *10 (N.D. Tex. Nov. 22, 2017).  In *Free Speech Systems, LLC v. Menzel*, which was on a motion to dismiss, the court determined that, even if the server test applies, the court could not take judicial notice of whether the underlying code pointed to a separate website.  390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019).  Plaintiff cites this case for the proposition that "[n]o case addressing the use of photography on a commercial website like Newsweek's has ever held that the physical location of possession of the infringing work was relevant" (P. Mot. at 11), but the *Free Speech* court opined only that the movant had not cited a case in the circuit outside of the search engine context—not that one did not exist.  390 F. Supp. 3d at 1172.

Plaintiff also contends that Newsweek *conceded* at a deposition that it "displayed" the Instagram Post (P. Mot. at 10–11), but this assertion is inherently misleading.  The same page of Diane Rice's cited deposition testimony shows that Plaintiff's counsel questioned her about the meaning of the word "display."  Rice Tr. 135:3–4.  Ms. Rice, who is not a lawyer, offered her own definition for what the word means—separate and distinct from the Copyright Act's definition—and answered the questions based on her definition.  Rice. Tr. 135:3–15.  Similarly,

in James Etherington-Smith's cited testimony, when Plaintiff's counsel asked whether a photograph is "displayed" when using an embed, Mr. Etherington-Smith, who is also not a lawyer, responded that it is "visible," substituting his own definition of the word "display."  E-S Tr. at 15:2–4.  Plaintiff cannot twist these answers, by non-lawyers, into a conclusory finding on one of the ultimate legal conclusions in the case.

### C.    Plaintiff Has Not Established a Violation of Any Other Exclusive Rights

While Plaintiff's motion focuses on the display right, Plaintiff also makes casual references to other exclusive rights.  To the extent that Plaintiff is asserting a violation of any of these rights, these arguments do not hold water.  A violation of the reproduction right requires that the defendant reproduce the work in "copies" (*i.e.*, "material objects . . . in which a work is fixed") and, as discussed above, the embed code is not a "material object."  17 U.S.C. §§ 101, 105; *see also* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.02 (2018) (noting that "in order to infringe the reproduction right, the defendant must embody the plaintiff's work in a 'material object'").  Similarly, distribution requires transmission of a "material object," 17 U.S.C. §§ 101, 106(3), and Plaintiff has not established that any material object changed hands to support a violation of the distribution right.  *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 CIV. 1615 (CM), 2012 WL 1107648, at *12 (S.D.N.Y. Mar. 30, 2012) ("Because the actual transfer of a file between computers must occur, merely providing a 'link' to a site containing copyrighted material does not constitute direct infringement of a holder's distribution right."), *adhered to on reconsideration*, No. 10 CIV. 1615 (CM), 2012 WL 2929392 (S.D.N.Y. July 18, 2012).

## II.    NEWSWEEK HAD A LICENSE TO EMBED THE INSTAGRAM POST

In any event, Plaintiff cannot succeed on its infringement claim because Newsweek had a license to embed the Instagram Post.  It is well-recognized that "[a] claim for infringement will

12

fail if the challenged use of the copyrighted work is authorized by a license."  *See Wu v. Pearson Educ. Inc.*, No. 10 CIV. 6537 (KBF), 2013 WL 145666, at *4 (S.D.N.Y. Jan. 11, 2013) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)).  While the burden of coming forward with evidence of a license is on the proponent, disputes regarding the scope of the license—which "present the court with a question that essentially is one of contract"—place the burden of persuasion on the party claiming breach.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

### A.     Plaintiff Authorized Instagram to Grant Newsweek a License

By agreeing to Instagram's Terms of Use, including its Platform Policy, which is incorporated by reference, Plaintiff indisputably authorized Instagram to grant users of its API a sublicense.  *See Sinclair v. Ziff Davis, LLC*, No. 18-CV-790 (KMW), 2020 WL 3450136, at *1 (S.D.N.Y. June 24, 2020) (adhering to "previous holding that, by agreeing to Instagram's Terms of Use, Plaintiff authorized Instagram to grant API users, such as Mashable, a sublicense to embed her public Instagram content, as set forth in Instagram's Platform Policy"); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839–40 (S.D.N.Y. 2012) (finding Facebook user assented to terms of use, even if he did not read the terms).  The Instagram Terms of Use state: "[W]hen you share, post, or upload content . . . you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content . . . ."  Gates Decl. Ex. Q at NEWS000167.  As this Court previously held in its decision on Newsweek's motion to dismiss, rejecting Plaintiff's argument on this point, Instagram's "Terms of Use unequivocally grant Instagram a license to sublicense Plaintiff's publicly posted content . . . ."  Dkt. No. 35 at 9.

Plaintiff cites *Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429 (S.D.N.Y. 2002), for the proposition that the sublicense must be made with his "explicit consent" (P. Mot. at 16), but Instagram's Terms of Use, which Plaintiff agreed to when he opened his Instagram account and continued to use Instagram, explicitly state that users grant a "sub-licensable" license to Instagram when they share, post, or upload content.   Gates Decl. Ex. Q at NEWS000167. Moreover, *Ward* dealt with licenses under the 1909 Copyright Act, which is not the case here. *See Ward*, 208 F. Supp. 2d at 441–42; *see also Ariel (UK) Ltd. v. Reuters Grp. PLC*, No. 05 CIV. 9646 (JFK), 2006 WL 3161467, at *6 (S.D.N.Y. Oct. 31, 2006) (applying *Ward* proposition to work analyzed under 1909 Act), *aff'd*, 277 F. App'x 43 (2d Cir. 2008).   Therefore, the only issue before the Court is whether there is a sublicense—either express or implied—between Instagram and Newsweek.   For the reasons set forth below, there is a sublicense.

