# EXHIBIT B

Atkinson Baker, a Veritext Company
www.depo.com

```
 1              UNITED  STATES  DISTRICT  COURT

 2            SOUTHERN  DISTRICT  OF  NEW  YORK

 3

 4    ELLIOT MCGUCKEN, an        )
      individual,                )
 5                               )
                Plaintiff,       )
 6                               )   Civil Action No.:
           vs.                   )   1:19-cv-09617-KPF
 7                               )
      NEWSWEEK, LLC, a New       )
 8    York Limited Liability     )
      Company; and DOES 1-10,    )
 9    inclusive,                 )
                                 )
10              Defendants.      )
                                 )
11    ------------------------- X

12

13             C O N F I D E N T I A L

14      30(b)(6)  ZOOM  VIDEOCONFERENCE  DEPOSITION  OF

15                NEWSWEEK  DIGITAL,  LLC

16                   BY  AND  THROUGH

17                     DIANE  RICE

18                     NEW  JERSEY

19                  MARCH  10,  2021

20

21    ATKINSON-BAKER,
      a VERITEX COMPANY
22    Telephone:  1-800-288-3376
      www.depo.com
23

24    REPORTED BY: Amelinda Lopez, RPR, CCR #30XI00229700

25    FILE NO.:  AE08879
```

**CERTIFIED COPY**

Atkinson Baker, a Veritext Company
www.depo.com

```
1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4    ELLIOT MCGUCKEN, an        )
     individual,                )
5                               )
                 Plaintiff,     )   Civil Action No.:
6                               )   1:19-cv-09617-KPF
          vs.                   )
7                               )
     NEWSWEEK, LLC, a New       )
8    York Limited Liability     )
     Company; and DOES 1-10,    )
9    inclusive,                 )
                                )
10               Defendants.    )
                                )
11   -------------------------X

12

13

14        Zoom videoconference deposition of DIANE

15   RICE, taken on behalf of the Plaintiff, commencing

16   at 1:00 p.m., Wednesday, March 10, 2021, before

17   Amelinda Lopez, RPR, CCR No. 30XI00229700.

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   A P P E A R A N C E S:

 2

 3   FOR PLAINTIFF:

 4        DONIGER/BURROUGHS
          BY:   SCOTT ALAN BURROUGHS, ESQ.
 5             LAURA ZAHARIA, ESQ.
          603 Rose Avenue
 6        Venice, California 90291
          Telephone:  (310) 590-1820
 7        E-Mail:  scott@donigerlawfirm.com
                   lzaharia@donigerlawfirm.com
 8

 9   FOR DEFENDANT:

10
          COWAN DEBAETS ABRAHAMS & SHEPPARD
11        BY:   NANCY E. WOLFF, ESQ.
               SARA GATES, ESQ.
12        41 Madison Avenue
          New York, New York 10010
13        Telephone:  (212) 974-7474
          Facsimile:  (212) 974-8474
14        E-Mail:  nwolff@cdas.com
                   sgates@cdas.com
15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

1                          I N D E X

2

3     WITNESS:  DIANE RICE

4     Examinations                                  Page

|  |  | By Ms. Gates | 211 |
| 6 |  | By Mr. Burroughs | 215 |
| 7 |  | E X H I B I T S | |
| 8 |  | | |
| 9 | No. | Description | Page |
| 10 | 1 | Amended Deposition Notice | 46 |
| 11 | 2 | Bates Stamp Newsweek 1 & 2 - | 75 |
|  |  | Updated Photo Guidelines | |
| 12 |  | | |
|  | 3 | Bates Stamp Newsweek 104 & 105 - | 103 |
| 13 |  | Photo Guidelines | |
| 14 | 4 | Bates Stamp McGucken 9 - Newsweek | 110 |
|  |  | Publication | |
| 15 |  | | |
|  | 5 | Bates Stamp Newsweek 5 - Image | 161 |
| 16 |  | | |
|  | 6 | Bates Stamp Newsweek 23 - 27 - | 164 |
| 17 |  | E-mail String | |
| 18 | 7 | Bates Stamp Newsweek 3 - E-mail | 173 |
|  |  | String | |
| 19 |  | | |
|  | 8 | Bates Stamp Newsweek 28 - | 175 |
| 20 |  | Instagram Message to Mr. McGucken | |
| 21 | 9 | Screen Capture - Newsweek Terms | 184 |
|  |  | and Conditions | |
| 22 |  | | |
|  | 10 | Bates Stamp Newsweek 157 through | 191 |
| 23 |  | 162 - Instagram Platform Policy | |
| 24 | 11 | Bates Stamp Newsweek 81 through | 211 |
|  |  | 83 - Full Article | |
| 25 |  | | |

1            New Jersey; March 10, 2021; 1:00 p.m.

2                      -- -- --

3

4            D I A N E   R I C E, having first

5    been duly sworn, testified as follows:

6

7                    EXAMINATION

8    BY MR. BURROUGHS:

9         Q.    Hello, Ms. Rice.  Would you please

10   state your name for the record?

11        A.    Diane Rice.

12        Q.    Is it R-I-C-E?

13        A.    Yes, R-I-C-E.

14        Q.    Okay.  Are you currently employed?

15        A.    Yes.

16        Q.    And what's your current employment?

17        A.    I'm director of photography for

18   Newsweek.

19        Q.    Okay.  Do you hold any other

20   employment currently?

21        A.    Not currently.

22        Q.    Okay.  How long have you worked at

23   Newsweek?

24        A.    Over three years now.

25        Q.    Have you always had that same title,

Atkinson Baker, a Veritext Company
www.depo.com

```
1   director of photography?
2       A.    As long as I've been with Newsweek,
3   I've been a director of photography.
4       Q.    Okay.  Prior to working with
5   Newsweek, were you employed?
6       A.    Yes.
7       Q.    Where were you employed?
8       A.    I was working with Manifest, which
9   is a creative agency prior to Newsweek.
10      Q.    Okay.  Is that an editorial agency,
11  a commercial agency, or something else?
12      A.    It was commercial.
13      Q.    Okay.  And how long did you work
14  there for?
15      A.    I worked with them for just over a
16  year.
17      Q.    And prior to working there, where
18  did you work?
19      A.    I worked for Washingtonian in D.C.
20      Q.    Okay.  And what was your title in
21  that position?
22      A.    I was a photo director.
23      Q.    And how long did you work there?
24      A.    Just over three years.
25      Q.    Okay.  And what was your title in
```

Atkinson Baker, a Veritext Company
www.depo.com

```
1    working at Manifest?
2         A.      Photo editor.
3         Q.      And did you go to college?
4         A.      I did.
5         Q.      Where did you go to college?
6         A.      I went to Nassau Community for two
7    years and Long Island University to finish my
8    degree.
9         Q.      Okay.  And what was your degree?
10        A.      Mixed concentration in graphic
11   design and photography.
12        Q.      Other than that degree, do you have
13   any training, formal or otherwise, relating to
14   photography?
15        A.      No, just my experience as a photo
16   editor.
17        Q.      Okay.  Do you have any training,
18   formal or otherwise, other than your experience
19   as an editor in applying editorial guidelines?
20        A.      Just as a photo editor.
21        Q.      Okay.  Have you ever had any legal
22   training that's relevant to your role as a
23   photo editor?
24        A.      Not outside of the Getty session.
25        Q.      Okay.  And have you had a Getty
```

Atkinson Baker, a Veritext Company
www.depo.com

1   session?

2       A.      Yes.

3       Q.      Okay.  When was that?

4       A.      It was 2019.

5       Q.      Can you estimate for me the month?

6       A.      I believe that was in November.

7       Q.      Okay.  Was that in person or online?

8       A.      It was in person.

9       Q.      Okay.  And where was it?

10      A.      It was held in our offices.

11  Newsweek.

12      Q.      Can you estimate for me how many

13  people were in attendance?

14      A.      It's slightly difficult to estimate

15  since some people dialed in, so I couldn't say

16  how many people dialed in.  But in the room,

17  there was probably at least 30, maybe more.

18  I'm not sure.

19      Q.      Okay.  Do you know if it was

20  required that Newsweek staff attend the

21  meeting?

22      A.      It was.  I believe so.

23      Q.      Okay.  Have you ever had your

24  deposition taken before?

25      A.      No, I have not.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  Have you ever had occasion to
2  obtain a personal lawyer for any purpose?
3      A.      No, I never had a need.
4      Q.      Are you represented by counsel
5  today?
6      A.      If you would count the counsel in
7  the room, I would suppose.  Yeah.
8      Q.      Okay.  Are you referring to
9  Ms. Gates and Ms. Wolff?
10      A.      I am.
11      Q.      Okay.  Do you recall when you first
12  spoke with either Ms. Gates or Ms. Wolff?
13      A.      I believe it might have been on an
14  e-mail correspondence in 2019, but I'm not
15  sure.
16      Q.      Okay.  When is the first time you
17  can recall communicating with Ms. Gates or
18  Ms. Wolff?
19      A.      That would be about a month or so
20  ago.
21      Q.      Okay.  And prior to that, had you
22  had any interaction with any other attorneys
23  working for or representing Newsweek?
24      A.      Not that I'm aware of.
25      Q.      Do you recall ever speaking with

Atkinson Baker, a Veritext Company
www.depo.com

1    anyone other than your attorneys about the

2    dispute that we're talking about today?

3        A.     Yes.

4        Q.     Okay.  And who did you speak with

5    other than your attorneys regarding this

6    dispute?

7        A.     That would be Yuliya, one of our

8    business associates.

9        Q.     Okay.  Do you mind spelling her name

10   for us?

11       A.     I'd need to pull it up in my e-mail.

12   I'm not a good speller.

13       Q.     No problem.  Okay.  Well, this

14   actually ducktails into a couple of the ground

15   rules.  So let me go over those with you since

16   you have not had your deposition taken before.

17            You know, there may come times during

18   today's proceedings where I will ask you for

19   spellings for the record.  That is primarily

20   for Madam Court Reporter to make sure that when

21   she transcribes what you're saying, she's

22   transcribing it accurately.  To that end, it's

23   also important for you and I to allow each

24   other to finish before we answer because that

25   will allow for a more clear transcription and

Atkinson Baker, a Veritext Company
www.depo.com

1    it also requires us to use language such as

2    "yes" and "no" as opposed to visual cues such

3    as head nods or shakes or guttural responses

4    like uh-huhs and huh-uhs.

5           Does that make sense?

6       A.     Understood.

7       Q.     Okay.  And the transcript is going

8    to be sent to you after this session for your

9    review and you will have the opportunity to

10   review it and make revisions.  However, to the

11   extent that you make a revision that's

12   substantial or substantive such as a yes to a

13   no or blue to a red, I'll be able to comment on

14   that when this case goes to trial and that may

15   impact your credibility in front of the jury.

16   So it's very important that if I ask the

17   question and you answer it, you know, you don't

18   do so until you understand the question.

19          Okay?

20      A.     Understood.

21      Q.     Okay.  So if I ask the question and

22   you answer it, I'm going to assume that you

23   understood the question.  Is that fair?

24      A.     Yes.

25      Q.     Okay.  And throughout the day, I may

Atkinson Baker, a Veritext Company
www.depo.com

1   be asking you for estimates such as dates or

2   amounts or measurements, things of that nature,

3   and, you know, I don't want you to guess in

4   response to those questions, but I am entitled

5   to your best estimate.  So if I were to ask

6   you, you know, how many days have you worked at

7   Newsweek, you may not have that number handy

8   but given your experience, you'll be able to

9   give me an estimate.

10          If I ask you how long I've worked in

11   my law firm, you would have to guess because

12   you don't know anything about that particular

13   location for me.

14          Does that make sense?

15      A.    Yes.

16      Q.    Okay.  And at certain points during

17   the proceedings, your attorneys may interpose

18   objections.  Now, unless they instruct you not

19   to answer, those are simply for the record, so

20   you should allow the court reporter to write

21   those objections down or type them as the case

22   may be and then provide a response.

23          Does that make sense?

24      A.    Yes.

25      Q.    Okay.  Now, is there any reason why

Atkinson Baker, a Veritext Company
www.depo.com

1   you wouldn't be able to give me your best

2   testimony today?  Any illnesses or drugs or

3   alcohol in the last 24 hours or anything like

4   that?

5       A.    No.

6       Q.    Okay.  So as the director of

7   photography at Newsweek, what are your

8   day-to-day obligations?

9       A.    Typically, I'm working with the

10  magazine staff, so I'm pulling images for news

11  stories that would be running in the magazine.

12  Make sure I'm downloading the licenses with

13  those images.  Tracking the information that

14  goes along with the photos so that our

15  reporters can access that information and make

16  proper captions.  Adding photo credits and just

17  double-checking to make sure there's no

18  misspellings and things like that in reference

19  to the visuals.

20      Q.    Okay.  When you say that part of

21  your job is pulling images, what do you mean by

22  that?

23      A.    Usually a stock research typically

24  or requesting images from, you know, sources.

25      Q.    When you say you're doing stock

Atkinson Baker, a Veritext Company
www.depo.com

```
 1  work, what do you mean by that?
 2       A.     Going to stock sites like Getty.
 3       Q.     Do you currently work with Getty in
 4  your role at Newsweek?
 5       A.     Yes, I do.
 6       Q.     Okay.  Do you work with any other
 7  stock agencies aside from Getty?
 8       A.     Typically, it is -- Getty is our
 9  main subscription.
10       Q.     Okay.  Are there any others that
11  you're working with now?
12       A.     We're starting to add AP, but I'm
13  not sure if that deal has been finalized.
14       Q.     Are there any others that you were
15  working with in 2020?
16       A.     Not in 2020.
17       Q.     Are there any others that you were
18  working with in 2019?
19       A.     Not in 2019.
20       Q.     Were you working with Getty in 2019?
21       A.     Yes.
22       Q.     Okay.  Was Newsweek working with
23  Getty when you joined the company?
24       A.     Yes.
25       Q.     Okay.  And one other ground rule
```

Atkinson Baker, a Veritext Company
www.depo.com

```
1    just so we're on the same page is that
2    throughout the proceedings I'm going to be
3    referring to "you" and "your" in connection
4    with my questions, and when I do so, do you
5    understand I'm referring to Newsweek, the
6    company?
7         A.    I do now.
8         Q.    Okay.  So you're speaking on behalf
9    of Newsweek.  Do you understand that?
10        A.    Yes.
11        Q.    Okay.  Now, do you currently obtain
12   photographs from anywhere other than Getty?
13        A.    Yes, when necessary.
14        Q.    Okay.  What sources do you recall
15   pulling images other than Getty?
16        A.    I would say like Netflix or HBO or
17   things that might be related to video content.
18        Q.    Okay.  So when you're pulling
19   Netflix photographs, for example, where are you
20   pulling those from?
21        A.    Up from the PR site.  I have access
22   to the PR images.
23        Q.    Is that the same for HBO?
24        A.    Yes.
25        Q.    Is that the same for the other media
```

Atkinson Baker, a Veritext Company
www.depo.com

1    companies with which you work?

2        A.      Yes, it would be.

3        Q.      Okay.  So aside from Getty and the

4    media PR sites, are you sourcing images from

5    anywhere else currently?

6        A.      Yeah, for doing a story on a

7    specific person, we might request that they

8    send us images.

9        Q.      Sometimes you may request the

10   subject provide a key art or image for a story?

11       A.      Correct.

12       Q.      Okay.  Do you have an understanding

13   of the term "key art"?

14       A.      Yes.

15       Q.      What does that mean to you?

16       A.      Typically a key art is in reference

17   to like a movie or movie cover.  News cover.

18       Q.      Does the word "hero image" mean

19   anything to you?

20       A.      We would use that in reference to

21   the lead image to a story.

22       Q.      So if Newsweek did a piece and there

23   was a photograph at the top beneath the URL,

24   would that be the hero image?

25       A.      I would call that a hero image, yes.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Has Newsweek ever published any

2  photographs that you've created?

3      A.      Personally, no.  Not that I'm --

4      Q.      Are you aware of Newsweek -- are you

5  aware of Newsweek ever posting or publishing

6  any photographs that any of its staff created?

7      A.      Yes.

8      Q.      When was the last time that you can

9  recall that happening?

10      A.      I would say maybe three months ago.

11  I know there was a reporter that had taken an

12  image I think of a particular brand in his

13  closet.

14      Q.      Okay.  Can you recall any other

15  examples?

16      A.      Not off the top of my head I cannot.

17      Q.      Okay.  So as you sit here today, you

18  can recall one instance in which one reporter

19  provided a photograph for a story on Newsweek,

20  but cannot recall any other instances in which

21  Newsweek published a photograph created by a

22  staff member.  Is that fair to say?

23      A.      That's fair, yes.

24      Q.      Okay.  Does Newsweek currently

25  employ any photographers?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.      No, they do not.

2      Q.      In your tenure there has Newsweek

3   ever employed a photographer?

4      A.      Not since I've been with the

5   magazine.  We've commissioned photographers,

6   but we don't employ staff photographers.

7      Q.      When was the last time you recall

8   Newsweek commissioning a photographer for a

9   Newsweek project?

10     A.      That would have probably -- that

11  would have been over the summer, I believe.

12     Q.      Okay.  And do you recall the

13  substance of that project?

14     A.      I think it was in -- I'm sorry,

15  actually, I'm sorry.  Let me backtrack.  There

16  was a more recent image for someone receiving a

17  medal of the arts that we commissioned.  Or

18  rather the photographer came to us and let us

19  know that he was doing -- he was going to be

20  photographing a specific person receiving a

21  medal and we agreed to publish the images.

22     Q.      Was that a pitch?

23     A.      It was a pitch, yes.  And we picked

24  it up prior to the images being shot.

25     Q.      Okay.  Can you estimate for me what

Atkinson Baker, a Veritext Company
www.depo.com

1    percentage of photographs that have appeared on

2    the Newsweek site during your tenure are from

3    Getty as opposed to from either a third-party

4    commissioned photographer or a staff

5    photographer or someone else?

6        A.      Specifically news images?  As Getty

7    images versus commissioned images you're

8    asking?

9        Q.      Or images created by staff even if

10   they're not photographers like the reporter

11   that you indicated earlier?

12       A.      I would say 99 percent of the images

13   are from Getty, maybe even more.

14       Q.      Okay.  Does or has Newsweek -- let

15   me withdraw the question.

16             In your tenure at Newsweek, has

17   Newsweek ever pulled photos from social media?

18       A.      Yes.

19       Q.      Okay.  Can you estimate for me how

20   many times that has happened in your tenure?

21       A.      That would be difficult to estimate.

22   I'm really not sure.

23       Q.      Would it be more than 25?

24       A.      I'm sorry, I really couldn't

25   estimate.

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.    Would it be more than five?

2    A.    I'm sorry, I really couldn't

3    estimate.

4    Q.    So as you sit here today, you have

5    no understanding or ability to estimate the

6    number of social media photographs that were

7    pulled for use on the Newsweek site; is that

8    correct?

9    A.    Yes.

10   Q.    Are you aware of that happening at

11   least once?

12   A.    Yes.

13   Q.    Okay.  And is that the photograph by

14   Mr. McGucken that we're here to talk about

15   today?

16   A.    I think we're talking about two

17   slightly different things.  If you can clarify

18   embedding an image versus using an image that

19   we had permission to use in social media.

20   Q.    Okay.  When I refer to Newsweek

21   displaying an image, I'm referring to the image

22   actually appearing for viewing by the public at

23   Newsweek.com.

24        Does that make sense?

25   A.    Yes.

Atkinson Baker, a Veritext Company
www.depo.com

```
1        Q.     Okay.
2               MS. WOLFF:  Objection.
3    BY MR. BURROUGHS:
4        Q.     So, you know, from my -- for most of
5    my questions, there's not going to be a
6    distinction between whether or not it was
7    uploaded directly as opposed to embedded.  My
8    question is going to address the photos that
9    are displayed and visible on Newsweek.com.
10              Does that make sense?
11              MS. WOLFF:  Objection.  That's a
12   legal definition.
13   BY MR. BURROUGHS:
14       Q.     Does that make sense?
15       A.     Yes.
16       Q.     Okay.  So going back to my question:
17   Is the instance in which Newsweek displayed
18   Mr. McGucken's photograph the only time that
19   you can recall Newsweek pulling a photograph
20   from social media?
21       A.     No.
22              MS. WOLFF:  Objection to form.
23       A.     Sorry.
24       Q.     Can you identify for me the other
25   photograph that you remember being pulled from
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   social media for display on Newsweek?
 2        A.     Not off the top of my head.
 3        Q.     Okay.  So as you sit here today, the
 4   only time that you can ever recall Newsweek
 5   displaying a photograph that it pulled from
 6   social media is the McGucken photograph that
 7   we're talking about today, correct?
 8              MS. WOLFF:  Objection to form.
 9        A.     It's the only specific instance.
10        Q.     Okay.  Do you have any other
11   recollection?
12        A.     Of?
13        Q.     Of any other photograph that was
14   pulled from social media for display on
15   Newsweek?
16        A.     Yes.
17              MS. WOLFF:  Objection to form.
18   BY MR. BURROUGHS:
19        Q.     What is that recollection?
20        A.     I mean, we've done it before with
21   other stories when it relates to the story.
22        Q.     Can you recall any story --
23        A.     I can't recall a specific story.  We
24   post hundreds of stories in a day, so it's
25   difficult for me to isolate just one.
```

Atkinson Baker, a Veritext Company
www.depo.com

1     Q.    Okay.  So as you sit here today, can

2  you recall any story other than the McGucken

3  story in which Newsweek displayed a photograph

4  pulled from social media?

5          MS. WOLFF:  Objection to form.

6     A.    Like I said, it's difficult for me

7  to isolate a specific story.

8     Q.    Can you recall any other story?

9     A.    Not a specific story.

10    Q.    Can you recall anything about any

11 other story?

12    A.    Not a specific story.

13    Q.    Can you recall anything specific

14 general or otherwise?

15    A.    I cannot.

16    Q.    Does Newsweek have in place the

17 policy regarding pulling photos from social

18 media?

19    A.    Yes.

20          MS. WOLFF:  Objection to form.

21 BY MR. BURROUGHS:

22    Q.    Okay.  When were you first made

23 aware of that policy?

24    A.    I created the policy in 2018.

25    Q.    Okay.  In creating the policy, were

Atkinson Baker, a Veritext Company
www.depo.com

1    you advised by counsel?

2         A.    I did run it by -- I did send what I

3    wrote to appropriate people within our company

4    for their review.

5         Q.    Were any of those, and I don't want

6    you to tell me what they said, but were any of

7    those attorneys?

8         A.    I don't know specifically if they

9    were attorneys.

10        Q.    Okay.  So who did you send it to

11   within the company?

12        A.    I sent it to my editors.  I sent it

13   to our CFO.  I sent it to Yuliya, I mentioned

14   earlier.

15        Q.    Okay.  Which editors did you send it

16   to?

17        A.    That would be Nancy, our

18   editor-in-chief.

19        Q.    And what's her last name?

20        A.    Sorry, I'm a little nervous.  I

21   apologize.  I can --

22        Q.    If you don't remember, that's fine.

23   Do you remember the name of any other editors

24   to whom you sent the work?

25        A.    Yes, Dayan with a "Y".  D-A-Y-A-N.

Atkinson Baker, a Veritext Company
www.depo.com

1     Q.    Okay.  Do you recall her last time?

2     A.    That's a he and it's a long last

3  name.

4     Q.    What do you recall about the last

5  name?

6     A.    I believe it begins with an "n."

7  I'm sorry.  I'm not particularly good with last

8  names.

9     Q.    That's okay.  You also indicated you

10  sent it to the CFO.  Who is the CFO that you

11  sent it to?

12     A.    Sorry, our CCO, chief content

13  officer.  That was Dayan.

14     Q.    Is Dayan still the CCO?

15     A.    Yes.

16     Q.    What is your understanding of what

17  the CCO's role is at the company?

18     A.    That he guides the editorial

19  direction.

20     Q.    Okay.  And would that include visual

21  assets like photography?

22     A.    It would include everything.

23     Q.    Okay.  Do you recall if he had any

24  feedback regarding your social media

25  guidelines?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.      I do not recall having any feedback.

2      Q.      Do you recall any feedback from

3   anyone at Newsweek?

4      A.      Not specifically.

5      Q.      Do you recall anything generally?

6      A.      Not generally.

7      Q.      Do you recall any feedback that you

8   received from anyone in regard to the

9   guidelines?

10      A.      I do not recall any feedback.

11      Q.      Okay.  From where did you draw in

12   drafting those social media guidelines for

13   Newsweek?

14      A.      Industry standards that I knew from

15   my experience as being a photo editor and it

16   would be updated periodically as needed.

17      Q.      Okay.  So the Newsweek social media

18   guidelines were drawn based on your personal

19   professional experience, correct?

20      A.      Correct.

21      Q.      Were they based on anything else?

22      A.      My experience and from what I know

23   about what kind of things to be aware of within

24   posting images.

25      Q.      Okay.  And that particular

1    experience you're referencing, can you break

2    down for me what that is?

3         A.    I started my career working for a

4    local newspaper in 2013.  I worked with them

5    for four years.  Then I moved on to another

6    magazine company, which I worked for for six

7    years.  Then I worked for Washingtonian for

8    three years followed by the agency for a year

9    and been here with Newsweek for over three

10   years now.  So it's a fairly long career and

11   seen a lot, heard a lot, so fairly familiar

12   with what are the dos and don'ts of how to use

13   visuals.

14        Q.    Okay.  And can you estimate for me

15   when you drafted those guidelines?

16        A.    It would have probably been either

17   -- it would have been early 2018, I believe.

18   Maybe even late 2017.

19        Q.    Okay.  And what was the name of the

20   magazine that you worked at for six years?

21        A.    It was Bonnier Corporation.  I

22   worked within their travel group.  The magazine

23   I worked for the longest for them was

24   Designation Weddings and Honeymoons and I also

25   worked with Caribbean Travel & Life, Spa

Atkinson Baker, a Veritext Company
www.depo.com

1   Magazine, Parenting Magazine.  I think I worked

2   on Yachting a little while too.  It was a wide

3   range of publications within their suite.

4        Q.     Okay.  And what was your title

5   there?

6        A.     I was photo editor.

7        Q.     Okay.  So is it fair to say that the

8   social media guidelines that you drew up for

9   Newsweek were based on your decade or so of

10  time in the industry?

11       A.     Yes.

12       Q.     And is it fair to say that they

13  reflect your understanding of industry

14  standards?

15       A.     Yes.

16       Q.     And is it fair to say that Newsweek

17  adopted those guidelines?

18       A.     Yes.

19       Q.     Were those guidelines circulated to

20  everyone at the company?

21       A.     That I'm aware of, yes.  It's also

22  been provided to our hiring manager whom I've

23  requested that she make sure everyone that

24  starts with the company receives a copy.

25       Q.     Okay.  Was there anything else

Atkinson Baker, a Veritext Company
www.depo.com

1   submitted to new hires related to intellectual

2   property other than your guidelines?

3       A.    I couldn't say for sure.  I don't

4   know what's included in the package.

5       Q.    Okay.  Were you responsible for

6   updating the guidelines as time passed?

7       A.    Yes, I did and every time I updated

8   it, I made sure it was recirculated.

9       Q.    Would you add in new dates to the

10  guidelines or indicate in some way that they've

11  been updated?

12      A.    Yes.

13      Q.    Okay.  How many versions of the

14  guidelines do you recall drafting?

15      A.    Most probably maybe five.

16      Q.    So five different versions of the

17  guidelines?

18      A.    To the best of my knowledge.

19      Q.    Okay.  And other than yourself, who

20  would know what was transmitted to employees or

21  new hires by Newsweek along with your

22  guidelines, if anything?

23      A.    I'm not sure I understand the

24  question.

25      Q.    You indicated before that you didn't

Atkinson Baker, a Veritext Company
www.depo.com

1    know whether or not anything else was sent with

2    your guidelines.  Do you recall that?

3        A.    Yes.

4        Q.    Who would know that?

5        A.    That would probably be Nancy.  Nancy

6    Cooper, sorry, is the last name.  Nancy Cooper

7    as well as Leiann Kaytmaz who's our HR person.

8        Q.    Are you aware of any instance in

9    which those guidelines were violated by

10   Newsweek?

11       A.    I can't recall any specific instance

12   that it was intentionally violated.

13       Q.    Okay.  As you sit here today, do you

14   recall any instance in which social media

15   guidelines that you wrote and Newsweek adopted

16   were violated by anyone working at or with

17   Newsweek?

18            MS. WOLFF:  Asked and answered.

19       A.    Not that I can recall beyond what

20   I've already stated.

21       Q.    Okay.  So in your entire tenure with

22   the company, you don't recall those guidelines

23   ever being violated, correct?

24       A.    Not specifically.

25       Q.    How about generally?

Atkinson Baker, a Veritext Company
www.depo.com

1    A.    Not generally.

2    Q.    Okay.  So is it fair to say then

3  that during your tenure at the company you

4  don't recall the social media guidelines that

5  you drafted and Newsweek adopted have ever been

6  violated?

7    A.    Not that I could recall at this

8  moment.

9    Q.    What do you recall in terms of your

10  revisions to the guidelines that had to do with

11  the use of third-party content?

12    A.    I don't believe that was changed

13  much, the third-party content.  We're already

14  pretty explicit.

15    Q.    Okay.  And what were you explicit in

16  stating?

17    A.    That permission usually needs to be

18  requested if it's coming from a third party.

19    Q.    You said that it usually needs to be

20  requested.  In what circumstances does it not

21  need to be requested?

22    A.    If it's an embedded image.

23    Q.    And what to your understanding is an

24  embedded image?

25    A.    If a link is applied to the site and

1    it's not hosted on our site.

2         Q.      Okay.  And is that set forth in the

3    guidelines?

4         A.      If we don't specify Instagram embeds

5    in the guidelines.

6         Q.      Is there any reference to any embeds

7    in the guidelines?

8         A.      No.

9         Q.      Is there any reference to embedding

10   in any guidelines: the ones you drafted, or any

11   others that you've seen at Newsweek that refer

12   to embedding?

13        A.      No.

14        Q.      Now, you indicated that your

15   guidelines only required that Newsweek request

16   the right to use third-party content; is that

17   accurate?

18        A.      We need permission for third-party

19   content.

20        Q.      Okay.  So it's not only that

21   Newsweek has to request the consent, it's that

22   they actually have to receive consent?

23        A.      Correct.

24        Q.      Under your policy, what is the

25   result when Newsweek requests permission but

Atkinson Baker, a Veritext Company
www.depo.com

1   doesn't receive it from a third-party creator?

2       A.      We typically would not use it.

3       Q.      Can you think of any time that you

4   asked for consent, did not receive it, yet used

5   the content anyways?

6       A.      I can't recall any situation.

7       Q.      Other than your guidelines, have you

8   ever seen any other guidelines relating to the

9   use of social media content on Newsweek's site?

10      A.      Not that I could recall.

11      Q.      Do you recall ever having any

12  conversations other than with your counsel

13  about whether or how Newsweek can display

14  social media content without the consent of the

15  creator?

16      A.      Not that --

17              MS. WOLFF:  Object to form.

18      A.      Not that I can recall.

19      Q.      In your decade or so experience in

20  the industry, do you believe it violates

21  industry-standard to display someone's

22  photograph on your commercial website without

23  obtaining their consent?

24              MS. WOLFF:  Object to form.

25      A.      We're not a commercial entity.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Understood.  But can you still

2  answer the question or you need me to rephrase

3  it?

4      A.      Could you rephrase?

5      Q.      Sure.  Given your experience in the

6  industry, does it violate industry-standard to

7  post an artist's photograph or display an

8  artist's photograph without their consent on a

9  website?

10              MS. WOLFF:  Object to form.

11      A.      That depends on the context.

12      Q.      Can you give a context in which it's

13  not okay?

14      A.      You can't, for example, you couldn't

15  take a picture of a coffee cup from a website

16  and use it for a random story about coffee.  It

17  has to be specific to that story; otherwise it

18  doesn't relate.

19      Q.      Understood.  So it's your

20  understanding based on your experience in the

21  industry, that so long as the story is about

22  the photograph, then Newsweek can display that

23  photograph without the creator of that

24  photograph's consent; is that accurate?

25      A.      Correct.

Atkinson Baker, a Veritext Company
www.depo.com

1          MS. WOLFF:  Objection.

2  Mischaracterizes.

3          MR. BURROUGHS:  Did you get her

4  response, Madam Court Reporter?

5          THE REPORTER:  Yes.

6  BY MR. BURROUGHS:

7      Q.     Do you take photographs yourself?

8      A.     I have in the past.

9      Q.     But you don't currently create

10  photographs?

11     A.     For personal use I do.

12     Q.     Okay.  If you, for personal use,

13  took a photo of a photograph on a website,

14  posted it, and wrote an article about it, would

15  you have an objection to that?

16     A.     It depends on the context.

17     Q.     In what context would you not have

18  an objection?

19     A.     If it had newsworthiness and it was

20  properly accredited to me or shared as a link,

21  I've had that happen in the past.  I actually

22  had an image go viral, so I've experienced

23  that.

24     Q.     Okay.  Any other context?

25     A.     It needs to have newsworthiness and

Atkinson Baker, a Veritext Company
www.depo.com

1    be specific to that visual.  But beyond that,

2    no.

3        Q.    Okay.  So other than your experience

4    in the industry, where did you gain that

5    knowledge that as long as the photograph is

6    newsworthy it can be exploited without consent?

7              MS. WOLFF:  Objection.

8        A.    My experience has to do with being a

9    photo editor and working in the industry.

10       Q.    Is there any other basis for your

11   understanding that newsworthiness allows you to

12   use an artist's work without consent?

13             MS. WOLFF:  Objection.

14       A.    Just based on my experience as a

15   photo editor.

16       Q.    Okay.  Other than what you told me

17   before, relating to the different publications

18   that you worked for, what other experience

19   informs that understanding?

20       A.    Just this -- only as being a photo

21   editor.  I've been a photo editor for many

22   years.

23       Q.    Okay.  Do you recall when you first

24   heard the term "newsworthiness"?

25       A.    I couldn't recall.

1     Q.     Okay.  What does that word mean to

2  you?

3     A.     If it's of interest or -- to society

4  as a whole.

5     Q.     Okay.  We are going to put a

6  document in front of you marked Exhibit 1.  Ms.

7  Zaharia is going to put that on her screen, so

8  take a look.  This is the deposition notice.

9           Okay.  While Ms. Zaharia is pulling

10  that exhibit, let me go on and ask a couple of

11  other questions and withdraw the exhibit

12  introduction for the time being.

13           What is your understanding of the

14  manner in which a photo can be pulled from a

15  social media website, specifically Instagram?

16           MS. WOLFF:  Object to form.  You can

17  answer.

18     A.     Are we talking about embedding a

19  link or are we talking about removing the image

20  entirely?

21     Q.     I'm asking you how in your role as

22  the photo editor at Newsweek, do you pull

23  images from Instagram?

24     A.     It typically, it would probably be

25  by a link.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      So what's your process for doing

2   that?

3      A.      There's a -- we go to Instagram and

4   we copy the embed link and it could be pasted

5   into the CMS.  So it shows up as it would on

6   Instagram.

7      Q.      Have you ever done that personally?

8      A.      Personally, I have not.

9      Q.      Who at Newsweek does that?

10     A.      Typically, it would be the writer

11  who is posting the story.

12     Q.      Okay.  So other than engaging in the

13  embed process you just mentioned, how else can

14  Newsweek display a photograph on its site that

15  originated on Instagram?

16     A.      We would need to go to the person

17  who took the image, request for the image to be

18  sent to us, and then we would post it -- we

19  would upload it to our site and host it that

20  way.

21     Q.      Okay.  So in that situation, you're

22  not actually taking the photograph from

23  Instagram, you're contacting the person that

24  posted it to Instagram, correct?

25     A.      Correct.  In that situation, yes.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     Other than embedding an Instagram

2  image, are you aware of any other manner in

3  which a photograph can be copied from Instagram

4  for display on Newsweek's site?

5      A.     I know of other ways it could be

6  done, but not that we would do it that way.

7      Q.     What ways are those?

8      A.     A screenshot could be taken.

9      Q.     Okay.  Any other ways?

10     A.     Not that I could recall.

11     Q.     Okay.  So as far as you know, the

12  only way to pull photographs from Instagram for

13  display on Newsweek's site is to either embed

14  the content or publish a screenshot of the

15  content, correct?

16     A.     Or to have the person send us the

17  image.

18     Q.     Okay.  And in that latter case, the

19  person sending you the actual photograph

20  directly, correct?

21     A.     Correct.

22     Q.     All right.  Are you familiar or have

23  you seen the McGucken article that we're here

24  to discuss today?

25     A.     Yes.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  When do you first recall

2   seeing that?

3      A.      I believe it was in October of 2019.

4      Q.      Okay.  Were you involved with that

5   article at or around the time it was published

6   by Newsweek?

7      A.      I was not involved when it was

8   published.

9      Q.      Okay.  Do you know who was involved

10   in the creation of that article?

11      A.      Other than the writer, I don't

12   recall any others.

13      Q.      Okay.  And who's the writer?

14      A.      Katherine.  Sorry, I don't recall

15   the last name.

16      Q.      Does Hignett refresh your

17   recollection?

18      A.      Yes, that sounds correct.

19      Q.      Okay.  Did you work with Ms. Hignett

20   while at Newsweek?

21      A.      Yes, I had.

22      Q.      Did you work with her in connection

23   with placing photography for her articles?

24      A.      If it was in the print magazine, I

25   might have worked with her.  Yes.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Did you ever work with her in

2  connection with the website?

3      A.      Not in connection with the website

4  unless it was something that ran in the story

5  -- ran in the magazine and I was putting it in

6  the CMS for her to post that specific story

7  from the magazine.

8      Q.      Do you recall that ever happening?

9      A.      Not a specific instance of doing

10  that, but I do recall at least one story where

11  I did work with her and with the magazine.

12      Q.      With the physical magazine?

13      A.      Correct.

14      Q.      Okay.  And did Ms. Hignett get a

15  copy of your social media guidelines?

16      A.      I would believe she did.

17      Q.      And why do you believe that?

18      A.      Because it was sent out via e-mail

19  to the whole company.  So I assume it would

20  have included her.

21      Q.      Have you seen that e-mail?

22      A.      I would have at some point, yes.

23      Q.      Have you reviewed your e-mails to

24  see if you could find a copy of it?

25      A.      I believe we provided a copy of it.

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.     Okay.  Have you reviewed your

2  e-mails to see if there were any other e-mails

3  between you and Ms. Hignett?

4    A.     In relation to this story, I did

5  look.  I did not have any direct e-mails to her

6  in relation to the story.

7    Q.     Was the only e-mail you were able to

8  find, in your Newsweek e-mail inbox, the e-mail

9  relating to the circulation of your social

10  media guidelines for which she was a recipient?

11    A.     Yes.

12    Q.     When you searched your e-mail, what

13  keywords did you use?

14    A.     Probably Newsweek guidelines.

15  Photo.  Maybe photos for Web.  And then usually

16  something with an attachment; that would be the

17  easiest way to find it.

18    Q.     Did you ever search your e-mail

19  using the search term Hignett?

20    A.     In relation -- I'm sorry, I'm a

21  little confused as to what you're asking.

22    Q.     Well, you were asked to produce

23  certain e-mails relating to this dispute,

24  correct?

25    A.     Correct.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      And when looking for those documents
2    and e-mails, did you ever search your e-mail
3    for the term Hignett?
4      A.      As far as a recipient?
5      Q.      In any way?
6      A.      I did search my e-mail for her.
7      Q.      And it's your testimony that you
8    were only able to locate one e-mail; is that
9    correct?
10     A.      Well, I have past e-mail
11   correspondence with her, but not related to the
12   story.
13     Q.      What do you recall relating to the
14   substance of those other e-mails?
15     A.      They were about a story that she was
16   working on in relation to someone who was
17   murdering cats.
18     Q.      Have you spoken with Ms. Hignett
19   regarding this dispute?
20     A.      I have not.
21     Q.      When was the last time you spoke to
22   Ms. Hignett?
23     A.      Probably in 2019, I believe.
24     Q.      Okay.  Was Ms. Hignett let go by
25   Newsweek?

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        A.     I'm not involved with hiring or
 2   removal of people.  I wouldn't know directly.
 3        Q.     What do you know about her
 4   separation from Newsweek?
 5        A.     It's my understanding she left on
 6   her own will.
 7        Q.     Okay.  Did her leaving have anything
 8   to do with the McGucken dispute?
 9        A.     Not that I'm aware of.
10        Q.     And currently, she has no
11   relationship with Newsweek, correct?
12        A.     I'm not involved with firing
13   writers, so I wouldn't know directly, but -- I
14   wouldn't know.
15        Q.     Okay.  Are you aware of her having
16   any relationship with Newsweek currently?
17        A.     Not that I'm aware of, but I
18   wouldn't be the person working with her so I
19   wouldn't know.
20        Q.     Does Newsweek still hold Ms. Hignett
21   out to the public as being on staff at
22   Newsweek?
23        A.     I'm not involved with those
24   practices, so I wouldn't know.  But not to my
25   knowledge.
```

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     If it did, would it surprise you

2    given that your understanding is that she left

3    the company in 2019?

