# EXHIBIT C

Atkinson-Baker, a Veritext Company
www.depo.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CERTIFIED COPY

ELLIOT MCGUCKEN, an individual, )
                                          )
          Plaintiff,        )
                                            )
     vs.                   ) No.
                                            ) 1:19-cv-09617-KPF
NEWSWEEK LLC, a New York     )
Limited Liability Company; and  )
DOES 1-10, inclusive,        )
                                            )
          Defendants.       )
                    ____   )

CONFIDENTIAL

VIDEOCONFERENCING 30(b)(6) DEPOSITION OF

NEWSWEEK DIGITAL LLC'S PERSON MOST QUALIFIED,

BY AND THROUGH, JAMES ETHERINGTON-SMITH

THURSDAY, MARCH 11, 2021

ATKINSON-BAKER, a Veritext Company
(800) 288-3376
www.depo.com

REPORTED BY:  MARYLYNNE SANDOVAL-ROBLES,
               CSR NO. 12498

FILE NO.:     AF01A27

Atkinson-Baker, a Veritext Company
www.depo.com

```
1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF NEW YORK

3

4    ELLIOT MCGUCKEN, an            )
                                    )
5    individual,                    )
                                    )
6                 Plaintiff,        )   No.
                                    )   1:19-cv-09617-KPF
7           vs.                     )
                                    )
8    NEWSWEEK LLC, a New York       )
     Limited Liability Company; and )
9    DOES 1-10, inclusive ,         )
                                    )
10                Defendants.       )
     _____)

11

12

13

14

15     CONFIDENTIAL VIDEOCONFERENCING 30(b)(6) DEPOSITION

16     OF JAMES ETHERINGTON-SMITH, taken on behalf of the

17     Plaintiff, commencing at 6:34 A.M., on Thursday,

18     March 11, 2021, pursuant to Notice, before MARYLYNNE

19     SANDOVAL-ROBLES, CSR No. 12498, a Certified Shorthand

20     Reporter, in and for the County of Los Angeles, State

21     of California.

22                           ***

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   APPEARANCES:

 2        For the Plaintiff:

 3             DONIGER BURROUGHS APC
               BY:  SCOTT A. BURROUGHS, ESQ.
 4                  LAURA M. ZAHARIA, ESQ.
               603 Rose Avenue
 5             Venice, California  90291
               (310) 590-1820
 6             scott@donigerlawfirm.com
               lzaharia@donigerlawfirm.com
 7
          For the Defendants:
 8
               COWAN, DeBAETS, ABRAHAMS & SHEPPARD
 9             BY:  SARA GATES, ESQ.
                    NANCY WOLFF, ESQ.
10             41 Madison Avenue
               38th Floor
11             New York, New York  10010
               (212) 974-7474
12             sgates@cdas.com
               nwolff@cdas.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                   I   N   D   E   X

 2
      WITNESS                 EXAMINATION              PAGE
 3
      James                By Mr. Burroughs         6, 168
 4    Etherington-Smith
                           By Ms. Gates                166
 5

 6

 7

 8                     E X H I B I T S

 9    PLAINTIFF'S                                      PAGE

10     12 - CMS's internal statistics for subject
                article, Bates stamped NEWS000012       127
11
       13 - CMS' internal statistics for subject
12              article, Bates stamped NEWS000013       129

13     14 - Editing portion for subject article, Bates
                stamped NEWS000014                      130
14
       15 - Editing portion for subject article, Bates
15              stamped NEWS000015                      137

16     16 - Dialogue box when embedding an image,
                Bates stamped NEWS000016                141
17
       17 - E-mail correspondence, Bates stamped NEWS
18              000017-000019                           149

19     18 - E-mail correspondence, Bates stamped
                NEWS000021-000022                       150
20
       19 - Google Analytics of subject article, Bates
21              stamped NEWS000020                      157

22

23

24

25
```

30(b)(6) James Etherington-Smith - Confidential
March 11, 2021                                        4

1                     I     N     D     E     X
                          (Continued)

2


3

                    PREVIOUSLY MARKED EXHIBITS

4
     PLAINTIFF'S                                          PAGE

5
       2 - Newsweek Policy, Bates stamped

6           NEWS000001-000002                              54


7      11 - Newsweek Article, Bates stamped
            NEWS000081-000083                              87

8


9


10


11


12              QUESTIONS  INSTRUCTED  NOT  TO  ANSWER

13                          None.

14


15


16


17


18


19               INFORMATION  REQUESTED

20                          None.

21


22


23


24


25

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1              CALIFORNIA, THURSDAY, MARCH 11, 2021

 2                        6:34 A.M.

 3

 4              JAMES ETHERINGTON-SMITH,

 5         called as a witness by and on behalf

 6         of the Plaintiff, being first duly

 7         sworn, was examined and testified

 8         as follows:

 9

10                      EXAMINATION

11  BY MR. BURROUGHS:

12     Q.   Good morning.  Can you state and spell your

13  name for the record?

14     A.   Yes.  James Etherington-Smith.  That's

15  J-A-M-E-S, E-T-H-E-R-I-N-G-T-O-N, hyphen, Smith,

16  S-M-I-T-H.

17     Q.   Great.  Now, where do you currently reside?

18     A.   In London, England.

19     Q.   Okay.  And are you currently employed?

20     A.   Yes.

21     Q.   Okay.  What is your current occupation?

22     A.   Currently managing editor at Newsweek London

23  Bureau.

24     Q.   Okay.  How long have you had that position?

25     A.   Since October of 2020.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Okay.  Before you had that position, were

2   you with Newsweek?

3      A.   Yes.

4      Q.   What was your title then?

5      A.   Copy chief.

6      Q.   Okay.  How long did you hold that position?

7      A.   From roughly March 2017, from my

8   recollection.

9      Q.   Okay.  And was that your first role at

10  Newsweek?

11     A.   Yes.

12     Q.   Okay.  Prior to working at Newsweek, where

13  did you work?

14     A.   I worked at International Business Times UK.

15     Q.   What was your title there?

16     A.   There I was chief subeditor.

17     Q.   Okay.  And how long did you work there?

18     A.   From September 2014 until I joined Newsweek.

19     Q.   Okay.  Was that your first -- well, let me

20  ask you this.

21          Did you go to university?

22     A.   I did.

23     Q.   Where did you go to university?

24     A.   In South Africa.  University of

25  Johannesburg.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Okay.  What did you study there?

2      A.   Journalism.  Bachelor of journalism.

3      Q.   Okay.  Was your first job after graduating

4  at IBT?

5      A.   It was not.

6      Q.   What was your first job after graduating?

7      A.   First journalism job, specifically?

8      Q.   (Indicating.)

9      A.   Yeah.  I worked at a website called

10 MyBroadband, which is a tech website.

11     Q.   Was that also a UK company?

12     A.   No.  That was a South African company.

13     Q.   Okay.  Have you ever worked directly for a

14 company based in the United States?

15     A.   Yeah.  I believe Newsweek is based in the

16 United States, and I work for Newsweek.

17     Q.   Okay.  Is your employer the Newsweek US

18 entity or another entity?

19     A.   I'm not entirely sure how they broke it

20 down, but I believe, yes, I work the Newsweek -- the

21 US entity.  There may be, you know, some UK

22 subsidiary or something, but I'm not sure of the

23 details.

24     Q.   When you receive a check or a wire transfer,

25 who is the sender?

Atkinson-Baker, a Veritext Company
www.depo.com

1    A.    From my memory, it's something like Newsweek

2    Digital, LLC, or something like that.

3    Q.    Okay.  And have you ever had your deposition

4    taken before?

5    A.    No.  First one.

6    Q.    Okay.  Well, I'm going to go real briefly

7    over a couple of ground rules.  You're doing

8    fantastic so far.

9          You know, the most important one, and this

10   is for the benefit of Ms. Sandoval, is, you know,

11   allow me to finish my questions before answering, and

12   make sure that you understand my question before

13   answering.  And when you do answer, make sure to use,

14   you know, audible cues, such as yeses or nos as

15   opposed to head nods or uh-huhs or huh-uhs.

16         Does all that make sense?

17   A.    Understood.

18   Q.    Okay.  And if you answer my question, I'm

19   going to assume that you understood it.  So if any of

20   my questions are in any way unclear, please let me

21   know.  Okay?

22   A.    Understood.

23   Q.    Okay.  And at the end of these proceedings,

24   you're going to get a bound transcript of everything

25   that is said today, and you're going to be able to

Atkinson-Baker, a Veritext Company
www.depo.com

1   make changes to it.

2          But to the extent that you make changes to

3   it that are substantive, like a yes to a no or a red

4   to a blue, I can comment on that when this case goes

5   to trial, and that may impact your credibility in

6   front of the jury.  So it's very important that you

7   only answer questions that you understand.  Okay?

8       A.   Yes.  Understood.

9       Q.   All right.  Is there any reason why you

10  wouldn't be able to give your best testimony today?

11  Have you had any illnesses, any drugs or alcohol in

12  the last 24 hours, anything like that?

13      A.   No reason.

14      Q.   Okay.  And you understand that you're here

15  today to testify -- you know, even though you are

16  you, a person, you're testifying on behalf of

17  Newsweek, the company?

18      A.   Yes.  I understand that.

19      Q.   And that your answers bind Newsweek, the

20  company?

21      A.   Yes.

22      Q.   Okay.  One final thing is, throughout the

23  proceedings, at times I may ask you to give me a best

24  estimate; dates, numbers, things like that.  I want

25  you -- and I'm actually entitled to your best

Atkinson-Baker, a Veritext Company
www.depo.com

1   estimate, but I don't want you to guess in response

2   to my question.

3          For example, you know, if I ask you how many

4   articles have you written, you probably don't know

5   the exact number.  Or maybe you do.  But you could

6   estimate for me how many you've written based on your

7   experience.

8          If I ask you how many articles I've written,

9   you know, unless you're familiar with my work, and

10  I'm assuming you're not, it's mostly legal stuff,

11  it's pretty boring, you'd have to guess.  You have no

12  personal knowledge of how many articles that I've

13  written.  So that's an illustrative aid showing the

14  difference between a guess and an estimate.

15         Does that make sense?

16     A.   It makes sense.

17     Q.   Okay.  Do you know why we're here today?

18     A.   I believe so.

19     Q.   Okay.  What's your understanding of why

20  we're here today?

21     A.   To sort of -- for you to gather information

22  on some of the processes that Newsweek undertakes in

23  the creation of its articles.

24     Q.   Do you understand a photographer,

25  Dr. Elliot McGucken, has alleged that Newsweek

Atkinson-Baker, a Veritext Company
www.depo.com

1   displayed one of his photographs without his consent?

2       A.   Yes.

3       Q.   Okay.  And is that a practice that Newsweek

4   does regularly?  Are they regularly using photographs

5   on their website without the artist's consent?

6       A.   No.

7       Q.   Okay.  Would you agree with the statement

8   that it wouldn't violate any Newsweek policy for

9   Newsweek to publish an artist's photograph without

10  their consent so long as they do it via a embed

11  process?

12           MS. GATES:  Objection as to form.

13  BY MR. BURROUGHS:

14      Q.   You should still answer.

15      A.   Can you repeat the question, please?

16      Q.   Sure.  And let me provide another ground

17  rule.  I believe I omitted that one.

18           Your attorney, Ms. Gates, may interpose

19  objections throughout the proceedings.  Those are

20  just for the record.  So allow her to make the

21  objection and the court reporter to write it down or

22  to type it out, but you should still answer the

23  questions.  Okay?

24      A.   Yes.  Understood.

25      Q.   All right.  Now, would you agree with the

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   statement that it doesn't violate any Newsweek
 2   policy, and is in fact compliant with Newsweek's
 3   policy, for Newsweek to publish photography from
 4   artists without their consent so long as they publish
 5   that photography via an embed process?
 6           MS. GATES:  Objection as to form.
 7           THE WITNESS:  I find sort of the structure
 8   of the question a bit confusing.  If you could maybe
 9   rephrase it?
10   BY MR. BURROUGHS:
11       Q.  Okay.  Let me ask it this way.
12           In your mind, does it violate Newsweek
13   policy to publish photographers' work without their
14   consent so long as Newsweek publishes it via
15   Instagram's embed process?
16           MS. GATES:  Objection as to form.
17           THE WITNESS:  Sorry.  Please repeat the
18   question.
19   BY MR. BURROUGHS:
20       Q.  No problem.  Yeah.  I can repeat it for you
21   as many times as you want.  I really --
22           (Speaking simultaneously.)
23           THE WITNESS:  Yeah, yeah, no.  I'm just
24   trying to figure out the structure of how you're
25   asking it so I can answer correctly.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2       Q.   Okay.  Well, let me ask a few foundational

3   questions.

4       A.   Yeah.

5       Q.   Does Newsweek have a policy about using

6   third-party artists' work?

7       A.   Yes.

8       Q.   Okay.  And is that policy enforced at

9   Newsweek?

10      A.   Yes.

11      Q.   And per that policy, can Newsweek publish

12  photography created by third-party artists without

13  their consent?

14      A.   No.  I mean, I guess it depends on what you

15  mean by "publish" in the context of why we're here.

16      Q.   Okay.  For that policy, can Newsweek

17  display, on its website, photography taken by

18  third-party artists without their consent?

19      A.   We do not host content without consent in

20  one way or another.

21      Q.   Do you display content without artist

22  consent?

23          MS. GATES:  Objection as to form.

24          THE WITNESS:  If by "display," you mean use

25  an embed, we will use an embed.

30(b)(6) James Etherington-Smith - Confidential
March 11, 2021                                    14

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2       Q.   Okay.  When you use an embed, is the

3   photograph displayed on Newsweek.com?

4       A.   It's -- it is visible on Newsweek.com.

5       Q.   Is it visible to readers of Newsweek.com?

6       A.   Yes.

7       Q.   Okay.  So is it compliant with Newsweek

8   policy to use third-party artists' work without their

9   consent so long as it's used via the embed process?

10          MS. GATES:  Objection as to form.

11          THE WITNESS:  Yeah.  Please repeat that one

12   more time.

13   BY MR. BURROUGHS:

14      Q.   Sure.  Is it compliant with Newsweek policy

15   to use third-party artwork without the artists'

16   consent so long as you use it via an embed process on

17   Newsweek.com?

18          MS. GATES:  Objection as to form.

19          THE WITNESS:  Yeah.  I would say that there

20   is no sort of policy on that specifically in the

21   sense that using an embed has never been considered

22   -- and sorry.  What was the last part of your

23   question?  Without consent.  Using an image -- an

24   embed without consent has never been considered a

25   potential copyright issue.

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. BURROUGHS:

2      Q.   So in your mind, as of today, March 11th,

3  2021, Newsweek doesn't have a policy about using

4  content via embeds; is that accurate?

5      A.   Nothing that sort of specifically addressed

6  using embeds and saying, do not use embeds without

7  consent.

8      Q.   Are you aware of whether or not Facebook has

9  taken a position on whether publications like yours

10  can use photographers' work without their consent via

11  the embed process?

12          MS. GATES:  Objection as to form.

13          THE WITNESS:  I'm not aware.

14  BY MR. BURROUGHS:

15      Q.   Would it surprise you to learn that Facebook

16  has publicly stated that publications like yours

17  cannot use photographers' content without consent

18  on --

19          MS. GATES:  Objection --

20          (Speaking simultaneously.)

21  BY MR. BURROUGHS:

22      Q.   -- websites like yours?

23      A.   Well, I -- "use" is sort of a very loose

24  word there.

25      Q.   Okay.  Are you aware that Facebook has taken

Atkinson-Baker, a Veritext Company
www.depo.com

1   the position that websites like yours cannot display

2   photography from Instagram without the artist's

3   consent?

4           MS. GATES:  Objection as to form.

5           THE WITNESS:  I'm not aware that we are --

6   that Facebook has taken the stance that we cannot

7   embed anything from Facebook or Instagram.

8   BY MR. BURROUGHS:

9       Q.   Are you aware of any public statements or

10  positions taken by Facebook relating to the use of

11  embedded content on websites like yours?

12      A.   No.

13      Q.   Have you ever done any due diligence or

14  researched the issue of whether Facebook allows sites

15  like yours to use photography from Instagram without

16  the artist's consent?

17          MS. GATES:  Objection as to form.

18          THE WITNESS:  I haven't.

19  BY MR. BURROUGHS:

20      Q.   Are you aware of anyone at Newsweek having

21  any conversations about whether Facebook allows its

22  websites like yours to use content embedded from

23  Instagram without the artist's consent?

24          MS. GATES:  Objection as to form and to the

25  extent this is getting into any privileged

Atkinson-Baker, a Veritext Company
www.depo.com

1   communications.

2          THE WITNESS:  Can you repeat the question,

3   please?

4   BY MR. BURROUGHS:

5      Q.   Sure.  Has anyone at Newsweek had any

6   conversations that you're aware of relating to

7   whether or not websites like yours can use content

8   from Instagram without the artist's consent?

9          MS. GATES:  Same objection.

10         THE WITNESS:  About whether we've had

11  conversations that Facebook -- sorry.  I'm -- repeat

12  that end part of the question again.  So sorry.

13  BY MR. BURROUGHS:

14     Q.   No problem.  Are you aware of any

15  conversations at Newsweek regarding whether or not

16  Facebook allows websites like yours to use content

17  from Instagram without the artist's consent?

18         MS. GATES:  Same objection.

19         THE WITNESS:  I am not aware.

20  BY MR. BURROUGHS:

21     Q.   So as you sit here today -- you the --

22  managing editor; is that correct?

23     A.   Yes.

24     Q.   You, the managing editor of Newsweek, have

25  no understanding as to Facebook's policy or position

1    regarding the use of Instagram content without

2    consent on websites like yours; is that correct?

3              MS. GATES:  Objection as to form.

4              THE WITNESS:  I don't know the specific

5    details of Facebook or Instagram's policies on this

6    matter.

7    BY MR. BURROUGHS:

8         Q.   Have you ever reviewed those policies?

9         A.   I have not.

10        Q.   Have you ever reviewed Instagram's terms?

11        A.   I have not.

12        Q.   Are you involved at all in reviewing

13   Instagram to look for material to copy for display on

14   your website?

15             MS. GATES:  Objection as to form.

16             THE WITNESS:  Can you sort of more clearly

17   define "review" in that question?

18   BY MR. BURROUGHS:

19        Q.   Look at.

20        A.   I have looked at Instagram.

21        Q.   Have you ever gone on Instagram specifically

22   with the purpose to find photographs to copy for

23   display on your website?

24             MS. GATES:  Objection as to form.

25             THE WITNESS:  Sorry.  So you said copy onto

Atkinson-Baker, a Veritext Company
www.depo.com

1  our website?

2  BY MR. BURROUGHS:

3       Q.   (Indicating.)

4       A.   I would say no.

5       Q.   Okay.  How about to display on your website

6  via an embed?

7       A.   I'm -- can't recall a specific incident

8  where I've done that.

9       Q.   Do you dispute that it's Newsweek's business

10  practice to regularly review Instagram to look for

11  content to reproduce and display on its website via

12  an embed?

13          MS. GATES:  Objection as to form.

14          THE WITNESS:  I wouldn't say -- I mean, it

15  is something we do, is embed stuff from Instagram,

16  yeah.

17  BY MR. BURROUGHS:

18       Q.   Over the past year, can you estimate for me

19  how many times you've done that?

20       A.   I don't think I'd be able to give an

21  accurate estimate.

22       Q.   More than ten?

23       A.   Probably more than ten.

24       Q.   More than 50?

25       A.   Possibly more than 50.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   More than a hundred?

2      A.   Yeah, probably.

3      Q.   Okay.  More than 200?

4      A.   I mean, yes, probably more than 200.  But

5  we're getting into this area of, you know, I don't

6  know what's in every single article on Newsweek.  So

7  I can estimate, but yeah.

8      Q.   Okay.  So is it fair to say that your best

9  estimate is, over the past year, Newsweek has

10  displayed on its website content from Instagram at

11  least 200 times via embed; is that correct?

12          MS. GATES:  Objection to form.  Speculation.

13          THE WITNESS:  Yeah.  I mean, I don't want to

14  estimate because I really just don't know.

15  BY MR. BURROUGHS:

16      Q.   Well, again, I am entitled to your best

17  estimate.  If you're telling me you have no

18  understanding or no estimate as to how many times

19  that's happened, that's fine.

20          But I believe you testified that your best

21  estimate was that it happened at least 200 times;

22  correct?

23      A.   It could have happened 200 times.

24      Q.   Okay.  And what's that estimate based on?

25      A.   Well, you said 200, so --

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Well, I -- do you recall --

2           (Speaking simultaneously.)

3           THE WITNESS:  Pardon me?

4   BY MR. BURROUGHS:

5      Q.   Didn't you say 200?

6      A.   Well, I also said 200.  But you -- you were

7   sort of going up through the numbers, and, you know,

8   I don't know where to stop.  So let's stop at 200.

9      Q.   Okay.  Well, just as a ground rule, you

10  should stop based on your personal knowledge and your

11  best estimate.  Okay?  I don't want you to guess.

12  I -- but I am entitled to your best estimate.  Okay?

13     A.   Yeah.  So like I say, I really don't know.

14  So if we're just going to estimate, let's say more

15  than ten.

16     Q.   Okay.  And is that your best estimate?

17     A.   Can you define "best"?

18     Q.   The best based on your personal knowledge

19  and recollection.  Okay?

20          Earlier you told me it was at least 200; now

21  you're telling me it's at least ten.  I just want to

22  know which one is true.

23     A.   Well, yeah, I mean, we've embedded many an

24  image from Instagram.  To give you a specific

25  estimate would be quite difficult.  So if I'm going

Atkinson-Baker, a Veritext Company
www.depo.com

1  to err on the side of caution, I will estimate a low

2  number.

3      Q.   Okay.

4      A.   But --

5          (Speaking simultaneously.)

6  BY MR. BURROUGHS:

7      Q.   When was the last time --

8      A.   Yeah.  Sorry.  Please carry on.

9      Q.   When was the last time Newsweek embedded an

10  Instagram image in one of its articles?

11     A.   I couldn't tell you specifically.

12     Q.   Do you recall it happening in the last six

13  months?

14     A.   I'm just racking my brains here.  I would

15  think it has happened in the last six months.

16  Although I can't recall, you know, the last time

17  specifically we did an Instagram embed.

18     Q.   Can you recall specifically if you used an

19  embed in the last year?

20     A.   Specifically, no.  But I am sure we have

21  used an embed on Instagram in the last year.

22     Q.   Okay.  And why are you sure?

23     A.   Based on just, you know, the nature of the

24  -- what we do every day and the kind of articles we

25  write, there is more than likely an Instagram embed

Atkinson-Baker, a Veritext Company
www.depo.com

1    in one of those articles.

2        Q.   Okay.  Can you provide me your best estimate

3    as to the percentage of the images displayed on

4    Newsweek.com that come from Instagram via embed as

5    opposed to your Getty images account?

6            MS. GATES:  Objection as to form.

7    Speculation.

8            THE WITNESS:  I couldn't give a sort of

9    percentage on that.

10   BY MR. BURROUGHS:

11       Q.   Okay.  So you couldn't tell me whether or

12   not it was 50/50, for example?

13       A.   I couldn't tell that you.

14       Q.   Okay.  So as you sit here today, you're

15   unaware of how many of the photographs displayed on

16   Newsweek came from Instagram as opposed to Getty;

17   correct?

18           MS. GATES:  Objection as to form.

19           THE WITNESS:  Yes.  I'm unaware of exactly

20   how many Instagram embeds we have on all of our

21   articles on Newsweek.

22   BY MR. BURROUGHS:

23       Q.   Can you provide me with your best estimate

24   as to the percentage?

25       A.   I don't -- I don't think I can, to be

Atkinson-Baker, a Veritext Company
www.depo.com

1   honest.  That's -- you know, there's a lot of have

2   variables involved.  So if I was -- I would be

3   guessing to just pick a percentage.

4        Q.   Okay.  That's fair.  So it's accurate to say

5   that, as you sit here today, you're unaware of the

6   percentage of Instagram photos used on Newsweek as

7   opposed to Getty photos; correct?

8             MS. GATES:  Objection as to form.

9             THE WITNESS:  Sorry.  Can you just repeat

10  that, please.

11  BY MR. BURROUGHS:

12       Q.   Sure.  As you sit here today, you're unaware

13  to give me an estimate as to the percentage of

14  photographs displayed on Newsweek that came from

15  Instagram as opposed to Newsweek -- I'm sorry -- as

16  opposed to Getty; correct?

17            MS. GATES:  Same objection.

18            THE WITNESS:  Yes.  It would be difficult

19  for me to give a percentage that was an estimate and

20  not a guess.

21  BY MR. BURROUGHS:

22       Q.   Okay.  And it's so difficult, in fact,

23  you're unable to do that; correct?

24       A.   Sorry.  Pardon me?

25       Q.   It's so difficult you're unable to do it;

Atkinson-Baker, a Veritext Company
www.depo.com

1    correct?

2        A.   Yes.  It would -- if I gave you a

3    percentage, it would be a guess and not even an

4    estimate because of, as I mentioned, lots of

5    variables, and I'm not, you know, able to look at

6    every single article ever that has been published on

7    Newsweek.

8        Q.   Okay.  So for the photographs that you've

9    displayed on your website via the embed from

10   Instagram, in how many of those cases do you recall

11   reaching out to the artist and requesting permission

12   in connection with their work?

13            MS. GATES:  Objection as to form.

14            THE WITNESS:  So it -- in my recollection of

15   doing that, I don't reach out to artists to request

16   permission.

17   BY MR. BURROUGHS:

18       Q.   Okay.  So as you sit here today, Newsweek

19   can't recall any instances in which it reached out to

20   the artist for using and displaying the artist's work

21   on Newsweek via the embed process; correct?

22            MS. GATES:  Objection as to form.

23            THE WITNESS:  I believe our reporters often

24   contact artists to request permission to host the

25   image on our site.  But not for permission to use the

Atkinson-Baker, a Veritext Company
www.depo.com

1    embed feature.

2    BY MR. BURROUGHS:

3        Q.    Understood.  You have no personal knowledge

4    of so doing; correct?

5        A.    No personal knowledge of what?  Sorry?

6        Q.    Of reaching out to the artists?

7        A.    I personally have never, to my recollection,

8    contacted an artist to request permission to host

9    their image on our website.

10       Q.    Okay.  Have you ever contacted an artist for

11   any purpose in connection with their work and your

12   website?

13       A.    To my memory, I've never personally

14   contacted an artist.

15       Q.    Okay.  And you're not personally aware of

16   anyone else at Newsweek doing that; correct?

17       A.    I am aware that our reporters will contact

18   artists about images.

19       Q.    When was the last time you recollect that

20   happening?

21       A.    I couldn't give a very specific answer

22   there.  It presumably happens all the time.

23       Q.    Okay.  So as you sit here today, you can't

24   recollect Newsweek ever reaching out to an artist in

25   connection with using or displaying work that the

1  artist has posted to Instagram; correct?

2        MS. GATES:  Objection as to form.

3  Mischaracterization.

4        THE WITNESS:  Sorry.  Could you repeat the

5  question?

6  BY MR. BURROUGHS:

7    Q.   Sure.  Well, I believe you just testified

8  you don't remember specifically anybody from Newsweek

9  ever reaching out to an artist that has posted work

10  on Instagram about Newsweek potentially displaying

11  their work; is that correct?

12        MS. GATES:  Objection.

13        THE WITNESS:  Sorry.  Well, yeah, I mean

14  obviously we're here today specifically for this

15  example.  So I -- I don't remember the event in which

16  our reporter contacted the artist.  You know, I

17  don't -- I don't sort of micromanage that aspect of

18  what they do.

19        So to give you sort of specific, you know,

20  times that a reporter contacted an artist about an

21  image, I wouldn't be able to do that.

22  BY MR. BURROUGHS:

23    Q.   Okay.  Are you aware of anyone at Newsweek

24  ever contacting an artist on Instagram and giving

25  them notice that Newsweek planned to display their

Atkinson-Baker, a Veritext Company
www.depo.com

1    Instagram work via an embed?

2         MS. GATES:  Objection as to form.

3         THE WITNESS:  Sorry.  Please repeat the

4    question again.

5    BY MR. BURROUGHS:

6         Q.   Are you aware of anyone at Newsweek ever

7    reaching out to the artist and giving them notice

8    that Newsweek intends to use their work from

9    Instagram on Newsweek.com?

10        A.   Can you define "notice"?

11        Q.   Let them know.  Advise them.

12        A.   I mean, it depends on the -- it depends on

13   the sense of that term.  We -- I am aware that our

14   reporters contact artists to request permission to

15   host the image on our website.  Otherwise we will

16   embed the image if they do not give us that

17   permission to host the image on our website.

18        Q.   So it's your understanding that Newsweek's

19   practice is when an artist declines to give consent

20   to Newsweek to host the image, Newsweek will instead

21   embed the image and display it via the link; correct?

22        MS. GATES:  Objection as to form.

23        THE WITNESS:  If an artist, you know, tells

24   us we do not have permission to host an image on our

25   website, then we will not host the image on our

Atkinson-Baker, a Veritext Company
www.depo.com

1  website.

2        And I'm not aware of any case where we have

3  also, having been told by an artist do not host our

4  image, that we then went ahead and also embedded it

5  after that fact.

6  BY MR. BURROUGHS:

7    Q.   In situations where you asked for consent

8  but the artist doesn't respond, will you still go

9  ahead and display their content on your site?

10        MS. GATES:  Objection as to form.

11        THE WITNESS:  If you've asked for consent to

12  host the image and they haven't responded, we will

13  probably embed the image.

14  BY MR. BURROUGHS:

15    Q.   Okay.  And that's your policy even today;

16  correct?

17    A.   Our policy is to request permission to host

18  the image.

19    Q.   Okay.  And if you're not given that

20  permission?

21    A.   Then we won't host the image.

22    Q.   Will you also -- will you at that point

23  embed the image?

24    A.   We may embed the image if we haven't heard

25  back from the artist.

Atkinson-Baker, a Veritext Company
www.depo.com

1     Q.    And that's your process even today at

2  Newsweek; correct?

3     A.    Yes.  We -- yeah, we do that.

4     Q.    Is there anyone at Newsweek, and perhaps

5  it's you, that reviews articles before they're posted

6  to Newsweek.com to ensure that they're compliant with

7  artists' rights?

8     A.    Yes.  We review articles before they're

9  posted.

10    Q.    And whose job is that?

11    A.    It is my job as well as some other editors

12  in the business.

13    Q.    Okay.  And what's the process for reviewing

14  that content to ensure that it doesn't infringe the

15  copyrights of any third parties?

16         MS. GATES:  Objection as to form.

17         THE WITNESS:  So we will take a look at the

18  article that the reporter has submitted.  Pardon me.

19  And we will, you know, in the process of looking at

20  that article, look at the images that are uploaded

21  into our system.

22         And, you know, if anything strikes us as,

23  you know, potentially an issue for whatever reason,

24  we will just then dig into the details of that and

25  review it with the reporter to ensure that we do have

Atkinson-Baker, a Veritext Company
www.depo.com

1   permission to use the image that's posted.

2   BY MR. BURROUGHS:

3       Q.   Okay.  So the images are uploaded to your

4   server for review by the editors before they go live

5   on Newsweek.com; is that accurate to say?

6           MS. GATES:  Objection as to form.

7           THE WITNESS:  Yeah.  When we upload an image

8   onto our server, it'll be part of the article that

9   the reporter submits, and the editors review those

10  articles before they go live.

11  BY MR. BURROUGHS:

12      Q.   When you're reviewing an article that uses

13  an embed, is a reproduction of that particular

14  photograph in your system, or how is that reviewed?

15          MS. GATES:  Objection as to form.  Compound.

16          THE WITNESS:  So yeah, embeds are simply

17  kind of like a window into what is posted on

18  Instagram or another server.  So those, you know, we

19  don't review them with any concerns for copyright

20  issues.

21  BY MR. BURROUGHS:

22      Q.   So what do you mean by that?

23      A.   I mean that, you know, embeds are -- you

24  know, by the nature of them, they -- they don't seem

25  to be, you know, a copyright issue because we are not

1   posting that content on our site.  It is posted

2   externally.  And all we've done is, you know,

3   embedded the window into viewing that content

4   externally.

5       Q.   Okay.  So it's your understanding as the

6   managing editor that displaying a third party's

7   content on your site is not a copyright infringement;

8   correct?

9           MS. GATES:  Objection as to form.

10          THE WITNESS:  Sorry.  Please repeat that.

11  BY MR. BURROUGHS:

12      Q.   Sure.  Let -- I -- let me ask you this way.

13          Is displaying an artist's work on your

14  website without their consent copyright infringement?

15          MS. GATES:  Objection as to form and to the

16  extent we're getting into legal conclusions.

17          THE WITNESS:  So we will display images --

18  well, we embed images.  That's not a copyright

19  concern as far as we are concerned.  And if we're

20  hosting an image, we will have obtained rights or

21  permission to use that image.

