# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN,

        *Plaintiff*,

    v.

NEWSWEEK LLC,

        *Defendant*.

Case No: 1:19-cv-09617 (KPF)

## **DEFENDANT'S REBUTTAL EXPERT DISCLOSURE**

Defendant Newsweek Digital LLC ("Defendant") hereby identifies Lynn Oberlander as a retained rebuttal expert. Pursuant to Fed. R. Civ. P. 26(a)(2), Defendant provides a written rebuttal report from Ms. Oberlander, attached hereto. Ms. Oberlander's address is 51 West 81st Street, Suite 6A New York, NY 10024.

Defendant reserves the right to supplement this disclosure, and to name additional responsive or rebuttal witnesses as necessary.

Dated:  New York, New York        COWAN, DeBAETS, ABRAHAMS &
        April 15, 2021                 SHEPPARD LLP

                                  By:    /s/ Nancy E. Wolff     
                                      Nancy E. Wolff
                                      Sara Gates
                                      41 Madison Avenue, 38th Floor
                                      New York, New York 10010
                                      Tel.: (212) 974-7474
                                      Fax: (212) 974-8474
                                      nwolff@cdas.com
                                      sgates@cdas.com

                                      *Attorneys for Defendant Newsweek Digital LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

I, Sara Gates, hereby certify that on April 15, 2021, a copy of the foregoing Rebuttal Expert

Disclosure was served by email on the following:

<div align="center">

Scott Alan Burroughs, Esq.
Laura M. Zaharia, Esq.
DONIGER / BURROUGHS
231 Norman Avenue, Suite 413
Brooklyn, New York 11222
scott@donigerlawfirm.com
lzaharia@donigerlawfirm.com

</div>

*Attorneys for Plaintiff Elliot McGucken*

<div align="right">

____/s/ Sara Gates_____
Sara Gates

</div>

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

ELLIOT MCGUCKEN,

          *Plaintiff*,

    v.

NEWSWEEK LLC,

          *Defendant*.

Case No: 1:19-cv-09617 (KPF)

## <u>REBUTTAL EXPERT REPORT OF LYNN OBERLANDER</u>

Submitted April 15, 2021

## PRELIMINARY STATEMENT

I have been retained by Newsweek Digital LLC ("Newsweek") related to a copyright infringement lawsuit filed by Elliot McGucken ("McGucken") to provide expert testimony as set forth below.  On April 1, 2021, McGucken's expert Thomas Maddrey ("Maddrey") submitted his "Expert Report of Thomas Maddrey" ("Maddrey Report").  Newsweek requested that I rebut the Maddrey Report and respond to certain opinions proffered by Maddrey.  This Rebuttal Report ("Report") has been prepared in connection with the above-referenced matter.  If called upon as a witness in this matter, I could and would provide the following testimony.

## I.   QUALIFICATIONS

I am a long-standing expert in media law, having served as in-house counsel for leading media companies since 1996.  In that capacity, I have worked extensively with digital newsrooms, journalists, and photographers in evaluating the legal risks of publication.  I have drafted and developed newsroom policies involving, among other things, copyright, photo licensing, and fair use.  I have taught and lectured extensively on news-gathering standards and copyright and fair use.  Over my career, I have trained hundreds, if not thousands, of journalists (including photographers and other visual journalists) in legal issues and newsroom standards, and I regularly advise on the use of photographs in news reporting.  I am a frequent speaker, have appeared on numerous panels, and have published on media law issues throughout my career.  I have also drafted, reviewed, and negotiated hundreds of licenses for third-party material, including photographs.  I am very familiar with digital newsroom best practices involving embedded links to social media websites, including Instagram.

I currently have my own legal practice, focusing exclusively on media law, though I will become Of Counsel to the law firm Ballard Spahr LLP as of May 3, 2021.  Most recently, I served

as Senior Vice President and Associate General Counsel, Media Law, for Univision Communications, Inc., the nation's leading Spanish-language media company.  From 2017 to 2020, I was the Executive Vice President and General Counsel for Gizmodo Media Group, LLC, one of the nation's largest digital media companies.  Its brands included *Gizmodo*, *Deadspin*, *Jezebel*, *Jalopnik*, *Kotaku*, *Splinter*, *Life Hacker*, *The Root*, *The Onion*, and *AV Club*.  Prior to that, I was the General Counsel, Media Services, for First Look Media Works, a 501(c)(3) publisher of *The Intercept* and *Field of Vision*, a documentary unit, from 2014 to 2017.  For eight years, from 2006 to 2014, I served as the general counsel of *The New Yorker*, and I held in-house positions at *Forbes* and *NBC* from 1996 to 2006.  I have written on a variety of media law topics for newyorker.com.  My list of publications is included with my resume, which are both attached as **Appendix A**.

In addition, for over 20 years I have taught graduate courses in both Media Law and Media Ethics at the New School in New York.  I am the former Chair of the Media Law Resource Center and the former Chair of the New York State Bar Association's ("NYSBA") Committee on Media Law.   I also serve as a member of the NYSBA Task Force on Free Expression in the Digital Age. I am the recipient of the 2018 National Press Photographers Association's Kenneth P. McLaughlin Award of Merit for outstanding service in the interest of visual journalism.  I also served as an External Advisor, MacArthur Foundation Journalism and Media Program for the 2017–2018 term.

## II.    COMPENSATION

I am being compensated at the rate of $450 per hour to prepare this Report and my compensation does not depend on the outcome of the case or the position I take.

## III.    MATERIALS CONSIDERED

In preparing this Report, I reviewed and considered the materials listed in **Appendix B**.

4

## IV.    BACKGROUND

It is my understanding that this dispute arises over the use of an Instagram post embedded in an article on Newsweek.com.  The plaintiff, Elliot McGucken, is a fine art photographer, who often captures landscape photography in national parks.  In early March 2019, while shooting in Death Valley National Park, McGucken captured a rare natural phenomenon when a ten-mile-long lake formed.  McGucken took hundreds of photographs of the ephemeral lake over the course of two days, and uploaded many of the images to his website, his Flickr account, and his public social media accounts, including Facebook and Instagram, to share his fine art photography.  Several news websites, as well as many arts and science-focused blogs, reached out to McGucken to request permission to use his images in stories about the lake.  McGucken permitted many of the websites, including *SFGate*, *Smithsonian Magazine*, *AccuWeather*, *Live Science*, *PetaPixel*, or *Atlas Obscura*, to select any of the images that they wanted to use and download the images from his website or Facebook in order to feature them in the articles (presumably by uploading the images to their content management systems, or CMS).

A writer for Newsweek also reached out to McGucken over Instagram to seek permission to upload the image that McGucken had posted to Instagram on Newsweek's website.  McGucken never responded to the Newsweek writer.  Newsweek still reported on the lake and McGucken's experience capturing the rare event in an article posted on March 14, 2019 (the "Article").  After evaluating the newsworthiness and context of the use, Newsweek embedded McGucken's Instagram post in the Article, using Instagram's API, pursuant to Instagram's terms of use, Newsweek policy, and industry standard.  A copy of the Article including the embed of

McGucken's Instagram post is attached as **Appendix C**.  Seven months later, without any notice, McGucken filed suit against Newsweek for copyright infringement.

Notably, McGucken has made the original high-resolution images available on his website and, as evident from his website, permits anyone to freely embed a slideshow of the photos on any website by copying the HTML embed code.[1]

## V.        REBUTTAL TO THE MADDREY REPORT

This matter presents interrelated questions of photographic industry standards, licensing, and social media, along with general copyright questions, as Maddrey states, but it also presents issues of digital newsroom industry standards and practices.  Based upon my review of the materials provided to me, and my experience, it is my opinion that Newsweek's actions in reporting on McGucken's social media post and embedding the post, in context, were fully compliant with industry practices and standards and do not represent an unauthorized use of McGucken's work.

