UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELLIOT McGUCKEN,

                    Plaintiff,

          -v.-

NEWSWEEK LLC,

                    Defendant.

19 Civ. 9617 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Elliot McGucken is a fine art photographer based in Los Angeles, California.  In March 2019, Plaintiff visited Death Valley National Park to take photographs.  During that trip, Plaintiff photographed a rare ephemeral lake that appeared in the park and subsequently shared that photograph on Instagram.  Defendant Newsweek published an article about the ephemeral lake, and embedded in the article the photograph that Plaintiff had posted on Instagram.  Thereafter, Plaintiff brought this action for copyright infringement, alleging that Defendant had reproduced and displayed his photograph on its website without his consent.

By Opinion and Order dated June 1, 2020, the Court dismissed Plaintiff's claims for contributory and vicarious infringement, but allowed his claim for direct copyright infringement and his prayer for enhanced damages to go forward.  *See McGucken* v. *Newsweek LLC*, 464 F. Supp. 3d 594 (S.D.N.Y. 2020) ("*McGucken I*"), *reconsideration denied*, No. 19 Civ. 9617 (KPF), 2020 WL 6135733 (S.D.N.Y. Oct. 19, 2020) ("*McGucken II*").  Now before the Court are the parties' cross-motions for summary judgment with respect to Plaintiff's

remaining claim.  Plaintiff asks this Court to find Defendant liable for copyright infringement and willful infringement, such that the case would proceed to trial solely on the issue of damages.  Defendant asks this Court to find as a matter of law that the embedding of the Instagram post did not actually infringe any of Plaintiff's exclusive rights under the Copyright Act; that it had a license to embed Plaintiff's Instagram post; or, alternatively, that its use of the Instagram post constituted fair use.  For the reasons that follow, the Court denies both motions.

## BACKGROUND[1]

### A.     Factual Background

#### 1.     The Photograph

In March 2019, Plaintiff, a fine art photographer based in Los Angeles, California, posted several photographs of the ephemeral lake he observed in

---

[1]     This Opinion draws on evidence from Plaintiff's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1" (Dkt. #56)); Defendant's Response and Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1(b) ("Def. 56.1 Reply" (Dkt. #68 at 8-13)); Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a) ("Def. 56.1" (Dkt. #68 at 1-8)); and Plaintiff's Response and Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1(b) ("Pl. 56.1 Reply" (Dkt. #72)).  The Court also considers the Declaration of Elliot McGucken in support of Plaintiff's motion ("McGucken Decl." (Dkt. #57)) and the exhibits attached thereto; the Declaration of Scott Alan Burroughs in support of Plaintiff's motion ("Burroughs Decl." (Dkt. #60)) and the exhibits attached thereto; and the Declaration of Sara Gates in support of Defendant's motion ("Gates Decl." (Dkt. #67)) and the exhibits attached thereto.

For ease of reference, the Court refers to Plaintiff's Memorandum of Law in Support of His Motion for Summary Judgment as "Pl. Br." (Dkt. #55); to Defendant's Memorandum of Law in Support of Its Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment as "Def. Br." (Dkt. #65); to Plaintiff's Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment as "Pl. Opp." (Dkt. #71); and to Defendant's Reply Memorandum of Law in Further Support of Its Cross-Motion for Summary Judgment as "Def. Reply" (Dkt. #73).

Death Valley, California to his public Instagram account.  (Pl. 56.1 ¶ 1; Def. 56.1 ¶¶ 2, 11).  Several news outlets used one or more of Plaintiff's photographs in their coverage of the ephemeral lake.  (Def. 56.1 ¶ 19). Defendant contacted Plaintiff to request permission to upload one of Plaintiff's photographs of the ephemeral lake (the "Photograph") to the Newsweek website, but Plaintiff did not respond.  (Def. 56.1 ¶ 25; McGucken Decl., Ex. 3).

On March 14, 2019, Defendant published on its website an article titled "Huge Lake Appears in Death Valley, One of the Hottest, Driest Places on Earth" (the "Article").  The Article incorporated one of Plaintiff's Instagram posts of the ephemeral lake (the "Instagram Post") through a process known as embedding.  (*See* Gates Decl., Ex. K).[2]  On April 1, 2019, Plaintiff registered the Photograph with the United States Copyright Office and received the registration number VA 2-145-698.  (McGucken Decl., Ex. 2).  Two days later, on April 3, 2019, Plaintiff's counsel sent a cease-and-desist letter to Defendant, providing notice that Defendant's use of the Photograph infringed on his copyright and requesting that Defendant remove the Photograph from the

---

[2]     As explained by Judge Kimba Wood, and as this Court quoted in *McGucken I*,

> Embedding allows a website coder to incorporate content, such as an image, that is located on a third-party's server, into the coder's website.  When an individual visits a website that includes an "embed code," the user's internet browser is directed to retrieve the embedded content from the third-party server and display it on the website.  As a result of this process, the user sees the embedded content on the website, even though the content is actually hosted on a third-party's server, rather than on the server that hosts the website.