## B.    Instagram Granted Newsweek a License Through Its Terms

Plaintiff posted the photograph to his public Instagram account (McGucken Tr. at 50:25–51:12, 87:21–88:13, 88:24–89:9), acknowledging that such public information can be seen, accessed, and reshared through APIs, including Instagram's embedding feature.  See Gates Decl. Ex. R at NEWS000184; *see also* Gates Decl. Ex. Q at NEWS000165 ("You must agree to the Data Policy to use Instagram.").   Plaintiff disputes only whether Instagram's terms granted Newsweek permission to embed Plaintiff's Instagram Post, but in doing so Plaintiff relies, in certain instances, on inoperative terms and ignores explicit language in the operative terms that granted embedders a license.  *See* P. Mot. at 13–15.

Instagram's Platform Policy (incorporated by reference in Instagram's Terms of Use, *see* Gates Decl. Ex. Q at NEWS000166), governs the use of the "Platform," which is broadly defined to include "**APIs**, SDKs, plugins, code, specifications, documentation, technology, and services

(**such as content**).”  Gates Decl. Ex. S at NEWS000157 (emphasis added).  The Platform Policy explains that the Platform “enable[s] others, including . . . website operators, to retrieve data from Instagram” and that the Platform is provided to “help members of our community share their own content with apps or services” and to “**help broadcasters and publishers discover content, get digital rights to media, and share media using web embeds**.”  *Id.* (emphasis added).  Further, the Platform Policy contains an *express* license provision, entitled “Licensed Uses and Restrictions,” stating that the “**Platform**” (which is defined to include “**content**”) “**is licensed to you** on a worldwide . . . non-exclusive, non-sublicensable basis in accordance with these terms” and that this license “continues until it is terminated by either party.”  *Id.* at NEWS000157, NEWS000160 (emphasis added).  Though the license provision indicates that “User Content is owned by users and not by Instagram,” it does not require licensees to first obtain consent from users to use their content.  *Id.*  Consent need only be obtained before including “User Content in any ad.”  *Id.* at NEWS000158.  These provisions, taken together, grant Newsweek a license to use Instagram’s Platform, including its APIs, code, and content.  *Cf. Wu*, 2013 WL 145666, at *4 (“Copyright licenses are generally construed according to neutral principles of contract interpretation.”).  Accordingly, when Newsweek assented to the Platform Policy and copied the embed code to Plaintiff’s Instagram Post in March 2019, it did so pursuant to a license granted by Instagram through these terms.

Plaintiff’s scant arguments against the existence of a license do not support his position.  Plaintiff cites only two cherry-picked provisions in Instagram’s terms in an attempt to argue that the terms do no authorize Newsweek’s copying.  *See* P. Mot. at 14–15.  *First*, Plaintiff construes a provision in the Terms of Use, which states that “[t]his agreement does not give rights to any third parties” to mean that Instagram does not grant users like Newsweek a sublicense.  *Id.* at 14.

But the Terms of Use do not state that this provision applies with equal force to the Platform Policy (where the sublicense is granted), and, in any event, Plaintiff's broad reading of "third parties" to include sublicensees would render all of the sublicense language meaningless, which is contrary to the cardinal rule of construction to give full meaning and effect to all contractual provisions. *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). *Second*, Plaintiff cites "guidance" in the Platform Policy that "instructs users to not 'sell, lease, or sublicense the Instagram Platform or any data derived from the Platform," P. Mot. at 15, but this is a red herring.   On its face, this provision advises *users* of the platform (like Newsweek) not to sublicense the platform or any data derived through the platform.   It does not state that users do not *receive* a sublicense from Instagram with respect to content; it only instructs that Newsweek may not further sublicense the platform or platform data (which would be akin to a sub-sub-license).   This interpretation makes sense because Instagram grants users like Newsweek a license to use its "Platform" (including content, by definition), but specifies that this license is "non-sublicensable."   Gates Decl. Ex. S at NEWS000160.

### C.    Newsweek Did Not Breach the License Granted Through Instagram's Terms

Relying on certain general provisions contained within the Platform Policy that do not pertain specifically to the license granted by Instagram, Plaintiff also asserts that Newsweek breached the license.   *See* P. Mot. at 16.   Plaintiff argues that by violating these contractual terms, Newsweek is still liable for infringement, but ignores the distinction between a breach of a *covenant* and a breach of a *condition* in a copyright license, only the latter of which gives rise to an action for copyright infringement.   *See Graham*, 144 F.3d at 236.   Generally speaking, terms of a contract are presumed to be covenants rather than conditions.   *Id.* at 237.   "[A] covenant is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a

promise in understanding that a commitment has been made." *Sohm v. Scholastic Inc.*, 959 F.3d 39, 45–46 (2d Cir. 2020) (internal quotation marks and citation omitted).  Whereas a condition is "an act or event . . . which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Id.* (internal quotation marks and citation omitted).[4]

Plaintiff presumes that all of the contractual terms cited are "conditions" and merely asserts that Newsweek violated these terms by providing a list thereof, noticeably without any explanation as to why these provisions qualify as conditions or how Newsweek violated them.[5] P. Mot. at 15–16.  Because these provisions all concern the acceptability of behavior in using Instagram's platform, rather than conditions that must occur prior to use, they do not qualify as conditions to give rise to a copyright infringement claim.  *See Muench Photography, Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*, 367 F. Supp. 3d 82, 88–89 (S.D.N.Y. 2019) ("Contract terms that merely delineate 'acceptable' and 'unacceptable' behavior under the licensing agreement are covenants." (internal citation omitted)).  For example, three of the provisions (in sections A.11, A.13, and A.35) are contained within a section entitled "General Terms" and concern general directions to users, but do not condition the license (granted in another section of the Platform Policy) on any of these provisions.  *See* P. Mot. at 16; Gates Decl. Ex. S at NEWS000157–58; *see also Sohm*, 959 F.3d at 46 ("[L]inguistic conventions of