4      A.     I suppose, but I'm not involved with

5    that, or I wouldn't know why they would or

6    wouldn't.

7           MS. WOLFF:  This is outside the

8    scope of what was in the notice and so the

9    witness has not been prepared on these

10    questions.

11    BY MR. BURROUGHS:

12      Q.     In your experience, is it industry

13    standard for a publication to hold out a

14    particular reporter to the public as employed

15    by the publication after they've separated from

16    the publication?

17           MS. WOLFF:  Objection.

18      A.     I'm not familiar with that practice.

19      Q.     Does your website have terms and

20    conditions?

21      A.     Could you elaborate on the question

22    in terms of what?

23      Q.     Does Newsweek.com have terms and

24    conditions?

25      A.     For what?

1    Q.    For the website.

2    A.    For readers?  For writers posting

3    content?  I'm not really sure I understand the

4    question.

5    Q.    Okay.  So as you sit here today,

6    you're not aware of Newsweek.com having any

7    terms and conditions; is that accurate?

8    A.    I'm not familiar with --

9          MS. WOLFF:  Objection.

10   A.    -- the terms and conditions of

11   Newsweek's website.

12   Q.    Understood.  And you yourself have

13   never reviewed the terms and conditions of

14   Newsweek's website, correct?

15   A.    Correct.

16   Q.    Okay.  All right.  We're going to

17   put a document in front of you marked as

18   Exhibit 1, a deposition notice.

19         (Exhibit 1 marked for

20   identification.)

21   BY MR. BURROUGHS:

22   Q.    And take a moment, Ms. Zaharia will

23   scroll slowly throughout it.  If you want her

24   to go faster or slower, please let her know.

25   But just take a moment and tell me if you've

Atkinson Baker, a Veritext Company
www.depo.com

1  seen this document before?

2      A.     I believe I've seen this.

3      Q.     And you understand that it indicates

4  that you are testifying on behalf of Newsweek

5  on particular topics?

6      A.     Yes.

7      Q.     Okay.  Now, to prepare for

8  testimony, to give testimony on those topics,

9  who did you speak to other than your lawyer?

10     A.     Yuliya.  That's my main point of

11  contact regarding this.

12     Q.     Okay.  And when did you first speak

13  with Yuliya?

14     A.     The first time she brought it to my

15  attention was October of 2019.

16     Q.     Okay.  And what did she tell you

17  when she brought it to your attention?

18     A.     She just let us know that it existed

19  and asked me to look into it.

20     Q.     Was that done by e-mail or phone

21  conversation or an in-person conversation or a

22  combination?

23     A.     It would have been e-mail.

24     Q.     Okay.  Do you recall having any

25  in-person conversations or telephone

Atkinson Baker, a Veritext Company
www.depo.com

1   conversations with Yuliya in or around October

2   2019 regarding this dispute?

3      A.    I do not recall having a phone

4   conversation with her regarding this case.

5      Q.    Okay.  And in October of 2019, did

6   Yuliya request that you remove the disputed

7   McGucken article?

8      A.    She did not request me to remove it.

9      Q.    What did she tell you or communicate

10   to you?

11      A.    She just simply asked me to look

12   into -- look into how the image or the visual

13   in question was to be displayed on the site as

14   part of the story.

15      Q.    And did you do that?

16      A.    Yes, I put her -- yeah, I put her in

17   touch with the appropriate people to get in

18   touch with the writer of the story.

19      Q.    And who did you put her in touch

20   with?

21      A.    I believe it was one of the people

22   from our HR department, Nancy, to see if they

23   can -- they had an e-mail on record for the

24   writer.

25      Q.    Did you yourself reach out to

1  Ms. Hignett?

2      A.    I did not.

3      Q.    In November of 2019, did Newsweek

4  remove the disputed McGucken post?

5      A.    No.

6      Q.    In December of 2019, did Newsweek

7  remove the disputed McGucken article?

8      A.    No.

9      Q.    In January of 2020, did Newsweek

10  remove the disputed McGucken article?

11      A.    Yes.

12      Q.    Okay.  And why did it do so in

13  January?

14      A.    I was requested to do so.  I don't

15  know the reasoning.

16      Q.    Did Yuliya request that you do so?

17      A.    Yes.

18      Q.    Was it your understanding that the

19  result of Yuliya's communication with Ms.

20  Hignett and potentially others resulted in the

21  discovery that this use was without consent?

22          MS. WOLFF:  Objection.

23      A.    I don't recall.  I couldn't

24  speculate what her reasoning was.

25      Q.    Okay.  So no one at Newsweek ever

Atkinson Baker, a Veritext Company
www.depo.com

1  told you why they wanted the McGucken article

2  removed; is that accurate?

3      A.     It was not -- the information was

4  not relayed to me as to why.

5      Q.     Okay.  Are you aware of what that

6  information is?

7      A.     No.

8      Q.     Okay.  So as you sit here today, you

9  have no understanding as to why you were asked

10  to remove the McGucken article from

11  Newsweek.com, correct?

12      A.     Correct.

13      Q.     Currently, is Newsweek embedding

14  content from Instagram without the creator's

15  consent?

16      A.     It does happen, yes.

17      Q.     When was the last time that

18  happened?

19      A.     I couldn't say.  I don't know.

20      Q.     As you sit here today, can you

21  recall any instance in which Newsweek has

22  embedded Instagram content without the

23  creator's consent?

24      A.     I cannot recall.

25      Q.     Other than the McGucken article, can

Atkinson Baker, a Veritext Company
www.depo.com

1   you recall any instance in which Newsweek

2   embedded Instagram content without the

3   creator's consent?

4       A.      No.

5       Q.      Okay.  So is it fair to say that

6   Newsweek did not have a pattern of practice of

7   embedding Instagram content without the

8   artist's consent?

9               MS. WOLFF:  Objection.

10      A.      It's not against our policy, but I

11  don't know how often it happens.

12      Q.      In fact, you don't recall it ever

13  happening other than the article for which the

14  lawsuit is taking place, correct?

15      A.      I do not.  I'm not involved with the

16  embedding of images in stories, so I couldn't

17  state when or how often it happens.  It's not

18  something I'm involved in.

19      Q.      Okay.  And before today, you didn't

20  look to see whether or not there were other

21  articles in which a creator's content had been

22  stolen from Instagram or embedded from

23  Instagram on Newsweek's page?

24      A.      We don't steal.

25      Q.      Do you understand the question?

Atkinson Baker, a Veritext Company
www.depo.com

1          MS. WOLFF:  Objection to form.

2    BY MR. BURROUGHS:

3      Q.     Okay.

4      A.      If you could rephrase it.

5      Q.     Sure.  Before today, have you

6    reviewed Newsweek's site to see if there were

7    any other instances in which a creator's

8    content was taken and used from Instagram

9    without the creator's consent on Newsweek.com?

10          MS. WOLFF:  Objection.

11     A.      I cannot -- I do read Newsweek

12   articles, but I don't -- I can't recall any

13   situations where I've frequently seen that or

14   can recall the last time I had seen an

15   Instagram image embedded in a story.

16     Q.     Okay.  As part of your job at

17   Newsweek, do you review the articles posted to

18   Newsweek.com?

19     A.     Only the ones that are involved with

20   the magazine.

21     Q.     Are you referring to the physical

22   magazine?

23     A.     Correct.

24     Q.     So you have no involvement with the

25   articles that are posted to Newsweek.com; is

Atkinson Baker, a Veritext Company
www.depo.com

 1   that accurate?

 2       A.    Occasionally, I'm asked to help out

 3   on a Web story, but for the most part, I do not

 4   on a day-to-day am involved in it.

 5       Q.    Okay.  Does anyone have your role as

 6   it relates to the Newsweek.com site?

 7       A.    No.

 8       Q.    Okay.  So there is no director of

 9   photography for Newsweek.com, correct?

10             MS. WOLFF:  Objection to form.

11       A.    No.

12       Q.    Is there a director of photography

13   for Newsweek.com?

14       A.    I am director of photography for the

15   company, but my focus is the magazine.

16       Q.    Okay.  Does anyone fill the role

17   that you fill for the magazine for the website?

18             MS. WOLFF:  Objection.

19       A.    There is no other photo editor, if

20   that's what you're asking.

21       Q.    Okay.  So is it fair to say that

22   you're Newsweek's director of photography, but

23   your primary focus is the print magazine?

24       A.    Correct.

25       Q.    And don't regularly review the

1   articles posted on Newsweek.com, correct?

2        A.     Correct.  There's hundreds of

3   stories posted a day.  It's not feasible.

4        Q.     Okay.  And you've never seen any

5   article on Newsweek.com other than the McGucken

6   article that used content taken from Instagram

7   without the creator's consent, correct?

8               MS. WOLFF:  Object to form.

9        A.     Correct.

10       Q.     Have you had any writers or other

11  Newsweek team members contact you in the last

12  year and ask you if they can embed an Instagram

13  photograph on Newsweek without the artist's

14  consent?

15       A.     No one's asked me.

16       Q.     Okay.  Does Newsweek.com run

17  advertising?

18       A.     Yes.

19       Q.     Do you have any involvement with the

20  sale or placement of the advertising?

21       A.     No.

22       Q.     Do you know if it's programmatic or

23  some other form?

24       A.     I'm not involved with the

25  advertisements.  I couldn't say.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  So after Yuliya sometime in

2   January of 2020 asked you to remove the

3   McGucken photograph, did you have any further

4   conversations with Yuliya about this dispute?

5      A.      She asked me if I had any guide --

6   she asked me for my guidelines and for dates

7   related to the guidelines and any other

8   educational material.

9      Q.      Okay.  And did you respond?

10     A.      Yes.

11     Q.      And did you send her the material?

12     A.      Yes.

13     Q.      Did that include the Getty material?

14     A.      Yes.

15     Q.      Okay.  After you sent that to her,

16   did you have any further conversations or

17   communications relating to this dispute?

18     A.      Not specifically that I could

19   recall.

20     Q.      Okay.  Did you discuss this

21   deposition with her or communicate with her

22   regarding this deposition?

23     A.      Only in relation to timing.

24     Q.      So Yuliya advised you what time the

25   deposition was; is that correct?

Atkinson Baker, a Veritext Company
www.depo.com

1       A.      She asked about availability.

2       Q.      Was there anything else communicated

3    between the two of you regarding this

4    deposition or the substance of the case?

5       A.      There was some correspondence, yes.

6       Q.      Okay.  What was covered in that

7    correspondence?

8       A.      I just gave her feedback as to

9    questions that I felt comfortable answering and

10   ones that I felt less familiar with.

11      Q.      Okay.  Did you ever indicate to her

12   whether or not you thought the McGucken article

13   was a violation of your social media

14   guidelines?

15      A.      By industry standards, it is not

16   considered a violation.  So no.

17      Q.      So you never advised her one way or

18   the other?

19      A.      I did not.

20      Q.      Okay.  So is it fair to say that you

21   never advised Yuliya or anyone at Newsweek that

22   the use of the McGucken content from Instagram

23   was not a violation of your guidelines?

24      A.      Can you rephrase?  I'm sorry.

25      Q.      Sure.  Well, I can ask it this way:

Atkinson Baker, a Veritext Company
www.depo.com

1  Did you ever advise Newsweek that the use of

2  the McGucken content from Instagram did not

3  violate your social media guidelines?

4      A.      Based on our knowledge of what is

5  allowed and what is not, it did not violate.

6      Q.      Did you ever advise anyone at

7  Newsweek of that fact or that belief?

8      A.      Yeah.

9      Q.      Who did you advise of that?

10     A.      Yuliya.

11     Q.      And Yuliya agreed with you?

12     A.      Yeah.

13     Q.      And is that why Yuliya continued to

14  run the post from October until January

15  of 2020?

16          MS. WOLFF:  Objection.

17     A.      I can't speculate as to her

18  reasoning.

19     Q.      Okay.  To your understanding, why

20  did Newsweek continue to run the McGucken

21  article from October 2019 to January 2020?

22          MS. WOLFF:  Objection.

23     A.      My understanding is it didn't

24  violate any policies.

25     Q.      And this is something that you

1    communicated with Yuliya, correct?

2         A.     I mean, it was up to her to make the

3    call whether or not to remove it, but by our

4    understanding, it was not, you know, it wasn't

5    against any policy.

6         Q.     Okay.  So is it your understanding

7    that Yuliya's decision not to remove the

8    McGucken content in October of 2019, November

9    of 2019, or December of 2019 was based on the

10   communication with you and your belief that the

11   use of the McGucken content from Instagram

12   without his consent did not violate your social

13   media guidelines?

14              MS. WOLFF:  Objection.

15        A.     I don't get final say in the matter,

16   so it's up to them to decide.  I just provide

17   them with what I'm aware of.

18        Q.     Understood.  So it sounds like you

19   advised Yuliya that the post at issue or the

20   article at issue did not violate the social

21   media guidelines and Newsweek continued to

22   publish the image with notice of the dispute,

23   but you don't know if it's because of your

24   interaction with Yuliya or some other reason.

25   Is that fair to say?

Atkinson Baker, a Veritext Company
www.depo.com

1     A.     Yes.

2     Q.     In your experience, has Newsweek

3   ever removed content in response to a claim by

4   an artist that the content was being used

5   without consent?

6     A.     I believe that's happened in the

7   past.

8     Q.     When was the last time you remember

9   that occurring?

10    A.     Maybe about a year ago.

11    Q.     Do you recall the circumstances?

12    A.     Not off the top of my head.

13    Q.     Okay.  But do I have the essence

14  right that a content creator contacted Newsweek

15  and advised that the material posted on

16  Newsweek violated its intellectual property

17  rights in some way?

18    A.     It has happened.

19    Q.     Okay.  What is Newsweek's business

20  practice for responding to such notices?

21    A.     I don't know what our legal under --

22  I'm not involved with that, so I couldn't speak

23  to it.

24    Q.     Okay.

25    A.     I don't know.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Does Newsweek have a formal policy,

2   which you're aware, for responding to copyright

3   notices?

4      A.      We have a process, yes.

5      Q.      And what's that process?

6      A.      Like I said, I'm sorry, I don't know

7   what the process is, I just know we have one

8   and I'm asked to advise occasionally when it

9   does.

10     Q.      How do you know that such a process

11  exists?

12     A.      Because we have an e-mail addressed

13  specific for copyright claims, so I know that

14  we have the availability to receive those

15  requests.

16     Q.      Is that copyright@newsweek.com?

17     A.      I believe it is.

18     Q.      Okay.  To your understanding, has

19  that e-mail address been fully functional

20  during your tenure at Newsweek?

21          MS. WOLFF:  Object to form.

22     A.      I'm not involved with the e-mail

23  system, so I couldn't say if it's ever not

24  worked, but as far as I know it works.

25     Q.      So it's fair to say that you're

Atkinson Baker, a Veritext Company
www.depo.com

```
1   aware that a copyright e-mail address exists

2   but you have no personal experience as to

3   whether or not it's functional.  Is that fair

4   to say?

5       A.    Yeah, the e-mails do not go to me,

6   so I don't know.

7       Q.    Okay.  So is the process by which

8   Newsweek responds to these notices an informal

9   one?

10          MS. WOLFF:  Objection.

11      A.    I don't know what would constitute

12  formal, so I couldn't say.

13      Q.    Well, is the policy a written

14  policy?

15      A.    I'm not involved with the procedure,

16  so I couldn't say.

17      Q.    Are you aware of any written policy

18  that speaks to Newsweek's process for

19  responding to copyright notices?

20      A.    Beyond what's on the website, I do

21  not know.

22      Q.    Okay.  Have you ever been instructed

23  about a formal process that Newsweek uses to

24  respond to copyright notices?

25      A.    Not beyond what I've already stated.
```

1    Q.    Okay.  So as far as you know when

2  Newsweek receives a copyright notice, an e-mail

3  goes out and you look into it.  Is that fair to

4  say?

5    A.    I know someone receives the e-mails

6  and they're relayed to the appropriate people.

7    Q.    Okay.  Is there anything more formal

8  than that?

9         MS. WOLFF:  Object to form.

10    A.    I'm not familiar with the process,

11  so I couldn't say for sure.

12    Q.    Can you say anything about a more

13  formal process?

14         MS. WOLFF:  Objection.

15    A.    I'm not familiar with the process

16  specifically, the specifics of the process so I

17  couldn't say.

18    Q.    Okay.  Can you estimate for me how

19  many times you've been involved in the process?

20    A.    I don't know the exact number, but I

21  would say in the past year it's probably maybe

22  five times I've been asked to look into

23  something.

24    Q.    Okay.  And of those approximately

25  five times, did you remove the content in each

Atkinson Baker, a Veritext Company
www.depo.com

1   situation?

2           MS. WOLFF:  Objection.

3       A.    Most of the cases I believe they

4   were not removed because they didn't end up

5   being an issue.

6       Q.    Okay.  Did any of those instances

7   relate to embedded content from Instagram or

8   any third-party social media site?

9       A.    We had one, I think, instance

10  someone asked us to take something down, but it

11  was nothing to do with the copyright and it was

12  just a preference.

13      Q.    And what was the preference?

14      A.    Someone just asked they -- we didn't

15  have a video that had them in it.

16      Q.    Was that removed?

17      A.    They disabled it on their end.  So

18  we removed it, but it was disabled on their end

19  so there was no, there was no action needed.

20      Q.    Okay.  To your understanding, the

21  McGucken content at issue here has been removed

22  though at this point, correct?

23      A.    At this point I believe it's been

24  removed, yes.

25      Q.    Is the article still online?

Atkinson Baker, a Veritext Company
www.depo.com

1        A.      The article is still online.

2        Q.      And was the photo asset replaced?

3        A.      The photo asset was not replaced.

4        Q.      Okay.  So do you know what's in the

5    place of the photo asset now?

6        A.      It was removed.

7        Q.      When I say the "photo asset," I'm

8    referring to the McGucken embedded photograph.

9        A.      It's the same story just minus the

10   Instagram embed.

11       Q.      Okay.  Would it surprise you to

12   learn that the photography asset was replaced

13   with a different photograph?

14       A.      It would.  Last time I looked at the

15   site it was not replaced.

16       Q.      Okay.  When was the last time you

17   looked at the site?

18       A.      This morning.

19       Q.      Okay.  To the extent that the site

20   now has a new photograph, that would have

21   happened sometime after this morning; is that

22   correct?

23              MS. WOLFF:  Object to form.

24       A.      Yes, it would.

25       Q.      Okay.  Do you know who would have

Atkinson Baker, a Veritext Company
www.depo.com

1    been responsible for placing that photograph?

2        A.    There's multiple people that have

3    access to the CMS, so it's, you know, I

4    wouldn't know there's one person specifically.

5        Q.    Okay.  Other than yourself who has

6    access?

7        A.    Pretty much every writer or editor.

8        Q.    Okay.  Can you give me the names of

9    those that you can recall?

10        A.    There's many.  There's many.

11        Q.    Okay.  Other than Yuliya, did you

12    speak with anyone else about this case or in

13    preparation for today's deposition?

14        A.    Nancy Cooper has been involved in

15    some of the e-mails.

16        Q.    Okay.  Have you had any telephone

17    conversations with Nancy or Yuliya about this

18    deposition or this dispute?

19        A.    No phone conversations.

20        Q.    Okay.  And when did you first

21    communicate with Nancy about this dispute?

22        A.    She probably would have been on the

23    first e-mail.

24        Q.    Okay.  And did she have any response

25    or did she give you any indication about

Atkinson Baker, a Veritext Company
www.depo.com

1  whether or not she believed that the use of the

2  McGucken content violated Newsweek's policies?

3      A.    Not that I recall.

4      Q.    Okay.  When was the last time you

5  communicated with her?

6      A.    Regarding this case?

7      Q.    Correct.

8      A.    Maybe about a week ago, two weeks.

9  I'm not sure.

10      Q.    Okay.  And what was discussed during

11  that conversation?

12      A.    Just specifics of timing, my

13  availability, and including one additional

14  person to be involved in answering your

15  questions.

16      Q.    Okay.  And who is that additional

17  person?

18      A.    That'll be James who you'll speak

19  with tomorrow.

20      Q.    Okay.  Can you give me James's last

21  name?

22      A.    Etherington-Smith.  James

23  Etherington-Smith.  It's hyphenated.  Dash

24  Smith.

25      Q.    Have you ever had any communication

Atkinson Baker, a Veritext Company
www.depo.com

1    with Etherington-Smith?

2        A.    Yes.

3        Q.    Were those by e-mail or telephone or

4    some other way?

5        A.    It was by e-mail and by phone.

6        Q.    Okay.  When did you last speak with

7    James?

8        A.    I believe it was Monday or

9    yesterday.  The days are blurring.

10       Q.    Did he call you or did you call him?

11       A.    It was a group call.

12       Q.    Okay.  Were attorneys on the call?

13       A.    Yes.

14       Q.    Okay.  Other than that call, have

15   you had any other conversations with James?

16       A.    There was one previous phone call we

17   had together.

18       Q.    Okay.  And what was the substance of

19   that call?

20       A.    It was just preparations for this

21   case.

22       Q.    Okay.  What did you discuss in

23   preparation?

24           MS. WOLFF:  Objection.  I believe

25   attorneys were on that call.

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        A.     Correct.

 2        Q.     Were attorneys on that call as well?

 3        A.     Correct.

 4        Q.     Have you ever had a conversation

 5   with James regarding this case other than with

 6   attorneys on the line?

 7        A.     No.

 8        Q.     Okay.  Does James work out of

 9   Newsweek's U.S. office or a different one?

10        A.     He's in our London office.

11        Q.     Okay.  Do you work with James on a

12   day-to-day basis in your role as the -- in your

13   role at Newsweek?

14        A.     Not day-to-day, but we have

15   corresponded in the past.

16        Q.     Okay.  Other than in connection with

17   this case, when was the last time you recall

18   corresponding with him?

19        A.     I can't recall.

20        Q.     Okay.  Okay.  Other than Yuliya,

21   Nancy, and James, did you speak with anyone

22   else about this case or about today's

23   proceedings?

24        A.     No, not that I can recall.

25        Q.     Did you communicate with anyone else
```

Atkinson Baker, a Veritext Company
www.depo.com

1    by e-mail, text message, anything like that?

2       A.     All our correspondence for this case

3    were over e-mail or the calls that I've had

4    with our attorneys.

5       Q.     Okay.  In your day-to-day at

6    Newsweek, is the vast majority of your

7    communication done by e-mail?

8       A.     Most of it is over e-mail or over

9    our Slack channel.

10      Q.     Okay.  Slack, S-L-A-C-K.

11             Is there a dedicated Slack channel as

12   Newsweek for photography or photo assets?

13      A.     Not specific to photography.

14      Q.     The channel in which photography is

15   discussed on your Slack program, what's it

16   titled?

17      A.     General.

18      Q.     Are photos uploaded to that general

19   channel?

20      A.     I suppose they have been in the

21   past.  It's mostly used just for conversation.

22      Q.     Conversation about the photographs?

23      A.     Or stories.  It's mostly pictures or

24   some ideas; just anything that might be needed

25   to go to, you know, go to the newsroom.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  So would a photographer at

2    Newsweek upload a photograph and say, "I'd like

3    to do an article about this photograph," has

4    that happened?

5      A.      I'm not directly involved with the

6    creation of stories, but I presume.

7      Q.      Have you seen that?

8      A.      Yes, I believe I've seen that.

9      Q.      Have you ever accessed the storage

10   for your -- for the Newsweek Slack program and

11   looked at the photo assets that have been

12   uploaded?

13     A.      No.

14     Q.      Has this case ever been discussed on

15   the Newsweek Slack channel?

16     A.      Not that I'm aware.

17     Q.      Any of them?

18     A.      Not that I'm aware.

19     Q.      Was Newsweek using Teams in 2019?

20   I'm sorry, withdraw the question.

21          Was Newsweek using Slack in 2019?

22     A.      Yes.

23     Q.      In or around February of 2019?

24     A.      Yes.

25     Q.      Okay.  Have you had occasion to

Atkinson Baker, a Veritext Company
www.depo.com

1  search your Slack platform using the search

2  term "Instagram"?

3      A.    I have not, but I don't believe we

4  -- our Slack stores information for very long.

5      Q.    What's that based -- what's your

6  basis for that belief?

7      A.    Typically, when I've gone back to

8  look at old conversations, they've disappeared.

9      Q.    Okay.  Do you know if Newsweek uses

10  the free version of Slack or the paid version?

11     A.    I don't know which version they're

12  using.

13     Q.    Are you aware of anyone at Newsweek

14  searching the Slack files to look for messages

15  relevant to this dispute?

16     A.    I'm not aware of that.

17     Q.    Okay.  But you are aware of writers

18  pitching stories on Newsweek's Slack program,

19  right?

20     A.    Yes.

21     Q.    Okay.  And the Newsweek Slack is

22  used by everyone in the U.S. office, the London

23  office, and elsewhere, correct?

24     A.    As far as I'm aware.

25     Q.    All right.  We're going to put in

Atkinson Baker, a Veritext Company
www.depo.com

1   front of you an exhibit -- well, before we do

2   that.  Other than the e-mails that we've

3   already discussed, did you review any other

4   documents in preparation for today's

5   deposition?

6       A.    Not specific to this case, no.

7       Q.    What did you review generally?

8       A.    I generally reviewed the

9   correspondence that I had in relation to this

10  story.

11      Q.    Okay.  So aside from the

12  correspondence, did you review anything else,

13  any other documents or evidence to prepare

14  yourself for today?

15      A.    I read the terms of service for

16  LinkedIn -- oh, I'm sorry, Instagram.

17      Q.    Was that the first time you had read

18  those?

19      A.    I've reviewed them in the past.

20      Q.    When do you recall was the first

21  time that you had reviewed those?

22      A.    I couldn't recall exactly.

23      Q.    Would it have been within the last

24  six months?

25      A.    Most likely, yes.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     Okay.  Do you recall ever reviewing
2  the Instagram terms of service before the last
3  six months?
4      A.     I may have, I couldn't say for
5  certain.
6      Q.     Do you recall that happening?
7      A.     I likely did.  I couldn't recall
8  when.
9      Q.     Okay.  When is the first time that
10  you recall reviewing those Instagram terms of
11  service?
12      A.     Probably fairly early on when I
13  signed up with Instagram.
14      Q.     And when would that have been?
15  What's your best estimate?
16      A.     Oh, boy.  2013, maybe.  I don't
17  recall the exact date.  I'd have to look that
18  up.
19      Q.     Understood.  And at that time, were
20  you reviewing them in connection with your
21  personal Instagram account?
22      A.     Yes.
23      Q.     Okay.  At the time, did you read the
24  embedding section of the terms?
25      A.     Yeah, I would have.

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.    Okay.  Do you recall reading the
2  embedding terms in 2013?
3    A.    I likely would have.
4    Q.    Would you recall doing that?
5    A.    It's a long time ago.  I can't
6  recall specifically.
7    Q.    So as you sit here today, you don't
8  recall reading the embedding language in the
9  Instagram terms of service in 2013, correct?
10   A.    I don't recall doing it, but I
11 believe I would have.
12   Q.    Okay.  When do you recall actually
13 reading those embedding terms in Instagram's
14 terms?
15   A.    I recall reading them when
16 photographers were signing off of the platform
17 because they were concerned that Instagram now
18 owned all their images.
19   Q.    Okay.  So that would have been in
20 the middle of -- middle to late 2019?
21   A.    I don't recall exactly when it was.
22   Q.    Okay.  Would it have been any
23 earlier than June of 2019?
24   A.    It probably would have been earlier
25 than that.

1       Q.      Okay.  And is that because you

2   believed the story about photographers' work

3   being stolen from Instagram came out earlier

4   than that?

5       A.      I believe so, yes.

6       Q.      But is it fair to say that your

7   recollection is that you first reviewed the

8   Instagram embedding terms at or around the time

9   the stories came out about photographers

10  removing their work from Instagram?

11      A.      Yes, I would have read it at that

12  time.

13      Q.      Okay.  Let's take a look at

14  Exhibit 2, which I believe it's Bates stamped

15  Newsweek 1 and 2.

16              (Exhibit 2 marked for

17  identification.)

18  BY MR. BURROUGHS:

19      Q.      Okay.  Have you -- well, do you want

20  us to scroll through to the next page so you

21  can take a look at this entire document?

22      A.      I've seen the document.

23      Q.      Okay.  So you recognize this

24  document?

25      A.      Yes.

Atkinson Baker, a Veritext Company
www.depo.com

```
1       Q.      What is it?

2       A.      This is the guidelines, the photo

3    guidelines for Web use that we provide to our

4    writers.

5       Q.      Okay.  Is this the document that you

6    yourself drafted?

7       A.      Correct.

8       Q.      Okay.  And this was drafted based

9    solely on your personal experience, correct?

10      A.      Correct.

11      Q.      Okay.  And you don't recall anyone

12   at Newsweek other than yourself having input

13   into this particular document, correct?

14      A.      Not that I recall, but it was based

15   off of my experience and things that I know

16   that are problematic.

17      Q.      Okay.  When was the last time you

18   looked at this document?

19      A.      This morning.

20      Q.      Okay.  Now, I want you to direct

21   your attention to paragraph 3 where it says,

22   "Do not use images without requesting

23   permission."

24              Do you see that?

25      A.      Yes.
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        Q.      Okay.  Did you write that?

 2        A.      Yes.

 3        Q.      Would you say that that lead as a

 4   general tenet is industry-standard, that a

 5   publication should not, quote, use images

 6   without requesting permission?

 7        A.      When it comes to hosting images

 8   within your site, yes.

 9        Q.      Okay.  So is it your position that

10   if you're not hosting the image you can use any

11   other artist's content for any purpose?

12        A.      As long as you're not taking it out

13   of context.

14        Q.      And what does that mean?

15        A.      It means it remains within the

16   format it was originally created.  For example,

17   if someone wanted to use a Newsweek cover, they

18   can use a Newsweek cover and description of

19   that context.

20        Q.      So is it your understanding that

21   right now you can go to Instagram and embed any

22   photograph from any of the public's accounts

23   there on Newsweek and it wouldn't be a

24   violation of these terms?

25        A.      If it was newsworthy and if it was
```

Atkinson Baker, a Veritext Company
www.depo.com

1   within context of the story.

2        Q.     So is the answer yes?

3        A.     If it was newsworthy and in context.

4   You can't do it if it's not newsworthy or not

5   in context.

6        Q.     Okay.  So is it fair to say that

7   Newsweek's position relating to the use of

8   social media content, is that so long as the

9   use on Newsweek.com is newsworthy and within

10  context, Newsweek has the right to pull any

11  photograph from any artist on Instagram without

12  that artist's consent?

13            MS. WOLFF:  Objection.

14  Mischaracterizes.

15       A.     As an embed, yes.

16       Q.     Okay.  Now, do you see the word

17  "embed" anywhere in your social media

18  guidelines?

19       A.     No.

20       Q.     Okay.  Is there any written document

21  anywhere within Newsweek's records that

22  reflects this embedding use that you're

23  describing now?

24       A.     Not that I can recall.

25       Q.     Okay.  And you can't recall any

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   other times in which Newsweek has used that
 2   embed process on Newsweek.com, correct?
 3       A.    You mean have they embedded other
 4   photographs in other stories?
 5       Q.    Correct.
 6       A.    Yes, they have.
 7       Q.    And when was the last time you can
 8   recall that happening?
 9       A.    Not in relation to Instagram I can't
10   think of any.
11       Q.    Okay.  So as you sit here today, you
12   don't recall a single time that Newsweek has
13   ever embedded an Instagram photograph without
14   the author's consent, correct?
15       A.    Not that --
16             MS. WOLFF:  Objection.
17   BY MR. BURROUGHS:
18       Q.    Go ahead.
19       A.    Not that I can recall.
20       Q.    Okay.  You note here that "The
21   legalities around social media images are
22   continually evolving."
23             Do you see that?
24       A.    Yes.
25       Q.    And "What may be okay today, could
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1    put us in violation of copyright tomorrow."
 2           Do you see that?
 3       A.    Yes.
 4       Q.    Okay.  And you're familiar with
 5    what's been happening in this case, correct?
 6       A.    Yes.
 7       Q.    Okay.  So given that a Court has
 8    ruled at least preliminary that embedding
 9    photographs or taking work from artists on
10    social media without their consent even if
11    embedded --
12           MS. WOLFF:  Objection.
13    BY MR. BURROUGHS:
14       Q.    -- may be a violation of copyright
15    --
16           MS. WOLFF:  There's no ruling.
17    Objection.  I'm stopping you right there.
18    There's no ruling.
19    BY MR. BURROUGHS:
20       Q.    Have you thought to update these
21    social media guidelines?
22           MS. WOLFF:  Objection.  Do not
23    answer that question.  There's been no ruling
24    that says anything like that.
25    BY MR. BURROUGHS:
```

1      Q.      Okay.  Let me rephrase.  Given the

2   rulings that have come out of the court so far,

3   have you thought to update your social media

4   guidelines to reflect a different approach to

5   taking content from Instagram creators without

6   their consent?

7              MS. WOLFF:  Objection.  She's not an

8   attorney.  She's not opining on rulings.  Do

9   not answer.

10  BY MR. BURROUGHS:

11     Q.      Okay.  Have you thought to amend the

12  social media guidelines to reflect the position

13  on embedding?

14     A.      We may eventually, but we have not

15  decided to do that at this moment.

16     Q.      Okay.  What conversations have you

17  had in that regard?

18     A.      We've questioned whether or not the

19  policy is changed, but from our understanding,

20  Instagram still allows us.  It's an

21  industry-standard still; it hasn't changed.

22     Q.      Okay.  So as of today, it's

23  Newsweek's intent to continue to embed

24  photographs from Instagram without the consent

25  of the creator; is that accurate?

Atkinson Baker, a Veritext Company
www.depo.com

```
 1                 MS. WOLFF:  Objection.

 2        A.     No decision has been made.

 3        Q.     Okay.  So as of today, it would

 4   still be within your social media guidelines

 5   for a Newsweek.com writer to take content from

 6   an artist on Instagram and post it without

 7   their consent on Newsweek.com, correct?

 8                 MS. WOLFF:  Objection.

 9        A.     Our policies haven't changed at this

10   moment.

11        Q.     Okay.  So if today a Newsweek writer

12   takes a photograph from Instagram.com without

13   the artist's consent and embeds it in a

14   Newsweek.com post, that would still be within

15   the social media guideline use at Newsweek,

16   correct?

17                 MS. WOLFF:  Objection.

18        A.     If it's newsworthy and it's within

19   context.

20        Q.     So the answer is yes?

21        A.     In specific --

22                 MS. WOLFF:  Objection.

23        A.     In specific circumstances.

24        Q.     And the answer would be yes?

25                 MS. WOLFF:  Objection.  Asked and
```

Atkinson Baker, a Veritext Company
www.depo.com

1    answered.

2    BY MR. BURROUGHS:

3        Q.     Sorry, I couldn't hear because of

4    the objection.  Is the answer yes?

5             MS. WOLFF:  Asked and answered.  You

6    asked that three times in a row now.

7             MR. BURROUGHS:  I don't think I

8    heard the answer because you were speaking over

9    the witness.

10            MS. WOLFF:  No, she did answer.  You

11   could repeat -- maybe the reporter can repeat

12   what she answered.

13            MR. BURROUGHS:  I don't think so.

14            MS. WOLFF:  I think she can.  Let's

15   try.  Why don't you read back the question for

16   us and the answer that she gave --

17            MR. BURROUGHS:  We're not going to

18   read back the question.