22  BY MR. BURROUGHS:

23      Q.   Okay.  So when I go to Newsweek.com, the

24  embedded images are visible to me, right, I can see

25  them?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   You should be able to, yes.

2      Q.   So is it fair to say they're being displayed

3   to me as the viewer?

4           MS. GATES:  Objection as to form.

5           THE WITNESS:  Well, they are visible to you,

6   yes.

7   BY MR. BURROUGHS:

8      Q.   And it's your understanding that Newsweek

9   making that image visible to me is not copyright

10  infringement; correct?

11          MS. GATES:  Objection as to form.

12          THE WITNESS:  So we don't -- we don't think

13  that embedding an image is -- from an external site

14  is copyright infringement presumably because the

15  person who uploaded that image intended for it to be

16  shared in this way because those, you know, systems

17  are, you know, widely known to be available to use

18  for that purpose.

19  BY MR. BURROUGHS:

20     Q.   And I understand your position on embedding.

21  My question is you're making it visible to me.  You

22  testified that Newsweek will make visible to me the

23  embedded photograph, and I'm asking you do you

24  believe that is infringement of the artist's

25  copyright?

1          MS. GATES:  Objection.  This is getting into

2   legal territory.

3          THE WITNESS:  I -- I don't think that the

4   embedded image that is visible to you is a copyright

5   infringement.

6   BY MR. BURROUGHS:

7     Q.   And you also testified that it's your

8   understanding that artists, in putting work on

9   Instagram, intend for companies like yours to display

10  it on their website; is that accurate?

11         MS. GATES:  Objection as to form.

12         THE WITNESS:  Well, I can't speak on behalf

13  of all the artists, but if, you know, an artist uses

14  a platform like Instagram, which is designed to share

15  images widely and they provide all the tools to embed

16  them and so on, one could assume that the artist knew

17  this might happen with their image.  It might be

18  embedded somewhere and visible, you know, outside of

19  directly on Instagram.com.  That is the very nature

20  of Instagram and social media.

21  BY MR. BURROUGHS:

22     Q.   Okay.  So is it fair to say that, you know,

23  your testimony regarding the artist's intent is based

24  on your assumption or assumptions regarding the

25  Instagram platform?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. GATES:  Objection as to form.

2          THE WITNESS:  Well, could you maybe repeat

3    the question, please?

4    BY MR. BURROUGHS:

5       Q.   Sure.  Well -- and I don't want to put words

6    in your mouth.  But I believe you testified that you

7    assume, if an artist puts something on Instagram,

8    they're aware that companies like yours are going to

9    display it on your website without their consent; is

10   that accurate and fair?

11         MS. GATES:  Objection.  Same objection.

12         THE WITNESS:  It seems like common sense

13   that if an artist posts their image to a site like

14   Instagram, which is intended for sharing and

15   embedding and provides all the tools for people to do

16   that, that they could expect that it might happen.

17   BY MR. BURROUGHS:

18      Q.   Have you ever read any -- anything, seen

19   anything, or talked to any artists who have actually

20   expressed that view to you?

21         MS. GATES:  Objection as to form.

22         THE WITNESS:  Not to my recollection.

23   BY MR. BURROUGHS:

24      Q.   Okay.  Would it surprise you to learn that

25   most artists do not share your view?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. GATES:  Objection as to form.

2          THE WITNESS:  I don't really have an opinion

3    on if that's their view.

4    BY MR. BURROUGHS:

5      Q.   But your view or the view of Newsweek is

6    that Newsweek can use on its website, so long as it

7    embeds the photograph, any photograph on Instagram

8    because Newsweek believes the -- that artists, when

9    posting to Instagram, understand that at least it's

10   going to be reproduced and displayed on other

11   websites; is that accurate?

12          MS. GATES:  Objection as to form.

13          THE WITNESS:  Yes.  Could you repeat that

14   one more time?  It's quite a complicated question.

15   BY MR. BURROUGHS:

16     Q.   Sure.  Let me -- let me try to break it

17   down.

18     A.   Yeah.

19     Q.   And I don't want to put any words in your

20   mouth, so let me try to rephrase it objectively.

21          But I believe Newsweek's position is that

22   artists who publish work on Instagram do so with some

23   sort of knowledge that websites like Newsweek are

24   eventually going to use their work as displayed on

25   their websites via embed.

Atkinson-Baker, a Veritext Company
www.depo.com

```
1              MS. GATES:  Objection as to form.
2    BY MR. BURROUGHS:
3         Q.   Is that accurate?
4         A.   So the -- I don't know what Newsweek's
5    position is on what the artists think.
6              But if the artist has posted an image to a
7    website that allows embedding, and then an image gets
8    embedded, I don't know why that would be a surprise.
9         Q.   Okay.  And is your belief based on anything
10   other than the fact that they put the work on a
11   social media platform?
12             MS. GATES:  Objection as to form.
13             THE WITNESS:  My belief that -- that what
14   specifically?  Sorry.
15   BY MR. BURROUGHS:
16        Q.   That Newsweek is free to display that work
17   on its website, and that the artists, you know,
18   wouldn't have any objection to that.
19             MS. GATES:  Objection as to form.  Compound.
20             THE WITNESS:  It's my belief that if the
21   image is shared on social media and the tool is
22   provided to embed that image, then, you know, we will
23   do that.
24   BY MR. BURROUGHS:
25        Q.   And when you say "we," that's the position
```

```
 1   of Newsweek; correct?  That's not your personal
 2   opinion.
 3       A.   I suppose as a representative of Newsweek
 4   and the fact that we do embed images and articles,
 5   yes.
 6       Q.   Have you ever had an artist reach out to
 7   Newsweek and object after Newsweek displayed one of
 8   their works without consent?
 9            MS. GATES:  Objection as to form.
10            THE WITNESS:  Not to my recollection.
11   BY MR. BURROUGHS:
12       Q.   Has Newsweek ever been in contact with
13   Facebook or Instagram about whether or not Newsweek's
14   use of user content is authorized?
15            MS. GATES:  Objection as to form.
16            THE WITNESS:  That I don't know.
17   BY MR. BURROUGHS:
18       Q.   Has Newsweek -- I'm sorry.  Withdraw the
19   question.
20            Has Facebook or Instagram ever affirmatively
21   authorized Newsweek to display content from Instagram
22   via the embed process?
23            MS. GATES:  Objection as to form.
24            THE WITNESS:  That I do not know.
25            ///
```

Atkinson-Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.   Okay.  Are you aware of any communications

3    between Newsweek and Facebook or Instagram?

4        A.   I am not.

5        Q.   What are your day-to-day responsibilities at

6    Newsweek?

7        A.   So I sort of oversee the production of the

8    articles.  I may edit some of them myself.  I may

9    offer guidance and advice to the reporters and

10   editors.  And, you know, other mundane administrative

11   tasks as well.  I mean, we can go into boring details

12   if you like.

13       Q.   Is your focus on prose -- on text or on

14   photography, or do you cover both?

15       A.   So we -- I would say probably mainly on the

16   text.  But the images are a part of the article that

17   gets published, so we do see the images and consider

18   them in the context of the article as well.

19       Q.   Okay.  What is your process, if any, in

20   terms of reviewing the photography or the visual

21   assets incorporated in your article?

22       A.   So if an image is, you know, hosted on our

23   site, we will generally have trained the reporters in

24   the -- you know, the policies on how to do this

25   properly.  Pardon me.

Atkinson-Baker, a Veritext Company
www.depo.com

1          And we will -- you know, the editor will,

2    during the course of reviewing the article, have a

3    look at the image.  You know, is it appropriate to

4    the context of the story and is it labeled correctly

5    and has it been credited correctly to the artist or

6    image licensing company.

7          And, you know, if any red flag comes up that

8    the image is not from one of our providers or we just

9    want to double-check with the reporter, we will do

10   that to make sure they got it from one of our

11   providers.  And then when we're happy, we will go

12   live with the article.

13     Q.   And if you're reviewing an article, and you

14   see a photograph that's being displayed in the

15   article as part of an embed process, you'll approve

16   that because you understand an embedded display not

17   to be copyright infringement; correct?

18          MS. GATES:  Objection as to form.

19          THE WITNESS:  So an embedded image, as I

20   said, is not hosted on our site.  So we don't

21   consider it, you know, in the copyright sense, so we

22   will go ahead and embed the image.

23   BY MR. BURROUGHS:

24     Q.   Okay.  So is it fair to say that once you

25   confirm that it is embed, there's no need to do

Atkinson-Baker, a Veritext Company
www.depo.com

1   further copyright inquiry or investigate whether or

2   not it's violated in any way; correct?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  I'm sorry.  Could you repeat

5   the question?  You just trailed off at the end there.

6   BY MR. BURROUGHS:

7      Q.   Sure.  So I believe you testified that once

8   you confirm it's an embed and it's not hosted on your

9   site, it's your position that there are no further

10  copyright concerns with Newsweek using the

11  photograph; correct?

12         MS. GATES:  Objection as to form.

13         THE WITNESS:  Yes.  Generally speaking,

14  embeds are, you know, not posted on our servers.  So

15  we don't think we, you know, have a concern about the

16  copyright of that image because it's external.  It's

17  not something we, you know, added to our site.

18  BY MR. BURROUGHS:

19     Q.   Okay.  So at that point, you wouldn't reach

20  out to the creator of that photograph to seek a

21  license; right?

22         MS. GATES:  Objection as to form.

23         THE WITNESS:  So in general terms, the

24  reporter may contact the creator of that image or

25  person who uploaded that photograph, or whatever it

Atkinson-Baker, a Veritext Company
www.depo.com

1   is, and ask permission to host a copy of that image

2   directly on our servers.  But if we, you know, don't

3   hear back, we'll probably continue with the embedded

4   version of that photograph or whatever it is.

5   BY MR. BURROUGHS:

6       Q.   Okay.  Aside from that, would you do

7   anything else to ensure that Newsweek's display of

8   the photograph didn't violate anyone's rights?

9           MS. GATES:  Objection as to form.

10          THE WITNESS:  Not -- I can't think of

11  anything we would do beyond that.

12  BY MR. BURROUGHS:

13      Q.   Okay.  So at that point you would approve

14  the article, and it would be published at

15  Newsweek.com; correct?

16      A.   Yeah.  As long as the image isn't offensive

17  to us in some way, yes.

18      Q.   Okay.  How many writers do you have working

19  under you now?

20      A.   On any given day, I think we have roughly 15

21  to 20 -- 15 to 18 writers working.  It can vary for

22  various reasons.

23      Q.   And do you have any photographers working

24  under you currently?

25      A.   I'm not aware of any photographers that have

Atkinson-Baker, a Veritext Company
www.depo.com

1   been hired.

2       Q.   During your tenure at Newsweek, are you

3   aware of any photographers ever being hired?

4       A.   I'm not aware of a specific case of a

5   photographer being hired.

6       Q.   So as far as you know, Newsweek's practice

7   is to source its photography from Getty or social

8   media; right?

9           MS. GATES:  Objection as to form.

10          THE WITNESS:  We will, you know, upload

11  images to our server from our licensed providers or

12  any other source where if Getty -- you know, a

13  copyright isn't released or is no longer obtainable.

14  And that's, you know, how we go about handling images

15  on our server.

16  BY MR. BURROUGHS:

17      Q.   Okay.  Are you aware of Newsweek ever paying

18  a photographer a license fee to use their photo?

19      A.   Well, I suppose sort of indirectly through

20  our agreements with Getty and iStock and so on.

21      Q.   Okay.  So aside from Getty, it's accurate to

22  say that Newsweek's practice is not to pay a license

23  fee for the use of photographs; right?

24          MS. GATES:  Objection as to form.

25          THE WITNESS:  I'm not aware of instances

Atkinson-Baker, a Veritext Company
www.depo.com

1 outside of Getty where we've paid a license fee, but

2 I wouldn't say it's our practice to not pay license

3 fees.

4 BY MR. BURROUGHS:

5   Q.   How many articles do you review a day on a

6 typical day?

7   A.   It can vary.  You know, it can be somewhere

8 between 10 and 20, depending.

9   Q.   And how many articles go live on

10 Newsweek.com on a typical day?

11   A.   I would estimate it's about -- somewhere

12 between 100 to 200.

13   Q.   And that's every day; correct?

14   A.   Yes.  Every day.

15   Q.   Well, what's your best estimate as to the

16 average time it takes one of your writers to put

17 together one of these articles?

18   A.   I would estimate they take about two hours

19 to write some of the standard sized articles.  Yeah.

20   Q.   So are some of your writers filing multiple

21 stories per day?

22   A.   Yes.  They will generally file three to four

23 stories a day.

24   Q.   What is the highest number of stories you've

25 ever seen filed by one writer in one day at Newsweek?

Atkinson-Baker, a Veritext Company
www.depo.com

1        MS. GATES:  Objection.  This is outside the

2   scope of the deposition topics.

3   BY MR. BURROUGHS:

4        Q.   Go ahead.

5        A.   I mean, maybe six per writer on a busy day.

6        Q.   And how long does it take you on average --

7   a standard sized piece, to edit the piece?

8        A.   I'll spend maybe 20 minutes to 30 minutes

9   editing the story.

10       Q.   And is it fair to say that it would take

11   much longer to put these pieces together if you had

12   to get in touch with the photographer for the -- a

13   visual element in a piece to obtain a license?

14       MS. GATES:  Objection as to form.

15       THE WITNESS:  I don't know that it would

16   take longer.  It's part of the two hours that I

17   mentioned that the reporter will contact anyone that

18   they want for comments or whatever as part of the

19   article.

20   BY MR. BURROUGHS:

21       Q.   Okay.  And then what are your writers paid

22   per article?

23       A.   Oh --

24       MS. GATES:  Objection.  Getting outside the

25   scope again.

Atkinson-Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.   Go ahead.

3        A.   A day -- I -- they don't get paid per

4    article.  They --

5        Q.   Per word?

6        A.   No.  They are paid just a salary for working

7    months.

8        Q.   And is their compensation tied in any way to

9    the number of articles that they file?

10       A.   Beyond sort of -- no.  It's not tied to the

11   number they produce.

12       Q.   Okay.  Do you as editor encourage your

13   writers to file as many pieces as possible?

14           MS. GATES:  Objection as to form.

15           THE WITNESS:  No.  We -- you know, we don't

16   want to overburden them with unreasonable demands in

17   that respect.

18   BY MR. BURROUGHS:

19       Q.   Okay.  Are you personally aware of any

20   differences in copyright law and the use of other

21   people's content between the UK and the US?

22           MS. GATES:  Objection as to form.

23           THE WITNESS:  No.  I'm not an expert on

24   those matters.

25           ///

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. BURROUGHS:

2     Q.   So as far as you know, for your purposes as

3  a journalist, the copyright laws in the UK and the US

4  are -- they're the same?

5          MS. GATES:  Objection as to form.

6          THE WITNESS:  I would assume there's many

7  subtle detailed differences, but I don't know what

8  they -- those are.

9  BY MR. BURROUGHS:

10    Q.   And you don't take any (audio issue) account

11 in your day-to-day job duties; right?

12         MS. GATES:  Objection as to form.

13         THE WITNESS:  Sorry.  Could you repeat it?

14 You just broke up a little bit there.

15 BY MR. BURROUGHS:

16    Q.   Sure.  You're not aware of any of these

17 distinctions, and they certainly don't impact the way

18 you do your job; correct?

19         MS. GATES:  Same objection.

20         THE WITNESS:  No.  Beyond the general sort

21 of vigilance for not hosting on our sites anything we

22 don't have a license to use.

23 BY MR. BURROUGHS:

24    Q.   Okay.  Are you aware of any steps other than

25 what you've mentioned that Newsweek takes to ensure

Atkinson-Baker, a Veritext Company
www.depo.com

```
1   that it's not violating the copyrights of third-party
2   artists?
3            MS. GATES:  Object --
4            THE WITNESS:  Sorry.  Can you repeat that
5   again?
6   BY MR. BURROUGHS:
7      Q.   Sure.  Are you aware of any steps that
8   Newsweek takes, other than what you've already
9   mentioned, to ensure that it's not violating the
10  rights of third-party artists?
11           MS. GATES:  Objection as to form.
12           THE WITNESS:  I'm not aware of any
13  additional steps that might be taken.
14  BY MR. BURROUGHS:
15     Q.   Okay.  Does Newsweek have any formal
16  copyright policy, for example?
17     A.   So we have a policy on images, which is sort
18  of shared widely and it's used to train reporters
19  with.
20     Q.   Okay.  Is that the social media guidelines
21  drafted by Ms. Rice?
22     A.   It could be.  If you showed me the document,
23  I'd confirm.
24     Q.   Aside from that, are you aware of any other
25  formal copyright policies at Newsweek?
```

Atkinson-Baker, a Veritext Company
www.depo.com

1    A.   Beyond the sort of general image copyright

2  issues and general best practice in journalism to not

3  copy other people's work and, you know, try and pass

4  it off as your own without proper citation or

5  reference or anything, I'm not aware of any

6  additional policies.

7    Q.   Okay.  Have you ever attended any

8  conferences or sessions at Newsweek regarding

9  intellectual property?

10    A.   I -- not to my recollection.

11    Q.   Have you ever had -- withdraw the question.

12         Prior to your deposition today, did you have

13  conversations or communications with anyone regarding

14  this case?

15         MS. GATES:  Objection to the extent we're

16  getting into privileged communications.

17  BY MR. BURROUGHS:

18    Q.   Aside from with your attorneys.

19    A.   No other conversations aside from the

20  attorneys.

21    Q.   Okay.  Have you ever had a conversation with

22  Ms. Rice regarding this case?

23    A.   Not with her, but she was present in

24  discussions with the attorneys.

25    Q.   Before those conversations, when was the

Atkinson-Baker, a Veritext Company
www.depo.com

1  last time you communicated with Ms. Rice?

2      A.   It's -- I couldn't tell you specifically.

3  I'd have to check my records.  Yeah.

4      Q.   Okay.  But as you sit here today, you don't

5  recall, other than the call with the attorneys, the

6  last time you communicated with Ms. Rice; correct?

7      A.   Not specifically, no.

8      Q.   Do you recall anything generally?

9      A.   In general -- just trying to rack my brains

10 here.  No, I mean, I can't -- I can't really think of

11 anything that I would have brought up with her.

12     Q.   Okay.  Have you discussed this case with

13 Yuliya?

14     A.   I have not discussed it with her.

15     Q.   Have you discussed this case with

16 Ms. Hignett?

17     A.   I have not discussed it with her.

18     Q.   Do you understand that the article at issue

19 in this case was drafted by or created by

20 Katherine Hignett?

21     A.   Yes.

22     Q.   Do you know Ms. Hignett?

23     A.   Yes.

24     Q.   Okay.  When was the last time you

25 communicated with Ms. Hignett?

1     A.   I couldn't tell you specifically.  Quite

2  some time ago.

3     Q.   Does she still work with Newsweek?

4     A.   She no longer works with Newsweek.

5     Q.   And she hasn't worked with Newsweek since

6  2019; correct?

7     A.   I couldn't tell you specifically off the top

8  of my head, but that sounds about right.

9     Q.   Have you talked to her since 2019?

10    A.   It's possible she was, you know, at the pub

11 one night or something like that.

12    Q.   Do you recall having any communications with

13 her since 2019?

14    A.   Nothing specifically.  My -- you know, my

15 last communication could very well have been her

16 farewell party.

17    Q.   Okay.  Did you ever communicate with

18 Ms. Hignett about the McGucken article we're

19 discussing today?

20    A.   No.

21    Q.   Okay.  Are you part of the Newsweek Slack

22 program?

23    A.   We do use Slack for our internal

24 communication.

25    Q.   Do you use that to communicate with your

Atkinson-Baker, a Veritext Company
www.depo.com

1   writers?

2       A.   Yes.

3       Q.   Have you ever discussed this dispute on

4   Slack?

5       A.   No.

6       Q.   Do your writers upload photographs to Slack

7   from time to time?

8       A.   The writers may -- I mean, I couldn't say

9   what goes on entirely on Slack.  You know, I don't --

10  I don't see everything that goes on.  So I don't know

11  what they've uploaded on Slack.

12      Q.   Have you ever seen a photograph uploaded to

13  Slack by one of your writers?

14      A.   Not that I can specifically recall.

15      Q.   Do you have any recollection of your writers

16  uploading photographs to Slack?

17      A.   Not that I can specifically recall.

18      Q.   If Ms. Hignett was no longer with Newsweek,

19  Newsweek wouldn't be holding her out to the public as

20  a Newsweek staff writer; correct?

21           MS. GATES:  Objection as to form.

22           THE WITNESS:  I'm not sure I understand the

23  question.

24  BY MR. BURROUGHS:

25      Q.   Okay.  Well, is Newsweek still representing

1   to the public that Ms. Hignett writes for Newsweek?

2          MS. GATES:  Objection as to form.  And I

3   think we're getting outside the scope here.

4          THE WITNESS:  I'm not aware if they are, but

5   as she no longer works with Newsweek, I don't suppose

6   they are.

7   BY MR. BURROUGHS:

8      Q.   And does Newsweek have any policy about

9   keeping current its representations to the public

10   about which individuals are writing for or

11   representing the publication?

12          MS. GATES:  Objection as to form.

13          THE WITNESS:  I'm not aware of any policy on

14   that.

15   BY MR. BURROUGHS:

16      Q.   All right.  Ms. Zaharia is going to show you

17   an exhibit that was previously marked Exhibit 2, the

18   policy, it appears, of Newsweek relating to certain

19   intellectual properties.  Newsweek 1 to 2.

20          (Plaintiff's Exhibit 2 was previously

21          marked by the court reporter for

22          identification and

23          is attached hereto.)

24   BY MR. BURROUGHS:

25      Q.   And just take a moment and tell me if you've

1    ever seen this before.

2         A.   Yes.  This document looks familiar.

3         Q.   Okay.  When was the first time you recall

4    seeing this document?

5         A.   I don't know specifically when I first saw

6    it.  Quite poor -- no.  I couldn't give you a

7    specific answer on that.

8         Q.   Would it have been recently?

9         A.   No.  I've been aware of this document for

10   quite some time.

11        Q.   Did you have any input into the creation of

12   this document?

13        A.   I did not.

14        Q.   Have you ever had the occasion to enforce

15   any of the terms of this document?

16        A.   Yeah.  If by "enforce" you mean just sort of

17   training reporters and ensuring that they are, you

18   know, following the guidelines, then yes.

19        Q.   Have you ever reprimanded or penalized any

20   of your team for violating these guidelines?

21        A.   I don't recall a disciplinary sort of action

22   relating to violation.

23        Q.   Are you aware of anyone at Newsweek ever

24   being reprimanded for violation of these guidelines?

25             MS. GATES:  Objection as to form.

Atkinson-Baker, a Veritext Company
www.depo.com

1        THE WITNESS:  I'm not aware of any sort of

2   formal reprimand that anyone had.

3   BY MR. BURROUGHS:

4        Q.   Okay.  Do you know who created this

5   document?

6        A.   I believe it was Diane Rice.

7        Q.   Okay.  And how do you know that?

8        A.   She was the one who distributed and -- yeah.

9   She distributed it to everyone via e-mail.

10       Q.   Okay.  So you recall receiving this document

11   from Ms. Rice via e-mail?

12       A.   Yes.  I received it at some point from her.

13       Q.   Okay.  And have you taken any steps in

14   connection with your oversight of your writers

15   ensuring that they follow these guidelines?

16       A.   Steps -- yeah.  Well, I mean, steps would be

17   to just ensure that they are indeed following these

18   guidelines.

19       Q.   Okay.  Do you recall having any

20   conversations with any of your writers relating to

21   these guidelines?

22       A.   Yes.  We may discuss certain images that

23   we're interested in using and whether or not we can

24   use them as it pertains to the guidelines.

25       Q.   And who did you have that conversation with?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.    I probably had it with most of the

2  reporters.  Although I couldn't tell you -- give you

3  a list specifically of who I've spoken to about it.

4      Q.    Can you name any writers with whom you had a

5  conversation regarding these guidelines?

6      A.    Well, yes.  Generally speaking, we -- when I

7  train new writers, for example, this will be

8  discussed during the training session.

9      Q.    Okay.  Who did you have that discussion

10  with?

11      A.    Well, there's many.  Should I get together a

12  list of names?

13      Q.    Any that you can recall?

14      A.    Right.  So from the most recent trainees, I

15  would guess --

16      Q.    Spell the name for me.  I'm sorry.  Can you

17  give me the name and then spell it for the record,

18  please?

19      A.    Sure.  I'm just trying to think who to

20  mention.  So I don't know why I'm drawing a blank

21  here on the guy's surname.  I'm trying to think of

22  another one.

23          So a guy called Jack Dutton, for example.

24      Q.    Okay.  Is that J-A-C-K, D-U-T-T-O-N?

25      A.    That's correct.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Okay.  And where does he work?  Which

2  office?

3      A.   He works for the London Bureau.

4      Q.   And what did you tell Mr. Dutton about these

5  particular guidelines?

6      A.   I can't recall specifically.  But in

7  general, I tell reporters when I'm training them that

8  they must review the guidelines.  And also during the

9  training session, when we're talking about images

10  specifically, we'll discuss these guidelines, and

11  I'll be very clear about our procedures in this

12  respect.

13      Q.   Okay.  And during that conversation, do you

14  inform them that they can display on Newsweek.com

15  photography from Instagram via an embed?

16          MS. GATES:  Objection as form.

17          THE WITNESS:  No.  It doesn't specifically

18  come up, embeds, because this document is about

19  hosting images on our websites.

20  BY MR. BURROUGHS:

21      Q.   Okay.  Is there a similar document that

22  relates to embedding?

23      A.   Not that I'm aware of.

24      Q.   So as far as you know, Newsweek, who does

25  have at least one intellectual property policy, has

Atkinson-Baker, a Veritext Company
www.depo.com

1  no policy regarding the use of embeds; correct?

2         MS. GATES:  Objection as to form.

3         THE WITNESS:  I'm not aware of a very

4  specific policy on embeds.  Yeah.

5  BY MR. BURROUGHS:

6     Q.   There's no handout like this that you give

7  to your writers regarding embedding; correct?

8     A.   No handout.

9     Q.   Was Ms. Hignett one of your writers?  Did

10  you edit her work?

11    A.   Yes.  I would have edited her work at times.

12    Q.   Okay.  About how many of her pieces did you

13  edit?

14    A.   I couldn't tell you specifically.  Many

15  because she worked with us for quite some time.  And

16  on any given day, I might edit a couple or none of

17  her work.

18    Q.   Okay.  Did you edit the disputed article

19  that we're talking about today?

20    A.   I don't recall editing that article.

21    Q.   Okay.  If you wanted to figure that out,

22  where would you look?

23    A.   If I wanted to see if I edited it, I would

24  look in the logs of the article.

25    Q.   And have you done that?

Atkinson-Baker, a Veritext Company
www.depo.com

1    A.   I did take a look at the logs, and,

2  unfortunately, they don't go that far back.  So I

3  can't recall having edited it.

4    Q.   How far back do they go?

5    A.   Off the top of my head, I can't remember.

6    Q.   Okay.  So is it accurate to say that you

7  went back to the article log to see whether or not

8  you were involved in the disputed article, and you

9  found that those logs were no longer available?

10        MS. GATES:  Objection as to form.

11        THE WITNESS:  Yes.  That's -- yeah, I had a

12  look at the article and had a look at the logs, and

13  the logs stop at a certain date.  I can't remember

14  exactly.  And so they weren't particularly

15  informative.

16  BY MR. BURROUGHS:

17    Q.   Okay.  Do you know who, if anyone, deleted

18  those older logs?

19        MS. GATES:  Objection as to form.

20        THE WITNESS:  I don't think anyone deleted,

21  although I don't know.  I think it's more a case of

22  the system doesn't have a log.  For some reason, it

23  maybe cuts off after a certain amount of time.  But I

24  think I'm just speculating there.

25        ///

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2     Q.   How far back did the logs go?

3        MS. GATES:  Objection.  Asked and answered.

4        THE WITNESS:  So I think, from my

5   recollection, they go back in detail, so i.e.,

6   recording every action for about three months.  But

7   that is -- that could be incorrect.  That's based on

8   old knowledge of how the system works.  So maybe it's

9   changed since then.

10   BY MR. BURROUGHS:

11     Q.   When did you look?

12     A.   When did I look at the -- at the logs of

13   this article?

14     Q.   (Indicating.)

15     A.   Quite recently once I was involved in this

16   deposition process.

17     Q.   So is it fair to say within the last couple

18   of weeks?

19     A.   That's fair to say, yeah.

20     Q.   So you said they go back three months in

21   detail.  What records go back further than that?

22        MS. GATES:  Objection as to form.

23        THE WITNESS:  I'm not aware of any records

24   on the system that go back further than that.

25        ///

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2       Q.   Okay.  So when you went back to review the

3   edit logs, you found only three months of extant

4   logging material?

5       A.   I'm not sure what the length of time was

6   there.  All I can say is it didn't go back far enough

7   to jog my memory on whether or not I edited this

8   article.

9       Q.   And what else would be shown in those logs?

10      A.   The logs -- it's kind of like a versioning

11  log.  So you can just see each date and time stamp

12  when somebody basically hit save on the work they

13  were doing.  And -- and then you can, you know,

14  compare each version as you go along to see what

15  changes were made.

16      Q.   Okay.  And it identifies the person

17  responsible for each of the changes; correct?

18      A.   Yes.

19      Q.   Okay.  What's the name of the program that

20  you use?

21      A.   So we have our -- our CMS content management

22  system is custom built.  So I don't think it really

23  has a name.  It's just that -- it's in-house.

24      Q.   Do you know what platform it rides on or

25  what underlying technology it uses?

1      A.   I don't know specifically, no.

2      Q.   Okay.  Do you know where it's hosted?

3      A.   I don't know where it's hosted.

4      Q.   Are these logs available to all writers at

5   Newsweek?

6      A.   I -- I believe they are available.  The

7   writers and the editors can all, you know, have a

8   look at the logs if they need to see changes for some

9   reason.

10      Q.   And it is possible to delete content from

11   those logs; correct?

12      A.   No.  The logs -- you cannot delete the log

13   version.  Or at least I'm not aware of, you know, a

14   writer or editor having that ability.  I think the

15   reason they don't go back far enough is probably a

16   technical one.

17      Q.   So is it fair to say that only -- well,

18   withdraw the question.

19           So writers and editors at Newsweek would not

20   be able to delete information from CMS; correct?

21      A.   The writers will not be able to delete

22   information from the CMS.  And very senior editors

23   will be able to unpublish an article.  But even then,

24   the logging of all of that up to whatever is

25   submitted in the logs is -- is not deletable, as far

Atkinson-Baker, a Veritext Company
www.depo.com

1   as I understand.

2       Q.   Okay.  Does Newsweek have a document

3   retention program that you're aware of?

4       A.   I'm not aware of.

5       Q.   At any time before two weeks ago, were you

6   ever advised to maintain records relating to the

7   McGucken dispute?

8           MS. GATES:  Objection to the extent we're

9   getting into privileged communications.

10          THE WITNESS:  I was not advised to retain.

11  BY MR. BURROUGHS:

12      Q.   Have you yourself ever directed any of your

13  writers to display a photograph on Newsweek as part

14  of their article via the embed process?

15          MS. GATES:  Objection as to form.

16          THE WITNESS:  I probably have done that.

17  BY MR. BURROUGHS:

18      Q.   Okay.  Do you recall the last time you did

19  that?

20      A.   Sorry.  Could you just repeat what you said

21  first.  The -- direct the writers to do what?

22      Q.   Do you direct your writers to display work

23  on Newsweek via Instagram embeds?

24          MS. GATES:  Objection as to form.

25          THE WITNESS:  Right.  In the sense that we

1  might spot a tweet or an Instagram or something that

2  we think is useful to embed, I may have directed them

3  to or told them to do that.  And specifically when I

4  last did that, I can't recall.

5  BY MR. BURROUGHS:

6      Q.   But it is part of your practice if you see

7  an appealing photograph on Instagram, you may

8  instruct your writer to go to the photograph, obtain

9  the link, and then -- and display it on Newsweek as

10  part of an article; correct?

11          MS. GATES:  Objection as to form.

12          THE WITNESS:  Yes.  We often will say, embed

13  some of these tweets or Instagram images if they

14  somehow supplement the article.

15  BY MR. BURROUGHS:

16      Q.   So if you see a photograph that would be a

17  proper illustrative aid for the article, you'll

18  instruct the writer to display it on Newsweek via the

19  embed process from Instagram; correct?

20          MS. GATES:  Objection as to form.

21          THE WITNESS:  Yeah.  If the Instagram image

22  is sort of part of the story in some way, we'll

23  probably want to include it.

24  BY MR. BURROUGHS:

25      Q.   Okay.  So if it, for example, illustrates

1   what's being talked about in the story, that would

2   qualify?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  If it -- yeah.  If the image

5   is, you know, part of the news in some way, we'll

6   possibly embed it.

7   BY MR. BURROUGHS:

8     Q.   And when you're instructing your writers to

9   obtain these illustrative aids for the Newsweek.com

10  articles, do you give them any indication as to

11  whether or not they should reach out to the artist?