### A.        The Maddrey Report Does Not Consider Industry Standards for Media

#### 1.        Licensing of Images Is Preferred as it Provides Control to Digital Media Companies

The practice of reputable digital media websites is to seek to license materials that will be uploaded into a website's CMS, as set forth in Newsweek's photo use policy.[2]  These licenses can be obtained through third-party photography websites, such as Getty Images or AP, or from stock

---

[1]  *See* NEWS000228–82; *see also Death Valley National Park*, Elliot McGucken Fine Art Photography, https://www.emcgucken.com/Death-Valley-National-Park/ (last visited April 15, 2021); *N-Photo Magazine Cover*, Elliot McGucken Photography & Fine Art, https://www.mcguckenart.com/N-Photo-Magazine-Cover/ (last visited April 15, 2021).

[2]  *See* NEWS000104–05 (Newsweek's operative photo policy in March 2019); *see also* NEWS000103–04 (Feb. 11, 2019 email with NEWS000104–05 as an attachment); Deposition Transcript of Diane Rice ("Rice Tr.") at 77:3–8, 85:25–86:4.

houses.  Licenses can also be sought directly from the photographer, as the author of the Article appears to have done in this case.  If material, including photographs, is licensed and uploaded to a media company's server, the material can generally be used to illustrate news reports, and can also be used apart from the context in which the content might otherwise appear in a social media post.  For example, had McGucken expressly licensed his photograph to Newsweek, Newsweek would have been able to show it in high resolution and as a tight crop (*i.e.*, without the Instagram frame, comments, hashtags, or other indicia), and could also have used the photograph in a thumbnail image in its own social media posts promoting its content.  Newsweek's photo use policy, like the photo policies and best practices of other digital media companies, reflects that a license or other form of express or implied permission is generally required to upload photographs to Newsweek's CMS, and that hosting images without such express or implied permission raises the risk of a claim of copyright infringement (though there remain statutory and other defenses such as fair use, implied license, handouts, etc.).[3]

Embedding of posts through the use of the HTML code provided by the social media platform—whether from Instagram, Facebook, or Twitter—is generally disfavored by editors because it removes their control over the published article.  The original author or creator of the post retains total control over the content and can remove or change the post at any point, potentially wreaking havoc on the article.[4]  The social media platform can also remove the post without warning.  Digital media editors prefer not to have their news reports marred by gaps where content has been removed.  Moreover, comments can be added to the source post that could appear

---

[3] *See* NEWS000104–05.

[4] *See, e.g.*, Rice Tr. at 63:6–19 (describing instance in which someone requested that Newsweek remove a video embed, and before Newsweek could remove it, the person disabled it through the social media platform).

through the embed, and digital media editors would be unable to screen or remove them, even if they are inflammatory.  In contrast, as noted above, uploading a photograph or another piece of content directly to the media company's CMS or server permits the digital media website to have control over the way the article appears to its readers.  This lack of control also differentiates the use of an embed from the use of a licensed work.

But, in any event, there is a crucial distinction to be made in this case.  Embedding of social media posts is not a substitute for licensing images and embedding posts in context was not considered to be a copyright infringement at the time the Article was posted in March 2019.

### 2.     Digital Media Companies and Photographers Generally Understood That the Ability to Share and Embed Posts Was Not an Infringement of Copyright in March 2019

Posts on social media often make news and are the subject of reporting.  Indeed, what citizen journalists and others post to their social media feeds is widely circulated and discussed. As we have recently seen with former President Trump's tweets, social media posts themselves are often central to discussions of public importance.[5]  These social media posts that drive news reporting frequently contain photographs, though they may also contain other media, text, or video. The ability to share the underlying social media post through an embedded link provides tremendous value to the ultimate reader, as they can interact with the material even as they read about it.  But it also leaves the original poster of the material (and the intermediary platform) in

---

[5] *See, e.g.*, Dareh Gregorian, *AG Barr Says Trump Tweets 'Make It Impossible for Me to Do My Job,'* NBC News (Feb. 13, 2020), https://www.nbcnews.com/politics/donald-trump/ag-barr-says-trump-tweets-make-it-impossible-me-do-n1136726; Daniel Politi, *Trump Tweets Invite to Kim Jong Un to "Shake His Hand and Say Hello" at Demilitarized Zone*, Slate (June 29, 2019), https://slate.com/news-and-politics/2019/06/trump-tweets-invite-kim-jong-un-meet-demilitarized-zone.html; Aaron Blake, *8 Trump Tweets That Did Real Damage*, Wash. Post (Jan. 13, 2018), https://www.washingtonpost.com/news/the-fix/wp/2018/01/12/8-trump-tweets-that-actually-did-some-damage/.

control of the experience, as they can draw people to their feeds, monetize the views, and remove or disable the post.

At the time that the Article was posted in March 2019, it was standard industry practice to use embeds of social media posts in news reports about the posts themselves. Social media platforms such as Instagram provided an application programming interface, or API, to allow for easy embedding of user posts in third-party materials, and each platform's terms of use generally made clear that material could be shared by embedding. In some cases, the platforms' terms of use went even further and explicitly stated that the user was granting the platform non-exclusive and sub-licensable licensing rights.[6] Discussion on the Internet from around that time period shows that the common understanding was that enabling the embedding API permitted third parties to embed creator's content without the need for the creator's explicit approval.[7]

Indeed, the availability of Instagram's API led many to believe that there was permission from the creator to embed posts—even those that included photos. The API is simple to use: a third-party user need only click the embed feature on a particular public Instagram post, copy the

---

[6] *See, e.g.*, NEWS000163–71 (Instagram's terms of use in effect in February 2019).

[7] *See, e.g.*, Kenny Novak, *Is It Legal to Embed YouTube Videos in a Blog Post?*, Blogpros (Dec. 6, 2018), https://blogpros.com/blog/2018/12/legal-embed-youtube-blog ("In other words, as long as YouTube's terms permit it, any YouTube user can embed your content without needing to ask your permission, because you already GAVE them permission simply by uploading your content to YouTube. Or, to turn it around as the person doing the embedding: if the content is publicly available on YouTube, and if the embed feature is enabled on the video, it's 100% acceptable to embed the video in your content, so long as your use of it complies with the full terms of service."); *Linking to Copyrighted Materials*, Digital Media Law Project, https://www.dmlp.org/legal-guide/linking-copyrighted-materials (last updated 2014) ("[E]mbedding media in your online work should not expose you to legal liability. . . ."); *see also* Timothy B. Lee, *Instagram Just Threw Users of Its Embedding API Under the Bus*, Ars Technica (June 4, 2020), https://arstechnica.com/tech-policy/2020/06/instagram-just-threw-users-of-its-embedding-api-under-the-bus/ ("Until now, people have generally felt free to embed Instagram posts on their own sites without worrying about copyright concerns.").

HTML code, and paste it into the back end of a website or CMS that processes the HTML code.[8] The post, including the photo, remained on Instagram's server and was not transferred to the media company's CMS or its server. The API does not permit the embedder to tightly frame or crop the image in any way—the entire post is shown in the context which the user intended. Further, if the user did not want their photo embedded or shared, they could either select the "private" account option or could explicitly indicate in their post any limitations on use. For example, as some photographers do, they could include "contact me for licensing" or other limitations. The username of the poster is prominently included in the embedded post, and the link in an embed is live: that is, clicking on it will bring the reader directly to the photographer's Instagram account.