*Sinclair* v. *Ziff Davis, LLC*, No. 18 Civ. 790 (KMW), 2020 WL 1847841, at *1 (S.D.N.Y. Apr. 13, 2020) (internal citations omitted), *adhered to in part on reconsideration*, 2020 WL 3450136 (S.D.N.Y. June 24, 2020).

Article.  (Burroughs Decl., Ex. 5).  It is unclear whether Defendant, in fact, received this letter, because Defendant's email system returned to Plaintiff a message indicating that there was a "permanent error" associated with the email address to which Plaintiff had sent the letter.  (*Id.* at ¶ 4; *see also id.*, Ex. 6).  Plaintiff's counsel attempted to send the letter to this email address two additional times, but received the same "permanent error" response each time. (*Id.* at ¶ 4).  Defendant did not remove the Photograph from its site until after this lawsuit was filed.  (*Id.*).

### 2.    Instagram's Agreements and Policies[3]

As in *McGucken I*, resolution of the parties' cross-motions requires discussion of the various agreements governing the parties' use of Instagram.

All Instagram users must agree to Instagram's Terms of Use in order to use the platform.  (Gates Decl., Ex. Q at 2).  The Terms of Use provide, in relevant part:

> [W]hen you share, post, or upload content that is covered by intellectual property rights …, you hereby grant to [Instagram] a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings).

(*Id.* at 6).

---

[3]    The Court quotes from the versions of these documents in effect during the relevant time period.

The Terms of Use also provide that users "must agree to the Data Policy to use Instagram." (Gates Decl., Ex. Q at 4). The Data Policy describes how information on Instagram is shared with others and informs users that,

> When you share and communicate using our Products, you choose the audience for what you share. … Public information can be seen by anyone, on or off our Products[.] This includes your Instagram username [and] any information you share with a public audience[.] You, other people using [Instagram], and we can provide access to or send public information to anyone on or off our products, including … through tools and APIs. Public information can also be seen, accessed, reshared, or downloaded through third-party services such as search engines, APIs, and offline media such as TV, and by apps, websites, and other services that integrate with our Products.

(*Id.*, Ex. R at 8).[4]

The use of Instagram's API is subject to Instagram's Platform Policy. (Gates Decl., Ex. Q at 7 ("[Y]our use of our API is subject to our Platform Policy.")). The Platform Policy defines Instagram's "Platform" as "a set of APIs, [Software Development Kits ('SDKs')], plugins, code, specifications, documentation, technology, and services (such as content) that enable others, including application developers and website operators, to retrieve data from Instagram or provide data to [Instagram]." (*See id.*, Ex. S ("Platform Policy") at 2). According to the Platform Policy, the Platform is provided "to help broadcasters and publishers discover content, get digital rights to media, and

---

[4]     An "API" or "application programming interface," is a service that "enable[s] users to access and share content posted by other users whose accounts are set to 'public' mode." *McGucken I,* 464 F. Supp. 3d at 601 n.3 (quoting *Sinclair*, 454 F. Supp. 3d at 344).

share media using web embeds." (*Id.*).  The Platform Policy instructs users to "[c]omply with any requirements or restrictions imposed on usage of Instagram user photos and videos … by their respective owners," and also prohibits users from "provid[ing] or promot[ing] content that violates any rights of any person, including but not limited to intellectual property rights[.]" (*Id.* at 3-4).  The Platform Policy further provides that the Platform is "licensed to you on a worldwide (except as limited below), non-exclusive, nonsublicenseable basis in accordance with these terms," and notes that "User Content is owned by users and not by Instagram." (*Id.* at 5).

## B.    Procedural Background

The Court assumes familiarity with the procedural history detailed in the Court's June 1, 2020 Opinion and Order.  *See McGucken I*, 464 F. Supp. 3d at 601-02.  In that Opinion and Order, the Court granted Defendant's motion to dismiss Plaintiff's claims for contributory and vicarious infringement; denied Defendant's motion to dismiss Plaintiff's claim for direct copyright infringement and prayer for enhanced damages; and denied Plaintiff's request for leave to amend.  *See id.* at 611.

On June 15, 2020, Defendant filed a motion for reconsideration of the Court's June 1, 2020 Opinion and Order (Dkt. #36-37), which motion was denied by this Court in an Opinion and Order dated October 19, 2020 (Dkt. #41).  Defendant filed its answer to the Amended Complaint on November 9, 2020.  (Dkt. #42).  On November 17, 2020, the Court endorsed the parties' proposed Civil Case Management Plan, approving the parties' proposed

discovery timeline and directing the parties to submit a joint status letter on or before March 25, 2021. (Dkt. #45). In that joint letter, the parties informed the Court that each party intended to move for summary judgment within 30 days of the close of expert discovery. (Dkt. #51). The Court subsequently held a telephone conference with the parties, during which it set a briefing schedule for the parties' contemplated motions. (*See* Minute Entry for March 30, 2021).

Plaintiff filed his motion for summary judgment and accompanying declarations on May 21, 2021. (Dkt. #54-60). Defendant filed its opposition and cross-motion for summary judgment on June 21, 2021. (Dkt. #64-68). Plaintiff filed his combined reply brief in further support of its motion for summary judgment and opposition to Defendant's cross-motion on July 9, 2021. (Dkt. #71-72). Finally, Defendant filed its reply brief in further support of its cross-motion for summary judgment on July 23, 2021. (Dkt. #73). Accordingly, the cross-motions for summary judgment are fully briefed and ripe for the Court's decision.