_____

[4] To the extent that California law would apply, based on the governing law provision in Instagram's Terms of Use (Gates Decl. Ex. Q at NEWS000171), California's view of conditions versus covenants does not differ.  *See Quest Software, Inc. v. DirecTV Operations, LLC*, No. SACV 09-1232 AG (ANX), 2011 WL 4500922, at *4 (C.D. Cal. Sept. 26, 2011) ("[C]onditions are contractual terms that limit a license's scope ... the breach of which constitute[s] copyright infringement.  All other license terms are covenants, which the Ninth Circuit has defined to mean a contractual promise, i.e., a manifestation or intention to act or refrain from acting in a particular way." (internal quotation marks and citations omitted)).

[5] Plaintiff relies upon a later version of the terms, captured in April 2020, *see* Dkt. No. 60 ("Burroughs Decl.") Ex. 9; however, the specific provisions cited by Plaintiff do not appear to differ from the terms in effect in March 2019.  *See* Gates Decl. Ex. S.

condition—such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to[]'—can make plain a condition precedent." (internal quotations and citation omitted)). Similarly, two other provisions (in sections D.9, D.10) are contained within a section entitled "Things you should know," but the grant of the license to the Instagram Platform is not conditioned on these representations and warranties either.  *See* P. Mot. at 16; Gates Decl. Ex. S at NEWS000159–60.  Another provision cited by Plaintiff from that section (D.13) concerns an entirely different license—from users to Instagram.  *See* P. Mot. at 16; Gates Decl. Ex. S at NEWS000161.  Plaintiff's citation to a section of Instagram's Community Guidelines also does not contain a condition and, in any event, refers to "post[ing] on Instagram," as Plaintiff did, not embedding an Instagram Post, as Newsweek did, so it is irrelevant.  *See* P. Mot. at 16; Burroughs Decl. Ex. 11.

Additionally, in arguing that Newsweek was obligated to seek his permission, Plaintiff relies heavily on the current 2021 iterations of two "Help Center" webpages, which merely provide information but do not require user assent.  *See* P. Mot. at 15 & n.9, n.10.  Plaintiff does not assert that these webpages were in existence in March 2019 or that users of the Platform, like Newsweek, were required to abide by such terms, yet nonetheless makes the erroneous claim that Newsweek "violated" each of these provisions.  This argument does not have any merit.

### D.      Newsweek Had an Implied License to Embed the Instagram Post

If the Court finds that Instagram did not grant an express license, it should find an implied license through Instagram's and Newsweek's conduct.   "[N[onexclusive licenses may . . . be granted orally, or may even be implied from conduct."  *Graham*, 144 F.3d at 235 (quoting 3 *Nimmer on Copyright* § 10.03[A][7], at 10–43); *see Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 64 (1st Cir. 2020) ("[W]here a licensor grants to a licensee the

unrestricted right to sublicense and permit others to use a copyrighted work, a sublicense may be implied by the conduct of the sublicensor and sublicensee.").   While the Second Circuit has not fully and finally decided the circumstances under which an implied license may arise, courts in this circuit have found an implied non-exclusive license "where one party created a work at the other's request and handed it over, intending that the other copy and distribute it."   *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020) (quoting *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009)); *see also SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (indicating that courts have found implied licenses under this framework but declining to address implied license defense).   Other courts have declined to require strict satisfaction of the three elements—request, delivery, and intent—and have instead focused on the "totality of the parties' conduct."   *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 141 (S.D.N.Y. 2019) (citing cases).

Under either test, in analyzing whether Newsweek had an implied license to use the Instagram Post from Instagram, the Court's analysis should focus on what Newsweek *actually copied*: the embed code to the Instagram Post.   *See* Gates Decl. Ex. L at NEWS000007–09. Here, Newsweek *requested* the embed code for the Instagram Post when it clicked on the "Embed" button among the options in connection with the Instagram Post, available on Instagram's Platform.   *See* Gates Decl. Ex. J at NEWS000150.   In response to this request, Instagram created and *delivered* a unique embed code that, using HTML instructions, would direct a website reading the instructions to the Instagram Post.   *See id.* at NEWS000148. Without the delivery of this unique code, Newsweek would have been unable to use the Instagram Post.   As evident from the ease of this technological function, Instagram's terms, and

its past public statements (before Newsweek's use and this litigation commenced), it was reasonable for Newsweek to understand that Instagram *intended* for users of its API to be able to embed and share public Instagram content through its platform on third-party websites.  For example, on its "Embedding" page, available in March 2019, Instagram described how to embed Instagram content, step by step, and proclaimed:

> Embedding Instagram posts is an easy way to add Instagram photos and videos to the stories you want to tell on articles or websites. You can embed your own content as well as photos and videos from public profiles. As always, people own their Instagram content, and embedded posts give the proper attribution by showing the username and linking back to the original content on Instagram.

Gates Decl. Ex. T at NEWS000153.  Instagram used the same language to describe the feature in a 2013 blog post announcing its release of web embedding and also walked users through how to request the unique embed code for a particular post.  Gates Decl. Ex. U at NEWS000100.