19            MS. WOLFF:  Okay.  Move on.

20            MR. BURROUGHS:  So I'll rephrase.

21   I'll rephrase it.

22   BY MR. BURROUGHS:

23       Q.     So today if a Newsweek.com writer

24   takes a photograph from Instagram via an embed

25   without that artist's consent and publishes it

Atkinson Baker, a Veritext Company
www.depo.com

1   to Newsweek.com, that would still be within and
2   compliant with Newsweek's guidelines for social
3   media use, correct?
4            MS. WOLFF:  Objection.
5       A.      I believe I did answer the question.
6       Q.      Was the answer yes?
7       A.      Within certain context.
8       Q.      So within certain context the answer
9   would be yes, correct?
10      A.      Within the context that it's in
11  relation -- a newsworthy story and it's within
12  -- referencing that specific image.
13      Q.      In such a context, the answer would
14  be yes?
15      A.      In that context, yes.
16      Q.      Okay.  And what is that context?
17      A.      If it's newsworthy and if it's
18  referencing that specific image.
19      Q.      Can you think of any situation in
20  when that context wouldn't apply?
21           MS. WOLFF:  Objection.  Speculation.
22      A.      I mean, there's always situations
23  where it wouldn't apply.
24      Q.      All right.  So looking at the second
25  bullet point in paragraph 3.  Do you see that?

```
 1      A.    Yes.

 2      Q.    Does it say, "We -- meaning

 3 Newsweek -- "must request permission for every

 4 image we publish"?

 5           Do you see that?

 6      A.    Yes.

 7      Q.    Now, what is your definition of

 8 publish?

 9      A.    That would be hosted within our CMS.

10      Q.    Okay.

11      A.    The physical image hosted in our

12 CMS.

13      Q.    So in your understanding, publish

14 does not mean display; is that accurate?

15      A.    Correct.

16      Q.    Do you recall if you've ever

17 indicated to the contrary that to display

18 something is to publish something?

19           MS. WOLFF:  Objection.  Legal.

20      A.    Can you rephrase that?

21      Q.    Sure.  Do you ever recall indicating

22 on social media or elsewhere that to display

23 something is to publish something?

24           MS. WOLFF:  Objection to form.

25      A.    I mean, if we're talking
```

Atkinson Baker, a Veritext Company
www.depo.com

1    specifically about what I wrote here, it's in

2    reference to hosting an image in our CMS.

3        Q.    Does it say that anywhere?

4        A.    The whole document is about the CMS.

5        Q.    Where does it say that that is

6    limited to hosting or that publishing is on

7    hosting?

8        A.    I mean, the whole point of this

9    piece -- I mean, I believe for Web use --

10   Photos for Web Use is the name of the document

11   and we do not specifically talk about links or

12   embeds.

13       Q.    So is it fair to say that nowhere in

14   this document do you actually refer to hosting

15   as displayed or as publishing?

16       A.    That specific word?

17       Q.    Correct.

18       A.    I don't believe I used that specific

19   word.

20       Q.    Okay.  So have you ever indicated in

21   the past that to display something on a website

22   is publishing it?

23            MS. WOLFF:  Objection.  We're

24   getting into legal definitions under copyright.

25   She's not an attorney.

Atkinson Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.    I'm just asking as your personal

3    experience, do you recall ever seeing or

4    writing something like that?

5        A.    There's more than one word that

6    could be used to describe the same thing, but

7    in this case, this was written by me and I

8    intended it to be hosting images as in

9    physically in our CMS, not links.  Linking to

10   stories is a separate thing.

11       Q.    So you're saying that publish could

12   be read in this context to mean either hosting

13   or displaying?

14            MS. WOLFF:  Objection.

15       A.    I mean, we're talking about

16   definitions.  That's not what this was intended

17   for.

18       Q.    Sure.  But you wrote this, right?

19       A.    Correct.  And it was with relation

20   to physical images being posted up to our

21   website.  I mean, the first line of the

22   document in number 1 was "Downloading an

23   image."  You wouldn't download an embed.

24       Q.    Okay.  So is it -- do you want to

25   scroll to the top and you can tell me what

Atkinson Baker, a Veritext Company
www.depo.com

1    you're referring to?

2        A.    Number 1 post bullet one:  "Each

3    download comes with a one-time license."

4    Re-download I do believe I used the word

5    "download" a number of times.

6        Q.    Sure.  In paragraph -- I see that in

7    paragraph 1?

8        A.    Correct.

9        Q.    And I see in paragraph 2 "Press

10   Images," which I don't see any reference to

11   download.  Do you?

12       A.    I didn't feel like it was necessary.

13   It was already stated in the previous one.

14       Q.    In paragraph 3 I don't have any

15   reference to download or hosting or anything.

16   Do you?

17       A.    No.

18       Q.    Okay.

19       A.    Although I do refer to screen grabs,

20   which would be a physical image.

21       Q.    Did you ever think given the

22   potential ambiguity in a word like "publish"

23   that you indicate in the only social media

24   guidelines used at Newsweek, that you're

25   referring to display as opposed to hosting

1    here?

2              MS. WOLFF:  Objection.

3         A.     I'm not a lawyer.  We did hold

4    classes around this document and I think it was

5    very clear within that class what we were

6    talking about.

7         Q.     Do you recall ever thinking to

8    consult with a lawyer about some of the words

9    and some of the language in this agreement or

10   any of the language in the agreement?

11        A.     I did provide this to Yuliya.  He

12   usually handles legal matters.  So if there --

13   and I asked for guidance, if they thought any

14   changes should be made to the document.

15        Q.     Okay.  So just so we're on the same

16   page, it's your testimony under oath that when

17   you write, quote, "We must request permission

18   for every image we publish," you're referring

19   to only articles that are displayed on the site

20   via upload and not displayed on the site via

21   embed.  Is that accurate?

22        A.     That's my intention, yes.

23        Q.     Well, is that the truth?

24        A.     Yes.

25             MS. WOLFF:  Objection.

Atkinson Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2       Q.    Okay.  So then you write:  "This is

3   work on the front end but will save us

4   thousands of unnecessary costs in legal fees."

5            What are you referring to there?

6       A.    If someone were to use an image and

7   upload it to our site without that

8   photographer's permission, it opens us up to

9   problems.

10      Q.    Okay.  Now, do you believe that even

11  that conduct would violate your social media

12  guidelines?

13      A.    Could you rephrase?

14      Q.    Sure.  You said it would open you up

15  to problems.  So I'm wondering if you think

16  that that would be a violation of these

17  guidelines or if you just think that would,

18  quote, open you up to problems?

19      A.    I mean, if you took an image without

20  permission and uploaded it to our website

21  through our CMS, that would be against our

22  guidelines.

23      Q.    Okay.  So let me ask you this

24  question:  When a viewer, and I know you said

25  you don't regularly read Newsweek.com, but if a

Atkinson Baker, a Veritext Company
www.depo.com

1  regular viewer of Newsweek.com went to the

2  website to read the articles, does the image

3  itself look any different whether or not it's

4  uploaded directly by Newsweek or embedded?

5       A.    Yes.

6            MS. WOLFF:  Objection.

7  BY MR. BURROUGHS:

8       Q.    In which ways?

9       A.    If it's embedded, it shows within --

10  it's like -- embedding an image is essentially

11  a window to another website.  So it would look

12  like it would look on Instagram or Twitter or

13  whoever, whatever the embed link was for.

14       Q.    Sure.  But please -- I understand

15  that, but listen to my question and answer the

16  question I'm asking because it's slightly

17  different.

18            The photograph itself, does it appear

19  any differently to the viewer on Newsweek.com

20  when it's uploaded directly as opposed to

21  embedded?

22            MS. WOLFF:  Objection to form.  You

23  can answer.

24       A.    The image itself doesn't change, but

25  the context with which it's displayed.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     Okay.  So is it fair to say that the

2    image itself when appearing on Newsweek.com via

3    either embed or direct upload appears exactly

4    the same?

5            MS. WOLFF:  Objection.

6      A.     The context looks different.  It

7    doesn't -- if you were to upload an image, it

8    wouldn't show -- look like it was on Instagram.

9      Q.     Again, you're answering a slightly

10   different question, so that maybe you don't

11   want to answer my question, but let me ask it

12   one more time and just try to answer the

13   question.  Okay?

14           When a viewer goes to Newsweek.com and

15   views a photograph on Newsweek.com, does the

16   photograph itself appear any different to the

17   viewer depending on whether it's uploaded

18   directly on Newsweek.com or embedded from

19   Instagram?

20           MS. WOLFF:  Objection.  Asked and

21   answered.

22     A.     The photograph looks the same, but

23   the context is not the same.

24     Q.     So the photograph looks exactly the

25   same, correct?

Atkinson Baker, a Veritext Company
www.depo.com

```
1        A.      We don't make changes to the image.
2        Q.      So it looks exactly the same as it
3   appeared on Instagram?
4                MS. WOLFF:  Objection to the form.
5   You've asked her now five times.  She's
6   answered to the best she can.  Just move on.
7   BY MR. BURROUGHS:
8        Q.      Does the photograph look exactly the
9   same as it does -- as appearing on Instagram?
10               MS. WOLFF:  Objection to form.
11       A.      Yes.  The image looks the same, but
12  the context is different.
13               MR. BURROUGHS:  Okay.  We've been
14  going for an hour and a half so let's take a
15  quick five-minute break and then we'll come
16  back on the record.
17               MS. WOLFF:  Can we take ten minutes,
18  please?
19               MR. BURROUGHS:  Sure.
20               (At this point in the proceeding, a
21  recess is taken from 2:34 p.m. to 2:45 p.m.)
22  BY MR. BURROUGHS:
23       Q.      So back on the record.  Ms. Rice,
24  you understand you're still under oath?
25       A.      Yes.
```

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  So let's direct our attention

2   to paragraph 13 of your social media

3   guidelines.  Do you see paragraph 13?

4      A.      Yes.

5      Q.      And I want to direct your attention

6   within that paragraph to the following

7   language, quote:  When it comes to

8   user-generated content, exclusive interviews

9   etc., you absolutely cannot take it.  You need

10  permission.

11          Do you recall writing that?

12     A.      Yes.

13     Q.      And why did you write that?

14     A.      Because there was an issue with the

15  screenshots.

16     Q.      Okay.  Now, in the sentence, you

17  call it, quote, user-generated content.  What

18  does that mean to you?

19     A.      Someone created the visual.

20     Q.      Okay.  So user-generated content

21  would be visuals created by users?

22     A.      Yeah.

23     Q.      Okay.  And then you indicate that

24  such visuals for the Newsweek team, they

25  absolutely cannot take it.  Do you see that?

Atkinson Baker, a Veritext Company
www.depo.com

1        A.      Yes.

2        Q.      Okay.  Now, is it your position that

3   when writing this, you were referring only to

4   screenshots and not to all user-generated

5   content?

6        A.      This was specifically in relation to

7   screenshots from video.

8        Q.      So is it your testimony that that

9   sentence relates only to screenshots from

10  video?

11       A.      That's what the paragraph is meant

12  for.

13       Q.      Okay.  And then it says, quote, You

14  need permission.  Do you see that?

15       A.      Uh-huh.  I do.

16       Q.      Okay.  So is it your testimony that

17  you're advising the Newsweek team that they

18  needed permission to use user-generated content

19  only when that content was a screenshot?

20               MS. WOLFF:  Objection.

21       A.      This is in relation to

22  user-generated content from videos and taking a

23  screenshot from that.

24       Q.      So is my statement correct?

25               MS. WOLFF:  Objection.

1      A.      If you're referring to

2   user-generated taking screenshots from video

3   and user -- user-generated video.

4      Q.      Well, I'm just reading, you know,

5   your language and it says, "When --

6              MS. WOLFF:  Objection.

7   BY MR. BURROUGHS:

8      Q.      -- "When it comes to user-generated

9   content."

10          Do you see that?

11     A.      Yes.

12     Q.      And it doesn't say "screenshot,"

13   correct?

14     A.      The paragraph is about screenshots

15   from video.

16     Q.      Understood.  But that sentence says

17   user-generated content, correct?

18              MS. WOLFF:  Objection.

19     A.      Yes, in reference to video.

20     Q.      And then it gives an example of

21   "exclusive interviews."

22          Do you see that?

23     A.      Yes.

24     Q.      Okay.  And then it says, "You

25   absolutely cannot take it."

Atkinson Baker, a Veritext Company
www.depo.com

1          Do you see that?

2     A.     Yes.

3     Q.     Now, there's nothing in here that

4    relates to whether or not you can take it with

5    an embedding process, correct?

6     A.     Correct.

7     Q.     Okay.  And there's nothing in here

8    that narrows user-generated content to only

9    screenshots, correct?

10          MS. WOLFF:  Objection.

11     A.     The headline of the paragraph is

12    Screenshots from Video.  This is specifically

13    related to that.

14     Q.     Okay.  And you see the example

15    "exclusive interviews," correct?

16     A.     Yes.

17     Q.     Okay.  And the next paragraph 14

18    says, "When in doubt contact the photo

19    department."

20          Do you see that?

21     A.     Yes.

22     Q.     Do you know if any Newsweek team

23    members ever contacted the photo department

24    about the social media guidelines?

25     A.     I do occasionally get questions from

Atkinson Baker, a Veritext Company
www.depo.com

1   writers regarding use of images and that

2   includes social media.

3       Q.      Have any of them ever indicated to

4   you that they were contacting you because they

5   had a question about your social media

6   guidelines?

7       A.      Occasionally it happens.

8       Q.      When was the last time that

9   happened?

10      A.      Maybe a few weeks ago.

11      Q.      And what was the question?

12      A.      I can't remember the specific

13  question, but someone might have asked me --

14  they needed an image of a specific person and

15  they want to know if it's okay to use something

16  from social media.

17      Q.      Okay.  And what did you tell them?

18      A.      If they want to host the image in

19  our CMS and upload it, you must have

20  permission.

21      Q.      Did you tell them if they wanted to

22  embed it, they did not need permission?

23      A.      I don't recall telling them that.

24      Q.      Okay.  Tell me the name of the

25  person you're talking to.

Atkinson Baker, a Veritext Company
www.depo.com

1    A.    I can't recall.  I get -- we have

2  many writers and I can't recall.

3    Q.    So you had this conversation a

4  couple of weeks ago and you don't remember the

5  person's name.  Is that accurate?

6    A.    Yes.

7    Q.    And you're under oath?

8    A.    I can't recall.  I could probably

9  look it up, but I can't recall at this moment.

10   Q.    Where would you go to look that up?

11   A.    I'd see if I had a Slack

12  conversation that was still active.

13   Q.    When is the last time you can recall

14  the person's name that you spoke to after they

15  inquired about the social media guidelines?

16   A.    I can't recall.

17   Q.    So as you sit here today, you can't

18  recall the name of a single person that you

19  ever spoke to regarding the social media

20  guidelines, correct?

21        MS. WOLFF:  Objection.

22   A.    Not off the top of my head.  Like I

23  said, we have many writers and it's difficult

24  to keep track of all their names.  I'm not

25  particularly great at remembering everyone's

Atkinson Baker, a Veritext Company
www.depo.com

1    name.

2         Q.     Okay.  In the future iterations of

3    your social media guidelines, did you remove

4    this paragraph 13?

5         A.     No.

6         Q.     Have you ever removed any of the

7    language from paragraph 13?

8         A.     No.

9         Q.     Okay.  Do you recall what, if

10   anything, that you ever removed from the

11   numbered paragraphs in these guidelines?

12        A.     There was an earlier iteration that

13   had an e-mail address requesting people to send

14   their permissions, approvals, to that e-mail

15   address.  That was removed.

16        Q.     Okay.  Do you recall any substantive

17   edits to the guidelines themselves?

18        A.     Not off the top of my head.

19        Q.     Okay.  In your copy of this

20   document, how is it titled?

21        A.     Probably Photos for Web Use and

22   there would be a date at the top.

23        Q.     Is there a reason why that title

24   doesn't appear on this document?

25        A.     I don't know.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     Okay.  So this isn't the actual copy

2   of the document from your files, correct?

3      A.     It looks like the same context.

4   It's in the version that I would have provided.

5      Q.     Okay.  But it's been altered at

6   least to remove the title, correct?

7      A.     I mean, I don't see the title in the

8   -- when I'm referring to the title, I mean the

9   name of the actual document.  There's been no

10  title removed from this, if we're talking about

11  the header.

12     Q.     Okay.  Are you referring to the file

13  name for the document?

14     A.     The file name for the document, yes.

15     Q.     What's your file name for the

16  document?

17     A.     It would be something to the effect

18  of photos for web use and the date.

19     Q.     Okay.  What's the date on this one,

20  if you know?

21     A.     I believe this might have been 8/20.

22     Q.     So August 2020?

23     A.     Yes.

24     Q.     Okay.  And is this the first

25  iteration of the guidelines to your knowledge?

Atkinson Baker, a Veritext Company
www.depo.com

1    A.    This is not the first.

2    Q.    Is it the second?

3    A.    I don't believe it's the second.

4    Q.    Okay.  Did the first or second

5  iteration include that paragraph 13?

6    A.    No.

7    Q.    So you added that paragraph 13 at

8  some point during your revisions to these

9  guidelines, correct?

10    A.    Correct.

11    Q.    And that is a substantive revision

12  that you made at some point, correct?

13    A.    Yes.

14    Q.    Do you recall what spurred you to

15  make that revision?

16    A.    There was a question about taking

17  screenshots from videos, so we decided to

18  clarify it.

19    Q.    Was Newsweek doing that prior to

20  your clarification of the guidelines?

21    A.    I'm sure there had at some point

22  been a screenshot from a video.

23    Q.    Okay.  Does Newsweek maintain its

24  own internal library of photography?

25    A.    We have a CMS system where all

Atkinson Baker, a Veritext Company
www.depo.com

1    images are uploaded to and that's where they

2    live.  I don't know if I'd necessarily call it

3    a library.

4        Q.    And are some or all those photos

5    proprietary Newsweek photos, by which I mean

6    photographs for which Newsweek owns the

7    copyright?

8        A.    There probably are some images that

9    we might hold the copyright to that exist in

10   our CMS, yes.

11       Q.    Okay.  How is it demarcated in the

12   CMS to reflect photographs that Newsweek owns

13   the copyright for and for third-party work?

14            MS. WOLFF:  Objection.  Outside the

15   scope.

16       A.    Typically, if we own it, it might

17   say for Newsweek in the credit.

18       Q.    Is the credit in the metadata?

19       A.    Yeah, it would be in the file.

20       Q.    Got it.  Got it.  Okay.  We're going

21   to put Exhibit 3 in front of you, which is

22   going to be Newsweek 104 and 105.

23            (Exhibit 3 marked for

24   identification.)

25       ///

Atkinson Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.     Take a moment and tell me if you

3    recognize this document.  Scroll all the way to

4    the bottom.

5        A.     I recognize it, yes.

6        Q.     Okay.  What is this document?

7        A.     It's an earlier iteration of our

8    guidelines.

9        Q.     Okay.  And how can you tell it's an

10   earlier iteration?

11       A.     It doesn't have the thirteenth

12   paragraph and there's some minor changes.

13       Q.     Okay.  So comparing this exhibit

14   with the one prior, does it refresh your

15   recollection as to when you added paragraph 13

16   relating to screencaps?

17       A.     I need to double-check dates of when

18   I added that iteration.  I'm not sure of the

19   specific date.

20       Q.     Okay.  And other than adding the --

21   we'll call it paragraph 13, do you recall

22   adding anything else to this particular

23   iteration of the guidelines that's substantive?

24       A.     I need to compare it to other ones.

25   I don't know of any other substantive changes,

Atkinson Baker, a Veritext Company
www.depo.com

1    additions.

2       Q.    Okay.  And you indicated earlier

3    that part of the in-house rights training that

4    took place in Newsweek, was it a Getty seminar;

5    is that accurate?

6       A.    One of them was a Getty seminar.  I

7    hosted one, or at least one.  I think I held

8    two.

9       Q.    Okay.  Was it your decision to hold

10   the Getty seminar?

11      A.    They offered it to us and we

12   accepted.

13      Q.    Okay.  Do you recall when the first

14   one of those took place?

15           MS. WOLFF:  Objection.

16      A.    You mean the Getty one or one that

17   I've held?

18      Q.    The Getty.

19      A.    We've only held one with Getty.

20      Q.    Okay.  And when was that held

21   approximately?

22      A.    I know it was in 2019.  Might have

23   been the fall.  I believe you have the dates

24   somewhere in the documents we provided.

25      Q.    Okay.  Do you recall if that Getty

Atkinson Baker, a Veritext Company
www.depo.com

1  seminar included any information about

2  embedding material from social media without

3  the creator's consent?

4      A.    I don't recall that specific

5  instance being covered.  It might have been,

6  but I don't recall.

7      Q.    Okay.  And you indicated you

8  yourself had at least one seminar for the team

9  dealing with intellectual property?

10     A.    Yes.

11     Q.    Okay.  Did that seminar include any

12  conversation regarding embedding?

13     A.    Yes.

14     Q.    Okay.  What was discussed in that

15  regard during that conference?

16     A.    It was discussed that if it was

17  within context of the story, and you weren't

18  taking it -- we're not taking a screenshot or

19  hosting it on our site, that Instagram allowed

20  for that.

21     Q.    And when did that conference take

22  place?

23     A.    Probably would have been the early

24  winter of -- sorry, early spring of 2019.

25     Q.    Okay.  And that conference was led

Atkinson Baker, a Veritext Company
www.depo.com

1    by you?

2        A.    Yes.

3        Q.    And was that -- the information you

4    gave there based entirely on your personal

5    experience?

6        A.    Yes.

7        Q.    Okay.  Was any lawyers at that

8    meeting?

9        A.    Not that I'm aware of.

10       Q.    Okay.  Did you seek any legal input

11   before holding that meeting?

12           MS. WOLFF:  Objection.

13       A.    Like I said previously, I've shown

14   this document to the person I usually talk with

15   about legal matters and I always ask for

16   feedback if they have any.

17       Q.    Sure.  And I'm not asking --

18       A.    The conversation was based off of

19   this document, so.

20       Q.    Okay.  Was it based off of anything

21   else?

22       A.    These were the points that were

23   covered.

24       Q.    Okay.  Was it based on anything

25   else?

Atkinson Baker, a Veritext Company
www.depo.com

1    A.    Just my knowledge of the industry.

2    Q.    Anything else?

3    A.    I believe I've answered the

4  question.

5    Q.    No.  So you've testified that you

6  gave this training to Newsweek relating to

7  intellectual property and social media use

8  based on your personal knowledge, and I'm

9  asking you is it based on anything else, and

10 you haven't quite answered me yet.

11         MS. WOLFF:  Objection.  Asked and

12 answered.

13 BY MR. BURROUGHS:

14   Q.    Do you want me to ask the question

15 again?

16   A.    I thought I answered it.  I'm sorry.

17   Q.    Not quite yet.  So this conference

18 that you gave to the Newsweek team relating to

19 the subject matter of these guidelines, you

20 testified that your guidance during that

21 conference was based on your personal

22 knowledge.  Was that guidance based on anything

23 else?

24   A.    My -- it was based off of this

25 document, which has been seen by people who

```
1   advise us on legal matters and it's based off
2   my experience.
3       Q.    Okay.  Anything else?
4           MS. WOLFF:  Objection.  You've asked
5   that three times and she's told you everything.
6   Asking it again will not get, you know,
7   something else.
8           MR. BURROUGHS:  Just trying to close
9   the loop here.
10          MS. WOLFF:  You closed the loop.
11  You asked that same question three times and
12  she told you everything she knows.
13  BY MR. BURROUGHS:
14      Q.    Let's go about it a different way.
15          Other than your personal experience
16  and this document that you prepared based on
17  your personal experience, was your instruction
18  to the Newsweek team related to the subject
19  matter based on anything else?
20          MS. WOLFF:  Objection.
21      A.    It was based off this document and
22  my experience.
23      Q.    Was it based on anything else?
24          MS. WOLFF:  Objection.  Asked and
25  answered.
```

Atkinson Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.    You should still respond, if you

3    can.

4        A.    I did respond.  I'm not sure what

5    you want from me.

6        Q.    Okay.  Tell me at the end of this

7    question, anything else that this guidance was

8    based on aside from your personal experience

9    and this document that was also based on your

10   personal experience.

11            MS. WOLFF:  Objection.

12       A.    Well, as I've said, that I've shown

13   this to our legal team and, you know, asked

14   them to review it as well.  So I wrote this

15   document up as you're aware and the

16   conversation was based off of this and what I

17   know about the industry.

18       Q.    Okay.  And I'll give you a chance

19   now.  If there's anything else that your

20   guidance is based on, please tell me now.

21       A.    I have nothing else to add.

22       Q.    Thank you.  We're going to now put a

23   document in front of you that we're going to

24   mark as Exhibit 4.  It's McGucken 9.

25       ///

Atkinson Baker, a Veritext Company
www.depo.com

1            (Exhibit 4 marked for

2    identification.)

3    BY MR. BURROUGHS:

4        Q.    Take a moment and look at Exhibit 4

5    and tell me if you've seen it before.

6        A.    Yes.

7        Q.    When was the first time you saw this

8    publication?

9        A.    When it was brought to my attention

10   in November of 2019.

11       Q.    Okay.  And who brought it to your

12   attention?

13       A.    Yuliya.

14       Q.    Okay.  And did she send that to you

15   by e-mail?

16       A.    Yes.

17       Q.    Okay.  And you understand this to

18   reflect the publication we've been discussing

19   today involving Elliot McGucken's photography,

20   correct?

21       A.    Yes.

22       Q.    Okay.  And I believe you testified

23   that you yourself weren't involved in the

24   embedding of this photograph to Newsweek's

25   page, correct?

1      A.      Correct.

2      Q.      Do you know who was?

3      A.      I don't know.  Probably the writer.

4      Q.      Okay.  If you wanted to figure that

5  out, where would you look?

6      A.      You might be able to look in the --

7  our CMS.

8      Q.      Okay.  Where in your CMS would you

9  look?

10     A.      There's an edit page; you need to

11  click on it and you can see the back end of the

12  story.

13     Q.      Does that edit page include a copy

14  of the photograph that's being embedded?

15     A.      You are able to see it as it shows a

16  rough display of how it would look on the

17  external side.

18     Q.      Okay.  And when you say "a rough

19  display," what do you mean?

20     A.      I believe it includes screenshots of

21  what it would look like, so you'll be able to

22  see that.  It doesn't look exactly like it

23  looks on the page here.  It's minus ads.

24     Q.      Understood.  So there is a

25  screenshot of the McGucken photograph used in

Atkinson Baker, a Veritext Company
www.depo.com

1    the embedding process at Newsweek, correct?

2        A.     It would be visible from the back

3    end.

4        Q.     Okay.  Visible to whom?

5        A.     The writers producing the story.

6        Q.     Okay.  And it's your belief that you

7    can look at that material and ascertain the

8    individual responsible for doing this

9    particular embedding, correct?

10             MS. WOLFF:  Objection.

11       A.     I'm not sure if it actually would

12   show that.  It does show dates of edits to a

13   story, but I'm not sure if it shows

14   specifically who or what the change was.  Like

15   I said, I'm not involved with that portion of

16   creation of stories, so I can't speak to it.

17       Q.     What is your understanding of how

18   the embed process works?

19       A.     You copy a link from Instagram and

20   you paste it into the CMS in the back end of

21   the story.

22       Q.     And have you yourself done that?

23       A.     I have not, no.

24       Q.     Okay.  Do you have any experience

25   working with the CMS program?

Atkinson Baker, a Veritext Company
www.depo.com

1     A.     I have experience uploading images

2   to the CMS.

3     Q.     Okay.  In your own language, how

4   does the CMS transport the linked content from

5   the original host to the display on Newsweek's

6   website?

7            MS. WOLFF:  Objection.

8     A.     That's outside my purview.

9     Q.     Okay.  So do you know how the

10  photograph comes to be hosted on Newsweek's

11  CMS?

12           MS. WOLFF:  Objection.

13    A.     It's via the link.  That's all I

14  know.

15    Q.     Okay.  So your understanding is that

16  the photograph is copied from the link and then

17  hosted on the CMS program on the Newsweek

18  platform; is that correct?

19           MS. WOLFF:  Objection.

20    A.     Instagram provides a link that

21  allows embedding and that's what's used.  They

22  include descriptions [sic] on how to do it on

23  Instagram's website.  It's similar to that

24  practice.

25    Q.     Have you ever followed those

Atkinson Baker, a Veritext Company
www.depo.com

1    instructions?

2        A.    I have read the instructions, but I

3    haven't personally done it.

4        Q.    Okay.  So is it your understanding

5    that those instructions allow Newsweek to copy

6    the photograph via the link and then host it on

7    the Newsweek platform?

8            MS. WOLFF:  Objection.

9        A.    Yes.

10       Q.    Okay.  Now, when you're looking at

11   the data in CMS on the back end, other than a

12   copy of the photograph that's being imported

13   from Instagram --

14           MS. WOLFF:  Objection to form.

15   BY MR. BURROUGHS:

16       Q.    -- and the link data, what other

17   information is there?

18           MS. WOLFF:  Objection to form.

19       A.    I'm not sure I understand the

20   question.

21       Q.    Okay.  Well, what else other than

22   what we talked about so far, what do you see

23   when you go into the back end?

24       A.    I'm not sure what you're getting at.

25       Q.    Okay.  Well, have you ever looked in

1    the back end yourself?

2        A.     I mean, I know what it looks like

3    once you go in to edit a story and what it

4    looks like.  I mean, it's like I said, it

5    essentially looks like what you see here minus

6    the ads and there's boxes.  It looks boxy -- I

7    mean, we provided screenshots of exactly what

8    it looks like.  You can reference those.  It

9    would be easier if you looked at those versus

10   me trying to describe it.

11       Q.     Okay.  Is it fair to say that

12   without relying on the document, you don't have

13   any personal knowledge of how that process

14   works?

15       A.     I'm not involved with the creation

16   of the website and the back-end data on what

17   makes it function.  I couldn't speak to that.

18       Q.     Understood.  That's because your

19   experience or your involvement with the website

20   itself is actually limited, correct?

21       A.     It's limited to uploading and --

22   yes.

23       Q.     Okay.  During your tenure at

24   Newsweek, have you worked with David Sim?

25       A.     Yeah, we corresponded.

1      Q.      Okay.  To your understanding, what

2  is David Sim's position at the company?

3      A.      He was a photo editor.

4      Q.      Okay.  Did you work closely with

5  him?

6      A.      Not closely.  He was based out of

7  the London office.  We correspond on occasion,

8  but we weren't direct.

9      Q.      Did you ever confer with him

10  regarding your social media guidelines?

11            MS. WOLFF:  Objection.

12      A.      I probably would have shared it with

13  him when I was first writing them.  I don't

14  recall the date that he left, so I'm not sure.

15      Q.      At a certain point was he the one

16  that people were supposed to contact if they

17  had any questions about the guidelines?

18      A.      If that was in the London office.

19      Q.      Okay.  So is it partitioned that way

20  that there's different guidelines for the

21  different offices, U.S. and London?

22      A.      To my knowledge they're the same.

23      Q.      Okay.  Is there anything in your

24  guidelines or in the Newsweek company policy in

25  general that relates to the different laws in

Atkinson Baker, a Veritext Company
www.depo.com

1    the U.K. versus the U.S. relating to the use of

2    third-party content?

3              MS. WOLFF:  Objection.

4       A.     Sorry, you were breaking up on that

5    question.

6       Q.     Okay.  Is there anything in your

7    social media guidelines or Newsweek's policies

8    in general that addresses any differences

9    between the legal ramifications of using

10   third-party content in the U.S. versus the

11   U.K.?

12      A.     We have the same guidelines for

13   both, both offices.

14      Q.     Okay.  So Newsweek did not have the

15   artist's consent to post the photograph we're

16   looking at here on Exhibit 4, correct?

17             MS. WOLFF:  Objection.

18      A.     He did not -- he did not

19   specifically give us permission to include the

20   link.

21      Q.     Okay.  And did Newsweek have any

22   conversations or communications with

23   Mr. McGucken whereby he gave any sort of

24   consent for the use?

25             MS. WOLFF:  Objection.

Atkinson Baker, a Veritext Company
www.depo.com

1      A.     To my knowledge, the writer reached

2  out, and from what I understand he didn't

3  respond.

4      Q.     Okay.  So here is it accurate to say

5  that Newsweek reached out to Mr. McGucken to

6  obtain consent to use his content on their

7  website?

8            MS. WOLFF:  Objection.

9      A.     From what I understand, they reached

10  out to be able to have a hard copy and host the

11  image on our site.

12      Q.     And what's that understanding based

13  on?

14      A.     A message that was sent to the

15  photographer.

16      Q.     Does that message indicate a request

17  for a hard copy?

18      A.     That was what it implied based on

19  what I saw.

20      Q.     How did that imply that?

21      A.     If you could pull up the screenshot,

22  I could better speak to it.

23      Q.     Okay.  But as you sit here today,

24  you have no independent recollection of that

25  implication?

Atkinson Baker, a Veritext Company
www.depo.com

```
 1              MS. WOLFF:  Objection.
 2      A.      I'm sorry, what was the question?
 3      Q.      We can move on.  Mr. McGucken did
 4   not consent to this use, correct?
 5              MS. WOLFF:  Objection.
 6      A.      We didn't request permission to
 7   embed the image because permission is not
 8   required to embed images.
 9      Q.      Did Mr. McGucken respond providing
10   any sort of consent for Newsweek to use his
11   work?
12              MS. WOLFF:  Objection.
13      A.      I'm not aware of any response that
14   he made.
15      Q.      Okay.  Is it a business practice of
16   Newsweek to use content from photographers
17   after Newsweek reaches out to that photographer
18   for consent and the photographer does not
19   consent?
20              MS. WOLFF:  Objection.
21      A.      Our guidelines say that if we're
22   going to host a hard copy of an image,
23   permission is necessary.
24      Q.      Okay.  But in this case, where
25   Newsweek reached out to the photographer to
```

1    request consent to use his work, the

2    photographer declined to grant that consent,

3    the work was used notwithstanding the fact that

4    he did not provide the consent, correct?

5              MS. WOLFF:  Objection.

6         A.    I'm not sure I understand the

7    question.

8         Q.    Okay.  So you admit that Newsweek

9    did contact Mr. McGucken requesting some sort

10   of consent to use this work, correct?

11             MS. WOLFF:  Objection.

12        A.    Like I said, to my knowledge, the

13   writer did reach out to the photographer.

14        Q.    To your knowledge, the photographer

15   did not grant to Newsweek any consent; isn't

16   that so?

17        A.    To my knowledge, the photographer

18   didn't respond.

19        Q.    And yet Newsweek used the content

20   for which it sought permission even

21   notwithstanding this lack of response, correct?

22             MS. WOLFF:  Objection.

23        A.    Permission is not required to embed

24   an image.

25        Q.    That's -- remember, you have to

Atkinson Baker, a Veritext Company
www.depo.com

1    answer my question.  I understand these answers

2    and what you're testifying to, but they're

3    simply not responsive to the question.  So

4    please listen closely to the question and try

5    to answer the question I'm asking you.  Okay?

6        A.    Okay.

7        Q.    So after not receiving a response

8    from Mr. McGucken relating to the use of this

9    photography, Newsweek, notwithstanding that

10   lack of response, displayed the photography

11   anyway, correct?

12            MS. WOLFF:  Objection.

13       A.    Correct.

14       Q.    Okay.  And is it a practice of

15   Newsweek to do that, to reach out for consent

16   from photographers, and if they decline

17   consent, Newsweek uses the content anyway?

18            MS. WOLFF:  Objection.

19       A.    If a photographer declines or tells

20   us explicitly they don't want us to use their

21   content, we are unlikely to use it.

22       Q.    But if they do not respond, is it

23   Newsweek's practice to use the material that

24   they sought consent for notwithstanding the

25   fact there was no response?

```
 1              MS. WOLFF:  Objection.
 2       A.     If it was an embed, no response is
 3   necessary.
 4       Q.     Okay.  So it's fair to say then that
 5   it's Newsweek's practice to reach out to
 6   photographers in search of consent and if
 7   consent isn't given, Newsweek will then just
 8   embed their photography anyway, correct?
 9              MS. WOLFF:  Objection.
10       A.     We don't have a policy against
11   embedding images.  We wouldn't take an image
12   without a photographer's permission and upload
13   it to our site.
14       Q.     Okay.
15       A.     But embedding is not -- is allowed
16   as per Instagram's terms.
17       Q.     Okay.  So even after a photographer
18   declines to grant consent, it's Newsweek's
19   practice to display their photography anyway by
20   the embedding process, correct?
21              MS. WOLFF:  Objection.
22       A.     If a photographer were to tell us
23   they don't want us to use their visuals it's --
24   unless there was a really strong newsworthy
25   reason to do so that fell under fair use, we'd
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   likely respect the photographer's wishes, but,
 2   you know.
 3       Q.    So is it Newsweek's practice when a
 4   photographer declines their request for consent
 5   to still use the work anyway as an embed?
 6            MS. WOLFF:  Objection.
 7       A.    If a photographer asked us not to
 8   use an image, we are unlikely to use that
 9   image.
10       Q.    I understand that.  You said that a
11   couple of times, but you have to respond to the
12   question I'm asking.  Okay?
13       A.    Are you simply wanting me to say yes
14   or no?
15            MS. WOLFF:  Objection.
16   BY MR. BURROUGHS:
17       Q.    That would be helpful, but what I'm
18   asking you is what happens in cases where
19   there's no response?  You're responding telling
20   me, Well, here's what happens if they say no,
21   okay, but that's not my question.  So please
22   listen carefully to the question; otherwise
23   there's going to be issues with the record.
24            MS. WOLFF:  Objection.
25   BY MR. BURROUGHS:
```

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      First and foremost, just one more

2    time.  In situations where Newsweek reaches out

3    to the photographer to request consent to use

4    their work, and the photographer does not

5    respond, is it Newsweek's practice to use that

6    material anyway through the embedding process?

7              MS. WOLFF:  Objection.

8      A.      It's possible we would do that.

9      Q.      Okay.  And doing so would not

10   violate Newsweek's social media guidelines,

11   correct?

12     A.      Embedding images does not violate

13   the guidelines that I had written out.

14     Q.      Okay.  And that's the case even if

15   the photographer declines a request for consent

16   or doesn't respond to a request for consent,

17   correct?

18             MS. WOLFF:  Objection.

19     A.      Declining and not responding aren't

20   the same thing.

21     Q.      So is it your testimony that if the

22   photographer does not respond to a request for

23   consent, Newsweek takes that as consent to use

24   the work on its website?

25             MS. WOLFF:  Objection.

Atkinson Baker, a Veritext Company
www.depo.com

1      A.     We would embed -- we embed images.

2      Q.     So it's Newsweek's business practice

3   when it is unable to obtain consent to simply

4   embed the image at issue; is that correct?

5            MS. WOLFF:  Objection.

6      A.      If the image is newsworthy and in

7   relation to the story, embedding images is

8   allowed as per our practice.

9      Q.     And your practice at Newsweek is to

10  do so even when you've directly contacted the

11  photographer and they did not respond providing

12  consent, correct?

13           MS. WOLFF:  Objection.  Asked and

14  answered.

15     A.     No permission is required when it

16  comes to embedding images.

17     Q.     And that's your position

18  irrespective of whether you've asked for

19  consent or received consent, correct?

20           MS. WOLFF:  Objection.

21     A.     I'm sorry.  Can you repeat the

22  question?