12         MS. GATES:  Objection as to form.

13         THE WITNESS:  So as mentioned earlier, we do

14  like to contact the person who uploaded any image and

15  request permission to host it on our site ourselves,

16  but we may go ahead and embed it if we don't hear

17  back from them.

18  BY MR. BURROUGHS:

19    Q.   Okay.  So in situations when you are

20  embedding it and displaying it on Newsweek.com via

21  the API, does it matter to you whether or not you

22  have the photographer's consent?

23         MS. GATES:  Objection as to form.

24         THE WITNESS:  So if we have contacted the

25  person who posted the image, and they for some reason

Atkinson-Baker, a Veritext Company
www.depo.com

1  said, you know, please don't use the image, we'll

2  respect that and don't use it.

3  BY MR. BURROUGHS:

4      Q.   But what will you do if they don't respond

5  to your request?

6      A.   I mean, it's -- the embed will probably just

7  remain in the article then.

8      Q.   So in terms of your approval process, it

9  doesn't sound like the lack of consent from the

10  photographer will stop you from displaying the

11  photograph on Newsweek via an embed; correct?

12          MS. GATES:  Objection as to form.

13          THE WITNESS:  Yes.  It -- you know, as I

14  mentioned, the nature of embedding images allows us

15  to, you know, put them there in the article.  And if

16  we don't hear back from the person, not having

17  contact with them, we'll -- the embed will probably

18  remain in the article.

19  BY MR. BURROUGHS:

20      Q.   Do you recall Newsweek ever reaching out to

21  an artist before embedding one of their works in an

22  article to advise them that they're going to be doing

23  that?

24          MS. GATES:  Objection as to form.

25          THE WITNESS:  Sorry.  Could you repeat the

Atkinson-Baker, a Veritext Company
www.depo.com

1  question, please?

2  BY MR. BURROUGHS:

3      Q.  Do you recall Newsweek ever reaching out to

4  an artist to advise them that Newsweek is going to be

5  displaying their work on Newsweek.com via the embed

6  process?

7            MS. GATES:  Objection as to form.

8            THE WITNESS:  Yeah.  So as mentioned, as

9  part of the process, we contact anyone who has posted

10  an image or what have you to Instagram and request

11  permission to host that on our site.  And I suppose

12  in a way that is giving them notice that the image is

13  going to be embedded on their site in the sense

14  that -- yeah.

15            You know, that's just like, you know, sort

16  of a courtesy thing we do to let people have the

17  opportunity to say "Don't embed that image."

18  BY MR. BURROUGHS:

19      Q.  Do you recall any circumstances where you

20  reached out to the artist for consent to upload, they

21  didn't respond, and then you followed up and said, "I

22  know you haven't responded, but we're going to

23  display your image anyways using embed"?

24            MS. GATES:  Objection as to form.

25            THE WITNESS:  So no, I don't remember a

Atkinson-Baker, a Veritext Company
www.depo.com

1    specific instance like that.

2    BY MR. BURROUGHS:

3        Q.   So is it fair to say that Newsweek will

4    routinely embed third-party artists' content without

5    advising them that they're doing so?

6            MS. GATES:  Objection as to form.

7            THE WITNESS:  I don't know about routinely.

8    The routine should be to contact the person who

9    uploaded the image, request permission to host it on

10   our site, and if we don't hear back, we will tend to

11   just go ahead and embed it.

12   BY MR. BURROUGHS:

13       Q.   And when you do that, you won't advise the

14   artist that you're embedding it; correct?

15           MS. GATES:  Objection as to form.

16           THE WITNESS:  Well, the artist, you know,

17   has a message from us saying:  "Hello.  Can we please

18   host it on our site?"  Whether or not they considered

19   that being advised that we're going to embed, I guess

20   that's for them to answer.

21   BY MR. BURROUGHS:

22       Q.   Okay.  But you see hosting and embedding as

23   two different things; correct?

24       A.   Yes.

25       Q.   And you testified your message is about

Atkinson-Baker, a Veritext Company
www.depo.com

1   hosting; correct?

2       A.   From -- from my recollection of what the

3   reporter said, maybe you can bring that document up.

4   I think she was requesting permission to host it on

5   our site.

6       Q.   Okay.  So my question is:  Do you ever

7   advise them that you're going to be embedding on your

8   site, or do you simply embed without telling the

9   artist?

10          MS. GATES:  Objection.  Compound.

11          THE WITNESS:  So we don't advise that we're

12   embedding.  We seek permission to host.

13   BY MR. BURROUGHS:

14       Q.   Can you recall Newsweek ever advising an

15   artist that Newsweek planned to display their

16   photography without their consent via an embed?

17          MS. GATES:  Objection as to form.

18          THE WITNESS:  No.  I don't recall us saying

19   we're going to display something without consent.

20   BY MR. BURROUGHS:

21       Q.   And it's Newsweek's position that it's under

22   no obligations to either obtain consent from the

23   artist or provide notice to the artist before using

24   their work so long as they use it as an embed;

25   correct?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. GATES:  Objection as to form and legal

2    conclusion.

3          THE WITNESS:  Could you repeat that, please?

4    BY MR. BURROUGHS:

5      Q.   Sure.  It's Newsweek's position that

6    Newsweek has no obligations to either obtain the

7    consent of the artist or provide notice to the artist

8    before using that artist's content on its website;

9    correct?

10     A.   No.

11     Q.   How is that incorrect?

12     A.   Well, like I said, if we're hosting it, we

13   will seek permission.  And if we are embedding it, we

14   don't seek permission because we don't see an embed

15   as sort of a copyright infringement.

16     Q.   Okay.  So it sounds -- and, again, correct

17   me if I'm wrong.  But it sounds like Newsweek's

18   position is -- and tell me if this is accurate.

19          Newsweek is under no obligation to obtain

20   the consent of or provide notice to any artist before

21   displaying that artist's work on Newsweek, so long as

22   Newsweek displays the work via the embed process; is

23   that accurate?

24          MS. GATES:  Objection as to form and legal

25   conclusion.

Atkinson-Baker, a Veritext Company
www.depo.com

1           THE WITNESS:  Yeah.  The structure of that

2   is quite long, so it confuses me a bit.  But, you

3   know, as I've stated, we seek permission to host.

4   And if we embed, we don't see the need to seek

5   permission to embed.

6   BY MR. BURROUGHS:

7      Q.   Okay.  So I'll break it up if I -- that was

8   helpful.  That last section there.

9           Is it accurate to say that Newsweek's

10  position is it has no obligations to obtain the

11  consent of a photographer before displaying their

12  work on Newsweek's website, so long as it's displayed

13  via an embed process?

14          MS. GATES:  Objection as to form and legal

15  conclusion.

16          THE WITNESS:  I think that's a good

17  interpretation of what I said.  But it does confuse

18  me a little bit in the length and the way it's put

19  together, the way you phrased it.

20          As I've said, we request permission for

21  hosting, and we'll go ahead and embed with -- you

22  know, regardless.

23  BY MR. BURROUGHS:

24     Q.   Right.  And as we've discussed, your

25  position is hosting and embedding are -- are two

1    different things; right?  You tend to be collapsing

2    them in response to answers -- so let's focus just on

3    the embedding.  Okay?

4        A.   Okay.

5        Q.   So is it accurate to say that Newsweek's

6    position is that it is under no obligation to obtain

7    the consent of a photographer before displaying that

8    photographer's work on Newsweek via the embed

9    process?

10           MS. GATES:  Objection as to form and legal

11   conclusion.

12           THE WITNESS:  I -- yeah, sorry.  One more

13   time if you wouldn't mind repeating that.  Getting a

14   bit flustered, you know?

15   BY MR. BURROUGHS:

16       Q.   No problem.  Is it Newsweek's position that

17   it has no obligations to obtain the consent of a

18   photographer before displaying that photographer's

19   work on Newsweek.com, so long as Newsweek displays

20   the content via the embed process?

21           MS. GATES:  Same objection.

22           THE WITNESS:  Yes.  I think so.

23   BY MR. BURROUGHS:

24       Q.   And is it Newsweek's position that it's

25   under no obligations to provide notice to that

Atkinson-Baker, a Veritext Company
www.depo.com

1    photographer?

2          MS. GATES:  Objection as to form and legal

3    conclusion.

4          THE WITNESS:  We -- we don't -- we don't

5    contact photographers to say, hey, we're embedding

6    their image.  We contact them to request permission

7    to host the image.

8    BY MR. BURROUGHS:

9       Q.   Do you give notice that you're going to

10   display their image before displaying it?

11         MS. GATES:  Objection as to form.

12         THE WITNESS:  Beyond the sort of standard

13   procedure to contact them to request to host, we

14   don't sort of do a specific message saying we are

15   intending to embed this image.

16   BY MR. BURROUGHS:

17      Q.   Okay.  In your experience with industry

18   standards, or if someone copied the entirety of one

19   of your articles, would you like to have notice

20   first?

21         MS. GATES:  Objection as to form.

22         THE WITNESS:  Yeah.  So if somebody copied

23   the article, I suppose there would have to be a

24   syndication discussion or something along those lines

25   before they could, you know, publish it as their own.

1   BY MR. BURROUGHS:

2       Q.    And let's say you told an article over 15

3   tweets and a publication copied those 15 tweets

4   verbatim -- let me withdraw the question.

5             Suppose you wrote an article over 15 tweets,

6   and another publication, through embed, displayed all

7   of those tweets to its readers, would you want to be

8   given notice of that beforehand?

9             MS. GATES:  Objection to form.  Speculation.

10            THE WITNESS:  Yeah.  I mean, I -- it --

11  we -- I don't -- I don't think we would want to or

12  necessarily expect to be given notice if our tweets

13  were being used in another article.

14  BY MR. BURROUGHS:

15      Q.    Does Newsweek itself ever create any

16  original photography?

17      A.    Possibly, but I don't know specifically.

18      Q.    So you don't recall Newsweek ever creating

19  any original photographs; correct?

20            MS. GATES:  Objection as to form.

21            THE WITNESS:  I don't recall this happening.

22  BY MR. BURROUGHS:

23      Q.    Okay.  And are most of Newsweek's articles

24  sourced from other sites?

25            MS. GATES:  Objection as to form.

Atkinson-Baker, a Veritext Company
www.depo.com

1         THE WITNESS:  I don't know about most.  But

2    our articles will be sourced from, you know, other

3    sourced -- other publications that -- and a mix of

4    also our own original reporting.

5    BY MR. BURROUGHS:

6       Q.   Are you aware of any of your writers doing

7    any reporting that went beyond just reading the

8    internet?

9         MS. GATES:  Objection as to form.

10        THE WITNESS:  Yes.  So them doing original

11   reporting?

12   BY MR. BURROUGHS:

13      Q.   Correct.

14      A.   Yes.

15      Q.   Does Newsweek have a policy regarding

16   reporting out an article or doing research beyond

17   just reading the internet?

18        MS. GATES:  Objection as to form.

19        THE WITNESS:  Yeah.  We -- we sort of -- I

20   wouldn't say it's a policy.

21        But it's kind of like a -- you know, a best

22   practices kind of thing, where we want it to be

23   greater than the sum of the parts.  So that should

24   include original comment, putting together multiple

25   streams of information into one place, and, you know,

Atkinson-Baker, a Veritext Company
www.depo.com

1   whatever else we could do to sort of, as I said,

2   create an article that's greater than the sum of its

3   parts.  So it's not just a rewriting of something

4   from one source.

5   BY MR. BURROUGHS:

6       Q.   Okay.  So if an article consisted of nothing

7   more than material sourced from other website

8   articles, would that be in line with what you

9   consider to be best business practices?

10          MS. GATES:  Objection as to form.

11  Speculation.

12          THE WITNESS:  If the article consisted of

13  information from multiple sources, that would be

14  fine.

15  BY MR. BURROUGHS:

16      Q.   If an article consisted of a video taken

17  from another website, a photograph taken from social

18  media, and then quotes taken from a third website,

19  would that for you be an original article under your

20  best business practices?

21          MS. GATES:  Objection as to form,

22  speculation, and we're getting outside the scope of

23  the deposition topics.

24          THE WITNESS:  Yeah.  So -- yeah.  If an

25  article contained these multiple elements -- a video,

Atkinson-Baker, a Veritext Company
www.depo.com

1  images from, just for example, people who are on the

2  scene of the news event or whatever it might be that

3  we're covering, and quotes that other publications

4  obtained -- and we sort of package that all together,

5  did some of our own original reporting, sort comments

6  from authorities, people involved, that sort of

7  thing, then that would be a good article I suppose in

8  my books.

9  BY MR. BURROUGHS:

10    Q.   Okay.  What if that article did not include

11  any, quote, original reporting?

12         MS. GATES:  Objection as to form.

13         THE WITNESS:  I mean, we're getting into

14  like nitty-gritty of what that means.  But if it --

15  if it pulled together lots of sources of information,

16  which you would consider perhaps not original

17  reporting, that would be fine as long as it's, as I

18  said, sort of greater than the sum of its parts

19  there.

20  BY MR. BURROUGHS:

21    Q.   Okay.  And what if the article did not

22  include any attempts to contact sources?

23         MS. GATES:  Objection as to form.

24         THE WITNESS:  We would likely ask the

25  reporter to actually contact sources or people

1   mentioned for comments and stuff like that.

2   BY MR. BURROUGHS:

3       Q.   Did Ms. Hignett ever contact anyone in

4   connection with the disputed article we're talking

5   about today?

6       A.   From my recollection, she did contact a few

7   experts for comment.

8       Q.   Did she contact anyone else?

9       A.   Well, of course the photographer in this

10  case as well, I think she contacted him via

11  Instagram.

12      Q.   Was that for quotes or was that to use his

13  work for free?

14          MS. GATES:  Objection as to form.

15          THE WITNESS:  I -- I can't recall

16  specifically.  I think we, in the documents, have

17  what she wrote there, so we can refer back to that.

18  BY MR. BURROUGHS:

19      Q.   Did Ms. Hignett pose any questions to

20  Mr. McGucken relating to the substance of the

21  article?

22      A.   I'm not sure about that.  Like I say, the --

23  from memory, I'm not sure.  So if we have a look at

24  what she wrote there in her message in our documents

25  here, we could provide that.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Did Ms. McGucken do any background -- I'm

2  sorry.  Withdraw the question.

3           Did Ms. Hignett do any background research

4  on Mr. McGucken before publishing the article?

5      A.   I don't know about that.

6      Q.   Did Ms. Hignett review any of Mr. McGucken's

7  prior work before publishing the article, aside from

8  the image that she displayed?

9           MS. GATES:  Objection to the form.

10  BY MR. BURROUGHS:

11      Q.   Did Ms. Hignett know anything about

12  Mr. McGucken other than what she obtained from

13  Instagram and the third-party article?

14           MS. GATES:  Objection as to form.

15  Speculation.

16           THE WITNESS:  I don't know.

17  BY MR. BURROUGHS:

18      Q.   So as far as Newsweek knows, Mr. Hignett did

19  no -- or Mrs. Hignett did no background research on

20  Mr. McGucken before publishing the article; correct?

21           MS. GATES:  Objection as to form.

22           THE WITNESS:  I don't -- I don't know what

23  she did, so I can't really answer that.

24  BY MR. BURROUGHS:

25      Q.   And the logs that would reflect that have --

Atkinson-Baker, a Veritext Company
www.depo.com

1   are no longer available; correct?

2          MS. GATES:  Objection as to form.

3          THE WITNESS:  So the -- I believe we have

4   some e-mails or some communications that she had, but

5   I can't recall the specific details of those.

6   BY MR. BURROUGHS:

7      Q.   Does Newsweek do any fact-checking anymore?

8          MS. GATES:  Objection as to form.

9          THE WITNESS:  We -- we do fact-check our

10  articles.

11  BY MR. BURROUGHS:

12     Q.   Was Ms. Hignett's article fact-checked?

13     A.   I would assume it was.

14     Q.   Okay.  Do you know who fact-checked that

15  article?

16     A.   I do not, unfortunately.

17     Q.   Would that information be in the logs that

18  are no longer available?

19         MS. GATES:  Objection as to form.

20         THE WITNESS:  Yes.

21  BY MR. BURROUGHS:

22     Q.   Okay.  As part of that fact-checking

23  process, would Newsweek have reached out to

24  Mr. McGucken to confirm the quotes that are in the

25  article?

1      A.   I'm not sure what processes took place

2  since, you know, I wasn't directly involved in the

3  article.

4      Q.   Are you aware of Newsweek's fact-checking

5  procedures and protocols?

6      A.   There -- we have, you know, just sort of a

7  general best practices approach as all journalists

8  should have to, you know, verify claims and so on.

9  And we expect our reporters to, you know, follow

10  these sorts of standards.

11      Q.   And what are those standards?

12      A.   Well, it would just be to actually, you

13  know, research whether what we are writing is true,

14  and if we suspect it is not or it is not from a

15  reliable source, try and corroborate that somehow.

16      Q.   Okay.  And wouldn't that include whether or

17  not someone said something that's attributed to them

18  in the Newsweek article?

19      A.   It may be if we have reason to believe the

20  source we are citing is not reliable for some reason.

21      Q.   Okay.  And how do you ensure that those

22  standards are followed by your writers and your

23  fact-checkers?

24      A.   So a lot of the responsibility is on the

25  reporter to, you know, do this work.  Their editor

1   will oversee their work and review it at times.  And,

2   you know, there's always the -- just the general sort

3   of recurring discussion about, you know, what our

4   standards are and, you know, what we expect from our

5   reporters.  So it's reinforced that way as well.

6           And as mentioned, some editors, for example,

7   will review an article, and if they have any

8   questions or something strikes them as out of place,

9   they will also flag it.

10          So basically I think multiple levels of

11  checks through this -- throughout the process from,

12  you know, the reporter through the editors to live.

13      Q.   How are the records of that kept?

14      A.   I would say not really kept because these

15  discussions might be verbal, often organic.  So we

16  don't -- you know, we don't have a sort of a big list

17  of every single time we sort of create something.

18  But if it's been sent out via e-mail, I'm sure

19  there's a record of that somewhere.

20      Q.   So for example, if a Newsweek staffer

21  reaches out to someone mentioned in the story to

22  confirm a fact, that's not logged anywhere?

23          MS. GATES:  Objection as to form.

24          THE WITNESS:  So if they reached out via

25  e-mail, there'll be an e-mail record.  Or if they did

Atkinson-Baker, a Veritext Company
www.depo.com

1   it via phone, they should have a -- like a recording

2   of that conversation, you know, if we've done an

3   interview or something like that.

4   BY MR. BURROUGHS:

5       Q.   Where are those records kept?

6       A.   Usually the reporters will retain them.  And

7   I'm assuming our e-mail records are on a server or

8   something.

9       Q.   So Newsweek itself has no formal document

10  infringement policy for the fact-checking or in photo

11  records; correct?

12          MS. GATES:  Objection as to form.

13          THE WITNESS:  Not that I can say as a --

14  sort of a formal policy on that.

15  BY MR. BURROUGHS:

16      Q.   Have you yourself ever selected a photograph

17  for use in an article?

18      A.   Yes.

19      Q.   And was that on social media or Getty or

20  somewhere else?

21      A.   It may have been through our licensed

22  providers, or I may have seen something on social

23  media that we decided to embed in an article.

24      Q.   And you've actually gone into the CMS and

25  used the embed language?

1    A.   Yes.  I understand how the system works.

2    Q.   And you yourself avail yourself of that

3  system; correct?

4    A.   Availed myself meaning?

5    Q.   Used it?

6    A.   I have used it.

7         MR. BURROUGHS:  Okay.  We've been going for

8  about two hours.  Let's take a quick five or

9  ten-minute break, if anyone has a preference.  And

10  we'll come back on the record.  What works?  Five

11  minutes?  Ten minutes?

12         MS. GATES:  Let's do ten minutes.

13         MR. BURROUGHS:  Ten minutes.  So we'll be

14  back at 11:15.

15         (Recess.)

16  BY MR. BURROUGHS:

17    Q.   And you understand you're still under oath?

18    A.   I do understand that.

19    Q.   Okay.  So in preparation for today's

20  deposition, did you review any documents?

21    A.   With -- with the attorneys.

22    Q.   Okay.  What documents did you review?

23    A.   I believe the ones that relate to this case.

24    Q.   What documents do you recall reviewing?

25    A.   The -- we had a look at the policy that you

Atkinson-Baker, a Veritext Company
www.depo.com

1  showed me.  The -- sorry.  I'm drawing a blank here.

2          The article itself is what I wanted to say,

3  just so I knew what I was talking about.  And some

4  sort of technical -- some charts of, you know, the

5  traffic that this article generated.

6      Q.   Okay.  And before looking at the article

7  recently, do you recall ever seeing that article

8  before?

9      A.   I have a very sort of hazy recollection of

10  it.  You know, it looks familiar.  But, yeah, you

11  know nothing in detail.

12     Q.   Okay.  And do you recall being involved in

13  any way with that article?

14     A.   I don't recall being involved with the

15  article.

16     Q.   Other than what you've already told me, did

17  you review any other documents in preparation for

18  today?

19     A.   The -- there were some -- the documents that

20  are sort of included with this.  There were some

21  e-mails I think, but the details escape me of -- you

22  know, there was a lot of stuff in there.

23     Q.   Okay.  Did you review any of your own

24  records in preparation for today?

25     A.   Other than, as mentioned, looking at the log

Atkinson-Baker, a Veritext Company
www.depo.com

1   of that article to see if -- to see if, you know,

2   what happened back there, I didn't.

3        Q.   Okay.  Did you review your own e-mails to

4   see if you had any correspondence with Ms. Hignett

5   regarding the article at issue?

6        A.   I did not review my e-mails for that

7   purpose.

8        Q.   Did you review your e-mails for any purpose

9   related to this case?

10       A.   No.  I think everything I needed to know

11  about this case was provided to me by the attorneys.

12       Q.   Understood.  And you yourself didn't provide

13  any material to them; correct?

14       A.   Other than sort of my knowledge that I have,

15  no.

16       Q.   We're going to put in front of you a

17  document we'll mark as Exhibit 11 -- or it was --

18  previously been marked as Exhibit 11.

19            (Plaintiff's Exhibit 11 was

20            previously marked by the court

21            reporter for identification and

22            is attached hereto.)

23  BY MR. BURROUGHS:

24       Q.   Do you recognize this document?  And if so,

25  how do you recognize it?

Atkinson-Baker, a Veritext Company
www.depo.com

1        A.    If you scroll back up there, please, to the

2    headline of the article.  Yeah.  I mean, this looks

3    like the article we're discussing.

4        Q.    Okay.  And you understand this to be the

5    article that's at issue in this case; correct?

6        A.    Yes.

7        Q.    The article that today I've been referring

8    to as the McGucken article or the disputed article;

9    correct?

10       A.    Yes.

11       Q.    Okay.  Now, looking at that -- the first

12   visual there, do you see that it says "continue" on

13   top of it?

14       A.    Yes.

15       Q.    Okay.  Did Newsweek create that video?

16       A.    I believe they would have.

17       Q.    Okay.  So it's your understanding that the

18   video at the top of the disputed article is a video

19   that Newsweek created; correct?

20       A.    Yeah.  I mean, I don't know specifically,

21   but it looks like the kind of video our video team

22   would have created.

23       Q.    Okay.  And let's scroll down.  Okay.  Stop.

24             Do you see that photograph?

25       A.    Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1        Q.   Okay.  And it's appearing on the

2    Newsweek.com website; correct?

3        A.   Yeah.  That looks like an embed.

4        Q.   Okay.  And so a viewer of this article on

5    Newsweek.com would see this McGucken image; correct?

6        A.   Yes.  It's visible to them.

7        Q.   Okay.  And they would see the entirety of

8    the McGucken image; correct?

9        A.   Yeah.  Barring any technical glitches, they

10   should see the embed as it is sort of distributed by

11   Instagram.

12       Q.   Okay.  Are you aware of any technical

13   glitches related to this article?

14       A.   I'm not aware.

15       Q.   Okay.  And Newsweek did not transform, edit,

16   or alter McGucken's photograph before displaying it

17   to its viewers; correct?

18            MS. GATES:  Objection as to form and legal

19   conclusion.

20            THE WITNESS:  I don't think we can

21   because -- or could have because it's -- it's posted

22   on Instagram.  It's not actually on our site as such.

23   BY MR. BURROUGHS:

24       Q.   Okay.  And McGucken's photograph is

25   displayed on Newsweek's site next to advertising for

Atkinson-Baker, a Veritext Company
www.depo.com

1   Disney; correct?

2          MS. GATES:  Objection as to form.

3          THE WITNESS:  It looks that way.

4   BY MR. BURROUGHS:

5      Q.   Okay.  And Disney paid Newsweek for that

6   advertising; correct?

7          MS. GATES:  Objection as to form.

8          THE WITNESS:  I don't know about that.

9   BY MR. BURROUGHS:

10     Q.   Okay.  Are you aware of Newsweek ever

11  offering free advertising to Disney?

12     A.   I'm not aware of that.

13     Q.   Okay.  Are you involved at all in the

14  advertising sales process?

15     A.   I am not.

16     Q.   Okay.  Do you know how Newsweek makes money?

17     A.   In broad terms, yes.

18     Q.   Okay.  How does Newsweek make money?

19         MS. GATES:  Objection.

20         THE WITNESS:  Advertising is one means.

21  BY MR. BURROUGHS:

22     Q.   So it sells advertising?

23         MS. GATES:  Objection as to form.

24         THE WITNESS:  It -- well, I don't work in

25  that, so I don't know exactly what they do in that

Atkinson-Baker, a Veritext Company
www.depo.com

1    department.

2    BY MR. BURROUGHS:

3        Q.    What do you know about what they do in that

4    department?

5            MS. GATES:   Objection as to form.

6            THE WITNESS:   Not a lot.

7    BY MR. BURROUGHS:

8        Q.    Okay.   Do they sell advertising?

9            MS. GATES:   Objection as to form.

10           THE WITNESS:   I would assume so, but I don't

11   know specifically what they do.

12   BY MR. BURROUGHS:

13       Q.    Okay.   Now, how -- well, let me ask you

14   this.   Does Newsweek sell programmatic advertising?

15           MS. GATES:   Objection as to form.

16           THE WITNESS:   I believe they do.

17   BY MR. BURROUGHS:

18       Q.    Does it sell banner advertising?

19           MS. GATES:   Objection as to form.

20           THE WITNESS:   Could you define "banner

21   advertising"?

22   BY MR. BURROUGHS:

23       Q.    A banner ad is generally the advertisement

24   that you'll see at the top of the frame above the

25   content.

1      A.   Can we scroll up and see if there's one

2  here?

3      Q.   Sure.

4      A.   Is that the banner ad at the top?

5      Q.   Is that your understanding of what a banner

6  ad is?

7      A.   Well, I -- I guess so.  But you asked me not

8  to guess.  So you're -- if you define banner ad as

9  the ad at the top, that looks like an ad at the top.

10      Q.   What would you call that?

11      A.   It looks like an advert.

12      Q.   Okay.  Is that an advert for which Newsweek

13  was paid?

14          MS. GATES:  Objection as to form.

15          THE WITNESS:  I don't know the details of

16  how that advert got there.

17  BY MR. BURROUGHS:

18      Q.   Okay.  So as you sit here today, you have no

19  knowledge of Newsweek's revenues as they pertain to

20  this article; correct?