Maddrey suggests that the choice between a public or private account on Instagram's platform "is a false choice and bad policy" (Maddrey Report at 8), but it is neither, as photographers understand the benefits—and costs—of using Instagram as a platform.[9] Instagram is, as Maddrey writes, a "critical outlet for the professional photographer" (*id.* at 7). But crucial to the services that Instagram offers is the ability to share and to embed those images. Distributing images via embedded links brings the viewer back to the source page or social media account of the photographer. Any promotional or monetary benefit that comes from visiting the source feeds accrue to the photographer and not to the embedding party. Professional photographers understand

---

[8] *See, e.g.*, NEWS000152 (Instagram post), NEWS000150 (list of settings including embed feature), NEWS00148 (embed code, requiring user to agree to Instagram's terms of use of its API); *see also* NEWS000099 ("[W]e're excited to introduce web embedding for Instagram content and bring you an easy way to add Instagram photos and videos to the stories you want to tell."); NEWS000157–62 (Instagram's terms of use for its API), NEWS000153–56 (Instagram's embedding instructions).

[9] Photographers who do not like the public/private choice are free to lobby Instagram to change its API.

the difference between public and private settings on the feeds and they generally set the uses to "public" so that they can receive access to the widest audience for their work.

Maddrey also suggests that Instagram's mid-2020 announcement that the embed function did not grant a sublicense to end users indicates that embedded posts containing photographs are now infringing. But even the headlines of the news articles about Instagram's policy change, which the Maddrey Report cites (at n.16), present more support for the conclusion that when the Newsweek Article was posted, in March 2019, industry practice was to embed social media posts without considering them to be infringements of copyright.

### 3.     The "Server Test" and the Legal Underpinnings of Embedding

Digital media companies (and technology companies alike) have long relied on the "server test" set out by the U.S. Court of Appeals for the Ninth Circuit in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). As embedded images were not posted on digital media companies' servers, there was no reason to believe that the use of embeds constituted an infringement of copyright. Though Judge Forrest's February 2018 decision in *Goldman v. Breitbart News Network, LLC* was quite troubling to media companies,[10] it did not conclusively change the law or industry practice. Notably, Judge Forrest only denied the defendants' motion for partial summary judgment and explicitly left open other defenses, such "a very serious and strong fair use defense, a defense under the Digital Millennium Copyright Act, and limitations on damages from innocent infringement."[11] The defendants immediately sought to appeal the

---

[10] *See, e.g.*, Brian Feldman, How a Photo of Tom Brady Could Change the Way That You See the Internet, N.Y. Mag. (Feb. 16, 2018), https://nymag.com/intelligencer/2018/02/court-rules-that-embedding-tweets-could-violate-copyright.html; Eriq Gardner, *Judge Rules News Publishers Violated Copyright by Embedding Tweets of Tom Brady Photo*, Hollywood Reporter (Feb. 15, 2018), https://www.hollywoodreporter.com/thr-esq/judge-rules-news-publishers-violated-copyright-by-embedding-tweets-tom-brady-photo-1085342.

[11] *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 596 (S.D.N.Y. 2018).

decision, and a coalition of entities in the media and technology space sought leave to file an amicus brief to opine on the implications of the decision.  The U.S. Court of Appeals for the Second Circuit declined to hear the interlocutory appeal, and the case was ultimately settled by the parties before the Court could fully and finally resolve the matter.  Judge Forrest's opinion remains non-binding on other judges in the District.

While it did not change the law, the *Breitbart* decision served to remind editors to be sure to seriously consider why the material needs to be embedded, such as what makes the content newsworthy and relevant to the context of the story, which is precisely what the Newsweek editors considered when embedding McGucken's post.[12]  As that was already a best practice among media companies, the *Breitbart* decision did not significantly change the industry standard.  Where the news being reported is about the social media posts themselves, a website's reporters or editors may choose to embed the social media posts directly into their stories using the social media website's API.  Embedding permits discussion of those newsworthy posts, in a timely fashion, in furtherance of the foundational purposes of copyright to promote the progress of science and useful arts.  Writing about the post and showing the post *in context* as an embed is therefore generally considered permissible in digital media newsrooms and remains a widespread practice.[13]

---

[12] *See* Deposition Transcript of James Etherington-Smith ("Etherington-Smith Tr.") at 65:12–14, 65:21–23, 66:4–6; 113:7, 113:12, 113:19–20, 114:8–10, 121:13–16.

[13] *See, e.g.*, Hilary Hanson, *'Haunted Victorian Child' Dog Wins Hearts Via Hysterically Honest Adoption Post*, HuffPost (Apr. 10, 2021), https://www.huffpost.com/entry/prancer-dog-chihuahua-victorian-child_n_6071bfe1c5b6c795e15421e5; Isobel Asher Hamilton, *Elon Musk's Brain-Chip Company, Neuralink, Released a Video of a Monkey Playing Video Games with Its Mind*, Business Insider (Apr. 9, 2021), https://www.businessinsider.com/elon-musk-neuralink-video-monkey-games-pong-brain-chip-2021-4; Francesca Gariano, *Cher Apologizes After Being Criticized for Tweet About George Floyd*, Today (Apr. 4, 2021), https://www.today.com/popculture/cher-apologizes-after-being-criticized-george-floyd-tweet-t213941; Martin Belam, *US Military Account's Gibberish Tweet Prompts Viral Mystery*, Guardian, (Mar. 30, 2021), https://www.theguardian.com/media/2021/mar/30/us-military-account-gibberish-tweet-viral-mystery; Terry Carter Jr., *A Woman Called Out Madonna For*

### B.   The Maddrey Report Does Not Support a Finding That Newsweek Did Not Follow Industry Standards

#### 1.   Newsweek Followed Media Industry Standards

McGucken's post was embedded in the Newsweek Article because it was the subject of the Article, or at least a part of it.[14]   The Article provided the context and commentary for the embedded post.   In this case, the Article was about the ephemeral lake that formed in the desert and described the experience of the photographer who had visited the area and captured photos of the phenomenon.   The Article noted that the photographer had "captured the Salt Creek spectacle and shared several snaps on Instagram this week."[15]   The Newsweek Article used McGucken's own words to express what it was like to be physically present, and then quoted McGucken commenting upon his own fine art photography and what it brought to the depiction.   The embed of his Instagram post provided an example of what McGucken was referring to when he said, "Nature presents this ephemeral beauty, and I think a lot of what photography is about is then searching for it and then capturing it."[16]   The source article for this quote (the *SFGate* article) was also directly referenced in the Newsweek Article, and the Instagram post, embedded between McGucken's comments, stated plainly "View More on Instagram" and provided any interested

---

*Photoshopping Herself Onto Her Body And It's Going Viral*, BuzzFeed (Mar. 25, 2021), https://www.buzzfeed.com/terrycarter/madonna-photoshopped-face-body-tiktok.

[14] *See* Etherington-Smith Tr. at 113:7 ("It's an image of that moment."), 113:12 ("It is part of the news event."); *see also* Etherington-Smith Tr. at 65:21–23 ("If the Instagram image is sort of part of the story in some way, we'll probably want to include it.").

[15] NEWS000081–83.

[16] *Id.*

viewer with a direct window to McGucken's Instagram feed to see more of his photos of the phenomenon along with his other photography.