## DISCUSSION

### A.      Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986).[5]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and

---

[5]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010). "When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration." *Gustavia Home, LLC* v. *Hoyer*, 362 F. Supp. 3d 71, 78 (E.D.N.Y. 2019) (citing *Morales* v. *Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## B. Plaintiff's Copyright Claim Is Not Amenable to Summary Judgment

Plaintiff's remaining claim for copyright infringement arises out of Defendant's embedding of his Instagram Post in the Article. In his motion for summary judgment, Plaintiff asks the Court to find Defendant liable for copyright infringement as a matter of law. Defendant makes three arguments

in defense: (i) the embedding of the Instagram Post did not actually infringe any of Plaintiff's exclusive rights under the Copyright Act; (ii) Defendant had a license to embed the Instagram Post; and (iii) Defendant's use of the Instagram Post constituted fair use.  The Court begins by providing a high-level overview of the Copyright Act and of the elements of Plaintiff's copyright infringement claim, before proceeding to assess each of Defendant's proffered defenses to that claim.

### 1.    Applicable Law

In order to establish a claim of copyright infringement, "a plaintiff with a valid copyright must demonstrate that: [i] the defendant has actually copied the plaintiff's work; and [ii] the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (internal citation omitted).  It is undisputed that Plaintiff holds the copyright to the Photograph.

The primary source of federal copyright law is the Copyright Act of 1976, 17 U.S.C. §§ 101-810, which gives a copyright owner several "exclusive rights." *Goldman* v. *Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 588 (S.D.N.Y. 2018) (quoting 17 U.S.C. § 106(5)).  Section 106 of the Act defines the "exclusive rights" granted by federal copyright law, which consist of the rights "to do and to authorize" the reproduction, distribution, performance, and display of a work, and the creation of derivative works based on a work.  *In re Jackson*, 972 F.3d 25, 43 (2d Cir. 2020) (quoting 17 U.S.C. § 106).  To "display"

a work, under the Act, is to "show a copy of it, either directly or by means of a film, slide, television image, *or any other device or process.*" *Goldman*, 302 F. Supp. 3d at 588-89 (emphasis added) (quoting 17 U.S.C. § 101).  A copyright holder has the exclusive right to "transmit or otherwise communicate ... a display of the work ... to the public, by means of any device or process." *Id.* at 589 (quoting 17 U.S.C. § 101).  The Act further defines "device or process" as "one now known or later developed."  17 U.S.C. § 101.

### 2.    Defendant "Displayed" Plaintiff's Work

For its first argument in defense, Defendant claims that it is not liable for copyright infringement because it did not actually "display" Plaintiff's work as that term is understood in copyright law.  (Def. Br. 7).  On this point, Defendant argues that *Instagram* showed a copy of Plaintiff's work, based on Plaintiff's posting of the Photograph to Instagram; and that Defendant merely copied Instagram's embed code, which consists of HTML directions to the Instagram Post.  (*Id.*; *see also* Def. Reply 1 ("The use of embed code, which is not a 'copy' capable of containing a copyrighted work, is not a public display but merely instructions on how to find the content, the same way it would not be a public display to provide someone with directions for how to see an artwork by Marc Chagall on display on the walls of the Metropolitan Museum of Art.")).  In support of this argument, Defendant relies on the "server test" established by the Ninth Circuit.  (Def. Br. 8 (citing *Perfect 10, Inc.* v. *Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)).  Under that test, a website publisher *displays* an image by "using a computer to fill a computer screen

11

with a copy of the photographic image fixed in the computer's memory." *Perfect 10, Inc.*, 508 F.3d at 1160.  In contrast, when a website publisher *embeds* an image, HTML code merely "gives the address of the image to the user's browser," and the browser "interacts with the [third-party] computer that stores the infringing image." *Id.* at 1161.  Because the image remains on a third-party's server and is not fixed in the memory of the infringer's computer, embedding does not qualify as "displaying" under the server test.  *Id.* at 1159.

This Court rejects Defendant's argument.  For starters, it notes that the server test has not been widely adopted outside of the Ninth Circuit, *see Goldman*, 302 F. Supp. 3d at 591, and that other courts have persuasively argued that such a test may be "contrary to the text and legislative history of the Copyright Act," *Nicklen* v. *Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 2021 U.S. Dist. LEXIS 142768, at *12 (S.D.N.Y. July 30, 2021).  After all, the Copyright Act defines "display" as "to show a copy of" a work, 17 U.S.C. § 101, and not "to make and then show a copy of the copyrighted work." *Nicklen*, 2021 U.S. Dist. LEXIS 142768, at *13.  The Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, would seem to make the display right merely a subset of the reproduction right.  *Id.* (internal citation omitted).  The Copyright Act makes clear, however, that to "show a copy" is to display it.  *Id.* (citing 17 U.S.C. § 101).