As discussed above, Instagram's Platform Policy defines the Instagram "Platform" broadly to include "APIs" and "content" and indicates that the purpose of the Platform is to help users "share their own content with apps or services," and "help broadcasters and publishers discover content, get digital rights to media, and share media using web embeds."  Gates Decl. Ex. S at NEWS000157.  Notably, the Platform Policy only requires website operators to obtain a person's consent before using their content within an ad, but not within editorial content.  *Id.* at NEWS000158.  Instagram's Data Policy, in effect in March 2019, also reminds users that:

> You, other people using Facebook and Instagram, and we can provide access to or send public information to anyone on or off our Products, including . . . through tools and APIs. Public information can also be seen, accessed, reshared or downloaded through third-party services such as search engines, APIs, and offline media . . . and by apps, websites and other services that integrate with our Products.

Gates Decl. Ex. R at NEWS000184.  The Data Policy further cautions users: "You should consider who you choose to share with, because people who can see your activity on our

20

Products can choose to share it with others on and off our Products, including people and businesses outside the audience you shared with." *Id.* Instagram also acknowledges in the "Help Center" section of its website, available in March 2019, that third-party sites, created with Instagram's API, may show user images, and directs users—if they do not want their images to appear—to revoke access to the third-party website or set their account to private. Gates Decl. Ex. V.

As a result, Instagram not only *knew* that it was making public posts available for use through its platform but was wholly responsible for technologically facilitating and encouraging the use, through its terms and public statements, and continued to permit such use throughout 2019 without any objection. *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (finding knowledge of use coupled with silence in the face of the use constituted an implied license); *accord Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) ("Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it."). It was not unreasonable for Newsweek (along with many other publishers in the media industry), to infer from Instagram's conduct that Instagram permitted the embedding of the Instagram Post. Indeed, the existence of an implied license in this instance is further evidenced by the custom and practice in the media industry at the time. Both of Newsweek's witnesses, who have considerable experience in the media industry, testified that they understood Instagram to permit publishers like Newsweek to embed public Instagram posts, as a matter of industry practice and by the nature of the embedding process. *See* Rice Tr. at 27:3–13, 128:4–8, 205:5–9, 208:11–24; E-S Tr. at 34:12–18, 35:13–20. Newsweek's expert witness, Lynn Oberlander, who has served as in-house counsel for numerous media companies and has decades of experience in the media

industry, also confirmed that Newsweek's understanding regarding embedding was standard practice in the media industry in March 2019.  *See* Gates Decl. Ex. D at 8–9.  As apparent from a recent class action lawsuit against Instagram, many believed that Instagram freely encouraged users to embed content.  *See* Complaint, *Hunley v. Instagram, LLC*, No. 3:21-cv-0377 (CRB) (N.D. Cal. May 19, 2021), ECF No. 1.  Indeed, four other media outlets that used Plaintiff's Death Valley photographs also chose the embed option.  *See* Gates Decl. Ex. W.

Plaintiff's citation to case law on this point is inapposite.  *Associated Press v. Meltwater U.S. Holdings, Inc.* is readily distinguishable because the only evidence that the defendant offered in support of its implied license argument was that the plaintiff did not require licensees to employ a specific technical protocol on their websites to exclude web crawlers.  931 F. Supp. 2d 537, 563 (S.D.N.Y. 2013).  *Barcroft Media, Ltd. v. Coed Media Group, LLC* is likewise inapt because the Court found that the defendant had waived any such claim because it did not plead the existence of license as a defense.  297 F. Supp. 3d 339, 349 (S.D.N.Y. 2017).  Additionally, the specific language quoted by Plaintiff (P. Mot. at 13) pertained to an alleged *oral* licensing agreement, which is not the case here.  *Barcroft*, 297 F. Supp. 3d at 349.  *Vian v. Carey* is also inapposite, as it concerned the formation of a contract, which is not a question before the Court in this action.  No. 92 CIV. 0485 (MBM), 1993 WL 138837, at *3 (S.D.N.Y. Apr. 26, 1993).

Moreover, any post-filing statements of unnamed persons associated with Instagram should not be credited by this Court,[6] as these statements serve only to indicate Instagram's intent to change what it permits (which it did).[7]  Because Instagram has since changed its terms

---

[6] Indeed, the Court previously referred to same as hearsay.  *See* Dkt. No. 41 at 8.

[7] Notably, Instagram changed its Platform Policy after the Court's decision on the motion to dismiss in June 2020; the URL now directs readers to the policy of its parent company, Facebook Inc., updated on June 26, 2020, which contains markedly different terms.  *See* P. Mot. at 14 n.6 (redirecting to https://developers.facebook.com/terms); Gates Decl. Ex. X.

and policy, there is no broad threat posed, as Plaintiff warns, if the Court finds in favor of Newsweek.

## III.    NEWSWEEK'S USE OF THE INSTAGRAM POST WAS FAIR USE

In the event that the Court does not grant summary judgment to Newsweek on any of the above grounds, the Court may still find in Newsweek's favor and dismiss the Amended Complaint on fair use grounds.   The Second Circuit has repeatedly "resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact." *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006).  As Section 107 of the Copyright Act indicates, "the fair use of a copyrighted work, . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  The statutory provision provides four factors that courts should consider in determining whether a work is fair use, but as the Supreme Court recently recognized, this list of factors is not exhaustive and "some factors may prove more important in some contexts than in others." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196–97 (2021) ("In a word, we have understood the provision to set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including significant changes in technology." (internal quotation marks and citation omitted)).