23     Q.     Okay.  Your position is that --

24  well, strike that.

25            Is it Newsweek's practice to use

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   material from third parties, after seeking
 2   consent and not obtaining it, via the embed
 3   process?
 4            MS. WOLFF:  Objection.
 5      A.    If it falls under fair use.
 6      Q.    Is that the only circumstance?
 7      A.    That I'm aware of.
 8      Q.    Okay.  So if it's not fair use,
 9   Newsweek will not use third-party content that
10   they've sought permission for and not obtained?
11            MS. WOLFF:  Objection.
12   BY MR. BURROUGHS:
13      Q.    Is that accurate?
14            MS. WOLFF:  Objection.
15      A.    We only use images that relate to
16   our stories.
17      Q.    In situations other than fair use
18   situations, is it Newsweek's policy to use
19   third-party content that it sought consent for
20   and did not receive?
21            MS. WOLFF:  Objection.
22      A.    Instagram doesn't require permission
23   to embed images.
24      Q.    Again, I'm not asking about
25   Instagram.  I'm asking about your company
```

Atkinson Baker, a Veritext Company
www.depo.com

1    policies.  So you keep telling me what

2    Instagram guides, but I'm asking about your

3    company policies.

4        A.    We follow Instagram's policies.

5        Q.    How do you ensure that you follow

6    Instagram's policies?

7        A.    We've read their policy and I'm

8    familiar with industry standards.

9        Q.    Other than reading their policy, how

10   does Newsweek ensure that it follows that

11   policy?

12              MS. WOLFF:  Objection.

13   BY MR. BURROUGHS:

14       Q.    I just want the record to reflect

15   that time is going by without an answer.

16       A.    I mean, I'm not sure what you want

17   me -- would you rephrase the question one more

18   time, please?

19       Q.    Sure.  You told me that you followed

20   Instagram's policies, I asked you how, and you

21   said you read them.  And I asked, Well, do you

22   do anything else at Newsweek to ensure that you

23   follow those policies, and you sat there for a

24   while without answering.

25       A.    We hold classes regularly to inform

Atkinson Baker, a Veritext Company
www.depo.com

```
1   people what the current industry standards are.
2        Q.    Does that have anything to do with
3   Instagram?
4              MS. WOLFF:  Objection.
5   BY MR. BURROUGHS:
6        Q.    Are you looking at the screen or --
7        A.    What is the current question?
8        Q.    -- are you typing?  I can't tell
9   what's happening.
10       A.    I'm sitting here.  I'm trying to
11  understand what you want from me.
12       Q.    Sure.  I'll ask one more time.
13             MS. WOLFF:  Objection.
14  BY MR. BURROUGHS:
15       Q.    I asked if Newsweek does anything
16  else aside from reading Instagram's terms in
17  order to ensure that they comply with those
18  terms?
19       A.    Well, I'm not sure what else could
20  be done.
21       Q.    Okay.  Then you can just tell me we
22  don't do anything other than read them.
23             MS. WOLFF:  Objection.
24  BY MR. BURROUGHS:
25       Q.    Is that your answer?
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        A.      I mean, yes.  I read the policy --
 2              MS. WOLFF:  You're badgering the
 3    witness right now.  Okay?  Let the record
 4    reflect that he's badgering the witness.
 5    BY MR. BURROUGHS:
 6        Q.      Has Newsweek ever violated any of
 7    Instagram's terms?
 8        A.      Not to my knowledge.
 9        Q.      And is it fair to say that it's
10    Newsweek's policy, even in cases where it
11    reached out to the photographer to request
12    consent to use their work and having not
13    received that consent, Newsweek will still
14    publish and display that consent [sic] via the
15    embed process?
16              MS. WOLFF:  Asked and answered.
17        A.      By what consent?  I'm sorry, I don't
18    understand what you mean by that question.
19        Q.      So you've testified that Newsweek
20    reached out to Mr. McGucken to request his
21    consent to use his photography, correct?
22        A.      Yes.
23        Q.      And you've testified that Mr.
24    McGucken did not give that consent, correct?
25        A.      I testified that he did not respond.
```

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.    Correct.  And you testified that

2   Newsweek, notwithstanding the fact that he

3   didn't respond, just went ahead and published

4   his photography, correct?

5           MS. WOLFF:  Objection.

6    A.    Permission is not required for

7   embedding an image --

8    Q.    And I'm not asking you whether or

9   not --

10   A.    -- so we did not --

11          MS. WOLFF:  Objection.  You're

12   putting words in her mouth.

13          MR. BURROUGHS:  Not correct.

14          MS. WOLFF:  She did not use the word

15   "publish."  Please let her answer the question.

16   If she can't answer yes or no, she has to

17   explain.

18   A.    You need to repeat the question

19   again.

20   Q.    Sure.  So, and I don't want to put

21   words in your mouth, but I believe you

22   testified that Newsweek admits that it

23   contacted Mr. McGucken to request a right to

24   use his photography.  And I believe you

25   testified that Mr. McGucken did not respond to

Atkinson Baker, a Veritext Company
www.depo.com

1    provide that consent.  And I believe you

2    testified that Newsweek published the

3    photography anyway.  Is that accurate?

4             MS. WOLFF:  Objection.

5       A.      We requested permission to have a

6    hard copy and host that image on the website.

7    That was the request.  We did not get a

8    response from the photographer and we instead

9    decided to include a link as per what's allowed

10   by Instagram's policy and that is what

11   happened.

12      Q.      And so Newsweek did display

13   Mr. McGucken's photograph on its website after

14   he declined to provide consent, correct?

15            MS. WOLFF:  Objection.  You're using

16   legal terms.

17      A.      The image was visible on our website

18   via an Instagram link.

19      Q.      Okay.  And is it in accord with

20   Newsweek's policies and practices to display

21   photography on its website after it has reached

22   out to the photographer for that photograph and

23   not receive consent?

24            MS. WOLFF:  Objection.

25      A.      We include Instagram links on our

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   website and we don't always seek permission.
 2        Q.    And in cases where you do seek
 3   permission and don't receive it, is it your
 4   practice to use the work anyway?
 5             MS. WOLFF:  Objection.
 6        A.    I've answered the question.  I don't
 7   understand what else I can add.
 8        Q.    It's a yes-or-no question, so I'm
 9   not really looking for much else other than yes
10   or no?
11             MS. WOLFF:  Objection.
12        A.    It's a nuance answer.  We include
13   links to Instagram stories.  We do not host
14   images in our CMS without permission.
15        Q.    Let me ask it this way:  The article
16   that you see in Exhibit 4, it's undisputed that
17   Newsweek reached out to Mr. McGucken and asked
18   for some sort of consent, correct?
19        A.    Correct.
20        Q.    And it's undisputed that
21   Mr. McGucken did not give Newsweek any consent,
22   correct?
23        A.    He did not respond.
24        Q.    So did you take that lack of
25   response to be consent?
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1              MS. WOLFF:  Objection.
 2      A.     We asked for permission to host the
 3   image.  We did not hear back, so we did not
 4   host the image in our site; therefore, we
 5   included a link.  They are two different
 6   questions.
 7      Q.     Well, when you include a link, are
 8   you displaying the Instagram content?
 9      A.     Correct.
10              MS. WOLFF:  Objection.  That calls
11   for a legal conclusion.
12              MR. BURROUGHS:  Madam Court
13   Reporter, did you get the answer?
14              THE REPORTER:  Yes.
15   BY MR. BURROUGHS:
16      Q.     Okay.  So here you are displaying
17   McGucken's photograph on Newsweek, correct?
18              MS. WOLFF:  Objection.  Legal
19   conclusion.
20   BY MR. BURROUGHS:
21      Q.     Do you understand the question?  I'm
22   happy to rephrase it.
23      A.     Please rephrase.
24      Q.     Sure.  Did Newsweek display
25   Mr. McGucken's photograph?
```

Atkinson Baker, a Veritext Company
www.depo.com

1           MS. WOLFF:  Objection.

2      A.     It was visible on our website, yes.

3      Q.     Okay.  What's your definition of

4  display?

5           MS. WOLFF:  Objection.

6      A.     There's multiple definitions of

7  display.

8      Q.     Okay.  Can you give me yours based

9  on your industry experience?

10     A.     What you can see.

11     Q.     Okay.  So per your definition, is it

12  possible for you to see McGucken's photograph

13  on the Newsweek website?

14          MS. WOLFF:  Objection.

15     A.     You can see it on our website, yes.

16     Q.     Okay.  So then it is fair to say

17  that the Newsweek website displayed Mr.

18  McGucken's photograph, correct?

19          MS. WOLFF:  Objection.

20     A.     Yes.

21     Q.     Okay.  And Newsweek displayed

22  Mr. McGucken's photograph despite the fact that

23  he had never affirmatively consented to that

24  display, correct?

25          MS. WOLFF:  Objection.

1      A.      As I've stated, there's two

2   questions at hand.  We asked for permission to

3   have a hard copy.  He didn't respond, so we

4   included a link.  We didn't ask permission to

5   include a link to his Instagram page.

6      Q.      So is it your understanding that his

7   failure to respond to your request gave you a

8   -- was it implied consent or was it some other

9   type of consent to embed?

10      A.      We don't need permission to embed.

11   We didn't ask for permission for an embed.

12      Q.      Understood.  So is it Newsweek's

13   position that it can embed photographers' work

14   even in situations where they've reached out to

15   that photographer for any type of consent?

16              MS. WOLFF:  Objection.

17      A.      As I've stated, we wouldn't host an

18   image -- we wouldn't take a hard copy of an

19   image and host that without permission, but we

20   would include a link to an Instagram page.

21      Q.      And that link would display the

22   photograph on Newsweek's site, correct?

23      A.      Correct.

24              MS. WOLFF:  Objection.

25      A.      Correct.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     Okay.  And you'll do that even in

2   cases where you've reached out to the

3   photographer and not heard back, correct?

4              MS. WOLFF:  Objection.  Asked and

5   answered.

6      A.     I have answered the same question

7   several times.  I'm not sure what more I could

8   add.

9      Q.     Okay.  Let me ask you this:  Does

10  it, under Newsweek's business practices, affect

11  in any way whether or not Newsweek decides to

12  display somebody's photograph via an embed

13  whether or not Newsweek has reached out to them

14  and/or heard a response from them in regards to

15  the use of the photograph?

16             MS. WOLFF:  Objection.

17     A.     I've answered your questions

18  already.  I'm not sure what else I could add.

19     Q.     So I think what you've told me, and

20  tell me if this is wrong, is that it does not

21  affect Newsweek's policy.  Newsweek is going to

22  embed a photograph from Instagram even in cases

23  where it's reached out to the artist and asked

24  for consent?

25             MS. WOLFF:  Objection.

1    BY MR. BURROUGHS:

2        Q.     Is that incorrect?

3        A.     We don't ask for consent for

4    embedded images.

5        Q.     But let's say that you did.  Let's

6    say that you reached out and asked an author

7    for consent, that author did not respond, would

8    that impact your decision whether or not to use

9    their content?

10              MS. WOLFF:  Objection.

11       A.     We wouldn't do that.  It's not

12   relevant.

13       Q.     Can you think of instances where you

14   yourself have corresponded with photographers

15   or artists about using their social media

16   content on your site?

17       A.     I can't recall personally doing

18   that.

19       Q.     Okay.  Do you have any recollection

20   of anybody else at the company ever doing that?

21       A.     I'm sure it's been done, but I can't

22   speak to what other people have done

23   specifically.

24       Q.     Okay.

25       A.     May I take a break for just a

Atkinson Baker, a Veritext Company
www.depo.com

1    moment?  My light is coming in my window and I

2    need to adjust it.

3        Q.    Sure.  Yeah, we can take a

4    five-minute break.  Is that okay?

5              (At this point in the proceeding, a

6    brief recess is taken.)

7    BY MR. BURROUGHS:

8        Q.    Okay.  You understand you're still

9    under oath?

10       A.    Yes.

11       Q.    Okay.  Now, when Newsweek obtains

12   photographs from Getty, does it pay a license

13   fee for the photographs?

14       A.    We have a subscription model with

15   them, so yes.

16       Q.    And when Newsweek uses photos from

17   commissioned photographers or even from the

18   reporter that you mentioned earlier who

19   submitted the photograph, does it compensate

20   those parties for use of the photograph?

21       A.    We wouldn't compensate a reporter if

22   they're staff.  Typically, we wouldn't

23   compensate a reporter, but if it's a

24   commissioned work we would.

25       Q.    Okay.  Do you recall Newsweek

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   actually paying independent contractor

 2   photographers for use of the work?

 3          MS. WOLFF:  Objection.

 4      A.    Yes.

 5      Q.    Okay.  When was the last time you

 6   recall that happened?

 7      A.    The most recent case was the one I

 8   described earlier with a medal of the arts

 9   recipient.

10      Q.    Okay.  And what did Newsweek pay for

11   the use of that work?

12      A.    $150.

13      Q.    Okay.  And do you recall what the

14   terms of use were for that payment?

15      A.    It was used for that story in

16   perpetuity.

17      Q.    Okay.  Online only?

18      A.    And print.

19      Q.    Okay.  Was it used in print?

20      A.    Yes.

21      Q.    Okay.  Do you know if Newsweek --

22   well, let me withdraw the question.

23          Did Newsweek offer to compensate

24   Mr. McGucken for the use of his photograph?

25          MS. WOLFF:  Objection.
```

1    A.    Not that I'm aware of.  There was no

2  correspondence with him.  So he never

3  responded, so there was no opportunity to do

4  so.

5    Q.    Okay.  Does Newsweek regularly reach

6  out via social media to ask if it can display

7  or use in some way social media content?

8         MS. WOLFF:  Objection.

9    A.    It's something that writers do.

10   Q.    You're aware of that happening

11  numerous times during your tenure at Newsweek,

12  correct?

13        MS. WOLFF:  Objection.

14   A.    I don't work directly with these

15  writers, so I can't say how frequently it

16  happens, but I know it happens.

17   Q.    And has it happened throughout your

18  tenure at Newsweek?

19   A.    As far as I'm aware, it's happened

20  while I've been with the company.

21   Q.    Okay.  And in those instances, would

22  it also be the understanding that when they're

23  reaching out and asking to use the social media

24  content, they're, in fact, asking for a hard

25  copy to be sent?

Atkinson Baker, a Veritext Company
www.depo.com

```
 1      A.     Typically, when they're reaching
 2  out, that's what they're seeking.
 3      Q.     Okay.  To your knowledge, is it
 4  possible to send photos via Instagram DM?
 5      A.     Not to my knowledge.
 6      Q.     Okay.  Have you ever heard of that
 7  happening?
 8      A.     I'm not familiar with that
 9  happening.
10      Q.     Okay.  Do you still have an
11  Instagram account?
12      A.     I have an Instagram account.
13      Q.     Okay.  Do you use it?
14      A.     Yes.
15      Q.     Okay.  Have you ever sent a
16  photograph via -- I'm sorry.  Have you ever
17  sent a photograph file via Instagram DM?
18      A.     A personal file?  It would be a link
19  usually.
20      Q.     Okay.  So you never sent a hard copy
21  or an actual TIFF or JPEG file via Instagram
22  DM, correct?
23              MS. WOLFF:  Objection.
24      A.     I don't know how Instagram functions
25  internally or what type of file is being
```

Atkinson Baker, a Veritext Company
www.depo.com

1  transferred if I were to send an image to show

2  someone else.  I don't know how that process

3  works.  I don't know what it would be called.

4      Q.    Okay.  So you don't recall doing

5  that, correct?

6      A.    To my knowledge, I don't know what

7  -- how the file is transferred within

8  Instagram's platform.

9      Q.    And you have no knowledge?

10     A.    I don't know how to answer that

11 question specific to what you're asking.

12     Q.    Okay.  And that's because you have

13 no knowledge in that regard, correct?

14           MS. WOLFF:  Objection.

15     A.    I don't know how Instagram is built.

16     Q.    Fantastic.  Okay.  Does Newsweek

17 have a standard release form that it uses with

18 outside photographers or artists?

19     A.    We have a release form, yes.

20     Q.    Have you seen that?

21     A.    Yes.

22     Q.    When is the last time you saw that

23 form?

24     A.    I probably looked at it when we were

25 licensing the image for the story which I

1    referenced earlier.

2        Q.    Okay.  And what do you recall about

3    the substance of that form?

4        A.    It's a pretty simple statement just

5    saying that we're granted permission to use the

6    image within context of that story that we're

7    requesting it for.

8        Q.    Okay.  And is it Newsweek's practice

9    to have that form signed by third-parties when

10   it uses third-party content?

11       A.    If we're hiring someone to do

12   something.  It's not always required when we're

13   seeking permission to offer an image that

14   already exists.  It's not always required.  A

15   simple yes or no is usually sufficient.

16       Q.    Okay.  So is it fair to say that it

17   is Newsweek's practice to not have a

18   photographer execute just a license when it

19   licenses a photograph to Newsweek?

20            MS. WOLFF:  Objection.

21       A.    Typically, when someone requests

22   permission to use an image and they respond,

23   Yes, you are allowed to use this image for the

24   story, that's sufficient.

25       Q.    And it's fair to say that what

Atkinson Baker, a Veritext Company
www.depo.com

1    you've just articulated is the Newsweek policy,

2    correct?

3          MS. WOLFF:  Objection.

4    A.     I'm not sure if I would call it a

5    standard policy, but it is a practice.

6    Q.     Okay.  Does Newsweek have a policy

7    in that regard?

8    A.     It's just our standard function to

9    do things that way.

10   Q.     Okay.  So if I were to ask you to

11   describe the policy to me, you wouldn't be able

12   to because there is no such policy, correct?

13         MS. WOLFF:  Objection.

14   A.     It's a pretty standard practice

15   across the industry to do things that way, so

16   it's not really something that warrants being

17   written in stone.

18   Q.     To do things which way?  To obtain a

19   license?  Or to obtain -- go ahead.

20   A.     To request an image and for the

21   person to respond affirmatively.

22   Q.     Okay.  So it's not your

23   understanding that industry practice generally

24   requires the photographer to sign a licensing

25   statement or agreement?

Atkinson Baker, a Veritext Company
www.depo.com

```
1              MS. WOLFF:  Objection.
2         A.     Not for Web use.
3         Q.     Okay.  And certainly, you're not
4    contest -- you're not asserting that McGucken
5    signed anything or gave any affirmative consent
6    to Newsweek for any purposes here, correct?
7              MS. WOLFF:  Objection.
8         A.     Not that I'm aware.
9         Q.     We got a bit sidetracked, but is it
10   your position that by not responding, he had
11   given Newsweek implied or some other type of
12   consent to use his work?
13             MS. WOLFF:  Objection.
14        A.     I believe we covered this already.
15        Q.     Was that your belief?
16        A.     Well, we ask permission to host the
17   image on our site.  We didn't hear a response
18   so we did not host the image on our site.  We
19   included a link instead, which permission is
20   not necessary for.
21        Q.     Okay.  And that link displayed the
22   image on Newsweek.com, correct?
23        A.     Correct.
24        Q.     And you don't believe that your
25   correspondence or lack thereof with
```

Atkinson Baker, a Veritext Company
www.depo.com

1    Mr. McGucken authorized that use to the extent

2    it has to be authorized?  I understand your

3    position that it doesn't have to be authorized.

4         A.    Correct.

5         Q.    Okay.  Are there any processes in

6    place to ensure that photography is properly

7    licensed or being used properly before it goes

8    live and is published on Newsweek.com?

9              MS. WOLFF:  Objection.

10        A.    That would probably be a better

11   question for James.  He would be able to speak

12   to that.

13        Q.    Okay.  So it's certainly not your

14   role, correct?

15             MS. WOLFF:  Objection.

16        A.    I'm not involved with posting the

17   stories, the daily stories.  There's hundreds

18   done a day, so I can't speak specifically to

19   that.

20        Q.    Okay.  And you testified earlier

21   that the writers themselves publish the stories

22   at Newsweek.com, correct?

23        A.    Writers or with the approval of

24   editors.  It's often more than one person.

25        Q.    But a writer can upload an article

```
 1   directly and it would publish in Newsweek.com
 2   without any further approval?
 3            MS. WOLFF:  Objection.
 4       A.     As I said, I can't speak to the
 5   exact processes of that.  That would be a
 6   question for James.
 7       Q.     Okay.  Are you aware of anyone at
 8   Newsweek that's tasked with reviewing articles
 9   to ensure that they don't violate third-party
10   copyrights before they're published on
11   Newsweek.com?
12            MS. WOLFF:  Objection.
13       A.     As I've said, I don't work
14   specifically with that process.
15       Q.     Are you aware of anyone?
16       A.     I couldn't speculate.
17       Q.     Okay.  So are you aware of anyone?
18            MS. WOLFF:  Objection.
19       A.     Of course, the editors review
20   stories.  They would catch errors or anything
21   of concern.  I'm sure they would flag it if
22   they saw something.
23       Q.     Okay.  Which is understandable, but
24   again, listen to my question and try to answer
25   the question that I'm asking.  Okay?
```

Atkinson Baker, a Veritext Company
www.depo.com

1           MS. WOLFF:   Objection.

2    BY MR. BURROUGHS:

3        Q.     Is there anyone at Newsweek whose

4    responsibility is to review articles before

5    they're published in Newsweek.com and ensure

6    that they're not violating anyone's copyrights?

7           MS. WOLFF:   Objection.

8        A.     Any editor assigned to a story would

9    flag a copyright issue if they saw it.

10       Q.     Okay.  And how do they know whether

11   or not there's a copyright issue as you say?

12          MS. WOLFF:   Objection.

13       A.     Hopefully, they would refer to my

14   guidelines and the industry professionals with

15   an understanding how copyright works.

16       Q.     Okay.  So it's Newsweek's

17   understanding that all of its editors and

18   writers have an understanding of how copyright

19   works and they rely on that when approving

20   stories and that's the extent of the approval

21   process?

22          MS. WOLFF:   Objection.

23       A.     I'm not involved with the hiring

24   practices of the writers and what questions and

25   how they're vetted.  I couldn't speak to that.

Atkinson Baker, a Veritext Company
www.depo.com

1     Q.     That's fair.  So as far as you know,

2   there's no one at Newsweek whose job is to

3   review these articles to make sure they're not

4   violating a photographer's rights before they

5   go up on the site, correct?

6     A.     We have educated writers [sic] that

7   if they saw a problem with a story, I'm sure

8   they would flag it.  And if the writer is

9   following our guidelines, they shouldn't be

10   violating copyrights.

11     Q.     Understood.  And aside from that,

12   there's nothing in place to ensure that the

13   articles are not copyright infringed, correct?

14               MS. WOLFF:  Objection.

15     A.     Beyond editors reviewing stories and

16   people following guidelines that we have set

17   forth, I'm not aware of any additional levels

18   of checks.

19     Q.     Okay.  And there's no one at

20   Newsweek whose job title or job

21   responsibilities include reviewing these

22   articles to look at specifically copyright

23   issues, correct?

24               MS. WOLFF:  Objection.

25     A.     As I've stated before, I can't say

Atkinson Baker, a Veritext Company
www.depo.com

1    what an editor looks at specifically for a

2    story.  I'm not involved in that process.

3        Q.    Okay.  So it sounds like you're

4    telling me that it's up to the editors

5    basically to look at the content and figure out

6    whether or not there are any copyright issues

7    at Newsweek?

8        A.    I'm saying I'm not involved

9    specifically with that process, so I can't

10   speak specifically to what they're doing.

11       Q.    Understood.  So you're unaware of

12   anything that Newsweek does to review these

13   articles for copyright issues before them being

14   uploaded to Newsweek.com, correct?

15            MS. WOLFF:  Objection.  And we have

16   designated particular people to speak to

17   particular subjects.  I don't see where this is

18   in our list of questions.

19   BY MR. BURROUGHS:

20       Q.    Is that correct?

21       A.    I've answered the question to the

22   best of my ability.

23       Q.    Okay.  And you yourself had no

24   involvement whatsoever with the McGucken

25   article that's at issue in this case, correct?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.      As I've stated, I wasn't

2    specifically involved with the posting of this

3    story.

4      Q.      Did you have any involvement with

5    the story or its posting?

6      A.      I was not involved with the creation

7    of this story.

8      Q.      Did you have any involvement

9    whatsoever with the story being created or

10   posted to Newsweek.com?

11     A.      I've already answered the question.

12     Q.      If you had any involvement with the

13   creation or publication of the article, please

14   tell me that now.

15           MS. WOLFF:  Objection.

16     A.      I've already answered the question.

17   I was not involved with the posting of this

18   story.

19     Q.      And you were not involved with the

20   creation of the story, correct?

21     A.      That's saying the same thing.  I

22   didn't create the story.  I didn't post the

23   story.

24     Q.      Okay.  So you weren't involved in

25   the creative process, correct?

```
 1              MS. WOLFF:  Asked and answered.
 2   BY MR. BURROUGHS:
 3       Q.     Did you write the story?
 4       A.     No.
 5              MS. WOLFF:  You asked her that five
 6   times.
 7   BY MR. BURROUGHS:
 8       Q.     Did you choose the photography for
 9   the story?
10       A.     No.
11              MS. WOLFF:  Asked and answered.
12   BY MR. BURROUGHS:
13       Q.     Had you even seen the story before
14   this lawsuit arose?
15              MS. WOLFF:  Asked and answered.
16       A.     As I've stated earlier, the first
17   time I saw the story was in November of 2019.
18       Q.     Okay.  Have you reviewed any
19   documents that would give you any information
20   or knowledge relating to the creation of the
21   article at issue?
22       A.     I believe we covered this already.
23       Q.     No.
24       A.     We provided the documents that we
25   had available in relation to the creation of
```

Atkinson Baker, a Veritext Company
www.depo.com

1    this story.

2        Q.     Did you look at any records

3    whatsoever relating to the creation of the

4    McGucken article?

5        A.     I've seen some e-mails in relation

6    to this story.

7        Q.     You've seen e-mails relating to the

8    creation of the McGucken article?

9        A.     Yes.

10       Q.     Okay.  And aside from those e-mails,

11   did you see any other documents that relate to

12   the creation of the McGucken article?

13       A.     Outside of the e-mails that were

14   provided, no.

15       Q.     Have you spoken to Ms. Hignett about

16   the creation of the McGucken article?

17       A.     No.

18       Q.     Do you have any knowledge or

19   information relating to Ms. Hignett's creative

20   decisions in connection with her creation of

21   the McGucken article?

22            MS. WOLFF:  Objection.

23       A.     I can't speak to her thought

24   process.

25       Q.     Okay.  As you sit here today, you

1   simply have no information whatsoever relating

2   to Ms. Hignett's creative process or anything

3   having to do with the creation of the McGucken

4   article, correct?

5           MS. WOLFF:  Objection.

6      A.      Beyond the creation of our

7   guidelines and the fact that as far as we are

8   aware she followed those guidelines.  I wasn't

9   involved with her thought process or her

10  creation of the story.

11     Q.      Okay.  So other than your knowledge

12  of your guidelines, you have no information

13  relating to the choices made in creating and

14  publishing the McGucken article on

15  Newsweek.com, correct?

16          MS. WOLFF:  Objection.

17     A.      The first time I saw the story was

18  in November of 2019.

19     Q.      Okay.  And that was months after it

20  had already gone online, correct?

21     A.      I believe it was posted in August.

22     Q.      Okay.  And so you're unaware of why,

23  for example, Ms. Hignett shows the McGucken

24  photograph to publish on Newsweek.com, correct?

25          MS. WOLFF:  Objection.

Atkinson Baker, a Veritext Company
www.depo.com

1      A.      I believe the story was about his
2  photo, so I assume that's why she included it.
3      Q.      I understand your assumption, but
4  you don't have any personal knowledge as to why
5  she chose that photograph, correct?
6              MS. WOLFF:  Objection.
7      A.      As I've said, I can't speak to her
8  thought process on the creation of the story.
9      Q.      You can't speak to her creative
10  process at all as it pertains to the McGucken
11  article, correct?
12      A.      I don't -- wasn't involved with the
13  creation of this story, so I cannot speak to
14  it.
15      Q.      Okay.  Do you recall ever conversing
16  or communicating with Ms. Hignett relating to
17  the substance of any of her articles?
18      A.      I have worked with her in the past
19  on a previous article.
20      Q.      Which article?
21      A.      In the story that we ran in the
22  magazine about somebody who had been murdering
23  cats.
24      Q.      Okay.  So aside from that, which you
25  mentioned earlier, did you ever communicate

Atkinson Baker, a Veritext Company
www.depo.com

1   with her relating to any other article that she

2   put together?

3       A.      It's possible.  That's the one that

4   stands out.

5       Q.      And do you recall any others other

6   than the cat murderer?

7       A.      That's the only one that I could

8   recall off the top of my head, but it's

9   possible we worked together on another story

10  that I'm not thinking of.

11      Q.      Okay.  Did you ever give her any

12  guidance as to her creative process?

13      A.      I provided the document that I

14  created that we reviewed earlier to everyone in

15  the company, so I'm assuming that she would

16  have received a copy.

17      Q.      You yourself provided that to her?

18      A.      Not directly, but it went to the

19  entire company, so I assume she would have been

20  included on that.

21      Q.      Okay.  And you're basing that

22  testimony on the fact that you saw an e-mail,

23  correct?

24      A.      An e-mail did go out that included

25  that, but it's meant to go to every single

1    person in the company.

2        Q.      Okay.  But you don't know as you sit

3    here today whether or not she ever received

4    that social media guideline document, correct?

5        A.      I didn't have access to every single

6    person whose name would have been included on

7    that mass e-mail list.

8        Q.      And you certainly don't know whether

9    or not she ever read those social media

10   guidelines, correct?

11            MS. WOLFF:  Objection.

12       A.      I have no way of knowing if she

13   absolutely read them, but she, when she

14   answered one of our earlier e-mails, she spoke

15   as if she was familiar with them.

16       Q.      Okay.  You never had any

17   conversation with her about the guidelines,

18   correct?

19       A.      Not specifically.

20       Q.      And you're not aware of anyone at

21   Newsweek ever having any conversation with her

22   about the guidelines, correct?

23            MS. WOLFF:  Objection.

24       A.      I can't speak to what other people

25   might have spoken to her about.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  And you're not aware of

2   Newsweek ever enforcing any part of the

3   guidelines against Ms. Hignett, correct?

4               MS. WOLFF:  Objection.

5      A.      I can't speak to what other people

6   might have had conversations with her about.

7      Q.      In fact, Newsweek has never enforced

8   these guidelines against any of its writers,

9   has it?

10              MS. WOLFF:  Objection.

11     A.      I'm not sure I understand what you

12  mean by "enforced."

13     Q.      Has Newsweek ever penalized any of

14  its staff members for violating your social

15  media guidelines?

16              MS. WOLFF:  Objection.

17     A.      I'm not any of the writers'

18  reporting editor, so I wouldn't be involved

19  with that if there were.

20     Q.      So as you sit here today, you're not

21  aware of Newsweek ever enforcing these social

22  media guidelines in any way upon any of its

23  team members, correct?

24              MS. WOLFF:  Objection.  And this is

25  outside of the scope of the contents in your

Atkinson Baker, a Veritext Company
www.depo.com

1   request.

2   BY MR. BURROUGHS:

3       Q.     Go ahead.

4       A.     I don't work -- I'm not any of the

5   writers' direct report, so I wouldn't have been

6   involved with enforcing rules upon them.  So I

7   can't speak to what another editor would have

8   done to penalize someone or otherwise.  I can't

9   speak to that.

10      Q.     Understood.  So as far as you know,

11  they may or they may not have been enforced at

12  some point?

13              MS. WOLFF:  Objection.

14      A.     It's outside my purview, so I

15  couldn't speak to it.

16      Q.     Okay.  So you have no knowledge in

17  that regard, correct?

18              MS. WOLFF:  Objection.

19      A.     Correct.

20      Q.     Okay.  Fantastic.  Thank you.  Do

21  you know if anyone from Newsweek has spoken

22  with Ms. Hignett over the last year or two?

23      A.     I wouldn't know.

24      Q.     Okay.  And you didn't ask anyone at

25  Newsweek whether or not they communicated with

1    Ms. Hignett relating to this article of

2    dispute, correct?

3        A.    I believe there were communications

4    with her regarding this case.

5        Q.    And why do you believe that?

6        A.    Because I've seen the e-mails, which

7    you have access to as well.

8        Q.    Okay.  Aside from those e-mails,

9    were there any other conversations or

10   communications that you're aware of?

11       A.    I don't know.  I'm not familiar with

12   any other conversations that may have happened,

13   but they wouldn't have come from me so I

14   wouldn't be able to speak to that.

15       Q.    Okay.  So the only contact between

16   Ms. Hignett and Newsweek that you're aware of

17   over the past couple of years are the e-mails

18   that you've produced, correct?

19            MS. WOLFF:  Objection.

20       A.    That I'm personally aware of, yes.

21       Q.    Okay.  I'm going to put another

22   exhibit in front of you.  We're going to mark

23   it as Exhibit 5.  It's Newsweek 5.

24            (Exhibit 5 marked for

25   identification.)

Atkinson Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.    Have you seen this image before?

3        A.    Yes.

4        Q.    Okay.  Were you responsible for

5    providing this image to your attorney?

6        A.    Yes.

7        Q.    Okay.  From where did you obtain

8    this image?

9        A.    The website.

10       Q.    Okay.  Was this Elliot McGucken

11   photograph live at this URL when you went to

12   this website?

13       A.    Yes.

14       Q.    Okay.  And do you recall when you

15   went to this website to make this screencap?

16       A.    It would have likely been the same

17   day I became aware of the case.

18       Q.    So that would have been back in the

19   summer to fall of 2019; is that correct?

20       A.    Yes.

21       Q.    Okay.  And is this -- I know it's

22   small, but is this your personal avatar in the

23   upper right-hand corner there?

24       A.    I can't see it.  I'm not sure where

25   you're looking.

1             MR. BURROUGHS:  Thank you, Ms.
2    Zaharia.
3    BY MR. BURROUGHS:
4       Q.     Is that you?
5       A.     That's me.
6       Q.     Okay.  And we can back out.
7             So Newsweek does not dispute that it
8    published McGucken's photograph at this URL,
9    correct?
10             MS. WOLFF:  Objection.
11       A.     Yes.  This is what I saw when I went
12    to this URL.
13       Q.     Okay.  And it was this McGucken
14    photograph that's in front of you in Exhibit 5,
15    correct?
16       A.     Correct.
17       Q.     Okay.  And when you made this
18    screencap, did you first send it to Yuliya?
19       A.     Yes.
20       Q.     Okay.  And it was at that time that
21    you had the back and forth regarding the
22    creation of this particular article, correct?
23             MS. WOLFF:  Objection.
24       A.     It's when we started corresponding
25    about it.

Atkinson Baker, a Veritext Company
www.depo.com

1       Q.      Okay.  Let's look at Exhibit 6,

2   which is going to be Newsweek 23 through 27.

3               (Exhibit 6 marked for

4   identification.)

5   BY MR. BURROUGHS:

6       Q.      Take a moment.  Ms. Zaharia will

7   slowly scroll through these.  I want to make

8   sure that you have a chance to read them.

9               (Pause in the Proceedings.)

10      Q.      Okay.  Have you had the opportunity

11  to review the e-mail?

12      A.      To the best of my ability, yes.

13      Q.      Okay.  Do you recognize those as

14  e-mails to which you were a party?

15      A.      I was not cc'd on all of these

16  e-mails, but I have seen them in the documents

17  that have been provided.

18      Q.      The ones for which you're not cc'd,

19  do you know where those came from?

20      A.      It would be like the one you're

21  looking at right here between Yuliya and the

22  writer directly.

23      Q.      Okay.  Aside from these e-mails, you

24  haven't had any e-mail contact with

25  Ms. Hignett, correct?

Atkinson Baker, a Veritext Company
www.depo.com

1       A.      Correct.

2       Q.      Okay.  And does the -- is it your

3   understanding that staff writers for Newsweek

4   could reach out to photographers and other

5   content creators using their personal Instagram

6   account in connection with official Newsweek

7   business?

8       A.      Yes, that's something they can do.

9       Q.      Okay.  Does Newsweek have its own

10  account on Instagram?

11      A.      Yes.

12      Q.      Okay.  Does the Newsweek team ever

13  use that team to reach out to content creators?

14      A.      I don't manage the account, so I'm

15  not sure if that's something that they do.

16      Q.      Okay.  Do you know who manages the

17  account?

18      A.      At the time that this happened,

19  would have been Adam's -- one of Adam Silvers'

20  subordinates.

21      Q.      Do you know who that would have

22  been?

23      A.      I don't know specifically.  He

24  manages -- he had a team.

25      Q.      Who was on that team that you

Atkinson Baker, a Veritext Company
www.depo.com

1   recall?

2       A.      I don't recall.  Like I said, we've

3   got people in multiple offices so I don't

4   always know.  But Adam Silvers would have been

5   the lead.

6       Q.      And does this e-mail thread confirm

7   that Ms. Hignett did not receive a response

8   from Mr. McGucken providing any sort of consent

9   for use of his work?

10      A.      I mean, that's subject to

11  interpretation, but based on what I interpret

12  from her e-mail, she said she did not receive a

13  response.  And if you looked at his Instagram

14  page where her question was, there was no

15  response.

16      Q.      Okay.  So is there any way to

17  interpret that other than Mr. McGucken did not

18  respond to this request for consent?

19      A.      That I'm aware of.

20      Q.      Okay.  And, in fact, to the extent

21  that Newsweek did use his work, it was done

22  without him granting consent?

23      A.      As we've stated earlier, no

24  permission is required for embedding an image.

25  We only asked for permission to have the image

Atkinson Baker, a Veritext Company
www.depo.com

1    hosted in our CMS and we did not do that.

2         Q.    Okay.  So when you say that We asked

3    for permission to have it hosted in our CMS,

4    where is that in Ms. Hignett's request?

5         A.    If you go up to where -- it's in the

6    e-mail here.  I don't know if that's the exact

7    wording she used.

8         Q.    We can scroll up and she quotes her

9    message.  Give us a moment.  I just want you to

10   point out to me where it mentions CMS or

11   anything to that effect.

12        A.    I mean, I'm using different jargon,

13   but that's what the request stated.  That's how

14   I interpreted it.

15        Q.    Understood.  So what you're telling

16   me is your interpretation of her message to a

17   third-party, correct?

18             MS. WOLFF:  Objection.

19        A.    Yes.  I believe she said "upload"

20   was the word.

21        Q.    Okay.  So is it your understanding

22   that, in fact, Ms. Hignett asked for consent to

23   upload the photograph on the Newsweek website?

24        A.    Yes.

25        Q.    And also based on your review of

Atkinson Baker, a Veritext Company
www.depo.com

1    Newsweek's records, there was never any consent

2    or there was never any advisement to Mr.

3    McGucken that the embed process or CMS process

4    was going to be used?

5              MS. WOLFF:  Objection.

6        A.    I mean, you can see what her

7    question is.  That's what was requested.

8        Q.    Okay.  Did Newsweek separately

9    contact Mr. McGucken to either:  A) request

10   some other type of consent; or B) advise him

11   that they're going to be displaying his

12   photography on their website?

13             MS. WOLFF:  Objection.

14       A.    Not that I'm aware.  You see the

15   question that she's presented to him.

16       Q.    Is it Newsweek's practice to advise

17   artists and photographers that Newsweek plans

18   to display their photography on their website

19   before doing so?

20             MS. WOLFF:  Objection.

21       A.    There's different forms of display.

22       Q.    Okay.  So is that the practice?

23             MS. WOLFF:  Objection.

24       A.    We always request permission to

25   upload an image to our website.  We do not

Atkinson Baker, a Veritext Company
www.depo.com

1   always request permission to embed a link to

2   somebody else's Web page.

3        Q.    Okay.  Do you ever advise the artist

4   that you're going to be displaying their work

5   on your site before you do so?

6             MS. WOLFF:  Objection.

7        A.    As I've stated earlier, we request

8   permission to upload images to our website.  We

9   do not always request permission to include an

10  embedded link.

11       Q.    Do you want me to ask the question

12  again?

13       A.    I feel like I've answered it.

14       Q.    Well, maybe we're getting caught up

15  on the language.  We talked a little bit about

16  consent and you conceded, look, we did not have

17  any consent from him.  Fine.  Now I'm asking

18  about notice.

19             So is it Newsweek's practice to

20  provide notice to these artists?  Not seek

21  consent, but to give them notice that Newsweek

22  plans to exploit their photography on their

23  website?

24             MS. WOLFF:  Objection.

25       A.    We request permission to use images.

Atkinson Baker, a Veritext Company
www.depo.com

1   We wouldn't request permission and say, Hey,

2   we're also going to -- I think we're talking

3   about two different things, but we don't use

4   images without permission when it's necessary.

5        Q.    Sure.  And now I'm asking about

6   notice.  Okay?  So my question is:  Is it

7   Newsweek's practice to provide notice to tell

8   the artist that Newsweek intends to display the

9   artist's photography on its website before

10  doing so?

11            MS. WOLFF:  Objection.

12       A.    As I've stated, we do not need to

13  give notice for an embed, so we wouldn't

14  provide notice for an embed.

15       Q.    Okay.  Fair enough.  So it's News --

16       A.    And we do not use an image uploaded

17  to our CMS without permission.  So no notice

18  would be made because we wouldn't do it without

19  permission.

20       Q.    Okay.  So is it fair to say or is it

21  accurate to say that it's Newsweek's business

22  practice, when using an embed, to exploit

23  photography without the photographer's consent

24  or without giving notice to the photographer?

25            MS. WOLFF:  Objection.

1      A.      We follow Instagram's guidelines,

2    which don't exploit.  If you --

3      Q.      I understand --

4      A.      Sorry.  Go ahead.

5      Q.      I understand the statement that

6    you're giving, but it's just simply not

7    responsive to the question.  So let me ask the

8    question one more time, and please listen to

9    the question and try to answer the question.

10   Okay?

11           Is it accurate to state that it's

12   Newsweek's business practice to display on its

13   website photography via embeds without the

14   consent of the photographer and without giving

15   prior notice to the photographer?

16           MS. WOLFF:  Objection.

17     A.      Correct.

18     Q.      Thank you.  Now, when looking at the

19   article at issue, did you see advertisements

20   surrounding Mr. McGucken's photograph?

21     A.      I gave a full screenshot to what was

22   visible to me and I showed the whole page.

23     Q.      Okay.  Do you recall seeing

24   advertisements?

25     A.      I don't recall.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Okay.  Does Newsweek run

2   advertisements on its website?

3      A.      Yes.

4      Q.      Is Newsweek paid for those

5   advertisements?

6      A.      I'm not involved with the

7   advertising side of the business, but I would

8   assume that they are paid.

9      Q.      Okay.  And per your guidelines, does

10   the fact whether or not there are

11   advertisements along with the photography

12   that's being used from a third-party site via

13   embed, does that impact your decision whether

14   or not to either get the consent of the

15   photographer or give notice to the

16   photographer?

17      A.      The journalistic organization ads

18   don't impact our stories in the way we write

19   them.

20      Q.      So I, and correct me if I'm wrong, I

21   don't want to put words in your mouth, so

22   you're telling me it doesn't matter whether or

23   not there's advertising alongside their work or

24   not, correct?

25      A.      Editorial content is editorial

1    content.

2         Q.     Okay.  So as far as the content of

3    the piece goes, it's immaterial to you whether

4    or not there is advertising or not on the page

5    with the content, correct?

6         A.     Correct.

7         Q.     All right.  We're going to look at

8    Exhibit 7, which is Newsweek 3.

9               (Exhibit 7 marked for

10   identification.)

11   BY MR. BURROUGHS:

12        Q.     Just tell me if you recognize these

13   e-mails?

14        A.     This is familiar, yes.

15        Q.     And you see the date there,

16   January 24, 2021.  Do you see that?

17        A.     Yes.

18        Q.     And below that January 21, 2020.  Do

19   you see that?

20        A.     Yes.

21        Q.     Okay.  And it indicates that on

22   January 21, 2020, Ms. Rice is working on

23   removing the, quote/unquote, image.  Do you

24   know what image she's referring to there?

25        A.     It would have been referring to the

1  embed.

2      Q.    Would that be the embed of

3  Mr. McGucken's photograph?

4      A.    Most likely, yes.

5      Q.    Okay.  So is it fair to say that

6  Newsweek removed Mr. McGucken's photograph from

7  Newsweek's website no earlier than January 21,

8  2020?

9      A.    Yes.

10          MR. BURROUGHS:  All right.  Ms.

11  Zaharia, what exhibit was this?  Okay.  So mark

12  this as Exhibit 7?

13  BY MR. BURROUGHS:

14      Q.    And I'm next going to direct your

15  attention to Exhibit 8, which is going to be

16  Newsweek 23 to 27.

17          Oh, I apologize.  We've actually

18  already marked this as Exhibit 26 -- I'm sorry,

19  it's Exhibit 6, I believe.  Is that correct,

20  Ms. Zaharia?  Okay.

21          So there is an indication -- we have

22  to scroll through it; this is one of the

23  difficulties of Zoom depositions -- that this

24  article may have been pitched by a Newsweek

25  editor.  Do you see that in the e-mail?

Atkinson Baker, a Veritext Company
www.depo.com