21          MS. GATES:  Objection to the form.

22          THE WITNESS:  I -- I don't know, you know,

23  the details of how each of these individual adverts

24  appeared here or why specifically it was Disney or

25  whatever it was.  In terms of the revenue for the

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   article, I believe that is part of the documentation.
 2   BY MR. BURROUGHS:
 3       Q.   Okay.  Do you have any personal knowledge of
 4   those revenues, or are you basing everything on
 5   documents you were shown?
 6       A.   I'm basing my knowledge on the documents
 7   that were shown.
 8       Q.   You yourself have never sold an
 9   advertisement for Newsweek; correct?
10            MS. GATES:  Objection as to form.
11            THE WITNESS:  I have not.
12   BY MR. BURROUGHS:
13       Q.   You yourself are not involved in any
14   transactions relating to the advertisement appearing
15   on this article; correct?
16            MS. GATES:  Objection to the form.
17            THE WITNESS:  I am not.
18   BY MR. BURROUGHS:
19       Q.   You yourself have no personal knowledge of
20   how Newsweek generates revenues; correct?
21            MS. GATES:  Objection as to form.
22            THE WITNESS:  As I mentioned, in broad
23   terms, yes.  We generate revenue from adverts and
24   other means, I'm sure.
25            ///
```

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. BURROUGHS:

2      Q.   So is it accurate to say that the entirety

3  of your knowledge relating to Newsweek's revenues for

4  this article is that Newsweek sells adverts?

5          MS. GATES:  Objection as to form.

6          THE WITNESS:  I -- I don't -- I'm not aware

7  of any other revenue streams that Newsweek may have

8  as it pertains to this article.

9  BY MR. BURROUGHS:

10     Q.   Do you know what a CPM is?

11     A.   I believe that means click per mille,

12  which --

13     Q.   What does that mean to you?

14     A.   Sorry.  I'm just trying to rack my brains if

15  I got that definition correct.  But I believe it is

16  a -- so the technical term the ads guys use to

17  describe the sort of average revenue per 1,000 clicks

18  on the article.

19     Q.   Okay.  Is Newsweek compensated on a CPM

20  basis, to your knowledge, by any of its advertisers

21  or partners?

22     A.   I don't know specifically the -- how the

23  compensation works for the adverts.

24     Q.   Okay.  And you would agree that Newsweek is

25  it a for-profit website and company; correct?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. GATES:  Objection as to form.

2          THE WITNESS:  Yeah.  I think making a profit

3     is part of the objective.

4     BY MR. BURROUGHS:

5          Q.   Okay.  And publishing articles is a part of

6     that objective; correct?

7          A.   Yes.

8          Q.   So you would agree that Newsweek publishes

9     articles like the one we're looking at to make money;

10    correct?

11         MS. GATES:  Objection as to form.

12         THE WITNESS:  Yes.  That's one reason to

13    publish the article.

14    BY MR. BURROUGHS:

15         Q.   Okay.  And let's scroll down.  And let's

16    look at this McGucken photograph again.  Based on

17    your experience as an editor, do you believe this

18    photograph to be creative?

19         MS. GATES:  Objection as to form.

20         THE WITNESS:  I'm not sure -- if you could

21    define "creative" for me in that sense.

22    BY MR. BURROUGHS:

23         Q.   Based on your experience in the creative

24    industries?

25         A.   That doesn't help me, so I'm not

Atkinson-Baker, a Veritext Company
www.depo.com

1    understanding the question.

2        Q.   Okay.  So is it your testimony that you

3    personally have no experience ascertaining whether or

4    not a work is creative or not?

5            MS. GATES:  Objection as to form.

6            THE WITNESS:  Creative in -- can you just

7    define the term "creative"?  Then I can answer.

8    BY MR. BURROUGHS:

9        Q.   Sure.  Reflecting artistic choices.

10       A.   Okay.  So yeah, if you ask the -- the full

11   question again, please.

12       Q.   Do you consider the McGucken photograph to

13   be a creative work?

14       A.   Yeah --

15           MS. GATES:  Objection as to form.

16           THE WITNESS:  -- as a photographer, I

17   suppose he created this image when he took it.

18   BY MR. BURROUGHS:

19       Q.   Okay.  Would you say this photograph is more

20   or less creative than a spontaneous paparazzi shot of

21   a celebrity on a sidewalk?

22           MS. GATES:  Objection as to form.

23           THE WITNESS:  I don't -- I mean, I don't

24   really follow the question in that sense.

25           ///

Atkinson-Baker, a Veritext Company
www.depo.com

 1  BY MR. BURROUGHS:

 2      Q.   Okay.

 3      A.   But both of those images were created by a

 4  photographer.

 5      Q.   Okay.  So Newsweek doesn't distinguish

 6  creatively between a photograph like the one we're

 7  looking at and a spontaneous paparazzi photograph of

 8  a celebrity on a sidewalk; correct?

 9          MS. GATES:  Objection as to form.

10          THE WITNESS:  Yeah.  I don't -- I mean, as I

11  said, they're both images that were created by a

12  photographer.  So we don't --

13  BY MR. BURROUGHS:

14      Q.   Okay.

15      A.   Yeah.  I think that's the answer.

16      Q.   Let's scroll down.  Do you see this

17  photograph of the landscape?

18      A.   Yes, I do.

19      Q.   Okay.  Did Newsweek create that photograph?

20      A.   We did not create it.

21      Q.   Okay.  And just to close the loop, Newsweek

22  doesn't claim that it created the McGucken

23  photograph; correct?

24      A.   I don't believe we do claim we created it.

25      Q.   And does Newsweek claim that Mr. Manzel

Atkinson-Baker, a Veritext Company
www.depo.com

1  [sic] ever affirmatively told them that Newsweek

2  could use the photograph on its website?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  Sorry.  Could you repeat that?

5  You said Mr. who?

6  BY MR. BURROUGHS:

7    Q.  Sure.  Does Newsweek claim that Mr. McGucken

8  ever gave Newsweek affirmative consent to use that

9  photograph on Newsweek's website?

10          MS. GATES:  Objection as to form.

11          THE WITNESS:  Do -- sorry.  Do we claim that

12  we gave -- he gave us affirmative consent to use it?

13  BY MR. BURROUGHS:

14    Q.  (Indicating.)

15    A.  I don't think we claim that he gave us

16  affirmative to -- to embed it.

17    Q.  Okay.  So is it accurate to say -- in this

18  article we're looking at, there's three visual

19  assets; correct?

20    A.  Sure.  If we're counting this Getty image as

21  one here, the embedded image, and the video at the

22  top.

23    Q.  Okay.  And of the three, you claim that

24  Newsweek created the video; correct?

25    A.  Yeah.  In the sense that the video file that

1 plays was put together by our video editing team.

2    Q.   Okay.   Do you claim that Newsweek created

3 any of the footage in the video, or is that, again,

4 all third-party footage?

5    A.   I don't -- I haven't seen the full video, so

6 I don't know.

7    Q.   Okay.   Now, if you scroll up, you'll see a

8 quote attributed to Mr. McGucken in the SF Gate.   Do

9 you see that?   "It's a surreal feeling," et cetera,

10 et cetera?

11    A.   Yes, I do.

12    Q.   Okay.   Now that is not a quote obtained by

13 Newsweek; correct?

14    A.   No.   It looks like it's from SF Gate.

15    Q.   Okay.   And that text was copied from SF Gate

16 by Ms. Hignett; correct?

17        MS. GATES:   Objection as to form.

18        THE WITNESS:   Yeah.   Looks like the quote --

19 I mean, I don't know, but that makes sense.   Right?

20 She inserted it into her article.

21 BY MR. BURROUGHS:

22    Q.   Okay.   And then below that, you'll see --

23 you know, below this ad for luxury retirement homes,

24 you'll see language that says:   "McGucken said park

25 officials told him the lake appeared to reach a

Atkinson-Baker, a Veritext Company
www.depo.com

1    length of about 10 miles at its peak."

2          Do you see that?

3      A.   I do.

4      Q.   Now, is that statement based on

5    Ms. Hignett's reporting, or was that also taken from

6    somewhere else?

7          MS. GATES:  Objection as to form.

8          THE WITNESS:  I don't know where that comes

9    from.  But based on -- based on the structure of this

10   article, I'm assuming it came from SF Gate; although

11   I haven't reviewed the SF Gate article to be sure.

12   BY MR. BURROUGHS:

13     Q.   And, in fact, it's not clear from the

14   language where that statement came from; correct?

15         MS. GATES:  Objection as to form.

16         THE WITNESS:  So we've cited our source of

17   where we're getting Mr. McGucken's remarks from.  So

18   it -- so it naturally follows that they all came from

19   the same source unless we introduce a new source

20   citation somewhere else.

21   BY MR. BURROUGHS:

22     Q.   Okay.  So per your business standards and

23   best practices, that statement is properly attributed

24   to the source; correct?

25         MS. GATES:  Objection as to form.

Atkinson-Baker, a Veritext Company
www.depo.com

1          THE WITNESS:  Just having a quick read here.

2          Yeah.  It's been attributed to SF Gate.

3   BY MR. BURROUGHS:

4      Q.   Okay.  And where do you see that

5   attribution?  Are you referring to the preceding

6   paragraph?

7          MS. GATES:  Objection as to form.

8          THE WITNESS:  Yes.

9   BY MR. BURROUGHS:

10     Q.   Okay.  Because, in fact, Ms. Hignett never

11  spoke with Mr. McGucken; correct?

12     A.   I'm not aware that she spoke to him.

13     Q.   Okay.  And Newsweek never fact-checked any

14  of these statements; correct?

15         MS. GATES:  Objection as to form.

16         THE WITNESS:  I -- I don't know whether

17  they -- one of the editors or Ms. Hignett did.

18  BY MR. BURROUGHS:

19     Q.   Okay.  In fact, Newsweek simply copied this

20  text directly from SF Gate and reprinted it on

21  Newsweek.com; correct?

22         MS. GATES:  Objection as to form.

23         THE WITNESS:  Well, it depends what you mean

24  by "this text."

25         ///

1  BY MR. BURROUGHS:

2      Q.   Okay.  The quotes from Mr. McGucken.

3      A.   So the direct quotes would likely be, you

4  know, from SF Gate and cited as such, and any

5  paraphrasing as well, but paraphrasing should not be

6  directly copied.

7      Q.   Okay.  And Ms. Hignett provided no original

8  reporting to the SF Gate quotes and statements

9  attributed to McGucken here; correct?

10          MS. GATES:  Objection as to form.

11          THE WITNESS:  By "original reporting," you

12  mean sort of building on what -- what SF -- what was

13  obtained from SF Gate?

14  BY MR. BURROUGHS:

15      Q.   Correct.

16      A.   I think -- I think we added our own original

17  reporting and -- with comments further down, if you

18  scroll down.

19      Q.   And those comments are on the SF Gate

20  material?

21          MS. GATES:  Objection as to form.

22          THE WITNESS:  Can we scroll down and have a

23  look?

24  BY MR. BURROUGHS:

25      Q.   Sure.  So take a moment to review that and

1  tell me how that builds on the SF Gate quotes

2  attributed to Mr. McGucken, if it does?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  Right.  It's a bit difficult

5  when it's -- I don't have the full article in front

6  of me.

7  BY MR. BURROUGHS:

8     Q.  Well, take your time.  We're happy to spend

9  as much time looking at it as you want.

10    A.  So what I'm looking for here is she -- from

11 my recollection, she cited some experts that she

12 contacted.

13    Q.  And did those experts comment on

14 Mr. McGucken's experience?

15    A.  Not that I can recall.  I'm just trying to

16 see if I can spot something to that effect.  Can we

17 scroll up a bit?  I'm actually looking for the bit

18 where we got comment from Hannah Cloke, for example.

19    Q.  Okay.  And before we get to that, I note

20 that the -- well, let's start at the bottom since

21 we're going to be talking about Ms. Cloke.  There it

22 is.

23          The original version of this article did not

24 include Hannah Cloke's comment; correct?

25          MS. GATES:  Objection as to form.

Atkinson-Baker, a Veritext Company
www.depo.com

1         THE WITNESS:  I don't know specifically, but

2    judging from the way we included that update note at

3    the bottom, I would expect -- I would suspect that it

4    did not, and then we added that after it went live.

5    BY MR. BURROUGHS:

6         Q.   Do you know when?

7         A.   I do not.

8         Q.   Okay.  Go ahead and scroll up.

9              So take a moment to review and tell me how

10   that builds on the SF Gate reporting about

11   Mr. McGucken?

12            MS. GATES:  Objection as to form.

13            THE WITNESS:  Right.  So I wouldn't say it

14   builds on it.  It is just, you know, more -- more

15   reporting on the subject.

16   BY MR. BURROUGHS:

17        Q.   Okay.  And that reporting is completely

18   unrelated to Mr. McGucken; correct?

19            MS. GATES:  Objection as to form.

20            THE WITNESS:  Well, it doesn't appear to be

21   commenting about him specifically, but the -- you

22   know, the event of this lake forming rather.

23   BY MR. BURROUGHS:

24        Q.   Correct.  Correct.  And it doesn't appear to

25   be commenting on McGucken's photograph specifically

Atkinson-Baker, a Veritext Company
www.depo.com

1    either; correct?

2         MS. GATES:  Objection as to form.

3         THE WITNESS:  I don't see it here

4    referencing his photograph.

5    BY MR. BURROUGHS:

6      Q.   Okay.  Ms. Cloke makes no comment about

7    Mr. McGucken or his photography; correct?

8         MS. GATES:  Objection as to form.

9         THE WITNESS:  Just double-checking.

10        Not that I can see here from the quotes in

11   front of me.

12   BY MR. BURROUGHS:

13     Q.   Okay.  In fact, there's nothing in this

14   article that comments on or criticizes Mr. McGucken

15   or his photography; correct?

16        MS. GATES:  Objection as to form.

17        THE WITNESS:  Well, I think we talk about

18   him if we scroll down.  As you can see, we're

19   mentioning his name and including some of his quotes

20   of his, you know, experience capturing this event.

21   BY MR. BURROUGHS:

22     Q.   And I believe you've testified that that

23   material was all taken from SF Gate and at most

24   paraphrased; correct?

25        MS. GATES:  Objection as to form.

Atkinson-Baker, a Veritext Company
www.depo.com

1          THE WITNESS:  Yeah.  It appears the quotes

2    were sourced from SF Gate, and some of the additional

3    information as well.

4    BY MR. BURROUGHS:

5      Q.   Okay.  So other than the material taken from

6    SF Gate, Newsweek does not comment or criticize

7    Mr. McGucken or his work at all in this piece;

8    correct?

9          MS. GATES:  Objection as to form.

10         THE WITNESS:  If we just scroll to the

11   bottom, please.

12         So can you repeat that question, please?

13   BY MR. BURROUGHS:

14     Q.   Sure.  Other than the material that

15   Ms. Hignett copied from SF Gate, and at most

16   paraphrased, about Mr. McGucken, this article doesn't

17   criticize or comment Mr. McGucken or his photography

18   at all, does it?

19         MS. GATES:  Objection as to form.

20         THE WITNESS:  I did not spot any criticism

21   of his photography.  And if we just scroll up to his

22   image again, please.  Whether we commented on it,

23   I -- you know, I think the -- there's no specific

24   comment.  Although we do include his own words.

25   Right?  Saying, you know, how -- his own comments on

1    the event.

2    BY MR. BURROUGHS:

3        Q.   Okay.  So is it accurate to say that the

4    only comments about the photography in this Newsweek

5    article are Mr. McGucken's comments?

6             MS. GATES:  Objection as to form.

7             THE WITNESS:  I guess that's -- that's fair

8    to say.

9    BY MR. BURROUGHS:

10       Q.   Okay.  Can you point out any other comments

11   on Mr. McGucken's photography in this Newsweek

12   article other than Mr. McGucken's comments?

13       A.   I did not notice any.

14       Q.   Okay.  Scroll down again to the bottom.

15            Do you know who appended the clarification

16   referencing Ms. Cloke at the bottom of this article?

17       A.   I do not know specifically who did.

18       Q.   If you wanted to know that, where would you

19   look?

20       A.   I would want to check the article log.

21       Q.   Okay.  And that would -- those logs are --

22   again, they're -- they no longer exist; correct?

23            MS. GATES:  Objection as to form.

24            THE WITNESS:  I don't know if -- you know,

25   they exist somewhere on the system.  But I can't

Atkinson-Baker, a Veritext Company
www.depo.com

1   access the changes to figure out who added that

2   comment at the bottom, for example.

3   BY MR. BURROUGHS:

4      Q.   Okay.  So as a managing editor of Newsweek,

5   the only records that would indicate to you when the

6   appendage was made are no longer available to you;

7   correct?

8          MS. GATES:  Objection as to form.

9          THE WITNESS:  It currently seems that way

10  unless there's a -- as I say, some other log that I'm

11  not aware of.

12  BY MR. BURROUGHS:

13     Q.   As a managing editor, would there be logs

14  you're not aware of, of articles?

15         MS. GATES:  Objection as to form.

16         THE WITNESS:  It's -- it's possible.  I

17  don't -- and I don't know exactly all the technical

18  details of how the system operates and how logs are

19  stored.

20  BY MR. BURROUGHS:

21     Q.   Okay.  Do you know who added the

22  Hannah Cloke material to this article after it was

23  published?

24         MS. GATES:  Objection.  Asked and answered.

25         THE WITNESS:  I don't know specifically.  I

Atkinson-Baker, a Veritext Company
www.depo.com

1    will assume it was the reporter.

2    BY MR. BURROUGHS:

3        Q.   Was she directed to add that material by

4    anyone at Newsweek?

5        A.   In a general sense.  She would -- it's just

6    our practice, if we receive some comment back, we

7    will include that comment.

8        Q.   Okay.  Do you know if that happened in this

9    case?

10       A.   It appears that way.

11       Q.   Okay.  At the time of this article's

12   publication, who would have given that direction on

13   behalf of Newsweek?

14       A.   So as mentioned, it's more of a general

15   practice to include comments once received.  So to

16   say somebody specifically told her to do it, I don't

17   think I can answer that.

18       Q.   Okay.  So you have no personal knowledge of

19   when, how, why, or at whose direction this Cloke

20   material was added to the piece; correct?

21           MS. GATES:  Objection as to form.  Compound.

22           THE WITNESS:  Nothing -- I couldn't tell you

23   specifically.  No.

24   BY MR. BURROUGHS:

25       Q.   Okay.

1      A.   But as mentioned, it's just general practice

2   to include comments once we've received it.

3      Q.   Okay.  The only records that would reflect

4   that information have been destroyed or are otherwise

5   unavailable; correct?

6           MS. GATES:  Objection as to form.

7           THE WITNESS:  I'm not aware of any existing,

8   you know, log of the fine details of who inserted

9   this comment and when.

10  BY MR. BURROUGHS:

11     Q.   Okay.  But it's your understanding that that

12  material, or those facts relating to when this

13  content was inserted, would have been in those logs

14  that you looked for but were unable to find because

15  they were no longer on the system; correct?

16          MS. GATES:  Objection as to form.

17          THE WITNESS:  Yeah.  It -- I could

18  essentially look at the log and see who -- you know,

19  which name was registered in the log, who made the

20  updates.  And on that basis, we could infer that that

21  person did it.

22  BY MR. BURROUGHS:

23     Q.   And that would also give you the date;

24  correct?

25     A.   Yes.  The date, the time stamp.  It's quite

1    specific, yes.

2        Q.   Did Newsweek eventually remove the McGucken

3    photograph from this article?

4        A.   Yes.  I think they did.

5        Q.   Were you involved in that process at all?

6        A.   I was not.

7        Q.   Do you have any knowledge about the decision

8    to remove the item or the length of time it took or

9    any facts relating to that removal?

10           MS. GATES:  Objection as to form.  Compound.

11           THE WITNESS:  I don't have detailed

12   knowledge of that.

13   BY MR. BURROUGHS:

14       Q.   Why did Newsweek remove the photograph?

15           MS. GATES:  Objection as to form.

16           THE WITNESS:  I don't know what the -- what

17   the thought process was behind that decision.

18   BY MR. BURROUGHS:

19       Q.   Okay.  And you don't know when it happened

20   either, do you?

21           MS. GATES:  Objection as to form.

22           THE WITNESS:  I don't specifically know when

23   it happened, no.

24   BY MR. BURROUGHS:

25       Q.   Does Newsweek have a policy for responding

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   to cease and desist letters or copyright notices?
 2       A.   Sorry.  Is that feedback from me or someone
 3   else?
 4            (Recess.)
 5            THE WITNESS:  Okay.  Sorry.  Could you
 6   repeat the question, please?
 7   BY MR. BURROUGHS:
 8       Q.   Sure.  Does Newsweek have a policy for
 9   responding to cease and desist letters and/or
10   copyright notices?
11       A.   I'm not aware of -- of a policy on that.
12       Q.   Okay.  Now, was any other material removed
13   from the article that we're looking at in Exhibit 11?
14       A.   I'm not aware of other material being
15   removed.
16       Q.   Was the video ever removed?
17       A.   Again, I'm not aware of the video being
18   removed.
19       Q.   So let's look -- scroll back up and look at
20   the McGucken photograph again.
21            So is Newsweek displaying the McGucken
22   photograph here to illustrate the story?
23            MS. GATES:  Objection to the form.
24            THE WITNESS:  It looks like -- you know,
25   like a supplemental image.  It captured this rare
```

Atkinson-Baker, a Veritext Company
www.depo.com

1    moment.  So you know, that's why it's included.

2    Yeah.

3    BY MR. BURROUGHS:

4        Q.   So it's illustrating this story about this

5    moment in Death Valley; correct?

6            MS. GATES:  Objection as to form.

7            THE WITNESS:  It's an image of that moment.

8    BY MR. BURROUGHS:

9        Q.   Does this photograph not illustrate the

10   story that it's incorporated in on Newsweek?

11           MS. GATES:  Objection as to form.

12           THE WITNESS:  It is part of the news event.

13   BY MR. BURROUGHS:

14       Q.   Okay.  So it's accurate to say that the

15   McGucken photograph is being used as an illustrative

16   aid to illustrate the article that we're looking at

17   in Exhibit 11; correct?

18           MS. GATES:  Objection as to form.

19           THE WITNESS:  The image, you know, shows the

20   event as captured by Mr. McGucken.

21   BY MR. BURROUGHS:

22       Q.   Okay.  So it shows the event; correct?

23       A.   It appears to, yes.

24       Q.   So it illustrates the event that's being

25   discussed in the article; is that your testimony?

Atkinson-Baker, a Veritext Company
www.depo.com

1           MS. GATES:  Objection as to form.

2           THE WITNESS:  Well, I mean, it's a picture

3    of this lake.  So that's what we reported on.

4    BY MR. BURROUGHS:

5       Q.   Is it used for any other purpose aside from

6    illustrating the story?

7           MS. GATES:  Objection as to form.

8           THE WITNESS:  Well, the purpose was to, you

9    know, supplement the news of this event with some

10   firsthand accounting from someone who was there.

11   BY MR. BURROUGHS:

12      Q.   Okay.  Other than illustrating the article

13   and supplementing the account, is it being used for

14   any other purpose?

15          MS. GATES:  Objection as to form.

16          THE WITNESS:  I'm not really sure I

17   understand what's the purpose you're getting at.

18   BY MR. BURROUGHS:

19      Q.   Okay.  So other than what you've told me,

20   you're unaware of any other purpose for which this

21   photograph was used; correct?

22          MS. GATES:  Objection as to form.

23          THE WITNESS:  Other than to show that the

24   event took place and this is what it looks like, I

25   don't see there's another, you know, purpose of the

Atkinson-Baker, a Veritext Company
www.depo.com

1    image.  It's just -- it's part of the news event, so

2    it's in the article.

3    BY MR. BURROUGHS:

4        Q.   Did SF Gate also publish this photograph?

5        A.   I'm not aware of what they did.

6        Q.   Assuming SF Gate did publish this

7    photograph, would they have been using it for the

8    same purpose as Newsweek?

9             MS. GATES:  Objection as to form.

10            THE WITNESS:  I don't know what SF Gate did,

11   so I can't speculate.

12   BY MR. BURROUGHS:

13       Q.   Okay.  Can you articulate any difference

14   between the purpose for Newsweek's display of this

15   photograph and Mr. McGucken's display of the

16   photograph?

17            MS. GATES:  Objection as to form.

18            THE WITNESS:  I don't -- I don't know -- I

19   don't know what Mr. McGucken's purpose might have

20   been to display the photograph.

21   BY MR. BURROUGHS:

22       Q.   Okay.  So as you sit here today, you can't

23   articulate any difference between his display of the

24   work and your display of the work in terms of

25   purpose; correct?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. GATES:  Objection as to form.  Misstates

2    testimony.

3          THE WITNESS:  So I can't because I don't

4    know what his purpose was.  So to -- to -- I'd just

5    be sort of dreaming up some sort of idea of what the

6    difference is.

7    BY MR. BURROUGHS:

8      Q.   Okay.  Does Newsweek's use of McGucken's

9    photograph depict what's being talked about in the

10   article?

11         MS. GATES:  Objection as to form.

12         THE WITNESS:  The -- the embedded photograph

13   shows the news event that we reported on.

14   BY MR. BURROUGHS:

15     Q.   Okay.  So it's accurate to say that it

16   depicts the subjects described in the article;

17   correct?

18         MS. GATES:  Objection as to form.

19         THE WITNESS:  Sorry.  Can you repeat the

20   question?

21   BY MR. BURROUGHS:

22     Q.   Is it accurate to say that the McGucken

23   photograph depicts the subjects described in the

24   article?

25         MS. GATES:  Same objection.

1           THE WITNESS:  The subject being the lake?

2  BY MR. BURROUGHS:

3      Q.   The subjects described in the article.

4      A.   So I'm just checking.  You mean the subject

5  being the news of this lake being formed?

6      Q.   It -- I don't -- it's your understanding

7  what the subject of this article is as the managing

8  editor of Newsweek.  If you're telling me you don't

9  know what the subject of the article is, that's okay

10 too.  You can tell me that.

11     A.   Right.  So the subject of the news article

12 is this lake has been formed, and this embedded image

13 demonstrates, you know, that -- you know, what that

14 might have looked like.

15     Q.   Okay.  So is it accurate to say that the

16 photograph depicts the subjects described in the

17 article?

18         MS. GATES:  Objection as to form.

19         THE WITNESS:  It's an image of the news

20 event, yes.

21 BY MR. BURROUGHS:

22     Q.   Okay.  Do you contend that your use of this

23 McGucken image served an important public purpose?

24         MS. GATES:  Objection as to form.

25         THE WITNESS:  Well, it -- it did in the

Atkinson-Baker, a Veritext Company
www.depo.com

1   sense that this is a rare event, a phenomenon, and

2   people wouldn't have been able to see it.  So this

3   is -- in that sense, yes.  Because it's -- you know,

4   it shows them what that event might have looked like

5   if they weren't able to see it themselves.

6   BY MR. BURROUGHS:

7       Q.   Okay.  So it's Newsweek's position that if

8   Newsweek hadn't displayed McGucken's photograph, the

9   public wouldn't have been able to see this

10  photograph?

11          MS. GATES:  Objection as to form.

12          THE WITNESS:  No, because the image is

13  posted on Instagram.  They can go look at it over

14  there, which essentially is what they're doing,

15  they're looking at Instagram through our web page.

16  BY MR. BURROUGHS:

17      Q.   Okay.  But I believe you testified -- and I

18  don't want to put words in your mouth -- but if

19  Newsweek hadn't displayed McGucken's photograph, the

20  public wouldn't have been able to see it.

21          Do you recall saying that under oath?

22          MS. GATES:  Objection as to form.  Misstates

23  testimony.

24          THE WITNESS:  No.  I didn't say that.

25          ///

Atkinson-Baker, a Veritext Company
www.depo.com

1    BY MR. BURROUGHS:

2        Q.    Okay.  The public would have been able to

3    see this photograph even if you hadn't displayed it

4    without the artist's consent; correct?

5            MS. GATES:  Objection as to form.

6            THE WITNESS:  The image is available on

7    Instagram, and it's displayed publicly on Instagram,

8    so they could have seen it there.

9    BY MR. BURROUGHS:

10       Q.    Was the image online anywhere else, any

11   other publications, to your knowledge?

12       A.    I don't know about that.

13       Q.    Have you ever undertaken a search to see

14   where else online this image may have been published

15   or posted?

16       A.    I have not.

17       Q.    Okay.  So assuming that this image is

18   available on another publication's website, do you

19   still believe that your display of it serves an

20   important public purpose?

21           MS. GATES:  Objection as to form.

22           THE WITNESS:  Yes.  We -- you know, news

23   websites all compete to, you know, report the news.