The use in court cases of PDFs of websites as exhibits is somewhat deceptive, as the PDFs lack the interoperability of the digital media as it exists.  In an embedded link, while the reader can view the post within the context of the article, the reader can also easily click on the embed and be brought directly to the poster's social media feed.  In this case, had Newsweek.com's readers clicked on the embed of McGucken's Instagram post, they would have been brought to his Instagram feed, where they could see all of his other Death Valley photos, along with anything else he had posted.  As McGucken noted during his deposition, he posted his photos on Instagram to share them and to build his fine art brand.[17]  Newsweek's embedding of his post in the Article did just that, potentially sharing his Instagram feed with many new viewers.

Maddrey's attempts to intimate that Newsweek did not follow industry standard practices, but other publications did, are unpersuasive.  Maddrey argues that *SFGate* and other publications "properly licensed the work for publication" and that Newsweek "took for free what other publications had to negotiate for" (Maddrey Report at 9), but it is undisputed that McGucken did not receive any monetary compensation or payment from *SFGate* or most of the media outlets that used his photographs of the lake in Death Valley.[18]  McGucken testified that he instead received promotional benefits and credit, and that the uses were good for his fine art brand.[19]  However, McGucken received the very same benefits—if not more—from Newsweek's inclusion of his embedded Instagram post because the embed provided readers with a window into his Instagram

---

[17] McGucken Tr. at 56:3–21.

[18] *See, e.g.*, McGucken Tr. at 99:3–5 (*SFGate*), 108:2–4 (*Smithsonian Magazine*), 112:2–4 (*AccuWeather*), 123:11–13 (*Live Science*), 131:19–20 (*PetaPixel*), 137:3–5 (*Atlas Obscura*).

[19] *See* McGucken Tr. at 99:6–11; 108:9–15, 112:11–13, 123:14–24, 130:14–16, 137:6–10.

feed and allowed readers to view McGucken's profile with the click of a button.  Maddrey further makes the point that *SFGate* was not an "outlier" because it followed "standard industry practice of reaching out to a creator before featuring their work" (Maddrey Report at 9).  But Maddrey's use of the term "featuring" here is ambiguous.  Newsweek did, in fact, reach out to McGucken to seek his permission to ***host*** his work on Newsweek's server.  McGucken did not refuse to license the image to Newsweek, but rather never responded to Newsweek's reasonable inquiry one way or the other, until he brought the instant lawsuit seven months later.

### 2.    Maddrey Misstates Newsweek's Photo Use Policy

Maddrey's assertion that Newsweek did not follow industry standards by not following its own photo policy is also unpersuasive.  Concerningly, the Maddrey Report not only relies upon a policy that was inoperative at the time in March 2019, but completely misrepresents Newsweek's photo use policy.  Maddrey describes Newsweek's policy as "do not use photos from social media unless you have express permission from the image creator" (Maddrey Report at 12), but the single section of the policy cited actually differentiates hosted photographs from embedded ones.  It provides: "Do not use photos from 'free stock sites', **screen grabs** from video or social media, unless you have express permission from the image creator."[20]  As Diane Rice, Newsweek's directory of photography, who wrote Newsweek's photo policies, indicated during her deposition, a "screen grab" is a physical image, not an embedded use;[21] rather, it requires capturing and locally saving on one's computer a screenshot of the image in a tight frame, and then uploading it to the CMS.  Both of Newsweek's Rule 30(b)(6) witnesses, Ms. Rice and James Etherington-Smith, managing editor for Newsweek's London bureau, testified that Newsweek does not have a written

---

[20] NEWS000001–02 (emphasis added).

[21] *See* Rice Tr. at 87:18–23, 88:19–20.

embedding policy, and that Newsweek's photo use policy only concerned ___*hosted*___ images uploaded to Newsweek's CMS.[22]

Moreover, the policy quoted in the Maddrey Report was not the operative policy in place at the time the Article was posted in March 2019, though the principles are largely the same.  The policy in effect at the time had a slightly different construction, and also confirmed that Newsweek was aware that ___*hosting*___ images (as opposed to embedding) from social media might raise copyright questions.[23]  It stated, in relevant part:

> **3.  Do not use images without requesting permission**:  Do not use photos from 'free stock sites', or social media, unless you have express permission from the image creator.
>
> - The legalities around social media images are continually evolving. What may be ok today, could put us in violation of copyright tomorrow.
> - We must request permission for every image we publish.  This is work on the front end but will save us thousands of unnecessary costs in legal fees.
> - Most private citizens and local news agencies (i.e. local fox or NBC stations), are willing to allow use of their images for credit, but we must request this permission before publishing.

Maddrey argues that the distinction between hosted photos and use of embedded links is not present in Newsweek's policy (Maddrey Report at 12), but the language of the operative policy written by Ms. Rice refers to images that are "publish[ed]."[24]  As Ms. Rice testified, her definition of "publish" is "hosted within our CMS."[25]  The absence of a direct discussion of embedded links in Newsweek's operative photo use policy is further proof that Newsweek—consistent with industry practice—did not consider embedding to be the same as hosting or uploading a photo to its CMS**.**

---

[22] Rice. Tr. at 78:16–24, 85:25–86:12; Etherington-Smith Tr. at 58:7–59:8.

[23] *See* NEWS000104–05 (attached to email from Rice dated Feb. 11, 2019, NEWS000102–03); *see also* Rice Tr. at 103:20–104:8 (confirming NEWS000104–05 is an earlier iteration of the policy).

[24] NEWS000104–05.

[25] *See* Rice Tr. at 85:7–9.

### 3. Maddrey Failed to Consider Other Indicia That Suggested McGucken Would Approve the Use of the Embedded Post

If the artist or photographer cannot be reached or does not respond to an inquiry from a journalist in a timely fashion, many publications will look to other indicia to see if the creator is likely to object to the publication's embed of a post. These indicia may include whether other media has used the work; language or options on the creator's websites; whether the photo is available for license on a third-party website; and whether the websites where the photo is posted contain any restrictions on use (such as Creative Commons license terms).

In this case, all of the other indicia suggests that McGucken would have welcomed Newsweek's embedding of the post. He had been interviewed by *SFGate* about the photographs and provided 30 of the images for a slideshow.[26] Numerous other websites had also used the images at the time that Newsweek embedded the image.[27] McGucken posted his photos widely—across his website, Flickr, and social media accounts—but did not impose any limits on reuse or language indicating that people should contact him to license.[28] His primary websites provide for licenses for fine art prints of his work at various sizes, but offer no mechanism to license a photo for news or editorial uses.[29]

---

[26] *See* MCGUCKEN000003–7.

[27] *See, e.g.*, MCGUCKEN000050–53 (*Smithsonian Magazine*), NEWS000218–22 (*The Independent*), NEWS000223–24 (*Los Angeles Times*), NEWS000225–27 (*Live Science*), NEWS000299–302 (*ScienceAlert*).

[28] *See* McGucken Tr. at 79:4–8 (stating that he posted the image on "Facebook, and Instagram, and probably Flickr"), 89:11–14 (stating in response to the question of whether he placed any requirements on restrictions on the use of his photo, "It has my name on it, beside it."), 90:20–91:25 (stating that he posted high-resolution versions and multi-shot panorama images on his website); *see also* MCGUCKEN000002 (Facebook post), NEWS000152 (Instagram post), NEWS000205–07 (Facebook album).

[29] *See* McGucken Tr. at 37:6–19; Elliot McGucken Fine Art Photography, https://www.emcgucken.com (last visited April 15, 2021); Elliot McGucken Photography & Fine Art, https://www.mcgucken.com/ (last visited April 15, 2021).