Congress did "not intend ... to freeze the scope of copyrightable technology" to then-existing methods of expression.  H.R. Rep. 94-1476, 47, 51

(1976).  Specifically, in considering the display right, Congress cast a very wide

net, intending to include "[e]ach and every method by which the images ...

comprising a ... display are picked up and conveyed," assuming that they reach

the public.  *Id.* at 64.  It further noted that "'display' would include the

projection of an image on a screen or other surface by any method, the

transmission of an image by electronic or other means, and the showing of an

image on a cathode ray tube, or similar viewing apparatus connected with any

sort of information storage and retrieval system."  *Id.*  Indeed, an infringement

of the display right could occur "if the image were transmitted by any method

(by closed or open circuit television, for example, or by a computer system)

from one place to members of the public elsewhere."  *Id.* at 80.

Under the server test, "a photographer who promotes his work on

Instagram ... surrenders control over how, when, and by whom their work is

subsequently shown — reducing the display right, effectively, to the limited

right of first publication that the Copyright Act of 1976 rejects."  *Nicklen*, 2021

U.S. Dist. LEXIS 142768, at *15.  Defendant is correct that Plaintiff

"maintained control" over the Instagram Post in the sense that he "could (and

still can) take it down at any time."  (Def. Br. 10).  But "it cannot be that the

Copyright Act grants authors an exclusive right to display their work publicly

only if that public is not online."  *Nicklen*, 2021 U.S. Dist. LEXIS 142768, at

*15.  Therefore, the Court finds that Defendant did in fact display Plaintiff's

Photograph when it embedded the Photograph in the Article.  *See id.* at *8-16

(finding that news outlet "displayed" copyright owner's video, within meaning of

Copyright Act, when it embedded video in online article about the video's popularity without obtaining license).

### 3. Genuine Disputes of Material Fact Exist as to Whether Instagram Granted Defendant an Express Sublicense

Defendant argues as a second line of defense that even if the Court were to find that Defendant "displayed" Plaintiff's Photograph on its website, Plaintiff still could not succeed on his infringement claim because Defendant had a license — more specifically, a sublicense — to embed the Instagram Post in the Article.  (Def. Br. 12).  Plaintiff responds that this claim is "demonstrably false," and that Instagram's terms are "unambiguous" that third parties must obtain permission to use Instagram content from other users.  (Pl. Opp. 12-13).  As set forth herein, the Court cannot find in favor of either side's position.

Ownership of a valid license to use a copyrighted work is generally a defense to copyright infringement.  *See Jose Luis Pelaez, Inc.* v. *McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 128 (S.D.N.Y. 2019); *see also Spinelli* v. *Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) ("A valid license to use the copyrighted work immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." (internal citation and quotation marks omitted)).  The existence of a license to engage in the challenged copying is "an affirmative defense to a claim of copyright infringement ... that the alleged infringer must plead and prove."  *Sohm* v. *Scholastic Inc.*, 959 F.3d 39, 48 (2d Cir. 2020) (quoting *Yamashita* v. *Scholastic Inc.*, 936 F.3d 98, 104 (2d Cir. 2019)).  Here, the parties dispute the existence of a license, and Plaintiff argues that even if

14

Instagram's terms could be read to grant a sublicense, Defendant breached
conditions precedent to the formation of that license.  (*See* Pl. Br. 15-17; Def.
Br. 14-18).

The Terms of Use unequivocally grant Instagram a license to sublicense
Plaintiff's publicly posted content.  *McGucken I*, 464 F. Supp. 3d at 603; *see
also Sinclair* v. *Ziff Davis, LLC*, No. 18 Civ. 790 (KMW), 2020 WL 3450136, at *1
(S.D.N.Y. June 24, 2020) ("[B]y agreeing to Instagram's Terms of Use, Plaintiff
authorized Instagram to grant API users … a sublicense to embed her public
Instagram content, as set forth in Instagram's Platform Policy.").  But while
there is no dispute that Instagram had the authority to grant a sublicense to
Defendant, the parties vigorously dispute whether Instagram in fact exercised
this authority.

In *McGucken I*, this Court observed that while Instagram's various terms
and policies clearly foresee the possibility of entities such as Defendant using
web embeds to share other users' content (*see* Platform Policy at 2 (noting that
Instagram's Platform exists in part "to help broadcasters and publishers
discover content, get digital rights to media, and share media using web
embeds")), the Court declined, at the pleadings stage, to read the terms and
policies as granting a sublicense to embedders.  *See* 464 F. Supp. 3d at 603-
04; *see also McGucken II*, 2020 WL 6135733, at *2-3 (denying Defendant's
motion for reconsideration with respect to the Court's determination that "there
was insufficiently clear language to support, in the context of a Rule 12(b)(6)
motion, the existence of a sublicense between Instagram and Defendant").  The

Court notes that the parties have not offered any evidence of a sublicense between Instagram and Defendant that was not already considered in *McGucken I* and *McGucken II*.  Instead, the parties continue to debate the legal significance of the terms of Instagram's Platform Policy, which the Court continues to find insufficiently clear to support, as a matter of law, the existence of a sublicense between Instagram and Defendant.