As noted above, Newsweek did not use Plaintiff's photograph, which Plaintiff claims is covered by the copyright registration, but, rather, used the code offered by Instagram to permit the embedding of Plaintiff's Instagram Post.   Gates Decl. Ex. L.   Plaintiff overlooks this important distinction in his fair use analysis, by focusing only on the photograph.  *See* P. Mot. at 17–25.  But the photograph cannot be viewed in a vacuum.  Newsweek's specific use of the Instagram Post is critical to the fair use analysis.

### A.      The Purpose and Character of the Use

For the first factor, the purpose and character of the use, courts consider whether the secondary use "'adds something new, with a further purpose or different character, altering' the copyrighted work 'with new expression, meaning or message'" and often use "the word 'transformative' to describe a copying use that adds something new and important." *Google*, 141 S. Ct. at 1202–03 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). "Paradigmatic examples of transformative uses are those Congress itself enumerated in the preamble to § 107," including "news reporting." *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99, 110 (2d Cir. 2021).  Here, Newsweek used the Instagram Post in an article to report a newsworthy event, which is a core statutory purpose of fair use.  17 U.S.C. § 107; *see* Gates Decl. Ex. K.  As Newsweek's witness testified, Newsweek specifically used the Instagram Post because it was part of the news story regarding a natural phenomenon.  *See* E-S Tr. at 113:4–12.

Like other cases in which courts have found the fair use of an embedded social media post, Plaintiff (the poster) was the *source* of the news.  *See, e.g.*, *Boesen v. United Sports Publ'ns, Ltd.*, No. 20-CV-1552 (ARR) (SIL), 2020 WL 6393010, at *4 (E.D.N.Y. Nov. 2, 2020), *reconsideration denied*, No. 20-CV-1552 (ARR) (SIL), 2020 WL 7625222 (E.D.N.Y. Dec. 22, 2020); *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 581 (S.D.N.Y. 2020).  It was Plaintiff and Plaintiff alone who captured and reported details of the event.[8]  McGucken Tr. at 31:24–32:1, 150:18–151:3, 151:22–152:7; *see also* Gates Decl. Ex. W at MCGUCKEN000003– 07.  Without his Instagram Post (or other photographs that he posted to his website and social

---

[8] Plaintiff makes the specious argument that the event was not "fast-breaking news nor time-sensitive" (P. Mot. at 19), but Plaintiff should not be the arbiter of what is and is not newsworthy.

media), there would be no news to report.  *See* McGucken Tr. at 31:24–32:1, 150:18–151:3, 151:22–152:7; *see also* Gates Decl. Ex. W at MCGUCKEN000003–07.  It was necessary for Newsweek to include the Instagram Post to report what happened because the photograph was the story, and it would have been difficult to explain the rare phenomenon captured without embedding the Instagram Post.  *See Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (finding that "because the pictures were the story[,] [i]t would have been much more difficult to explain the controversy without reproducing the photographs" (internal quotation marks omitted)); *see also Barcroft*, 297 F. Supp. 3d at 352 (pointing out that use of a copyrighted photograph may be appropriate where "the copyrighted work is itself the subject of the story, transforming the function of the work in the new context").  Plaintiff, on the other hand, testified that he took the photographs of the ephemeral lake for fine art purposes and posted the photographs on his website and social media accounts to share his art.  McGucken Tr. at 44:11–15, 80:22–24, 85:23–25, 86:8–16, 92:6–8, 140:3–4, 145:9–10, 149:3–7, 152:16–17.  Newsweek's inclusion of the Instagram Post in the article therefore served an entirely different purpose than Plaintiff's fine art use.

Newsweek also added new expression to Plaintiff's Instagram Post, which did not include information regarding the photograph or subjects beyond the location and descriptive hashtags.  *See* Gates Decl. Ex. K.  Newsweek's article described Plaintiff's perception of the event, introduced his Instagram Post, and added commentary from experts to explain how such a phenomenon could have occurred.  *Id.*; Gates Decl. Ex. M.  The Second Circuit has described such a use as transformative where it "communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015).  Contrary to

Plaintiff's assertion (P. Mot. at 20), it is well-settled in this circuit that the new work need not specifically comment on the original work to make it transformative. *See Andy Warhol*, 992 F.3d at 110; *see also Walsh*, 464 F. Supp. 3d at 584 (finding that article's lack of commentary or criticism about the Instagram post did not undermine its conclusion regarding transformativeness).   Here, Newsweek transformed Plaintiff's Instagram Post by using it for a newsworthy purpose (as opposed to Plaintiff's admitted fine art purpose) and adding necessary comment and detail to explain the natural phenomenon, how Plaintiff captured it, and why it was so fascinating. *See* Gates Decl. Ex. K; Rice Tr. at 177:10–13, 178:20–179:1, 179:17–20, 190:2–8; E-S Tr. at 79:3–11, 105:18–20.   Newsweek was not simply taking a photograph and announcing its contents to trigger the concern raised by this Court in *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 406 (S.D.N.Y. 2016).   *See* P. Mot. at 18.   All photographs, by their nature, illustrate the subject depicted but this use of Plaintiff's Instagram Post was more than illustrative of the article—it was the story itself.   Newsweek, when it needed a mere illustrative photograph of the desert, licensed a photograph from Getty Images, which it hosted in its CMS.   Rice Tr. at 181:9–15, 213:17–25; E-S Tr. at 137:12–25.