```
 1                    (Pause in the proceedings.)

 2       Q.      Do you see that language?

 3       A.      Yes.

 4       Q.      Do you know whether or not it was

 5   pitched by an editor, this particular article?

 6       A.      I can't -- I don't know.

 7       Q.      Okay.  Do you know who her editor

 8   was at the time?

 9       A.      James would probably know; I don't.

10       Q.      Now, we're going to direct your

11   attention to the real Exhibit 8, which is

12   Newsweek 28.

13                    (Exhibit 8 marked for

14   identification.)

15   BY MR. BURROUGHS:

16       Q.      Do you recognize this screen?

17       A.      I've seen it.

18       Q.      When did you first see this screen?

19       A.      Maybe a couple of weeks ago.

20       Q.      Okay.  In what context did you see

21   this screen?

22       A.      Yuliya provided it to me.

23       Q.      Okay.  So is it your understanding

24   that this is the message sent by Newsweek to

25   Mr. McGucken requesting consent?
```

Atkinson Baker, a Veritext Company
www.depo.com

1        A.      To my knowledge, yes.

2        Q.      Okay.  And to your knowledge, this

3    is the only message that was sent by Newsweek

4    to Mr. McGucken, correct?

5        A.      That I'm aware of.

6        Q.      Okay.  Okay.  So looking back at

7    Exhibit 4 real briefly, that's, I believe, the

8    screenshot of the McGucken publication at issue

9    or article at issue.

10               (Pause in the Proceedings.)

11       Q.      Okay.  So have you reviewed the

12   entire article, the text, and everything else

13   for this particular item?

14       A.      I've read the story.

15       Q.      You read it.  Okay.  Now, in your

16   words, what is the story about?

17       A.      The story is about this specific

18   lake that was created and it also references

19   the photographer's experience on it.

20       Q.      Okay.  Is the story about the

21   photograph?

22               MS. WOLFF:  Objection.

23       A.      The story is about the formation of

24   this lake.

25       Q.      Okay.  So it's fair to say that the

Atkinson Baker, a Veritext Company
www.depo.com

1    story is not about the photograph, correct?

2             MS. WOLFF:  Objection.

3        A.    The image illustrates the lake that

4    the story is about.

5        Q.    Okay.  So is it accurate to say that

6    the story is not itself about the photograph?

7             MS. WOLFF:  Objection.

8        A.    I don't know the thought process in

9    the creation of this story, so I don't know

10   what started the piece.  But the story is about

11   this specific lake and I think at least two

12   paragraphs worth of the story is about the

13   photographer's experience of this lake.

14       Q.    Okay.  Does the story comment at all

15   on the photograph?

16            MS. WOLFF:  Objection.

17       A.    I believe it does or at least

18   photographs in plural.

19       Q.    How does it do that?

20       A.    I mean, you'd need to go to the

21   story.  I could point to it specifically where

22   it says that.

23       Q.    Okay.  Did Newsweek add anything to

24   the photograph?

25            MS. WOLFF:  Objection.

Atkinson Baker, a Veritext Company
www.depo.com

1  BY MR. BURROUGHS:

2      Q.     Before publishing it here?

3      A.     We didn't manipulate the photograph.

4      Q.     Okay.  Do you know how long it took

5  Ms. Hignett to write this particular item?

6      A.     I'm not aware of the length of time

7  it took her to produce this story.

8      Q.     Okay.  And you're not aware of any

9  of the other specifics relating to the actual

10  creation of this article, correct?

11      A.     I'm not.

12             MS. WOLFF:  Objection.

13  BY MR. BURROUGHS:

14      Q.     Okay.  Now, you said earlier that

15  you felt that you could use any photographer's

16  work without their consent so long as it was

17  newsworthy?

18             MS. WOLFF:  Objection.

19  BY MR. BURROUGHS:

20      Q.     In what circumstances would you

21  decide, as the photo editor for the magazine or

22  for the website, that something is newsworthy?

23      A.     I mean, it's an event that happens.

24  In relation to this specific, it's a weather

25  event.  I would consider a weather event

Atkinson Baker, a Veritext Company
www.depo.com

1    newsworthy.

2        Q.    Okay.  So in your estimation,

3    weather is newsworthy?

4        A.    Yes.

5        Q.    Okay.  And why is that?

6              MS. WOLFF:  Objection.

7        A.    Because --

8              MS. WOLFF:  You can answer.

9        A.    I mean, if it affects people.

10       Q.    Okay.  So it sounds to me like

11   you're saying anytime a story affects people,

12   it's newsworthy enough to use an artist's work

13   without consent.  Is that accurate?

14             MS. WOLFF:  Objection.

15       A.    I think you're putting words in my

16   mouth.

17       Q.    Oh, please can you explain to me a

18   little bit more about why you think that this

19   particular photograph is newsworthy?

20       A.    It's an unusual occurrence.

21       Q.    Okay.  Anything else?  From where

22   did you learn your definition of the phrase

23   "newsworthy" as you're using it today?

24             MS. WOLFF:  Objection.

25       A.    I couldn't say exactly.  I've been

Atkinson Baker, a Veritext Company
www.depo.com

1    in the industry a long time.

2        Q.    Okay.  Let's say hypothetically

3    that, you know, I was in the news because I won

4    a Grammy award.  In such a circumstance, do you

5    feel that using a photograph of me would be

6    newsworthy?

7             MS. WOLFF:  Objection.

8        A.    Yes.

9        Q.    Okay.  And is it fair to say that

10   you're using or Newsweek is -- let me withdraw

11   the question.

12             Is Newsweek using McGucken's

13   photograph to illustrate this story about the

14   weather in Death Valley?

15             MS. WOLFF:  Objection.

16       A.    I mean, it's included as part of the

17   story to illustrate what was seen.

18       Q.    Okay.  For what other purposes is it

19   being included, if any?

20       A.    It's informative.

21       Q.    Okay.  In what sense?

22       A.    It shows the lake that was described

23   in the story.

24       Q.    Okay.  So is it fair to say that the

25   sole reason to use McGucken's photograph is to

Atkinson Baker, a Veritext Company
www.depo.com

1    illustrate what's being talked about in the

2    story?

3            MS. WOLFF:  Objection.

4        A.    I can't speak to the writer's

5    thought process, but I believe she used it

6    because it related to the piece.

7        Q.    Okay.  Any other reason?

8        A.    No, not that I can think of.

9        Q.    Okay.  Now, assuming that you didn't

10   embed this photograph here and we're looking

11   for a picture of Death Valley to illustrate the

12   piece, would you obtain one from Getty under

13   your paid subscription?

14       A.    That would be the proper means, the

15   first means that we would have used.

16       Q.    Okay.  And if you were obtaining it

17   from a third-party photographer, would you make

18   some sort of license payment to them?

19           MS. WOLFF:  Objection.

20       A.    Unlikely.  We would have asked

21   permission.  If they said no, we just would

22   have moved on.

23       Q.    Okay.  So in certain circumstances

24   when the artist tells you no or doesn't give

25   you consent, you'll move on and not use the

1    work?

2              MS. WOLFF:  Objection.

3         A.    That was in reference to uploading

4    an image to our CMS.

5         Q.    Okay.  Well, let's say that you

6    weren't able to copy Mr. McGucken's work and

7    had to reach out to another source, another

8    photographer --

9              MS. WOLFF:  Objection.

10        Q.    -- for a photograph to illustrate

11   this story, would you typically pay for such a

12   license?

13             MS. WOLFF:  Objection.

14        A.    No.

15        Q.    Okay.  Has Newsweek ever, other than

16   the one instance you told me earlier, ever paid

17   a third-party photographer for the use of their

18   work during your tenure?

19             MS. WOLFF:  Objection.

20        A.    Yes.

21        Q.    Okay.  And other than the one you've

22   already told me about, when is the last time

23   that happened?

24        A.    It doesn't happen very frequently.

25        Q.    Okay.  But in certain circumstances,

Atkinson Baker, a Veritext Company
www.depo.com

1  if Newsweek wants to publish a photograph to

2  illustrate one of its stories, it will pay the

3  creator and/or owner a license fee to use it,

4  correct?

5      A.     Only under very specific

6  circumstances.  It's not something we typically

7  do.  If we can't get an image from a

8  photographer, we just won't use it or possibly

9  not publish the story.

10     Q.     Okay.  So is it fair to say that

11  Newsweek's business practice in terms of visual

12  assets and publishing photography is to rely on

13  its Getty subscription and rely on obtaining

14  free photographs from creators?

15          MS. WOLFF:  Objection.

16     A.     That's our -- typically what we do.

17     Q.     Okay.  Now, does Newsweek claim to

18  own the copyright for the articles posted on

19  its site?

20          MS. WOLFF:  Objection.

21     A.     The words, yes.

22     Q.     Okay.  Does Newsweek claim to own

23  the copyright on the photographs it posts on

24  its site?

25     A.     We license the photographs from

Atkinson Baker, a Veritext Company
www.depo.com

1  Getty in most cases, so they license it to us.

2      Q.     Okay.  In your experience over the

3  years as the photo director at Newsweek, has

4  Newsweek ever claimed to own the copyright for

5  the photographs on its website?

6           MS. WOLFF:  Objection.

7      A.     There's maybe a handful of places

8  where we might, but for the most part, we

9  consider things one-time use specific to the

10  story it was originally created for.

11      Q.     So if you were to learn that

12  Newsweek was claiming to own copyright in the

13  photographs on its website, that would be a

14  surprise to you and it would be a false

15  statement to copyright ownership, correct?

16           MS. WOLFF:  Objection.

17      A.     I'm not aware of such a statement.

18      Q.     Okay.  We're going to put in front

19  of you Exhibit 9, which there's no Bates stamp,

20  but I believe it's the Newsweek's terms and

21  conditions.

22           (Exhibit 9 marked for

23  identification.)

24  BY MR. BURROUGHS:

25      Q.     Have you ever reviewed these before?

Atkinson Baker, a Veritext Company
www.depo.com

1     A.    I don't believe so.

2     Q.    Okay.  We can pull that exhibit

3  down.

4          So as you sit here today, and maybe

5  this makes sense given that you're not involved

6  with the website to a great degree, you've

7  never reviewed the website's terms and

8  conditions, correct?

9     A.    Not the ones that you presented to

10 me.

11    Q.    Okay.  Do you recall reviewing other

12 terms and conditions?

13    A.    I do not recall.

14    Q.    Okay.  Okay.  Let's go off the

15 record for five minutes.  We're probably just

16 about done.

17          (At this point in the proceeding, a

18 brief recess is taken.)

19 BY MR. BURROUGHS:

20    Q.    Let's go back on the record.  You

21 understand you're still under oath?

22    A.    Yes.

23    Q.    Okay.  So looking again at

24 Exhibit 4, the McGucken article at issue as

25 posted on Newsweek.com.

Atkinson Baker, a Veritext Company
www.depo.com

1              Okay.  When Newsweek distributed this

2    article to its viewers, did it distribute the

3    entirety of the McGucken photograph?

4              MS. WOLFF:  Objection.

5       A.     I'm not sure what you mean.  Like if

6    it was visible on Facebook, the only thing you

7    would see would actually be the Getty image and

8    then you wouldn't see the full story until you

9    click on it.

10      Q.     Okay.  So when Newsweek distributed

11   this particular article, the one that

12   incorporates the McGucken photograph to

13   viewers, the viewers would see the entirety of

14   the McGucken photograph.  Is that accurate?

15             MS. WOLFF:  Objection.

16      A.     If they clicked on the story, they

17   would see it.

18      Q.     Okay.  And the version they would

19   see, would that be modified or altered at all?

20             MS. WOLFF:  Objection.

21      A.     Not that I'm aware of.

22      Q.     Okay.  Would it appear to the viewer

23   of the Newsweek site exactly as it appears on

24   Mr. McGucken's Instagram?

25      A.     It would.

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.    Okay.  And looking at the

2    photograph, you know, as someone with

3    experience in the industry, does this strike

4    you as a creative photograph?

5              MS. WOLFF:  Objection.

6    A.    It's subjective.  It could be

7    creative or it could be editorial depending on

8    its use.

9    Q.    Okay.  Based on your experience

10   looking at the work in front of you, would you

11   consider this to be a creative photograph?

12             MS. WOLFF:  Objection.

13   A.    I'd say it could be either.

14   Q.    Would you lean one way or the other?

15   A.    I'd say it's editorial.  It's

16   showing a moment in time.

17   Q.    Okay.  Do you believe that the

18   photograph reflects any artistic choices?

19             MS. WOLFF:  Objection.

20   A.    It does look like there's a bit of a

21   filter on it.

22   Q.    Anything else?

23   A.    I mean, when anyone takes an image,

24   they are deciding on composition.

25   Q.    Okay.  Anything else?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.      No.

2      Q.      Okay.  And how do you define

3   editorial?

4      A.      It's a news event.

5      Q.      Would you agree that this photograph

6   is entirely different in terms of creativity

7   from a photograph, let's say, shot by a

8   paparazzi of a sports player?

9              MS. WOLFF:  Objection.

10     A.      I mean, that's apples and oranges.

11   They're different.

12     Q.      And why are they different?

13     A.      One's a -- sports fall under a

14   different category typically for photography.

15     Q.      And can you explain a little bit

16   more to me why is that different?

17     A.      It's a different type of

18   photographer, typically.

19     Q.      Okay.  Anything else?

20     A.      No.

21     Q.      Okay.  Would you say based on your

22   experience that the photograph you see in front

23   of you by Mr. McGucken is more creative than a

24   paparazzi photograph of a professional athlete?

25              MS. WOLFF:  Objection.

1      A.      They're different.  It's apples and

2   oranges.  One is a sporting event.

3      Q.      Is one more creative than the other

4   in your mind?

5              MS. WOLFF:  Objection.

6      A.      It's very subjective.  I think a

7   sporting event can be very creative.

8      Q.      So is it Newsweek's position that

9   paparazzi photographs of athletes are more

10  creative than the type of photograph we see in

11  front of us here in the exhibit?

12             MS. WOLFF:  Objection.

13     A.      When you say "paparazzi," you're

14  thinking about a street photographer taking

15  pictures of a random individual versus an

16  actual event where someone is playing a sport.

17  I think you need to clarify what you mean.  I'm

18  not really sure what you're getting at.

19     Q.      I think you have the distinction --

20  you seem to have stated it perfectly.  A

21  photograph of an athlete walking down the

22  street, let's say.  Will that type of

23  photograph be more creative than the photograph

24  in front of you?

25     A.      It depends on the photographer, I

1    suppose.

2        Q.      Okay.  Do you know why Newsweek

3    chose to publish Mr. McGucken's photograph as

4    part of this article as opposed to some other

5    photograph of Death Valley?

6        A.      I believe because they wanted to

7    write about this specific photographer's

8    experience in seeing this lake.

9        Q.      And what's that knowledge based

10   upon?

11       A.      I mean, you asked me to assume what

12   was thought.  That's all I can tell you.

13       Q.      Okay.  So your testimony about why

14   they chose this photograph is a guess or

15   speculation, correct?

16              MS. WOLFF:  Objection.

17       A.      I wasn't involved with the creation

18   of the story.

19       Q.      And as you sit here today, you have

20   no understanding or no knowledge as to why this

21   particular photograph was chosen to be

22   published as part of this story, correct?

23              MS. WOLFF:  Objection.

24       A.      I believe it was chosen because they

25   wanted to write about this specific instance,

Atkinson Baker, a Veritext Company
www.depo.com

1   this specific photographer's experience.

2      Q.      But that belief is based on your

3   speculation, correct?

4              MS. WOLFF:  Objection.

5      A.      There's also a reference to the

6   story, I believe, in one of the e-mails.

7      Q.      Okay.  What reference are you

8   referring to?

9      A.      There's a reference to this

10  photographer experiencing this lake.  There's a

11  story that was referenced in there.

12     Q.      Okay.  Is there any other basis for

13  your testimony?

14     A.      No.

15     Q.      Okay.  Let's look at -- well, strike

16  that.

17              Earlier you testified, and I don't

18  want to put words in your mouth, but I believe

19  you testified that Newsweek has never violated

20  any of Instagram's terms.  Do you stand by that

21  testimony?

22              MS. WOLFF:  Objection.

23     A.      To my knowledge.

24     Q.      Okay.  I'm going to put a document

25  in front of you, Exhibit 10.  It's Newsweek

Atkinson Baker, a Veritext Company
www.depo.com

1  157, I believe.

2          (Exhibit 10 marked for

3  identification.)

4  BY MR. BURROUGHS:

5      Q.    And Ms. Zaharia will scroll through

6  it, but can you tell me if you've ever seen

7  this before?

8      A.    Yes.

9      Q.    Okay.  When was the first you recall

10  reading this particular document?

11      A.    I would say about a week ago.

12      Q.    Okay.  And when you read it, were

13  you at home or were you somewhere else?

14      A.    I was at home.

15      Q.    Okay.  And do you have any

16  understanding of these terms other than what

17  you gleaned from your review that took place

18  recently?

19          MS. WOLFF:  Objection.

20      A.    Can you rephrase the question?

21      Q.    Sure.  So you testified that you

22  reviewed these terms recently, correct?

23      A.    Uh-huh.

24      Q.    Had you reviewed them in the past or

25  conferred with anyone regarding their contents?

1      A.      This specific document?

2      Q.      Correct.

3      A.      I haven't since I read this one last

4    week.

5      Q.      What about before that?

6      A.      As I stated, this particular

7    document I saw about a week ago.  I've seen

8    other terms of service for Instagram.

9      Q.      Okay.  All right.  Let's take a look

10   at paragraph A-11.  Okay.  Well, let me ask

11   you, what's your understanding of this -- these

12   terms or this document?

13     A.      It's my understanding that you can

14   embed images and the only time you need

15   permission is if it's commercial use.

16     Q.      Okay.  Do you understand that these

17   are the terms that one has to comply with if

18   they want to embed content from Instagram?

19     A.      Yes.

20     Q.      Okay.  So take a look at paragraph

21   11.  I'll read it to you.

22            It says, "Comply with any requirements

23   or restrictions imposed on usage of Instagram

24   user photos and videos ("User Content") by

25   their respective owners.  You are solely

Atkinson Baker, a Veritext Company
www.depo.com

1  responsible for making use of User Content in

2  compliance with owners' requirements or

3  restrictions?"

4           Do you see that?

5     A.     Yes.

6     Q.     Okay.  In connection with Newsweek's

7  use of McGucken's photography, did Newsweek

8  comply with paragraph 11 of this policy?

9     A.     As far as I'm aware, there were no

10 terms of compliance written on his site, so I'm

11 not sure what that would be referencing to.

12    Q.     Did Newsweek comply with paragraph

13 11 when publishing McGucken's content?

14           MS. WOLFF:  Objection.

15    A.     As far as I'm aware.

16    Q.     Okay.  What steps did Newsweek take

17 to ensure that they complied with paragraph 11?

18    A.     I'm not sure what steps could be

19 taken.

20    Q.     Okay.  Well, per paragraph 11, were

21 you aware that Newsweek was, quote, solely

22 responsible for making use of user content in

23 compliance with owners' requirements or

24 restrictions?

25    A.     Yes, but I'm not sure what

Atkinson Baker, a Veritext Company
www.depo.com

1   restrictions -- it's a pretty vague statement.

2       Q.      What's your understanding of it?

3       A.      I mean, if the owner has

4   requirements that they state to us, we follow

5   them.

6       Q.      So it's Newsweek's position that all

7   paragraph 11 requires is that for Newsweek to

8   comply with restrictions that are affirmatively

9   provided to Newsweek?

10          MS. WOLFF:  Objection.

11      A.      I'm not sure where else that

12  information would come from.

13      Q.      So is that Newsweek's position?

14          MS. WOLFF:  Objection.

15      A.      You asked my interpretation of it.

16  I'm trying to provide my interpretation of it.

17      Q.      Remember, as discussed at the

18  outset, you are testifying on behalf of

19  Newsweek.

20          MS. WOLFF:  Objection.

21  BY MR. BURROUGHS:

22      Q.      So I'm looking for how Newsweek

23  interprets this.  I think you're telling me,

24  and I don't want to put words in your mouth,

25  you're telling me that Newsweek doesn't have to

1   comply with paragraph 11 unless the artist

2   somehow reached out to them with restrictions.

3   Is that what you're saying?

4          MS. WOLFF:  Objection.  The document

5   speaks for itself.

6   BY MR. BURROUGHS:

7      Q.     Is that what you're saying?

8      A.     I think you're putting words in my

9   mouth.  I don't really have a response to this.

10     Q.     Okay.  What steps did Newsweek do to

11  comply with McGucken's requirements and

12  restrictions in connection with the use of the

13  McGucken photograph at issue?

14         MS. WOLFF:  Objection.

15     A.     Unless there's something written in

16  his site about his requirements and rules on

17  the Instagram page, I'm not -- I don't know

18  where -- there was no information provided by

19  the photographer there.

20     Q.     Okay.  So is it fair to say that

21  it's Newsweek's position that unless the

22  Instagram account has some sort of restrictions

23  written on the account, Newsweek does not need

24  to take any further steps to ensure they are,

25  quote, in compliance with the owners'

1    requirements or restrictions, unquote?

2              MS. WOLFF:  Objection.

3        A.    Yes.

4              MR. BURROUGHS:  Did you get the

5    answer, Madam Court Reporter?

6              THE REPORTER:  Yes.

7              MR. BURROUGHS:  Correct.  Okay.

8    BY MR. BURROUGHS:

9        Q.    And as you sit here today, you don't

10   recall, other than the message sent by Ms.

11   Hignett, Newsweek doing anything to ensure it

12   was in compliance with McGucken's requirements

13   or restrictions relating to the photograph at

14   issue, correct?

15             MS. WOLFF:  Objection.

16       A.    Correct.

17       Q.    Okay.  Now let's take a look at

18   paragraph 13 and I'll read it.

19             It says you must, "Obtain a person's

20   consent before including their User Content in

21   any ad."

22             Do you see that?

23       A.    Yes.

24       Q.    What do you take that to mean?

25       A.    That means you need permission for

1    an ad, but it also implies that since it says

2    you need permission for an ad, it would state

3    that you would need it for editorial, if it was

4    required for editorial.

5        Q.    Okay.  Do you recall advertising

6    being incorporated with the subject photograph

7    on the Newsweek page at issue?

8            MS. WOLFF:  Objection.

9        A.    There may have been ads on the page,

10   but that doesn't mean a visual was incorporated

11   in the ad.

12       Q.    Okay.

13       A.    It specifically says in an ad.

14       Q.    Okay.  Let's take a look at

15   paragraph 16.  Well, let me ask you one more

16   time.  On 13, do you believe Newsweek complied

17   with that paragraph --

18       A.    Yes.

19       Q.    -- in using Mr. McGucken's work?

20       A.    Yes.

21       Q.    Okay.  16 says, "Don't use the

22   Instagram Platform to simply display User

23   Content, import or backup content, or manage

24   Instagram relationships, without our prior

25   permission."

1          Do you see that?

2     A.     Yes.

3     Q.     Did Newsweek use the Instagram

4  platform simply to display Mr. McGucken's

5  content on its website?

6              MS. WOLFF:  Objection.

7     A.     No.  It used it to illustrate the

8  concept in the story.  It was not random.

9     Q.     Okay.  Do you believe that the

10  McGucken photograph was displayed on the

11  Newsweek website?

12              MS. WOLFF:  Objection.

13     A.     It was visible on the website by an

14  Instagram link.

15     Q.     Okay.  And I believe your definition

16  of "display" is to make something visible,

17  correct?

18     A.     That's a broad definition of it,

19  yes.

20     Q.     Okay.  Was that your definition?

21     A.     I would say that's accurate.

22     Q.     Okay.  Did you obtain Instagram's

23  prior permission before displaying McGucken's

24  content on Newsweek?

25              MS. WOLFF:  Objection.

1      A.     I don't see where that's required.

2      Q.     Okay.  So your read of paragraph 16

3  is that no such permission is required,

4  correct?

5            MS. WOLFF:  Objection.

6  BY MR. BURROUGHS:

7      Q.     Take a look -- well, is that

8  correct?

9      A.     It says that without permission if

10  you wanted to simply display random content.

11  We didn't display random content.

12      Q.     I don't believe it says random

13  content.  I believe it says user content.

14  Isn't that correct?

15      A.     That is correct.

16      Q.     And isn't your understanding that

17  Mr. McGucken's photograph as published on your

18  website is user content?

19            MS. WOLFF:  Objection.

20      A.     It would simply be defined as user

21  content.

22      Q.     I'm sorry, I wasn't able to hear

23  that.  Can you repeat the answer?

24      A.     Yes.

25      Q.     Okay.  So we're in agreement that

Atkinson Baker, a Veritext Company
www.depo.com

1   Mr. McGucken's photograph, as published on your

2   website, fits within the user content

3   definition in paragraph 16, correct?

4              MS. WOLFF:  Objection.

5       A.    I don't know if there's an earlier

6   definition for user content in the site, but

7   images posted to Instagram, I believe, this is

8   referring to as user content.

9       Q.    Okay.  And we're in agreement that

10  Newsweek displayed that user content in the

11  form of the McGucken photograph, correct?

12             MS. WOLFF:  Objection.

13      A.    I believe I've answered this

14  question multiple times.

15      Q.    Okay.  So, correct?

16      A.    The image was visible on our

17  website, yes, via an Instagram link.

18      Q.    Okay.  And before displaying Mr.

19  McGucken's user content on Newsweek.com, you

20  did not obtain the prior permission of

21  Instagram, correct?

22             MS. WOLFF:  Objection.

23      A.    I'm not sure how that's relevant.

24      Q.    Did you obtain the permission or

25  not?

1          MS. WOLFF:  Objection.

2     A.    We did not communicate with

3   Instagram regarding this image.

4     Q.    Okay.  Have you ever had -- has --

5   withdraw the question.

6          Has Newsweek had any communications

7   with Instagram or Facebook relating to this

8   image?

9     A.    Not to my knowledge.

10    Q.    Has Newsweek had any communications

11  with Instagram or Facebook relating to the

12  publication of user content from those

13  platforms?

14    A.    Not that I'm aware of it.

15    Q.    Okay.  So it sounds like we're in

16  agreement that there was no outreach by

17  Newsweek to Instagram in connection with the

18  McGucken photograph that would in any way

19  relate to paragraph 16, correct?

20          MS. WOLFF:  Objection.

21  BY MR. BURROUGHS:

22    Q.    Is that correct?

23    A.    I'm sorry, I didn't realize that was

24  a question.

25    Q.    Looking at paragraph 16, it's

1   accurate to say that Newsweek at no point has

2   reached out to Instagram or Facebook to obtain

3   any permission to publish or display content

4   from those platforms?

5        MS. WOLFF:  Objection.

6        A.    We did not communicate with

7   Instagram regarding this particular case.

8        Q.    And Facebook --

9        A.    That I'm aware of.  That I'm aware

10  of.

11       Q.    Understood.  So Newsweek is not

12  aware of any such communications with

13  Instagram.  How about Facebook?

14       A.    Not that I'm aware of.

15       Q.    Okay.  Let's look at paragraph 35.

16  Okay.  I'm going to read you this section.

17        It says, quote:  Comply with all

18  applicable laws or regulations.  Don't provide

19  or promote content that violates any rights of

20  any person, including but not limited to

21  intellectual property rights, rights of

22  privacy, or rights of personality.  Don't

23  expose Instagram or people who use Instagram to

24  harm or legal liability.

25        Do you see that?