24   So this is how these things work.  We wouldn't just

25   not report a phenomenon like this because someone

```
 1   else has.
 2   BY MR. BURROUGHS:
 3       Q.   Any other reason?
 4       A.   Any other reason for what?  Sorry.
 5       Q.   For why you believe it served an important
 6   public purpose to display his work without his
 7   consent?
 8            MS. GATES:  Objection as to form.
 9            THE WITNESS:  So we embedded this image in
10   our article, and we sought consent to host it.
11   BY MR. BURROUGHS:
12       Q.   Okay.  Any other reasons?
13       A.   Sorry.  Sorry.  Got lost on the question.
14   Any other reason for?
15       Q.   I asked if you believe that your display of
16   his photograph served an important public purpose.
17   And I'm asking, other than what you've told me, is
18   there any other basis for that belief?
19            MS. GATES:  Objection as to form.
20            THE WITNESS:  I think I've told you why it
21   serves public purpose.
22   BY MR. BURROUGHS:
23       Q.   Okay.  So there's no other basis that you
24   can think of; correct?
25            MS. GATES:  Objection as to form.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1          THE WITNESS:  Can you remind me of what I

2   said already now?

3   BY MR. BURROUGHS:

4      Q.   If you don't recall, you can tell me again.

5      A.   So yeah, the -- this image is serving a

6   public purpose because it so captures this rare

7   event.

8      Q.   Any other reason?

9          MS. GATES:  Objection as to form.

10          THE WITNESS:  Well, you know, I'm racking my

11   brains.  I mean, that's a fairly broad description,

12   so let me just think.

13          No, yeah, I think it's fair to say that this

14   image captures that news event, and that's the

15   sort -- the public purpose of it, is to -- you know,

16   it's a record of this rare phenomenon.

17   BY MR. BURROUGHS:

18      Q.   Okay.  Could Newsweek have published this

19   article about the Death Valley lake without using

20   McGucken's photograph?

21          MS. GATES:  Objection as to form.

22          THE WITNESS:  Could we have published it

23   without the embedded image?

24   BY MR. BURROUGHS:

25      Q.   (Indicating.)

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   We could have.  But then it would fall

2  somewhat short of, you know, demonstrating what the

3  event looked like.

4      Q.   Okay.  And why would that be?

5      A.   Well, simply because we didn't have an image

6  of the event, so we'd have to describe it in, you

7  know, word form.

8      Q.   Would that require more reporting from

9  Newsweek?

10         MS. GATES:  Objection as to form.

11  Speculation.

12         THE WITNESS:  Arguably, yes, the -- you

13  know, it depends on how descriptive you want to be in

14  writing.

15  BY MR. BURROUGHS:

16     Q.   Okay.  So is it accurate to say that

17  Newsweek still could have reported on the Death

18  Valley lake without using the McGucken photograph,

19  but the article wouldn't have been as appealing or it

20  would have required more work on the part of Newsweek

21  in reporting?

22         MS. GATES:  Objection as to form.  Compound.

23  Speculation.

24         THE WITNESS:  We could have reported the

25  story without embedding the image, perhaps.  I don't

Atkinson-Baker, a Veritext Company
www.depo.com

1    know about more work or whether it would have been

2    worse in any way.  But because the image was

3    available to embed, it served -- it was included as

4    a -- sort of a supplement to all the information we

5    gathered on the event.

6    BY MR. BURROUGHS:

7        Q.   Okay.  So is it fair to say that if you

8    didn't have Mr. McGucken's firsthand accounts of the

9    Death Valley lake, you would have had to send a

10   reporter to do some investigation or some due

11   diligence to obtain such information?

12           MS. GATES:  Objection as to form.

13   Speculation.

14           THE WITNESS:  Not necessarily.  Because we

15   included the comment from experts on the event, and

16   there was reporting from other, you know, reputable

17   sites that this happened.

18   BY MR. BURROUGHS:

19       Q.   Okay.  But the article itself is still

20   viable and meets your publishing standards even

21   without the McGucken photograph; correct?

22           MS. GATES:  Objection as to form.

23           THE WITNESS:  Yes.

24   BY MR. BURROUGHS:

25       Q.   Okay.  And, in fact, Newsweek is still

Atkinson-Baker, a Veritext Company
www.depo.com

1  publishing and making available online this article

2  without the McGucken photograph; correct?

3      A.  Yes.

4          MS. GATES:  Objection as to form.

5  BY MR. BURROUGHS:

6      Q.  Do you believe, based on your industry

7  experience, that using photographers' firsthand

8  reporting and creative works in your articles without

9  compensation affects their ability to license their

10 work?

11         MS. GATES:  Objection as to form.

12         THE WITNESS:  Sir, that's a complicated

13 question.  Can you repeat it, please?

14 BY MR. BURROUGHS:

15     Q.  Sure.  Does Newsweek believe that using

16 photography from third-party artists without

17 compensating them affects that photographer's ability

18 to license its photography?

19         MS. GATES:  Same objection.

20         THE WITNESS:  We -- we wouldn't -- we

21 wouldn't host an image on our site without licensing

22 it.

23 BY MR. BURROUGHS:

24     Q.  Sure.  But do you believe that hosting it on

25 your site or embedding it on your site without

Atkinson-Baker, a Veritext Company
www.depo.com

1  compensating the artist impacts that artist's ability

2  to license their work or otherwise make a living?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  I don't think I can comment on

5  that at all.

6  BY MR. BURROUGHS:

7     Q.   So it's Newsweek's position that it doesn't

8  know one way or the other whether displaying an

9  artist's work without paying them affects their

10  ability to license their work; is that accurate?

11         MS. GATES:  Objection as to form.  Misstates

12  testimony.

13         THE WITNESS:  I don't think that's what I

14  said.  The -- as I said, we host on our site images

15  that we have licensed.  And the rest of the question

16  seems to be really just merely speculating.

17  BY MR. BURROUGHS:

18    Q.   Okay.  What, if anything, is Newsweek's

19  position on whether or not Newsweek's display of

20  photographs without compensating the photographer

21  affects that photographer's ability to license the

22  photograph?

23         MS. GATES:  Objection as to form.  We're

24  getting outside the scope of the deposition topics

25  here.

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2       Q.   Go ahead.

3       A.   Please repeat the question.

4       Q.   Sure.  What is Newsweek's position, if any,

5   on whether or not Newsweek's display of photographs,

6   without licensing the photograph from the

7   photographer, affects that photographer's ability to

8   license its work?

9           MS. GATES:  Same objection.

10          THE WITNESS:  We -- we don't host images

11  that we haven't licensed, is our policy.

12  BY MR. BURROUGHS:

13      Q.   Okay.  Does the display of those images via

14  embed affect the photographer's ability to license or

15  otherwise monetize that work?

16          MS. GATES:  Objection as to form.

17          THE WITNESS:  I don't -- I don't know about

18  that.

19  BY MR. BURROUGHS:

20      Q.   Okay.  As an editor, would you be more or

21  less likely to use a work depicting a landscape that

22  had already appeared on numerous other websites?

23          MS. GATES:  Objection as to form.

24          THE WITNESS:  I -- I don't think so.  More

25  or less likely -- I think if it's good, we'll use it.

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2      Q.   Does the exclusive nature of the photograph,

3   in the sense that you may be one of the only

4   publications to display the photograph, affect your

5   decision-making in whether or not to run a

6   photograph?

7           MS. GATES:  Objection as to form.

8           THE WITNESS:  No.

9   BY MR. BURROUGHS:

10     Q.   Okay.  I'm going to put a document in front

11  of you we're going to mark as Exhibit 12.  It's

12  coincidentally Newsweek 12, screenshot of Ms. Rice.

13          (Plaintiff's Exhibit 12 was marked

14          for identification by the court

15          reporter and is attached hereto.)

16  BY MR. BURROUGHS:

17     Q.   Tell me if you've -- if you've seen this

18  document before.

19     A.   I have.

20     Q.   Okay.  And what is this document, and how do

21  you recognize it?

22     A.   This looks like the -- our CMS's internal

23  statistics for this article.

24     Q.   And what is it showing?

25     A.   It's not showing a lot.  Can we scroll down

Atkinson-Baker, a Veritext Company
www.depo.com

1    a bit?

2        Q.    Yes.

3        A.    Shall I talk top to bottom?

4        Q.    Yes.

5        A.    Okay.  So the -- the top statistics there,

6    as the label suggests, just shows the amount of

7    traffic it's received on an hourly basis from the

8    channel there.  It's divided up in search, social,

9    links, and internal and direct.

10            So basically this is showing, for example,

11   it had one visitor at -- on Tuesday at 9:00 a.m. on

12   whatever date this screenshot was taken.

13       Q.    So is this reflecting two days of traffic?

14       A.    It seems to be, as it says Tuesday and

15   Wednesday here.

16       Q.    Okay.  Does Newsweek have the same data

17   going back to the date the article at issue was

18   posted?

19       A.    We should have the -- not -- perhaps not

20   here on this internal statistics, but in another form

21   there would be some sort of record of the traffic the

22   article received.

23       Q.    Have you reviewed that information?

24       A.    Yes.  I had a look at the document that was

25   provided as part of this case.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.    Okay.  Now, this is not a document that you

2   generated; correct?

3      A.    This is just generated in the back end of

4   our system.  If you're asking if I screenshotted

5   this, I did not.

6      Q.    Okay.  I'm going to direct your attention to

7   Exhibit 13, which is coincidentally Newsweek 13.

8           (Plaintiff's Exhibit 13 was marked

9           for identification by the court

10          reporter and is attached hereto.)

11  BY MR. BURROUGHS:

12     Q.    Do you recognize this document?

13     A.    Yes.  This looks to be the same sort of area

14  of the CMS with the statistics.  I will assume it's

15  the same article.

16     Q.    Is there any way of telling by looking at

17  the document what article this references?

18     A.    Not -- not at this specific screenshot.  But

19  I'm assuming it's just the continuation of the

20  previous one.

21     Q.    Okay.  Can you tell from looking at this

22  what time period this covers?

23     A.    Sorry.  Let me get my Zoom guys out of the

24  way.  It doesn't seem to, at least from what I can

25  see here.  If we scroll down maybe.  Uh-huh.  Okay.

1          That -- yeah, so as it says by the label,

2   traffic in the last 40 days up to 13 January '20.

3      Q.   Okay.  So this exhibit, like Exhibit 12,

4   doesn't reflect the full traffic for the article at

5   issue; correct?

6      A.   I don't think so.  Since the article was up

7   longer than 40 days.

8      Q.   Okay.  We're now going to look at exhibit --

9   we're going to look at a document marked Exhibit 14,

10  Newsweek 14.

11          (Plaintiff's Exhibit 14 was marked

12          for identification by the court

13          reporter and is attached hereto.)

14  BY MR. BURROUGHS:

15     Q.   Have you seen this document before, and if

16  so, how do you recognize it?  Is it --

17     A.   This looks like the back end of the article.

18  So the editing side of the article.

19     Q.   Is -- this how it would appear in your CMS

20  system?

21     A.   That's right.

22     Q.   Okay.  And if can scroll all the way down to

23  the bottom just so you can see the entire thing.

24          So you'll see that content section; correct?

25     A.   Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q.   What usually appears in that content

2  section?

3    A.   That will be the bulk of the article that is

4  visible on the front side of the site.

5    Q.   Okay.  And that will include copies of the

6  visual assets that are in the article; correct?

7    A.   It will show the video, the embeds, the

8  image we hosted.

9    Q.   Okay.  So we would see McGucken's photograph

10  in this back end if it was still online; correct?

11    A.   If -- if -- if the embed was still in the

12  back end, we should see it here.

13    Q.   Yeah.  So --

14        (Speaking simultaneously.)

15        THE WITNESS:  -- indication of, you know,

16  where it is in this -- in the article.

17  BY MR. BURROUGHS:

18    Q.   Okay.  So the fact that you don't see a copy

19  of the McGucken photograph here, does that indicate

20  to you that this screen capture was created recently?

21        MS. GATES:  Objection as to form.

22        THE WITNESS:  So this isn't actually the

23  entirety of the body, so I can't -- I don't actually

24  know if the embed is there or not.  I assume there's

25  another part of this image somewhere.

1   BY MR. BURROUGHS:

2      Q.   Okay.   What does "non-verified, expired"

3   mean to you?

4      A.   That, from my knowledge, is just related to

5   the -- the video team's operations.  And how they --

6   you know, we may have an advertising campaign, for

7   example, that will only run on a video for a certain

8   amount of time.  And I think they can program the

9   sorts of details in, but it's not something I am

10  involved in.

11     Q.   Does Newsweek have a procedure for verifying

12  visual assets before it publishes them or displays

13  them on its website?

14           MS. GATES:  Objection as to form.

15           THE WITNESS:  Yeah.  So the usual sort of

16  journalistic practices of fact-checking whatever the

17  visual asset is is -- is probably taking place here.

18  Again, the video team is responsible, and I don't

19  have any direct involvement with them.

20  BY MR. BURROUGHS:

21     Q.   Okay.   Is there any indication on this

22  exhibit that this article was fact-checked?

23           MS. GATES:  Objection as to form.

24           THE WITNESS:  I mean, not -- no.

25           ///

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. BURROUGHS:

2     Q.   Okay.  Is there any indication on this -- on

3  this exhibit that the artist for the visuals that are

4  displayed in the Newsweek article gave consent for

5  that display?

6           MS. GATES:  Objection as to form.

7           THE WITNESS:  Sorry.  Can you repeat the

8  question?

9  BY MR. BURROUGHS:

10    Q.   Sure.  Is there any indication in this

11  exhibit that the creators of the visual assets

12  displayed in the Newsweek article gave consent for

13  that display?

14          MS. GATES:  Objection as to form.

15          THE WITNESS:  Not in this exhibit from what

16  I can see here.

17  BY MR. BURROUGHS:

18    Q.   Where, if anywhere, would that information

19  appear?

20          MS. GATES:  Objection as to form.

21          THE WITNESS:  So I believe the -- I don't --

22  again, if we could see the rest of this exhibit, the

23  rest of the article in the back end, you will -- you

24  should be able to see sort of a little credit --

25  sorry -- a little credit at the bottom of the video

Atkinson-Baker, a Veritext Company
www.depo.com

1  and at the bottom of the hosted image.

2  BY MR. BURROUGHS:

3      Q.   Okay.

4      A.   And just to add to that, I don't know this

5  video specifically, what is going to be played here,

6  but often credit is included in the video, a sort of

7  end card itself.

8      Q.   Okay.  But if that didn't exist, would there

9  be any other place where the identities of the

10  photographers or the -- or whether or not they gave

11  consent was indicated?

12          MS. GATES:  Objection as to form.

13          THE WITNESS:  So no, no image that is hosted

14  in our system should be hosted in our system if we

15  don't have a license to use it.  And when we do

16  upload that image, it includes the name of the

17  photographer or the image library that supplied it to

18  us.

19  BY MR. BURROUGHS:

20      Q.   Where does it include that name?

21      A.   So there's sort of like a separate section

22  of the CMS where you can see all the images, for

23  example, and all of the information related to the

24  images is contained there.

25      Q.   And if the document we're looking at

Atkinson-Baker, a Veritext Company
www.depo.com

1  existed, then there would absolutely be a page

2  reflecting that visual information as well; correct?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  Yeah.  So -- so there's

5  also -- sorry.  I'm not sure I'm fully understanding

6  the question.

7  BY MR. BURROUGHS:

8      Q.   Sure.  Well, have you yourself seen the

9  screen where the copy of Mr. McGucken's photograph

10 appears in this system?

11         MS. GATES:  Objection as to form.

12 Speculation.

13         THE WITNESS:  There's no copy of his image

14 in our system.

15 BY MR. BURROUGHS:

16     Q.   Okay.  So have you seen his image appear

17 anywhere in your system?

18     A.   Aside from the embedded aspect where we will

19 see the image, I haven't seen it.  It's not hosted on

20 our system.  It's -- the image itself resides on

21 Instagram.  It doesn't reside on our system.

22     Q.   But I believe you testified it's visible in

23 your system; correct?

24         MS. GATES:  Objection as to form.

25         THE WITNESS:  The Instagram embed provides a

Atkinson-Baker, a Veritext Company
www.depo.com

1   window.  The code provides a window to that content,

2   which is hosted on Instagram.

3   BY MR. BURROUGHS:

4       Q.   And you're able to view that in your system,

5   correct, the actual image?

6           MS. GATES:  Objection as to form.

7           THE WITNESS:  Yes.  You can -- you can see a

8   sort of a window into what that content is over on

9   Instagram.

10  BY MR. BURROUGHS:

11      Q.   And you sitting at your computer accessing

12  Newsweek's proprietary system can also see that image

13  on Newsweek's proprietary system; correct?

14          MS. GATES:  Objection as to form.

15          THE WITNESS:  Yes.  I have a view of what

16  the image is over on Instagram, whatever the embed

17  is.

18  BY MR. BURROUGHS:

19      Q.   Okay.  And you're viewing that within the

20  Newsweek platform; correct?

21          MS. GATES:  Objection as to form.

22          THE WITNESS:  Yes.  The embed is within our

23  content creation system here.

24  BY MR. BURROUGHS:

25      Q.   Okay.  I'm going to put a document in front

Atkinson-Baker, a Veritext Company
www.depo.com

1  of you we're going to mark as Exhibit 15.  Please

2  take a moment to look at that document.  It's

3  Newsweek 15.

4          (Plaintiff's Exhibit 15 was marked

5          for identification by the court

6          reporter and is attached hereto.)

7  BY MR. BURROUGHS:

8     Q.   Do you recognize this document, and if so,

9  how?

10    A.   Yes.  This looks like the bottom half of the

11  previous exhibit we were discussing.

12    Q.   Okay.  And here again we see one of the

13  visual assets that was incorporated into the disputed

14  article; correct?

15    A.   This looks like the image -- the sort of

16  stock image that we hosted.

17    Q.   Okay.  Is that how you would refer to this

18  article -- this image that we're seeing in

19  Exhibit 15, as a stock image?

20         MS. GATES:  Objection as to form.

21         THE WITNESS:  Well, yeah, colloquially

22  speaking, it's -- it was obtained off of Getty, I

23  think.  If we could scroll down, we might see the

24  source of the image.  Yes.  So that -- I mean, that's

25  like a wire image of Death Valley.

Atkinson-Baker, a Veritext Company
www.depo.com

1   BY MR. BURROUGHS:

2       Q.   Okay.  Would you also refer to the McGucken

3   photograph as a stock image, or would you refer to it

4   as something else?

5           MS. GATES:  Objection as to form.  Compound.

6           THE WITNESS:  I wouldn't refer to it as a

7   stock image.  It's an embedded image.

8   BY MR. BURROUGHS:

9       Q.   Would you refer to it as anything else?

10      A.   No.  Sorry.  The shaking of the head.  No, I

11   wouldn't.

12      Q.   Okay.  So you see there's a -- the number 15

13   in the middle of the page in the black box.

14           Do you see that?

15      A.   Yes.

16      Q.   What does that indicate to you, if anything?

17      A.   That is just a paragraph number.

18      Q.   Okay.  Is there any information within this

19   platform that would allow us to see when the

20   Hannah Cloke update was made?

21      A.   As previously mentioned, if the logs were

22   available, we could see that.  But, unfortunately,

23   they're not available.

24      Q.   So were the logs accessible in -- generally

25   speaking from, you know, this page?

Atkinson-Baker, a Veritext Company
www.depo.com

1     A.   Yes.   I don't know if you have the rest of

2  the page here.   But if you scroll down, you can

3  usually see the log section.

4     Q.   Okay.   And there's a button to access

5  additional material generally; right?

6          MS. GATES:   Objection as to form.

7          THE WITNESS:   Not sure what you mean by

8  additional material.

9  BY MR. BURROUGHS:

10    Q.   All right.   Okay.   Have you ever -- aside

11 from this case, have you ever had the occasion to

12 look for logs relating to an article and found them

13 not to exist anymore?

14         MS. GATES:   Objection as to form.

15         THE WITNESS:   I can't say I recall a

16 specific occasion that I went to look for logs and

17 they don't exist anymore.   As mentioned, I think it's

18 just a limitation of the system that after a certain

19 amount of time, the logs are just no longer

20 accessible.

21 BY MR. BURROUGHS:

22    Q.   Okay.   Have you looked for logs in the past?

23    A.   Yes.

24    Q.   And in those -- and in those cases, you've

25 found the logs?

1    A.   Yes.   When -- when needed, usually because

2    it's sort of a recent reason to be looking.   So the

3    article isn't particularly old.

4    Q.   Okay.   So is the -- withdraw the question.

5         Are the logs for the McGucken article the

6    only logs that you have looked for in your tenure at

7    Newsweek and been unable to locate?

8         MS. GATES:   Objection as to form.

9         THE WITNESS:   I can't -- I can't recall a

10   specific example of another article I looked at where

11   the logs weren't available.   But on the basis that

12   the logs do expire and there's some other technical

13   reasons why they're not accessible, it's plausible

14   that I looked at an old article and the log wasn't

15   there.

16   BY MR. BURROUGHS:

17   Q.   Okay.   So is it accurate to say that the

18   McGucken logs are the only logs that you've sought

19   out and been unable to find?

20        MS. GATES:   Objection as to form.   Misstates

21   testimony.

22        THE WITNESS:   No.   I don't think that's

23   accurate.   As I said, I can't recall a specific

24   instance where I did this, but it's plausible that I

25   have.   I've worked here for a while, so...

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. BURROUGHS:

2      Q.   Okay.  So let me rephrase.

3           It is accurate to say that the McGucken logs

4  are the only specific logs that you can recall ever

5  looking for and being unable to locate on the

6  Newsweek system?

7           MS. GATES:  Objection as to form.

8           THE WITNESS:  I would say that I can -- this

9  is the only instance I can recall right now where I

10  wanted to look at the old logs for some reason and I

11  couldn't.

12  BY MR. BURROUGHS:

13      Q.   And you couldn't locate them; correct?

14      A.   They weren't available in the back of our

15  CMS here.

16      Q.   Okay.  We're going to put another document

17  in front of you that we're going to mark as

18  Exhibit 16.  It's Newsweek 16.

19           (Plaintiff's Exhibit 16 was marked

20           for identification by the court

21           reporter and is attached hereto.)

22  BY MR. BURROUGHS:

23      Q.   Do you recognize this exhibit, and if so,

24  how?

25      A.   Yes.  This looks like the -- a dialogue box

Atkinson-Baker, a Veritext Company
www.depo.com

1    that pops up when -- pardon me -- when embedding an

2    image.

3        Q.   Okay.  And do you know who inserted that

4    URL?

5        A.   I don't know specifically, but it's easy to

6    assume it was the author of the article.

7        Q.   Okay.  And you see that the information

8    identifies Elliot McGucken as the author?

9        A.   Yeah.  I see that.  I guess that's pulled in

10   from Instagram.

11       Q.   Okay.  So does the Newsweek system

12   automatically copy the company data from Instagram

13   photographs into the Newsweek system?

14            MS. GATES:  Objection as to form.

15            THE WITNESS:  Well, it -- it's -- it

16   accesses whatever Instagram provides.  And it -- and

17   through the embed, you get to see what's on

18   Instagram.

19   BY MR. BURROUGHS:

20       Q.   So it's importing into Newsweek's system the

21   provider, the name of the author, and any text that

22   the author has included below the photograph;

23   correct?

24            MS. GATES:  Objection as to form.

25            THE WITNESS:  It looks like it is displaying

Atkinson-Baker, a Veritext Company
www.depo.com

1  that information here.  Yeah, for -- yeah, I guess

2  so.  There it is.

3  BY MR. BURROUGHS:

4      Q.   And you can also view a copy of McGucken's

5  photograph on this -- on the Newsweek system;

6  correct?

7          MS. GATES:  Objection as to form.

8          THE WITNESS:  So that's not a copy of the

9  photograph.  It's just a -- again, the embedded

10  window that allows you to see what is posted on

11  Instagram.

12  BY MR. BURROUGHS:

13      Q.   Can you see the photograph?

14      A.   Yes.

15      Q.   Is the photograph reproduced visually in

16  Newsweek's system?

17          MS. GATES:  Objection as to form.

18          THE WITNESS:  It's visible here.  But I

19  wouldn't say it's -- you know, there's a copy of it

20  here.

21  BY MR. BURROUGHS:

22      Q.   Okay.  Is it more accurate to say it's a

23  reproduction?

24          MS. GATES:  Objection as to form.

25          THE WITNESS:  Reproduction sounds like

Atkinson-Baker, a Veritext Company
www.depo.com

1    another word for copy, so I wouldn't say that.

2    BY MR. BURROUGHS:

3        Q.   Okay.  How would you describe the image that

4    we're looking at?  If it's not a copy or a

5    reproduction, what is it?

6             MS. GATES:  Objection --

7    BY MR. BURROUGHS:

8        Q.   The actual image that we're looking at, not

9    the text.

10            MS. GATES:  Objection as to form.  Compound.

11            THE WITNESS:  It's -- it's an image from

12   Instagram.

13   BY MR. BURROUGHS:

14       Q.   Now, is there any indication here that

15   Mr. McGucken has provided consent for the use, in any

16   way, of this photograph on the Newsweek website?

17            MS. GATES:  Objection as to form.

18            THE WITNESS:  No consent in, you know, like

19   a very highly descriptive, I, Elliot McGucken, give

20   consent to embed an image from Instagram.

21   BY MR. BURROUGHS:

22       Q.   What evidence of consent do you see here?

23            MS. GATES:  Objection as to form.

24            THE WITNESS:  Well, I don't know that I can

25   answer that.  It's merely an embed, so it is simply

1   publicly available like that.

2   BY MR. BURROUGHS:

3       Q.   Okay.  Can Newsweek identify any indicia or

4   information in its CMS system that reflects the

5   photographer's consent for Newsweek to display their

6   photograph on their site?

7            MS. GATES:  Objection as to form.

8            THE WITNESS:  Sorry.  Just repeat that,

9   please.

10  BY MR. BURROUGHS:

11      Q.   Sure.  Is there anything in this system that

12  indicates whether or not the artist consented to

13  Newsweek displaying their photograph?

14           MS. GATES:  Same objection.

15           THE WITNESS:  So if we've hosted an image on

16  our server, the credits for that is displayed as part

17  of the sort of licensing agreement of hosting that

18  image.

19  BY MR. BURROUGHS:

20      Q.   What if it's embedded?

21      A.   Whatever is embedded is -- is pulled from

22  Instagram.  It's not on our system.  So whatever

23  Instagram is displaying.

24      Q.   So for embeds, there's no information

25  relating to consent in the system; correct?

Atkinson-Baker, a Veritext Company
www.depo.com

1        MS. GATES:  Objection as to form.  Misstates

2   testimony.

3        THE WITNESS:  From -- you kind of get what

4   you see from Instagram.

5   BY MR. BURROUGHS:

6      Q.   Okay.  So is there any indicia?

7        MS. GATES:  Objection as to form.

8        THE WITNESS:  Sorry.  I don't understand

9   that word.

10  BY MR. BURROUGHS:

11     Q.   Is there anything, any information, any text

12  in your system, to indicate whether or not the artist

13  consented to an embed?

14       MS. GATES:  Objection as to form.

15       THE WITNESS:  As mentioned, I -- I don't

16  believe we have anywhere in the system saying, I, the

17  artist, consent to this embed.

18  BY MR. BURROUGHS:

19     Q.   That's because Newsweek doesn't care whether

20  or not the photographer has consented for use of an

21  embed; correct?

22       MS. GATES:  Objection as to form.

23  Speculation.  Argumentative.

24  BY MR. BURROUGHS:

25     Q.   Go ahead.

1    A.    Sorry.  Could you repeat the question?

2    Q.    Sure.  And there's no indicia or no text in

3  your system to reflect whether or not the

4  photographer has consented to the embed of their work

5  because Newsweek doesn't care one way or the other

6  whether or not they have photographer consent.

7         MS. GATES:  Same objection.

8  BY MR. BURROUGHS:

9    Q.    Correct?

10   A.    So there's -- there's no text here saying,

11  I, the author of this image, consent to embedding.

12   Q.    Okay.  And there's no text anywhere in the

13  system; correct?

14        MS. GATES:  Objection as to form.

15        THE WITNESS:  What kind of text?

16  BY MR. BURROUGHS:

17   Q.    Reflecting whether or not the artist

18  consented.

19   A.    To using an embed?

20   Q.    Correct.

21   A.    So as stated, we don't have a text somewhere

22  saying, I, the artist, consent to the embed.

23   Q.    Okay.  And is there a reason why you don't

24  choose to include that?

25        MS. GATES:  Objection as to form.

Atkinson-Baker, a Veritext Company
www.depo.com

1          THE WITNESS:  So as stated earlier, the

2    embedding is not considered a sort of a copyright

3    issue because it's not hosted on our system.  It's

4    hosted externally.

5    BY MR. BURROUGHS:

6       Q.   Okay.  So because it's not a -- in your

7    estimation, a copyright issue, you don't feel that

8    it's important to indicate whether or not the artist

9    consented to the use of their work; correct?

10          MS. GATES:  Objection as to form.

11          THE WITNESS:  So by posting their image on a

12   website that allows you to -- or allows people to

13   embed that image, we -- we make use of that.

14   BY MR. BURROUGHS:

15      Q.   Any other reason?

16      A.   Sorry.  Any other reason for?

17      Q.   For why there's no indication in your system

18   as to whether or not the artist has consented to your

19   display of their work?

20          MS. GATES:  Objection as to form.

21          THE WITNESS:  No.

22   BY MR. BURROUGHS:

23      Q.   We're going to put another exhibit in front

24   of you.  This will be Exhibit 17.  I believe we're

25   going to depart from the -- oh, no, this is Newsweek

1    17 as well.

2             (Plaintiff's Exhibit 17 was marked

3             for identification by the court

4             reporter and is attached hereto.)

5    BY MR. BURROUGHS:

6        Q.   Have you ever seen this e-mail before?

7        A.   Yes.  It looks like it was a part of the

8    documents provided.

9        Q.   Okay.  And do you see a reference to

10   revenue?  "Probably we can calculate it based on the

11   RPM of May 2019."

12            Do you see that?

13       A.   Yes.

14       Q.   What does that mean to you?

15       A.   It means they can probably calculate the

16   revenue.

17       Q.   What is an RPM?

18       A.   I -- I think it stands for revenue per mille

19   or per thousand.

20       Q.   Okay.  But that's not something you work

21   with; correct?

22       A.   No.

23       Q.   You don't know why they would choose May of

24   2019 to calculate it; correct?

25       A.   I don't.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Okay.   We're going to put one more document

2   in front of you.   This will be Exhibit 18, but it's

3   Newsweek 21.

4            (Plaintiff's Exhibit 18 was marked

5            for identification by the court

6            reporter and is attached hereto.)

7   BY MR. BURROUGHS:

8      Q.   Have you seen this document before?

9      A.   Yes.   I believe it's part of the documents

10  provided.

11     Q.   Okay.   So this isn't a document that you

12  generated; correct?

13     A.   No.

14     Q.   And this isn't a document that you had any

15  personal experience with; correct?

16     A.   What do you mean by personal experience?

17     Q.   Were you involved in any way in the drafting

18  of this document, putting together the data for this

19  document?   Do you have any involvement whatsoever

20  with it?

21     A.   No.

22            MS. GATES:   Objection as to form.   Compound.

23  BY MR. BURROUGHS:

24     Q.   So your involvement with this document is

25  you saw it at some time when your attorney showed it

Atkinson-Baker, a Veritext Company
www.depo.com

1    to you; correct?

2           MS. GATES:  Objection as to form.  Getting

3    into privileged communications.

4           THE WITNESS:  Yes.

5    BY MR. BURROUGHS:

6       Q.   Okay.  Now you see a calculation there.  And

7    just to clarify, you're -- are you aware that you're

8    Newsweek's designated witness to testify in regards

9    to Newsweek's revenues related to this action?

10      A.   As to the extent of my knowledge on the

11   subject, yes.

12      Q.   Okay.  So it indicates in here, as per

13   average RPM of May 2019, it will be around 16.80

14   average times 5,472 PVs equals $91.92.

15           Do you see that?

16      A.   I do.

17      Q.   And what does that mean to you?

18      A.   Right.  It's -- it sounds like the average

19   revenue as of May of 2019 will be -- so that's the

20   average per 1,000 PVs, which is page views.

21           So the average is $16.80 times the total

22   number of page views that the article had, which

23   equals the 91.92.

24      Q.   Do you know why they did an average as

25   opposed to calculating the specific amount of revenue

Atkinson-Baker, a Veritext Company
www.depo.com

 1   attributable to the page at issue?

 2          MS. GATES:  Objection as to form.

 3          THE WITNESS:  I don't know.

 4   BY MR. BURROUGHS:

 5      Q.   Okay.  Do you know why they chose May 2019

 6   as opposed to some other month?

 7          MS. GATES:  Objection as to form.

 8          THE WITNESS:  I don't know.

 9   BY MR. BURROUGHS:

10      Q.   Do RPMs change from month to month, to your

11   knowledge?

12      A.   I don't know.

13      Q.   Is there any data or financial documents

14   that underlie this particular accounting, to your

15   knowledge?

16      A.   So I believe the data will be gathered from

17   analytics of the content.

18      Q.   What analytics?

19      A.   There's likely a Google Analytics report as

20   there is for every article.

21      Q.   Have you seen those?

22      A.   I haven't seen the analytics report.

23      Q.   Okay.  So as far as you know, these numbers

24   in this e-mail could have been pulled from thin air;

25   correct?

1          MS. GATES:  Objection as to form.

2    Argumentative.

3          THE WITNESS:  I -- I didn't provide these

4    numbers, so I don't know where they came from.

5    BY MR. BURROUGHS:

6       Q.   Okay.  And you haven't seen any underlying

7    documents or numbers or evidence that would support

8    these numbers; correct?

9          MS. GATES:  Objection as to form.  Compound.

10         THE WITNESS:  I think we have a screenshot

11   of the analytics page, which speaks to this.

12   BY MR. BURROUGHS:

13      Q.   Other than that, are there any documents

14   that would support this calculation that you're aware

15   of?

16      A.   Not that I'm aware of.

17      Q.   Okay.  Do you know if this accounting is

18   done per accepted industry standards for calculating

19   revenues for particular pages?

20         MS. GATES:  Objection as to form.

21         THE WITNESS:  I don't know.  It's outside of

22   my department.

23   BY MR. BURROUGHS:

24      Q.   Okay.  In fact, you yourself have no

25   experience in calculating revenues for the website;

Atkinson-Baker, a Veritext Company
www.depo.com

1   correct?

2          MS. GATES:  Objection as to form.

3          THE WITNESS:  I don't.

4   BY MR. BURROUGHS:

5      Q.   Okay.  And you yourself don't have any

6   experience calculating those revenues or have not

7   reviewed any documents relating to those revenues;

8   correct?

9          MS. GATES:  Objection as to form.

10         THE WITNESS:  Not in general terms.  And

11  aside from the one mentioned specifically about this

12  measurement here.

13  BY MR. BURROUGHS:

14     Q.   Okay.  And have you spoken with anyone about

15  how these numbers were calculated?

16     A.   No.

17     Q.   Okay.  So is it accurate to say that the

18  entirety of your understanding relating to Newsweek's

19  revenues related to the article at issue come from

20  these documents you were given?

21         MS. GATES:  Objection as to form.

22         THE WITNESS:  Yes.

23  BY MR. BURROUGHS:

24     Q.   Okay.  Let's scroll down.  Stop.

25         Have you seen this e-mail before?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   I mean, it's not a lot to see here.

2      Q.   Who is L. Costa?

3      A.   Luciano Costa, one of the sort of technical

4   executives I believe.

5      Q.   Is she an attorney?

6      A.   Luciano, no, I don't think so.  I actually

7   don't know.

8      Q.   Okay.  Who is Rosie McKimmie?

9      A.   I believe Rosie is our legal counsel.

10     Q.   Okay.  Is she in-house?

11     A.   In the sense that we can contact her on

12   legal queries, yes.

13     Q.   Okay.  Who is Alvaro Palacios?

14     A.   I believe another one of the technical team.

15     Q.   Okay.  Is Alvaro an attorney?

16     A.   Not to my knowledge.

17     Q.   Okay.  How long has Rosie been with

18   Newsweek?

19     A.   That I'm not sure of.

20     Q.   Okay.  Before this dispute, had you ever

21   gone to her with a legal question before?

22     A.   Yes.  I've dealt with her (audio issue).

23     Q.   Okay.  What do you recall asking her in the

24   past, what subjects?

25     A.   It will often just be to clear any stories

Atkinson-Baker, a Veritext Company
www.depo.com

1  with her that we might have a legal concern about.

2      Q.   Okay.  Do you recall specifically doing that

3  at any time?

4      A.   I recall -- I don't recall specifically the

5  instances, but I have done that.

6      Q.   Did you consult with her relating to

7  Ms. Hignett's article?

8      A.   I did not.

9      Q.   Okay.  But theoretically she was available

10  as a resource, so if you wanted to check with her at

11  the time relating to Ms. Hignett's article, you could

12  have; correct?

13          MS. GATES:  Objection as to form.

14          THE WITNESS:  Theoretically she's available

15  for us to -- you know, for any legal questions we

16  might have.

17  BY MR. BURROUGHS:

18      Q.   Okay.  Did Ms. McKimmie ever see

19  Ms. Hignett's article in 2019?

20          MS. GATES:  Objection as to form.  Calls for

21  speculation.

22          THE WITNESS:  That I don't know.

23          MR. BURROUGHS:  All right.  Let's go off the

24  record for five minutes.  I think we're almost done,

25  if not done.

Atkinson-Baker, a Veritext Company
www.depo.com

1        (Recess.)

2            MR. BURROUGHS:   Let's go back on the record.

3    BY MR. BURROUGHS:

4        Q.   We're going to put this -- a document on the

5    screen for your viewing that we're going to mark as

6    Exhibit 19, it's Newsweek 20.

7            (Plaintiff's Exhibit 19 was marked

8            for identification by the court

9            reporter and is attached hereto.)

10   BY MR. BURROUGHS:

11       Q.   And I want you to tell me if you recognize

12   this document, and if so, how?

13       A.   Yes.   This looks like part of the documents

14   provided.

15       Q.   Okay.   And what is it?

16       A.   This looks like the Google Analytics of

17   presumably this article.   Yeah.   Or I can sort of

18   tell from that URL down there.

19       Q.   Okay.   Is this a document of the type that

20   you work with regularly at Newsweek?

21       A.   Yes.   We can look at the analytics of our

22   articles.

23       Q.   I understand that you can.   Do you regularly

24   do that?

25       A.   Can you define "regularly"?

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q.   Every day?

2    A.   Not every day.

3    Q.   Every week?

4    A.   Not every week.

5    Q.   Every month?

6    A.   Not every month on a recurring basis.  I

7  might look -- yeah, I might look in here when I have

8  purpose to, such as gathering some information on

9  performance of an article.

10    Q.   Is your compensation tied in any way to

11  traffic?

12    A.   No.  Not directly tied to traffic.

13    Q.   Is it tied in any way to traffic?

14    A.   In the sense that if Newsweek gets no

15  traffic, we won't have a business.

16    Q.   Is it fair to say that traffic is what gives

17  Newsweek its value?

18         MS. GATES:  Objection as to form.

19         THE WITNESS:  I need the definition of

20  "value" there.

21  BY MR. BURROUGHS:

22    Q.   The ability to pay its employees?

23         MS. GATES:  Objection as to form.

24         THE WITNESS:  I would assume that traffic is

25  one of the ways that we are able to pay our

Atkinson-Baker, a Veritext Company
www.depo.com

1   employees.

2   BY MR. BURROUGHS:

3       Q.   What are the other ways?

4       A.   I don't know specific details, but I'm sure

5   there are some sort of marketing agreements or other

6   agreements in place that generate revenue.  But I

7   don't know what those are.

8       Q.   Are you aware of any of those actually

9   existing, or are you speculating?

10          MS. GATES:  Objection as to form.

11          THE WITNESS:  I would say I'm not aware of

12  anything specific in that regard, but in general

13  I'm -- they -- they exist, but I guess -- I suppose

14  I'm using the word "guess," so I am speculating on

15  what avenues of revenue generation, those sorts of

16  things bring.

17  BY MR. BURROUGHS:

18      Q.   Okay.  Who -- is your writers' compensation

19  tied in any way to traffic?

20      A.   Our writers would receive a bonus payment

21  based on the amount of traffic they receive.

22      Q.   What's the threshold for the lowest bonus

23  payment, in terms of traffic?

24      A.   I can't recall off the top of my head.

25      Q.   So is it fair to say that Newsweek

Atkinson-Baker, a Veritext Company
www.depo.com

1   incentivizes its writers to publish articles that

2   will attract a lot of traffic?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  That -- that's partially true,

5   but they will get paid even if they don't generate a

6   lot of traffic.

7   BY MR. BURROUGHS:

8       Q.   Will they get paid the bonuses?

9          MS. GATES:  Objection as to form.

10         THE WITNESS:  They -- sorry.  Can I go?

11  BY MR. BURROUGHS:

12      Q.   Sure.

13      A.   They -- they -- there's sort of different

14  thresholds of bonuses.  If they don't meet the

15  threshold, they don't get the bonus.

16         MS. GATES:  Are we frozen?

17         THE WITNESS:  I think Scott's frozen.

18  BY MR. BURROUGHS:

19      Q.   (Audio issue.)

20         THE REPORTER:  Could you repeat that

21  question because --

22         MS. GATES:  Sorry.  Can you repeat --

23         MR. BURROUGHS:  All right.  Am I unfrozen?

24         MS. GATES:  You're unfrozen now.

25         MR. BURROUGHS:  Am I unfrozen?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. GATES:  Yes.

2          THE WITNESS:  Yes, I can hear you.

3    BY MR. BURROUGHS:

4      Q.   Okay.  In your experience at Newsweek, do

5    Newsweek articles with photographs attract more

6    traffic than articles without photographs?

7          MS. GATES:  Objection as to form.

8          THE WITNESS:  I couldn't say either way.

9    BY MR. BURROUGHS:

10     Q.   Okay.  So as far as you know, traffic is

11   generally the same for articles with photographs and

12   without; correct?

13         MS. GATES:  Objection as to form.

14         THE WITNESS:  I couldn't say.  I think it

15   would be a case-by-case basis.

16   BY MR. BURROUGHS:

17     Q.   Okay.  Do you have any guidelines whereby a

18   photograph has to be included with an article before

19   it's published?

20         MS. GATES:  Objection as to form.

21         THE WITNESS:  Yes.  In the sense that every

22   article has an accompanying image, we will upload one

23   into our system.

24   BY MR. BURROUGHS:

25     Q.   Are you aware of any Newsweek articles

Atkinson-Baker, a Veritext Company
www.depo.com

1    during your tenure that didn't include a visual?

2        A.    I can't say of a specific article, but it's

3    plausible that could have happened.

4        Q.    Okay.  But it's fair to say that the vast

5    majority of Newsweek articles include visuals;

6    correct?

7        A.    All of the articles that I work on will

8    typically include a visual.

9        Q.    Okay.  That's because it's understood in the

10    industry that articles with photographs perform

11    better in terms of traffic; correct?

12        MS. GATES:  Objection as to form.

13    Speculation.

14        THE WITNESS:  The -- the sort of most basic

15    requirements to the image is so that there is an

16    image display on a platform such as Google News and

17    Facebook and so on when that article is sort of

18    shared up via those ways.  So that's sort of the

19    basic driving reason for having an image in it.

20    BY MR. BURROUGHS:

21        Q.    Okay.  Have you ever approved an article for

22    publication that didn't include a visual?

23        A.    I have not.

24        Q.    So looking at the exhibit in front of you,

25    is this for the entire period of time during which

1    the disputed article was online?

2        A.    This -- if you look at the top right there,

3    this is for the period of, as you can see, 1 March

4    2018 to October 31, 2019.

5        Q.    Okay.  Did you choose this period?

6        A.    I did not.

7        Q.    Was the disputed article online in November

8    of 2019, to your knowledge?

9        A.    To -- I don't know.

10        Q.    And what does this reflect in terms of page

11    views for this time period?

12        A.    If we could just scroll down to the bottom

13    just so I can see the rest, please.  Yeah.  Okay.

14    And sorry, if you don't mind going back up again.

15            So that -- that appears to tell me that

16    during this period of 1 March 2018 up to the October

17    31, 2019, it generated 5,427 page views.

18        Q.    Okay.  And does this indicate to you where

19    those viewers came from?

20        A.    Only in the broadest sense.  So if we scroll

21    down a little bit.

22            For example, you can see that URL string

23    there on No. 3 mentions Twitter.  You know, that

24    tells me that they came via Twitter.  And so on.  But

25    no details really.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   Did Newsweek distribute a link to this

2    article on Twitter?

3      A.   I don't know for certain.  But I think it's

4    safe to say it probably was tweeted on our account at

5    some point.

6      Q.   And is that based at least in part on the

7    records in front of you?

8      A.   No.  Because it is possible that these --

9    that that traffic came from another Twitter user.  So

10   I can't be sure if that was from our person or from

11   someone else.

12     Q.   Okay.  Is it Newsweek's general practice,

13   and was it Newsweek's general practice in 2019, to

14   tweet out links to each of its articles?

15     A.   Yes.  In general, a tweet would go out for

16   each article, although the social media editor may

17   have chosen not to for some reason.

18     Q.   And when Newsweek would tweet out an

19   article, they would include the visual with the

20   tweet; correct?

21          MS. GATES:  Objection as to form.

22          THE WITNESS:  The visual will typically be

23   the image we have uploaded to our system.

24   BY MR. BURROUGHS:

25     Q.   Can you tell me whether or not, in this

1    case, Newsweek ever tweeted out a tweet incorporating

2    the McGucken image?

3          MS. GATES:  Objection as to form.

4          THE WITNESS:  I -- not to my knowledge.  I

5    don't know.

6    BY MR. BURROUGHS:

7      Q.   Okay.  So you're unaware one way or the

8    other; correct?

9          MS. GATES:  Objection as to form.

10         THE WITNESS:  I -- I don't know if we

11   tweeted out this article with the McGucken image

12   somehow attached to that.

13   BY MR. BURROUGHS:

14     Q.   Okay.  Would there be a record of that if

15   you did?

16     A.   Presumably you could just look at our

17   Twitter feed or our social feeds and then see for

18   yourself.

19     Q.   Okay.  And you haven't done that; correct?

20     A.   I have not done that.

21     Q.   Okay.  Was it also Newsweek's practice to

22   post on Facebook relating to new articles?

23     A.   Yes.  Generally speaking, articles will be

24   posted to Facebook, but as with Twitter, there may

25   have been an editor who decided not to for some

Atkinson-Baker, a Veritext Company
www.depo.com

1   reason, so I can't say specifically.

2       Q.   Okay.  And you don't know one way or the

3   other whether or not Newsweek published McGucken's

4   photograph on Facebook as well; correct?

5           MS. GATES:  Objection as to form.

6           THE WITNESS:  I don't know.

7           MR. BURROUGHS:  Okay.  I have no further

8   questions.  Ms. Gates, if you want to question your

9   witness, go ahead.

10          MS. GATES:  If we could just take a few

11  minutes off record.

12          (Recess.)

13

14                  EXAMINATION

15  BY MS. GATES:

16      Q.   So if we could -- I just have a few

17  questions here.  If we could just take a quick look

18  at that last exhibit, I believe I can actually pull

19  it up here on my screen.  So this is Exhibit 19,

20  Newsweek 20.

21          So let's take a look at some of these

22  numbers here.  Can you just read off the page views

23  and the unique page views for me?

24      A.   Sure.  So the total for that period, March

25  1, 2018, to October 31, 2019, total page views,

Atkinson-Baker, a Veritext Company
www.depo.com

1    5,427, and total unique page views 5,099.

2         Q.    And what is a page view?

3         A.    Page view is just a user viewing the page --

4    the article.

5         Q.    And what is a unique page view?

6         A.    A unique page view will generate -- sorry.

7    Just trying to think how to phrase it.

8              It's not quite the same as a page view

9    because this is the unique viewers of that page.  So

10   for example, here there were 400-odd people who may

11   have refreshed the page and viewed it twice as such.

12   So there were 5,099 uniquely identified viewers of

13   this page, according to these analytics.

14        Q.    So is it correct that the page view count

15   could capture duplicate views from the same viewer?

16        A.    It's technically possible, yes.

17        Q.    And as far as the total page views on this

18   article, is -- would you say that this is a highly

19   viewed article?

20        A.    I would not.

21        Q.    How would you characterize it, in your

22   estimation, by the number of page views?

23        A.    So you know, for 5,000 page views, that

24   article is -- it's debatable if it was worth the

25   effort to produce it.

1      Q.   What is typical of articles?  What -- what

2  would you expect to see in page views?

3      A.   So what I would like to see is, you know,

4  10,000 on the day it's published as sort of a minimum

5  just as a real -- what is the word I'm looking for

6  here?  As just kind of a benchmark for whether it's a

7  good -- it was worth producing that article, whether

8  we even had a good idea and it succeeded.

9      Q.   And how many page views would you expect to

10  get from a highly popular article?

11      A.   So once we start getting to like 30,000 and

12  above, that's kind of a -- you know, what I'd

13  categorize as a successful news article.  And once

14  you start hitting the hundreds of thousands, it's

15  very successful.

16      Q.   All right.  Thank you.

17          MS. GATES:  That's all the questions we have

18  at this time subject to --

19          MR. BURROUGHS:  Just one question following

20  up on that.

21

22              FURTHER EXAMINATION

23  BY MR. BURROUGHS:

24      Q.   As editor of Newsweek, do you believe that

25  the article would have had more traffic if the

1  Newsweek reporter had done more original reporting

2  instead of primarily respond -- or relying on

3  material that was already online elsewhere?

4          MS. GATES:  Objection as to form.

5  Speculation.

6          THE WITNESS:  I can't say one way or the

7  other how it would have performed if we did things

8  differently.

9  BY MR. BURROUGHS:

10     Q.   Okay.  In your opinion, does the amount of

11  original Newsweek reportage in a piece affect the

12  traffic numbers?

13          MS. GATES:  Objection as to form.

14          THE WITNESS:  Not necessarily.  It really

15  depends on the subject.

16          MR. BURROUGHS:  Nothing further.

17          MS. GATES:  And nothing further at this

18  time.

19          MR. BURROUGHS:  So we can now relieve the

20  court reporter of her duties.

21          And before we go off-line, we'll agree that

22  a certified copy will be sent to Ms. Gates, and

23  Mr. Etherington-Smith will have 30 days from Ms.

24  Gates' receipt of the transcript to make any

25  revisions.  If he doesn't make any revisions in that

Atkinson-Baker, a Veritext Company
www.depo.com

1    time, the transcript will stand as constituted when

2    sent.  And I believe that's all.

3         Is that agreeable?

4         MS. GATES:  That is agreeable.

5         And we also agree to temporarily designate

6    this transcript as confidential subject to our review

7    and designation of specific portions during that

8    30-day period contemplated by the protective order.

9         MR. BURROUGHS:  Okay.  That's -- I don't

10   have the protective order in front me, but we'll

11   absolutely comply with the protective order.

12        MS. GATES:  Great.

13        MR. BURROUGHS:  All right.  Thanks,

14   everyone.

15        THE REPORTER:  Ms. Gates, would you like a

16   copy?

17        MS. GATES:  Yes, please.

18        (Whereupon the deposition was

19        concluded at 10:11 a.m.)

20

21

22

23

24

25

1

2

3

4

5   STATE OF CALIFORNIA        )
                              )   ss.
6   COUNTY OF LOS ANGELES     )

7

8          I, JAMES ETHERINGTON-SMITH, having appeared

9   for my deposition on Thursday, March 11, 2021, do

10  this date declare under penalty of perjury that I

11  have read the foregoing deposition, I have made any

12  corrections, additions or deletions that I was

13  desirous of making in order to render the within

14  transcript true and correct.

15         IN WITNESS WHEREOF, I have hereunto

16  subscribed my name this _____ day of_____,

17  2021.

18

19

20

21

22         _____

23              JAMES ETHERINGTON-SMITH

24

25

Atkinson-Baker, a Veritext Company
www.depo.com