Perhaps most important, all three of McGucken's websites offer visitors the option of **_embedding_** slideshows of his high-resolution images, including the Death Valley images that are the subject of this lawsuit.[30]  Notably, the websites do not require users to ask permission before embedding the links, nor do they limit the sharing to a particular type of website; anyone can freely copy and paste the embed code to show a slideshow of McGucken's photos on their website.[31] McGucken had other ways of limiting the use of his photos through embeds, had he wanted to do so.  He could have added a comment to the post to indicate how to license the image or set forth a requirement that others not embed the image without contacting him.  But not only did he not do this, he actively encouraged sharing his photos through embedding.

In cases where the digital media company has not received explicit permission to use a photograph or other content in an embedded post, it is also general industry practice to respect the wishes of the creator of the social media post if they later seek to have it removed.  In most cases, the websites will remove the post or the embed and/or seek to retroactively license the work for a reasonable fee or other consideration.  This is Newsweek's policy as well, as both Mr. Etherington-Smith and Ms. Rice testified.[32]  But McGucken did not give Newsweek the opportunity to do so, choosing to sue over the use of the embedded post before reaching out in any way to Newsweek.

---

[30] *See* NEWS000228–82; *see also Death Valley National Park*, Elliot McGucken Fine Art Photography, https://www.emcgucken.com/Death-Valley-National-Park/ (last visited April 15, 2021); *N-Photo Magazine Cover*, Elliot McGucken Photography & Fine Art, https://www.mcguckenart.com/N-Photo-Magazine-Cover/ (last visited April 15, 2021).

[31] *See, e.g.*, NEWS000228–82 (walking through the embed process from McGucken's website).

[32] *See* Etherington-Smith Tr. at 66:24–67:2 ("So if we have contacted the person who posted the image, and they for some reason said, you know, please don't use the image, we'll respect that and don't use it."); Rice Tr. at 122:19–21 ("If a photographer declines or tells us explicitly they don't want us to use their content, we are unlikely to use it."); *see also* Rice Tr. at 59:2–7, 60:1–4, 60:12–15, 62:1–6, 63:6–19 (describing removal of content and policies).

This game of "gotcha" does nothing more than drive up the costs to all involved, including the photographer and the media company.

### C.    Newsweek's Embed of McGucken's Post
   Shows an Attempt to Meet the Fair Use Test

If, contrary to industry practice and understanding at the time, this use of the embedded post is found to be an infringement of McGucken's copyright, there is a strong fair use defense here under the four-factor test.[33]   Although fair use is generally for the court to decide, as Maddrey expresses his opinion on several of the factors, I will respond in kind.

The first factor—the purpose and character of the use—weighs strongly in favor of fair use.  The embedded post was used for news reporting and comment, which are both expressly permitted fair uses under the Copyright Act.  *See* 17 U.S.C. § 107; *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, No. 19-cv-2420, 2021 WL 1148826, at *4 (2d Cir. Mar. 26, 2021) ("Paradigmatic examples of transformative uses are those Congress itself enumerated in the preamble to § 107: 'criticism, comment, news reporting, teaching ..., scholarship, or research.'"). The article as a whole was about the seemingly miraculous appearance of a ten-mile-long lake in a desert, and several paragraphs were devoted to McGucken's experience photographing the event. In this vein, the photographer himself commented on the experience of capturing the event and what he was trying to accomplish in his photographs.  Newsweek's article made clear that McGucken shared his photographs publicly on his Instagram feed and explicitly credited him in conjunction with his work.

---

[33] Maddrey indicates that the ability to decide to whom to license one's work is a key right of copyright.  *See* Maddrey Report at 14.  I agree, but that is not one of the factors for consideration in the fair use determination.

Although Maddrey states in his report that the embedded photo was used for purely "illustrative" purposes, this is false.  Rather, the embedded post was used because McGucken was commenting directly on his experience photographing the lake.   As Mr. Etherington-Smith testified (which Maddrey curiously omits from his report), the purpose of the use of was to supplement the news of the event with some first-hand knowledge from someone who was there and the use served an important public purpose by showing a rare event.[34]  When Newsweek needs a purely "illustrative" image, it regularly licenses stock images from Getty Images.[35]  In fact, in this instance, Newsweek did also include an image of Death Valley from Getty Images in the article (which was uploaded to Newsweek's CMS) for illustrative purposes, further exemplifying its understanding of what may and may not be fairly used.[36]

The second factor is the nature of the copyrighted work, and it is well-settled that more protection is given to creative works.   As a strong supporter of both news and fine art photographers, I would never argue that what they do is not creative, and I am not suggesting otherwise here.

The third factor focuses on the amount and substantiality of the portion of the infringed work used.  Although the entirety of the photo that McGucken posted to Instagram was used, it was used in the context of the Instagram post, and was not cropped or edited in any way by

---

[34] *See* Etherington-Smith Tr. at 114:8–10, 121:5–7.

[35] *See* Rice Tr. at 181:8–15 ("Q: Now, assuming that you didn't embed this photograph here and we're looking for a picture of Death Valley to illustrate the piece, would you obtain one from Getty under your paid subscription? A: That would be the proper means, the first means that we would have used."); *see also* Rice Tr. at 19:12–13 ("I would say 99 percent of the images are from Getty, maybe even more.")

[36] *See* Rice. Tr. at 213:17–25 (explaining that the Getty Images photo is "an illustrative image that was included so that it can post to social media. We can't use embedded images for social media purposes. So this image was illustrative of the area . . . .").

Newsweek.  Notably, as McGucken acknowledged during his deposition, the image he uploaded to Instagram was a compressed, lower-resolution version of his original photograph,[37] so this factor should tip in Newsweek's favor.[38]

The fourth factor looks at the potential effect on the market for and value of the work.  As McGucken testified during his deposition, he classifies himself as a "fine arts photographer," in the vein of Ansel Adams.[39]  McGucken does not seem to have (or even be interested in) a market for licensing his work for news or editorial uses of his images.[40]  He does not provide a mechanism to license his images for editorial uses on his websites, but rather appears to focus on print and commercial sales.[41]  He testified that licensing inquiries are occasional—every six months or so— and 90 percent of his income comes from *retroactive* licenses, *i.e.*, enforcement efforts.[42]  And, as McGucken testified during his deposition, he did not seek payment from *SFGate*, *Smithsonian Magazine*, *AccuWeather*, *Live Science*, *PetaPixel*, or *Atlas Obscura*, for their uses of numerous of

---

[37] *See* McGucken Tr. at 55:5–14.

[38] *See Boesen v. United Sports Publications, Ltd.*, No. 20-cv-1552-ARR-SIL, 2020 WL 6393010, at *6 (E.D.N.Y. Nov. 2, 2020) ("Here, by embedding the post, defendant did not control how the photograph would be presented. Wozniacki chose to crop the image and use a lower resolution version of it—choices that in themselves tip this factor slightly in defendant's favor."), *reconsideration denied*, No. 20CV1552ARRSIL, 2020 WL 7625222 (E.D.N.Y. Dec. 22, 2020).
[39] *See* McGucken Tr. at 31:16–17.

[40] *See, e.g.*, McGucken Tr. at 112:17–21, 112:22–113:2, 117:9–15, 127:4–10, 127:16–17, 128:19– 22, 129:15–21, 137:3–10, 139:24–140:4, 144:6–8, 144:18–25, 145:8–11.

[41] *See* McGucken Tr. at 37:6–19; Elliot McGucken Fine Art Photography, https://www.emcgucken.com (last visited April 15, 2021); Elliot McGucken Photography & Fine Art, https://www.mcgucken.com/ (last visited April 15, 2021).