The Platform Policy in place during the relevant period begins by stating, "By using the Instagram Platform, you agree to this policy."  Paragraph Eight of the Platform Policy, entitled "Licensed Uses and Restrictions," reads, "The Instagram Platform is owned by Instagram and is licensed to you on a worldwide (except as limited below), non-exclusive, nonsublicenseable basis in accordance with these terms."  (Platform Policy at 5).  "Platform" is defined as "a set of APIs, SDKs, plugins, code, specifications, documentation, technology, and services (such as content) that enable others, including application developers and website operators, to retrieve date from Instagram or provide data to us."  (*Id.* at 2).  The Court acknowledges that one plausible reading of the Platform Policy is that users of the Instagram Platform possess an express "worldwide" "non-exclusive, nonsublicenseable" license to use the content that is posted on Instagram.  However, in the very same paragraph containing this reference to a license, the Platform Policy provides that "User Content is owned by users and not by Instagram," and that "[a]ll rights not expressly granted to you are reserved by Instagram."  (*Id.* at 5).  Moreover, the "terms" referenced in Paragraph Eight include "represent[ing] and warrant[ing] that you own or have

secured all rights necessary to display, distribute and deliver all content in your app or website"; and "represent[ing] and warrant[ing] that you satisfy all licensing, reporting, and payout obligations to third parties in connection with your app or website." (*Id.*). Further, while the definition of "Platform" includes the word "content," it does not contain the defined term "User Content." The Court perceives this language as sufficiently muddying the waters as to precisely what a user of Instagram may do with user content on the Platform, and under what circumstances.

Because a reasonable factfinder could conclude that the Platform Policy did not unambiguously grant Defendant a sublicense permitting it to embed Plaintiff's Instagram Post, Defendant is not entitled to summary judgment on the theory that it had an express sublicense to embed Plaintiff's post. (*Cf.* Gates Decl., Ex. Q at 2 (unambiguously stating that "when you share, post, or upload content that is covered by intellectual property rights ..., you hereby grant to [Instagram] a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license[.]")).[6]  Conversely, because a reasonable factfinder could

---

[6]     As noted, the Court considers only those policies in effect at the time of Defendant's publication of the Photograph. The Court recognizes that since this litigation commenced, Instagram has changed its policies to make clear that the Platform Policy grants a license "only to the extent permitted in these Terms," including a requirement that the embedder "obtain (and represent that you own or have secured) all rights necessary from all applicable rights holders to ... display... content." *See* https://developers.facebook.com/terms (last accessed March 15, 2022); *see also Hunley* v. *BuzzFeed, Inc.*, No. 20 Civ. 8844 (ALC), 2021 WL 4482101, at *1 (S.D.N.Y. Sept. 30, 2021) ("[A]ccording to the Instagram Platform Policy, Instagram embed users are not automatically granted a license, sublicense, or implied sublicense to freely embed or display the photos and videos of Instagram account holders absent confirmation that [Defendant] received 'all rights necessary to display the content of general Instagram users.'").

conclude that the Platform Policy *did* grant Defendant such a sublicense, Plaintiff is not entitled to summary judgment on his claim of copyright infringement.

### 4. Genuine Disputes of Material Fact Exist as to Whether Instagram Granted Defendant an Implied Sublicense

Defendant argues that even if the Court (or a jury) were to conclude that no express sublicense existed, Instagram granted Defendant an *implied* sublicense to embed Plaintiff's publicly posted Photograph. (Def. Br. 18). Plaintiff contends that there is no implied license because he did not create the Photograph with knowledge and intent that it would be published on Defendant's website. (Pl. Br. 14). Plaintiff misapprehends the nature of the sublicense to which Defendant claims entitlement; it is one that Defendant alleges was granted by Instagram, and not by Plaintiff himself.

A non-exclusive license can be implied from conduct. *Associated Press* v. *Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013). "Although the Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," courts in this Circuit have found an implied non-exclusive license where one party (i) "created a work, (ii) "at the other's request," and (iii) "handed it over, intending that the other copy and distribute it." *Solid Oak Sketches, LLC* v. *2K Games, Inc.*, 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020) (quoting *Weinstein Co.* v. *Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009) (internal quotation marks omitted)). "Even those courts that do not require evidence of each of these three elements do require evidence of a meeting of the minds between the

licensor and licensee such that it is fair to infer that the licensor intended to grant a nonexclusive license." *Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d at 562.

Defendant insists that "the Court's analysis should focus on what Newsweek actually copied: the embed code to the Instagram Post," not Plaintiff's actual Instagram Post. In other words, Defendant claims it requested the embed code for the Instagram Post when it clicked on the "Embed" button in connection with the Instagram Post, available on Instagram's Platform; that in response to this request, Instagram created and delivered a unique HTML code that would direct a website to the Instagram Post; and that Instagram intended that the code would be copied and distributed. (Def. Br. 19). The Court finds unavailing Defendant's attempts to cabin its "copying" to a mere string of HTML code, but acknowledges Defendant's stronger argument that it was reasonable for Defendant to understand that Instagram intended for users of its API to be able to embed and share public Instagram content through its platform on third-party websites, as evidenced by the ease of this technological function, Instagram's terms, and Instagram's public statements about embedding. (Def. Br. 19-20).[7] For example, Instagram's website included a page entitled "Embedding," which provided instructions for embedding posts and stated:

---

[7] Plaintiff attempts to introduce a statement to the contrary, made by an unidentified Instagram representative in an article published in *Ars Technica* after this litigation commenced. (*See* Pl. Opp. 10). The Court finds this statement to be irrelevant to the parties' understanding at the time the relevant conduct occurred.