It is important to note that Newsweek's minimal earning of revenue from advertisements on the web page for the article, which performed well below normal expectations for a typical article, is not dispositive of the first factor. *See* Gates Decl. Ex. K; E-S Tr. at 151:18–23, 166:21–168:15; *see also Google*, 141 S. Ct. at 1204.   Newsweek is an editorial website (Rice Tr. at 33:25, 172:20–173:6), but, like other news organizations, needs to make money to survive and continue to report the news. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (recognizing that "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit").   The mere presence of advertisements on the web

page for the article does not establish a connection between Newsweek's purported commercial gain and its specific use of the Instagram Post to tip this factor against fair use. *See Boesen*, 2020 WL 6393010, at *4.

Plaintiff asserts that Newsweek's "bad faith" must also be considered for the first factor (P. Mot. at 21); however, the Supreme Court has recognized that a defendant's intentions are of dubious import in considering fair use. *See Google*, 141 S. Ct. 1204.  In any event, there is no evidence of bad faith because Newsweek did not violate Instagram's terms (*see supra* Section II.C), or its own photo policy (*see* Gates Decl. Ex. P), but rather made an attempt to reach out to the photographer to license the work for use in its CMS.  *See* Dkt. No. 57 ("McGucken Decl.") Ex. 3; Rice Tr. at 77:3–8, 132:5–11, 167:2–24.  Receiving no response, Newsweek followed industry standards and applicable rules and policies and embedded the Instagram Post because it was newsworthy and part of the story.  *See* Rice Tr. at 56:11–16, 126:2–8, 132:5–11, 134:2–6, 136:1–5, 146:16–20, 166:6–15, 208:11–24; Gates Decl. Ex. D at 12–18.

### B.     The Nature of the Copyrighted Work

For the second factor, courts consider whether the copyrighted work is creative or more factual and informational, and published or unpublished, often finding that more informational, published works favor fair use.  *Blanch*, 467 F.3d at 256.  Here, the Instagram Post is both creative and informational, as it contains a photograph, which Plaintiff argues is creative, but that is also a record of a factual natural event and contains at least eight other factual elements including (1) a username, (2) a geographic location, (3) links/directions to view the profile or view more on Instagram, (4) the number of likes, (5) a short descriptive caption, (6) a link to another Instagram account, (7) 28 hashtags of words and short phrases, and (8) other features inherent in Instagram's functionality.  Gates Decl. Ex. L at NEWS000005.  Plaintiff does not

acknowledge any of these factual elements, argue that they are entitled to copyright protection, or address how these informational elements affect the scope of copyright protection and, in turn, the fair use analysis. *See* P. Mot. at 22. The Court should not view the photograph in a vacuum, as Plaintiff tacitly encourages in his fair use analysis, and should consider the import of the numerous informational elements, as depicted in the Instagram Post, for this factor.

Additionally, Plaintiff does not dispute that he previously published the Instagram Post, and the underlying photograph, on his other social media accounts and website, and that numerous other media outlets had used the Instagram Post or photographs. *See* McGucken Decl. Ex. 2; McGucken Tr. at 75:19–24, 79:4–8, 86:8–10, 92:6–11; Gates Decl. Ex. W. There is no concern of usurping a right of first publication in this case. *See also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564 (1985). These considerations should serve to tip this factor in Newsweek's favor. *See Boesen*, 2020 WL 6393010, at *5 (finding the second factor tipped slightly in defendant's favor where the Instagram post contained both informational and creative elements and the plaintiff had published it on his own social media and website).

### C.   The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

Evaluating the third factor, courts consider whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal quotation marks and citation omitted). As the Second Circuit has recognized, there are no bright line or "absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) (quoting *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986)). The extent of permissible copying varies with the purpose and character of the use and it may be necessary, for certain purposes, to copy the entire work. *See id.*; *Bill Graham Archives v. Dorling Kindersley*

*Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006).  Notably, "this factor weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 621 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).

There is no dispute that Newsweek took only as much as Plaintiff made available for embedding through his public Instagram account because this is what Instagram's platform and technical requirements permitted.  *See* P. Mot. at 23; Gates Decl. Ex. K; Rice Tr. at 37:21–38:6, 90:23–91:13, 91:24–25; E-S Tr. at 89:1–22.  Newsweek did not use a high-resolution photograph, such as the photographs Plaintiff made readily available (also for embedded use) on his website (Gates Decl. Ex. G), but used only the public embed code.  Gates Decl. Ex. L; Rice Tr. at 113:17–21, 114:20–24.  By embedding the Instagram Post, Newsweek did not control how the work would be presented.  *See Boesen*, 2020 WL 6393010, at *6 (finding that the Instagram poster "chose to crop the image and use a lower resolution version of it—choices that in themselves tip this factor slightly in defendant's favor").  As Plaintiff testified, Instagram crops and compresses photographs so that they appear as lower resolution versions of the original image.  McGucken Tr. at 55:5–14.  The Instagram Post also included the other eight factual elements, which are not entitled to copyright protection, and serve to further diminish the amount of the underlying work used.  Gates Decl. Ex. L at NEWS000005; *see also Boesen*, 2020 WL 6393010, at *6 ("Moreover, the embedded post retained all the markings of Instagram—i.e., Wozniacki's avatar, her profile name, the accompanying text—which further dilute the image.").

Plaintiff makes the misleading argument that because the entirety of the underlying photograph was used—overlooking the apparent, and admitted, differences between the

underlying photograph and the Instagram Post—this factor weighs against fair use. P. Mot. at 23. But Plaintiff ignores the crux of the analysis, which is to consider the amount used *in relation* to the purpose of the use. *See Campbell*, 510 U.S. at 586 (emphasis added). Here, Newsweek used the Instagram Post because Plaintiff was the *source* of the news, and it was necessary to embed the Instagram Post in order to report what happened. *See supra* Section III.A. Newsweek's purpose was distinct from Plaintiff's stated purpose in capturing the photographs for fine art.[9] McGucken Tr. at 140:3–4, 145:9–10, 149:3–7, 152:16–17. Newsweek could not have taken any less of the Instagram Post, without making it useless to the article. *See Núñez*, 235 F.3d at 24.