```
1        A.     Yes.
2        Q.     Okay.  Do you believe that Newsweek
3   is in compliance with that?
4               MS. WOLFF:  Objection.
5        A.     Yes.
6        Q.     Do you believe that Newsweek's
7   publication of McGucken's photograph violated
8   any intellectual property rights?
9               MS. WOLFF:  Objection.
10       A.     I believe that's what is trying to
11  be decided here.  So if there's no outcome,
12  then I don't have a response.
13       Q.     Okay.  So you have no position as to
14  whether or not the use violated intellectual
15  property rights as we sit here today?
16              MS. WOLFF:  Objection.
17       A.     We're under the impression we
18  followed the terms of service, so no.
19       Q.     Okay.  Let's look down at D-8.  I'll
20  read to you the relevant section.
21              It says, "Please note that User
22  Content is owned by users and not by
23  Instagram."
24              Do you see that?
25       A.     Yes.
```

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.     And "All rights not expressly

2   granted to you are reserved by Instagram."

3          Do you see that?

4      A.     Yes.

5      Q.     Okay.  So do you believe after

6   reviewing that language that Instagram gave you

7   the right to display McGucken's photograph?

8               MS. WOLFF:  Objection.

9      A.     It's industry-wide belief that, yes.

10      Q.     Other than the, quote, industry-wide

11   belief, is there any other basis for that

12   answer?

13               MS. WOLFF:  Objection.

14      A.     It's our interpretation that we did.

15      Q.     Okay.  Has anyone at Instagram or

16   Facebook ever communicated with Newsweek to

17   confirm that Newsweek can use any content on

18   Facebook or Instagram?

19               MS. WOLFF:  Objection.

20      A.     Not to my knowledge.

21      Q.     Okay.  Let's take a look at

22   paragraph 9.

23          It says, "You represent and warrant

24   that you own or have secured all rights

25   necessary to display, distribute and deliver

1    all content in your app or website."

2          Do you see that?

3      A.    Yes.

4      Q.    What steps, if any, did Newsweek

5    take to secure the rights in the McGucken

6    photograph before using the content on its

7    website?

8          MS. WOLFF:  Objection.

9      A.    It's my interpretation that's in

10   reference to what you're putting on your own

11   site, as in your own images, that you're not

12   violating your own copyright.

13     Q.    And what's that understanding based

14   on?

15     A.    How I interpret what I'm seeing

16   here.

17     Q.    Okay.  At the time you wrote your

18   social media guidelines for Newsweek, did you

19   consult these terms?

20     A.    Not these specific terms, but I have

21   read other terms for Instagram.

22     Q.    Okay.  At the time you wrote the

23   social media guidelines, did you review any

24   Instagram terms?

25     A.    I likely did.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      Do you recall doing so?

2      A.      I don't recall offhand.

3      Q.      Do you recall why you chose not to

4    indicate in your social media guidelines any of

5    the requirements of Instagram?

6              MS. WOLFF:  Objection.

7      A.      Because we only felt that writing

8    about the embeds were -- sorry, the Instagram

9    uploads to our CMS system was what needed to be

10   covered.

11     Q.      Okay.  Take a look at paragraph

12   11 -- I'm sorry, 13.

13              I'll read you the relevant language

14   that "You are responsible for obtaining the

15   necessary rights from all applicable rights

16   holders to grant this license."

17              Do you see that?

18     A.      I'm sorry, point at it, please.

19     Q.      There it is.

20     A.      Again, I believe that's in reference

21   to content that's being uploaded.

22     Q.      Okay.  Did Newsweek take any steps

23   to obtain the necessary rights from McGucken

24   per this paragraph?

25              MS. WOLFF:  Objection.

1      A.      This is in reference to content

2   that's being uploaded to Instagram, not

3   embedding from Instagram.

4      Q.      Okay.  So it's fair to say that

5   Newsweek didn't reach out to McGucken for any

6   reason in connection with this paragraph,

7   right?

8              MS. WOLFF:  Objection.

9      A.      I believe we covered that in our

10  correspondence.

11     Q.      Okay.  And Newsweek doesn't claim

12  that Instagram or Facebook gave them a

13  sublicense to use McGucken's work, correct?

14             MS. WOLFF:  Objection.

15     A.      I mean, that's interpretive

16  according to these terms of service.  It's

17  believed that we had permission to do so via

18  Instagram.

19     Q.      And are you basing that entirely on

20  these terms of service?

21             MS. WOLFF:  Objection.

22     A.      That and the industry, I believe,

23  and the interpretation of these terms of

24  service.

25     Q.      Any other basis?

1      A.     No.

2      Q.     Okay.  Did Instagram or Facebook

3  ever advise you specifically that you had the

4  right to publish Mr. McGucken's content on your

5  website?

6              MS. WOLFF:  Objection.

7      A.     As I've stated before, we have not

8  communicated directly with the platform.

9      Q.     Okay.  Has the platform communicated

10  with you in any way to indicate to you that

11  they grant to you a sublicense to use

12  McGucken's work on your website?

13             MS. WOLFF:  Objection.

14     A.     We haven't specifically spoken with

15  the platform.

16     Q.     Okay.  Give me one moment to go over

17  my notes here.  I think we're just about done.

18             One more question.  Does Newsweek keep

19  copies of its archived posts?

20     A.     Define what you mean by posts.

21     Q.     Articles.

22     A.     I mean, stories stay on the website;

23  they don't come down.

24     Q.     Okay.  To the extent that --

25  withdrawn.

Atkinson Baker, a Veritext Company
www.depo.com

1          Earlier you testified that you believe

2     that the McGucken article at issue is still

3     online but with a different photograph,

4     correct?

5          A.     The story remained up, but the

6     Instagram embed was removed.

7          Q.     Okay.  And it's your understanding

8     that the embed was not replaced, right?

9          A.     The embed was not replaced.

10         Q.     Okay.  Is -- does Newsweek maintain

11    a copy of that article with the McGucken

12    photograph in place?

13         A.     No.

14              MR. BURROUGHS:  Okay.  All right, I

15    have no further questions.  We can relieve the

16    court reporter of her duties at this time.  We

17    can go off the record.

18              MS. WOLFF:  Can we just have a

19    moment?  Can we just have a moment to see if

20    there's anything we would like to ask?

21              MR. BURROUGHS:  Oh, sure.

22              MS. WOLFF:  Thank you.  I just want

23    to go over my notes for a minute.  Okay?

24              (Pause in the Proceedings.)

25              MS. WOLFF:  Okay.  Can you see the

Atkinson Baker, a Veritext Company
www.depo.com

1   screen?  We just have a follow-up question

2   about one document.  And I think Sara is going

3   to do it because she's more proficient with

4   Zoom here.

5            MS. GATES:  Well, we'd like to share

6   an exhibit.  Do you have a preference for

7   whether we would designate this as Exhibit 11

8   or start a new naming convention?

9            MR. BURROUGHS:  A new Exhibit 11 is

10  fine.

11           MS. GATES:  Okay.

12

13                    EXAMINATION

14  BY MS. GATES:

15     Q.    Okay.  So I'm sharing a document on

16  my screen here.  This is Newsweek 81 through

17  83.

18           (Exhibit 11 marked for

19  identification.)

20  BY MS. GATES:

21     Q.    Does this document -- have you -- do

22  you recognize this?

23     A.    Yes.

24     Q.    What is this document?

25     A.    This is the story that's been in

1   question regarding an ephemeral lake that

2   formed.

3        Q.    And this is the full article?

4        A.    Yes.

5        Q.    Does this refresh your recollection

6   about what the article was about?

7        A.    Yes.  It's specific to this specific

8   photographer's capture of this lake.

9        Q.    Where is that in the article if you

10  can point it out for me?

11       A.    If you can scroll down.  Right about

12  there.  The top there.  It starts there and

13  there's two paragraphs based on the

14  photographer's experience and quoting him as

15  well.

16       Q.    And you're referring to Newsweek 82,

17  the Bates number?

18       A.    I can't see the number, sorry -- oh,

19  yes, there it is.  Yes.  Correct.

20       Q.    So the article talks about the

21  photographer Elliot McGucken's experience.  Is

22  that correct?

23       A.    Correct.  And the capture of these

24  images and posting to Instagram.  Hence, like

25  including the Instagram link was relevant.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.      So does this document refresh your

2   recollection about why this specific photo on

3   Instagram was selected for the article?

4           MR. BURROUGHS:   I just object that

5   you're leading your own witness.

6   BY MS. GATES:

7      Q.      You can answer.

8      A.      Yes, it -- most likely it was

9   started from the San Francisco Gate's piece.

10  It was, probably, inspired the piece about that

11  specific photographer's experience of this

12  lake.

13     Q.      And when you refer to the San

14  Francisco Gate piece, what do you mean?

15     A.      The quote with which the

16  photographer is included in the story.

17     Q.      What is this image on Newsweek 83?

18     A.      It's an illustrative image that was

19  included so that it can post to social media.

20  We can't use embedded images for social media

21  purposes.   So this image was illustrative of

22  the area and you can see the date on it, it's

23  from a previous formation.

24     Q.      So this image is from Getty?

25     A.      Yes.  Correct.  Correct.

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.    And of the images in the article, do

2   you know which image would have been the -- I

3   believe the term was hero image or lead image?

4    A.    Usually the first image that's

5   visible is considered the hero.  That's a

6   video.

7    Q.    So would the hero image in this

8   instance be of the Getty image?

9    A.    No, the first image that's visual is

10   the Instagram image.

11    Q.    Okay.  Do you recall if this story

12   was popular at the time?

13    A.    Not particularly.  At least in terms

14   of the amount of views that this story

15   received.  I believe there were other stories

16   based off of this specific instance.

17    Q.    My apologies.  I think my Zoom froze

18   there a bit, so I may have missed the end of

19   your answer?

20    A.    The last bit I said was that there

21   were other stories, I believe, that other

22   organizations may have done on this specific

23   experience.

24        MS. GATES:  Okay.  I think that may

25   be it for our questions subject to potential

Atkinson Baker, a Veritext Company
www.depo.com

1  redirect if you have any further questions.

2       You're muted.

3            MR. BURROUGHS:  Let's put Exhibit 11

4  back on the screen, please.

5            MS. GATES:  Is that for me?

6            MR. BURROUGHS:  Yes, Ms. Gates.  Do

7  you mind putting the exhibit back on the

8  screen?

9

10                      EXAMINATION

11  BY MR. BURROUGHS:

12     Q.    Okay.  Ms. Rice, in response to your

13  attorney's questions, you provided some

14  testimony about the context or creation of this

15  article, correct?

16     A.    Correct.

17     Q.    And that testimony was based

18  entirely on speculation and guesswork, correct?

19     A.    I can't assume to know what the

20  photographer was thinking, but there are

21  indications that that may have been the case.

22     Q.    Okay.  So to the extent that you

23  testified regarding the substance of this

24  article, that was based on your own feelings,

25  your own assumptions, and your own take,

Atkinson Baker, a Veritext Company
www.depo.com

1  correct?

2          MS. WOLFF:  Objection.

3          MS. GATES:  Objection.

4     A.     It's my interpretation.

5     Q.     That's not based in any way on

6  records or conversations with the writer or

7  being there and involved in the article at the

8  time, correct?

9     A.     Correct.  James might have further

10  insight that he could provide.

11     Q.     And looking at Exhibit 11, does it

12  refresh your recollection as to whether or not

13  Newsweek ran advertisements alongside

14  Mr. McGucken's photograph?

15          And if I can ask Ms. Gates to slowly

16  scroll through Exhibit 11.  I'd like you to

17  count for me the number of advertisements that

18  you see on the piece.  If you can go down a

19  little bit further.  Okay.

20          Okay.  So scroll back up to the

21  McGucken photograph?  Do you see an

22  advertisement for what appears to be Frozen

23  directly adjacent to Mr. McGucken's photograph?

24     A.     Yes.

25     Q.     Okay.  Would that have been a

Atkinson Baker, a Veritext Company
www.depo.com

1   paid-for advertisement?

2        A.    I don't know how our ads work, but I

3   would assume so.  I should also add that

4   there's two versions -- this is what the

5   standard view would be.

6        Q.    What would be the other version?

7        A.    What I can see on my end.  My

8   perception is not with ads since I'm an admin.

9        Q.    I see.  So when you see the post,

10  it's in admin mode.  That's a copy of the site

11  without ads?

12       A.    Correct.  Because once before --

13  when it's not live, there's no ads.

14       Q.    And so the admin view does have a

15  copy of the McGucken photograph on it?

16       A.    Not anymore it doesn't.  It's been

17  removed.

18       Q.    And you testified that there were

19  other stories about this particular instance

20  that did better.  Do you recall that?

21       A.    I don't know if they did better.  I

22  just know there were other stories about this

23  on other websites.

24       Q.    What other websites?

25       A.    At least the one that's referenced

Atkinson Baker, a Veritext Company
www.depo.com

1  by the photographer, San Francisco Gate, I

2  believe, or SFGATE.

3      Q.    Okay.  Do you know if that

4  particular publication obtained a license from

5  Mr. McGucken to use the work?

6      A.    I wouldn't know what the process is.

7      Q.    Do you know if the writer of this

8  Newsweek piece copied content from that article

9  as well?

10     A.    I don't know how she generated the

11 story, but she had her own sources.

12     Q.    Do you know if the Newsweek author

13 that wrote this story copied McGucken's quotes

14 from the SFGATE article?

15     A.    I believe so, but that's standard

16 practice.  It's not unusual as long as there's

17 a source to where the quote came from.

18     Q.    Do you know if the Newsweek writer

19 reached out to Mr. McGucken for any quote for

20 this article?

21     A.    You're aware of the communications

22 I'm aware of.

23     Q.    Okay.  So as far as you know, she

24 did not reach out to Mr. McGucken for quotes,

25 correct?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.      Had he responded, she probably would

2    have requested quotes.

3      Q.      And why do you say that?

4      A.      Because that's journalistic

5    practice, so I imagine she would have liked the

6    original quote.

7      Q.      Again, like your testimony about the

8    context and creation of the article, you're

9    purely speculating, correct?

10     A.      I'm speaking of a standard practice.

11     Q.      Any other basis?

12     A.      No.

13     Q.      And you said that other stories

14   performed better than your Newsweek story.  How

15   do you know that?

16     A.      I don't know if other stories

17   performed better.  I don't -- if I said that,

18   it's not what I was implying.

19     Q.      Okay.  Other than potentially that,

20   is there any other statements that you made

21   today that you feel are false or perjurious?

22          MS. GATES:  Objection.

23     A.      I didn't make any false statements.

24     Q.      So as you sit here today, you don't

25   know whether or not these other stories you

1    referenced did that, correct?

2         A.     I have no way of knowing that.

3              MR. BURROUGHS:  All right.  I have

4    nothing further.  Unless you guys have any

5    other questions, Ms. Gates, Ms. Wolff.

6              MS. GATES:  Nothing further.

7              MR. BURROUGHS:  Okay.  Then we can

8    relieve the court reporter of her duties under

9    the Code and go off the record.

10             [Reporter requested direction in

11   handling the read and sign.]

12             MS. GATES:  You can send it to me

13   and I can make sure it's directed to the proper

14   party.

15             THE REPORTER:  Would you like a copy

16   of the transcript?

17             MS. GATES:  Yes.

18             MR. BURROUGHS:  And to the extent

19   that, Ms. Gates, you're going to be ordering a

20   copy, do you want to agree that that copy can

21   be the one reviewed by your client to make any

22   revisions, and if she's going to make any

23   revisions, she do so within 30 days of your

24   receipt, and if there are no revisions in that

25   time period, we'll agree that the transcript

Atkinson Baker, a Veritext Company
www.depo.com

1   will stand as constituted when sent?

2          MS. GATES:  My apologies.  Our Zoom

3   froze, so I did not catch most of what you said

4   there.  If you could just repeat it.

5          MR. BURROUGHS:  No problem.  You're

6   going to be getting a copy of the transcript,

7   right, per your order.  You want to use that as

8   the copy that your client will review to make

9   revisions?  If she has any revisions, that

10  she'll send those to us in 30 days by e-mail.

11  If she doesn't send any revisions in that

12  period of time, we'll agree that the transcript

13  stands as constituted when sent.

14          MS. GATES:  We can agree to do it by

15  e-mail.

16          MR. BURROUGHS:  Great.  All right.

17  So the original will come to my office.  The

18  copy will go to Ms. Gates for revisions and

19  we'll go from there.

20          MS. GATES:  And one more thing

21  regarding the confidentiality designation.  I

22  know the protective order allows for us to

23  designate portions of the transcript as

24  confidential up to 30 days out.  Since I

25  believe most of the exhibits were marked as

Atkinson Baker, a Veritext Company
www.depo.com

1    confidential and I would assume the testimony

2    would relate to same, we'd like to just go

3    ahead and designate the transcript as

4    confidential and we can clean up anything later

5    within that 30-day period.

6              MR. BURROUGHS:  We can't agree to a

7    blanket designation, but send us the lines and

8    certainly if it's really sensitive information,

9    we'll agree to that.

10             MS. GATES:  Yeah, happy to do that.

11   I just wanted to put in that placeholder for

12   now because I believe the protective order

13   considers the transcript as confidential during

14   that 30-day period as we are going over the

15   specific portions.

16             MR. BURROUGHS:  All right.  Thanks,

17   everyone.  Take care.  We'll see you tomorrow.

18

19             (Whereupon, the proceeding is then

20   concluded at 5:22 p.m.)

21

22

23

24

25

```
 1   STATE OF _____)
                                           )   ss.
 2   COUNTY OF _____)

 3

 4

 5

 6

 7        I, the undersigned, declare under penalty of

 8   perjury that I have read the foregoing transcript,

 9   and I have made any corrections, additions, or

10   deletions that I was desirous of making; that the

11   foregoing is a true and correct transcript of my

12   testimony contained therein.

13        EXECUTED this _____ day of _____,

14   20_____, at _____, _____.

15                    (City)                (State)