```
1    STATE OF CALIFORNIA        )
                                )    ss.
2    COUNTY OF LOS ANGELES      )

3            I, MARYLYNNE SANDOVAL-ROBLES, CSR No. 12498,

4    a court reporter for the County of Los Angeles, State

5    of California, do hereby certify;

6            That prior to being examined, JAMES

7    ETHERINGTON-SMITH, the witness named in the foregoing

8    deposition, was by me duly sworn to testify the

9    truth, the whole truth, and nothing but the truth;

10           That said deposition was taken before me at

11   the time and place herein set forth, and was taken by

12   me in shorthand and thereafter transcribed into

13   typewriting under my direction and supervision, and I

14   hereby certify that the said deposition is a full,

15   true and correct transcript of my shorthand notes so

16   taken;

17           I further certify that I am neither counsel

18   for nor related to any party to said action, nor in

19   any way interested in the outcome thereof.

20           IN WITNESS WHEREOF, I hereto subscribe my

21   name this 23rd day of March, 2021.

22

23

24   _____
     Certified Shorthand Reporter in
25   and for the County of Los Angeles,
```

Atkinson-Baker, a Veritext Company
www.depo.com                                   Index: $16.80..addressed

---

**Exhibits**

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
2)  4:10 5:5,6
 54:17,20

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
11)  5:7 87:17,18,
 19 112:13
 113:17

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
12)  4:10 127:11,
 13 130:3

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
13)  4:11,12
 129:7,8

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
14)  4:13 130:9,11

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
15)  4:14,15
 137:1,4,19

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
16)  4:16 141:18,
 19

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
17)  4:17,18
 148:24 149:2

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
18)  4:19 150:2,4

30(b)(6)
 James Etherin
gton-
Smith March 11
, 2021_Exhibit-(
19)  4:20,21
 157:6,7 166:19

---

**$**

$16.80  151:21
$91.92  151:14

---

**1**

1  54:19 163:3,16
 166:25

1,000  94:17
 151:20

10  45:8 100:1

10,000  168:4

100  45:12

10:11  170:19

11  6:1 87:17,18,
 19 112:13
 113:17

---

11:15  85:14

11th  16:2

12  127:11,12,13
 130:3

13  129:7,8 130:2

14  130:9,10,11

15  43:20,21 75:2,
 3,5 137:1,3,4,19
 138:12

16  141:18,19

16.80  151:13

17  148:24 149:1,
 2

18  43:21 150:2,4

19  157:6,7
 166:19

---

**2**

2  54:17,19,20

20  43:21 45:8
 46:8 130:2 157:6
 166:20

200  21:3,4,11,21,
 23,25 22:5,6,8,
 20 45:12

2014  7:18

2017  7:7

2018  163:4,16
 166:25

2019  52:6,9,13
 149:11,24
 151:13,19 152:5
 156:19 163:4,8,
 17 164:13
 166:25

2020  6:25

2021  6:1 16:3

21  150:3

24  10:12

---

**3**

3  163:23

30  46:8 169:23

30,000  168:11

30-day  170:8

31  163:4,17
 166:25

---

**4**

40  130:2,7

400-odd  167:10

---

**5**

5,000  167:23

5,099  167:1,12

5,427  163:17
 167:1

5,472  151:14

50  20:24,25

50/50  24:12

---

**6**

6:34  6:2

---

**9**

91.92  151:23

9:00  128:11

---

**A**

a.m.  6:2 128:11
 170:19

ability  63:14
 124:9,17 125:1,
 10,21 126:7,14
 158:22

absolutely
 135:1 170:11

---

accepted
 153:18

access  108:1
 139:4

accesses
 142:16

accessible
 138:24 139:20
 140:13

accessing
 136:11

accompanying
 161:22

account  24:5
 48:10 114:13
 164:4

accounting
 114:10 152:14
 153:17

accounts  123:8

accurate  16:4
 20:21 25:4 32:5
 35:10 36:10
 37:11 38:3 44:21
 60:6 71:18,23
 72:9 73:5 94:2
 98:17 107:3
 113:14 116:15,
 22 117:15
 122:16 125:10
 140:17,23 141:3
 143:22 154:17

action  55:21
 61:6 151:9

actual  136:5
 144:8

ad  91:23 92:4,6,
 8,9 99:23

add  109:3 134:4

added  42:17
 102:16 104:4
 108:1,21 109:20

additional
 49:13 50:6 106:2
 139:5,8

addressed  16:5

---

Atkinson-Baker, a Veritext Company
www.depo.com        Index: administrative..attorney

**administrative** 40:10

**ads** 94:16

**advert** 92:11,12, 16

**advertisement** 91:23 93:9,14

**advertisers** 94:20

**advertising** 89:25 90:6,11, 14,20,22 91:8, 14,18,21 132:6

**adverts** 92:23 93:23 94:4,23

**advice** 40:9

**advise** 29:11 67:22 68:4 69:13 70:7,11

**advised** 64:6,10 69:19

**advising** 69:5 70:14

**affect** 126:14 127:4 169:11

**affects** 124:9,17 125:9,21 126:7

**affirmative** 98:8,12,16

**affirmatively** 39:20 98:1

**Africa** 7:24

**African** 8:12

**agree** 12:7,25 94:24 95:8 169:21 170:5

**agreeable** 170:3,4

**agreement** 145:17

**agreements** 44:20 159:5,6

**ahead** 30:4,9

**appended** 107:15

**approach** 82:7

**approval** 67:8

**approve** 41:15 43:13

**approved** 162:21

**area** 21:5 129:13

**Arguably** 122:12

**Argumentative** 146:23 153:2

**article** 21:6 26:6 31:18,20 32:8,12 40:16,18,21 41:2,12,13,15 43:14 46:19,22 47:4 51:18 52:18 59:18,20,24 60:7,8,12 61:13 62:8 63:23 64:14 65:10,14,17 67:7,15,18,22 74:23 75:2,5,13 76:16 77:2,6,12, 16,19,25 78:7, 10,21 79:4,21 80:4,7,13,20 81:12,15,25 82:3,18 83:7 84:17,23 86:2,5, 6,7,13,15 87:1,5 88:2,3,5,7,8,18 89:4,13 92:20 93:1,15 94:4,8, 18 95:13 98:18 99:20 100:10,11 103:5,23 105:14 106:16 107:5,12, 16,20 108:22 111:3 112:13 113:16,25 114:12 115:2 116:10,16,24 117:3,7,9,11,17 120:10 121:19 122:19 123:19 124:1 127:23 128:17,22

**129:15,17 130:4, 6,17,18 131:3,6, 16 132:22 133:4, 12,23 137:14,18 139:12 140:3,5, 10,14 142:6 151:22 152:20 154:19 156:7,11, 19 157:17 158:9 161:18,22 162:2, 17,21 163:1,7 164:2,16,19 165:11 167:4,18, 19,24 168:7,10, 13,25**

**article's** 109:11

**articles** 11:4,8, 12,23 23:10,24 24:1,21 31:5,8 32:10 39:4 40:8 45:5,9,17,19 47:9 66:10 74:19 75:23 76:2 77:8 81:10 95:5,9 108:14 124:8 157:22 160:1 161:5,6,11,25 162:5,7,10 164:14 165:22, 23 168:1

**articulate** 115:13,23

**artist** 14:21 26:11,20 27:8, 10,14,24 28:1,9, 16,20,24 29:7, 19,23 30:3,8,25 35:13,16 36:7,13 38:6 39:6 41:5 66:11 67:21 68:4,20 69:14,16 70:9,15,23 71:7, 20 125:1 133:3 145:12 146:12, 17 147:17,22 148:8,18

**artist's** 12:5,9 17:2,16,23 18:8, 17 26:20 33:13 34:24 35:23 71:8,21 119:4 125:1,9

**artistic** 96:9

**artists** 13:4 14:12,18 26:15, 24 27:6,18 29:14 35:8,13 36:19,25 37:8,22 38:5,17 49:2,10 124:16

**artists'** 14:6 15:8,15 31:7 69:4

**artwork** 15:15

**ascertaining** 96:3

**aspect** 28:17 135:18

**asset** 132:17

**assets** 40:21 98:19 131:6 132:12 133:11 137:13

**assume** 9:19 35:16 36:7 48:6 81:13 91:10 109:1 129:14 131:24 142:6 158:24

**assuming** 11:10 84:7 100:10 115:6 119:17 129:19

**assumption** 35:24

**assumptions** 35:24

**attached** 54:23 87:22 127:15 129:10 130:13 137:6 141:21 149:4 150:6 157:9 165:12

**attempts** 78:22

**attended** 50:7

**attention** 129:6

**attorney** 12:18 150:25 155:5,15

**aid** 11:13 65:17 113:16

**aids** 66:9

**air** 152:24

**alcohol** 10:11

**alleged** 11:25

**alter** 89:16

**Alvaro** 155:13, 15

**amount** 60:23 128:6 132:8 139:19 151:25 159:21 169:10

**analytics** 152:17,18,19,22 153:11 157:16, 21 167:13

**and/or** 112:9

**answering** 9:11, 13

**answers** 10:19 73:2

**anymore** 81:7 139:13,17

**anyone's** 43:8

**API** 66:21

**appealing** 65:7 122:19

**appeared** 92:24 99:25 126:22

**appearing** 89:1 93:14

**appears** 54:18 106:1 109:10 113:23 131:1 135:10 163:15

**appendage** 108:6

30(b)(6) James Etherington-Smith - Confidential
March 11, 2021        174

Atkinson-Baker, a Veritext Company
www.depo.com

**attorneys**
50:18,20,24 51:5
85:21 87:11

**attract** 160:2
161:5

**attributable**
152:1

**attributed** 82:17
99:8 100:23
101:2 102:9
103:2

**attribution**
101:5

**audible** 9:14

**audio** 48:10
155:22 160:19

**author** 142:6,8,
21,22 147:11

**authorities** 78:6

**authorized**
39:14,21

**automatically**
142:12

**avail** 85:2

**Availed** 85:4

**avenues** 159:15

**average** 45:16
46:6 94:17
151:13,14,18,20,
21,24

**aware** 16:8,13,
25 17:5,9,20
18:6,14,19
27:15,17 28:23
29:6,13 30:2
36:8 40:2 43:25
44:3,4,17,25
47:19 48:16,24
49:7,12,24 50:5
54:4,13 55:9,23
56:1 58:23 59:3
61:23 63:13
64:3,4 76:6 82:4
89:12,14 90:10,
12 94:6 101:12
108:11,14 110:7
112:11,14,17

115:5 151:7
153:14,16 159:8,
11 161:25

---

**B**

**Bachelor** 8:2

**back** 30:25 43:3
60:2,4,7 61:2,5,
20,21,24 62:2,6
63:15 66:17
67:16 69:10
79:17 85:10,14
87:2 88:1 109:6
112:19 128:17
129:3 130:17
131:10,12
133:23 141:14
157:2 163:14

**background**
80:1,3,19

**banner** 91:18,
20,23 92:4,5,8

**Barring** 89:9

**based** 8:14,15
11:6 21:24
22:10,18 23:23
35:23 38:9 61:7
95:16,23 100:4,9
124:6 149:10
159:21 164:6

**basic** 162:14,19

**basically** 62:12
83:10 128:10

**basing** 93:4,6

**basis** 94:20
110:20 120:18,
23 128:7 140:11
158:6 161:15

**behalf** 6:5 10:16
35:12 109:13

**belief** 38:9,13,20
120:18

**believes** 37:8

**benchmark**
168:6

**benefit** 9:10

**big** 83:16

**bind** 10:19

**bit** 13:8 48:14
72:2,18 73:14
103:4,17 128:1
163:21

**black** 138:13

**blank** 57:20 86:1

**blue** 10:4

**body** 131:23

**bonus** 159:20,
22 160:15

**bonuses** 160:8,
14

**books** 78:8

**boring** 11:11
40:11

**bottom** 103:20
104:3 106:11
107:14,16 108:2
128:3 130:23
133:25 134:1
137:10 163:12

**bound** 9:24

**box** 138:13
141:25

**brains** 23:14
51:9 94:14
121:11

**break** 37:16 72:7
85:9

**briefly** 9:6

**bring** 70:3
159:16

**broad** 90:17
93:22 121:11

**broadest**
163:20

**broke** 8:19
48:14

**brought** 51:11

**building** 102:12

**builds** 103:1
104:10,14

**built** 62:22

**bulk** 131:3

**Bureau** 6:23
58:3

**BURROUGHS**
6:11 12:13
13:10,19 14:1
15:1,13 16:1,14,
21 17:8,19 18:4,
13,20 19:7,18
20:2,17 21:15
22:4 23:6 24:10,
22 25:11,21
26:17 27:2 28:6,
22 29:5 30:6,14
32:2,11,21
33:11,22 34:7,19
35:6,21 36:4,17,
23 37:4,15 38:2,
15,24 39:11,17
40:1 41:23 42:6,
18 43:5,12 44:16
45:4 46:3,20
47:1,18 48:1,9,
15,23 49:6,14
50:17 53:24
54:7,15,24 56:3
58:20 59:5 60:16
61:1,10 62:1
64:11,17 65:5,
15,24 66:7,18
67:3,19 68:2,18
69:2,12,21
70:13,20 71:4
72:6,23 73:15,23
74:8,16 75:1,14,
22 76:5,12 77:5,
15 78:9,20 79:2,
18 80:10,17,24
81:6,11,21 84:4,
15 85:7,13,16
87:23 89:23
90:4,9,21 91:2,7,
12,17,22 92:17
93:2,12,18 94:1,
9 95:4,14,22
96:8,18 97:1,13
98:6,13 99:21
100:12,21 101:3,

9,18 102:1,14,24
103:7 104:5,16,
23 105:5,12,21
106:4,13 107:2,9
108:3,12,20
109:2,24 110:10,
22 111:13,18,24
112:7 113:3,8,
13,21 114:4,11,
18 115:3,12,21
116:7,14,21
117:2,21 118:6,
16 119:1,9
120:2,11,22
121:3,17,24
122:15 123:6,18,
24 124:5,14,23
125:6,17 126:1,
12,19 127:1,9,16
129:11 130:14
131:17 132:1,20
133:1,9,17
134:2,19 135:7,
15 136:3,10,18,
24 137:7 138:1,8
139:9,21 140:16
141:1,12,22
142:19 143:3,12,
21 144:2,7,13,21
145:2,10,19
146:5,10,18,24
147:8,16 148:5,
14,22 149:5
150:7,23 151:5
152:4,9 153:5,
12,23 154:4,13,
23 156:17,23
157:2,3,10
158:21 159:2,17
160:7,11,18,23,
25 161:3,9,16,24
162:20 164:24
165:6,13 166:7
168:19,23 169:9,
16,19 170:9,13

**business** 7:14
20:9 31:12 77:9,
20 100:22
158:15

**busy** 46:5

**button** 139:4

**C**

calculate 149:10,15,24

calculated 154:15

calculating 151:25 153:18, 25 154:6

calculation 151:6 153:14

CALIFORNIA 6:1

call 51:5 92:10

called 6:5 8:9 57:23

Calls 156:20

campaign 132:6

capture 131:20 167:15

captured 112:25 113:20

captures 121:6, 14

capturing 105:20

card 134:7

care 146:19 147:5

carry 23:8

case 10:4 30:2 44:4 50:14,22 51:12,15,19 60:21 79:10 85:23 87:9,11 88:5 109:9 128:25 139:11 165:1

case-by-case 161:15

cases 26:10 139:24

categorize

168:13

caution 23:1

cease 112:1,9

celebrity 96:21 97:8

certified 169:22

cetera 99:9,10

change 152:10

changed 61:9

channel 128:8

characterize 167:21

charts 86:4

check 8:24 51:3 107:20 156:10

checking 117:4

checks 83:11

chief 7:5,16

choices 96:9

choose 147:24 149:23 163:5

chose 152:5

chosen 164:17

circumstances 68:19

citation 50:4 100:20

cited 100:16 102:4 103:11

citing 82:20

claim 97:22,24, 25 98:7,11,15,23 99:2

claims 82:8

clarification 107:15

clarify 151:7

clear 58:11 100:13 155:25

click 94:11

clicks 94:17

Cloke 103:18,21 105:6 107:16 108:22 109:19 138:20

Cloke's 103:24

close 97:21

CMS 62:21 63:20,22 84:24 129:14 130:19 134:22 141:15 145:4

CMS's 127:22

code 136:1

coincidentally 127:12 129:7

collapsing 73:1

colloquially 137:21

comment 10:4 76:24 79:7 103:13,18,24 105:6 106:6,17, 24 108:2 109:6,7 110:9 123:15 125:4

commented 106:22

commenting 104:21,25

comments 46:18 78:5 79:1 102:17,19 105:14 106:25 107:4,5,10,12 109:15 110:2

common 36:12

communicate 52:17,25

communicated 51:1,6,25

communication 52:15,24

communication s 18:1 40:2 50:13,16 52:12 64:9 81:4 151:3

companies 35:9 36:8

company 8:11, 12,14 10:17,20 41:6 94:25 142:12

compare 62:14

compensated 94:19

compensating 124:17 125:1,20

compensation 47:8 94:23 124:9 158:10 159:18

compete 119:23

completely 104:17

compliant 13:2 15:7,14 31:6

complicated 37:14 124:12

comply 170:11

Compound 32:15 38:19 70:10 109:21 111:10 122:22 138:5 144:10 150:22 153:9

computer 136:11

concern 33:19 42:15 156:1

concerned 33:19

concerns 32:19 42:10

concluded 170:19

conclusion 71:2,25 72:15 73:11 74:3 89:19

conclusions 33:16

conferences 50:8

confidential 170:6

confirm 41:25 42:8 49:23 81:24 83:22

confuse 72:17

confuses 72:2

confusing 13:8

connection 26:12 27:11,25 56:14 79:4

consent 12:1,5, 10 13:4,14 14:13,18,19,22 15:9,16,23,24 16:7,10,17 17:3, 16,23 18:8,17 19:2 29:19 30:7, 11 33:14 36:9 39:8 66:22 67:9 68:20 70:16,19, 22 71:7,20 72:11 73:7,17 98:8,12 119:4 120:7,10 133:4,12 134:11 144:15,18,20,22 145:5,25 146:17 147:6,11,22

consented 145:12 146:13, 20 147:4,18 148:9,18

considered 15:21,24 69:18 148:2

consisted 77:6, 12,16

constituted 170:1

consult 156:6

contact 26:24 27:17 29:14 39:12 42:24

Atkinson-Baker, a Veritext Company
www.depo.com

46:17 66:14 67:17 68:9 69:8 74:5,6,13 78:22, 25 79:3,6,8 155:11

**contacted** 27:8, 10,14 28:16,20 66:24 79:10 103:12

**contacting** 28:24

**contained** 77:25 134:24

**contemplated** 170:8

**contend** 117:22

**content** 14:19, 21 16:4,17 17:11,22 18:7,16 19:1 20:11 21:10 30:9 31:14 33:1, 3,7 39:14,21 47:21 62:21 63:10 69:4 71:8 73:20 91:25 110:13 130:24 131:1 136:1,8,23 152:17

**context** 14:15 40:18 41:4

**continuation** 129:19

**continue** 43:3 88:12

**conversation** 50:21 56:25 57:5 58:13 84:2

**conversations** 17:21 18:6,11,15 50:13,19,25 56:20

**copied** 74:18,22 75:3 99:15 101:19 102:6 106:15

**copies** 131:5

**copy** 7:5 19:13,

22,25 43:1 50:3 131:18 135:9,13 142:12 143:4,8, 19 144:1,4 169:22 170:16

**copyright** 15:25 32:19,25 33:7, 14,18 34:9,14,25 35:4 41:17,21 42:1,10,16 44:13 47:20 48:3 49:16,25 50:1 71:15 112:1,10 148:2,7

**copyrights** 31:15 49:1

**correct** 18:22 19:2 21:11,22 24:17 25:7,16,23 26:1,21 27:4,16 28:1,11 29:21 30:16 31:2 33:8 34:10 39:1 41:17 42:2,11 43:15 45:13 48:18 51:6 52:6 53:20 57:25 59:1,7 62:17 63:11,20 65:10, 19 67:11 69:14, 23 70:1,25 71:9, 16 75:19 76:13 80:20 81:1 84:11 85:3 87:13 88:5, 9,19 89:2,5,8,17 90:1,6 92:20 93:9,15,20 94:15,25 95:6,10 97:8,23 98:19,24 99:13,16 100:14, 24 101:11,14,21 102:9,15 103:24 104:18,24 105:1, 7,15,24 106:8 107:22 108:7 109:20 110:5,15, 24 113:5,17,22 114:21 115:25 116:17 119:4 120:24 123:21 124:2 129:2 130:5,24 131:6, 10 135:2,23 136:5,13,20

137:14 141:13 142:23 143:6 145:25 146:21 147:9,13,20 148:9 149:21,24 150:12,15 151:1 152:25 153:8 154:1,8 156:12 161:12 162:6,11 164:20 165:8,19 166:4 167:14

**correctly** 13:25 41:4,5

**correspondence** 87:4

**corroborate** 82:15

**Costa** 155:2,3

**counsel** 155:9

**count** 167:14

**counting** 98:20

**couple** 9:7 59:16 61:17

**court** 12:21 54:21 87:20 127:14 129:9 130:12 137:5 141:20 149:3 150:5 157:8 169:20

**courtesy** 68:16

**cover** 40:14

**covering** 78:3

**covers** 129:22

**CPM** 94:10,19

**create** 75:15 77:2 83:17 88:15 97:19,20

**created** 14:12 51:19 56:4 88:19,22 96:17 97:3,11,22,24 98:24 99:2 131:20

**creating** 75:18

**creation** 11:23 55:11 136:23

**creative** 95:18, 21,23 96:4,6,7, 13,20 124:8

**creatively** 97:6

**creator** 42:20,24

**creators** 133:11

**credibility** 10:5

**credit** 133:24,25 134:6

**credited** 41:5

**credits** 145:16

**criticism** 106:20

**criticize** 106:6, 17

**criticizes** 105:14

**cues** 9:14

**current** 6:21 54:9

**custom** 62:22

**cuts** 60:23

---

**D**

**D-U-T-T-O-N** 57:24

**data** 128:16 142:12 150:18 152:13,16

**date** 60:13 62:11 110:23,25 128:12,17

**dates** 10:24

**day** 23:24 43:20 45:5,6,10,13,14, 21,23,25 46:5 47:3 59:16 158:1,2 168:4

**day-to-day** 40:5 48:11

**days** 128:13 130:2,7 169:23

**dealt** 155:22

**Death** 113:5 121:19 122:17 123:9 137:25

**debatable** 167:24

**decided** 84:23 165:25

**decision** 111:7, 17

**decision-making** 127:5

**declines** 29:19

**define** 19:17 22:17 29:10 91:20 92:8 95:21 96:7 157:25

**definition** 94:15 158:19

**deletable** 63:25

**delete** 63:10,12, 20,21

**deleted** 60:17, 20

**demands** 47:16

**demonstrates** 117:13

**demonstrating** 122:2

**depart** 148:25

**department** 91:1,4 153:22

**depending** 45:8

**depends** 14:14 29:12 101:23 122:13 169:15

**depict** 116:9

**depicting** 126:21

**depicts** 116:16, 23 117:16

Atkinson-Baker, a Veritext Company
www.depo.com

**deposition** 9:3 46:2 50:12 61:16 77:23 85:20 125:24 170:18

**describe** 94:17 122:6 144:3

**description** 121:11

**descriptive** 122:13 144:19

**designate** 170:5

**designated** 151:8

**designation** 170:7

**designed** 35:14

**desist** 112:1,9

**destroyed** 110:4

**detail** 61:5,21 86:11

**detailed** 48:7 111:11

**details** 8:23 19:5 31:24 40:11 81:5 86:21 92:15,23 108:18 110:8 132:9 159:4 163:25

**dialogue** 141:25

**Diane** 56:6

**difference** 11:14 115:13,23 116:6

**differences** 47:20 48:7

**differently** 169:8

**difficult** 22:25 25:18,22,25 103:4

**dig** 31:24

**Digital** 9:2

**diligence** 17:13 123:11

**direct** 64:21,22 102:3 128:9 129:6 132:19

**directed** 64:12 65:2 109:3

**direction** 109:12,19

**directly** 8:13 35:19 43:2 82:2 101:20 102:6 158:12

**disciplinary** 55:21

**discuss** 56:22 58:10

**discussed** 51:12,14,15,17 53:3 57:8 72:24 113:25

**discussing** 52:19 88:3 137:11

**discussion** 57:9 74:24 83:3

**discussions** 50:24 83:15

**Disney** 90:1,5, 11 92:24

**display** 14:17, 21,24 17:1 19:13,23 20:5,11 28:25 29:21 30:9 33:17 35:9 36:9 38:16 39:21 41:16 43:7 58:14 64:13,22 65:9,18 68:23 70:15,19 74:10 115:14,15, 20,23,24 119:19 120:6,15 125:19 126:5,13 127:4 133:5,13 145:5 148:19 162:16

**displayed** 12:1 15:3 21:10 24:3, 15 25:14 26:9

34:2 37:10,24 39:7 41:14 72:12 75:6 80:8 89:25 118:8,19 119:3,7 133:4,12 145:16

**displaying** 26:20 27:25 28:10 33:6,13 66:20 67:10 68:5 71:21 72:11 73:7,18 74:10 89:16 112:21 125:8 142:25 145:13,23

**displays** 71:22 73:19 132:12

**dispute** 20:9 53:3 64:7 155:20

**disputed** 59:18 60:8 79:4 88:8, 18 137:13 163:1, 7

**distinctions** 48:17

**distinguish** 97:5

**distribute** 164:1

**distributed** 56:8,9 89:10

**divided** 128:8

**document** 49:22 55:2,4,9, 12,15 56:5,10 58:18,21 64:2 70:3 84:9 87:17, 24 127:10,18,20 128:24 129:1,12, 17 130:9,15 134:25 136:25 137:2,8 141:16 150:1,8,11,14, 18,19,24 157:4, 12,19

**documentation** 93:1

**documents** 79:16,24 85:20, 22,24 86:17,19

93:5,6 149:8 150:9 152:13 153:7,13 154:7, 20 157:13

**double-check** 41:9

**double-checking** 105:9

**drafted** 49:21 51:19

**drafting** 150:17

**drawing** 57:20 86:1

**dreaming** 116:5

**driving** 162:19

**drugs** 10:11

**due** 17:13 123:10

**duly** 6:6

**duplicate** 167:15

**duties** 48:11 169:20

**Dutton** 57:23 58:4

**E**

**e-mail** 56:9,11 83:18,25 84:7 149:6 152:24 154:25

**e-mails** 81:4 86:21 87:3,6,8

**E-T-H-E-R-I-N-G-T-O-N** 6:15

**earlier** 22:20 66:13 148:1

**easy** 142:5

**edit** 40:8 46:7 59:10,13,16,18 62:3 89:15

**edited** 59:11,23 60:3 62:7

**editing** 46:9 59:20 99:1 130:18

**editor** 6:22 18:22,24 33:6 41:1 47:12 63:14 82:25 95:17 108:4,13 117:8 126:20 164:16 165:25 168:24

**editors** 31:11 32:4,9 40:10 63:7,19,22 83:6, 12 101:17

**effect** 103:16

**effort** 167:25

**element** 46:13

**elements** 77:25

**Elliot** 11:25 142:8 144:19

**embed** 12:10 13:5,15 14:25 15:2,9,16,21,24 16:11 17:7 20:6, 12,15 21:11 23:17,19,21,25 24:4 26:9,21 27:1 29:1,16,21 30:13,23,24 32:13 33:18 35:15 37:25 38:22 39:4,22 41:15,22,25 42:8 58:15 64:14 65:2,12,19 66:6, 16 67:6,11,17 68:5,17,23 69:4, 11,19 70:8,16,24 71:14,22 72:4,5, 13,21 73:20 74:15 75:6 84:23,25 89:3,10 98:16 123:3 126:14 131:11, 24 135:25 136:16,22 142:17 144:20, 25 146:13,17,21 147:4,19,22 148:13

**embedded** 17:11,22 22:23 23:9 30:4 33:3, 24 34:23 35:4,18 38:8 41:16,19 43:3 68:13 98:21 116:12 117:12 120:9 121:23 135:18 138:7 143:9 145:20,21

**embedding** 34:13,20 36:15 38:7 58:22 59:7 66:20 67:14,21 69:14,22 70:7,12 71:13 72:25 73:3 74:5 122:25 124:25 142:1 147:11 148:2

**embeds** 16:4,6 24:20 32:16,23 37:7 42:14 58:18 59:1,4 64:23 131:7 145:24

**employed** 6:19

**employees** 158:22 159:1

**employer** 8:17

**encourage** 47:12

**end** 9:23 18:12 42:5 129:3 130:17 131:10, 12 133:23 134:7

**enforce** 55:14, 16

**enforced** 14:8

**England** 6:18

**ensure** 31:6,14, 25 43:7 48:25 49:9 56:17 82:21

**ensuring** 55:17 56:15

**entire** 130:23 162:25

**entirety** 74:18 89:7 94:2 131:23

154:18