[42] *See* McGucken Tr. at 34:2–7, 62:23–63:2, 210:1–9; *see also Dr. Elliot McGucken Demand Letters – Photo Infringement [What You Need to Know to Avoid a Lawsuit Being Filed Against Your Company and Potentially its Officers and Directors for Personal Liability] and Information on Settlements*, Vondran Legal,  https://www.vondranlegal.com/mcgucken-photo-infringement (last visited Apr. 15, 2021).

his photos of the Death Valley lake, but received benefits in the form of publicity for his fine art brand.[43]

Although Maddrey argues that "those who would buy a print of this work may very well be less inclined to do so if the use that Newsweek made was widespread" (Maddrey Report at 14), this assertion is belied by McGucken's acknowledgment during his deposition that Instagram compresses images and this affects the quality of the photos, so one would not be able to print.[44] As the photo Newsweek used appeared in an Instagram post, replete with McGucken's profile information, commentary, and hashtags, a compressed lower-resolution image would be a poor substitute for the original high-resolution work.  McGucken's offer of embedding on each of his websites would also seem to disprove any assertion of negative market effect, as McGucken essentially makes his Death Valley photographs, along with all of his other work, available for free embedded use by anyone who copies and pastes the HTML code.[45]

---

[43] *See* McGucken Tr. at 99:3–5, 99:6–11, 108:2–4, 108:9–15, 112:2–4, 112:11–13, 123:11–13, 123:14–24, 130:14–16, 131:19–20, 137:3–5, 137:6–10.

[44] McGucken Tr. at 55:5–14.

[45] *See*, e.g., NEWS000228–82; *Death Valley National Park*, Elliot McGucken Fine Art Photography, https://www.emcgucken.com/Death-Valley-National-Park/ (last visited April 15, 2021); *N-Photo Magazine Cover*, Elliot McGucken Photography & Fine Art, https://www.mcguckenart.com/N-Photo-Magazine-Cover/ (last visited April 15, 2021).

## VI.     CONCLUSION

Based on the above, my experience in the industry, and the materials provided to me, it is my opinion that Newsweek did not infringe McGucken's photograph when it embedded a link to his Instagram account in March 2019.  Further, if the use does constitute an infringement, it is my opinion that it is not an intentional infringement, and that the complete context of the use would qualify it as a fair use of the photograph under the Copyright Act.


Respectfully submitted,

*Lynn Oberlander*

Lynn Oberlander

Executed on April 15, 2021 in New York, New York

# Appendix A

# Lynn B. Oberlander

New York, NY 10024

(347)-453-8111

Lynn.Oberlander@aya.yale.edu|  linkedin.com/in/lynn-oberlander-27412912/

## General Counsel

Highly analytical and forward-thinking expert media counsel across digital, broadcast and traditional platforms.  Solutions-focused with demonstrated strong communication, management and problem-solving skills. Areas of expertise:

Litigation | Advertising, Marketing and Distribution | Intellectual Property | First Amendment | Cybersecurity and Privacy

## Experience

**Law Offices of Lynn B. Oberlander**, New York, NY                                   **August 2020 – Present**
**Sole Proprietor**
Legal office providing media legal services, including contract and license negotiation, review and drafting; litigation; pre-broadcast and pre-publication review; pre-production services; fair use review and analysis; Freedom of Information Act requests and access.

**Univision Communications Inc.,** New York, NY                                   **March 2017 – August 2020**
   **Senior Vice President, Associate General Counsel, Media Law**              **August 2019 – August 2020**
      Chief news counsel for Univision Communications Inc. as of May 2018 (while also working as GC of Gizmodo Media Group, a subsidiary).
      - Extensive pre-broadcast review and litigation oversight across leading Spanish-language broadcaster and related cable and digital properties.
      - Established media law and copyright training program and advised on news standards, conflicts of interest and social media policy development.
      - Member of Women's Leadership Council Steering Committee.

   **Gizmodo Media Group, LLC**                                                      **March 2017 - July 2019**
   **Executive Vice President & General Counsel**
      Chief legal officer for digital media company. Eleven brands included *Gizmodo*, *Deadspin*, *The Root*, and *The Onion* with over 80 million monthly unique viewers.
      - Oversaw all legal operations, including editorial, litigation, marketing, ad network and distribution contracts, and extension into video, podcasts, film and television.
      - Member of executive leadership team, with varied training, real estate, and people-op responsibilities.
      - Led GDPR and privacy initiatives, including development of internal policies and processes.
      - Management representative for editorial union negotiations (WGA-E).

**First Look Media Works, Inc.,** New York, NY                                   **March 2014 - March 2017**
**General Counsel, Media Operations**
Chief legal officer for digital media start-up funded by E-Bay founder Pierre Omidyar with non-profit and for-profit affiliated companies. Editorial products included national-security focused site *The Intercept* and documentary unit *Field of Vision*.
   - Developed and directed Press Freedom Defense Fund, providing financial support for third-party freedom of expression cases.
   - Drafted, reviewed, and negotiated distribution and production agreements, work-for-hire and content licenses, subleases, employment contracts, agency, and book contracts.
   - Conducted extensive legal review for national security and other journalism projects.
   - Developed and implemented privacy, encryption, and cybersecurity policies, including security protocol for archive of Snowden documents.
   - Drafted corporate resolutions for non-profit news organization. Provided counseling and advice to company's leadership team.

**Condé Nast,** New York, NY                                                    **November 2006 - March 2014**
**General Counsel, The New Yorker**
Chief legal officer for weekly magazine of news and ideas and affiliated website. Responsibilities included extensive newsroom counseling and pre-publication review; litigation management, contract and license negotiation, drafting, and review; claim analysis and resolution; copyright and trademark; information privacy and security; and conducting regular legal seminars.

## Other Positions

**Forbes Inc.,** Editorial Counsel                                                                 **2001 - 2006**
**NBC, Inc.,** Senior Media Counsel, Media Counsel, Litigation Counsel                             **1996 - 2001**
**Paul, Weiss, Rifkind, Wharton & Garrison,** Associate                                            **1992 - 1996**
**District Court for the District of Columbia, Chambers of U.S. District Judge John H. Pratt,** Judicial Clerk   **1991 - 1992**

## Teaching Experience

**The New School,** New York, NY                                                              **1998 – Present**
**Adjunct Professor**
Teach in-person and online courses "Media, Corporate Responsibility and the Law" and "Media Ethics" to graduate students in media studies and media management program.

## Education

**Juris Doctor (J.D.)**
Columbia University School of Law, New York, NY.
**Honors:** Samuel I. Rosenman Prize (for academic excellence in public law courses and citizenship); Harlan Fiske Stone Scholar, Olin Law and Economics Junior Fellow
**Activities:** Notes and Comments Editor, *Columbia Law Review*; Editor, *Law School News*; Teaching Assistant, "The First Amendment & The Law," Columbia Journalism School

**Bachelor of Arts (B.A.),** *cum laude***, with Distinction in Economics and Political Science**
Yale University, New Haven, CT
**Activities:** News Editor & Columnist, *Yale Daily News*; Director, Yale Co-op

## Selected Professional Activities

- Frequent speaker on media law topics, including national security and espionage, newsgathering and encryption, access, defamation, copyright, ethics, DMCA
- Recipient, 2018 National Press Photographers Association's Kenneth P. McLaughlin Award of Merit for outstanding service in the interest of visual journalism
- External Advisor, MacArthur Foundation Journalism and Media Program, 2017-18
- Chair, Media Law Committee, New York State Bar Association, 2012-16; member since 2005
- Chair, Media Law Resource Center, January 2015- December 2018; Director, 2012-20; Chair, Vice-Chair, International Committee, 2010-12
- Media Law Committee, New York City Bar Association, 2003-06, 2008-16
- Trustee, The New Jewish Home, Secretary 2016 – 19; Chair, Manhattan Division, 2012-15; Chair, Bronx Division, 2009-12; Vice-Chair, Bronx Division, 2008-09; Treasurer, 2006-08; Trustee, 2005-06
- Director, YDN Foundation (Alumni board of *Yale Daily News*), 2008-present
- Member, Board of Governors, Association of Yale Alumni, 2008-10