> Embedding Instagram posts is an easy way to add Instagram photos and videos to the stories you want to tell on articles or websites. You can embed your own content as well as photos and videos from public profiles.   As always, people own their Instagram content, and embedded posts give the proper attribution by showing the username and linking back to the original content on Instagram.

(Gates Decl., Ex. T at 2).  A reasonable factfinder could conclude that it was reasonable for Defendant to understand that Instagram intended for users of its API to be able to embed and share public Instagram content through its platform on third-party websites.  Because a reasonable juror could conclude that Instagram did, or did not, grant Defendant an implied sublicense to embed Plaintiff's Instagram Post, the Court must deny both parties' requests for summary judgment on this point.

### 5. Genuine Disputes of Material Fact Exist as to Whether Defendant's Use of the Photograph Constituted Fair Use

The issue of fair use was discussed at length in *McGucken I*.  Much of the analysis in the Court's prior opinion remains applicable and leads the Court to conclude that it is unable to determine as a matter of law that Defendant's use of the Photograph did, or did not, constitute fair use.

Under the "fair use" doctrine, "a defendant who otherwise would have violated one or more of [a plaintiff's] exclusive rights may avoid liability if [it] can establish that [it] made 'fair use' of the copyrighted material."  *Walsh* v. *Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 579 (S.D.N.Y. 2020) (quoting *Swatch Grp. Mgmt. Servs. Ltd.* v. *Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014)), *reconsideration denied*, No. 19 Civ. 4958 (VSB), 2021 WL 4481602

(S.D.N.Y. Sept. 30, 2021).  The Copyright Act provides that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  In determining whether the use made of a work in any particular case is a fair use, courts consider the following factors: (i) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (ii) "the nature of the copyrighted work"; (iii) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (iv) "the effect of the use upon the potential market for or value of the copyrighted work."  *Id.*

"The determination of fair use is a mixed question of fact and law" and is an "open-ended and context-sensitive inquiry."  *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 347 (quoting *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 81; *Blanch* v. *Koons*, 467 F.3d 244, 251 (2d Cir. 2006)).  "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues."  *Id.* (quoting *Bill Graham Archives* v. *Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006)).

### a.    Purpose and Character of the Use

In evaluating the purpose and character of an allegedly infringing use, courts consider three sub-factors: (i) whether the use was transformative, (ii) whether it was commercial in nature, and (iii) whether the defendant acted in bad faith.  *See McGucken I*, 464 F. Supp. 3d. at 604-07.

*First*, courts consider "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 347 (quoting *Bill Graham Archives*, 448 F.3d at 608).  To that end, courts consider whether the allegedly infringing use is "transformative," that is, (i) whether the two works have different purposes, (ii) the size of the reproductions, (iii) whether the expressive value of the reproduced material is minimized, and (iv) the proportion of copied material.  *Id.*  The Second Circuit has also recognized that:

> In the context of news reporting and analogous activities, … the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration. Courts often find such uses transformative by emphasizing the altered purpose or context of the work, as evidenced by surrounding commentary or criticism.

*Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 84.

*Second*, the commercial nature of the secondary use is also relevant; "[t]he greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Swatch,* 756 F.3d at 83 (alteration in original) (internal quotation marks omitted) (quoting *Am. Geophysical Union* v. *Texaco Inc.,* 60 F.3d 913, 922 (2d Cir. 1994)); *accord Harper & Row Publishers, Inc.* v. *Nation Enters.,* 471 U.S. 539, 562 (1985) ("The fact that a publication was commercial as opposed to

nonprofit is a separate factor that tends to weigh against a finding of fair use."). On the other hand, "purposes such as criticism, comment, [and] news reporting" are set forth in the Copyright Act as prototypical examples of fair use as set forth in 17 U.S.C. § 107, and the Second Circuit has "recognized that '[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit.'" *Swatch,* 756 F.3d at 83 (alteration in original) (quoting *Consumers Union of U.S., Inc.* v. *Gen. Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir. 1983)). Accordingly, though a work may be commercial in nature, where it is found to be transformative courts "do not place much significance on that fact due to the transformative nature of the work." *Cariou* v. *Prince*, 714 F.3d 694, 708 (2d Cir. 2013).

*Third*, and finally, courts considering the first statutory fair use factor are directed to consider whether a defendant acted in bad faith in its use of the copyrighted material. *See NXIVM Corp.* v. *Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004). However, "while the good or bad faith of a defendant … should be considered, it generally contributes little to fair use analysis." *Ferdman* v. *CBS Interactive, Inc.*, 342 F. Supp. 3d 515, 531 (S.D.N.Y. 2018) (quoting *NXIVM Corp.*, 364 F.3d at 479 n.2); *see also Yang* v. *Mic Network, Inc.*, 405 F. Supp. 3d 537, 546 (S.D.N.Y. 2019) ("[T]he Second Circuit has cautioned that bad faith is not 'itself conclusive of the fair use question, or even of the first factor.'" (quoting *NXIVM Corp.*, 364 F.3d at 479)).