### D. The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

For the fourth factor, which focuses on the effect on the market for or value of the copyrighted work (§ 107), courts should consider whether the use would produce a market substitute, the amount and source of the loss, and the public benefits the copying will likely produce. *Google*, 141 S. Ct. at 1206. If a defendant's work does not usurp the market for the copyrighted work, then the fourth factor leans toward fair use. *Campbell*, 510 U.S. at 593.

Critically, Newsweek's use of the Instagram embed code, with the cropped, lower-resolution version of Plaintiff's photograph, does not serve as a market substitute for Plaintiff's original high-resolution fine artwork. Plaintiff classifies himself as a fine art photographer and does not seem to have (or want) an editorial licensing market for Newsweek to usurp. McGucken Tr. at 25:21–26:5, 26:23–24, 27:7–19, 31:14–16, 32:11–13, 63:24–64:21, 84:19–25. Notably, Plaintiff makes the concerted choice not to work with photography agencies, does not

---

[9] Plaintiff's citation to *Michael Grecco Prods., Inc. v. Valuewalk, LLC* may be distinguished for that reason, as, there, both parties captured and used the image for biographical purposes. 345 F. Supp. 3d 482, 505, 507–08 (S.D.N.Y. 2018).

work on assignment, does not classify himself as a freelance photographer, and does not work for a company or publication regularly, but rather, primarily focuses on building his long-term fine art brand. *Id.* at 25:21–26:2, 26:23–24, 31:8–23, 212:13–16, 212:20–213:2, 215:1–19. Plaintiff posts his photographic work online only to share his art and drum up interest in his fine art photography. *Id.* at 56:3–14, 80:22–24, 88:20–23, 92:6–8. Newsweek's use, in this instance, did not include a high-resolution photograph, which Plaintiff would typically sell (*Id.* at 55:5–14), but rather showed an embedded Instagram Post from Plaintiff's social media account, alongside Plaintiff's username, which users could click to see more of Plaintiff's art or follow to his website to purchase a fine art print. Gates Decl. Ex. at I, K. It is implausible that Newsweek's use would compete with Plaintiff's fine art sales or affect the value of the market for Plaintiff's original full-resolution photographs. Someone interested in purchasing a fine art print or high-resolution photograph would not find an adequate substitute in a compressed, lower-resolution image contained within the framing of a social media post on a news website.

Moreover, Plaintiff did not face a potential loss of revenue based on Newsweek's use of his Instagram Post. Plaintiff admittedly gave his high-resolution photographs away to most news organizations for free. McGucken Tr. at 99:8–11, 108:2–4, 112:2–4, 123:11–13, 131:19–20, 137:3–5. Nor did he face a non-cognizable loss that would decrease demand for the original high-resolution photographs; rather, Newsweek's use directed viewed back to Plaintiff's Instagram account, where he promotes his art, and thereby provided Plaintiff with further viewers and engagement, which may translate into potential purchasers of his fine art prints. Gates Decl. Ex. I, K. Crucially, the fourth factor "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 755 F.3d at 99. Any economic harm caused by

31

transformative uses does not factor into the analysis, "because such uses, by definition do not serve as substitutes for the original work." *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 395 (S.D.N.Y. 2014) (quoting *HathiTrust*, 755 F.3d at 99).   As a result, because Newsweek's use of the Instagram Post was not a market substitute, there was no cognizable injury to Plaintiff.   On balance, the fair use factors weigh in favor of Newsweek.

## IV.   PLAINTIFF HAS NOT ESTABLISHED THAT THE ALLEGED INFRINGEMENT WAS WILLFUL

Plaintiff's argument that the Court should grant summary judgment in his favor on the ground that the alleged infringement was willful does not pass muster.   As Plaintiff points out, he carries the burden of establishing willfulness and the Court must draw all reasonable inferences in Newsweek's favor.   *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005) (finding that "our standard of review requires that we decide in favor of the non-moving party" on the issue of willfulness); *Lipton v. Nature Co.*, 71 F.3d 464, 472–73 (2d Cir. 1995) (reversing district court's award of summary judgment on the question of willfulness).   Nonetheless, Plaintiff argues that the Court should find in his favor on this issue based on specious arguments that are unsupported by the evidence.   Plaintiff's argument for a finding of willfulness centers on: (1) his hollow claim that Newsweek failed to comply with his requirements, (2) his erroneous claim that he declined to grant a license to Newsweek, (3) his misconstruction of Newsweek's internal policy, and (4) his unsubstantiated claim that Newsweek conducted no due diligence.   *See* P. Mot. at 8–9.   These arguments all fail.

*First*, Plaintiff argues that Newsweek failed to comply with Instagram's terms by failing to comply with his requirements, but Plaintiff does not identify any requirements that he imposed on use of the Instagram Post at the time.   *See* P. Mot. at 8.   A review of the Instagram Post shows that there are no restrictions or requirements included in the caption of the post, or anywhere

within the frame for that matter (Gates Decl. Ex. L at NEWS000005), and Plaintiff testified that he did not impose any restrictions or requirements on the use, other than the inclusion of his name. McGucken Tr. at 89:11–14. *Second*, Plaintiff makes a false statement in his argument that he *declined* to grant a license to Newsweek. Rather, Plaintiff admitted that he did not respond to the Newsweek writer's inquiry regarding uploading the image to Newsweek's CMS. *See* McGucken Decl. Ex. 3; McGucken Tr. at 178:4–9. As one of Newsweek's witnesses recognized, a lack of response and expressly declining permission to use are not the same and would warrant different actions—for example, if a photographer asked Newsweek not to use a photograph, Newsweek would not use it. Rice Tr. at 32:24–33:2, 122:14–21, 125:14–20.