16

17

18

19

20

21        _____

22                    Diane Rice

23

24

25
```

1

2                C E R T I F I C A T I O N

3

4

5          I, AMELINDA LOPEZ, a Certified Court

6    Reporter, Registered Professional Reporter, and

7    Notary Public of the State of New Jersey, certify

8    that the foregoing is a true and accurate

9    transcript of the testimony at the time and the

10   date hereinbefore set forth.

11          I further certify that I am neither attorney

12   nor counsel for, nor related to or employed by any

13   of the parties to the action in which the testimony

14   was taken; and further that I am not a relative or

15   employee of any attorney or counsel employed by the

16   parties hereto, nor am I financially interested in

17   the action.

18          Signature reserved.

19          Dated this 23rd day of March, 2021.

20          _____

21

22          AMELINDA LOPEZ, CCR, RPR
            Certified Court Reporter & Notary Public
23          License No. 30XI00229700

24

25

Atkinson Baker, a Veritext Company
www.depo.com

**Exhibits**

**Exhibit 1** 5:0
37:6 46:18,19

**Exhibit 2** 5:0
75:14,16

**Exhibit 3** 5:0
103:21,23

**Exhibit 4** 5:0
110:24 111:1,4
118:16 133:16
176:7 185:24

**Exhibit 5** 5:0
161:23,24
163:14

**Exhibit 6** 5:0
164:1,3 174:19

**Exhibit 7** 5:0
173:8,9 174:12

**Exhibit 8** 5:0
174:15 175:11,
13

**Exhibit 9** 5:0
184:19,22

**Exhibit 10** 5:0
191:25 192:2

**Exhibit 11** 5:0
211:7,9,18 215:3
216:11,16

**$**

**$150** 140:12

**1**

**1** 37:6 46:18,19
75:15 87:22
88:2,7

**10** 5:1 191:25
192:2

**104** 103:22

**105** 103:22

**11** 193:21 194:8,

13,17,20 195:7
196:1 207:12
211:7,9,18 215:3
216:11,16

**13** 94:2,3 100:4,7
102:5,7 104:15,
21 197:18
198:16 207:12

**14** 97:17

**157** 192:1

**16** 198:15,21
200:2 201:3
202:19,25

**1:00** 5:1

**2**

**2** 75:14,15,16
88:9

**2013** 27:4 73:16
74:2,9

**2017** 27:18

**2018** 23:24
27:17

**2019** 8:4 9:14
14:18,19,20 40:3
43:23 45:3 47:15
48:2,5 49:3,6
57:21 58:8,9
70:19,21,23
74:20,23 105:22
106:24 111:10
153:17 155:18
162:19

**2020** 14:15,16
49:9 55:2 57:15,
21 101:22
173:18,22 174:8

**2021** 5:1 173:16

**21** 173:18,22
174:7

**23** 164:2 174:16

**24** 13:3 173:16

**25** 19:23

**26** 174:18

**27** 164:2 174:16

**28** 175:12

**2:34** 93:21

**2:45** 93:21

**3**

**3** 76:21 84:25
88:14 103:21,23
173:8

**30** 8:17 220:23

**35** 203:15

**4**

**4** 110:24 111:1,4
118:16 133:16
176:7 185:24

**5**

**5** 161:23,24
163:14

**6**

**6** 164:1,3 174:19

**7**

**7** 173:8,9 174:12

**8**

**8** 174:15 175:11,
13

**8/20** 101:21

**81** 211:16

**82** 212:16

**83** 211:17 213:17

**9**

**9** 110:24 184:19,

**22** 205:22

**99** 19:12

**A**

**A-11** 193:10

**ability** 20:5
151:22 164:12

**absolutely** 94:9,
25 96:25 158:13

**accepted**
105:12

**access** 13:15
15:21 65:3,6
158:5 161:7

**accessed** 70:9

**accord** 132:19

**account** 73:21
142:11,12 165:6,
10,14,17 196:22,
23

**accounts** 77:22

**accredited**
35:20

**accurate** 32:17
34:24 46:7 50:2
53:1 81:25 85:14
89:21 99:5 105:5
119:4 127:13
132:3 170:21
171:11 177:5
179:13 186:14
199:21 203:1

**accurately**
10:22

**action** 63:19

**active** 99:12

**actual** 39:19
101:1,9 142:21
178:9 189:16

**ad** 197:21 198:1,
2,11,13

**Adam** 165:19
166:4

**Adam's** 165:19

**add** 14:12 29:9
110:21 133:7
137:8,18 177:23
217:3

**added** 102:7
104:15,18

**adding** 13:16
104:20,22

**additional**
66:13,16 150:17

**additions** 105:1

**address** 21:8
60:19 61:1
100:13,15

**addressed**
60:12

**addresses**
118:8

**adjacent** 216:23

**adjust** 139:2

**admin** 217:8,10,
14

**admit** 121:8

**admits** 131:22

**adopted** 28:17
30:15 31:5

**ads** 112:23
116:6 172:17
198:9 217:2,8,
11,13

**advertisement**
216:22 217:1

**advertisements**
54:25 171:19,24
172:2,5,11
216:13,17

**advertising**
54:17,20 172:7,
23 173:4 198:5

**advise** 57:1,6,9
60:8 109:1
168:10,16 169:3
209:3

**advised** 24:1
55:24 56:17,21
58:19 59:15

**advisement**
168:2

**advising** 95:17

**affect** 137:10,21

**affects** 179:9,11

**affirmative**
146:5

**affirmatively**
135:23 145:21
195:8

**agencies** 14:7

**agency** 6:9,10,
11 27:8

**agree** 188:5
220:20,25

**agreed** 18:21
57:11

**agreement**
89:9,10 145:25
200:25 201:9
202:16

**ahead** 79:18
131:3 145:19
160:3 171:4

**alcohol** 13:3

**allowed** 57:5
106:19 123:15
126:8 132:9
144:23

**alongside**
172:23 216:13

**altered** 101:5
186:19

**ambiguity**
88:22

**amend** 81:11

**amount** 214:14

**amounts** 12:2

**and/or** 137:14
183:3

**answering** 56:9
66:14 92:9
128:24

**answers** 122:1

**anymore** 217:16

**anyone's** 149:6

**anytime** 179:11

**AP** 14:12

**apologies**
214:17

**apologize** 24:21
174:17

**app** 206:1

**appeared** 19:1
93:3

**appearing**
20:22 92:2 93:9

**appears** 92:3
186:23 216:22

**apples** 188:10
189:1

**applicable**
203:18 207:15

**applied** 31:25

**apply** 84:20,23

**applying** 7:19

**approach** 81:4

**approval** 147:23
148:2 149:20

**approvals**
100:14

**approving**
149:19

**approximately**
62:24 105:21

**archived** 209:19

**area** 213:22

**arose** 153:14

**art** 16:10,13,16

**article** 35:14
39:23 40:5,10

48:7 49:7,10
50:1,10,25 51:13
54:5,6 56:12
57:21 58:20
63:25 64:1 70:3
133:15 147:25
151:25 152:13
153:21 154:4,8,
12,16,21 155:4,
14 156:11,19,20
157:1 161:1
163:22 171:19
174:24 175:5
176:9,12 178:10
185:24 186:2,11
190:4 210:2,11
212:3,6,9,20
213:3 214:1
215:15,24 216:7
218:8,14,20
219:8

**articles** 40:23
51:21 52:12,17,
25 54:1 89:19
91:2 148:8 149:4
150:3,13,22
151:13 156:17
183:18 209:21

**articulated**
145:1

**artist** 59:4 78:11
82:6 137:23
169:3 170:8
181:24 196:1

**artist's** 34:7,8
36:12 51:8 54:13
77:11 78:12
82:13 83:25
118:15 170:9
179:12

**artistic** 187:18

**artists** 80:9
138:15 143:18
168:17 169:20

**arts** 18:17 140:8

**ascertain** 113:7

**asserting** 146:4

**asset** 64:2,3,5,7,
12

**assets** 25:21
69:12 70:11
183:12

**assigned** 149:8

**associates** 10:8

**assume** 11:22
41:19 156:2
157:19 172:8
190:11 215:19
217:3

**assuming**
157:15 181:9

**assumption**
156:3

**assumptions**
215:25

**athlete** 188:24
189:21

**athletes** 189:9

**attachment**
42:16

**attend** 8:20

**attendance**
8:13

**attention** 47:15,
17 76:21 94:1,5
111:9,12 174:15
175:11

**attorney** 81:8
86:25 162:5

**attorney's**
215:13

**attorneys** 9:22
10:1,5 12:17
24:7,9 67:12,25
68:2,6 69:4

**August** 101:22
155:21

**author** 138:6,7
218:12

**author's** 79:14

**authorized**
147:1,2,3

**availability** 56:1
60:14 66:13

**avatar** 162:22

**award** 180:4

**aware** 9:24 17:4,
5 20:10 23:23
26:23 28:21 30:8
39:2 44:9,15,17
46:6 50:5 58:17
60:2 61:1,17
70:16,18 71:13,
16,17,24 107:9
110:15 120:13
127:7 141:1,10,
19 146:8 148:7,
15,17 150:17
155:8 158:20
159:1,21 161:10,
16,20 162:17
166:19 168:14
176:5 178:6,8
184:17 186:21
194:9,15,21
202:14 203:9,12,
14 218:21,22

**B**

**back** 21:16 71:7
83:15,18 93:16,
23 112:11 113:2,
20 115:11,23
116:1 134:3
137:3 162:18
163:6,21 176:6
185:20 215:4,7
216:20

**back-end**
116:16

**backtrack** 18:15

**backup** 198:23

**badgering**
130:2,4

**based** 26:18,21
28:9 34:20 36:14
57:4 58:9 71:5
76:8,14 107:4,
18,20,24 108:8,
9,21,22,24

Atkinson Baker, a Veritext Company
www.depo.com      Index: basically..communications

109:1,16,19,21,
23 110:8,9,16,20
117:6 119:12,18
135:8 166:11
167:25 187:9
188:21 190:9
191:2 206:13
212:13 214:16
215:17,24 216:5

**basically** 151:5

**basing** 157:21
208:19

**basis** 36:10
68:12 71:6
191:12 205:11
208:25 219:11

**Bates** 75:14
184:19 212:17

**begins** 25:6

**behalf** 15:8 47:4
195:18

**belief** 57:7 58:10
71:6 113:6
146:15 191:2
205:9,11

**believed** 66:1
75:2 208:17

**beneath** 16:23

**bit** 146:9 169:15
179:18 187:20
188:15 214:18,
20 216:19

**blue** 11:13

**blurring** 67:9

**Bonnier** 27:21

**bottom** 104:4

**boxes** 116:6

**boxy** 116:6

**boy** 73:16

**brand** 17:12

**break** 27:1 93:15
138:25 139:4

**breaking** 118:4

**briefly** 176:7

**broad** 199:18

**brought** 47:14,
17 111:9,11

**built** 143:15

**bullet** 84:25 88:2

**BURROUGHS**
5:8 21:3,13
22:18 23:21
35:3,6 45:11
46:21 52:2 75:18
79:17 80:13,19,
25 81:10 83:2,7,
13,17,20,22 87:1
90:1 91:7 93:7,
13,19,22 96:7
104:1 108:13
109:8,13 110:1
111:3 115:15
124:16,25
127:12 128:13
129:5,14,24
130:5 131:13
134:12,15,20
138:1 139:7
149:2 151:19
153:2,7,12 160:2
162:1 163:1,3
164:5 173:11
174:10,13
175:15 178:1,13,
19 184:24
185:19 192:4
195:21 196:6
197:4,7,8 200:6
202:21 210:14,
21 211:9 213:4
215:3,6,11
220:3,7,18

**business** 10:8
59:19 120:15
126:2 137:10
165:7 170:21
171:12 172:7
183:11

---

**C**

**call** 16:25 58:3
67:10,11,12,14,
16,19,25 68:2

**briefly** — (column 3 starts)

94:17 103:2
104:21 145:4

**called** 143:3

**calls** 69:3
134:10

**captions** 13:16

**capture** 212:8,
23

**career** 27:3,10

**carefully** 124:22

**Caribbean**
27:25

**case** 11:14
12:21 39:18 48:4
56:4 65:12 66:6
67:21 68:5,17,22
69:2 70:14 72:6
80:5 87:7 120:24
125:14 140:7
151:25 161:4
162:17 203:7
215:21

**cases** 63:3
124:18 130:10
133:2 137:2,22
184:1

**cat** 157:6

**catch** 148:20

**category** 188:14

**cats** 43:17
156:23

**caught** 169:14

**cc'd** 164:15,18

**CCO** 25:12,14

**CCO's** 25:17

**CFO** 24:13 25:10

**chance** 110:18
164:8

**change** 91:24
113:14

**changed** 31:12
81:19,21 82:9

**channel** 69:9,
11,14,19 70:15

**checks** 150:18

**chief** 25:12

**choices** 155:13
187:18

**choose** 153:8

**chose** 156:5
190:3,14 207:3

**chosen** 190:21,
24

**circulated**
28:19

**circulation** 42:9

**circumstance**
127:6 180:4

**circumstances**
31:20 59:11
82:23 178:20
181:23 182:25
183:6

**claim** 59:3
183:17,22
208:11

**claimed** 184:4

**claiming** 184:12

**claims** 60:13

**clarification**
102:20

**clarify** 20:17
102:18 189:17

**class** 89:5

**classes** 89:4
128:25

**clear** 10:25 89:5

**click** 112:11
186:9

**clicked** 186:16

**client** 220:21

**close** 109:8

**closed** 109:10

**closely** 117:4,6
122:4

**closet** 17:13

**CMS** 38:5 41:6
65:3 85:9,12
86:2,4 87:9
90:21 98:19
102:25 103:10,
12 112:7,8
113:20,25 114:2,
4,11,17 115:11
133:14 167:1,3,
10 168:3 170:17
182:4 207:9

**Code** 220:9

**coffee** 34:15,16

**college** 7:3,5

**combination**
47:22

**comfortable**
56:9

**comment** 11:13
177:14

**commercial**
6:11,12 33:22,25
193:15

**commissioned**
18:5,17 19:4,7
139:17,24

**commissioning**
18:8

**communicate**
48:9 55:21 65:21
68:25 156:25
202:2 203:6

**communicated**
56:2 58:1 66:5
160:25 205:16
209:8,9

**communicating**
9:17 156:16

**communication**
49:19 58:10
66:25 69:7

**communication
s** 55:17 118:22

Atkinson Baker, a Veritext Company
www.depo.com

161:3,10 202:6,
10 203:12
218:21

**Community** 7:6

**companies**
16:1

**company** 14:23
15:6 24:3,11
25:17 27:6
28:20,24 30:22
31:3 41:19 45:3
53:15 117:2,24
127:25 128:3
138:20 141:20
157:15,19 158:1

**compare** 104:24

**comparing**
104:13

**compensate**
139:19,21,23
140:23

**compliance**
194:2,10,23
196:25 197:12
204:3

**compliant** 84:2

**complied**
194:17 198:16

**comply** 129:17
193:17,22 194:8,
12 195:8 196:1,
11 203:17

**composition**
187:24

**conceded**
169:16

**concentration**
7:10

**concept** 199:8

**concern** 148:21

**concerned**
74:17

**conclusion**
134:11,19

**conditions**

45:20,24 46:7,
10,13 184:21
185:8,12

**conduct** 90:11

**confer** 117:9

**conference**
106:15,21,25
108:17,21

**conferred**
192:25

**confirm** 166:6
205:17

**confused** 42:21

**connection**
15:3 40:22 41:2,
3 68:16 73:20
154:20 165:6
194:6 196:12
202:17 208:6

**consent** 32:21,
22 33:4,14,23
34:8,24 36:6,12
49:21 50:15,23
51:3,8 52:9 54:7,
14 58:12 59:5
78:12 79:14
80:10 81:6,24
82:7,13 83:25
106:3 118:15,24
119:6 120:4,10,
18,19 121:1,2,4,
10,15 122:15,17,
24 123:6,7,18
124:4 125:3,15,
16,23 126:3,12,
19 127:2,19
130:12,13,14,17,
21,24 132:1,14,
23 133:18,21,25
136:8,9,15
137:24 138:3,7
146:5,12 166:8,
18,22 167:22
168:1,10 169:16,
17,21 170:23
171:14 172:14
175:25 178:16
179:13 181:25
197:20

**consented**
135:23

**considered**
56:16 214:5

**constitute**
61:11

**consult** 89:8
206:19

**contact** 47:11
54:11 97:18
117:16 121:9
161:15 164:24
168:9

**contacted**
59:14 97:23
126:10 131:23

**contacting**
38:23 98:4

**content** 15:17
25:12 31:11,13
32:16,19 33:5,9,
14 39:14,15 46:3
50:14,22 51:2,7,
21 52:8 54:6
56:22 57:2 58:8,
11 59:3,4,14
62:25 63:7,21
66:2 77:11 78:8
81:5 82:5 94:8,
17,20 95:5,18,
19,22 96:9,17
97:8 114:4
118:2,10 119:6
120:16 121:19
122:17,21 127:9,
19 134:8 138:9,
16 141:7,24
144:10 151:5
165:5,13 172:25
173:1,2,5
193:18,24 194:1,
13,22 197:20
198:23 199:5,24
200:10,11,13,18,
21 201:2,6,8,10,
19 202:12 203:3,
19 204:22
205:17 206:1,6
207:21 208:1
209:4 218:8

**consented**
135:23

**contents** 159:25
192:25

**contest** 146:4

**context** 34:11,
12 35:16,17,24
77:13,19 78:1,3,
5,10 82:19 84:7,
8,10,13,15,16,20
87:12 91:25
92:6,23 93:12
101:3 106:17
144:6 175:20
215:14 219:8

**continually**
79:22

**continue** 57:20
81:23

**continued**
57:13 58:21

**contractor**
140:1

**contrary** 85:17

**convention**
211:8

**conversation**
47:21 48:4 66:11
68:4 69:21,22
99:3,12 106:12
107:18 110:16
158:17,21

**conversations**
33:12 47:25 48:1
55:4,16 65:17,19
67:15 71:8 81:16
118:22 159:6
161:9,12 216:6

**conversing**
156:15

**Cooper** 30:6
65:14

**copied** 39:3
114:16 218:8,13

**copies** 209:19

**copy** 28:24 38:4
41:15,24,25
100:19 101:1
112:13 113:19

115:5,12 119:10,
17 120:22 132:6
136:3,18 141:25
142:20 157:16
182:6 210:11
217:10,15
220:15,20

**copyright** 60:2,
13 61:1,19,24
62:2 63:11 80:1,
14 86:24 103:7,
9,13 149:9,11,
15,18 150:13,22
151:6,13 183:18,
23 184:4,12,15
206:12

**copyright@
newsweek.com**
60:16

**copyrights**
148:10 149:6
150:10

**corner** 162:23

**Corporation**
27:21

**correct** 16:11
20:8 22:7 26:19,
20 30:23 32:23
34:25 38:24,25
39:15,20,21
40:18 41:13
42:24,25 43:9
44:11 46:14,15
50:11,12 51:14
52:23 53:9,24
54:1,2,7,9 55:25
58:1 63:22 64:22
66:7 68:1,3
71:23 74:9 76:7,
9,10,13 79:2,5,
14 80:5 82:7,16
84:3,9 85:15
86:17 87:19 88:8
92:25 95:24
96:13,17 97:5,6,
9,15 99:20
101:2,6 102:9,
10,12 111:20,25
112:1 113:1,9
114:18 116:20
118:16 120:4

Atkinson Baker, a Veritext Company
www.depo.com

121:4,10,21
122:11,13 123:8,
20 125:11,17
126:4,12,19
130:21,24 131:1,
4,13 132:14
133:18,19,22
134:9,17 135:18,
24 136:22,23,25
137:3 141:12
142:22 143:5,13
145:2,12 146:6,
22,23 147:4,14,
22 150:5,13,23
151:14,20,25
152:20,25 155:4,
15,20,24 156:5,
11 157:23 158:4,
10,18,22 159:3,
23 160:17,19
161:2,18 162:19
163:9,15,16,22
164:25 165:1
167:17 171:17
172:20,24 173:5,
6 174:19 176:4
177:1 178:10
183:4 184:15
185:8 190:15,22
191:3 192:22
193:2 197:7,14,
16 199:17 200:4,
8,14,15 201:3,
11,15,21 202:19,
22 208:13 210:4
212:19,22,23
213:25 215:15,
16,18 216:1,8,9
217:12 218:25
219:9 220:1

**correspond**
117:7

**corresponded**
68:15 116:25
138:14

**correspondenc
e** 9:14 43:11
56:5,7 69:2 72:9,
12 141:2 146:25
208:10

**costs** 90:4

**counsel** 9:4,6
24:1 33:12

**count** 9:6
216:17

**couple** 10:14
37:10 99:4
124:11 161:17
175:19

**court** 10:20
12:20 35:4 80:7
81:2 134:12
197:5 210:16
220:8

**cover** 16:17
77:17,18

**covered** 56:6
106:5 107:23
146:14 153:22
207:10 208:9

**create** 35:9
152:22

**created** 17:2,6,
21 19:9 23:24
77:16 94:19,21
152:9 157:14
176:18 184:10

**creating** 23:25
155:13

**creation** 40:10
70:6 113:16
116:15 152:6,13,
20 153:20,25
154:3,8,12,16,20
155:3,6,10
156:8,13 163:22
177:9 178:10
190:17 215:14
219:8

**creative** 6:9
152:25 154:19
155:2 156:9
157:12 187:4,7,
11 188:23 189:3,
7,10,23

**creativity** 188:6

**creator** 33:1,15
34:23 59:14
81:25 183:3

**creator's** 50:14,
23 51:3,21 52:7,
9 54:7 106:3

**creators** 81:5
165:5,13 183:14

**credibility**
11:15

**credit** 103:17,18

**credits** 13:16

**cues** 11:2

**cup** 34:15

**current** 5:16
129:1,7

---

**D**

**D-8** 204:19

**D-A-Y-A-N**
24:25

**D.C.** 6:19

**daily** 147:17

**Dash** 66:23

**data** 115:11,16
116:16

**date** 73:17
100:22 101:18,
19 104:19
117:14 173:15
213:22

**dates** 12:1 29:9
55:6 104:17
105:23 113:12

**David** 116:24
117:2

**day** 11:25 22:24
54:3 147:18
162:17

**day-to-day** 13:8
53:4 68:12,14
69:5

**Dayan** 24:25
25:13,14

**days** 12:6 67:9
220:23

**deal** 14:13

**dealing** 106:9

**Death** 180:14
181:11 190:5

**decade** 28:9
33:19

**December** 49:6
58:9

**decide** 58:16
178:21

**decided** 81:15
102:17 132:9
204:11

**decides** 137:11

**deciding** 187:24

**decision** 58:7
82:2 105:9 138:8
172:13

**decisions**
154:20

**decline** 122:16

**declined** 121:2
132:14

**declines** 122:19
123:18 124:4
125:15

**Declining**
125:19

**dedicated** 69:11

**define** 188:2
209:20

**defined** 200:20

**definition** 21:12
85:7 135:3,11
179:22 199:15,
18,20 201:3,6

**definitions**
86:24 87:16
135:6

**degree** 7:8,9,12
185:6

**deliver** 205:25

**demarcated**
103:11

**department**
48:22 97:19,23

**depending**
92:17 187:7

**depends** 34:11
35:16 189:25

**deposition** 8:24
10:16 37:8 46:18
55:21,22,25 56:4
65:13,18 72:5

**depositions**
174:23

**describe** 87:6
116:10 145:11

**describing**
78:23

**description**
77:18

**descriptions**
114:22

**design** 7:11

**designate** 211:7

**designated**
151:16

**Designation**
27:24

**dialed** 8:15,16

**Diane** 5:11

**differences**
118:8

**differently**
91:19

**difficult** 8:14
19:21 22:25 23:6
99:23

**difficulties**
174:23

**direct** 42:5
76:20 92:3 94:1,
5 117:8 160:5
174:14 175:10

**directed** 220:13

**direction** 25:19 220:10

**directly** 21:7 39:20 44:2,13 70:5 91:4,20 92:18 126:10 141:14 148:1 157:18 164:22 209:8 216:23

**director** 5:17 6:1,3,22 13:6 53:8,12,14,22 184:3

**disabled** 63:17, 18

**disappeared** 71:8

**discovery** 49:21

**discuss** 39:24 55:20 67:22

**discussed** 66:10 69:15 70:14 72:3 106:14,16 195:17

**discussing** 111:18

**display** 22:1,14 33:13,21 34:7,22 38:14 39:4,13 85:14,17,22 86:21 88:25 112:16,19 114:5 123:19 130:14 132:12,20 134:24 135:4,7, 24 136:21 137:12 141:6 168:18,21 170:8 171:12 198:22 199:4,16 200:10, 11 203:3 205:7, 25

**displayed** 21:9, 17 23:3 48:13 86:15 89:19,20 91:25 122:10 135:17,21

**displaying** 20:21 22:5 87:13 134:8,16 168:11 169:4 199:23 201:18

**dispute** 10:2,6 42:23 43:19 44:8 48:2 55:4,17 58:22 65:18,21 71:15 161:2 163:7

**disputed** 48:6 49:4,7,10

**distinction** 21:6 189:19

**distribute** 186:2 205:25

**distributed** 186:1,10

**DM** 142:4,17,22

**document** 37:6 46:17 47:1 75:21,22,24 76:5,13,18 78:20 86:4,10,14 87:22 89:4,14 100:20, 24 101:2,9,13, 14,16 104:3,6 107:14,19 108:25 109:16, 21 110:9,15,23 116:12 157:13 158:4 191:24 192:10 193:1,7, 12 196:4 211:2, 15,21,24 213:1

**documents** 43:1 72:4,13 105:24 153:19, 24 154:11 164:16

**don'ts** 27:12

**dos** 27:12

**double-check** 104:17

**double- checking** 13:17

**doubt** 97:18

**download** 87:23 88:3,5,11,15

**downloading** 13:12 87:22

**drafted** 27:15 31:5 32:10 76:6, 8

**drafting** 26:12 29:14

**draw** 26:11

**drawn** 26:18

**drew** 28:8

**drugs** 13:2

**ducktails** 10:14

**duly** 5:5

**duties** 210:16 220:8

---

**E**

**e-mail** 9:14 10:11 41:18,21 42:7,8,12,18 43:2,6,8,10 47:20,23 48:23 60:12,19,22 61:1 62:2 65:23 67:3, 5 69:1,3,7,8 100:13,14 111:15 157:22, 24 158:7 164:11, 24 166:6,12 167:6 174:25

**e-mails** 41:23 42:2,5,23 43:2, 14 61:5 62:5 65:15 72:2 154:5,7,10,13 158:14 161:6,8, 17 164:14,16,23 173:13 191:6

**earlier** 19:11 24:14 74:23,24

**double-check** 104:17

75:3 100:12 104:7,10 105:2 139:18 140:8 144:1 147:20 153:16 156:25 157:14 158:14 166:23 169:7 174:7 178:14 182:16 191:17 201:5 210:1

**early** 27:17 73:12 106:23,24

**easier** 116:9

**easiest** 42:17

**edit** 112:10,13 116:3

**editor** 7:2,16,19, 20,23 26:15 28:6 36:9,15,21 37:22 53:19 65:7 117:3 149:8 151:1 159:18 160:7 174:25 175:5,7 178:21

**editor-in-chief** 24:18

**editorial** 6:10 7:19 25:18 172:25 187:7,15 188:3 198:3,4

**editors** 24:12, 15,23 147:24 148:19 149:17 150:15 151:4

**edits** 100:17 113:12

**educated** 150:6

**educational** 55:8

**effect** 101:17 167:11

**elaborate** 45:21

**Elliot** 111:19 162:10 212:21

**else's** 169:2

**embed** 38:4,13

39:13 54:12 64:10 77:21 78:15,17 79:2 81:23 83:24 87:23 89:21 91:13 92:3 98:22 113:18 120:7,8 121:23 123:2,8 124:5 126:1,4 127:2,23 130:15 136:9,10,11,13 137:12,22 168:3 169:1 170:13,14, 22 172:13 174:1, 2 181:10 193:14, 18 210:6,8,9

**embedded** 21:7 31:22,24 50:22 51:2,22 52:15 63:7 64:8 79:3, 13 80:11 91:4,9, 21 92:18 112:14 138:4 169:10 213:20

**embedding** 20:18 32:9,12 37:18 39:1 50:13 51:7,16 73:24 74:2,8,13 75:8 78:22 80:8 81:13 91:10 97:5 106:2,12 111:24 113:1,9 114:21 123:11,15,20 125:6,12 126:7, 16 131:7 166:24 208:3

**embeds** 32:4,6 82:13 86:12 171:13 207:8

**employ** 17:25 18:6

**employed** 5:14 6:5,7 18:3 45:14

**employees** 29:20

**employment** 5:16,20

**end** 10:22 63:4, 17,18 90:3 110:6

112:11 113:3,20 115:11,23 116:1 214:18 217:7

**enforced** 159:7, 12 160:11

**enforcing** 159:2,21 160:6

**engaging** 38:12

**ensure** 128:5, 10,22 129:17 147:6 148:9 149:5 150:12 194:17 196:24 197:11

**entire** 30:21 75:21 157:19 176:12

**entirety** 186:3, 13

**entitled** 12:4

**entity** 33:25

**ephemeral** 212:1

**errors** 148:20

**essence** 59:13

**essentially** 91:10 116:5

**estimate** 8:5,12, 14 12:5,9 18:25 19:19,21,25 20:3,5 27:14 62:18 73:15

**estimates** 12:1

**estimation** 179:2

**Etherington-smith** 66:22,23 67:1

**event** 178:23,25 188:4 189:2,7,16

**eventually** 81:14

**everyone's** 99:25

**evidence** 72:13

**evolving** 79:22

**exact** 62:20 73:17 148:5 167:6

**EXAMINATION** 5:7 211:13 215:10

**examples** 17:15

**exclusive** 94:8 96:21 97:15

**execute** 144:18

**exhibit** 37:6,10, 11 46:18,19 72:1 75:14,16 103:21, 23 104:13 110:24 111:1,4 118:16 133:16 161:22,23,24 163:14 164:1,3 173:8,9 174:11, 12,15,18,19 175:11,13 176:7 184:19,22 185:2, 24 189:11 191:25 192:2 211:6,7,9,18 215:3,7 216:11, 16

**exist** 103:9

**existed** 47:18

**exists** 60:11 61:1 144:14

**experience** 7:15,18 12:8 26:15,19,22 27:1 33:19 34:5,20 36:3,8,14,18 45:12 59:2 61:2 76:9,15 87:3 107:5 109:2,15, 17,22 110:8,10 113:24 114:1 116:19 135:9 176:19 177:13 184:2 187:3,9 188:22 190:8 191:1 212:14,21 213:11 214:23

**experienced** 35:22

**experiencing** 191:10

**explain** 131:17 179:17 188:15

**explicit** 31:14,15

**explicitly** 122:20

**exploit** 169:22 170:22 171:2

**exploited** 36:6

**expose** 203:23

**expressly** 205:1

**extent** 11:11 64:19 147:1 149:20 166:20 209:24 215:22 220:18

**external** 112:17

**F**

**Facebook** 186:6 202:7,11 203:2, 8,13 205:16,18 208:12 209:2

**fact** 51:12 57:7 121:3 122:25 131:2 135:22 141:24 155:7 157:22 159:7 166:20 167:22 172:10

**failure** 136:7

**fair** 11:23 17:22, 23 28:7,12,16 31:2 51:5 53:21 56:20 58:25 60:25 61:3 62:3 75:6 78:6 86:13 92:1 116:11 123:4,25 127:5, 8,17 130:9 135:16 144:16, 25 150:1 170:15, 20 174:5 176:25

**180:**9,24 183:10 196:20 208:4

**fairly** 27:10,11 73:12

**fall** 105:23 162:19 188:13

**falls** 127:5

**false** 184:14 219:21,23

**familiar** 27:11 39:22 45:18 46:8 56:10 62:10,15 80:4 128:8 142:8 158:15 161:11 173:14

**Fantastic** 143:16 160:20

**faster** 46:24

**feasible** 54:3

**February** 70:23

**fee** 139:13 183:3

**feedback** 25:24 26:1,2,7,10 56:8 107:16

**feel** 88:12 169:13 180:5 219:21

**feelings** 215:24

**fees** 90:4

**fell** 123:25

**felt** 56:9,10 178:15 207:7

**figure** 112:4 151:5

**file** 101:12,14,15 103:19 142:17, 18,21,25 143:7

**files** 71:14 101:2

**fill** 53:16,17

**filter** 187:21

**final** 58:15

**finalized** 14:13

**find** 41:24 42:8, 17

**fine** 24:22 169:17 211:10

**finish** 7:7 10:24

**firing** 44:12

**firm** 12:11

**fits** 201:2

**five-minute** 93:15 139:4

**flag** 148:21 149:9 150:8

**focus** 53:15,23

**follow** 128:4,5, 23 171:1 195:4

**follow-up** 211:1

**foremost** 125:1

**form** 21:22 22:8, 17 23:5,20 33:17,24 34:10 37:16 52:1 53:10 54:8,23 60:21 62:9 64:23 85:24 91:22 93:4,10 115:14,18 143:17,19,23 144:3,9 201:11

**formal** 7:13,18 60:1 61:12,23 62:7,13

**format** 77:16

**formation** 176:23 213:23

**formed** 212:2

**forms** 168:21

**Francisco** 213:9,14 218:1

**free** 71:10 183:14

**frequently** 52:13 141:15 182:24

**front** 11:15 37:6

Atkinson Baker, a Veritext Company
www.depo.com                                      Index: froze..identification

46:17 72:1 90:3
103:21 110:23
161:22 163:14
184:18 187:10
188:22 189:11,
24 191:25

**froze** 214:17

**Frozen** 216:22

**full** 171:21 186:8
212:3

**fully** 60:19

**function** 116:17
145:8

**functional**
60:19 61:3

**functions**
142:24

**future** 100:2

---

**G**

**gain** 36:4

**Gate** 213:14
218:1

**Gate's** 213:9

**Gates** 9:9,12,17
211:5,11,14,20
213:6 214:24
215:5,6 216:3,15
219:22 220:5,6,
12,17,19

**gave** 56:8 83:16
107:4 108:6,18
118:23 136:7
146:5 171:21
205:6 208:12

**general** 23:14
69:17,18 77:4
117:25 118:8

**generally** 26:5,6
30:25 31:1 72:7,
8 145:23

**generated**
218:10

**Getty** 7:24,25

14:2,3,7,8,20,23
15:12,15 16:3
19:3,6,13 55:13
105:4,6,10,16,
18,19,25 139:12
181:12 183:13
184:1 186:7
213:24 214:8

**give** 12:9 13:1
34:12 47:8 65:8,
25 66:20 110:18
118:19 130:24
133:21 135:8
153:19 157:11
167:9 169:21
170:13 172:15
181:24 209:16

**giving** 170:24
171:6,14

**gleaned** 192:17

**good** 10:12 25:7

**grabs** 88:19

**Grammy** 180:4

**grant** 121:2,15
123:18 207:16
209:11

**granted** 144:5
205:2

**granting** 166:22

**graphic** 7:10

**great** 99:25
185:6

**ground** 10:14
14:25

**group** 27:22
67:11

**guess** 12:3,11
190:14

**guesswork**
215:18

**guidance** 89:13
108:20,22 110:7,
20 157:12

**guide** 55:5

**guideline** 82:15

158:4

**guidelines** 7:19
25:25 26:9,12,18
27:15 28:8,17,19
29:2,6,10,14,17,
22 30:2,9,15,22
31:4,10 32:3,5,7,
10,15 33:7,8
41:15 42:10,14
55:6,7 56:14,23
57:3 58:13,21
76:2,3 78:18
80:21 81:4,12
82:4 84:2 88:24
90:12,17,22 94:3
97:24 98:6
99:15,20 100:3,
11,17 101:25
102:9,20 104:8,
23 108:19
117:10,17,20,24
118:7,12 120:21
125:10,13
149:14 150:9,16
155:7,8,12
158:10,17,22
159:3,8,15,22
171:1 172:9
206:18,23 207:4

**guides** 25:18
128:2

**guttural** 11:3

**guys** 220:4

---

**H**

**half** 93:14

**hand** 136:2

**handful** 184:7

**handles** 89:12

**handling** 220:11

**handy** 12:7

**happen** 35:21
50:16 182:24

**happened**
19:20 50:18
59:6,18 64:21
70:4 98:9 132:11

140:6 141:17,19
161:12 165:18
182:23

**happening** 17:9
20:10 41:8 51:13
73:6 79:8 80:5
129:9 141:10
142:7,9

**happy** 134:22

**hard** 119:10,17
120:22 132:6
136:3,18 141:24
142:20

**harm** 203:24

**HBO** 15:16,23

**head** 11:3 17:16
22:2 59:12 99:22
100:18 157:8

**header** 101:11

**headline** 97:11

**hear** 83:3 134:3
146:17 200:22

**heard** 27:11
36:24 83:8
137:3,14 142:6

**held** 8:10 105:7,
17,19,20

**helpful** 124:17

**hero** 16:18,24,25
214:3,5,7

**Hey** 170:1

**Hignett** 40:16,19
41:14 42:3,19
43:3,18,22,24
44:20 49:1,20
154:15 155:23
156:16 159:3
160:22 161:1,16
164:25 166:7
167:22 178:5
197:11

**Hignett's**
154:19 155:2
167:4

**hires** 29:1,21

**hiring** 28:22
44:1 144:11
149:23

**hold** 5:19 44:20
45:13 89:3 103:9
105:9 128:25

**holders** 207:16

**holding** 107:11

**home** 192:13,14

**Honeymoons**
27:24

**host** 38:19 98:18
114:5 115:6
119:10 120:22
132:6 133:13
134:2,4 136:17,
19 146:16,18

**hosted** 32:1
85:9,11 105:7
114:10,17 167:1,
3

**hosting** 77:7,10
86:2,6,7,14 87:8,
12 88:15,25
106:19

**hour** 93:14

**hours** 13:3

**HR** 30:7 48:22

**huh-uhs** 11:4

**hundreds** 22:24
54:2 147:17

**hyphenated**
66:23

**hypothetically**
180:2

---

**I**

**ideas** 69:24

**identification**
46:20 75:17
103:24 111:2
161:25 164:4
173:10 175:14
184:23 192:3

Atkinson Baker, a Veritext Company
www.depo.com                    Index: identify..interpretation

211:19

**identify** 21:24

**illnesses** 13:2

**illustrate**
180:13,17 181:1,
11 182:10 183:2
199:7

**illustrates**
177:3

**illustrative**
213:18,21

**image** 16:10,18,
21,24,25 17:12
18:16 20:18,21
31:22,24 35:22
37:19 38:17
39:2,17 48:12
52:15 58:22
77:10 84:12,18
85:4,11 86:2
87:23 88:20
89:18 90:6,19
91:2,10,24 92:2,
7 93:1,11 98:14,
18 119:11 120:7,
22 121:24
123:11 124:8,9
126:4,6 131:7
132:6,17 134:3,4
136:18,19 143:1,
25 144:6,13,22,
23 145:20
146:17,18,22
162:2,5,8
166:24,25
168:25 170:16
173:23,24 177:3
182:4 183:7
186:7 187:23
201:16 202:3,8
213:17,18,21,24
214:2,3,4,7,8,9,
10

**images** 13:10,
13,21,24 15:15,
22 16:4,8 18:21,
24 19:6,7,9,12
26:24 37:23
51:16 74:18
76:22 77:5,7
79:21 87:8,20

88:10 98:1
103:1,8 114:1
120:8 123:11
125:12 126:1,7,
16 127:15,23
133:14 138:4
169:8,25 170:4
193:14 201:7
206:11 212:24
213:20 214:1

**imagine** 219:5

**immaterial**
173:3

**impact** 11:15
138:8 172:13,18

**implication**
119:25

**implied** 119:18
136:8 146:11

**implies** 198:1

**imply** 119:20

**implying** 219:18

**import** 198:23

**important** 10:23
11:16

**imported**
115:12

**imposed** 193:23

**impression**
204:17

**in-house** 105:3

**in-person**
47:21,25

**inbox** 42:8

**include** 25:20,
22 55:13 102:5
106:11 112:13
114:22 118:19
132:9,25 133:12
134:7 136:5,20
150:21 169:9

**included** 29:4
41:20 106:1
134:5 136:4
146:19 156:2

157:20,24 158:6
180:16,19
213:16,19

**includes** 98:2
112:20

**including** 66:13
197:20 203:20
212:25

**incorporated**
198:6,10

**incorporates**
186:12

**incorrect** 138:2

**independent**
119:24 140:1

**indicating**
85:21

**indication**
65:25 174:21

**indications**
215:21

**individual** 113:8
189:15

**industry** 26:14
28:10,13 33:20
34:6,21 36:4,9
45:12 56:15
108:1 110:17
128:8 129:1
135:9 145:15,23
149:14 180:1
187:3 208:22

**industry-
standard** 33:21
34:6 77:4 81:21

**industry-wide**
205:9,10

**inform** 128:25

**informal** 61:8

**information**
13:13,15 50:3,6
71:4 106:1 107:3
115:17 153:19
154:19 155:1,12
195:12 196:18

**informative**
180:20

**informs** 36:19

**infringed**
150:13

**input** 76:12
107:10

**inquired** 99:15

**insight** 216:10

**inspired** 213:10

**Instagram** 32:4
37:15,23 38:3,6,
15,23,24 39:1,3,
12 50:14,22
51:2,7,22,23
52:8,15 54:6,12
56:22 57:2 58:11
63:7 64:10 71:2
72:16 73:2,10,
13,21 74:9,17
75:3,8,10 77:21
78:11 79:9,13
81:5,20,24 82:6
83:24 91:12
92:8,19 93:3,9
106:19 113:19
114:20 115:13
127:22,25 128:2
129:3 132:18,25
133:13 134:8
136:5,20 137:22
142:4,11,12,17,
21,24 143:15
165:5,10 166:13
186:24 193:8,18,
23 196:17,22
198:22,24 199:3,
14 201:7,17,21
202:3,7,11,17
203:2,7,13,23
204:23 205:2,6,
15,18 206:21,24
207:5,8 208:2,3,
12,18 209:2
210:6 212:24,25
213:3 214:10

**Instagram's**
74:13 114:23
123:16 128:4,6,
20 129:16 130:7

132:10 143:8
171:1 191:20
199:22

**Instagram.com**
82:12

**instance** 17:18
21:17 22:9 30:8,
11,14 41:9 50:21
51:1 63:9 106:5
182:16 190:25
214:8,16 217:19

**instances** 17:20
52:7 63:6 138:13
141:21

**instruct** 12:18

**instructed**
61:22

**instruction**
109:17

**instructions**
115:1,2,5

**intellectual**
29:1 59:16 106:9
108:7 203:21
204:8,14

**intended** 87:8,
16

**intends** 170:8

**intent** 81:23

**intention** 89:22

**intentionally**
30:12

**interaction** 9:22
58:24

**interest** 37:3

**internal** 102:24

**internally**
142:25

**interpose** 12:17

**interpret**
166:11,17
206:15

**interpretation**
166:11 167:16

Atkinson Baker, a Veritext Company
www.depo.com

195:15,16
205:14 206:9
208:23 216:4

**interpreted**
167:14

**interpretive**
208:15

**interprets**
195:23

**interviews** 94:8
96:21 97:15

**introduction**
37:12

**involved** 40:4,7,
9 44:1,12,23
45:4 51:15,18
52:19 53:4 54:24
59:22 60:22
61:15 62:19
65:14 66:14 70:5
111:23 113:15
116:15 147:16
149:23 151:2,8
152:2,6,17,19,24
155:9 156:12
159:18 160:6
172:6 185:5
190:17 216:7

**involvement**
52:24 54:19
116:19 151:24
152:4,8,12

**involving**
111:19

**irrespective**
126:18

**Island** 7:7

**isolate** 22:25
23:7

**issue** 58:19,20
63:5,21 94:14
126:4 149:9,11
151:25 153:21
171:19 176:8,9
185:24 196:13
197:14 198:7
210:2

**issues** 124:23
150:23 151:6,13

**item** 176:13
178:5

**iteration** 100:12
101:25 102:5
104:7,10,18,23

**iterations** 100:2

---

**J**

**James** 66:18,22
67:7,15 68:5,8,
11,21 147:11
148:6 175:9
216:9

**James's** 66:20

**January** 49:9,13
55:2 57:14,21
173:16,18,22
174:7

**jargon** 167:12

**Jersey** 5:1

**job** 13:21 52:16
150:2,20

**joined** 14:23

**journalistic**
172:17 219:4

**JPEG** 142:21

**June** 74:23

**jury** 11:15

---

**K**

**Katherine** 40:14

**Kaytmaz** 30:7

**key** 16:10,13,16

**keywords** 42:13

**kind** 26:23

**knew** 26:14

**knowing** 158:12
220:1

**knowledge**
29:18 36:5 44:25
57:4 101:25
108:1,8,22
116:13 117:22
119:1 121:12,14,
17 130:8 142:3,5
143:6,9,13
153:20 154:18
155:11 156:4
160:16 176:1,2
190:9,20 191:23
202:9 205:20

---

**L**

**lack** 121:21
122:10 133:24
146:25

**lake** 176:18,24
177:3,11,13
180:22 190:8
191:10 212:1,8
213:12

**language** 11:1
74:8 89:9,10
94:7 96:5 100:7
114:3 169:15
175:2 205:6
207:13

**late** 27:18 74:20

**law** 12:11

**laws** 117:25
203:18

**lawsuit** 51:14
153:14

**lawyer** 9:2 47:9
89:3,8

**lawyers** 107:7

**lead** 16:21 77:3
166:5 214:3

**leading** 213:5

**lean** 187:14

**learn** 64:12
179:22 184:11

**leaving** 44:7

**led** 106:25

**left** 44:5 45:2
117:14

**legal** 7:21 21:12
59:21 85:19
86:24 89:12 90:4
107:10,15 109:1
110:13 118:9
132:16 134:11,
18 203:24

**legalities** 79:21

**Leiann** 30:7

**length** 178:6

**levels** 150:17

**liability** 203:24

**library** 102:24
103:3

**license** 88:3
139:12 144:18
145:19 181:18
182:12 183:3,25
184:1 207:16
218:4

**licensed** 147:7

**licenses** 13:12
144:19

**licensing**
143:25 145:24

**Life** 27:25

**light** 139:1

**limited** 86:6
116:20,21
203:20

**link** 31:25 35:20
37:19,25 38:4
91:13 113:19
114:13,16,20
115:6,16 118:20
132:9,18 134:5,7
136:4,5,20,21
142:18 146:19,
21 169:1,10
199:14 201:17
212:25

**linked** 114:4

**Linkedin** 72:16

**Linking** 87:9

**links** 86:11 87:9
132:25 133:13

**list** 151:18 158:7

**listen** 91:15
122:4 124:22
148:24 171:8

**live** 103:2 147:8
162:11 217:13

**local** 27:4

**locate** 43:8

**location** 12:13

**London** 68:10
71:22 117:7,18,
21

**long** 5:22 6:2,13,
23 7:7 12:10
25:2 27:10 34:21
36:5 71:4 74:5
77:12 78:8
178:4,16 180:1
218:16

**longest** 27:23

**looked** 64:14,17
70:11 76:18
115:25 116:9
143:24 166:13

**loop** 109:9,10

**lot** 27:11

---

**M**

**Madam** 10:20
35:4 134:12
197:5

**made** 23:22 29:8
82:2 89:14
102:12 120:14
155:13 163:17
170:18 219:20

**magazine**
13:10,11 18:5
27:6,20,22 28:1
40:24 41:5,7,11,

12 52:20,22
53:15,17,23
156:22 178:21

**main** 14:9 47:10

**maintain** 102:23
210:10

**majority** 69:6

**make** 10:20
11:5,10,11
12:14,23 13:12,
15,17 20:24
21:10,14 28:23
58:2 93:1 102:15
150:3 162:15
164:7 181:17
199:16 219:23
220:13,21,22

**makes** 116:17
185:5

**making** 194:1,
22

**manage** 165:14
198:23

**manager** 28:22

**manages**
165:16,24

**Manifest** 6:8 7:1

**manipulate**
178:3

**manner** 37:14
39:2

**March** 5:1

**mark** 110:24
161:22 174:11

**marked** 37:6
46:17,19 75:16
103:23 111:1
161:24 164:3
173:9 174:18
175:13 184:22
192:2 211:18

**mass** 158:7

**material** 55:8,
11,13 59:15
106:2 113:7
122:23 125:6

127:1

**matter** 58:15
108:19 109:19
172:22

**matters** 89:12
107:15 109:1

**Mcgucken**
20:14 22:6 23:2
39:23 44:8 48:7
49:4,7,10 50:1,
10,25 54:5 55:3
56:12,22 57:2,20
58:8,11 63:21
64:8 66:2 110:24
112:25 118:23
119:5 120:3,9
121:9 122:8
130:20,24
131:23,25
133:17,21
140:24 146:4
147:1 151:24
154:4,8,12,16,21
155:3,14,23
156:10 162:10
163:13 166:8,17
168:3,9 175:25
176:4,8 185:24
186:3,12,14
188:23 196:13
199:10 201:11
202:18 206:5
207:23 208:5
210:2,11 216:21
217:15 218:5,19,
24

**Mcgucken's**
21:18 111:19
132:13 134:17,
25 135:12,18,22
163:8 171:20
174:3,6 180:12,
25 182:6 186:24
190:3 194:7,13
196:11 197:12
198:19 199:4,23
200:17 201:1,19
204:7 205:7
208:13 209:4,12
212:21 216:14,
23 218:13

**meaning** 85:2

**means** 77:15
181:14,15
197:25

**meant** 95:11
157:25

**measurements**
12:2

**medal** 18:17,21
140:8

**media** 15:25
16:4 19:17 20:6,
19 21:20 22:1,6,
14 23:4,18 25:24
26:12,17 28:8
30:14 31:4 33:9,
14 37:15 41:15
42:10 56:13 57:3
58:13,21 63:8
78:8,17 79:21
80:10,21 81:3,12
82:4,15 84:3
85:22 88:23
90:11 94:2 97:24
98:2,5,16 99:15,
19 100:3 106:2
108:7 117:10
118:7 125:10
135:15 141:6,7,
23 158:4,9
159:15,22
206:18,23 207:4
213:19,20

**meeting** 8:21
107:8,11

**member** 17:22

**members** 54:11
97:23 159:14,23

**mentioned**
24:13 38:13
139:18 156:25

**mentions**
167:10

**message** 69:1
119:14,16 167:9,
16 175:24 176:3
197:10

**messages**

71:14

**metadata**
103:18