**entitled** 10:25 21:16 22:12

**entity** 8:18,21

**equals** 151:14, 23

**err** 23:1

**escape** 86:21

**essentially** 110:18 118:14

**estimate** 10:24 11:1,6,14 20:18, 21 21:7,9,14,17, 18,21,24 22:11, 12,14,16,25 23:1 24:2,23 25:13,19 26:4 45:11,15,18

**estimation** 148:7 167:22

**Etherington-smith** 6:4,14 169:23

**event** 28:15 78:2 104:22 105:20 107:1 113:12,20, 22,24 114:9,24 115:1 116:13 117:20 118:1,4 121:7,14 122:3,6 123:5,15

**eventually** 37:24 111:2

**evidence** 144:22 153:7

**exact** 11:5

**EXAMINATION** 6:10 166:14 168:22

**examined** 6:7

**exclusive** 127:2

**executives** 155:4

**exhibit** 54:17,20 87:17,18,19 112:13 113:17

127:11,13 129:7, 8 130:3,8,9,11 132:22 133:3,11, 15,22 137:1,4, 11,19 141:18,19, 23 148:23,24 149:2 150:2,4 157:6,7 162:24 166:18,19

**exist** 107:22,25 134:8 139:13,17 159:13

**existed** 135:1

**existing** 110:7 159:9

**expect** 36:16 75:12 82:9 83:4 104:3 168:2,9

**experience** 11:7 74:17 95:17,23 96:3 103:14 105:20 124:7 150:15,16 153:25 154:6 161:4

**expert** 47:23

**experts** 79:7 103:11,13 123:15

**expire** 140:12

**expired** 132:2

**expressed** 36:20

**extant** 62:3

**extent** 10:2 17:25 33:16 50:15 64:8 151:10

**external** 34:13 42:16

**externally** 33:2, 4 148:4

──────────

**F**

──────────

**Facebook** 16:8,

15,25 17:6,7,10, 14,21 18:11,16 19:5 39:13,20 40:3 162:17 165:22,24 166:4

**Facebook's** 18:25

**fact** 13:2 25:22 30:5 38:10 39:4 83:22 100:13 101:10,19 105:13 123:25 131:18 153:24

**fact-check** 81:9

**fact-checked** 81:12,14 101:13 132:22

**fact-checkers** 82:23

**fact-checking** 81:7,22 82:4 84:10 132:16

**facts** 110:12 111:9

**fair** 21:8 25:4 34:2 35:22 36:10 41:24 46:10 61:17,19 63:17 69:3 107:7 121:13 123:7 158:16 159:25 162:4

**fairly** 121:11

**fall** 122:1

**familiar** 11:9 55:2 86:10

**fantastic** 9:8

**farewell** 52:16

**feature** 27:1

**fee** 44:18,23 45:1

**feed** 165:17

**feedback** 112:2

**feeds** 165:17

**feel** 148:7

**feeling** 99:9

**fees** 45:3

**figure** 13:24 59:21 108:1

**file** 45:22 47:9,13 98:25

**filed** 45:25

**filing** 45:20

**final** 10:22

**financial** 152:13

**find** 13:7 19:22 110:14 140:19

**fine** 21:19 77:14 78:17 110:8

**finish** 9:11

**firsthand** 114:10 123:8 124:7

**flag** 41:7 83:9

**flustered** 73:14

**focus** 40:13 73:2

**follow** 56:15 82:9 96:24

**footage** 99:3,4

**for-profit** 94:25

**form** 12:12 13:6, 16 14:23 15:10, 18 16:12 17:4, 17,24 19:3,15,24 20:13 21:12 24:6,18 25:8 26:13,22 28:2 29:2,22 30:10 31:16 32:6,15 33:9,15 34:4,11 35:11 36:1,21 37:1,12 38:1,12, 19 39:9,15,23 41:18 42:3,12,22 43:9 44:9,24 46:14 47:14,22 48:5,12 49:11 53:21 54:2,12 55:25 58:16 59:2 60:10,19 61:22

Atkinson-Baker, a Veritext Company
www.depo.com

64:15,24 65:11, 20 66:3,12,23 67:12,24 68:7,24 69:6,15 70:17 71:1,24 72:14 73:10 74:2,11,21 75:9,20,25 76:9, 18 77:10,21 78:12,23 79:14 80:9,14,21 81:2, 8,19 83:23 84:12 89:18 90:2,7,23 91:5,9,15,19 92:14,21 93:10, 16,21 94:5 95:1, 11,19 96:5,15,22 97:9 98:3,10 99:17 100:7,15, 25 101:7,15,22 102:10,21 103:3, 25 104:12,19 105:2,8,16,25 106:9,19 107:6, 23 108:8,15 109:21 110:6,16 111:10,15,21 112:23 113:6,11, 18 114:1,7,15,22 115:9,17 116:1, 11,18 117:18,24 118:11,22 119:5, 21 120:8,19,25 121:9,21 122:7, 10,22 123:12,22 124:4,11 125:3, 11,23 126:16,23 127:7 128:20 131:21 132:14, 23 133:6,14,20 134:12 135:3,11, 24 136:6,14,21 137:20 138:5 139:6,14 140:8, 20 141:7 142:14, 24 143:7,17,24 144:10,17,23 145:7 146:1,7, 14,22 147:14,25 148:10,20 150:22 151:2 152:2,7 153:1,9, 20 154:2,9,21 156:13,20 158:18,23

**formal** 49:15,25 56:2 84:9,14

**formed** 117:5,12

**forming** 104:22

**found** 60:9 62:3 139:12,25

**foundational** 14:2

**frame** 91:24

**free** 38:16 79:13 90:11

**front** 10:6 87:16 103:5 105:11 127:10 131:4 136:25 141:17 148:23 150:2 162:24 164:7 170:10

**frozen** 160:16, 17

**full** 96:10 99:5 103:5 130:4

**fully** 135:5

___

**G**

**Gate** 99:8,14,15 100:10,11 101:2, 20 102:4,8,13,19 103:1 104:10 105:23 106:2,6, 15 115:4,6,10

**Gates** 12:12,18 13:6,16 14:23 15:10,18 16:12, 19 17:4,17,24 18:9,18 19:3,15, 24 20:13 21:12 24:6,18 25:8,17 26:13,22 28:2,12 29:2,22 30:10 31:16 32:6,15

33:9,15 34:4,11 35:1,11 36:1,11, 21 37:1,12 38:1, 12,19 39:9,15,23 41:18 42:3,12,22 43:9 44:9,24 46:1,14,24 47:14,22 48:5, 12,19 49:3,11 50:15 53:21 54:2,12 55:25 58:16 59:2 60:10,19 61:3,22 64:8,15,24 65:11,20 66:3, 12,23 67:12,24 68:7,24 69:6,15 70:10,17 71:1,24 72:14 73:10,21 74:2,11,21 75:9, 20,25 76:9,18 77:10,21 78:12, 23 79:14 80:9, 14,21 81:2,8,19 83:23 84:12 85:12 89:18 90:2,7,19,23 91:5,9,15,19 92:14,21 93:10, 16,21 94:5 95:1, 11,19 96:5,15,22 97:9 98:3,10 99:17 100:7,15, 25 101:7,15,22 102:10,21 103:3, 25 104:12,19 105:2,8,16,25 106:9,19 107:6, 23 108:8,15,24 109:21 110:6,16 111:10,15,21 112:23 113:6,11, 18 114:1,7,15,22 115:9,17 116:1, 11,18,25 117:18, 24 118:11,22 119:5,21 120:8, 19,25 121:9,21 122:10,22 123:12,22 124:4, 11,19 125:3,11, 23 126:9,16,23 127:7 131:21 132:14,23 133:6,

14,20 134:12 135:3,11,24 136:6,14,21 137:20 138:5 139:6,14 140:8, 20 141:7 142:14, 24 143:7,17,24 144:6,10,17,23 145:7,14 146:1, 7,14,22 147:7, 14,25 148:10,20 150:22 151:2 152:2,7 153:1,9, 20 154:2,9,21 156:13,20 158:18,23 159:10 160:3,9, 16,22,24 161:1, 7,13,20 162:12 164:21 165:3,9 166:5,8,10,15 168:17 169:4,13, 17,22 170:4,12, 15,17

**Gates'** 169:24

**gather** 11:21

**gathered** 123:5 152:16

**gathering** 158:8

**gave** 26:2 98:8, 12,15 133:4,12 134:10

**general** 42:23 48:20 50:1,2 51:9 58:7 82:7 83:2 109:5,14 110:1 154:10 159:12 164:12, 13,15

**generally** 40:23 42:13 45:22 51:8 57:6 91:23 138:24 139:5 161:11 165:23

**generate** 93:23 159:6 160:5 167:6

**generated** 86:5 129:2,3 150:12 163:17

14,20 134:12 135:3,11,24 136:6,14,21 137:20 138:5 139:6,14 140:8, 20 141:7 142:14, 24 143:7,17,24 144:6,10,17,23 145:7,14 146:1, 7,14,22 147:7, 14,25 148:10,20 150:22 151:2 152:2,7 153:1,9, 20 154:2,9,21 156:13,20 158:18,23 159:10 160:3,9, 16,22,24 161:1, 7,13,20 162:14 165:3,9 166:5,8,10,15 168:17 169:4,13, 17,22 170:4,12, 15,17

**generates** 93:20

**generation** 159:15

**Getty** 24:5,16 25:7,16 44:7,12, 20,21 45:1 84:19 98:20 137:22

**give** 10:10,23 20:20 22:24 24:8 25:13,19 27:21 28:19 29:16,19 55:6 57:2,17 59:6 66:10 74:9 110:23 144:19

**giving** 28:24 29:7 68:12

**glitches** 89:9,13

**good** 6:12 72:16 78:7 126:25 168:7,8

**Google** 152:19 157:16 162:16

**graduating** 8:3, 6

**Great** 6:17 170:12

**greater** 76:23 77:2 78:18

**ground** 9:7 12:16 22:9

**guess** 11:1,11, 14 14:14 22:11 25:20 26:3 57:15 69:19 92:7,8 107:7 142:9 143:1 159:13,14

**guessing** 25:3

**guidance** 40:9

**guidelines** 49:20 55:18,20, 24 56:15,18,21, 24 57:5 58:5,8, 10 161:17

**guy** 57:23

**guy's** 57:21

**guys** 94:16
129:23

---

**H**

**half** 137:10

**handling** 44:14

**handout** 59:6,8

**Hannah** 103:18,
24 108:22
138:20

**happen** 35:17
36:16

**happened**
21:19,21,23
23:15 87:2 109:8
111:19,23
123:17 162:3

**happening**
23:12 27:20
75:21

**happy** 41:11
103:8

**hazy** 86:9

**head** 9:15 52:8
60:5 138:10
159:24

**headline** 88:2

**hear** 43:3 66:16
67:16 69:10
161:2

**heard** 30:24

**helpful** 72:8

**hereto** 54:23
87:22 127:15
129:10 130:13
137:6 141:21
149:4 150:6
157:9

**hey** 74:5

**highest** 45:24

**highly** 144:19
167:18 168:10

**Hignett** 51:16,
20,22,25 52:18
53:18 54:1 59:9
79:3,19 80:3,6,
11,18,19 87:4
99:16 101:10,17
102:7 106:15

**Hignett's** 81:12
100:5 156:7,11,
19

**hired** 44:1,3,5

**hit** 62:12

**hitting** 168:14

**hold** 7:6

**holding** 53:19

**homes** 99:23

**honest** 25:1

**host** 14:19 26:24
27:8 29:15,17,
20,24,25 30:3,
12,17,21 43:1
66:15 68:11
69:9,18 70:4,12
72:3 74:7,13
120:10 124:21
125:14 126:10

**hosted** 40:22
41:20 42:8 63:2,
3 131:8 134:1,
13,14 135:19
136:2 137:16
145:15 148:3,4

**hosting** 33:20
48:21 58:19
69:22 70:1 71:12
72:21,25 124:24
145:17

**hourly** 128:7

**hours** 10:12
45:18 46:16 85:8

**huh-uhs** 9:15

**hundred** 21:1

**hundreds**
168:14

**hyphen** 6:15

---

**I**

**i.e.** 61:5

**IBT** 8:4

**idea** 116:5 168:8

**identification**
54:22 87:21
127:14 129:9
130:12 137:5
141:20 149:3
150:5 157:8

**identified**
167:12

**identifies** 62:16
142:8

**identify** 145:3

**identities** 134:9

**illnesses** 10:11

**illustrate** 112:22
113:9,16

**illustrates**
65:25 113:24

**illustrating**
113:4 114:6,12

**illustrative**
11:13 65:17 66:9
113:15

**image** 15:23
22:24 23:10
26:25 27:9 28:21
29:15,16,17,20,
21,24,25 30:4,
12,13,18,21,23,
24 32:1,7 33:20,
21 34:9,13,15
35:4,17 36:13
38:6,7,21,22
40:22 41:3,6,8,
19,22 42:16,24
43:1,16 50:1
65:21 66:4,14,25
67:1 68:10,12,
17,23 69:9 74:6,
7,10,15 80:8
89:5,8 96:17
98:20,21 106:22

112:25 113:7,19
115:1 117:12,19,
23 118:12 119:6,
10,14,17 120:9
121:5,14,23
122:5,25 123:2
124:21 131:8,25
134:1,13,16,17
135:13,16,19,20
136:5,12,16
137:15,16,18,19,
24,25 138:3,7
142:2 144:3,8,
11,20 145:15,18
147:11 148:11,
13 161:22
162:15,16,19
164:23 165:2,11

**images** 24:3,5
27:18 31:20 32:3
33:17,18,24
35:15 39:4
40:16,17 44:11,
14 49:17 56:22
58:9,19 65:13
67:14 78:1 97:3,
11 125:14
126:10,13
134:22,24

**impact** 10:5
48:17

**impacts** 125:1

**important** 9:9
10:6 117:23
119:20 120:5,16
148:8

**importing**
142:20

**in-house** 62:23
155:10

**incentivizes**
160:1

**incident** 20:7

**include** 65:23
76:24 78:10,22
82:16 103:24
106:24 109:7,15
110:2 131:5
134:20 147:24
162:1,5,8,22

164:19

**included** 86:20
104:2 113:1
123:3,15 134:6
142:22 161:18

**includes** 134:16

**including**
105:19

**incorporated**
40:21 113:10
137:13

**incorporating**
165:1

**incorrect** 61:7
71:11

**Indicating** 8:8
20:3 61:14 98:14
121:25

**indication**
66:10 131:15
132:21 133:2,10
144:14 148:17

**indicia** 145:3
146:6 147:2

**indirectly** 44:19

**individual** 92:23

**individuals**
54:10

**industries**
95:24

**industry** 74:17
124:6 153:18
162:10

**infer** 110:20

**inform** 58:14

**information**
11:21 63:20,22
76:25 77:13
78:15 81:17
106:3 110:4
123:4,11 128:23
133:18 134:23
135:2 138:18
142:7 143:1
145:4,24 146:11
158:8

Atkinson-Baker, a Veritext Company
www.depo.com

**informative** 60:15

**infringe** 31:14

**infringement** 33:7,14 34:10, 14,24 35:5 41:17 71:15 84:10

**input** 55:11

**inquiry** 42:1

**inserted** 99:20 110:8,13 142:3

**Instagram** 17:2, 7,15,23 18:8,17 19:1,13,20,21 20:10,15 21:10 22:24 23:10,17, 21,25 24:4,16,20 25:6,15 26:10 28:1,10,24 29:1, 9 32:18 35:9,14, 20,25 36:7,14 37:7,9,22 39:13, 20,21 40:3 58:15 64:23 65:1,7,13, 19,21 68:10 79:11 80:13 89:11,22 118:13, 15 119:7 135:21, 25 136:2,9,16 142:10,12,16,18 143:11 144:12, 20 145:22,23 146:4

**Instagram's** 13:15 19:5,10

**Instagram.com.** 35:19

**instance** 69:1 140:24 141:9

**instances** 26:19 44:25 156:5

**instruct** 65:8,18

**instructing** 66:8

**intellectual** 50:9 54:19 58:25

**intend** 35:9

**intended** 34:15 36:14

**intending** 74:15

**intends** 29:8

**intent** 35:23

**interested** 56:23

**internal** 52:23 127:22 128:9,20

**International** 7:14

**internet** 76:8,17

**interpose** 12:18

**interpretation** 72:17

**interview** 84:3

**introduce** 100:19

**investigate** 42:1

**investigation** 123:10

**involved** 19:12 25:2 60:8 61:15 78:6 82:2 86:12, 14 90:13 93:13 111:5 132:10 150:17

**involvement** 132:24 150:19, 24

**issue** 15:25 17:14 31:23 32:25 48:10 51:18 87:5 88:5 128:17 130:5 148:3,7 152:1 154:19 155:22 160:19

**issues** 32:20 50:2

**istock** 44:20

**item** 111:8

**J**

**J-A-C-K** 57:24

**J-A-M-E-S** 6:15

**Jack** 57:23

**James** 6:4,14

**January** 130:2

**job** 8:3,6,7 31:10,11 48:11, 18

**jog** 62:7

**Johannesburg** 7:25

**joined** 7:18

**journalism** 8:2, 7 50:2

**journalist** 48:3

**journalistic** 132:16

**journalists** 82:7

**judging** 104:2

**jury** 10:6

**K**

**Katherine** 51:20

**keeping** 54:9

**kind** 23:24 32:17 62:10 76:21,22 88:21 146:3 147:15 168:6,12

**knew** 35:16 86:3

**knowledge** 11:12 22:10,18 27:3,5 37:23 61:8 87:14 92:19 93:3,6,19 94:3, 20 109:18 111:7, 12 119:11 132:4 151:10 152:11, 15 155:16 163:8 165:4

**J**

**label** 128:6 130:1

**labeled** 41:4

**lack** 67:9

**lake** 99:25 104:22 114:3 117:1,5,12 121:19 122:18 123:9

**landscape** 97:17 126:21

**language** 84:25 99:24 100:14

**law** 47:20

**laws** 48:3

**learn** 16:15 36:24

**legal** 11:10 33:16 35:2 71:1, 24 72:14 73:10 74:2 89:18 155:9,12,21 156:1,15

**length** 62:5 72:18 100:1 111:8

**letters** 112:1,9

**levels** 83:10

**library** 134:17

**license** 42:21 44:18,22 45:1,2 46:13 48:22 124:9,18 125:2, 10,21 126:8,14 134:15

**licensed** 44:11 84:21 125:15 126:11

**licensing** 41:6 124:21 126:6 145:17

**limitation**

**L**

139:18

**lines** 74:24

**link** 29:21 65:9 164:1

**links** 128:9 164:14

**list** 57:3,12 83:16

**live** 32:4,10 41:12 45:9 83:12 104:4

**living** 125:2

**LLC** 9:2

**locate** 140:7 141:5,13

**log** 60:7,22 62:11 63:12 86:25 107:20 108:10 110:8,18, 19 139:3 140:14

**logged** 83:22

**logging** 62:4 63:24

**logs** 59:24 60:1, 9,12,13,18 61:2, 12 62:3,9,10 63:4,8,11,12,25 80:25 81:17 107:21 108:13, 18 110:13 138:21,24 139:12,16,19,22, 25 140:5,6,11, 12,18 141:3,4,10

**London** 6:18,22 58:3

**long** 6:24 7:6,17 12:10 13:4,14 15:9,16 37:6 43:16 46:6 70:24 71:21 72:2,12 73:19 78:17 155:17

**longer** 44:13 46:11,16 52:4 53:18 54:5 60:9 81:1,18 107:22 108:6 110:15

Atkinson-Baker, a Veritext Company
www.depo.com

130:7 139:19

**looked** 19:20
110:14 117:14
118:4 122:3
139:22 140:6,10,
14

**loop** 97:21

**loose** 16:23

**lost** 120:13

**lot** 25:1 82:24
86:22 91:6
127:25 155:1
160:2,6

**lots** 26:4 78:15

**low** 23:1

**lowest** 159:22

**Luciano** 155:3,6

**luxury** 99:23

_____

**M**

**made** 62:15
108:6 110:19
138:20

**maintain** 64:6

**majority** 162:5

**make** 9:12,13,16
10:1,2 11:15
12:20 34:22
41:10 90:18 95:9
125:2 148:13
169:24,25

**makes** 11:16
90:16 99:19
105:6

**making** 34:9,21
95:2 124:1

**management**
62:21

**managing** 6:22
18:22,24 33:6
108:4,13 117:7

**Manzel** 97:25

**March** 6:1 7:7
16:2 163:3,16
166:24

**mark** 87:17
127:11 137:1
141:17 157:5

**marked** 54:17,
21 87:18,20
127:13 129:8
130:9,11 137:4
141:19 149:2
150:4 157:7

**marketing**
159:5

**material** 19:13
62:4 77:7 87:13
102:20 105:23
106:5,14 108:22
109:3,20 110:12
112:12,14 139:5,
8 169:3

**matter** 19:6
66:21

**matters** 47:24

**Mcgucken**
11:25 52:18 64:7
79:20 80:1,4,12,
20 81:24 88:8
89:5,8 95:16
96:12 97:22 98:7
99:8,24 101:11
102:2,9 103:2
104:11,18 105:7,
14 106:7,16,17
111:2 112:20,21
113:15,20
116:22 117:23
122:18 123:21
124:2 131:19
138:2 140:5,18
141:3 142:8
144:15,19 165:2,
11

**Mcgucken's**
80:6 89:16,24
100:17 103:14
104:25 107:5,11,
12 115:15,19
116:8 118:8,19
121:20 123:8

131:9 135:9
143:4 166:3

**Mckimmie**
155:8 156:18

**meaning** 85:4

**means** 78:14
90:20 93:24
94:11 149:15

**measurement**
154:12

**media** 35:20
38:11,21 44:8
49:20 77:18
84:19,23 164:16

**meet** 160:14

**meets** 123:20

**memory** 9:1
27:13 62:7 79:23

**mention** 57:20

**mentioned** 26:4
46:17 48:25 49:9
66:13 67:14 68:8
79:1 83:6,21
86:25 93:22
109:14 110:1
138:21 139:17
146:15 154:11

**mentioning**
105:19

**mentions**
163:23

**message** 69:17,
25 74:14 79:24

**micromanage**
28:17

**middle** 138:13

**miles** 100:1

**mille** 94:11
149:18

**mind** 13:12 16:2
73:13 163:14

**minimum** 168:4

**minutes** 46:8
85:11,12,13

156:24 166:11

**Mischaracteriz
ation** 28:3

**Misstates** 116:1
118:22 125:11
140:20 146:1

**mix** 76:3

**moment** 54:25
102:25 104:9
113:1,5,7 137:2

**monetize**
126:15

**money** 90:16,18
95:9

**month** 152:6,10
158:5,6

**months** 23:13,
15 47:7 61:6,20
62:3

**morning** 6:12

**mouth** 36:6
37:20 118:18

**multiple** 45:20
76:24 77:13,25
83:10

**mundane** 40:10

**Mybroadband**
8:10

_____

**N**

**names** 57:12

**naturally** 100:18

**nature** 23:23
32:24 35:19
67:14 127:2

**necessarily**
75:12 123:14
169:14

**needed** 87:10
140:1

**news** 66:5 78:2
113:12 114:9
115:1 116:13

117:5,11,19
119:22,23
121:14 162:16
168:13

**Newsweek** 6:22
7:2,10,12,18
8:15,16,17,20
9:1 10:17,19
11:22,25 12:3,8,
9 13:1,3,12,14
14:5,9,11,16
15:7,14 16:3
17:20 18:5,15,24
21:6,9 23:9
24:16,21 25:6,
14,15 26:7,18,21
27:16,24 28:8,
10,23,25 29:6,8,
20 31:2,4 34:8,
22 37:5,6,8,23
38:16 39:1,3,7,
12,18,21 40:3,6
42:10 44:2,17
45:25 48:25
49:8,15,25 50:8
52:3,4,5,21
53:18,19,20,25
54:1,5,8,18,19
55:23 58:24
63:5,19 64:2,13,
23 65:9,18
67:11,20 68:3,4
69:3 70:14,15
71:6,19,21,22
73:8,19 75:15,18
76:15 80:18
81:7,23 82:18
83:20 84:9
88:15,19 89:15
90:5,10,16,18
91:14 92:12
93:9,20 94:4,7,
19,24 95:8 97:5,
19,21,25 98:1,7,
8,24 99:2,13
101:13,19 106:6
107:4,11 108:4
109:4,13 111:2,
14,25 112:8,21
113:10 115:8
117:8 118:8,19
121:18 122:9,17,
20 123:25
124:15 127:12

Atkinson-Baker, a Veritext Company
www.depo.com

128:16 129:7
130:10 132:11
133:4,12 136:20
137:3 140:7
141:6,18 142:11,
13 143:5 144:16
145:3,5,13
146:19 147:5
148:25 150:3
155:18 157:6,20
158:14,17
159:25 161:4,5,
25 162:5 164:1,
18 165:1 166:3,
20 168:24 169:1,
11

**Newsweek's**
13:2 20:9 29:18
37:21 38:4 39:13
43:7 44:6,22
70:21 71:5,17
72:9,12 73:5,16,
24 75:23 82:4
89:25 92:19 94:3
98:9 115:14
116:8 118:7
125:7,18,19
126:4,5 136:12,
13 142:20
143:16 151:8,9
154:18 164:12,
13 165:21

**Newsweek.com**
15:3,5,17 24:4
29:9 31:6 32:5
33:23 43:15
45:10 58:14
66:9,20 68:5
73:19 89:2,5
101:21

**Newsweek.
com.** 15:4

**night** 52:11

**nitty-gritty**
78:14

**nods** 9:15

**non-verified**
132:2

**nos** 9:14

**note** 103:19
104:2

**notice** 28:25
29:7,10 68:12
70:23 71:7,20
73:25 74:9,19
75:8,12 107:13

**notices** 112:1,
10

**November**
163:7

**number** 11:5
23:2 45:24 47:9,
11 138:12,17
151:22 167:22

**numbers** 10:24
22:7 152:23
153:4,7,8 154:15
166:22 169:12

**numerous**
126:22

---

**O**

**oath** 85:17
118:21

**object** 39:7 49:3

**objection** 12:12,
21 13:6,16 14:23
15:10,18 16:12,
19 17:4,17,24
18:9,18 19:3,15,
24 20:13 21:12
24:6,18 25:8,17
26:13,22 28:2,12
29:2,22 30:10
31:16 32:6,15
33:9,15 34:4,11
35:1,11 36:1,11,
21 37:1,12 38:1,
12,18,19 39:9,
15,23 41:18
42:3,12,22 43:9
44:9,24 46:1,14,
24 47:14,22
48:5,12,19 49:11
50:15 53:21
54:2,12 55:25
58:16 59:2

60:10,19 61:3,22
64:8,15,24
65:11,20 66:3,
12,23 67:12,24
68:7,24 69:6,15
70:10,17 71:1,24
72:14 73:10,21
74:2,11,21 75:9,
20,25 76:9,18
77:10,21 78:12,
23 79:14 80:9,
14,21 81:2,8,19
83:23 84:12
89:18 90:2,7,19,
23 91:5,9,15,19
92:14,21 93:10,
16,21 94:5 95:1,
11,19 96:5,15,22
97:9 98:3,10
99:17 100:7,15,
25 101:7,15,22
102:10,21 103:3,
25 104:12,19
105:2,8,16,25
106:9,19 107:6,
23 108:8,15,24
109:21 110:6,16
111:10,15,21
112:23 113:6,11,
18 114:1,7,15,22
115:9,17 116:1,
11,18,25 117:18,
24 118:11,22
119:5,21 120:8,
19,25 121:9,21
122:10,22
123:12,22 124:4,
11,19 125:3,11,
23 126:9,16,23
127:7 131:21
132:14,23 133:6,
14,20 134:12
135:3,11,24
136:6,14,21
137:20 138:5
139:6,14 140:8,
20 141:7 142:14,
24 143:7,17,24
144:6,10,17,23
145:7,14 146:1,
7,14,22 147:7,
14,25 148:10,20
150:22 151:2
152:2,7 153:1,9,

20 154:2,9,21
156:13,20
158:18,23
159:10 160:3,9
161:7,13,20
162:12 164:21
165:3,9 166:5
169:4,13

**objections**
12:19

**objective** 95:3,6

**objectively**
37:20

**obligation**
71:19 73:6

**obligations**
70:22 71:6 72:10
73:17,25

**obtain** 46:13
65:8 66:9 70:22
71:6,19 72:10
73:6,17 123:11

**obtainable**
44:13

**obtained** 33:20
78:4 80:12 99:12
102:13 137:22

**occasion** 55:14
139:11,16

**occupation**
6:21

**October** 6:25
163:4,16 166:25

**off-line** 169:21

**offensive** 43:16

**offer** 40:9

**offering** 90:11

**office** 58:2

**officials** 99:25

**older** 60:18

**omitted** 12:17

**online** 119:10,14
124:1 131:10
163:1,7 169:3

**operates** 108:18

**operations**
132:5

**opinion** 37:2
39:2 169:10

**opportunity**
68:17

**opposed** 9:15
24:5,16 25:7,15,
16 151:25 152:6

**order** 170:8,10,
11

**organic** 83:15

**original** 75:16,
19 76:4,10,24
77:19 78:5,11,16
102:7,11,16
103:23 169:1,11

**overburden**
47:16

**oversee** 40:7
83:1

**oversight** 56:14

---

**P**

**package** 78:4

**pages** 153:19

**paid** 45:1 46:21
47:3,6 90:5
92:13 160:5,8

**Palacios** 155:13

**paparazzi** 96:20
97:7

**paragraph**
101:6 138:17

**paraphrased**
105:24 106:16

**paraphrasing**
102:5

**pardon** 22:3
25:24 31:18
40:25 142:1

**park** 99:24

**part** 15:22 18:12
32:8 40:16 41:15
46:16,18 52:21
64:13 65:6,10,22
66:5 68:9 81:22
93:1 95:3,5
113:12 115:1
122:20 128:25
131:25 145:16
149:7 150:9
157:13 164:6

**partially** 160:4

**parties** 31:15

**partners** 94:21

**parts** 76:23 77:3
78:18

**party** 52:16

**party's** 33:6

**pass** 50:3

**past** 20:18 21:9
139:22 155:24

**pay** 44:22 45:2
158:22,25

**paying** 44:17
125:9

**payment**
159:20,23

**peak** 100:1

**penalized** 55:19

**people** 36:15
68:16 78:1,6,25
118:2 148:12
167:10

**people's** 47:21
50:3

**percentage**
24:3,9,24 25:3,6,
13,19 26:3

**perform** 162:10

**performance**
158:9

**performed**
169:7

**period** 129:22
162:25 163:3,5,
11,16 166:24
170:8

**permission**
26:11,16,24,25
27:8 29:14,17,24
30:17,20 32:1
33:21 43:1 66:15
68:11 69:9 70:4,
12 71:13,14
72:3,5,20 74:6