## Lynn B. Oberlander
## Publications

"New York Affirms the Protection of Confidential Sources," *newyorker.com*, December 11, 2013

"Snowden and the Journalists: Whose Papers are Safe?" *newyorker.com*, August 23, 2013

"Why We Had a Right to Watch the Zimmerman Trial," *newyorker.com*, July 20, 2013

"Holder's New Rules for Pursuing Reporters," *newyorker.com*, July 13, 2013

"Can Justice Sotomayor Stop the N.S.A.?" *newyorker.com*, June 7, 2013

"The Law Behind the A.P. Phone-Record Scandal," *newyorker.com*, May 14, 2013

"The Chiquita Phone-Hacking Scandal," *newyorker.com*, July 28, 2011

"The Pomegranate Papers: Update," *newyorker.com*, August 2, 2010

"The Pomegranate Papers," *newyorker.com*, July 27, 2010

"Plame Game," *American Lawyer*, October 2007 (Review of *Off the Record: The Press, The Government, and the War over Anonymous Sources* by Norman Pearlstine)

"How Free is Your Speech?" *Understanding Hate* (Scholastic Inc., February 2001)

Book Review, *We the People: The Fourteenth Amendment and the Supreme Court*, by Michael Perry, *Columbia Magazine* (Summer 2000)

Book Review, *Transforming Practices: Finding Joy and Satisfaction in the Legal Life*, by Stephen Keeva, *New York Law Journal*, September 7, 1999

"Corporate Plaintiffs: Public or Private Figures," *Communications Lawyer*, Vol. 16, No. 1, Spring 1998

"A First Amendment Right of Access to Affidavits in Support of Search Warrants," *Columbia Law Review*, Vol. 90, p. 2216, December 1990

# Appendix B

**Materials Considered**

| Description | Docket or Bates Number Reference |
|---|---|
| Amended Complaint | Dkt. No. 17 |
| Answer | Dk. No. 14 |
| Opinion and Order on Motion to Dismiss | Dkt. No. 35 |
| Opinion and Order on Reconsideration | Dkt. No. 41 |
| Expert Report of Thomas Maddrey | |
| Deposition Transcript of Diane Rice (and all exhibits thereto) | |
| Deposition Transcript of James Etherington-Smith (and all exhibits thereto) | |
| Deposition Transcript of Elliot McGucken (and all exhibits thereto) | |
| Documents Produced by Newsweek During Discovery | NEWS000001–02<br>NEWS000081–83<br>NEWS000099–101<br>NEWS000102–03<br>NEWS000104–05<br>NEWS000148<br>NEWS000150<br>NEWS000152<br>NEWS000153–56<br>NEWS000157–62<br>NEWS000163–71<br>NEWS000205–07<br>NEWS000218–22<br>NEWS000223–24<br>NEWS000225–27<br>NEWS000228–82<br>NEWS000299–302 |
| Documents Produced by McGucken During Discovery | MCGUCKEN000002<br>MCGUCKEN000003–7<br>MCGUCKEN000050–53 |
| McGucken's Websites | *Death Valley National Park*, Elliot McGucken Fine Art Photography, https://www.emcgucken.com/Death-Valley-National-Park/ (last visited April 15, 2021)<br><br>Elliot McGucken Fine Art Photography, https://www.emcgucken.com (last visited April 15, 2021) |

| | |
|---|---|
| | Elliot McGucken Photography & Fine Art, https://www.mcgucken.com/ (last visited April 15, 2021)<br><br>*N-Photo Magazine Cover*, Elliot McGucken Photography & Fine Art, https://www.mcguckenart.com/N-Photo-Magazine-Cover/ (last visited April 15, 2021) |
| Copyright Act | 17 U.S.C. § 107 |
| Court Cases | *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, No. 19-2420-CV, 2021 WL 1148826 (2d Cir. Mar. 26, 2021)<br><br>*Boesen v. United Sports Publications, Ltd.*, No. 20-cv-1552-ARR-SIL, 2020 WL 6393010 (E.D.N.Y. Nov. 2, 2020)<br><br>*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018) |
| Other Materials | Aaron Blake, *8 Trump Tweets That Did Real Damage*, Wash. Post (Jan. 13, 2018), https://www.washingtonpost.com/news/the-fix/wp/2018/01/12/8-trump-tweets-that-actually-did-some-damage/<br><br>Brian Feldman, How a Photo of Tom Brady Could Change the Way That You See the Internet, N.Y. Mag. (Feb. 16, 2018), https://nymag.com/intelligencer/2018/02/court-rules-that-embedding-tweets-could-violate-copyright.html<br><br>Dareh Gregorian, *AG Barr Says Trump Tweets 'Make It Impossible for Me to Do My Job,'* NBC News (Feb. 13, 2020), https://www.nbcnews.com/politics/donald-trump/ag-barr-says-trump-tweets-make-it-impossible-me-do-n1136726<br><br>Daniel Politi, *Trump Tweets Invite to Kim Jong Un to "Shake His Hand and Say Hello" at Demilitarized Zone*, Slate (June 29, 2019), https://slate.com/news-and-politics/2019/06/trump-tweets-invite-kim-jong-un-meet-demilitarized-zone.html<br><br>*Dr. Elliot McGucken Demand Letters – Photo Infringement [What You Need to Know to Avoid a* |

*Lawsuit Being Filed Against Your Company and Potentially its Officers and Directors for Personal Liability] and Information on Settlements*, Vondran Legal, https://www.vondranlegal.com/mcgucken-photo-infringement (last visited Apr. 15, 2021).

Eriq Gardner, *Judge Rules News Publishers Violated Copyright by Embedding Tweets of Tom Brady Photo*, Hollywood Reporter (Feb. 15, 2018), https://www.hollywoodreporter.com/thr-esq/judge-rules-news-publishers-violated-copyright-by-embedding-tweets-tom-brady-photo-1085342

Francesca Gariano, *Cher Apologizes After Being Criticized for Tweet About George Floyd*, Today (Apr. 4, 2021), https://www.today.com/popculture/cher-apologizes-after-being-criticized-george-floyd-tweet-t213941

Hilary Hanson, *'Haunted Victorian Child' Dog Wins Hearts Via Hysterically Honest Adoption Post*, HuffPost (Apr. 10, 2021), https://www.huffpost.com/entry/prancer-dog-chihuahua-victorian-child_n_6071bfe1c5b6c795e15421e5

Isobel Asher Hamilton, *Elon Musk's Brain-Chip Company, Neuralink, Released a Video of a Monkey Playing Video Games with Its Mind*, Business Insider (Apr. 9, 2021), https://www.businessinsider.com/elon-musk-neuralink-video-monkey-games-pong-brain-chip-2021-4

Kenny Novak, *Is It Legal to Embed YouTube Videos in a Blog Post?*, Blogpros (Dec. 6, 2018), https://blogpros.com/blog/2018/12/legal-embed-youtube-blog

*Linking to Copyrighted Materials*, Digital Media Law Project, https://www.dmlp.org/legal-guide/linking-copyrighted-materials (last updated 2014)