Sister courts have noted that the use of a copyrighted photograph in a news article can properly be deemed transformative where the photograph itself

is the subject of the story.  *See, e.g., Ferdman*, 342 F. Supp. 3d at 534 (finding that use of a photograph in an article was transformative because the central subject of the article was the existence of, and commentary on, the photograph); *Barcroft Media, Ltd.* v. *Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (noting that "a news report about a video that has gone viral on the internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about").  But as this Court noted in *McGucken I*, that is not the case here.  Plaintiff posted the Photograph as an illustration of a phenomenon he observed, and Defendant similarly used the Photograph primarily as an illustrative aid depicting the subject of the Article.  *See Ferdman*, 342 F. Supp. 3d at 534 (quoting *Barcroft Media*, 297 F. Supp. 3d at 352).  And while it is true that the Article incorporates quotes from Plaintiff about the taking of the Photograph, "the mere addition of some token commentary is not enough to transform the use of a photograph when that photograph is not itself the focus of the article."  *McGucken I*, 464 F. Supp. 3d at 606.

Defendant continues to argue (as it did in its motion to dismiss) that its use was transformative because it used the Photograph to report a newsworthy event, and news reporting is one of the "paradigmatic examples" of transformative uses enumerated by Congress in the preamble to 17 U.S.C. § 107.  (Def. Br. 24); *see also Andy Warhol Found. for Visual Arts, Inc.* v. *Goldsmith*, 11 F.4th 26 (2d Cir. 2021).  Defendant further argues that it added new expression to Plaintiff's Instagram Post by describing Plaintiff's perception

of the event and adding commentary from experts to explain how such a phenomenon could have occurred. (*Id.* at 25). For his part, Plaintiff disputes that Defendant's use — which he describes as "cop[ying] McGucken's work and then publish[ing it] verbatim and in full on its commercial website with generic text and material copied from other third parties" — was transformative. (Pl. Br. 20).

The parties also dispute the weight to be ascribed to the fact that Defendant's use was "commercial" in nature. Plaintiff argues that Defendant "profited from its exploitation of McGucken's work in several ways, including increased traffic to its site and revenues from the paid advertising it displayed alongside the [Photograph]," which "militates against crediting the 'fair use' defense." (Pl. Br. 22). Defendant claims that its "minimal earning of revenue from advertisements on the web page for the article, which performed well below normal expectations for a typical article, is not dispositive of the first factor." (Def. Br. 26).

Finally, the parties continue to dispute whether Defendant acted in bad faith. Plaintiff claims that Defendant failed to investigate the possibility of intellectual property violations prior to publishing the Instagram Post, and that it continued to display the Photograph after receiving notice of the infringement. (Pl. Br. 9). Defendant argues that it attempted to reach out to Plaintiff to license the work for use in its article, and after receiving no response, "followed industry standards and applicable rules and policies" and embedded the Instagram Post because it was "newsworthy and part of the

story." (Def. Br. 27). In fact, it is unclear whether Defendant ever actually received notice of the infringement. (*See* Pl. Br. 9 n.4 ("This notice was sent three times to …. the address provided for such notices by Newsweek[.] Each time[,] it triggered a 'permanent error' response.")).

The balancing of these sub-factors — whether Defendant's use of the Photograph was transformative, whether the use was commercial, and whether Defendant acted in bad faith — is a fact-intensive inquiry that necessarily requires the resolution of disputed facts. A jury could reasonably find in favor of either party on the issues of whether Defendant's use of Plaintiff's Photograph was transformative, whether its use amounted to commercial exploitation, and whether Defendant acted in bad faith. Moreover, because these factors do not all clearly favor one party, "the appropriate balance of the considerations is itself a factual question that is not … appropriately made on summary judgment." *Sarl Louis Feraud Int'l* v. *Viewfinder Inc.*, 627 F. Supp. 2d 123, 131 (S.D.N.Y. 2008).

### b.    Nature of the Copyrighted Work

The Court must next consider the nature of the copyrighted work. This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Blanch*, 467 F.3d at 256 (internal quotation marks omitted). Courts consider two factors in evaluating whether the copyrighted work is of the nature that is conducive to fair use: "[i] whether the work is expressive or creative ... or more factual, with

a greater leeway being allowed to a claim of fair use where the work is factual

or informational, and [ii] whether the work is published or unpublished, with

the scope for fair use involving unpublished works being considerably

narrower." *Id.* (internal citation omitted).

That Plaintiff's work is creative undoubtedly pushes the second fair use

factor in his direction (*see* Pl. Br. 22), while its prior publication weighs in

Defendant's favor (*see* Def. Br. 28).  But once again, this factor is complex and

turns on factual judgments.  A reasonable factfinder could conclude that

Defendant used Plaintiff's creative work for a transformative purpose, and that

its use did not interfere with Plaintiff's ability to control the first public

appearance of his work.  In short, this factor too requires a fact-intensive

balancing, and a jury could determine that this factor should be given lesser

weight.  *See Sarl Louis Feraud Int'l*, 627 F. Supp. 2d at 133 (declining to find

fair use as matter of law on motion for summary judgment).