*Third*, Plaintiff argues that Newsweek did not follow its own policy, but in making this argument Plaintiff wholly misconstrues the cited policy,[10] which, as Newsweek's witness who drafted the policy testified, applies only to digital image files that are saved and uploaded to Newsweek's CMS. Rice Tr. at 78:16–24, 85:25–86:12, 87:5–10, 87:18–23, 89:15–24, 207:3–10. Newsweek makes a clear distinction between digital image files that it hosts in its CMS and embedded posts. *See id.* Only the former is subject to Newsweek's written policy (requiring permission for use), while the latter is governed by industry standards. *See id.* In arguing that Newsweek did not follow its own policy, Plaintiff cherry-picked a few lines of deposition testimony and ignored the relevant testimony, in which Newsweek's witness who drafted the policy confirmed that Newsweek did not have a written policy on embedding. *See id.*

*Fourth*, Plaintiff also claims that Newsweek conducted no due diligence or analysis before using the Instagram Post, without citing any evidence to support this unsubstantiated

---

[10] Plaintiff also relies upon a version of the policy that was inoperative at the time of the alleged infringement in March 2019. *See* Burroughs Decl. Ex. 12. As Ms. Rice (who drafted the documents) testified, the particular policy cited by Plaintiff was not in effect in March 2019. Rice Tr. at 76:2–7, 101:19–102:3.

assertion (*see* P. Mot. at 9)—likely because this claim is contradicted by Newsweek's testimony regarding its editorial process.  E-S Tr. at 31:4–32:1, 82:21–83:12.  The only semblance of support that Plaintiff offers is a citation to Ms. Rice's deposition transcript where Plaintiff's counsel questioned her about whether she thought the image was newsworthy.  *See* P. Mot. at 9 (citing Burroughs Decl. Ex. 13).  But the use of the testimony is inherently misleading because Plaintiff's counsel did not ask Ms. Rice any questions about whether a fair use analysis or due diligence was performed at the time the article was posted; his questions merely inquired into her understanding of what is "newsworthy" on the day of her deposition and included hypotheticals. Rice Tr. at 179:17–180:8.  The cases Plaintiff cites, *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424 (S.D.N.Y. 2014), and *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001), are distinguishable for this reason.  In both cases, the courts considered trial evidence regarding each defendant's specific actions leading up to the alleged infringing uses.  *Yurman Design*, 262 F.3d at 113; *Beastie Boys*, 66 F. Supp. 3d at 440–43.  Here, Plaintiff's counsel did not elicit testimony from Newsweek regarding its specific practices or actions leading up to the posting of the article at issue but focused on general questions regarding a belief held on the day of the deposition or hypotheticals.  Rice Tr. at 179:17–180:8.  Such testimony is insufficient to support Plaintiff's off-hand assertion that "Newsweek conceded that it conducted no due diligence or analysis before publishing the infringing content."  P. Mot. at 9.  Moreover, neither of these cases dealt with grey or novel areas in the law, as are presented here.

Additionally, Plaintiff's argument that Newsweek continued to violate his rights "for an unreasonable time" after receiving notice of infringement does not support a finding of willfulness.  P. Mot. at 9.  Plaintiff concedes that Newsweek never received his counsel's notice in April 2019 (*id.*), so Newsweek would not have received notice until the initiation of this action

at the end of October 2019.  Dkt. No. 1.  Moreover, it would not be unreasonable for Newsweek to leave the article with the Instagram Post up for a short time at an initial stage of the litigation, if it believed there was no infringement.  As the Court acknowledged during the January 7, 2020 conference, based on the license theory espoused by Newsweek, there was no legal reason for Newsweek to have taken the Instagram Post down.  Dkt. No. 19.  Plaintiff's citation to *Peer Int'l Corp. v. Luna Recs., Inc.*, 887 F. Supp. 560 (S.D.N.Y. 1995), is inapposite for this reason, as that case concerned the express revocation of a license; whereas, here, Newsweek is asserting, among its other defenses, that it had a license and there is no allegation that it was revoked.  *Fallaci v. New Gazette Literary Corp.*, 568 F. Supp. 1172 (S.D.N.Y. 1983), is similarly inapposite as it involved a defendant that failed to appear and defend the action, which is not the case here.

## **CONCLUSION**

For the reasons stated herein, Newsweek respectfully requests that the Court deny Plaintiff's motion for summary judgment in its entirety, and grant Newsweek's cross-motion for summary judgment.

Respectfully Submitted,

Dated:  New York, New York
       June 21, 2021

COWAN, DeBAETS, ABRAHAMS & SHEPPARD LLP

By:    /s/ Nancy E. Wolff   
     Nancy E. Wolff
     Sara Gates
     41 Madison Avenue, 38th Floor
     New York, New York 10010
     Tel.: (212) 974-7474
     Fax: (212) 974-8474
     nwolff@cdas.com
     sgates@cdas.com

     *Attorneys for Defendant Newsweek Digital LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Nancy E. Wolff, hereby certify that a true and correct complete copy of the foregoing Defendant Newsweek Digital LLC's Memorandum of Law in Support of Its Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment has been served on all counsel of record via the Court's CM/ECF service.


_____/s/ Nancy Wolff_____
Nancy E. Wolff