**middle** 74:20

**mind** 10:9 189:4
215:7

**minor** 104:12

**minus** 64:9
112:23 116:5

**minute** 210:23

**minutes** 93:17
185:15

**Mischaracteriz
es** 35:2 78:14

**missed** 214:18

**misspellings**
13:18

**Mixed** 7:10

**mode** 217:10

**model** 139:14

**modified** 186:19

**moment** 31:8
46:22,25 81:15
82:10 99:9 104:2
111:4 139:1
164:6 167:9
187:16 209:16
210:19

**Monday** 67:8

**month** 8:5 9:19

**months** 17:10
72:24 73:3
155:19

**morning** 64:18,
21 76:19

**mouth** 131:12,
21 172:21
179:16 191:18
195:24 196:9

**move** 83:19 93:6
120:3 181:25

**moved** 27:5
181:22

**movie** 16:17

**multiple** 65:2
135:6 166:3
201:14

**murderer** 157:6

**murdering**
43:17 156:22

**muted** 215:2

──────────

**N**

**names** 25:8 65:8
99:24

**naming** 211:8

**Nancy** 24:17
30:5,6 48:22
65:14,17,21
68:21

**narrows** 97:8

**Nassau** 7:6

**nature** 12:2

**necessarily**
103:2

**needed** 26:16
63:19 69:24
95:18 98:14
207:9

**nervous** 24:20

**Netflix** 15:16,19

**news** 13:10
16:17 19:6
170:15 180:3
188:4

**newspaper**
27:4

**newsroom**
69:25

**Newsweek**
5:18,23 6:2,5,9
8:11,20 9:23
12:7 13:7 14:4,
22 15:5,9 16:22
17:1,4,5,19,21,
24 18:2,8,9 19:2,
14,16,17 20:7,20

21:17,19 22:1,4, 15 23:3,16 26:3, 13,17 27:9 28:9, 16 29:21 30:10, 15,17 31:5 32:11,15,21,25 33:13 34:22 37:22 38:9,14 40:6,20 42:8,14 43:25 44:4,11, 16,20,22 47:4 49:3,6,9,25 50:13,21 51:1,6 52:11,17 54:11, 13 56:21 57:1,7, 20 58:21 59:2, 14,16 60:1,20 61:8,23 62:2 68:13 69:6,12 70:2,10,15,19,21 71:9,13,21 75:15 76:12 77:17,18, 23 78:10 79:1,12 82:11,15 85:3 88:24 91:4 94:24 95:17 97:22 102:19,23 103:5, 6,12,17,22 105:4 108:6,18 109:18 113:1 114:17 115:5,7 116:24 117:24 118:14, 21 119:5 120:10, 16,17,25 121:8, 15,19 122:9,15, 17 123:7 125:2, 23 126:9 127:9 128:10,22 129:15 130:6,13, 19 131:2,22 132:2,12 133:17, 21 134:17,24 135:13,17,21 137:11,13,21 139:11,16,25 140:10,21,23 141:5,11,18 143:16 144:19 145:1,6 146:6,11 148:8 149:3 150:2,20 151:7, 12 158:21 159:2, 7,13,21 160:21, 25 161:16,23

163:7 164:2 165:3,6,9,12 166:21 167:23 168:8,17 169:21 170:8 172:1,4 173:8 174:6,16, 24 175:12,24 176:3 177:23 180:10,12 182:15 183:1,17, 22 184:3,4,12 186:1,10,23 190:2 191:19,25 194:7,12,16,21 195:7,9,19,22,25 196:10,23 197:11 198:7,16 199:3,11,24 201:10 202:6,10, 17 203:1,11 204:2 205:16,17 206:4,18 207:22 208:5,11 209:18 210:10 211:16 212:16 213:17 216:13 218:8,12, 18 219:14

**Newsweek's** 33:9 39:4,13 46:11,14 51:23 52:6 53:22 59:19 61:18 66:2 68:9 71:18 78:7,21 81:23 84:2 111:24 114:5,10 118:7 122:23 123:5,18 124:3 125:5,10 126:2, 25 127:18 130:10 132:20 136:12,22 137:10,21 144:8, 17 149:16 168:1, 16 169:19 170:7, 21 171:12 174:7 183:11 184:20 189:8 194:6 195:6,13 196:21 204:6

**Newsweek.com** 45:23 46:6 50:11 52:9,18,25 53:6, 9,13 54:1,5,16

78:9 79:2 82:5,7, 14 83:23 84:1 90:25 91:1,19 92:2,14,15,18 146:22 147:8,22 148:1,11 149:5 151:14 152:10 155:15,24 201:19

**Newsweek. com.** 20:23 21:9 185:25

**newsworthines s** 35:19,25 36:11, 24

**newsworthy** 36:6 77:25 78:3, 4,9 82:18 84:11, 17 123:24 126:6 178:17,22 179:1, 3,12,19,23 180:6

**nods** 11:3

**note** 79:20 204:21

**notes** 209:17 210:23

**notice** 37:8 45:8 46:18 58:22 62:2 169:18,20,21 170:6,7,13,14, 17,24 171:15 172:15

**notices** 59:20 60:3 61:8,19,24

**notwithstandin g** 121:3,21 122:9, 24 131:2

**November** 8:6 49:3 58:8 111:10 153:17 155:18

**nuance** 133:12

**number** 12:7 20:6 62:20 87:22 88:2,5 212:17,18 216:17

**numbered** 100:11

**numerous** 141:11

**O**

**oath** 89:16 93:24 99:7 139:9 185:21

**object** 33:17,24 34:10 37:16 54:8 60:21 62:9 64:23 213:4

**objection** 21:2, 11,22 22:8,17 23:5,20 35:1,15, 18 36:7,13 45:17 46:9 49:22 51:9 52:1,10 53:10,18 57:16,22 58:14 61:10 62:14 63:2 67:24 78:13 79:16 80:12,17, 22 81:7 82:1,8, 17,22,25 83:4 84:4,21 85:19,24 86:23 87:14 89:2,25 91:6,22 92:5,20 93:4,10 95:20,25 96:6,18 97:10 99:21 103:14 105:15 107:12 108:11 109:4,20,24 110:11 113:10 114:7,12,19 115:8,14,18 117:11 118:3,17, 25 119:8 120:1, 5,12,20 121:5, 11,22 122:12,18 123:1,9,21 124:6,15,24 125:7,18,25 126:5,13,20 127:4,11,14,21 128:12 129:4,13, 23 131:5,11 132:4,15,24 133:5,11 134:1, 10,18 135:1,5, 14,19,25 136:16, 24 137:4,16,25 138:10 140:3,25

141:8,13 142:23 143:14 144:20 145:3,13 146:1, 7,13 147:9,15 148:3,12,18 149:1,7,12,22 150:14,24 151:15 152:15 154:22 155:5,16, 23 159:4,10,16, 24 160:13,18 161:19 163:10, 23 167:18 168:5, 13,20,23 169:6, 24 170:11,25 171:16 176:22 177:2,7,16,25 178:12,18 179:6, 14,24 180:7,15 181:3,19 182:2, 9,13,19 183:15, 20 184:6,16 186:4,15,20 187:5,12,19 188:9,25 189:5, 12 190:16,23 191:4,22 192:19 194:14 195:10, 14,20 196:4,14 197:2,15 198:8 199:6,12,25 200:5,19 201:4, 12,22 202:1,20 203:5 204:4,9,16 205:8,13,19 206:8 207:6,25 208:8,14,21 209:6,13 216:2,3 219:22

**objections** 12:18,21

**obligations** 13:8

**obtain** 9:2 15:11 119:6 126:3 145:18,19 162:7 181:12 197:19 199:22 201:20, 24 203:2 207:23

**obtained** 127:10 218:4

**obtaining** 33:23 127:2 181:16 183:13 207:14

**obtains** 139:11

**occasion** 9:1 70:25 117:7

**occasionally** 53:2 60:8 97:25 98:7

**occurrence** 179:20

**occurring** 59:9

**October** 40:3 47:15 48:1,5 57:14,21 58:8

**offer** 140:23 144:13

**offered** 105:11

**offhand** 207:2

**office** 68:9,10 71:22,23 117:7, 18

**officer** 25:13

**offices** 8:10 117:21 118:13 166:3

**official** 165:6

**one's** 54:15 188:13

**one-time** 88:3 184:9

**online** 8:7 63:25 64:1 140:17 155:20 210:3

**open** 90:14,18

**opens** 90:8

**opining** 81:8

**opportunity** 11:9 141:3 164:10

**opposed** 11:2 19:3 21:7 88:25 91:20 190:4

**oranges** 188:10 189:2

**order** 129:17

**ordering** 220:19

**organization** 172:17

**organizations** 214:22

**original** 114:5 219:6

**originally** 77:16 184:10

**originated** 38:15

**outcome** 204:11

**outreach** 202:16

**outset** 195:18

**owned** 74:18 204:22

**owner** 183:3 195:3

**owners** 193:25

**owners'** 194:2, 23 196:25

**ownership** 184:15

**owns** 103:6,12

**— P —**

**p.m.** 5:1 93:21

**package** 29:4

**paid** 71:10 172:4,8 181:13 182:16

**paid-for** 217:1

**paparazzi** 188:8,24 189:9, 13

**paragraph** 76:21 84:25 88:6,7,9,14 94:2,

3,6 95:11 96:14 97:11,17 100:4,7 102:5,7 104:12, 15,21 193:10,20 194:8,12,17,20 195:7 196:1 197:18 198:15, 17 200:2 201:3 202:19,25 203:15 205:22 207:11,24 208:6

**paragraphs** 100:11 177:12 212:13

**Parenting** 28:1

**part** 13:20 48:14 52:16 53:3 105:3 159:2 180:16 184:8 190:4,22

**parties** 127:1 139:20

**partitioned** 117:19

**party** 31:18 164:14 220:14

**passed** 29:6

**past** 35:8,21 43:10 59:7 62:21 68:15 69:21 72:19 86:21 156:18 161:17 192:24

**paste** 113:20

**pasted** 38:4

**pattern** 51:6

**pause** 164:9 175:1 176:10 210:24

**pay** 139:12 140:10 182:11 183:2

**paying** 140:1

**payment** 140:14 181:18

**penalize** 160:8

**penalized** 159:13

**people** 8:13,15, 16 24:3 44:2 48:17,21 62:6 65:2 100:13 108:25 117:16 129:1 138:22 150:16 151:16 158:24 159:5 166:3 179:9,11 203:23

**percent** 19:12

**percentage** 19:1

**perception** 217:8

**perfectly** 189:20

**performed** 219:14,17

**period** 220:25

**periodically** 26:16

**perjurious** 219:21

**permission** 20:19 31:17 32:18,25 76:23 77:6 85:3 89:17 90:8,20 94:10 95:14,18 98:20, 22 118:19 120:6, 7,23 121:20,23 123:12 126:15 127:10,22 131:6 132:5 133:1,3,14 134:2 136:2,4, 10,11,19 144:5, 13,22 146:16,19 166:24,25 167:3 168:24 169:1,8, 9,25 170:1,4,17, 19 181:21 193:15 197:25 198:2,25 199:23 200:3,9 201:20, 24 203:3 208:17

**permissions** 100:14

**perpetuity** 140:16

**person** 8:7,8 16:7 18:20 30:7 38:16,23 39:16, 19 44:18 65:4 66:14,17 98:14, 25 99:18 107:14 145:21 147:24 158:1,6 203:20

**person's** 99:5, 14 197:19

**personal** 9:2 26:18 35:11,12 61:2 73:21 76:9 87:2 107:4 108:8,21 109:15, 17 110:8,10 116:13 142:18 156:4 162:22 165:5

**personality** 203:22

**personally** 17:3 38:7,8 115:3 138:17 161:20

**pertains** 156:10

**phone** 47:20 48:3 65:19 67:5, 16

**photo** 6:22 7:2, 15,20,23 13:16 26:15 28:6 35:13 36:9,15,20,21 37:14,22 42:15 53:19 64:2,3,5,7 69:12 70:11 76:2 97:18,23 117:3 156:2 178:21 184:3 213:2

**photograph** 16:23 17:19,21 20:13 21:18,19, 25 22:5,6,13 23:3 33:22 34:7, 8,22,23 35:13 36:5 38:14,22 39:3,19 54:13 55:3 64:8,13,20 65:1 70:2,3

77:22 78:11
79:13 82:12
83:24 91:18
92:15,16,22,24
93:8 111:24
112:14,25
114:10,16 115:6,
12 118:15
132:13,22
134:17,25
135:12,18,22
136:22 137:12,
15,22 139:19,20
140:24 142:16,
17 144:19
155:24 156:5
162:11 163:8,14
167:23 171:20
174:3,6 176:21
177:1,6,15,24
178:3 179:19
180:5,13,25
181:10 182:10
183:1 186:3,12,
14 187:2,4,11,18
188:5,7,22,24
189:10,21,23
190:3,5,14,21
196:13 197:13
198:6 199:10
200:17 201:1,11
202:18 204:7
205:7 206:6
210:3,12 216:14,
21,23 217:15

**photograph's**
34:24

**photographer**
18:3,8,18 19:4,5
70:1 119:15
120:17,18,25
121:2,13,14,17
122:19 123:17,
22 124:4,7
125:3,4,15,22
126:11 130:11
132:8,22 136:15
137:3 144:18
145:24 170:24
171:14,15
172:15,16
181:17 182:8,17
183:8 188:18

189:14,25
191:10 196:19
212:21 213:16
215:20 218:1

**photographer's**
90:8 123:12
124:1 150:4
170:23 176:19
177:13 178:15
190:7 191:1
212:8,14 213:11

**photographers**
17:25 18:5,6
19:10 74:16 75:9
120:16 122:16
123:6 138:14
139:17 140:2
143:18 165:4
168:17

**photographers'**
75:2 136:13

**photographing**
18:20

**photographs**
15:12,19 17:2,6
19:1 20:6 35:7,
10 39:12 69:22
79:4 80:9 81:24
103:6,12 139:12,
13 177:18
183:14,23,25
184:5,13 189:9

**photography**
5:17 6:1,3 7:11,
14 13:7 25:21
40:23 53:9,12,
14,22 64:12
69:12,13,14
102:24 111:19
122:9,10 123:8,
19 130:21 131:4,
24 132:3,21
147:6 153:8
168:12,18
169:22 170:9,23
171:13 172:11
183:12 188:14
194:7

**photos** 13:14
19:17 21:8 23:17
42:15 69:18

86:10 100:21
101:18 103:4,5
139:16 142:4
193:24

**phrase** 179:22

**physical** 41:12
52:21 85:11
87:20 88:20

**physically** 87:9

**picked** 18:23

**picture** 34:15
181:11

**pictures** 69:23
189:15

**piece** 16:22 86:9
173:3 177:10
181:6,12 213:9,
10,14 216:18
218:8

**pitch** 18:22,23

**pitched** 174:24
175:5

**pitching** 71:18

**place** 23:16
51:14 64:5
105:4,14 106:22
147:6 150:12
192:17 210:12

**placement**
54:20

**places** 184:7

**placing** 40:23
65:1

**plans** 168:17
169:22

**platform** 71:1
74:16 114:18
115:7 143:8
198:22 199:4
209:8,9,15

**platforms**
202:13 203:4

**player** 188:8

**playing** 189:16

**plural** 177:18

**point** 41:22
47:10 63:22,23
84:25 86:8 93:20
102:8,12,21
117:15 139:5
160:12 167:10
177:21 185:17
203:1 207:18
212:10

**points** 12:16
107:22

**policies** 57:24
66:2 82:9 118:7
128:1,3,4,6,20,
23 132:20

**policy** 23:17,23,
24,25 32:24
51:10 58:5 60:1
61:13,14,17
81:19 117:24
123:10 127:18
128:7,9,11
130:1,10 132:10
137:21 145:1,5,
6,11,12 194:8

**popular** 214:12

**portion** 113:15

**position** 6:21
77:9 78:7 81:12
95:2 117:2
126:17,23
136:13 146:10
147:3 189:8
195:6,13 196:21
204:13

**possibly** 183:8

**post** 22:24 34:7
38:18 41:6 49:4
57:14 58:19
82:6,14 88:2
118:15 152:22
213:19 217:9

**posted** 35:14
38:24 52:17,25
54:1,3 59:15
87:20 152:10
155:21 183:18
185:25 201:7

**posting** 17:5
26:24 38:11 46:2
147:16 152:2,5,
17 212:24

**posts** 183:23
209:19,20

**potential** 88:22
214:25

**potentially**
49:20 219:19

**PR** 15:21,22 16:4

**practice** 45:18
51:6 59:20
114:24 120:15
122:14,23 123:5,
19 124:3 125:5
126:2,8,9,25
133:4 144:8,17
145:5,14,23
168:16,22
169:19 170:7,22
171:12 183:11
218:16 219:5,10

**practices** 44:24
132:20 137:10
149:24

**preference**
63:12,13 211:6

**preliminary**
80:8

**preparation**
65:13 67:23 72:4

**preparations**
67:20

**prepare** 47:7
72:13

**prepared** 45:9
109:16

**presented**
168:15 185:9

**Press** 88:9

**presume** 70:6

**pretty** 31:14
65:7 144:4
145:14 195:1

**previous** 67:16
88:13 156:19
213:23

**previously**
107:13

**primarily** 10:19

**primary** 53:23

**print** 40:24
53:23 140:18,19

**prior** 6:4,9,17
9:21 18:24
102:19 104:14
171:15 198:24
199:23 201:20

**privacy** 203:22

**problem** 10:13
150:7

**problematic**
76:16

**problems** 90:9,
15,18

**procedure**
61:15

**proceeding**
93:20 139:5
185:17

**proceedings**
10:18 12:17 15:2
68:23 164:9
175:1 176:10
210:24

**process** 38:1,13
60:4,5,7,10 61:7,
18,23 62:10,13,
15,16,19 79:2
97:5 113:1,18
116:13 123:20
125:6 127:3
130:15 143:2
148:14 149:21
151:2,9 152:25
154:24 155:2,9
156:8,10 157:12
168:3 177:8
181:5 218:6

**processes**
147:5 148:5

**produce** 42:22
178:7

**produced**
161:18

**producing**
113:5

**professional**
26:19 188:24

**professionals**
149:14

**proficient** 211:3

**program** 69:15
70:10 71:18
113:25 114:17

**programmatic**
54:22

**project** 18:9,13

**promote** 203:19

**proper** 13:16
181:14 220:13

**properly** 35:20
147:6,7

**property** 29:2
59:16 106:9
108:7 203:21
204:8,15

**proprietary**
103:5

**provide** 12:22
16:10 58:16 76:3
89:11 121:4
132:1,14 169:20
170:7,14 195:16
203:18 216:10

**provided** 17:19
28:22 41:25
101:4 105:24
116:7 153:24
154:14 157:13,
17 164:17
175:22 195:9
196:18 215:13

**providing** 120:9
126:11 162:5
166:8

**public** 20:22
44:21 45:14

**public's** 77:22

**publication**
45:13,15,16 77:5
111:8,18 152:13
176:8 202:12
204:7 218:4

**publications**
28:3 36:17

**publish** 18:21
39:14 58:22
85:4,8,13,18,23
87:11 88:22
89:18 130:14
131:15 147:21
148:1 155:24
183:1,9 190:3
203:3 209:4

**published** 17:1,
21 40:5,8 131:3
132:2 147:8
148:10 149:5
163:8 190:22
200:17 201:1

**publishes** 83:25

**publishing** 17:5
86:6,15,22
155:14 178:2
183:12 194:13

**pull** 10:11 37:22
39:12 78:10
119:21 185:2

**pulled** 19:17
20:7 21:25 22:5,
14 23:4 37:14

**pulling** 13:10,21
15:15,18,20
21:19 23:17 37:9

**purely** 219:9

**purpose** 9:2
77:11

**purposes** 146:6
180:18 213:21

**purview** 114:8
160:14

**put** 37:5,7 46:17
48:16,19 71:25
80:1 103:21
110:22 131:20
157:2 161:21
172:21 184:18
191:18,24
195:24 215:3

**putting** 41:5
131:12 179:15
196:8 206:10
215:7

**Q**

**question** 11:17,
18,21,23 19:15
21:8,16 29:24
34:2 45:21 46:4
48:13 51:25
70:20 80:23
83:15,18 84:5
90:24 91:15,16
92:10,11,13
98:5,11,13
102:16 108:4,14
109:11 110:7
115:20 118:5
120:2 121:7
122:1,3,4,5
124:12,21,22
126:22 128:17
129:7 130:18
131:15,18 133:6,
8 134:21 137:6
140:22 143:11
147:11 148:6,24,
25 151:21
152:11,16
166:14 168:7,15
169:11 170:6
171:7,8,9 180:11
192:20 201:14
202:5,24 209:18
211:1 212:1

**questioned**
81:18

**questions** 12:4
15:4 21:5 37:11
45:10 56:9 66:15
97:25 117:17
134:6 136:2

137:17 149:24
151:18 210:15
214:25 215:1,13
220:5

**quick** 93:15

**quote** 77:5
89:17 90:18
94:7,17 95:13
194:21 196:25
203:17 205:10
213:15 218:17,
19 219:6

**quote/unquote**
173:23

**quotes** 167:8
218:13,24 219:2

**quoting** 212:14

**R**

**R-I-C-E** 5:12,13

**ramifications**
118:9

**ran** 41:4,5
156:21 216:13

**random** 34:16
189:15 199:8
200:10,11,12

**range** 28:3

**Re-download**
88:4

**reach** 48:25
121:13 122:15
123:5 141:5
165:4,13 182:7
208:5 218:24

**reached** 119:1,
5,9 120:25
130:11,20
132:21 133:17
136:14 137:2,13,
23 138:6 196:2
203:2 218:19

**reaches** 120:17
125:2

**reaching** 141:23

142:1

**read** 52:11
72:15,17 73:23
75:11 83:15,18
87:12 90:25 91:2
115:2 128:7,21
129:22 130:1
158:9,13 164:8
176:14,15
192:12 193:3,21
197:18 200:2
203:16 204:20
206:21 207:13
220:11

**readers** 46:2

**reading** 74:1,8,
13,15 96:4 128:9
129:16 192:10

**real** 175:11
176:7

**realize** 202:23

**reason** 12:25
58:24 100:23
123:25 180:25
181:7 208:6

**reasoning**
49:15,24 57:18

**recall** 9:11,17,25
15:14 17:9,14,
18,20 18:7,12
21:19 22:4,22,23
23:2,8,10,13
25:1,4,23 26:1,2,
5,7,10 29:14
30:2,11,14,19,22
31:4,7,9 33:6,10,
11,18 36:23,25
39:10 40:1,12,14
41:8,10 43:13
47:24 48:3 49:23
50:21,24 51:1,12
52:12,14 55:19
59:11 65:9 66:3
68:17,19,24
72:20,22 73:1,6,
7,10,17 74:1,4,6,
8,10,12,15,21
76:11,14 78:24,
25 79:8,12,19
85:16,21 87:3

89:7 94:11 98:23
99:1,2,8,9,13,16,
18 100:9,16
102:14 104:21
105:13,25 106:4,
6 117:14 138:17
139:25 140:6,13
143:4 144:2
156:15 157:5,8
162:14 166:1,2
171:23,25
185:11,13 192:9
197:10 198:5
207:1,2,3 214:11
217:20

**receipt** 220:24

**receive** 32:22
33:1,4 60:14
127:20 132:23
133:3 166:7,12

**received** 26:8
126:19 130:13
157:16 158:3
214:15

**receives** 28:24
62:2,5

**receiving** 18:16,
20 122:7

**recent** 18:16
140:7

**recently** 192:18,
22

**recess** 93:21
139:6 185:18

**recipient** 42:10
43:4 140:9

**recirculated**
29:8

**recognize** 75:23
104:3,5 164:13
173:12 175:16
211:22

**recollection**
22:11,19 40:17
75:7 104:15
119:24 138:19
212:5 213:2
216:12

**record** 5:10
10:19 12:19
48:23 93:16,23
124:23 128:14
130:3 185:15,20
210:17 220:9

**records** 78:21
154:2 168:1
216:6

**red** 11:13

**redirect** 215:1

**refer** 20:20
32:11 86:14
88:19 149:13
213:13

**reference** 13:18
16:16,20 32:6,9
86:2 88:10,15
96:19 116:8
182:3 191:5,7,9
206:10 207:20
208:1

**referenced**
144:1 191:11
217:25 220:1

**references**
176:18

**referencing**
27:1 84:12,18
194:11

**referring** 9:8
15:3,5 20:21
52:21 64:8 88:1,
25 89:18 90:5
95:3 96:1 101:8,
12 173:24,25
191:8 201:8
212:16

**reflect** 28:13
81:4,12 103:12
111:18 128:14
130:4

**reflects** 78:22
187:18

**refresh** 40:16
104:14 212:5
213:1 216:12

**regard** 26:8
81:17 106:15
143:13 145:7
160:17

**regular** 91:1

**regularly** 53:25
90:25 128:25
141:5

**regulations**
203:18

**relate** 34:18 63:7
127:15 154:11
202:19

**related** 15:17
29:1 43:11 55:7
97:13 109:18
181:6

**relates** 22:21
53:6 95:9 97:4
117:25

**relating** 7:13
33:8 36:17 42:9,
23 43:13 55:17
78:7 104:16
108:6,18 118:1
122:8 153:20
154:3,7,19
155:1,13 156:16
157:1 161:1
178:9 197:13
202:7,11

**relation** 42:4,6,
20 43:16 55:23
72:9 79:9 84:11
87:19 95:6,21
126:7 153:25
154:5 178:24

**relationship**
44:11,16

**relationships**
198:24

**relayed** 50:4
62:6

**release** 143:17,
19

**relevant** 7:22
71:15 138:12
201:23 204:20

207:13 212:25

**relieve** 210:15
220:8

**rely** 149:19
183:12,13

**relying** 116:12

**remained** 210:5

**remains** 77:15

**remember**
21:25 24:22,23
59:8 98:12 99:4
121:25 195:17

**remembering**
99:25

**removal** 44:2

**remove** 48:6,8
49:4,7,10 50:10
55:2 58:3,7
62:25 100:3
101:6

**removed** 50:2
59:3 63:4,16,18,
21,24 64:6
100:6,10,15
101:10 174:6
210:6 217:17

**removing** 37:19
75:10 173:23

**repeat** 83:11
126:21 131:18
200:23

**rephrase** 34:2,4
52:4 56:24 81:1
83:20,21 85:20
90:13 128:17
134:22,23
192:20

**replaced** 64:2,3,
12,15 210:8,9

**report** 160:5

**reporter** 10:20
12:20 17:11,18
19:10 35:4,5
45:14 83:11
134:13,14
139:18,21,23

Atkinson Baker, a Veritext Company
www.depo.com                                    Index: reporters..service

197:5,6 210:16
220:8,10,15

**reporters** 13:15

**reporting**
159:18

**represent**
205:23

**represented**
9:4

**representing**
9:23

**request** 16:7,9
32:15,21 38:17
48:6,8 49:16
85:3 89:17
119:16 120:6
121:1 124:4
125:3,15,16,22
130:11,20
131:23 132:7
136:7 145:20
160:1 166:18
167:4,13 168:9,
24 169:1,7,9,25
170:1

**requested**
28:23 31:18,20,
21 49:14 132:5
168:7 219:2
220:10

**requesting**
13:24 76:22 77:6
100:13 121:9
144:7 175:25

**requests** 32:25
60:15 144:21

**require** 127:22

**required** 8:20
32:15 120:8
121:23 126:15
131:6 144:12,14
166:24 198:4
200:1,3

**requirements**
193:22 194:2,23
195:4 196:11,16
197:1,12 207:5

**requires** 11:1
145:24 195:7

**research** 13:23

**reserved** 205:2

**respect** 124:1

**respective**
193:25

**respond** 55:9
61:24 110:2,4
119:3 120:9
121:18 122:22
124:11 125:5,16,
22 126:11
130:25 131:3,25
133:23 136:3,7
138:7 144:22
145:21 166:18

**responded**
141:3 219:1

**responding**
59:20 60:2 61:19
124:19 125:19
146:10

**responds** 61:8

**response** 12:4,
22 35:4 59:3
65:24 120:13
121:21 122:7,10,
25 123:2 124:19
132:8 133:25
137:14 146:17
166:7,13,15
196:9 204:12
215:12

**responses** 11:3

**responsibilities**
150:21

**responsibility**
149:4

**responsible**
29:5 65:1 113:8
162:4 194:1,22
207:14

**responsive**
122:3 171:7

**restrictions**
193:23 194:3,24

195:1,8 196:2,
12,22 197:1,13

**result** 32:25
49:19

**resulted** 49:20

**review** 11:9,10
24:4 52:17 53:25
72:3,7,12 110:14
148:19 149:4
150:3 151:12
164:11 167:25
192:17 206:23

**reviewed** 41:23
42:1 46:13 52:6
72:8,19,21 75:7
153:18 157:14
176:11 184:25
185:7 192:22,24
220:21

**reviewing** 73:1,
10,20 148:8
150:15,21
185:11 205:6

**revision** 11:11
102:11,15

**revisions** 11:10
31:10 102:8
220:22,23,24

**Rice** 5:9,11
93:23 173:22
215:12

**right-hand**
162:23

**rights** 59:17
105:3 150:4
203:19,21,22
204:8,15 205:1,
24 206:5 207:15,
23

**role** 7:22 14:4
25:17 37:21
53:5,16 68:12,13
147:14

**room** 8:16 9:7

**rough** 112:16,18

**row** 83:6

**rule** 14:25

**ruled** 80:8

**rules** 10:15
160:6 196:16

**ruling** 80:16,18,
23

**rulings** 81:2,8

**run** 24:2 54:16
57:14,20 172:1

**running** 13:11

**S**

**S-L-A-C-K**
69:10

**sale** 54:20

**San** 213:9,13
218:1

**Sara** 211:2

**sat** 128:23

**save** 90:3

**scope** 45:8
103:15 159:25

**screen** 37:7
88:19 129:6
175:16,18,21
211:1,16 215:4,8

**screencap**
162:15 163:18

**screencaps**
104:16

**screenshot**
39:8,14 95:19,23
96:12 102:22
106:18 112:25
119:21 171:21
176:8

**screenshots**
94:15 95:4,7,9
96:2,14 97:9,12
102:17 112:20
116:7

**scroll** 46:23
75:20 87:25

104:3 164:7
167:8 174:22
192:5 212:11
216:16,20

**search** 42:18,19
43:2,6 71:1
123:6

**searched** 42:12

**searching**
71:14

**section** 73:24
203:16 204:20

**secure** 206:5

**secured** 205:24

**seek** 107:10
133:1,2 169:20

**seeking** 127:1
142:2 144:13

**selected** 213:3

**seminar** 105:4,
6,10 106:1,8,11

**send** 16:8 24:2,
10,15 39:16
55:11 100:13
111:14 142:4
143:1 163:18
220:12

**sending** 39:19

**sense** 11:5
12:14,23 20:24
21:10,14 180:21
185:5

**sentence** 94:16
95:9 96:16

**separate** 87:10

**separated**
45:15

**separately**
168:8

**separation** 44:4

**service** 72:15
73:2,11 74:9
193:8 204:18
208:16,20,24

Atkinson Baker, a Veritext Company
www.depo.com

**session** 7:24
8:1 11:8

**set** 32:2 150:16

**SFGATE** 218:2,
14

**shakes** 11:3

**share** 211:5

**shared** 35:20
117:12

**sharing** 211:15

**shot** 18:24 188:7

**show** 92:8
113:12 143:1

**showed** 171:22

**showing** 187:16

**shown** 107:13
110:12

**shows** 38:5 91:9
112:15 113:13
155:23 180:22

**sic** 114:22
130:14 150:6

**side** 112:17
172:7

**sidetracked**
146:9

**sign** 145:24
220:11

**signed** 73:13
144:9 146:5

**signing** 74:16

**Silvers** 166:4

**Silvers'** 165:19

**Sim** 116:24

**Sim's** 117:2

**similar** 114:23

**simple** 144:4,15

**simply** 12:19
48:11 122:3
124:13 126:3
155:1 171:6

198:22 199:4
200:10,20

**single** 79:12
99:18 157:25
158:5

**sit** 17:17 20:4
22:3 23:1 30:13
46:5 50:8,20
74:7 79:11 99:17
119:23 154:25
158:2 159:20
185:4 190:19
197:9 204:15
219:24

**site** 15:21 19:2
20:7 31:25 32:1
33:9 38:14,19
39:4,13 48:13
52:6 53:6 63:8
64:15,17,19 77:8
89:19,20 90:7
106:19 119:11
123:13 134:4
136:22 138:16
146:17,18 150:5
169:5 172:12
183:19,24
186:23 194:10
196:16 201:6
206:11 217:10

**sites** 14:2 16:4

**sitting** 129:10

**situation** 33:6
38:21,25 63:1
84:19

**situations**
52:13 84:22
125:2 127:17,18
136:14

**Slack** 69:9,10,
11,15 70:10,15,
21 71:1,4,10,14,
18,21 99:11

**slightly** 8:14
20:17 91:16 92:9

**slower** 46:24

**slowly** 46:23
164:7 216:15

**small** 162:22

**Smith** 66:24

**social** 19:17
20:6,19 21:20
22:1,6,14 23:4,
17 25:24 26:12,
17 28:8 30:14
31:4 33:9,14
37:15 41:15 42:9
56:13 57:3
58:12,20 63:8
78:8,17 79:21
80:10,21 81:3,12
82:4,15 84:2
85:22 88:23
90:11 94:2 97:24
98:2,5,16 99:15,
19 100:3 106:2
108:7 117:10
118:7 125:10
138:15 141:6,7,
23 158:4,9
159:14,21
206:18,23 207:4
213:19,20

**society** 37:3

**sole** 180:25

**solely** 76:9
193:25 194:21

**somebody's**
137:12

**someone's**
33:21

**sort** 118:23
120:10 121:9
133:18 166:8
181:18 196:22

**sought** 121:20
122:24 127:10,
19

**sounds** 40:18
58:18 151:3
179:10 202:15

**source** 182:7
218:17

**sources** 13:24
15:14 218:11

**sourcing** 16:4

**Spa** 27:25

**speak** 10:4 47:9,
12 59:22 65:12
66:18 67:6 68:21
113:16 116:17
119:22 138:22
147:11,18 148:4
149:25 151:10,
16 154:23 156:7,
9,13 158:24
159:5 160:7,9,15
161:14 181:4

**speaking** 9:25
15:8 83:8 219:10

**speaks** 61:18
196:5

**specific** 16:7
18:20 22:9,23
23:7,9,12,13
30:11 34:17 36:1
41:6,9 60:13
69:13 72:6
82:21,23 84:12,
18 86:16,18
98:12,14 104:19
106:4 143:11
176:17 177:11
178:24 183:5
184:9 190:7,25
191:1 193:1
206:20 212:7
213:2,11 214:16,
22

**specifically**
19:6 24:8 26:4
30:24 37:15
55:18 62:16 65:4
74:6 86:1,11
95:6 97:12
113:14 118:19
138:23 147:18
148:14 150:22
151:1,9,10 152:2
158:19 165:23
177:21 198:13
209:3,14

**specifics** 62:16
66:12 178:9

**speculate** 49:24

57:17 148:16

**speculating**
219:9

**speculation**
84:21 190:15
191:3 215:18

**speller** 10:12

**spelling** 10:9

**spellings** 10:19

**spoke** 9:12
43:21 99:14,19
158:14

**spoken** 43:18
154:15 158:25
160:21 209:14

**sport** 189:16

**sporting** 189:2,
7

**sports** 188:8,13

**spring** 106:24

**spurred** 102:14

**staff** 8:20 13:10
17:6,22 18:6
19:4,9 44:21
139:22 159:14
165:3

**stamp** 184:19

**stamped** 75:14

**stand** 191:20

**standard** 45:13
143:17 145:5,8,
14 217:5 218:15
219:10

**standards**
26:14 28:14
56:15 128:8
129:1

**stands** 157:4

**start** 211:8

**started** 27:3
163:24 177:10
213:9

Atkinson Baker, a Veritext Company
www.depo.com

**starting** 14:12

**starts** 28:24 212:12

**state** 5:10 51:17 171:11 195:4 198:2

**stated** 30:20 61:25 88:13 136:1,17 150:25 152:1 153:16 166:23 167:13 169:7 170:12 189:20 193:6 209:7

**statement** 95:24 144:4 145:25 171:5 184:15,17 195:1

**statements** 219:20,23

**stating** 31:16

**stay** 209:22

**steal** 51:24

**steps** 194:16,18 196:10,24 206:4 207:22

**stock** 13:23,25 14:2,7

**stolen** 51:22 75:3

**stone** 145:17

**stopping** 80:17

**storage** 70:9

**stores** 71:4

**stories** 13:11 22:21,24 51:16 54:3 69:23 70:6 71:18 75:9 79:4 87:10 113:16 127:16 133:13 147:17,21 148:20 149:20 150:15 172:18 183:2 209:22 214:15,21 217:19,22

219:13,16,25

**story** 16:6,10,21 17:19 22:21,22, 23 23:2,3,7,8,9, 11,12 34:16,17, 21 38:11 41:4,6, 10 42:4,6 43:12, 15 48:14,18 52:15 53:3 64:9 72:10 75:2 78:1 84:11 106:17 112:12 113:5,13, 21 116:3 126:7 140:15 143:25 144:6,24 149:8 150:7 151:2 152:3,5,7,9,18, 20,22,23 153:3, 9,13,17 154:1,6 155:10,17 156:1, 8,13,21 157:9 176:14,16,17,20, 23 177:1,4,6,9, 10,12,14,21 178:7 179:11 180:13,17,23 181:2 182:11 183:9 184:10 186:8,16 190:18, 22 191:6,11 199:8 210:5 211:25 213:16 214:11,14 218:11,13 219:14

**street** 189:14,22

**strike** 126:24 187:3 191:15

**strong** 123:24

**subject** 16:10 108:19 109:18 166:10 198:6 214:25

**subjective** 187:6 189:6

**subjects** 151:17

**sublicense** 208:13 209:11

**submitted** 29:1 139:19

**subordinates** 165:20

**subscription** 14:9 139:14 181:13 183:13

**substance** 18:13 43:14 56:4 67:18 144:3 156:17 215:23

**substantial** 11:12

**substantive** 11:12 100:16 102:11 104:23, 25

**sufficient** 144:15,24

**suite** 28:3

**summer** 18:11 162:19

**suppose** 9:7 45:4 69:20 190:1

**supposed** 117:16

**surprise** 45:1 64:11 184:14

**surrounding** 171:20

**sworn** 5:5

**system** 60:23 102:25 207:9

___

**T**

**takes** 82:12 83:24 125:23 187:23

**taking** 38:22 51:14 77:12 80:9 81:5 95:22 96:2 102:16 106:18 189:14

**talk** 20:14 86:11 107:14

**talked** 115:22

169:15 181:1

**talking** 10:2 20:16 22:7 37:18,19 85:25 87:15 89:6 98:25 101:10 170:2

**talks** 212:20

**tasked** 148:8

**team** 54:11 94:24 95:17 97:22 106:8 108:18 109:18 110:13 159:23 165:12,13,24,25

**Teams** 70:19

**telephone** 47:25 65:16 67:3

**telling** 98:23 124:19 128:1 151:4 167:15 172:22 195:23, 25

**tells** 122:19 181:24

**ten** 93:17

**tenet** 77:4

**tenure** 18:2 19:2,16,20 30:21 31:3 60:20 116:23 141:11, 18 182:18

**term** 16:13 36:24 42:19 43:3 71:2 214:3

**terms** 31:9 45:19,22,23 46:7,10,13 72:15 73:2,10,24 74:2, 9,13,14 75:8 77:24 123:16 129:16,18 130:7 132:16 140:14 183:11 184:20 185:7,12 188:6 191:20 192:16, 22 193:8,12,17 194:10 204:18 206:19,20,21,24

208:16,20,23 214:13

**testified** 5:5 108:5,20 111:22 130:19,23,25 131:1,22,25 132:2 147:20 191:17,19 192:21 210:1 215:23 217:18

**testifying** 47:4 122:2 195:18

**testimony** 13:2 43:7 47:8 89:16 95:8,16 125:21 157:22 190:13 191:13,21 215:14,17 219:7

**text** 69:1 176:12

**That'll** 66:18

**thereof** 146:25

**thing** 87:6,10 125:20 152:21 186:6

**things** 12:2 13:18 15:17 20:17 26:23 76:15 145:9,15, 18 170:3 184:9

**thinking** 89:7 157:10 189:14 215:20

**third-parties** 144:9

**third-party** 19:3 31:11,13 32:16, 18 33:1 63:8 103:13 118:2,10 127:9,19 144:10 148:9 167:17 172:12 181:17 182:17

**thirteenth** 104:11

**thought** 56:12 80:20 81:3,11 89:13 108:16 154:23 155:9

Atkinson Baker, a Veritext Company
www.depo.com

156:8 177:8
181:5 190:12

**thousands** 90:4

**thread** 166:6

**TIFF** 142:21

**time** 9:16 17:8
18:7 21:18 22:4
25:1 28:10 29:6,
7 33:3 37:12
40:5 43:21 47:14
50:17 52:14
55:24 59:8
64:14,16 66:4
68:17 72:17,21
73:9,19,23 74:5
75:8,12 76:17
79:7,12 92:12
98:8 99:13 111:7
125:2 128:15,18
129:12 140:5
143:22 153:17
155:17 163:20
165:18 171:8
175:8 178:6
180:1 182:22
187:16 193:14
198:16 206:17,
22 210:16
214:12 216:8
220:25

**times** 10:17
19:20 62:19,22,
25 79:1 83:6
88:5 93:5 109:5,
11 124:11 137:7
141:11 153:6
201:14

**timing** 55:23
66:12

**title** 5:25 6:20,25
28:4 100:23
101:6,7,8,10
150:20

**titled** 69:16
100:20

**today** 9:5 10:2
13:2 17:17 20:4,
15 22:3,7 23:1
30:13 39:24 46:5
50:8,20 51:19

52:5 72:14 74:7
79:11,25 81:22
82:3,11 83:23
99:17 111:19
119:23 154:25
158:3 159:20
179:23 185:4
190:19 197:9
204:15 219:21,
24

**today's** 10:18
65:13 68:22 72:4

**told** 36:16 50:1
109:5,12 128:19
137:19 182:16,
22

**tomorrow** 66:19
80:1

**top** 16:23 17:16
22:2 59:12 87:25
99:22 100:18,22
157:8 212:12

**topics** 47:5,8

**touch** 48:17,18,
19

**track** 99:24

**Tracking** 13:13

**training** 7:13,17,
22 105:3 108:6

**transcribes**
10:21

**transcribing**
10:22

**transcript** 11:7
220:16,25

**transcription**
10:25

**transferred**
143:1,7

**transmitted**
29:20

**transport** 114:4

**travel** 27:22,25

**trial** 11:14

**truth** 89:23

**Twitter** 91:12

**type** 12:21
136:9,15 142:25
146:11 168:10
188:17 189:10,
22

**typically** 13:9,
23 14:8 16:16
33:2 37:24 38:10
71:7 103:16
139:22 142:1
144:21 182:11
183:6,16 188:14,
18

**typing** 129:8

———————

**U**

**U.K.** 118:1,11

**U.S.** 68:9 71:22
117:21 118:1,10

**Uh-huh** 95:15
192:23

**uh-huhs** 11:4

**unable** 126:3

**unaware** 151:11
155:22

**understand**
11:18 15:5,9
29:23 46:3 47:3
51:25 91:14
93:24 111:17
115:19 119:2,9
121:6 122:1
124:10 129:11
130:18 133:7
134:21 139:8
147:2 156:3
159:11 171:3,5
185:21 193:16

**understandable**
148:23

**understanding**
16:12 20:5 25:16
28:13 31:23
34:20 36:11,19

37:13 44:5 45:2
49:18 50:9
57:19,23 58:4,6
60:18 63:20
77:20 81:19
85:13 113:17
114:15 115:4
117:1 119:12
136:6 141:22
145:23 149:15,
17,18 165:3
167:21 175:23
190:20 192:16
193:11,13 195:2
200:16 206:13
210:7

**understood**
11:6,20,23 34:1,
19 46:12 58:18
73:19 96:16
112:24 116:18
136:12 150:11
151:11 160:10
167:15 203:11

**undisputed**
133:16,20

**University** 7:7

**unnecessary**
90:4

**unquote** 197:1

**unusual** 179:20
218:16

**update** 80:20
81:3

**updated** 26:16
29:7,11

**updating** 29:6

**upload** 38:19
70:2 89:20 90:7
92:3,7 98:19
123:12 147:25
167:19,23
168:25 169:8

**uploaded** 21:7
69:18 70:12
90:20 91:4,20
92:17 103:1
151:14 170:16
207:21 208:2

**uploading**
114:1 116:21
182:3

**uploads** 207:9

**upper** 162:23

**URL** 16:23
162:11 163:8,12

**usage** 193:23

**user** 96:3 193:24
194:1,22 197:20
198:22 200:13,
18,20 201:2,6,8,
10,19 202:12
204:21

**user-generated**
94:8,17,20 95:4,
18,22 96:2,3,8,
17 97:8

**users** 94:21
204:22

———————

**V**

**vague** 195:1

**Valley** 180:14
181:11 190:5

**vast** 69:6

**version** 71:10,
11 101:4 186:18
217:6

**versions** 29:13,
16 217:4

**versus** 19:7
20:18 116:9
118:1,10 189:15

**vetted** 149:25

**video** 15:17
63:15 95:7,10
96:2,3,15,19
97:12 102:22
214:6

**videos** 95:22
102:17 193:24

**view** 217:5,14

Atkinson Baker, a Veritext Company
www.depo.com

**viewer** 90:24
91:1,19 92:14,17
186:22

**viewers** 186:2,
13

**viewing** 20:22

**views** 92:15
214:14

**violate** 34:6
57:3,5,24 58:12,
20 90:11 125:10,
12 148:9

**violated** 30:9,
12,16,23 31:6
59:16 66:2 130:6
191:19 204:7,14

**violates** 33:20
203:19

**violating** 149:6
150:4,10 159:14
206:12

**violation** 56:13,
16,23 77:24
80:1,14 90:16

**viral** 35:22

**visible** 21:9
113:2,4 132:17
135:2 171:22
186:6 199:13,16
201:16 214:5

**visual** 11:2
25:20 36:1 48:12
94:19 183:11
198:10 214:9

**visuals** 13:19
27:13 94:21,24
123:23

**W**

**walking** 189:21

**wanted** 50:1
77:17 98:21
112:4 190:6,25
200:10

**wanting** 124:13

**warrant** 205:23

**warrants** 145:16

**Washingtonian**
6:19 27:7

**ways** 39:5,7,9
91:8

**weather** 178:24,
25 179:3 180:14

**web** 42:15 53:3
76:3 86:9,10
100:21 101:18
146:2 169:2

**website** 33:22
34:9,15 35:13
37:15 41:2,3
45:19 46:1,11,14
53:17 61:20
86:21 87:21
90:20 91:2,11
114:6,23 116:16,
19 119:7 125:24
132:6,13,17,21
133:1 135:2,13,
15,17 162:9,12,
15 167:23
168:12,18,25
169:8,23 170:9
171:13 172:2
174:7 178:22
184:5,13 185:6
199:5,11,13
200:18 201:2,17
206:1,7 209:5,
12,22

**website's** 185:7

**websites**
217:23,24

**Weddings**
27:24

**week** 66:8
192:11 193:4,7

**weeks** 66:8
98:10 99:4
175:19

**whatsoever**
151:24 152:9
154:3 155:1

**wide** 28:2

**window** 91:11
139:1

**winter** 106:24

**wishes** 124:1

**withdraw** 19:15
37:11 70:20
140:22 180:10
202:5

**withdrawn**
209:25

**Wolff** 9:9,12,18
21:2,11,22 22:8,
17 23:5,20 30:18
33:17,24 34:10
35:1 36:7,13
37:16 45:7,17
46:9 49:22 51:9
52:1,10 53:10,18
54:8 57:16,22
58:14 60:21
61:10 62:9,14
63:2 64:23 67:24
78:13 79:16
80:12,16,22 81:7
82:1,8,17,22,25
83:5,10,14,19
84:4,21 85:19,24
86:23 87:14
89:2,25 91:6,22
92:5,20 93:4,10,
17 95:20,25
96:6,18 97:10
99:21 103:14
105:15 107:12
108:11 109:4,10,
20,24 110:11
113:10 114:7,12,
19 115:8,14,18
117:11 118:3,17,
25 119:8 120:1,
5,12,20 121:5,
11,22 122:12,18
123:1,9,21
124:6,15,24
125:7,18,25
126:5,13,20
127:4,11,14,21
128:12 129:4,13,
23 130:2,16
131:5,11,14

132:4,15,24
133:5,11 134:1,
10,18 135:1,5,
14,19,25 136:16,
24 137:4,16,25
138:10 140:3,25
141:8,13 142:23
143:14 144:20
145:3,13 146:1,
7,13 147:9,15
148:3,12,18
149:1,7,12,22
150:14,24
151:15 152:15
153:1,5,11,15
154:22 155:5,16,
25 156:6 158:11,
23 159:4,10,16,
24 160:13,18
161:19 163:10,
23 167:18 168:5,
13,20,23 169:6,
24 170:11,25
171:16 176:22
177:2,7,16,25
178:12,18 179:6,
8,14,24 180:7,15
181:3,19 182:2,
9,13,19 183:15,
20 184:6,16
186:4,15,20
187:5,12,19
188:9,25 189:5,
12 190:16,23
191:4,22 192:19
194:14 195:10,
14,20 196:4,14
197:2,15 198:8
199:6,12,25
200:5,19 201:4,
12,22 202:1,20
203:5 204:4,9,16
205:8,13,19
206:8 207:6,25
208:8,14,21
209:6,13 210:18,
22,25 216:2
220:5

**won** 180:3

**wondering**
90:15

**word** 16:18 37:1
78:16 86:16,19

87:5 88:4,22
131:14 167:20

**wording** 167:7

**words** 89:8
131:12,21
172:21 176:16
179:15 183:21
191:18 195:24
196:8

**work** 6:13,18,23
14:1,3,6 16:1
24:24 36:12
40:19,22 41:1,11
68:8,11 75:2,10
80:9 90:3 103:13
117:4 120:11
121:1,3,10 124:5
125:4,24 130:12
133:4 136:13
139:24 140:2,11
141:14 146:12
148:13 160:4
166:9,21 169:4
172:23 178:16
179:12 182:1,6,
18 187:10
198:19 208:13
209:12 217:2
218:5

**worked** 5:22
6:15,19 12:6,10
27:4,6,7,20,22,
23,25 28:1 36:18
40:25 60:24
116:24 156:18
157:9

**working** 6:4,8,
17 7:1 9:23 13:9
14:11,15,18,20,
22 27:3 30:16
36:9 43:16 44:18
113:25 173:22

**works** 60:24
113:18 116:14
143:3 149:15,19

**worth** 177:12

**write** 12:20 77:1
89:17 90:2 94:13
153:3 172:18
178:5 190:7,25

**writer** 38:10 40:11,13 48:18, 24 65:7 82:5,11 83:23 112:3 119:1 121:13 147:25 150:8 164:22 216:6 218:7,18

**writer's** 181:4

**writers** 44:13 46:2 54:10 71:17 76:4 98:1 99:2, 23 113:5 141:9, 15 147:21,23 149:18,24 150:6 159:8 165:3

**writers'** 159:17 160:5

**writing** 87:4 94:11 95:3 117:13 207:7

**written** 61:13,17 78:20 87:7 125:13 145:17 194:10 196:15, 23

**wrong** 137:20 172:20

**wrote** 24:3 30:15 35:14 86:1 87:18 110:14 206:17, 22 218:13

**Y**

**Yachting** 28:2

**year** 6:16 27:8 54:12 59:10 62:21 160:22

**years** 5:24 6:24 7:7 27:5,7,8,10, 20 36:22 161:17 184:3

**yes-or-no** 133:8

**yesterday** 67:9

**Yuliya** 10:7 24:13 47:10,13

48:1,6 49:16 55:1,4,24 56:21 57:10,11,13 58:1,19,24 65:11,17 68:20 89:11 111:13 163:18 164:21 175:22

**Yuliya's** 49:19 58:7

**Z**

**Zaharia** 37:7,9 46:22 163:2 164:6 174:11,20 192:5

**Zoom** 174:23 211:4 214:17