**person** 10:16
34:15 42:25
62:16 66:14,25
67:16 69:8
110:21 164:10

**personal** 11:12
22:10,18 27:3,5
39:1 93:3,19
109:18 150:15,
16

**personally**
27:7,13,15 47:19
96:3

**pertain** 92:19

**pertains** 56:24
94:8

**phenomenon**
118:1 119:25
121:16

**phone** 84:1

**photo** 44:18
84:10

**photograph**
12:9 15:3 32:14
34:23 37:7 41:14
42:11,20,25
43:4,8 53:12
64:13 65:7,8,16
67:11 77:17
84:16 88:24
89:16,24 95:16,
18 96:12,19
97:6,7,17,19,23
98:2,9 104:25
105:4 111:3,14
112:20,22 113:9,
15 114:21 115:4,

7,15,16,20
116:9,12,23
117:16 118:8,10,
19 119:3 120:16
121:20 122:18
123:21 124:2
125:22 126:6
127:2,4,6 131:9,
19 135:9 138:3
142:22 143:5,9,
13,15 144:16
145:6,13 161:18
166:4

**photographer**
11:24 44:5,18
46:12 67:10
72:11 73:7,18
74:1 79:9 96:16
97:4,12 125:20
126:7 134:17
146:20 147:4,6

**photographer's**
66:22 73:8,18
124:17 125:21
126:7,14 145:5

**photographers**
43:23,25 44:3
74:5 134:10

**photographers'**
13:13 16:10,17
124:7

**photographs**
12:1,4 19:22
24:15 25:14 26:8
44:23 53:6,16
75:19 125:20
126:5 142:13
161:5,6,11
162:10

**photography**
13:3,5 14:12,17
17:2,15 40:14,20
44:7 58:15 70:16
75:16 105:7,15
106:17,21 107:4,
11 124:16,18

**photos** 25:6,7

**phrase** 167:7

**phrased** 72:19

**pick** 25:3

**picture** 114:2

**piece** 46:7,13
106:7 109:20
169:11

**pieces** 46:11
47:13 59:12

**place** 76:25 82:1
83:8 114:24
132:17 134:9
159:6

**Plaintiff** 6:6

**plaintiff's** 54:20
87:19 127:13
129:8 130:11
137:4 141:19
149:2 150:4
157:7

**planned** 28:25
70:15

**platform** 35:14,
25 38:11 62:24
136:20 138:19
162:16

**plausible**
140:13,24 162:3

**played** 134:5

**plays** 99:1

**point** 30:22
42:19 43:13
56:12 107:10
164:5

**policies** 19:5,8
40:24 49:25 50:6

**policy** 12:8 13:2,
3,13 14:5,8,11,
16 15:8,14,20
16:3 18:25
30:15,17 49:16,
17 54:8,13,18
58:25 59:1,4
76:15,20 84:10,
14 85:25 111:25
112:8,11 126:11

**poor** 55:6

**pops** 142:1

**popular** 168:10

**portions** 170:7

**pose** 79:19

**position** 6:24
7:1,6 16:9 17:1
18:25 34:20
37:21 38:5,25
42:9 70:21 71:5,
18 72:10,25
73:6,16,24 118:7
125:7,19 126:4

**positions** 17:10

**possibly** 20:25
66:6 75:17

**post** 165:22

**posted** 28:1,9
31:5,9 32:1,17
33:1 38:6 42:14
66:25 68:9 89:21
118:13 119:15
128:18 143:10
165:24

**posting** 33:1
37:9 148:11

**posts** 36:13

**potential** 15:25

**potentially**
28:10 31:23

**practice** 12:3
20:10 29:19
44:6,22 45:2
50:2 65:6 109:6,
15 110:1 164:12,
13 165:21

**practices** 76:22
77:9,20 82:7
100:23 132:16

**preceding**
101:5

**preference** 85:9

**preparation**
85:19 86:17,24

**present** 50:23

**pretty** 11:11

**previous** 129:20
137:11

**previously**
54:17,20 87:18,
20 138:21

**primarily** 169:2

**prior** 7:12 50:12
80:7

**privileged**
17:25 50:16 64:9
151:3

**problem** 13:20
18:14 73:16

**procedure**
74:13 132:11

**procedures**
58:11 82:5

**proceedings**
9:23 10:23 12:19

**process** 12:11
13:5,15 15:9,16
16:11 26:21
31:1,13,19 39:22
40:19 41:15
61:16 64:14
65:19 67:8 68:6,
9 71:22 72:13
73:9,20 81:23
83:11 90:14
111:5,17

**processes**
11:22 82:1

**produce** 47:11
167:25

**producing**
168:7

**production**
40:7

**profit** 95:2

**program** 52:22
62:19 64:3 132:8

**programmatic**
91:14

**proper** 50:4
65:17

**properly** 40:25
100:23

**properties**
54:19

**property** 50:9
58:25

**proprietary**
136:12,13

**prose** 40:13

**protective**
170:8,10,11

**protocols** 82:5

**provide** 12:16
24:2,23 35:15
70:23 71:7,20
73:25 79:25
87:12 153:3

**provided** 38:22
87:11 102:7
128:25 144:15
149:8 150:10
157:14

**provider** 142:21

**providers** 41:8,
11 44:11 84:22

**pub** 52:10

**public** 17:9
53:19 54:1,9
117:23 118:9,20
119:2,20 120:6,
16,21 121:6,15

**publication**
54:11 75:3,6
109:12 162:22

**publication's**
119:18

**publications**
16:9,16 76:3
78:3 119:11
127:4

**publicly** 16:16
119:7 145:1

**publish** 12:9
13:3,4,13 14:11,
15 37:22 74:25
95:13 115:4,6

160:1

**published** 26:6
40:17 43:14
108:23 119:14
121:18,22
161:19 166:3
168:4

**publishes** 13:14
95:8 132:12

**publishing**
80:4,7,20 95:5
123:20 124:1

**pull** 166:18

**pulled** 78:15
142:9 145:21
152:24

**purpose** 19:22
27:11 34:18
87:7,8 114:5,8,
14,17,20,25
115:8,14,19,25
116:4 117:23
119:20 120:6,16,
21 121:6,15
158:8

**purposes** 48:2

**put** 36:5 37:19
38:10 45:16
46:11 67:15
72:18 87:16 99:1
118:18 127:10
136:25 141:16
148:23 150:1
157:4

**puts** 36:7

**putting** 35:8
76:24 150:18

**PVS** 151:14,20

**Q**

**qualify** 66:2

**queries** 155:12

**question** 9:12,
18 11:2 12:15
13:8,18 15:23
18:2,12 19:17

28:5 29:4 34:21
36:3 37:14 39:19
42:5 50:11 53:23
63:18 68:1 70:6
75:4 80:2 96:1,
11,24 106:12
112:6 116:20
120:13 124:13
125:15 126:3
133:8 135:6
140:4 147:1
155:21 160:21
166:8 168:19

**questions** 9:11,
20 10:7 12:23
14:3 79:19 83:8
156:15 166:8,17
168:17

**quick** 85:8 101:1
166:17

**quote** 78:11
99:8,12,18

**quotes** 77:18
78:3 79:12 81:24
102:2,3,8 103:1
105:10,19 106:1

**R**

**rack** 51:9 94:14

**racking** 23:14
121:10

**rare** 112:25
118:1 121:6,16

**reach** 26:15 39:6
42:19 66:11
99:25

**reached** 26:19
68:20 81:23
83:24

**reaches** 83:21

**reaching** 26:11
27:6,24 28:9
29:7 67:20 68:3

**read** 36:18 101:1
166:22

**readers** 15:5

75:7

**reading** 76:7,17

**real** 9:6 168:5

**reason** 10:9,13
31:23 60:22
63:9,15 66:25
82:19,20 95:12
120:3,4,14 121:8
140:2 141:10
147:23 148:15,
16 162:19
164:17 166:1

**reasons** 43:22
120:12 140:13

**recall** 20:7 22:1
23:12,16,18
26:10,19 51:5,8
52:12 53:14,17
55:3,21 56:10,19
57:13 58:6 59:20
60:3 64:18 65:4
67:20 68:3,19
70:14,18 75:18,
21 79:15 81:5
85:24 86:7,12,14
103:15 118:21
121:4 139:15
140:9,23 141:4,9
155:23 156:2,4
159:24

**receipt** 169:24

**receive** 8:24
109:6 159:20,21

**received** 56:12
109:15 110:2
128:7,22

**receiving** 56:10

**recent** 57:14
140:2

**recently** 55:8
61:15 86:7
131:20

**Recess** 85:15
112:4 157:1
166:12

**recognize**
87:24,25 127:21
129:12 130:16

Atkinson-Baker, a Veritext Company
www.depo.com

137:8 141:23
157:11

**recollect** 27:19,
24

**recollection** 7:8
22:19 26:14 27:7
36:22 39:10
50:10 53:15 61:5
70:2 79:6 86:9
103:11

**record** 6:13
12:20 57:17
83:19,25 85:10
121:16 128:21
156:24 157:2
165:14 166:11

**recording** 61:6
84:1

**records** 51:3
61:21,23 64:6
83:13 84:5,7,11
86:24 108:5
110:3 164:7

**recurring** 83:3
158:6

**red** 10:3 41:7

**refer** 79:17
137:17 138:2,3,
6,9

**reference** 50:5
149:9

**references**
129:17

**referencing**
105:4 107:16

**referring** 88:7
101:5

**reflect** 80:25
110:3 130:4
147:3 163:10

**reflecting** 96:9
128:13 135:2
147:17

**reflects** 145:4

**refreshed**
167:11

**regard** 159:12

**registered**
110:19

**regularly** 12:4
20:10 157:20,23,
25

**reinforced** 83:5

**relate** 85:23

**related** 87:9
89:13 132:4
134:23 151:9
154:19

**relates** 58:22

**relating** 17:10
18:6 54:18 55:22
56:20 64:6 79:20
93:14 94:3
110:12 111:9
139:12 145:25
154:7,18 156:6,
11 165:22

**released** 44:13

**reliable** 82:15,
20

**relieve** 169:19

**relying** 169:2

**remain** 67:7,18

**remarks** 100:17

**remember** 28:8,
15 60:5,13 68:25

**remind** 121:1

**removal** 111:9

**remove** 111:2,8,
14

**removed**
112:12,15,16,18

**repeat** 12:15
13:17,20 15:11
18:2,11 25:9
28:4 29:3 33:10
36:2 37:13 42:4
48:13 49:4 64:20
67:25 71:3 98:4
106:12 112:6

116:19 124:13
126:3 133:7
145:8 147:1
160:20,22

**repeating** 73:13

**rephrase** 13:9
37:20 141:2

**report** 119:23,25
152:19,22

**reportage**
169:11

**reported** 114:3
116:13 122:17,
24

**reporter** 12:21
28:16,20 31:18,
25 32:9 41:9
42:24 46:17
54:21 70:3 78:25
82:25 83:12
87:21 109:1
123:10 127:15
129:10 130:13
137:6 141:21
149:4 150:6
157:9 160:20
169:1,20 170:15

**reporters** 26:23
27:17 29:14
40:9,23 49:18
55:17 57:2 58:7
82:9 83:5 84:6

**reporting** 76:4,
7,11,16 78:5,11,
17 100:5 102:8,
11,17 104:10,15,
17 122:8,21
123:16 124:8
169:1

**representation
s** 54:9

**representative**
39:3

**representing**
53:25 54:11

**reprimand** 56:2

**reprimanded**
55:19,24

**reprinted**
101:20

**reproduce**
20:11

**reproduced**
37:10 143:15

**reproduction**
32:13 143:23,25
144:5

**reputable**
123:16

**request** 26:15,
24 27:8 29:14
30:17 66:15 67:5
68:10 69:9 72:20
74:6,13

**requesting**
26:11 70:4

**require** 122:8

**required** 122:20

**requirements**
162:15

**research** 76:16
80:3,19 82:13

**researched**
17:14

**reside** 6:17
135:21

**resides** 135:20

**resource**
156:10

**respect** 47:17
58:12 67:2

**respond** 30:8
67:4 68:21 169:2

**responded**
30:12 68:22

**responding**
111:25 112:9

**response** 11:1
73:2

**responsibilities**
40:5

**responsibility**
82:24

**responsible**
62:17 132:18

**rest** 125:15
133:22,23 139:1
163:13

**retain** 64:10
84:6

**retention** 64:3

**retirement**
99:23

**revenue** 92:25
93:23 94:7,17
149:10,16,18
151:19,25 159:6,
15

**revenues** 92:19
93:4,20 94:3
151:9 153:19,25
154:6,7,19

**review** 19:17
20:10 31:8,25
32:4,9,19 45:5
58:8 62:2 80:6
83:1,7 85:20,22
86:17,23 87:3,6,
8 102:25 104:9
170:6

**reviewed** 19:8,
10 32:14 100:11
128:23 154:7

**reviewing** 19:12
31:13 32:12
40:20 41:2,13
85:24

**reviews** 31:5

**revisions**
169:25

**rewriting** 77:3

**Rice** 49:21 50:22
51:1,6 56:6,11
127:12

**rides** 62:24

**rights** 31:7
33:20 43:8 49:10

Atkinson-Baker, a Veritext Company
www.depo.com

**role** 7:9

**Rosie** 155:8,9, 17

**roughly** 7:7 43:20

**routine** 69:8

**routinely** 69:4,7

**RPM** 149:11,17 151:13

**RPMS** 152:10

**rule** 12:17 22:9

**rules** 9:7

**run** 127:5 132:7

---

**S**

**S-M-I-T-H** 6:16

**safe** 164:4

**salary** 47:6

**sales** 90:14

**Sandoval** 9:10

**save** 62:12

**scene** 78:2

**scope** 46:2,25 54:3 77:22 125:24

**Scott's** 160:17

**screen** 131:20 135:9 157:5 166:19

**screenshot** 127:12 128:12 129:18 153:10

**screenshotted** 129:4

**scroll** 88:1,23 92:1 95:15 97:16 99:7 102:18,22 103:17 104:8 105:18 106:10, 21 107:14 112:19 127:25 129:25 130:22

137:23 139:2 154:24 163:12, 20

**search** 119:13 128:8

**section** 72:8 130:24 131:2 134:21 139:3

**seek** 42:20 70:12 71:13,14 72:3,4

**selected** 84:16

**sell** 91:8,14,18

**sells** 90:22 94:4

**send** 123:9

**sender** 8:25

**senior** 63:22

**sense** 9:16 11:15,16 15:21 29:13 36:12 41:21 64:25 68:13 95:21 96:24 98:25 99:19 109:5 118:1,3 127:3 155:11 158:14 161:21 163:20

**separate** 134:21

**September** 7:18

**served** 117:23 120:5,16 123:3

**server** 32:4,8,18 44:11,15 84:7 145:16

**servers** 42:14 43:2

**serves** 119:19 120:21

**serving** 121:5

**session** 57:8 58:9

**sessions** 50:8

**SF** 99:8,14,15 100:10,11 101:2,

20 102:4,8,12, 13,19 103:1 104:10 105:23 106:2,6,15 115:4,6,10

**shaking** 138:10

**share** 35:14 36:25

**shared** 34:16 38:21 49:18 162:18

**sharing** 36:14

**short** 122:2

**shot** 96:20

**show** 54:16 114:23 131:7

**showed** 49:22 86:1 150:25

**showing** 11:13 127:24,25 128:10

**shown** 62:9 93:5,7

**shows** 113:19, 22 116:13 118:4 128:6

**sic** 98:1

**side** 23:1 130:18 131:4

**sidewalk** 96:21 97:8

**similar** 58:21

**simply** 32:16 70:8 101:19 122:5 144:25

**simultaneously** 13:22 16:20 22:2 23:5 131:14

**single** 21:6 26:6 83:17

**Sir** 124:12

**sit** 18:21 24:14 25:5,12 26:18 27:23 51:4 92:18

115:22

**site** 26:25 30:9 33:1,7 34:13 36:13 40:23 41:20 42:9,17 66:15 68:11,13 69:10,18 70:5,8 89:22,25 124:21, 25 125:14 131:4 145:6

**sites** 17:14 48:21 75:24 123:17

**sitting** 136:11

**situations** 30:7 66:19

**sized** 45:19 46:7

**Slack** 52:21,23 53:4,6,9,11,13, 16

**Smith** 6:15

**social** 35:20 38:11,21 44:7 49:20 77:17 84:19,22 128:8 164:16 165:17

**sold** 93:8

**sort** 11:21 13:7 15:20 16:5,23 19:16 22:7 24:8 28:17,19 37:23 40:7 44:19 47:10 48:20 49:17 50:1 55:16,21 56:1 65:22 68:15 71:15 74:12,14 76:19 77:1 78:4, 5,6,18 82:6 83:2, 16,17 84:14 86:4,9,20 87:14 89:10 94:17 102:12 116:5 121:15 123:4 128:21 129:13 132:15 133:24 134:6,21 136:8 137:15 140:2 145:17 148:2 155:3 157:17

159:5 160:13 162:14,17,18 168:4

**sorts** 82:10 132:9 159:15

**sought** 120:10 140:18

**sound** 67:9

**sounds** 52:8 71:16,17 143:25 151:18

**source** 44:7,12 77:4 82:15,20 100:16,19,24 137:24

**sourced** 75:24 76:2,3 77:7 106:2

**sources** 77:13 78:15,22,25

**South** 7:24 8:12

**speak** 35:12

**speaking** 13:22 16:20 22:2 23:5 42:13 57:6 131:14 137:22 138:25 165:23

**speaks** 153:11

**specific** 19:4 20:7 22:24 27:21 28:19 44:4 55:7 59:4 69:1 74:14 81:5 106:23 111:1 129:18 139:16 140:10, 23 141:4 151:25 159:4,12 162:2 170:7

**specifically** 8:7 15:20 16:5 19:21 23:11,17,18,20 28:8,14 38:14 51:2,7 52:1,7,14 53:14,17 55:5 57:3 58:6,10,17 59:14 63:1 65:3 75:17 79:16 88:20 91:11

Atkinson-Baker, a Veritext Company
www.depo.com

92:24 94:22 104:1,21,25 107:17 108:25 109:16,23 111:22 134:5 142:5 154:11 156:2,4 166:1

**speculate** 115:11

**speculating** 60:24 125:16 159:9,14

**speculation** 21:12 24:7 75:9 77:11,22 80:15 122:11,23 123:13 135:12 146:23 156:21 162:13 169:5

**spell** 6:12 57:16, 17

**spend** 46:8 103:8

**spoke** 101:11,12

**spoken** 57:3 154:14

**spontaneous** 96:20 97:7

**spot** 65:1 103:16 106:20

**staff** 53:20

**staffer** 83:20

**stamp** 62:11 110:25

**stance** 17:6

**stand** 170:1

**standard** 45:19 46:7 74:12

**standards** 74:18 82:10,11, 22 83:4 100:22 123:20 153:18

**stands** 149:18

**start** 103:20 168:11,14

**state** 6:12

**stated** 16:16 72:3 147:21 148:1

**statement** 12:7 13:1 100:4,14,23

**statements** 17:9 101:14 102:8

**States** 8:14,16

**statistics** 127:23 128:5,20 129:14

**steps** 48:24 49:7,13 56:13,16

**stock** 137:16,19 138:3,7

**stop** 22:8,10 60:13 67:10 88:23 154:24

**stored** 108:19

**stories** 45:21, 23,24 155:25

**story** 41:4 46:9 65:22 66:1 83:21 112:22 113:4,10 114:6 122:25

**streams** 76:25 94:7

**strikes** 31:22 83:8

**string** 163:22

**structure** 13:7, 24 72:1 100:9

**study** 8:1

**stuff** 11:10 20:15 79:1 86:22

**subeditor** 7:16

**subject** 104:15 117:1,4,7,9,11 151:11 168:18 169:15 170:6

**subjects** 116:16,23 117:3,

16 155:24

**submits** 32:9

**submitted** 31:18 63:25

**subsidiary** 8:22

**substance** 79:20

**substantive** 10:3

**subtle** 48:7

**succeeded** 168:8

**successful** 168:13,15

**suggests** 128:6

**sum** 76:23 77:2 78:18

**supplement** 65:14 114:9 123:4

**supplemental** 112:25

**supplementing** 114:13

**supplied** 134:17

**support** 153:7, 14

**suppose** 39:3 44:19 54:5 68:11 74:23 75:5 78:7 96:17 159:13

**surname** 57:21

**surprise** 16:15 36:24 38:8

**surreal** 99:9

**suspect** 82:14 104:3

**sworn** 6:7

**syndication** 74:24

**system** 31:21 32:14 60:22

61:8,24 62:22 85:1,3 107:25 108:18 110:15 129:4 130:20 134:14 135:10, 14,17,20,21,23 136:4,12,13,23 139:18 141:6 142:11,13,20 143:5,16 145:4, 11,22,25 146:12, 16 147:3,13 148:3,17 161:23 164:23

**systems** 34:16

_____

**T**

**takes** 45:16 48:25 49:8

**taking** 132:17

**talk** 105:17 128:3

**talked** 36:19 52:9 66:1 116:9

**talking** 58:9 59:19 79:4 86:3 103:21

**tasks** 40:11

**team** 55:20 88:21 99:1 132:18 155:14

**team's** 132:5

**tech** 8:10

**technical** 63:16 86:4 89:9,12 94:16 108:17 140:12 155:3,14

**technically** 167:16

**technology** 62:25

**telling** 21:17 22:21 70:8 117:8 129:16

**tells** 29:23

163:24

**temporarily** 170:5

**ten** 20:22,23 22:15,21 85:11, 12,13

**ten-minute** 85:9

**tend** 69:10 73:1

**tenure** 44:2 140:6 162:1

**term** 29:13 94:16 96:7

**terms** 19:10 40:20 42:23 55:15 67:8 90:17 92:25 93:23 115:24 154:10 159:23 162:11 163:10

**territory** 35:2

**testified** 6:7 21:20 28:7 34:22 35:7 36:6 42:7 69:25 105:22 118:17 135:22

**testify** 10:15 151:8

**testifying** 10:16

**testimony** 10:10 35:23 96:2 113:25 116:2 118:23 125:12 140:21 146:2

**text** 40:13,16 99:15 101:20,24 142:21 144:9 146:11 147:2,10, 12,15,21

**theoretically** 156:9,14

**there'll** 83:25

**thin** 152:24

**thing** 10:22 68:16 76:22 78:7 130:23

Atkinson-Baker, a Veritext Company
www.depo.com

**things** 10:24
69:23 73:1
119:24 159:16
169:7

**third-party**
14:6,12,18 15:8,
15 49:1,10 69:4
80:13 99:4
124:16

**thought** 111:17

**thousand**
149:19

**thousands**
168:14

**threshold**
159:22 160:15

**thresholds**
160:14

**THURSDAY** 6:1

**tied** 47:8,10
158:10,12,13
159:19

**time** 15:12 23:7,
9,16 27:19,22
37:14 45:16
51:1,6,24 52:2
53:7 55:3,10
59:15 60:23
62:5,11 64:5,18
73:13 83:17
103:8,9 109:11
110:25 111:8
129:22 132:8
139:19 150:25
156:3,11 162:25
163:11 168:18
169:18 170:1

**times** 7:14 10:23
13:21 20:19
21:11,18,21,23
28:20 59:11 83:1
151:14,21

**title** 7:4,15

**today** 9:25
10:10,15 11:17,
20 16:2 18:21
24:14 25:5,12
26:18 27:23

**today's** 85:19

**told** 22:20 30:3
65:3 75:2 86:16
98:1 99:25
109:16 114:19
120:17,20

**tool** 38:21

**tools** 35:15
36:15

**top** 52:7 60:5
88:13,18 91:24
92:4,9 98:22
128:3,5 159:24
163:2

**topics** 46:2
77:23 125:24

**total** 151:21
166:24,25 167:1,
17

**touch** 46:12

**traffic** 86:5
128:7,13,21
130:2,4 158:11,
12,13,15,16,24
159:19,21,23
160:2,6 161:6,10
162:11 164:9
168:25 169:12

**trailed** 42:5

**train** 49:18 57:7

**trained** 40:23

**trainees** 57:14

**training** 55:17
57:8 58:7,9

**transactions**
93:14

**transcript** 9:24
169:24 170:1,6

**transfer** 8:24

**transform** 89:15

**trial** 10:5

**true** 22:22 82:13
160:4

**Tuesday**
128:11,14

**tweet** 65:1
164:14,15,18,20
165:1

**tweeted** 164:4
165:1,11

**tweets** 65:13
75:3,5,7,12

**Twitter** 163:23,
24 164:2,9
165:17,24

**type** 12:22
157:19

**typical** 45:6,10
168:1

**typically** 162:8
164:22

**U**

**Uh-huh** 129:25

**uh-huhs** 9:15

**UK** 7:14 8:11,21
47:21 48:3

**unable** 25:23,25
110:14 140:7,19
141:5

**unavailable**
110:5

**unaware** 24:15,
19 25:5,12
114:20 165:7

**unclear** 9:20

**underlie** 152:14

**underlying**
62:25 153:6

**understand**
9:12 10:7,14,18
11:24 34:20 37:9
41:16 51:18

**understanding**
11:19 18:25
21:18 29:18 33:5
34:8 35:8 88:17
92:5 96:1 110:11
117:6 135:5
154:18

**understood**
9:17,19,22 10:8
12:24 27:3 87:12
162:9

**undertaken**
119:13

**undertakes**
11:22

**unfrozen**
160:23,24,25

**unique** 166:23
167:1,5,6,9

**uniquely** 167:12

**United** 8:14,16

**university** 7:21,
23,24

**unpublish**
63:23

**unreasonable**
47:16

**unrelated**
104:18

**update** 104:2
138:20

**updates** 110:20

**upload** 32:7
44:10 53:6 68:20
134:16 161:22

**uploaded** 31:20
32:3 34:15 42:25
53:11,12 66:14
69:9 164:23

**uploading**
53:16

53:22 64:1 85:1,
17,18 88:4
114:17 146:8
157:23

**understanding**

**URL** 142:4
157:18 163:22

**user** 39:14 164:9
167:3

**usual** 132:15

**V**

**Valley** 113:5
121:19 122:18
123:9 137:25

**variables** 25:2
26:5

**vary** 43:21 45:7

**vast** 162:4

**verbal** 83:15

**verbatim** 75:4

**verify** 82:8

**verifying** 132:11

**version** 43:4
62:14 63:13
103:23

**versioning**
62:10

**viable** 123:20

**video** 77:16,25
88:15,18,21
98:21,24,25
99:1,3,5 112:16,
17 131:7 132:5,
7,18 133:25
134:5,6

**view** 36:20,25
37:3,5 136:4,15
143:4 167:2,3,5,
6,8,14

**viewed** 167:11,
19

**viewer** 34:3 89:4
167:15

**viewers** 89:17
163:19 167:9,12

**viewing** 33:3
136:19 157:5

167:3

**views** 151:20,22
163:11,17
166:22,23,25
167:1,15,17,22,
23 168:2,9

**vigilance** 48:21

**violate** 12:8
13:1,12 43:8

**violated** 42:2

**violating** 49:1,9
55:20

**violation** 55:22,
24

**visible** 15:4,5
33:24 34:5,9,21,
22 35:4,18 89:6
131:4 135:22
143:18

**visitor** 128:11

**visual** 40:20
46:13 88:12
98:18 131:6
132:12,17
133:11 135:2
137:13 162:1,8,
22 164:19,22

**visually** 143:15

**visuals** 133:3
162:5

**W**

**wanted** 59:21,23
86:2 107:18
141:10 156:10

**ways** 158:25
159:3 162:18

**web** 118:15

**website** 8:9,10
12:5 14:17
19:14,23 20:1,5,
11 21:10 26:9
27:9,12 29:15,
17,25 30:1 33:14
35:10 36:9 37:6

38:7,17 71:8
72:12 77:7,17,18
89:2 94:25 98:2,
9 119:18 132:13
144:16 148:12
153:25

**websites** 16:22
17:1,11,22 18:7,
16 19:2 37:11,
23,25 58:19
119:23 126:22

**Wednesday**
128:15

**week** 158:3,4

**weeks** 61:18
64:5

**whatsoever**
150:19

**widely** 34:17
35:15 49:18

**window** 32:17
33:3 136:1,8
143:10

**wire** 8:24 137:25

**withdraw** 39:18
50:11 63:18 75:4
80:2 140:4

**word** 16:24 47:5
122:7 144:1
146:9 159:14
168:5

**words** 36:5
37:19 106:24
118:18

**work** 7:13,17
8:16,20 11:9
13:13 14:6 15:8
16:10 26:12,20
27:11,25 28:9,11
29:1,8 33:13
35:8 37:22,24
38:10,16 50:3
52:3 58:1 59:10,
11,17 62:12
64:22 68:5 70:24
71:21,22 72:12
73:8,19 79:13
80:7 82:25 83:1

90:24 96:4,13
106:7 115:24
119:24 120:6
122:20 123:1
124:10 125:2,9,
10 126:8,15,21
147:4 148:9,19
149:20 157:20
162:7

**worked** 7:14
8:9,13 52:5
59:15 140:25

**working** 7:12
43:18,21,23 47:6

**works** 39:8 52:4
54:5 58:3 61:8
67:21 85:1,10
94:23 124:8

**worse** 123:2

**worth** 167:24
168:7

**write** 12:21
23:25 45:19

**writer** 45:25
46:5 53:20 63:14
65:8,18

**writers** 43:18,21
45:16,20 46:21
47:13 53:1,6,8,
13,15 56:14,20
57:4,7 59:7,9
63:4,7,19,21
64:13,21,22 66:8
76:6 82:22
159:20 160:1

**writers'** 159:18

**writes** 54:1

**writing** 54:10
82:13 122:14

**written** 11:4,6,8,
13

**wrong** 71:17

**wrote** 75:5
79:17,24

**Y**

**year** 20:18 21:9
23:19,21

**yeses** 9:14

**Yuliya** 51:13

**Z**

**Zaharia** 54:16

**Zoom** 129:23