Martin Belam, *US Military Account's Gibberish Tweet Prompts Viral Mystery*, Guardian, (Mar. 30,

| | 2021), https://www.theguardian.com/media/2021/mar/30/us-military-account-gibberish-tweet-viral-mystery |
|---|---|
| | Terry Carter Jr., *A Woman Called Out Madonna For Photoshopping Herself Onto Her Body And It's Going Viral*, BuzzFeed (Mar. 25, 2021), https://www.buzzfeed.com/terrycarter/madonna-photoshopped-face-body-tiktok |
| | Timothy B. Lee, *Instagram Just Threw Users of Its Embedding API Under the Bus*, Ars Technica (June 4, 2020), https://arstechnica.com/tech-policy/2020/06/instagram-just-threw-users-of-its-embedding-api-under-the-bus/ |

# Appendix C

newsweek.com/death-valley-lake-california-flooding-rain-winter-storm-1362695



THE BRITISH-OR-IRISH QUIZ
SPONSORED BY THE NEW YORK TIMES
Test your knowledge of British and Irish dialects.
See More

Mon, Dec 02, 2019

# Newsweek

SIGN IN   SUBSCRIBE >

U.S. | World | Business | Tech & Science | Culture | Newsgeek | Sports | Health | Opinion | Vantage    Search

## U.S.

# HUGE LAKE APPEARS IN DEATH VALLEY, ONE OF THE HOTTEST, DRIEST PLACES ON EARTH

BY KATHERINE HIGNETT ON 3/14/19 AT 9:16 AM EDT

CONTINUE

**TODAY'S TOP STORY**

**DEADLY STORM SLAMS CALIFORNIA**
FLOODING AND MUDSLIDES KILL 4; FORCE EVACUATIONS

SHARE

U.S.    CALIFORNIA    FLOODING    RAIN    WINTER STORM

SPONSORED BY SAS

**Keeping life-savers airborne**
Lockheed Martin uses SAS® to help C-130
Hercules operators know when maintenance i...

See More

FEATURED SLIDESHOWS

**A Look at Every Starbucks Winter Holiday Cup By Year from 1997 to 2019**

**What Starbucks Christmas Holiday Drinks Are Available This Year?**

**Meet the Master Carver Who Turns Pumpkins Into Portraits**

**Our Cosplay Favorites from NYCC 2019**

Residents of California have been battling severe weather for weeks. But amid the chaos, the rain has created a lake in the usually arid Death Valley.

One of the hottest and driest places in the world, the temporary lake emerged after the desert valley was drenched with 0.87 inches of rain on March 5 and 6, Weather.com reported.

Although it may not sound like much, that's about a third of Death Valley's yearly average, meteorologist Chris Dolce said. "Because water is not readily absorbed in the desert environment, even moderate rainfall can cause flooding in Death Valley."

Or, as NWS meteorologist Todd Lericos previously told local outlet SF Gate, "It's like putting water on concrete."

The area near Salt Creek has seen temporary pools before, but the size of the lake is particularly notable, education and interpretation chief Patrick Taylor told the publication. "It has formed before in smaller ponds, but I don't remember seeing it this large in this location before," said Taylor, who has worked at the park for six years.

Hannah Cloke, a hydrologist at the University of Reading in the U.K., called the lake "fascinating." A combination of heavy rain and very dry soil, she explained, can allow such bodies of water to pool surprisingly quickly—a bit like a road that fills with water when rain overwhelms its drains. "When the rainfall is very heavy, prolonged or you get lots of storms one after the other, it can take only a matter of hours to create a lake appearance on dry ground," she told Newsweek.

"Of course in wetter parts of the world we see such flooding regularly," she said. But in desert regions like Death Valley, she added, "I haven't seen anything quite like that before."



newsweek.com/death-valley-lake-california-flooding-rain-winter-storm-1362695

Newsweek HUGE LAKE APPEARS IN DEATH VALLEY, ONE OF THE HOTTEST, DRIEST PLACES ON EARTH | U.S.

Photographer Elliott McGucken captured the Salt Creek spectacle and shared several snaps on Instagram this week. "It's a surreal feeling seeing so much water in the world's driest place," he told SF Gate. "Nature presents this ephemeral beauty, and I think a lot of what photography is about is searching for it and then capturing it."

Supreme Court could expand gun rights in biggest Second Amendment case in a decade

Should gun rights under the Heller decision be expanded to extend outside of one's home?

- Yes, is implied in the Second Amendment
- No, should not be expanded
- No, should be more limited
- I don't know/care

Powered by

LUXURY RETIREMENT HOMES

SPONSORED BY THE NEW YORK TIMES

A new batch of retirement communities caters to wealthy, style-focused seniors.

See More

McGucken said park officials told him the lake appeared to reach a length of about 10 miles at its peak. But they didn't know exactly how large the body of water had stretched. Although the water was still still there Tuesday, the lake is reportedly shrinking.

elliotmcgucken
Death Valley National Park

View Profile

View More on Instagram

588 likes

elliotmcgucken

Death Valley Lake! See more golden ratio harmonies @goldennumberratio !! #landscape #visitcalifornia #special_shots #deathvalleydesert #nationalparks #deathvalleyreflection #departmentoftheinterior #nationalpark #deathvalleynationalpark #longexposure #waycoolshots #igpodium #deathvalleynationalpark #deathvalleynp #deathvalleynps #sonyalpha #deathvalleylake #sky_sultans #deathvalleydunes #mastershots #chasingemotions #artofvisuals #landscapephotography #sunset #nationalparks #earthpix #dreamworldimages #saltcreekdeathvalley

view all 11 comments

Add a comment...

The Great Alone: Walking the Pacific Crest Trail

SPONSORED BY ELECTRIFY AMERICA

Think Electric Cars Are Weird?

Electric cars. They're normal now. With longer ranges, faster charging, and many models to...

See More

SIGN UP FOR OUR NEWSLETTER

SIGN UP >

Update your preferences »

Case 1:19-cv-09617-KPF Document 67-4 Filed 06/21/21 Page 38 of 38

← → C 🔒 newsweek.com/death-valley-lake-california-flooding-rain-winter-storm-1362695

**Newsweek** HUGE LAKE APPEARS IN DEATH VALLEY, ONE OF THE HOTTEST, DRIEST PLACES ON EARTH | U.S.

RELATED STORIES

Experts Fear California Isn't Prepared For Mega Storms

California Slammed With More Heavy Rain and Flooding

California Winter Storm Brings Heavy Rain and Snowfall

Winter storms have been battering California for weeks, bringing flash floods, mudslides and even a sinkhole to The Golden State. But the wet weather also brought millions of painted lady butterflies to Southern California in February in the largest migration event since 2005.

Experts say the rain created a super bloom event, in which plants and butterflies flourished on a massive scale. "The more plants, the more butterflies," University of California, Davis, professor Art Shapiro said at the time.

One conservationist said the butterflies made him feel "like a Disney princess," while he was cycling in Riverside County. "They were flying parallel to me, just bobbing along as I rode past the date palms," James Danoff-Burg said. "It was absolutely magical."

*This article has been updated with comment from Hannah Cloke.*



A general view of Salt Creek in Death Valley National Park in Death Valley, California on February 14, 2017.
RHONA WISE/AFP/GETTY IMAGES

REQUEST REPRINT & LICENSING, SUBMIT CORRECTION OR VIEW EDITORIAL GUIDELINES

SPONSORED CONTENT                                                    mgid ▷



Former Fox News Host Is Back. What's His Goal? Watch Now
Oxford Club



Dads Are Getting Super Ripped On This Stuff!
Trustedproductreview



74-Year-Old Grandma Shocks Doctors: Forget Botox, Do This
Simply Restore





**Trump Signs Largest Wilderness Protection Law in Decade**



**California Slammed With More Heavy Rain and Flooding**



**Temperature Hits 51C on India's Hottest**