### c.   Amount and Substantiality of the Use

Third, the Court considers "whether the secondary use employs more of

the copyrighted work than is necessary, and whether the copying was excessive

in relation to any valid purposes asserted under the first factor."  *Solid Oak*

*Sketches, LLC*, 449 F. Supp. 3d at 349 (quoting *Authors Guild, Inc.* v.

*HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014)).  Copying the entire work does not

necessarily weigh against fair use, "because copying the entirety of a work is

sometimes necessary to make a fair use of the image."  *Id.* (citing *Bill Graham*

*Archives*, 448 F.3d at 613 (finding fair use despite entire copying where

(i) whole images were necessary to portray historical artifacts and (ii) copied images were reduced in size, such that "the visual impact of their artistic expression [was] significantly limited")).

In the instant action, Defendant reproduced the Photograph in its entirety.  However, "this factor weighs less when considering a photograph — where all or most of the work often must be used in order to preserve any meaning at all — than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value."  *Ferdman*, 342 F. Supp. 3d at 539 (quoting *N. Jersey Media Grp. Inc.* v. *Pirro*, 74 F. Supp. 3d 605, 621 (S.D.N.Y. 2015)) (internal quotation marks omitted).  Given the purpose for which the Photograph was used in the Article — describing the rare ephemeral lake that had appeared in Death Valley, California — it is difficult for the Court to see how Defendant could have used less than the entirety of the Photograph in the context of the Article.  Here, too, "the ultimate weight of this factor in the fair use balance would again depend on factual findings … balanced against the transformative and distinctive purpose of [Defendant's] use."  *See Sarl Louis Feraud Int'l*, 627 F. Supp. 2d at 134.

### d.   Effect on the Market

The fourth fair use factor considers the effect of the allegedly infringing work on any existing or potential market for, or value of, the copyrighted work. This inquiry focuses on "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential

purchasers may opt to acquire the copy in preference to the original." *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 349 (quoting *Authors Guild* v. *Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015)).   "[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." *Id.* (quoting *Authors Guild, Inc.* v. *HathiTrust*, 755 F.3d at 99). Transformative uses do not cause actionable economic harm because "by definition, [such uses] do not serve as substitutes for the original work." *Id.*; *see also Authors Guild* v. *Google, Inc.*, 804 F.3d at 223 ("[T]he more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original.").

Plaintiff offers his photographs for licensing to news and media outlets and for sale as fine art prints on his website.  (Pl. Br. 24).  Indeed, he licensed the Photograph to several other publications, all of which obtained his consent and provided "one or more forms of compensation prior to posting."  (*Id.*). Plaintiff argues that by choosing not to obtain his consent, Defendant "took for free what other publications had to negotiate for."  (*Id.* at 25).  Moreover, Plaintiff argues, allowing Defendant to circumvent copyright through embedding "would give organizations like Newsweek [a] free pass from ever having to pay for the visual content that drives readership, clicks, and monetization."  (*Id.* (internal citation omitted)).

Defendant counters that Plaintiff is not a freelance photographer working on assignment, but rather is a fine art photographer who posts his work online "only to share his art and drum up interest in his fine art photography." Therefore, Defendant argues, its use of the Instagram embed code (which Defendant claims produced a cropped, lower-resolution version of Plaintiff's photograph) does not serve as a market substitute for Plaintiff's original high-resolution fine artwork.  (Def. Br. 30).

While a reasonable factfinder could conclude that Defendant's activities affect the market for Plaintiff's Photograph, the extent of such an effect cannot be determined as a matter of law on this record.  Under these circumstances, whether and to what extent this factor favors a finding of fair use presents an issue for trial.

### 6. The Court Denies Summary Judgment as to Plaintiff's Claim of Willfulness

In his Amended Complaint, Plaintiff requests an award of statutory damages pursuant to 17 U.S.C. § 504(c)(2).  (Am. Compl. ¶¶ 21, 27).  After establishing liability for copyright infringement, a copyright owner may elect to recover either statutory damages or actual damages and profits.  *See* 17 U.S.C. § 504(c)(1) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable … in a sum of not less than $750 or more than $30,000 as the court considers just.").  Should the copyright owner choose to recover statutory damages, the burden falls on him

to prove that the infringement is willful.  *Id.*  If the Court determines that the plaintiff has met that burden, it may, in its discretion, enhance the statutory damages award up to $150,000 per infringed work.  *Id.* § 504(c)(2). Alternatively, if the infringer "was not aware and had no reason to believe that" its acts "constituted an infringement," the Court may "reduce the award of statutory damages to a sum of not less than $200."  *Id.*  Plaintiff moves for summary judgment on the issue of "willfulness."  However, Plaintiff has not yet established liability for copyright infringement.  Therefore, summary judgment must be denied.

## CONCLUSION

For the reasons set forth in this Opinion, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is DENIED.  The Clerk of Court is directed to terminate the motions at docket entries 54 and 64.  On or before **April 15, 2022**, the parties shall submit a joint status letter proposing next steps in this litigation.

SO ORDERED.

Dated:      March 21, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge